ORIGINAL

John H. Patton, California SBN 069261
Bruce A. Mcintosh, California SBN 175607
SHAPIRO BUCHMAN PROVINE & PATTON LLP
1333 North California Boulevard, Suite 350
Walnut Creek, CA 94596
Telephone: (925) 944-9700
Facsimile: (925) 944-9701
E-mail: jpatton@sbllp.com
Attorneys for Plaintiff CRV Enterprises, Inc.

FILED
SEP 19 2006
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CRV ENTERPRISES, INC.,

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.

No. 06-660 L

COMPLAINT FOR RECOVERY OF JUST COMPENSATION
(MONEY DAMAGES) FOR INVERSE CONDEMNATION

Plaintiff CRV Enterprises, Inc. (CRV) alleges as follows, as and for its Complaint herein:

GENERAL ALLEGATIONS

Summary of the Action.

1. This is an action in inverse condemnation to recover just compensation based on the Fifth Amendment of the United States Constitution, pursuant to 42

RECEIVED
SEP 19 2006
OFFICE OF THE CLERK
U.S. COURT OF FEDERAL CLAIMS

U.S.C. § 1983. This action consists of a claim for money damages as compensation against the defendant United States of America (USA) arising out of the defendant's uncompensated taking of and injury to real property owned by plaintiff CRV, as authorized by the Tucker Act, 28 U.S.C. § 1491. There are no other pending actions or claims governing CRV's rights and obligations arising out of the matters alleged in this Complaint, pursuant to 28 U.S.C. § 1500.

The Parties.

2. At all times herein mentioned, plaintiff CRV Enterprises, Inc. ("CRV") was and is a corporation duly organized, existing, and in good standing pursuant to the laws of the State of California, with its principal place of business located within the City of Galt, County of Sacramento, State of California.

3. At all times herein mentioned, the defendant USA has acted through its duly authorized agency, the United States Environmental Protection Agency ("EPA"). The EPA was established in 1970 by Executive Act of the President of the USA, as an autonomous regulatory body intended to oversee the enforcement of environmental policy, as promulgated under the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321-4347. For purposes of the allegations of this Complaint, the EPA is sometimes referred to as the "USA" and/or "Defendant."

4. As it concerns the claims of plaintiff CRV herein, the actions of the defendant USA, through the EPA, were duly authorized and conducted pursuant to the authority granted under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), as amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA), 42 U.S.C. §§ 9601, *et seq.*

Jurisdiction and Venue.

5. As alleged below, the amount of plaintiff CRV's claim against the defendant USA greatly exceeds $10,000, and jurisdiction and venue are therefore appropriate in the above-entitled Court pursuant to 28 U.S.C. §§ 1346(a)(2) and 1491.

The Maritime Center Property.

6. Plaintiff CRV is the owner of all right, title and interest in approximately 9.54 acres of improved real property located in the City of Stockton, San Joaquin County, California, described as Assessor's Parcel No. 145-190-08, and bearing a street address of 1404 West Weber Avenue, Stockton, CA 95203, sometimes called the "E Port Center," and sometimes called the "Stockton Maritime Center" (hereinafter, the "Maritime Center"). Attached hereto, marked Exhibit A, and incorporated herein by reference, is a true and correct copy of the Assessor's Parcel Map depicting the Maritime Center property (designated by the arrow labeled "SUBJECT"). Plaintiff CRV also owns a 10.57 acre parcel described as Assessor's Parcel No. 145-190-16, to the north of the Maritime Center property ("the adjacent property").

7. Plaintiff CRV originally acquired a written option and entered into a written purchase and sale agreement to purchase the Maritime Center property on August 25, 2000, and on or before October 1, 2001, delivered nonrefundable option consideration and deposits to the Seller of at least $200,000 toward acquisition of said property.

8. CRV acquired the Maritime Center property with the expectation and intent of developing same. In connection with and as a result of its acquisition of the above-alleged contract rights and obligations, and as part of its planned development effort for the Maritime Center, plaintiff CRV has invested approximately $300,000 in additional funds in master plans and studies for the development of the subject property, and adjacent property.

9. On or about November 8, 2002, and pursuant to the above-alleged contract rights and obligations, and prior its delivery of monetary consideration, and subsequent to and as a result of its investment of substantial funds in planning and studies, plaintiff completed its acquisition of all right, title, and interest in the Maritime Center property, at a purchase price of $1,315,000.

10. At all times relevant, the Maritime Center was and is situated at the western end of West Weber Avenue, one of the main arterial streets of the City of Stockton, California, which street leads directly east from said property into downtown Stockton, less than a mile away. The Maritime Center was and is also situated just to the southeast of, and near the Stockton Deep Water Channel, a navigable body of water providing access for vessels of all types from the San Francisco Bay and San Joaquin Delta to service, dock, load and unload, and to otherwise utilize the Port of Stockton.

11. At all times relevant, the Maritime Center was and is situated on a body of water known as the Mormon Channel or the Old Mormon Slough (hereinafter, "Mormon Channel," or "the Slough"), near its confluence with the Stockton Deep Water Channel. The Mormon Channel is a dead-end waterway

approximately 2,500 feet long and 180 feet wide. Plaintiff alleges on information and belief that the northwestern end of the Mormon Channel was dredged to a depth of approximately sixteen (16) feet in around 1993, to facilitate barge access and the movement of vessels thereon, and that the majority of the remainder of the Channel is approximately ten (10) feet deep. The approximate location of the Mormon Channel is depicted on the Assessor's Parcel Map attached hereto as Exhibit A.

12. By means of the Stockton Deep Water Channel, and then the Mormon Channel, small and medium-sized vessels, barges, and other watercraft have historically, and still could, absent interference, readily access the entire southern and southwestern side of the Maritime Center property along the northern and northeastern edges of the Mormon Channel. Further, the Maritime Center property has for years enjoyed existing improvements that enhance its maritime use and value, including a barge slip, sheet pile wall, and loading docks, all of which have been beneficially utilized in the enjoyment of this property, and said property had been used for such marine purposes for a number of years. Plaintiff CRV purchased the Maritime Center property with the intent of continuing to enjoy and capitalize on these maritime uses and maritime access and egress to such property, via the Mormon Channel.

13. Until recently, plaintiff CRV used the Maritime Center property in connection with barge storage, maintenance, shipping, docking, wood storage, and other maritime-related activities, however, CRV acquired such property with the intent, plan, and expectation of developing and improving same for its highest and best use, as more particularly described below.

14. At all times relevant, the Maritime Center property was located near other active projects and developments within the developing Port Industrial Redevelopment Project Area ("the Project Area") for the City of Stockton. The Project Area was and is intended to upgrade the infrastructure of the Port of Stockton and surrounding areas, and to provide incentives for new commercial and industrial development and redevelopment in the area.

15. At all times relevant, plaintiff CRV acquired the Maritime Center property with the intent and expectation of developing same as part of a mixed use master plan development involving a marina with office, recreational, and retail commercial facilities, such as boat slips, dry boat storage facilities, marine sales and service facilities, restaurants, hotel/motel, and other planned and potential amenities, consistent with the highest and best use of the property ("the development plan"), and which use is reasonable and feasible in all respects. As alleged above, plaintiff CRV has already invested approximately $300,000 in planning and development activities toward the development of the Maritime Center property for such use.

16. A critical element for the development of the Maritime Center property for its highest and best use, was and is marine access and egress and docking capability for vessels to and from the property, via the northern and northeastern edges of the Mormon Channel to and from the Stockton Deep Water Channel. At all times herein mentioned prior to the commencement of defendant's remediation project (as more particularly alleged below), such marine access and egress has existed, and has for years on end been utilized by the owners of the Maritime Center property, including plaintiff CRV, as well as by other property owners located along

the Mormon Channel. Until the actions of the USA described herein occurred, plaintiff CRV realized substantial revenues and income from its activities permitting and leasing the Maritime Center property for such uses.

17. Maritime access and egress and docking capability for vessels via the Mormon Channel is essential to plaintiff CRV's most economically viable use of the Maritime Center property, and is a critical feature to said property's highest and best use.

18. At all times herein mentioned prior to the completion of defendant's remediation project (as more particularly alleged below), the Maritime Center property was and is readily reasonably developable for the uses contemplated by plaintiff CRV's development plan, as more particularly alleged above.

<u>The McCormick & Baxter Superfund Site</u>.

19. The former properties of the McCormick & Baxter Creosoting Company (collectively, "the M&B Site") are situated to the south and to the west of, and across the Mormon Channel from, the Maritime Center property. According to the EPA, from approximately 1946 through 1990, McCormick & Baxter operated a wood preserving facility at the M&B Site, in which creosote and oil-borne solution treatment products were used during wood treatment operations, and in which oily waste ponds were maintained for purposes of waste preservation. According to the EPA, these treatment products contained various contaminants, and as a result of the use of such products at the M&B Site, such contaminants migrated by various means, including stormwater runoff, chemical process spills, and the maintenance of

oily waste ponds, into the ground at the property, and allegedly into areas on the southern and/or southwestern side of the Mormon Channel.

20. Plaintiff alleges on information and belief that the contaminants present at the M&B Site are confined to that site and perhaps to the southern side of the Mormon Channel immediately adjacent to the M&B Site, and are not substantially present at the Maritime Center property, or in the northern and northeastern Mormon Channel areas that permit maritime access and egress to and from said property. At no time has the Maritime Center property required or been the subject of any environmental remediation investigations or measures pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), as amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA), 42 U.S.C. §§ 9601, *et seq.*

Defendant's Remediation Project.

21. Plaintiff alleges on information and belief that as a result of the presence and migration of various contaminants at the M&B Site, the EPA began studying the M&B Site sometime during the 1990's. Plaintiff alleges on information and belief that since that time, the EPA has conducted a series of investigations, as well as removal and stabilization actions at the M&B Site, including demolition and disposal of structures and equipment, excavation of contaminated soil and containment of same in a lined repository, installation of an asphalt cap over the lined repository, and the installation of a sheet piling wall along the southwestern shoreline of the Mormon Channel, all intended to control oily seepages from the former oily waste pond area.

22. On or about October 26, 2001, the defendant USA, through the EPA, notified the then-owner/seller of the Maritime Center property of its intention to install environmental remediation improvements on and adjacent to the Maritime Center property to address allegedly contaminated sediment in the Mormon Channel. According to the EPA, this sediment had been and was accumulating in areas of the Mormon Channel immediately adjacent to M&B Site waste ponds, central processing area, and eastern end of the Channel, as a result of the previous operations of McCormick & Baxter on the M&B Site, across the Channel from the Maritime Center Property. All of these areas are located on the southern and southwest sides of the Mormon Channel, opposite the Channel from the Maritime Center property. According to the EPA, the mouth of the Mormon Channel was considered a "low-level threat area because contamination is not widespread there." However, the mouth of the Mormon Channel was and is vital and critical to plaintiff CRV's productive use of its property, and to its investment-backed expectations for the Maritime Center property.

23. On or about June 1, 2006, the USA commenced construction of the remediation improvements on and adjacent to the Maritime Center, which construction is scheduled to be completed on or about September 30, 2006. The remediation improvements carried out by the defendant USA for the M&B Superfund Site are a permanent physical invasion, interfering with and substantially disrupting plaintiff CRV's property rights -- essentially the erection of government-owned physical construction improvements, as opposed to mere regulatory and/or legislative restrictions, and included the placement of a 2-foot thick sand cap

covering approximately ¾ of the bottom of the Mormon Channel, reducing the depth of the channel, installation of a silt curtain across the mouth of the Mormon Channel, as well as the installation of a temporary sheet pile wall and ultimately, physical erection of a permanent log boom across the Mormon Channel, blocking and precluding any marine access to or egress from a substantial majority of the Maritime Center property, and dispossessing CRV from such beneficial use and enjoyment.

24. According to the EPA, these remediation improvements are to also include the removal of the temporary sheet pile wall at the end of the EPA construction, followed by the immediate placement of a permanent log boom across the mouth of the Mormon Channel, designed and intended to prevent marine traffic from moving into the slough and potentially disturbing the sand cap to be placed in the Channel by the EPA. According to the EPA, this permanent log boom is being placed across the Channel in a location beginning on the northwest bank of the Maritime Center property, and spans the entire mouth of the Mormon Channel in a northwesterly direction until reaching the bank of the M&B site on the northwest side of the Channel. Defendant USA acknowledges that the placement of its permanent log boom across the Mormon Channel necessarily deprives the owner of the Maritime Center property of any marine access to the Channel area to the southeast of the log boom, thereby preventing any marine access to or egress from, nearly the entire Maritime Center property. A diagram depicting the approximate locations of defendant's announced improvements, as they impact the Maritime Center property, is attached hereto, marked Exhibit B, and incorporated herein by reference.

25. According to defendant, the overall goal and objective of the remedial action announced by the EPA is to protect human health and the environment from the risks presented by contaminated soil, groundwater and sediment, including, among numerous other considerations, minimizing the migration of contaminants from subsurface soils and from the migration of groundwater from the M&B site into the Mormon Channel. Defendant's remediation project is therefore at least ostensibly one that utilizes public improvements to achieve a public purpose, the proclaimed environmental remediation of the M&B Site, and, to a lesser extent, immediately adjacent property on the southern and southwest sides of the Mormon Channel. But defendant's remediation project does not purport to confer any significant environmental benefit to the Maritime Center property, and any proclaimed environmental benefit claimed for areas necessary for maritime access to the Maritime Center property (such as the mouth of the slough and the northern areas of the Channel), if any there be, is far outweighed by the detriment caused by said remediation project, as constructed, which precludes virtually any maritime access and egress to the Maritime Center property. Indeed, even if there were significant contamination of the Slough that some day might be remediated by the EPA's project, the existence of such contamination has not and would not substantially interfere with CRV's existing and planned use and enjoyment of the Maritime Center Property, and therefore the EPA's project confers no real benefit to CRV's property, but rather a imposes a huge detriment on such property and its use. At all times, the defendant USA had the option of conferring equivalent

environmental benefits upon the Slough without interfering with maritime uses and access, yet it has deliberately chosen to act in a manner which precludes such uses.

26. At no time relevant has Defendant ever acted or attempted to act so as to regulate navigation within the Mormon Channel as it impacts the Maritime Center property, or to in any way to improve the navigational characteristics of same. Defendant's remediation project is not intended to, does not purport to, and does not in any way improve or otherwise serve any navigational interest in the Mormon Channel, in the adjacent Stockton Deep Water Channel, or otherwise. Defendant's remediation project is therefore not one conducted in the exercise of any power to regulate commerce or navigation in navigable waters, but rather, entirely an exercise of the EPA's environmental administrative and remedial powers granted pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), as amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA), 42 U.S.C. §§ 9601, *et seq.* As such, defendant's actions constitute a physical taking of and interference with private property for public purposes, requiring payment of just compensation.

27. In devising its remediation project, defendant considered, but ultimately rejected, no action, as well as potential remediation measures which would have eliminated and/or minimized the project's interference with plaintiff CRV's use and enjoyment of the Maritime Center property, while still accomplishing the EPA's stated objectives, including dredging of allegedly contaminated material from the Mormon Channel combined with other measures, such as off-site disposal, treatment, and capping after dredging. Defendant specifically rejected protests from

the seller and plaintiff CRV that its installation of a permanent log boom and other improvements across the mouth of the Mormon Channel interferes with the use and enjoyment of the Maritime Center property, deprives the great majority of such property of any marine access or egress, or docking capability, and greatly diminishes and/or destroys the economic value of such property, and defendant has refused to implement more reasonable and less intrusive measures that would permit continued marine access and egress to and from the Maritime Center property, insisting upon proceeding as determined to be in its own best interests, and contrary to those of owners such as CRV. In short, defendant elected to make a conscious decision and taking for its own purposes, when alternative reasonable measures were available that would have eliminated or minimized the taking and interference with private property, while still accomplishing the intended environmental result.

28. On or about October of 2002, defendant first entered into possession of the M&B site and portions of the south and southwestern banks of the Mormon Channel, and commenced construction of its remediation project, including construction of a berm and grading and stabilization work along the southern and southwestern banks of the Mormon Channel preparatory to installation of a sand cap over the bottom of the Channel, and installation of the permanent log boom across the mouth of the Channel. Due to budgetary and other circumstances, including negotiations and efforts to compensate other property owners within the Slough, and to make arrangements to move vessels from the Slough, defendant's project, including the majority of the work in the Mormon Channel, was put on hold and

discontinued for a period of years, until approximately July 1, 2006, when construction work resumed which continues until the project is completed (scheduled for September 30, 2006). At present, there is a temporary boom blocking marine access to the Slough and to CRV's property, which, according to the EPA, will be replaced by the permanent log boom within a matter of weeks from the date of this Complaint.

29. As defendant previously announced, the installation of the sand cap, temporary sheet pile wall, and permanent log boom in the Mormon Channel commenced on or about July 1, 2006. As of the date of this Complaint, defendant had driven the pilings to anchor its stationary silt curtain and permanent log boom into locations across the slough, and is preparing to install the log boom itself across the mouth of the slough, ending maritime access to the Channel area to the southeast of the log boom, thereby precluding any marine access to or egress from, nearly the entire Maritime Center property, and depriving such property of valuable maritime uses. All of these activities have had an immediate, negative, and permanent impact upon the beneficial use and value of plaintiff CRV's Maritime Center property, and will continue to have such an impact, and have deprived plaintiff CRV of the economically viable use and value of its property. All of these activities will be and are substantially complete, and the taking and interference consummated, as of the filing of this Complaint.

WHEREFORE, plaintiff prays Judgment as hereinafter set forth.

## FIRST CAUSE OF ACTION

## (FOR JUST COMPENSATION FOR GOVERNMENTAL TAKING)

30. Plaintiff incorporates by reference, as though set forth in full, each and all of the allegations of Paragraphs 1-29 set forth above.

31. The Fifth Amendment of the United States Constitution provides that private property shall not be taken by the federal government for public use without payment of just compensation.

32. Defendant's construction and maintenance of its remediation project for the M&B Site, in the particulars alleged above, amounts to a public taking of and interference with plaintiff CRV's interests in private property, the Maritime Center property, further amounts to a public denial of and interference with the full, highest and best use and enjoyment of such private property, and permanently destroys economically viable uses of such property. Said taking and interference has been and is exclusively intended and carried out to accomplish the sole public purpose of environmental remediation with regard to alleged contamination emanating from the M&B Site, to the injury of the Maritime Center property. The purpose of defendant USA's remediation project has nothing to do with the regulation of navigation. Under the Firth Amendment of the United States Constitution, such taking and interference require payment of just compensation to Plaintiff CRV, and justify this action in inverse condemnation to recover just compensation, which defendant has refused to pay.

33. As a direct result of the permanent interference caused by defendant's construction of its remediation project, plaintiff CRV's Maritime Center property, and

the use thereof, and such property interests have been and continue to be damaged by such taking. Such damage includes, but is not limited to: the loss of maritime vessel access to and egress from almost the entire Maritime Center property; loss of docking and storage facilities; the loss of use of said property for commercial maritime and related uses; lost rentals and income; the loss of the highest and best use of said property; the loss of the economically viable uses of said property; inability to fully develop or build; loss of marketability; extensive diminution in the fair market value of said property; out-of-pocket expenditures for investigations, and mitigating steps; and litigation expenses, including attorney's fees, costs, and expert and consulting expenses.

34. The above-described damage was and continues to be substantially and/or proximately caused by the acts and omissions and public improvements of the defendant USA as alleged herein, which, as designed, constructed, and maintained, necessarily preclude marine access, barge and boat traffic from utilizing the Mormon Channel, and virtually all of the Maritime Center property.

35. As a result of the above-described taking plaintiff CRV has been damaged in an amount in excess of this Court's jurisdictional minimum, in the minimum sum of $1,250,000, or in such other sum according to proof at the time of trial herein. Plaintiff will pray leave to amend this Complaint to specify the exact amount of such damage in accordance with such proof, at the time of trial herein.

36. Plaintiff CRV has received no compensation from Defendant for any of the damage, interference or harm alleged herein, nor has Defendant taken any steps

to alleviate, minimize, or mitigate such damage, notwithstanding requests by CRV that it do so.

WHEREFORE, Plaintiff prays judgment against the defendant United States of America, as follows:

## PRAYER

1. For compensatory damages in the sum of $1,250,000, or such other sum according to proof at the time of trial herein.

2. For interest on such compensatory damages as are awarded, from the date of taking, and as permitted by law.

3. For recovery of attorney's fees as permitted by law.

4. For recovery of expert witness/consultant fees as permitted by law.

5. For recovery of costs of suit herein incurred, as permitted by law.

6. For such other and further relief as the Court deems just and proper.

Dated: September 15, 2006

SHAPIRO BUCHMAN PROVINE & PATTON LLP

By: ______________________
John H. Patton
Attorneys for Plaintiff CRV Enterprises, Inc.

195319.1




EXHIBIT
A

# ASSESSOR'S PARCEL MAP

RECYCLED PAPER MADE FROM 30% POST CONSUMER CONTENT


WEBER
OLD MORMON SLOUGH
UPRR PROPERTY
SOUTHERN PACIFIC RAIL ROAD
Position of Permanent Log Boom
Position of Temp. Sheetpile Wall
EXISTING SHEETPILE WALL
EXISTING SHEETPILE (APPROX)
A
B
C
EXHIBIT
B

EXHIBIT B







Initial docking area selected based on location of other vessels (the Holland and Barge 51) already moored in the area.