John H. Patton, California SBN 069261
Matthew K. Wisinski, California SBN 195535
SHAPIRO BUCHMAN PROVINE & PATTON, LLP
1333 North California Boulevard, Suite 350
Walnut Creek, CA 94596
Telephone: (925) 944-9700
Facsimile: (925) 944-9701
E-mail: jpatton@sbllp.com

Attorneys for Plaintiffs CRV Enterprises, Inc.
and C. Ryan Voorhees

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**CRV ENTERPRISES, INC., a California corporation, C. Ryan Voorhees, an individual,**

Plaintiffs,

vs.

**THE UNITED STATES OF AMERICA,**

Defendant.

No. 06-660L

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS CRV ENTERPRISES, INC. AND C. RYAN VOORHEES' MOTION FOR ORDER GRANTING INTERLOCUTORY SUMMARY JUDGMENT ON LIABILITY ISSUES, DETERMINING THE OCCURRENCE OF A COMPENSABLE GOVERNMENT TAKING OF PRIVATE PROPERTY [RCFC 56(c)]**

Date: To be assigned by the Court
Judge: George W. Miller

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs C. Ryan Voorhees and CRV Enterprises, Inc. ("CRV") respectfully submit the following Memorandum of Points and Authorities in support of their motion under RCFC 56(c) for interlocutory summary judgment on liability issues, establishing the occurrence of a compensable taking in this case.[1]

[1] By a series of stipulations and scheduling orders, the latest of which was entered January 29, 2008, the parties have reserved discovery and litigation on the issues of just compensation/damages until disposition of their cross-motions on the issues of liability/taking. Upon the Court's ruling on these cross-motions, plaintiffs request a further Status/Case Management Conference to schedule such discovery and set a trial date.

# TABLE OF CONTENTS

Page(s)

I. PRELIMINARY STATEMENT ..... 2

II. SUMMARY OF THE ISSUES RAISED BY PLAINTIFFS' MOTION ..... 2

III. SUMMARY OF THE UNDISPUTED MATERIAL FACTS ..... 3

A. The Old Mormon Slough ("OMS"). ..... 3

B. The Subject Property. ..... 4

C. Plaintiffs' Acquisition/Ownership of the Subject Property. ..... 5

D. The McCormick & Baxter ("M&B") Superfund Site. ..... 6

E. Plaintiffs learn of the EPA's intended project. ..... 10

F. The Government's improvements are installed in Fall, 2006. ..... 11

IV. GROUNDS FOR SUMMARY JUDGMENT ON LIABILITY ..... 13

V. LEGAL ARGUMENT ..... 13

A. The Fifth Amendment to the United States Constitution mandates the payment of just compensation for the Government's taking of private property. ..... 13

B. Under California law, a riparian owner owns extensive property rights connected with adjacent waters. ..... 14

C. The Government's installation of the sand cap and log boom in 2006 physically took plaintiffs' riparian property rights from their bundle of sticks composing the Subject Property. ..... 17

D. The Government's taking has nothing to do with the exercise of its navigational servitude. ..... 20

VI. CONCLUSION ..... 24

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Aerojet-General Corp. v. Superior Court* (1988) 211 C.A.3rd 216 Cal.Rptr. 621 .......15

*Ball v. U.S.*, 1 Fed.Cl. 180 (1982) .......16

*Cane Tennessee, Inc. v. U.S* 62 Fed.Cl. 703 (2004) .......19

*Cienega Gardens v. United States*, 265 F.3d 1237 (Fed.Cir. 2001) .......14

*Crance v. State*, 128 N.Y.S.2nd 479 (1954) .......23

*Drakes Bay Land Co. v. United States*, 191 Ct.Cl. 389, 424 F.2d 574 (1970); .......18

*Goodwyn v. United States*, 32 Fed.Cl. 409 (1994) .......23

*Hendler v. U.S.*, 952 F.2nd 1364 (Fed. Cir. 1991) .......19

*In re Jamaica Bay in City of New York*, 256 N.Y. 382, 176 N.E. 539 (1931) .......23

*In re Waters of Long Valley Creek Stream System* (1979), 25 Cal.3rd 339, 599 P.2nd 656 .......16

*In re West 205th St. in City of New York*, 240 N.Y. 66, 147 N.E. 361 (1925) .......23

*International Paper Co. v. United States*, 282 U.S. 399, 51 S.Ct. 176, 75 L.Ed. 410 (1931) .......16, 17

*John R. Sand & Gravel Co. v. U.S.*, 60 Fed.Cl. 230 (2004) .......14, 15, 19

*Jones v. Dist. of Columbia Dept. of Corrections*, 429 F.3rd 276 (D.C. Cir. 2005) .......20

*Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383 (1979) .......13, 20, 23

*Lake County Estates v. Tahoe Planning Agency*, 440 U.S. 391, 99 S.Ct. 1171 (1979) .......14

*Laney v. U.S.*, 661 F.2d 145 (Ct.Cl. 1981) .......18, 20, 22

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164 (1982) .......18, 19

*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886 (1992) .......19, 21

*MacLeod v. Santa Clara County*, 749 F.2nd 541 (9th Cir. 1984). .......14

*Marks v. Whitney* (1971) 6 Cal.3rd 261, 491 P.2nd 374 .......16

TABLE OF AUTHORITIES

Page(s)

*Palazzolo v. Rhode Island*, 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) .......... 14

*Palm Beach Isles Associates v. U.S.* 231 F.3d 1354 (Fed. Cir. 2000) .......... 19, 21

*Pete v. United States*, 202 Ct.Cl. 1109 (1973) .......... 18

*Pete v. United States*, 209 Ct.Cl. 270, 531 F.2d 1018 (1976) .......... 18

*San Francisco Sav. Union v. R.G.R. Petroleum & Min. Co.* (1904), 144 Cal. 134, 77 P. 823 .......... 15, 16

*Smith v. Municipal Court* (1988) 202 C.A.3rd 685, 245 Cal.Rptr. 300 .......... 15

*St. Louis v. Western Union Telegraph Co.*, 148 U.S. 92, 13 S.Ct. 485 (1893) .......... 18

*State ex rel. Squire v. City of Cleveland* (1948), 150 Ohio St. 303, 82 N.E.2nd 709 .......... 17

*Tamulion v. Michigan State Waterways Comm.*, 50 Mich.App. 60, 212 N.W.2nd 828 (1973) .......... 23

*Tulare Lake Basin Water Storage District v. United States*, 49 Fed.Cl. 313 (2001) .......... 13, 14, 19, 24

*U.S. v. 50 Foot Right of Way of Servitude In, Over and Across Certain Land in the City of Bayonne, Hudson County, N.J.*, 337 F.2nd 956 (3rd Cir. 1964) .......... 17, 18, 21, 22

*U.S. v. Rands*, 389 U.S. 121, 88 S.Ct. 265 (1967) .......... 20

*United States v. 412.715 Acres of Land, Contra Costa County, Cal.*, 53 F.Supp. 143 (N.D. Cal.1943) .......... 22

*United States v. Ahtanum Irrigation District*, 124 F.Supp. 818 (D.C.E.D. Wash. 1953) .......... 17

*United States v. Causby*, 328 U.S. 256, 66 S.Ct. 1062 (1946) .......... 13, 18, 22

*United States v. Craft*, 535 U.S. 274, 122 S.Ct. 1414, 152 L.Ed.2d 437 (2002) .......... 14, 15

*United States v. General Motors Corp.*, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945) .......... 14

*United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 70 S.Ct. 955 (1950) .......... 23

*United States v. River Rouge Improvement Co.*, 269 U.S. 411, 46 S.Ct. 144 (1926) .......... 21

TABLE OF AUTHORITIES

Page(s)

*Yamagiwa v. City of Half Moon Bay*, 523 F.Supp.2nd 1036, 1088 (N.D. Cal. 2007) ..... 24

*Yates v. City of Milwaukee*, 77 U.S. 497, 1879 WL 12827, 19 L.Ed. 984 (1870) ..... 16

**Other Authorities**

1 William Blackstone, *Commentaries* 138 ..... 14, 15

2 William Blackstone, *Commentaries* 2 ..... 14, 15

2 Nichols on Eminent Domain, § 5.79, p. 5-302 (Rev. Ed. 1981) ..... 16

56 Am.Jur. Waters, § 233 ..... 16, 17

65 C.J.S., Navigable Waters, §§ 61-69 ..... 16, 17

*Black's Law Dictionary* 955 (2d ed.1910) ..... 14

Cal. Const., Art. X, § 2 ..... 16

Coulson & Forbes on Waters (6th ed. 1952) pp. 69--70 ..... 16

RCFC 56(c) ..... 13, 24

The Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 1983 ..... 14

The Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 ..... 7

U.S.C. Const. Amend V ..... 13

# TABLE OF EXHIBITS


| Declaration | Exhibit No. | Description |
|---|---|---|
| Voorhees | 1 | Assessor's Map depicting Subject Property |
| Voorhees | 2 | Google Earth™ aerial image of Subject Property |
| Voorhees | 3A | Google Earth™ aerial image of Subject Property |
| Voorhees | 3B | Google Earth™ aerial image of Subject Property |
| Voorhees | 4 | 8/25/2000 Option to Purchase 1404 W. Weber Ave. |
| Voorhees | 5 | Stockton Maritime Center Site Plan |
| Voorhees | 6 | Grant Deed recorded 11/5/02 |
| Voorhees | 7 | Grant Deed recorded 10/20/04 |
| Voorhees | 8 | Government Diagram of M&B Site |
| Voorhees | 9 | Worlddredging.com image of sand cap installation |
| Voorhees | 10 | Government Diagram of M&B site, OMS, and Subject Property |
| Voorhees | 11 | Voorhees photograph of Government's log boom |
| Voorhees | 12 | Voorhees photograph of Government's signs |
| | | |
| Patton | 1 | Excerpts from 10/23/07 Deposition of Marie Lacey |
| Patton | 2 | Webpage from USEPA website |
| Patton | 3 | Google map of Stockton/San Joaquin River |
| Patton | 4 | Google map of Northern California/Bay Area |
| Patton | 5 | USEPA Site Description for M&B Superfund Site |
| Patton | 6 | Chapter 4.3 from USEPA Feasibility Analysis |
| Patton | 7 | USEPA Alternative SD-2 for in Situ Capping of OMS |
| Patton | 8 | USEPA Table ES.2 Comparison of Remedial Alternatives for Sediments in OMS |
| Patton | 9 | July 1999 USEPA Fact Sheet for M&B Superfund Site |
| Patton | 10 | February 2006 Fact Sheet for M&B Superfund Site |
| Patton | 11 | 8/18/06 USEPA Website Press Release for M&B Superfund Site |
| | | |


208194.1

## I. PRELIMINARY STATEMENT

This is an inverse condemnation case arising out of defendant United States of America's ("the Government") appropriation of the Old Mormon Slough ("OMS") in Stockton, San Joaquin County, California for the exclusive use of the Environmental Protection Agency ("USEPA"). That appropriation was carried out through the construction of public improvements within the OMS, erected solely in connection with the USEPA's "Superfund" cleanup project on adjoining property, the McCormick & Baxter site ("M&B site"). [See Patton Exs. 3 and 4 for site location.] *The appropriation by the USEPA has nothing to do with any exercise of the Government's navigational servitude, and has in fact destroyed navigation.* Rather, the taking was meant to accomplish the USEPA's ostensible environmental purposes. Under the 5th Amendment of the United States Constitution, such a taking requires payment of just compensation for private property taken as a result. That is the purpose of this motion; to obtain an Order adjudicating that a compensable taking has occurred.

## II. SUMMARY OF THE ISSUES RAISED BY PLAINTIFFS' MOTION

The following issues are critical to the disposition of this motion:

A. Under California law, which governs plaintiffs' property rights, what are the relevant "sticks" in the bundle of rights that plaintiffs owned/enjoyed with regard to the property that is the subject of this action?

B. Did the Government's actions within the OMS deprive plaintiffs of their property rights?

C. Does the fact that the OMS is a navigable body of water mean that the Government may deprive plaintiffs of their property rights without affording just compensation?

## III. SUMMARY OF THE UNDISPUTED MATERIAL FACTS

### A. The Old Mormon Slough ("OMS").

The OMS is a finger of navigable water, approximately 180 feet wide and 2,500 feet long, that is connected to the Stockton Deep Water Channel ("SDWC") within the San Joaquin River, in Stockton, California. As of 2000, and according to the Government, the OMS had been dredged at its mouth to a depth of approximately 16 feet at its western end, near its confluence with the river. The eastern portion of the OMS had a depth of approximately 10 feet. [Patton Ex. 5.]

The Port of Stockton ("the Port") is located on the SDWC, northeast of the OMS. Large ships and vessels of all sorts are able to reach the Port via the San Joaquin River, which flows westward from the Port, first through the SDWC, then through the San Joaquin Delta and into the Suisun and San Pablo Bays, the eastern arms of the San Francisco Bay. Ultimately, vessels sailing from the Port can reach the Pacific Ocean from the San Francisco Bay, approximately 90 miles away. [PF No. 4;[2] Voorhees Dec., ¶¶ 5, 6, Exs. 1, 2; Patton Exs. 3, 4.]

As of 2000, and because of its depth and size configurations, the OMS was navigable for shallow draft craft such as commercial barges, and medium and small-sized vessels, such smaller commercial fishing boats, recreational fishing and sport boats, sailboats, and the like. The OMS was frequently used by such craft, in particular commercial vessels and barges seeking to load and unload materials at Dutra Marine Construction ("DMC"), a business located on the northern side of the OMS. To service such vessels, and at considerable expense and trouble, DMC had installed hundreds of feet of sheet pile walls at land's edge (the "foreshore"), adjacent to the OMS. [PF No. 8; Voorhees Dec., ¶¶ 5-18, 29.]

---

[2] Plaintiffs' accompanying Proposed Findings of Uncontroverted Facts are hereinafter referred to as "PF."

### B. The Subject Property.

In 2000, DMC's marine construction business was located at the property that is the subject of this action, 1404 West Weber Avenue, Stockton ("Subject Property"). The Subject Property is consists of approximately 9.54 commercially zoned acres. It is bounded on the north by the southern edge of abandoned West Weber Avenue, and 2 commercial parcels formerly owned by Catellus Development Corporation situated north of the former street, also owned by plaintiff Ryan Voorhees ("the Catellus parcels"). On the east, the Subject Property is bounded by a private parcel (owned by Stockton Cold Storage, Inc.). On the west and south, the property abuts the OMS. [Voorhees Dec., ¶¶ 4-13.] The Subject Property and its relationship to the OMS and adjoining properties is depicted in Voorhees Exhibits 1-3, and 10. Voorhees Exhibit 1, a copy of the San Joaquin County Assessor's Map, provides the basic orientation information (the Subject Property is shown in yellow; the Catellus parcels are cross-hatched):




In 2000, the Subject Property was owned by Bill T. Dutra, the principal owner/operator of DMC. As noted above, Dutra/DMC had installed valuable sheet

pile walls within the Subject Property to enhance its commercial marine use for their marine construction business. [Voorhees Dec., ¶ 4-12, Exs. 3A and 3B.]

**C. Plaintiffs' Acquisition/Ownership of the Subject Property.**

Plaintiffs Ryan Voorhees and his company, CRV, are real estate developers operating in the Sacramento/Stockton areas of Northern California. They became aware of the Subject Property in the Summer of 2000, in connection with acquiring the Catellus parcels to its north (cross-hatched in Voorhees Ex. 1). Plaintiffs were attracted by the property's marine amenities and development potential, including lengthy frontage on the OMS, and the existence of 3 valuable sheet pile walls. In October of 2000, CRV entered into a written Option to purchase the Subject Property, and plaintiffs opened escrow, deposited funds, and began due diligence for the development process. [PF Nos. 4, 5, 8; Voorhees Dec., [¶¶ 2-17, Exs. 3A, 3B, and 4.]

CRV's engineering consultants verified that the Subject Property was environmentally clean and free from significant contamination during the due diligence process. CRV and its consultants also formulated various development plan alternatives for a marine-based use of the Subject Property along with the Catellus properties to the north. Voorhees Exhibit 5 depicts one such formulation:



The option period and escrow for the purchase were extended several times while plaintiffs and Dutra worked through various development issues. Voorhees and CRV paid significant consideration for these extensions, and invested substantial sums toward developing the Subject Property. By 2002, Voorhees and CRV had committed hundreds of thousands of dollars toward the property and its development. On October 29, 2002, plaintiffs exercised the option rights, and escrow closed November 8, 2002. Ryan Voorhees personally paid the purchase price of $1,315,000, plus additional option payments made prior to the closing. [PF Nos. 5, 6; Voorhees Dec., ¶¶ 8, 9, Exs. 4, 6.]

Subsequently, in 2004, Ryan Voorhees' accountant pointed out the fact the most or all of the funds used to purchase the Subject Property, as well as the adjoining Catellus Parcels, had come personally from Mr. Voorhees, as opposed to CRV, and suggested that it would be appropriate for title to be held in Mr. Voorhees' name. As a result, on October 11, 2004, CRV conveyed these properties to Ryan Voorhees, who since that time has been the record holder of title.[3] [PF No. 7; Voorhees Dec., ¶ 19, Ex. 7.]

**D. The McCormick & Baxter ("M&B") Superfund Site.**

Directly across (south) the OMS from the Subject Property is the site of former operations by the McCormick & Baxter Creosoting Company ("M&B"). According to official documents issued by the USEPA (*see, e.g.,* Patton Ex. 5), M&B operated a wood treatment facility on that site from 1946 to 1991, which resulted in the release of various contaminants (chiefly creosote) into the surface soils, deeper soils, and groundwater. Further, according to the USEPA, stormwater from the site

---

[3] Mr. Voorhees had forgotten this transfer at the time that this second inverse condemnation action was filed on September 19, 2006, and the action was filed only in CRV's name as plaintiff. As a result of questioning at his deposition in this case concerning the property's ownership, counsel double-checked and discovered the conveyance. On January 23, 2008, and pursuant to leave of court, Ryan Voorhees was added into the case as a named plaintiff.

discharged into the OMS until approximately 1976-78, at which time M&B installed a perimeter dike and stormwater collection system to eliminate runoff. The relevant portions of the M&B site are well-depicted in Voorhees Exhibit 10 (shown below):




Through monitoring, the USEPA determined that the M&B site constituted a threat to the environment, and throughout the 1990's investigated various remediation measures. In approximately 1992, it designated the M&B site as an active "Superfund" site under The Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601, *et seq.* [Lacey Deposition, pp. 15, 17, 18, 23 (Patton Ex. 1).] According to USEPA documents, by early 1999, the Government had installed a sheet pile wall (approximately 400 feet long) along the southwestern edge of the OMS to control contaminant seepages from waste ponds that had been located on the M&B Site. In or about 2003, the Government also stabilized the remaining bank of the northern portion of the M&B site that was not protected by its sheet pile wall, and installed a clean earth berm

and bank protection material at that portion of the bank, designed to eliminate seepages of contaminants from the M&B site into the OMS. [PF Nos. 11, 12; Patton Exs. 5, 9, 10, 11.]

As part of its investigations, the Government also conducted sampling on the Subject Property to determine whether contamination had spread beyond the M&B site. Those investigations confirmed that the Subject Property was free of any significant level of contamination, and that the northern side of the OMS (near the Subject Property) was relatively free of contamination, especially as compared to the southern side (adjacent to the M&B site). [Lacey Deposition, pp. 45-46 (Patton Ex. 1); Voorhees Dec., ¶ 23.]

In March of 1999, but unknown to plaintiffs, the Government completed a Record of Decision ("ROD") which contained selected "remedies" for both the M&B site and for the OMS.[4] While the focus of the Government's actions deservedly addressed the M&B site itself, the Government also formed an intent to conduct activities in the OMS. In essence, that plan called for the installation of two sets of improvements within the OMS. The primary improvement was the deposit of a layer of clean sand ("cap") approximately 2 feet thick, over the sediment bottom of the OMS, from a location near its mouth (approximately where the concrete barge moorings are housed on the Subject Property) east to the terminus of the slough. The sole purpose of this sand cap was to trap whatever contaminants had seeped or run off from the M&B site into the OMS sediment bottom, and prevent them from

[4] Plaintiffs place the term "remedies" in quotes because that is the Government's characterization of its actions. Plaintiffs do not necessarily agree that these actions have had any "remedial" effect, particularly in the OMS. For example, in the OMS, instead of dredging the allegedly contaminated sediments from the bottom of the slough and improving the quality of the environment, the Government elected instead to leave whatever contaminants that existed in the sediment, and bury them under a layer of sand.

migrating westward into the San Joaquin River. [PF No. 16; Lacey Deposition, pp. 59, 65-66, 92-95, 103-04, 126-27 (Patton Ex. 1); Patton Exs. 5-10.]

As an adjunct to this plan, the Government also planned to erect two pilings within the OMS near its mouth, one adjacent to each bank (north and south), and then install a permanent log boom stretching between the pilings. The purpose of the log boom was solely to protect and serve the 2-foot thick sand cap, by walling off the OMS to any marine traffic which potentially might disturb the sand cap, at least 8 feet below the surface.[5] In essence, the USEPA's selected plan was to permanently appropriate the OMS from its mouth eastward, for its exclusive use as a vacant property. [PF No. 17; Lacey Deposition, pp. 59, 65-66, 126-27 (Patton Ex. 1); Patton Exs. 5-10.] Patton Exhibit 7 (shown below) depicts the EPA's intended alternative:




[5] At her deposition, the USEPA official who managed the M&B project, was unable to point to any evidence or studies suggesting, let alone showing, that vessels capable of entering the OMS would disturb the 2-foot thick cap of sand on its bottom to the extent that any significant level of contaminants might escape from the sediment buried beneath. [See Lacey Deposition, 66-68, 108-109, 114-15, Patton Ex. 10.] She was also unable to articulate any evidence to suggest, let alone establish, that the level of contamination in the OMS sediment was or is likely to pose any realistic threat to human health, or that placement of the sand cap would materially reduce any such threat or significantly improve the quality of the water within the OMS. [See pp. 38-39, Patton Ex. 10.] This is why plaintiffs are reluctant to agree with the Government's characterization of its actions as a "remedy."

The Government also ostensibly considered several other alternatives, including alternatives that provided for dredging and capping a portion of the OMS to remove any contamination in the sediment, and eliminating the log boom or placing it much further back (east) in the OMS. Most of these alternatives would have preserved full marine access to the western portion of the OMS, and the properties adjoining it, and would have removed far more contaminants from the OMS. [Patton Exs. 6, 8.] But dredging the sediment to remove the contaminants was far more expensive than burying them under two feet of sand. [Patton Dec., ¶ 16, Lacey Deposition, pp. 108-09 (Patton Ex. 1); Patton Ex. 8.]

**E. Plaintiffs learn of the EPA's intended project.**

By 2002, and after investing significant time, effort, and capital into their development plan, plaintiffs Ryan Voorhees and CRV had learned that the USEPA intended to proceed with a remedial project at the M&B Site, and was considering actions within the OMS itself. Plaintiffs requested and obtained assistance from DMC employees in efforts to try to ensure that whatever actions were taken in the OMS did not interfere with their development of the Subject Property, and a series of communications and discussions ensued between plaintiffs, DMC, counsel for DMC, and representatives of the USEPA on that topic. [Voorhees Dec., ¶¶ 20-26.]

By 2003, however, it had become apparent to plaintiffs that notwithstanding their protestations, the Government was definitely going to place a sand cap across the bottom of the OMS, and curtain off the capped area with a permanent log boom, forever closing down the OMS and all marine access and amenities within it.[6] With

[6] While the Government is loathe to admit it, it chose to bury the contaminants in the OMS rather than remove them by dredging, and to close off the OMS forever, because, as its Regional Project Manager testified, *it would have cost more than 11 times as much to dredge the contaminated sediment as to simply bury it under the sand cap.* [Pages 92-93, 108-09, Lacey Deposition, Patton Exs. 6 & 9.] Having availed itself of millions in cost savings, the least the Government must do is offer compensation for the taking that resulted from this decision. Or it could simply move its log boom further back in the OMS (beyond the property line) to restore navigational access to the Subject Property.

this realization, plaintiffs requested that they be paid compensation for the anticipated deprivation of their property. When the Government refused those requests, Ryan Voorhees caused CRV to file its initial inverse condemnation action (1:03-cv-00867-GWM) on April 30, 2003, believing that the sand cap and log boom were going to be installed that Summer, as had been advised by the EPA. [Voorhees Dec., ¶¶ 26-28.]

But for reasons beyond the control of plaintiffs (had they any control, no improvements would *ever* have been installed), the Government's installation of improvements into the OMS were delayed (connected with removing barges owned by other owners from the OMS). No improvements were installed in 2004. When the Government informed plaintiffs that no improvements would be installed in 2005 either, plaintiffs and the Government agreed to dismiss the action without prejudice, because it was not yet ripe – no taking had yet occurred. [Voorhees Dec., ¶ 28.]

**F. The Government's improvements are installed in Fall, 2006.**

In the Summer of 2006, the Government finally cleared the OMS and (through contractors) began laying its sand cap over the sediment bottom. By September, that work was substantially complete; the two pilings driven in at the mouth of the slough, and the permanent log boom strung between the pilings, permanently closing off the OMS to marine traffic and appropriating it for the USEPA's exclusive "use" as vacant property. [PF No. 18; Voorhees Dec., ¶¶ 29-31.] Shortly thereafter, Ryan Voorhees shot a photograph from the Subject Property that accurately depicts the boom in place, stretching southward across the mouth of the OMS (Voorhees Exhibit 11), shown on the following page:



It is no different than if the Government had built a dam or a fence across the mouth of the OMS. With the installation of the Government's improvements in the OMS, all maritime and riparian rights and uses of the OMS have ceased beyond (east of) the log boom. The majority of the foreshore of the Subject Property can no longer receive or provide access to marine traffic, and is completely useless as marina-type property or for any maritime use (loading, unloading, shipping, barging, etc.) The USEPA has taken the OMS, and the foreshore along it, to build itself a vacant lot with no use other than for the USEPA's purposes. [PF No. 19; Voorhees Dec., ¶¶ 29-34.]

This taking has obviously damaged the Subject Property, by depriving it of most of its highest and best use, maritime use. While the damage phase has not yet been litigated in this case, the loss is a substantial diminution in fair market value. The Government also refused all requests that it provide just compensation for the taking. [PF Nos. 19-22; Voorhees Dec., ¶¶ 34-36.]

On September 19, 2006, CRV filed its Complaint in inverse condemnation, seeking just compensation for the taking. As noted above, Ryan Voorhees was added as a plaintiff in the First Amended Complaint filed January 23, 2008. Plaintiffs

seek Judgment confirming that the Government's actions in the OMS depriving plaintiffs of riparian usage and access to the OMS constitutes a compensable taking for which the Government must pay just compensation.

## IV. GROUNDS FOR SUMMARY JUDGMENT ON LIABILITY

As the Court well knows, CRFC Rule 56 permits entry of summary judgment where the moving party is able to demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c). Furthermore, the Court is empowered to render judgment, interlocutory in character, on the issue of liability alone reserving trial on the issue as to the amount of damages (or in this case, just compensation). *Id.* *See, e.g., Tulare Lake Basin Water Storage District v. United States,* 49 Fed.Cl. 313, 324 (2001) (holding summary judgment appropriate to establish Government liability for compensable taking).

## V. LEGAL ARGUMENT

### A. The Fifth Amendment to the United States Constitution mandates the payment of just compensation for the Government's taking of private property.

The 5th Amendment to the United States Constitution provides in relevant part, "nor shall private property be taken for public use, without just compensation." U.S.C. Const. Amend. V. Such a taking occurs, without the filing of condemnation proceedings, whenever government action beneficial to the public results in the destruction or restriction of the use and general enjoyment of privately owned property. *See, e.g., Kaiser Aetna v. United States,* 444 U.S. 164, 178-80, 100 S.Ct. 383, 392-93 (1979); *United States v. Causby,* 328 U.S. 256, 261-62, 66 S.Ct. 1062,

1065-66 (1946). The cause of action in such an instance is inverse condemnation, and such actions are cognizable under 42 U.S.C. § 1983. *See, e.g., Lake County Estates v. Tahoe Planning Agency,* 440 U.S. 391, 398-400, 99 S.Ct. 1171, 1175-77 (1979); *MacLeod v. Santa Clara County,* 749 F.2nd 541, 544 (9th Cir. 1984).

Takings generally break down into two broad (and sometimes overlapping) categories. "A physical taking occurs 'when the government encroaches upon or occupies private land for its own proposed use.' *Palazzolo v. Rhode Island,* 533 U.S. 606, 617, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001); *Tulare Lake Basin Water Storage District v. United States, supra,* 49 Fed.Cl. 313, 318-20 (2001). A regulatory taking occurs 'when government action, although not encroaching upon or occupying private property, still affects and limits its use to such an extent that a taking occurs.' *Cienega Gardens v. United States,* 265 F.3d 1237, 1244 (Fed.Cir.2001) (citing *Palazzolo,* 533 U.S. at 617, 121 S.Ct. 2448)." *John R. Sand & Gravel Co. v. U.S.*, 60 Fed.Cl. 230, 234 (2004).

**B. Under California law, a riparian owner owns extensive property rights connected with adjacent waters.**

The first critical inquiry (be the taking physical or regulatory) is what did the plaintiffs own before the taking occurred. *See, e.g., John R. Sand & Gravel Co. v. U.S., supra,* 60 Fed.Cl. 230, 234 (2004) (applying analysis to a regulatory taking). It is undisputed that prior to the Government's actions in the OMS, which took place in 2006, plaintiffs owned the Subject Property. [Patton Ex. 11.]

> "Property has been described as a 'bundle of sticks,' *see, e.g., United States v. Craft,* 535 U.S. 274, 278, 122 S.Ct. 1414, 152 L.Ed.2d 437 (2002), and as the 'group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it,' *United States v. General Motors Corp.,* 323 U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311 (1945); *see also Black's Law Dictionary* 1232 (7th ed.1999) (defining property as '[t]he right to possess, use, and enjoy a determinate thing'). William Blackstone stated that the right of property 'consists in the free use, enjoyment, and disposal of all a person's acquisitions.' *Black's Law Dictionary* 955 (2d ed.1910) (citing 1 William

Blackstone, *Commentaries* 138; 2 William Blackstone, *Commentaries* 2, 15)."

*John R. Sand & Gravel Co. v. U.S., supra,* 60 Fed.Cl. 230, 236-37 (2004).

State law determines which sticks are in a person's "bundle" of property rights. *United States v. Craft, supra,* 535 U.S. 274, 278, 122 S.Ct. 1414, 1420. The Subject Property is located in Stockton, California, and therefore, California law determines the nature and extent of plaintiffs' property rights.

It is without controversy that the Subject Property is located immediately adjacent to the OMS, a navigable body of water connected to the SDWC, with depths varying from approximately 16 feet to 10 feet. [Patton Ex. 5.] Prior to the Government's actions giving rise to this lawsuit, the OMS was freely navigable for all manner of commercial and recreational vessels, barges and craft, except large, deep-water vessels. Prior to the Government's actions, the Subject Property was used for maritime-related commerce, and expensive sheet-pile walls had been erected to accommodate such uses. Prior to the Government's actions, plaintiffs were actively pursuing the development of the Subject Property for a marina-type property. [PF Nos. 8, 9; Voorhees Dec., ¶¶ 5-18, 29, Ex. 5.]

Under California law, the riparian right of access to the navigable part of waters is a valuable and protectable property right of the property owner. *See, e.g., San Francisco Sav. Union v. R.G.R. Petroleum & Min. Co.* (1904) 144 Cal. 134, 135-36, 77 P. 823, 824-25. Water in its natural state is a part of the land, and therefore real property. *Smith v. Municipal Court* (1988) 202 C.A.3rd 685, 689-90, 245 Cal.Rptr. 300, 303. The riparian or littoral owner, of course, does not own title to the waters (the State does, in public trust), but rather owns the rights to use it. *Aerojet-General Corp. v. Superior Court* (1988) 211 C.A.3rd 216, 229, 257 Cal.Rptr. 621, 629. But these rights are not trivial. For example:

> "A littoral owner has a right in the foreshore adjacent to his property separate and distinct from that of the general public (Gould on Waters, 3d ed., s 149). This is a property right and is valuable, and although it must be enjoyed in due subjection to the rights of the public, it cannot be arbitrarily or capriciously destroyed. (*Yates v. Milwaukee* (1870) 77 U.S. 497, 504, 10 Wall. 497, 504, 19 L.Ed. 984.) A littoral owner can enjoin as a nuisance interference by a private person with this right. (*San Francisco Sav. Union v. R.G.R. Petroleum & Mining Co.* (1904) 144 Cal. 134, 135-49, 77 P. 823. A littoral owner has been held to have the right to build a pier out to the line of navigability; a right to accretion; a right to navigation (the latter right being held in common with the general public) (see 65 C.J.S. Navigable Waters ss 61--69; 56 Am.Jur. Waters, s 233); and a right of access from every part of his frontage across the foreshore (see Coulson & Forbes on Waters (6th ed. 1952) pp. 69--70). This right of access extends to ordinary low tide both when the tide is in and when the tide is out. (*San Francisco Sav. Union v. R.G.R. Petroleum & Mining Co., supra,* 144 Cal. 134, 77 P. 823."

*Marks v. Whitney* (1971) 6 Cal.3rd 261, 262-63, 491 P.2nd 374, 382.

A riparian owner's right to reasonable and beneficial use of the State's waters is protected by the California Constitution. Cal. Const., Art. X, § 2; *see, e.g., In re Waters of Long Valley Creek Stream System* (1979) 25 Cal.3rd 339, 351, 599 P.2nd 656, 663. These riparian rights, of course, are burdened by a servitude in favor of the State in the exercise of its trust powers over navigable waters. *Marks, supra*, 6 Cal. 3rd 251, 262-63, 491P.2nd 374, 382. However, as in *Marks*, the State of California has not exercised those powers in our case.

The Federal Courts also recognize the importance and protectable nature of riparian rights. The United States Supreme Court recognizes riparian and littoral rights as valuable and protectable property rights. *See, e.g., See, e.g., Yates v. City of Milwaukee*, 77 U.S. 497, 503-07, 1879 WL 12827, 19 L.Ed. 984 (1870). In *Ball v. U.S.*, 1 Fed.Cl. 180 (1982), this Court stated: "In general terms, water rights in surface waters, whether riparian or appropriative, constitute property, and, under familiar principles, cannot be taken 'except for the public use and upon payment of just compensation.' 2 Nichols on Eminent Domain, § 5.79, p. 5-302 (Rev. Ed. 1981); *see also International Paper Co. v. United States,* 282 U.S. 399, 51 S.Ct. 176, 75

L.Ed. 410 (1931); *United States v. Alexander,* 148 U.S. 186, 13 S.Ct. 529, 37 L.Ed. 415 (1893); *United States v. Ahtanum Irrigation District,* 124 F.Supp. 818, 827 (D.C.E.D. Wash. 1953), *rev'd on other grounds,* 236 F.2d 321 (9th Cir.1956), *cert. denied,* 352 U.S. 988, 77 S.Ct. 386, 1 L.Ed.2d 367 (1957)."

Thus, plaintiffs, as riparian owners, had rights in the foreshore of their property adjacent to the OMS, rights of navigation, rights of access from every part of their frontage on the OMS across the foreshore, rights to build piers or dock slips,[7] and rights of reasonable and beneficial use of the OMS. Those rights added value to the Subject Property, and were the chief reason for plaintiffs' acquisition.

**C. The Government's installation of the sand cap and log boom in 2006 physically took plaintiffs' riparian property rights from their bundle of sticks composing the Subject Property.**

In August/September of 2006, and as part of its Superfund project in connection with the remediation of the McCormick & Baxter site, the Government, through its agency, the USEPA, took exclusive possession of the OMS, by installation of its 2-foot sand cap, and permanent log boom across the mouth of the OMS. [PF Nos. 18-22; Voorhees Dec., ¶¶ 20-36, Voorhees Exs. 9-11.] As admitted in Paragraph 30 of the Government's Answer, plaintiffs have not had navigational access to the capped portion of the OMS since the installation of these improvements. [PF No. 19-22] These actions preclude any maritime use or access for the Subject Property, including sheet-pile walls, except for the northwestern corner. Approximately 60-65% of the property's foreshore access to the OMS has been taken. [Voorhees Dec., ¶¶ 34-36.]

---

7 Plaintiffs realize that the right to install wharfs or slips is subject to regulation and control by state and federal governments, but nonetheless, such rights exist and have value, and such permission had previously been provided, in the case of the sheet pile walls. *See, e.g., State ex rel. Squire v. City of Cleveland* (1948)150 Ohio St. 303, 323, 82 N.E.2nd 709, 729; *U.S. v. 50 Foot Right of Way of Servitude In, Over and Across Certain Land in the City of Bayonne, Hudson County, N.J.*, 337 F.2nd 956, 959 (3rd Cir. 1964); 65 C.J.S., Navigable Waters, §§ 61-69; 56 Am.Jur., Waters, § 233.

Deprivation of access, marine or otherwise, constitutes a taking. As this Court has noted:

> "In other contexts, that a deliberate cutoff of access by all feasible routes is a taking is well established in the decisions of this court. *Drakes Bay Land Co. v. United States*, 191 Ct.Cl. 389, 424 F.2d 574 (1970); *Pete v. United States*, 202 Ct.Cl. 1109 (1973); *Pete v. United States*, 209 Ct.Cl. 270, 531 F.2d 1018 (1976)."

*Laney v. U. S.*, 661 F.2d 145, 149 (Ct.Cl. 1981).

This taking is a *physical* deprivation of plaintiffs' riparian rights, in the same manner that the installation of a pipeline over a bed of navigable water constitutes a physical deprivation of access rights. *See, e.g., U.S. v. 50 Foot Right of Way of Servitude In, Over and Across Certain Land in the City of Bayonne, Hudson County, supra, N.J.*, 337 F.2nd 956, 959-61 (3rd Cir. 1964). The Government, through its physical occupation and appropriation of the OMS for purposes related to its remediation of the M&B Superfund site, has permanently destroyed plaintiffs' riparian rights in the majority of the Subject Property. *See, e.g., St. Louis v. Western Union Telegraph Co.*, 148 U.S. 92, 101-102, 13 S.Ct. 485, 488-89 (1893).

Any invasion of property rights, whether it be above or below the surface, and whether it be temporary or permanent is a *taking*, such as constructing pipes, tunnels, bridges, or telephone wires. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 425, 429-30, 102 S.Ct. 3164, 3173 (1982). The frequent flight of airplanes immediately over a property constitutes a permanent physical invasion of the property, and a taking. *Loretto v. Teleprompter Manhattan CATV Corp., supra*, 458 U.S. 419, 430, 102 S.Ct. 3164, 3173 (1982), citing *United States v. Causby*, 328 U.S. 256, 261, 265-66, 66 S.Ct. 1062, 1065, 1067-68 (1946). Indeed, in the *Causby* case, the Supreme Court noted that such an invasion is no different than "if the United States had entered upon the surface of the land and taken exclusive possession of it." 328 U.S. 256, 261, 66 S.Ct. 1062, 1066 (1946); *see*

*also, Tulare Lake Basin Water Storage District v. United States, supra,* 49 Fed.Cl. 313, 319-20 (2001) (deprivation of water rights is a physical taking). Just as certainly, the Government's permanent physical invasion of the OMS constitutes such a taking, as to plaintiffs' riparian access rights vis-à-vis the foreshore of its property, and access to the OMS.

Such a physical invasion authorized by the Government is a "taking" without regard to the public interests it may serve. *Loretto v. Teleprompter Manhattan CATV Corp., supra,* 458 U.S. 419, 426-27, 102 S.Ct. 3164, 3170-71 (1982); *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1028, 112 S.Ct. 2886, 2900 (1992). The rule is that in physical takings cases, the Government owes compensation to the property owner regardless of the public interests served by the taking.[8] *John R. Sand & Gravel Co. v. U.S., supra,* 60 Fed.Cl. 230, 236 (2004). Moreover, the Federal Circuit has held that in the physical invasion context, the question is not why the owner acquired the property taken, but only did he or she own it at the time of the taking. Inquiry into whether the owner had investment-backed expectations at the time the property was acquired is not part of the analysis. *Palm Beach Isles Associates v. U.S.,* 231 F.3d 1354, 1357 (Fed. Cir. 2000); *Cane Tennessee, Inc. v. U.S.,* 62 Fed.Cl. 703, 716 (2004). Further, such a taking is *permanent* and by no means temporary. [Lacey Deposition, page 128 (Ex. 1, Patton Dec.)] *See, e.g., Hendler v. U.S.,* 952 F.2[nd] 1364, 1374-76 (Fed. Cir. 1991).

Accordingly, plaintiffs have established that a taking of their riparian property rights has occurred by the Government's physical invasion of the OMS. It is without controversy that the Government has refused to pay just compensation to plaintiffs for this taking, as the Government expressly admits in Paragraph 37 of its Answer. [PF No. 23; Voorhees Declaration, ¶ 37.]

---

[8] Thus, we need not debate the wisdom or efficacy of the Government's actions. They were committed for a public purpose, and they are a taking.

**D. The Government's taking has nothing to do with the exercise of its navigational servitude.**

In its 5th affirmative defense, found in its Answer, filed February 5, 2008, the Government has alleged that it need not pay just compensation because its invasion and occupation of the OMS has been in exercise of the Government's navigational servitude, which permits the United States to regulate navigation in navigable waters without providing just compensation.[9] *See, e.g., U.S. v. Rands,* 389 U.S. 121, 88 S.Ct. 265 (1967) (riparian rights taken by sovereign as part of comprehensive plan for development of Columbia River without compensation). But the defense is in no way a categorical defense, and its application is subject to the same examination and inquiry as any other affirmative defense. In *Laney v. U. S., supra,* 661 F.2d 145 (Ct. Cl. 1981), this court cited to the Supreme Court's opinion in *Kaiser Aetna* in observing that there is nothing magical about the navigational servitude, stating:

> "Nevertheless, it is noteworthy the Court states " * * * this Court has never held that the navigational servitude creates a blanket exception to the Takings Clause whenever Congress exercises its Commerce Clause authority to promote navigation. * * * " *Id.* at 172, 100 S.Ct. at 388. We think the case is helpful in its indication that there is no special mystique in exercise of the navigation servitude that permits uncompensated takings when compensation would be required in other contexts."
>
> *Laney v. U. S., supra,* 661 F.2d 145, 149 (Ct.Cl. 1981), citing *Kaiser Aetna v. United States, supra,* 444 U.S. 164, 172, 100 S.Ct. 383, 389 (1979).

As an affirmative defense to the takings claim, the Government bears the burden of proof to establish facts to support this defense. *See, e.g., Jones v. Dist. of Columbia Dept. of Corrections,* 429 F.3rd 276, 279 (D.C. Cir. 2005). And as the Federal Circuit has also noted:

> ". . . [I]n order to assert a defense under the navigational servitude, the Government must show that the regulatory imposition was for a

---

9 This is in fact the Government's sole defense to the requirement that it pay compensation. There is no factual justification for this defense, however.

> purpose related to navigation; absent such a showing, it will have failed to 'identify background principles ... that prohibit the uses [the landowner] now intends." *Lucas*, 505 U.S. at 1031, 112 S.Ct. 2886."
>
> *Palm Beach Isles Associates v. U.S., supra,* 208 F.3rd 1374, 1385 (Fed. Cir. 2000), citing *Lucas v. South Carolina Coastal Council, supra,* 505 U.S. 1003, 1031, 112 S.Ct. 2886, 2901-02 (1992).

In other words, the Government's rights in navigable waters within the several States, such as the OMS, are limited to "the control thereof for the purpose of navigation." *United States v. River Rouge Improvement Co.*, 269 U.S. 411, 419, 46 S.Ct. 144, 147 (1926); *U.S. v. 50 Foot Right of Way or Servitude In, Over and Across Certain Land In City of Bayonne, Hudson County, N. J., supra,* 337 F.2nd 956, 959 (3rd Cir. 1964). The defense has no application where the taking is not done for that purpose, and does not give the Government immunity to occupy or block navigable waters for other purposes.

In our case, the Government's assertion of the navigational servitude as a defense to the taking claim is entirely pretextual. The Government's invasion and occupation of the OMS was not done in the context of regulating or improving navigation, but rather for the purpose of allowing its agency, the USEPA, to exclusively occupy and hold the OMS as part of its Superfund project for the adjacent M&B site – in other words, to take property solely to prevent the potential spread of contaminants purportedly sitting on the sediment bottom, underneath the Government's sand cap and behind its log boom.[10] *The Government's Superfund project and taking have no navigational purpose whatsoever, and in fact forever ended navigation in the capped area of the OMS.*

There is a significant body of case law addressing this point that examines the nature of the taking and its purposes, and which requires just compensation unless the taking is actually (not pretextually) done within the context of the

---

[10] The USEPA's mission is not to regulate navigation, but rather, "to protect human health and the environment," according to its Region IX Project Manager. [Patton Dec., ¶ 3, Ex. 2.]

navigational servitude. Those cases demonstrate that the Government's defense cannot apply here, and just compensation is required.

In *United States v. 412.715 Acres of Land, Contra Costa County, Cal.*, 53 F.Supp. 143 (N.D. Cal.1943), the Government condemned land and waters to construct a naval fuel supply depot for the U.S. Navy, and urged that it was not required to provide compensation for the taking because of the navigational servitude.[11] But the District Court saw through the pretext and ordered compensation, where the taking, albeit for the Navy, was not done for navigational purposes, but so that the Government could exclusively occupy these waters and lands for a naval supply depot "to maintain a navy." 53 F.Supp. 148-49. While the Government has not built a supply depot surrounded by military fencing at the M&B Site or in the OMS, it has exclusively invaded and occupied the OMS just as completely as if it had done so. Its sand cap and log boom have sealed off the OMS to marine traffic just as assuredly had it erected a military fence across and around the OMS. It has now turned the OMS into its own disposal site, and deprived it of all maritime uses. Just as in *412.715 Acres of Land,* the Government's actions were not for navigational purposes, but to maintain a sand-capped disposal site (as opposed to a naval supply depot).

The installation of a pipeline over a bed of navigable water constitutes a physical deprivation of access rights, and in no way can be said to be in exercise of the navigational servitude. *See, e.g., U.S. v. 50 Foot Right of Way of Servitude In, Over and Across Certain Land in the City of Bayonne, Hudson County, supra, N.J.*, 337 F.2nd 956, 959-61 (3rd Cir. 1964); *see, also, Laney v. U.S., supra,* 661 F.2d 145, 149 (Ct.Cl. 1981). The Government's log boom is nothing more than the physical equivalent of a floating pipeline across the mouth of the OMS. So, too, the

---

[11] As a matter of perhaps some interest, this supply depot is situated on Suisun Bay, approximately 40 miles downstream of the Subject Property and the OMS.

construction of a permanent dike along land bordering a navigable waterway, has been held to constitute a compensable taking. *Goodwyn v. United States*, 32 Fed.Cl. 409, (1994).

The U.S. Supreme Court has held that invocation of the navigational servitude cannot be a pretext to avoid an otherwise compensable taking. In *United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 70 S.Ct. 955 (1950), the Government claimed that its construction of the Friant Dam across the San Joaquin River (well upstream of the Subject Property) as part of a reclamation and flood control project was in the control of navigation. The Court rejected this contention and required compensation, noting ". . . [T]his court has never permitted the Government to pervert its navigational servitude into a right to destroy riparian interests without reimbursement where no navigation purpose existed." 339 U.S. 737, 70 S.Ct. 961-62; *see, also, Kaiser Aetna v. United States, supra,* 444 U.S. 164, 172, 100 S.Ct. 383, 389 (1979) (navigational servitude is not a blanket exception to the Takings Clause of the 5th Amendment). The Government's erection of its sand cap and log boom in the OMS is the practical equivalent of a dam across the mouth of the Slough, at least for marine traffic seeking to access most of the Subject Property, and for the use of the foreshore of most of that property. *It forecloses any navigational use beyond the boom – the antithesis of navigation.*[12]

The Government has no material evidence that its improvements erected in the OMS serve any navigational purpose. Rather, they are simply an occupancy and taking of otherwise navigable waters, and the riparian rights of the adjoining

---

[12] State cases dealing with the sovereign's ability to invoke the navigational servitude also require that the taking have a purpose grounded in the control of navigation in order to avoid the Constitutional requirement of just compensation. *See, e.g., Crance v. State,* 128 N.Y.S.2nd 479 (1954); *Tamulion v. Michigan State Waterways Comm.*, 50 Mich.App. 60, 212 N.W.2nd 828 (1973); *In re Jamaica Bay in City of New York*, 256 N.Y. 382, 176 N.E. 539 (1931); *In re West 205th St. in City of New York*, 240 N.Y. 66, 147 N.E. 361 (1925).

owners (plaintiffs). Thus, the Government has no defense to the takings claim, and summary judgment is appropriate.

## VI. CONCLUSION

Plaintiffs have established that prior to the taking, they owned the Subject Property, and among the bundle of rights enjoyed by that property was complete riparian access and use of the OMS along the property's southern foreshore. [PF Nos. 1, 2, 8, 9.] These were valuable rights, and an important facet in plaintiffs' acquisition and development efforts for the property. These rights are protectable and compensable.

In 2006, the Government elected to deprive plaintiffs of their riparian rights in the Subject Property and to the OMS, by physically invading and occupying the OMS, on a permanent basis to meet the environmental purposes of the USEPA.[13] [PF Nos. 18-22.] That amounts to a compensable taking. But the Government has refused to provide compensation, necessitating this lawsuit. [PF No. 23.] The United States Constitution requires that the Government make just compensation to plaintiffs for its taking. And it cannot hide behind the navigational servitude to avoid such compensation where its remedial actions have nothing to do with navigation. [PF Nos. 24, 25.] Plaintiffs have met their burden of demonstrating, by undisputed material facts, that a compensable taking has occurred, and are entitled to interlocutory summary judgment pursuant to RCFC 56(c). *See, e.g., Tulare Lake Basin Water Storage District v. United States, supra,* 49 Fed.Cl. 313, 324 (2001)

---

[13] Again, the Government had other alternatives to the taking, such as partially or completely dredging the OMS to remove the contaminants, as opposed to burying them, foregoing the log boom, or moving the log boom further back in the channel so as not to take plaintiffs' riparian rights. Indeed, it could *still* reposition the boom to a point beyond plaintiffs' property line and accomplish the same environmental ends, while mitigating plaintiffs' loss. Having elected to take plaintiffs' property rights instead, it must afford just compensation.

(holding summary judgment appropriate to establish Government liability for compensable taking).[14]

It is respectfully submitted that plaintiffs' requested Order (attached to Notice of Motion) should be granted.

Dated: April 11, 2008

Respectfully Submitted,

SHAPIRO BUCHMAN PROVINE & PATTON, LLP

By: ______________________________
John H. Patton
Attorneys for Plaintiffs CRV Enterprises, Inc. and C. Ryan Voorhees

207536.1

[14] Plaintiffs have also met their burden under California state law for liability under a claim of inverse condemnation: 1) they own an interest in property; 2) participation by the sovereign in the planning, approval, construction, or operation of a public improvement; 3) damage to the property; and 4) that the public improvement was a substantial cause of the damage to the property. *See, e.g., Yamagiwa v. City of Half Moon Bay*, 523 F.Supp.2nd 1036, 1088 (N.D. Cal. 2007).