IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---oOo---

CRV ENTERPRISES, INC., )
)
Plaintiff, )
)
vs. ) Case No. 06-6607L
) Judge: George W. Miller
THE UNITED STATES OF )
AMERICA, )
)
Defendant. )
_______________________________

---oOo---

DEPOSITION OF MARIE N. LACEY

Tuesday, October 23, 2007

---oOo---

REPORTED BY: LAURA A. REDING, CSR NO. 9711

EXHIBIT
tabbies
1

00015

been at the EPA, if you can give me an approximate number?

A. It's difficult to say. Some projects are very large projects. Sometimes there are several -- initially I started working on several smaller sites. It's difficult to give a total.

Q. Would it be fair to say you've been involved with at least more than 20 projects? Can you say that?

A. In one degree or another, yes.

Q. When did you first have anything to do with the McCormick & Baxter project? Can I call it a project?

A. Yes.

Q. When were you -- did you first have any involvement with that?

A. I started working on the McCormick & Baxter site after it was listed on the National Priorities List in 1992.

Q. And who creates the National Priorities List?

A. The National Priorities List is created by EPA headquarters.

Q. Going back to your work as a remedial project manager, would you just describe for me what your basic duties are?

A. My duties as the remedial project manager are to provide overall management of the clean-up of superfund sites.

Q. And I would imagine with a project such as the

Q. We're going to look at some of those and I'll ask you whether you were involved in that particular publication.
Okay. Once the McCormick & Baxter site got onto the National Priorities List, how did that get assigned to you as a remedial project manager?
A. I asked for an assignment and that was the one that was available at the time.
Q. I assume there are other remedial project managers at Region IX in San Francisco besides yourself. Is that true?
A. Yes.
Q. This is going to be somewhat of a general question, but could you tell me just generally what you did when you were initially assigned the McCormick & Baxter project?
A. The first thing I did was to review the package of information that was put together to list the site on the National Priorities List.
Q. And could you just describe for me what that information was?
A. My recollection of that material is that it was a review of available data on the contamination at the site.
Q. Had somebody done a study or some kind of analysis of the site from the EPA in order for this site to get onto the National Priorities List?
A. Yes.

00018

Q. At the time you started working on the site, McCormick & Baxter was no longer operating a creosote plant there, correct?

A. They had shut down operations.

Q. And did they shut down operations sometime around 1991? Isn't that right? Do you know?

A. It may have been 1990, 1991. I'm not sure of the exact year. Around that time.

Q. I'm going to mark a publication that came off the EPA web site as -- this will be Exhibit 1.

(Marked Plaintiff's Exhibit No. 1)

I don't know whether you visit the EPA web site from time to time since you work there, but do you recognize this as being information that came from the EPA's web site?

A. I'm not familiar with this.

Q. I'd just like you to look at the -- up at the top where it has a paragraph that's entitled "Our Mission." And it says, "The mission of the Environmental Protection Agency is to protect human health and the environment." Is that consistent with your understanding as to what the mission is of the EPA?

A. I would say that's consistent with my understanding of the mission.

Q. Who do you report to at the EPA? Who is your supervisor?

00023

Stockton.

Q. And is that so that they have room to turn, those large vessels?

A. That's correct.

Q. Now, in your visits to the site, have you seen vessels in the Old Mormon Slough?

A. Yes, I have.

Q. Have you seen any vessels down at the east end of the slough in that area near the cold -- I think you called it cold storage.

A. Stockton Cold Storage.

Q. Have you seen vessels down in that area?

A. Yes, I have.

Q. I'm going to show you just a slightly different photograph of the site. That will be Exhibit 4.

(Marked Plaintiff's Exhibit No. 4)

Can you identify Exhibit 4 as a slightly closer-in photograph of the McCormick & Baxter remediation site?

A. That's what it appears to be, yes.

Q. You're aware that my client is a company called CRV Enterprises, right?

A. Yes, I am.

Q. Do you know where their property is -- can you tell us where that property is located on Exhibit 4?

A. My understanding of the boundary of that property is

00025

potential uses of the property.

Q. What do you remember discussing with him about potential uses of the property?

A. I explained to him that there -- I explained to him the type of clean-up that we proposed to do at the McCormick & Baxter site, the fact that contamination would be left in place on portions of the site and that would limit some future uses of the site.

Q. You said contamination -- some contamination would be left at the site?

A. That's correct.

Q. In what areas were you talking about? Can you describe that on Exhibit 4, where the contamination would be?

A. The entire surface of the site is contaminated. Surface soil is contaminated. The proposed remedy or the selected remedy for the soil is to excavate roughly the eastern half of the site surface soil, move it to the western half of the site, and cap that area.

Q. Can I stop you right there? I want to ask you about that. The site you're talking about is the McCormick & Baxter site to the south side of the slough where the soil is going to be moved?

A. That is correct.

Q. And I don't know whether I interrupted you on what you were -- you said there was going to be contamination left

00026

at the site. Are there any other areas where contamination
was going to be left at the site?
A. Contamination is left in place in the slough and it
has been capped over. That remedy has been completed. There
is also contaminated groundwater at the site that has not
been re mediated yet.
Q. And where is that groundwater located?
A. Groundwater, the source, main source of groundwater
is in the central part of the site.
Q. So that would be on the south side of the slough?
A. That's correct.
Q. But you said there is some contamination left in the
slough that has been capped over; is that correct?
A. That's correct.
Q. And is that the entire area of the slough that we
can see on Exhibit 4?
A. No. The area of capping ends at approximately a
point here (indicating).
Q. And you're pointing to the --
A. There's a notched area.
Q. The notched area on the left of the photograph on
Exhibit 4 where CRV's property is?
A. Yes. The cap ends approximately there.
Q. Is there contamination in the area that is towards
the Stockton channel that has been left as well that is not

00033

Q. I'm going to call that the CRV property. Okay?
A. (Witness nods head.)
MR. SHAPIRO: Just the property to the south of Weber?
MR. PATTON: Just to the south. We all know that he owns the property to the north as well. Or it, not he.
Q. Let me show you something else that came from the EPA web site. This one is entitled "Site Description" for superfund site for McCormick & Baxter Creosoting. This will be Exhibit 8.
(Marked Plaintiff's Exhibit No. 8)
Do you recognize Exhibit 8?
A. I don't recognize it in this format.
Q. Did you have anything to do with preparing the site description, the text that we see for this site description that is Exhibit 8?
A. No, I didn't.
Q. Do you know who prepared this?
A. I believe it was prepared by EPA headquarters.
Q. And where would they get the information to prepare this, or where did they get the information to prepare this site description?
A. I believe their source -- I don't know what time this was prepared, so I'm not certain what documents were available at that time. But they would have looked at site

00038

MR. PATTON: Q. And again, my question is your understanding.

A. My understanding of the risk from the contaminated sediment is that it can be harmful to humans who came in contact with the sediment. It can also accumulate -- the contamination can accumulate in fish, either causing ecological impacts to the fish or causing risks to humans who eat fish that are contaminated.

Q. Sediment is at the bottom of the slough, right, under water?

A. That is correct.

Q. So in the case of the Mormon Slough, for humans to come into contact with that, they would have to be swimming in the slough, right?

A. They could also come in contact with it if they were dropping an anchor in the slough and pulling it up, if they were fishing for crawdads with cages, pulling those up from the bottom.

Q. I assume that the EPA made an effort to determine the level or concentration of the contaminants in the slough.

A. Yes, we did.

Q. Is there some -- what I'm trying to get from you is was there a determination made as to the threat of human contact with these contaminants as the level of the threat in terms of the concentration of these contaminants?

00039

MR. SHAPIRO: I'll object to the question as vague.

MR. PATTON: Q. Did the EPA ever quantify just how much the potential threat was to humans coming into contact with these contaminants in the slough?

MR. SHAPIRO: I'll raise the same objection.

MR. PATTON: Q. Okay. I'd like an answer.

A. My understanding is that we did not do a quantitative estimate of risk from direct contact with sediment. We evaluated risk from humans consuming contaminated fish.

Q. And with regard to that evaluation, can you tell me what risk the EPA determined with regard to humans consuming fish that were in the slough?

A. I don't recall the exact risk numbers.

Q. Do you believe, for instance, we would find that in the Record of Determination?

A. It would be summarized there. And the details would be in the risk assessment, the Human Health Risk Assessment Report.

Q. I know you won't be able to tell me the quantity, but if you were to look at the Human Health Risk Assessment Report, would we be able to get an idea as to how much fish a human would have to eat that came out of the slough in order to have some kind of a risk of a health problem? Would we be able to find that out?

00040

A. That's included in the report.

Q. Have you seen anybody fishing in the slough?

A. Yes, I have.

Q. Did you talk to them about it?

A. Yes, I have.

Q. And did you warn them not to eat the fish from the slough?

A. Yes.

Q. I'm going to read to you another segment from Exhibit 8. Some of this stuff is just -- I want to confirm it's accurate so that I have some of the basic facts and we can easily establish them. This is towards the middle, a little bit below the middle of the page. It says, "The slough is approximately 2,500 feet long and 180 feet wide." Are you following me?

A. Yes. I have it.

Q. Can I ask you is that consistent with your understanding of the dimensions of the slough?

A. I would have to check those figures.

Q. As you sit here right now, do you have any reason to think that those are inaccurate?

A. No, I don't.

Q. And then it goes on to say, "Most of the slough is approximately ten feet deep, although the western portion near the mouth has historically been dredged for barge

00041

access." Do you believe that's an accurate statement?

A. I'm not certain if this is the -- if ten feet is an average. I would have to look at the reports to be able to say whether ten feet was an accurate average depth.

Q. Do you have a memory of a different average depth of the slough?

A. No, I don't.

Q. And what about the statement that the western portion near the mouth of the slough has historically been dredged for barge access, do you believe that's accurate?

A. We have copies of reports, permits issued by the Corps of Engineers for dredging in that area.

Q. So you believe that's an accurate statement?

A. Yes.

Q. And then it goes on to say, "The slough is tidally influenced, with a maximum tidal range of approximately three feet." Do you believe that is an accurate statement?

A. To the best of my knowledge, yes.

Q. And then it goes on to say, "Stockton channel, the Port of Stockton turning basin and the entrance to the slough are areas of net sediment deposition." Do you know what that means, being an area of net sediment deposition?

A. Net sediment deposition means that over time there is more sediment deposited in Old Mormon Slough than is washed away.

00042

Q. So sediment is accumulating in those areas?

A. That's what the sentence says, yes.

Q. And then it goes on to say that those areas are periodically dredged to maintain depths appropriate for ship traffic. Do you believe that is a true statement?

A. Yes. The Port of Stockton does maintenance dredging.

Q. Now I want to go down a little bit farther and I'm going to take you to a statement where it says, "Sediment contamination related to the M&B site appears to be limited to the slough, which is located directly adjacent to the McCormick & Baxter Creosoting Company facility." Is that consistent with your understanding of the site?

A. Yes, it is.

Q. So let me ask you this: Did the EPA also do some sampling outside of the slough to determine whether contamination was getting from the slough into the turning basin?

A. Yes. We did sampling outside of the slough, both for that purpose and also to establish reference concentrations in the area.

Q. And what did you determine by doing that sampling in that regard?

A. By having reference concentrations, we could determine how much higher contamination in the slough was

00043

compared to other areas.
Q. And can you tell me what -- how much higher the contamination was in the slough as opposed to the area of the turning basin where you did sampling?
A. I can't recall that information, no.
Q. Can you just tell me in a general sense? I don't want you to -- I don't know whether you can quantify it or not, but was the level of contamination that was sampled in the turning basin less than the level of contamination in the slough?
A. Yes.
Q. And was there a significant difference?
MR. SHAPIRO: I'll object as vague.
MR. PATTON: Q. In your mind, was the difference significant?
MR. SHAPIRO: Same objection.
THE WITNESS: It was enough for us to clean up Old Mormon Slough but not clean up areas outside of there.
MR. PATTON: Well put.
Q. Then it goes on -- Exhibit 8 goes on to say, "The primary COCs --" COC stands for chemical of concern?
A. Yes.
Q. "The primary COCs identified in sediments are PAHs and dioxin." And those are the two types of contaminants you described for me I think earlier --

00044

A. Yes.

Q. -- that were found in the slough. Okay.

Skipping down to the next -- skipping down a couple of sentences, it says, "Total PAH concentrations in the slough decrease with increasing depth in the western half of the slough." Is that consistent with your understanding of the situation at the site?

A. Yes, it is.

Q. And it goes on to say, that sentence, "and increase with increasing depth in the eastern half of the slough." Is that consistent with your understanding?

A. To the best of my knowledge, yes.

Q. So to put it even more simply, would it be fair to say that there is more contamination in the eastern part of the slough than there is in the western part near the mouth?

A. In terms of volume, I couldn't say that. It's referred to depth of contamination.

Q. I see. So the depth -- contamination goes deeper in the eastern part of the slough than it does in the western part of the slough?

A. Yes. I believe that's correct.

Q. Okay. I misunderstood that sentence.

Then going down a little further, there's a sentence that says, "EPA divided the slough into four subareas based on the types and depths of contamination found at different

00045

parts of the M&B site." Is that a true statement?

A. Yes.

Q. Why did the EPA do that?

A. This allowed us to conduct or to use different types of -- different numbers and spatial locations of samples based on the potential sources in each of these subareas.

Q. Was any sampling done on the CRV property?

MR. SHAPIRO: I'll object. I'm not exactly sure what you mean by CRV property.

MR. PATTON: I'll do this again.

Q. I'm going to show you --

MR. SHAPIRO: You mean north of the slough?

MR. PATTON: Yeah. Was this Exhibit 7?

MR. SHAPIRO: Yes.

MR. PATTON: Q. Take a look at Exhibit 7. And remember we went through this exercise where I asked you to look at the property with the arrow that says "Subject" pointing in and then we -- I was going to call that the CRV property.

A. (Witness nods head.)

Q. That's the property I'm talking about. Was there any property done -- I'm sorry. Was there any sampling done for contamination on the CRV property?

A. By EPA?

Q. Yes.

00046

A. Yes.

Q. And did you determine -- what did you determine from that sampling?

A. What we were looking for was whether there was any subsurface contamination from groundwater reaching -- coming under the slough and reaching the CRV property.

Q. And what did you determine?

A. We did not find any evidence of contamination from the McCormick & Baxter property there.

Q. Did the EPA make McCormick & Baxter take any measures to either prevent or clean up contamination? Do you know whether they ever did that?

A. McCormick & Baxter was out of business by the time EPA took over the site.

Q. Was the EPA involved in shutting down McCormick & Baxter?

A. No, we were not.

Q. So do you know whether anybody -- before McCormick & Baxter went out of business whether anybody made them take measures to either reduce or alleviate the contamination?

A. Yes. The State of California did.

Q. What did they have -- what did the State of California do in that regard?

A. The State of California had McCormick & Baxter conduct investigations to determine the extent of

00053

contamination found at the Newark-Sierra Paper Corporation site that was attributed to the McCormick & Baxter operation?

A. I don't believe that contamination reached that far.

Q. And we see also that there was a well established on the north side of the Mormon Slough. Do you see that?

A. Yes.

Q. Do you recall whether that indicated that there was any groundwater contamination at that location?

A. I don't believe we found any contamination in that well, but I would have to check the reports to confirm that.

Q. I'm going to show you Exhibit 12, which is an excerpt from a document that has the date of July 1998 and it's written "Public Comment Draft" on it.

(Marked Plaintiff's Exhibit No. 12)

This is not the entire document. It's got a date of July 22, 1998. It's basically a chapter from that, 4.3 to be exact.

Do you know what -- just looking at Exhibit 12, can you tell me what this appears to be?

A. This appears to be from the feasibility study report that was prepared for the surface water operable unit.

Q. And what was the function of the feasibility report? Can I call it just that, the feasibility report?

A. Yes.

Q. What was the function of that document?

00059
Corps of Engineers.
Q. Do you recall who that was?
A. Montgomery Watson Harza was the main contractor.
Q. And how did they physically do that, put the sand cap down?
A. They brought the sand material in by barge from another location and they used a clamshell to pick up sand, place it on the surface of the water, and it settled in on the bottom.
Q. Clamshell, is that like a --
A. Similar to a bucket for picking up objects.
Q. And it's on a crane?
A. It's on a crane, yes.
Q. Now, that alternative doesn't remove the contaminants from the site, right?
A. That's correct.
Q. I guess the -- well, you tell me. Is the concept that the contaminants will not spread via the water if the sand is on top of them? Is that the concept?
A. The concept is that the sand cap isolates the contamination so it can't migrate anymore.
Q. Has there been any study as to how long it will take before -- let me start over with the question. Has there been any kind of study or evaluation as to how long it will take from the installation of the sand cap before the risk

00065

the way out to the notched area, it would be out there?

A. I believe that's correct.

Q. Now, SD-3 was not selected by the EPA as the remediation for the sediment, right?

A. No, it was not.

Q. Do you know how the -- was there any further effort to determine where the log boom would be under this alternative beyond what we see on Exhibit 13?

A. I can't say that based on this figure. I'd have to look at the text of the report to determine that.

Q. Do you know whether there was any further work done to analyze where the capping would go under alternative SD-3 beyond what we see on Exhibit 13?

A. I don't know that.

Q. I want to talk about alternative SD-2 a little bit more. So we're going back a little bit. I'm going to show you what will be marked Exhibit 14.

(Marked Plaintiff's Exhibit No. 14)

Do you recognize Exhibit 14 as the figure that depicts alternative SD-2, in situ capping?

A. That appears to be a page from the feasibility study, yes.

Q. But this page depicts alternative SD-2, right?

A. Yes.

Q. In fact, this is the repair that was selected by the

00066

EPA and, in fact, has been put into place at the site?
A. That's correct.
Q. And in this configuration, the log boom is right at the notch at the CRV property, correct?
A. Yes.
Q. And what is the function of the log boom?
A. The function of the log boom is to protect the cap once it's in place by keeping out boat traffic.
Q. And with regard to Dutra and its business, that was something that Dutra was concerned about, wasn't it, the log boom?
A. Dutra contacted me after the Record of Decision was signed for this remedy asking for information about the remedy.
Q. Was there any consideration given by the EPA -- during the selection process of the remedy for the sediment, was there any consideration given to the fact that the installation of the log boom might impact the business of the owners of the property on the slough?
A. We didn't have that information when we were selecting the remedy.
Q. So you're saying there was no consideration given on that?
A. We weren't aware that -- no, we did not give consideration to it. We were not aware that it was a

00066

EPA and, in fact, has been put into place at the site?

A. That's correct.

Q. And in this configuration, the log boom is right at the notch at the CRV property, correct?

A. Yes.

Q. And what is the function of the log boom?

A. The function of the log boom is to protect the cap once it's in place by keeping out boat traffic.

Q. And with regard to Dutra and its business, that was something that Dutra was concerned about, wasn't it, the log boom?

A. Dutra contacted me after the Record of Decision was signed for this remedy asking for information about the remedy.

Q. Was there any consideration given by the EPA -- during the selection process of the remedy for the sediment, was there any consideration given to the fact that the installation of the log boom might impact the business of the owners of the property on the slough?

A. We didn't have that information when we were selecting the remedy.

Q. So you're saying there was no consideration given on that?

A. We weren't aware that -- no, we did not give consideration to it. We were not aware that it was a

00067

potential problem. We hadn't been contacted by anyone.
Q. Didn't you know that there were vessels that were using the slough?
A. Yes. That's correct. We did see vessels there.
Q. And you saw barges in there, didn't you, in the slough, before you --
A. Saw barges, yes.
Q. Did you make any inquiry of anybody as to whether there was any business use of the slough?
A. No, we did not.
Q. And just so I understand it, the concern that the EPA had about boat traffic in the slough was that that boat traffic might disturb the cap?
A. That's correct.
Q. Were any studies done as to the potential impact of boat traffic on the cap?
A. There were no specific studies done that I'm aware of when the -- during the remedy selection process. When we were contacted by Dutra, we did consider I believe in the report that we prepared what impacts may occur from boat traffic.
Q. What kind of study was done in that regard?
A. It was an evaluation of dredging alternative that Dutra asked us to do.
Q. Was there any study, though, done as to the impact

00068

of boat traffic without dredging?
A. Not separate from that report that I'm aware of.
Q. So as far as you know, there's not been any studies done as to the potential impact of boat traffic on the cap over the sediment in the slough?
A. The only one I'm aware of that -- only one I recall is it may have been a component of the evaluation of the dredging alternative for Dutra.
Q. And do you know what was done to analyze the impact, if anything?
A. I believe we asked Dutra to provide some information on the type of vessels that they might be bringing into the area.
Q. And what did Dutra tell you in that regard?
A. I'd have to look at the report to be able to answer that.
MR. PATTON: Why don't we take a lunch break.
(Whereupon a lunch recess was taken.)
MR. PATTON: Back on the record.
Q. I'd like to have you look at Exhibits 12 and 13 together. And we're back on alternative SD-2. No, we're not. I'm sorry. I gave you the wrong exhibits. I want you to look at Exhibits 14 and 12 because I want to talk about alternative SD-2.
And if you turn to the second page of Exhibit 12,

00092

those stations are, can't we? That's page 2.12.

A. Yes. Those three locations are either near the CPA or the end of the slough.

Q. Right. And based on your understanding of where the CRV property is, isn't the CRV property to the west of all of those locations?

A. The CRV property is to the west of those three locations you mentioned.

Q. Let's look at something different now. You can put Exhibit 17 back together if you would for me.

Let me mark now a table that came from the document we talked about, what we called the -- I called the public comment draft. And it was dated July 22, 1998. This will be Exhibit 18.

(Marked Plaintiff's Exhibit No. 18)

Is Exhibit 18 a comparison of the various alternatives for remedying the contamination in the sediment at the Mormon Slough that was considered by the EPA?

A. This appears to be the comparison table from the feasibility study.

Q. Who prepared this comparison table; do you know?

A. This appears to be part of the feasibility study, so it would have been prepared by Battelle.

Q. Pacific Northwest?

A. Pacific Northwest.

00093

Q. I take it you didn't have any role in preparing this table.

A. I didn't prepare it. I would have reviewed it but not prepared it.

Q. Did you review the entire feasibility study before it was released to the public?

A. Yes, I did.

Q. Did you make comments on it or suggest changes to the document?

A. I believe I did, yes.

Q. Does this table reflect the nine different criteria that you testified about earlier?

A. It shows seven of the criteria. The other criteria that are missing relate to getting input from the community and from the state agencies on the proposed remedy.

Q. But the seven criteria that are listed are seven out of the nine?

A. They are part of the nine.

Q. So if we look over to the far right in the cost column, this was the estimated cost of each of the various alternatives?

A. At the time this document was prepared, yes.

Q. Right. As of July 22, 1998, correct?

A. Yes.

Q. Which leads me to the question -- let's talk about

00094

alternative SD-2, the in situ capping. It was estimated it was going to cost -- I have trouble reading it. Is it 1.21 million to 2.37 million?

A. That's what it looks like on this copy.

Q. What did it turn out that the cost actually came out to be to do that?

A. I believe the total cost was approximately $5 million.

Q. Five million?

A. In that range.

Q. And, in part, I take it that was because the project didn't get done until 2006. Right?

A. It was due to cost increases due to the delays but also because we added a component for bank stabilization.

Q. And where was that bank stabilization work done?

A. The bank stabilization was done on the McCormick & Baxter shoreline.

Q. Was any of it done on the CRV property?

A. No.

Q. And I don't think I've actually determined this. When was the physical work for the project completed?

A. The construction of the cap was completed I believe it was October of 2006.

Q. And when was the bank stabilization work? Was that done before the cap was put in?

00095

A. That was done in 2002.

Q. And when was the log boom installed?

A. The log boom was installed I believe it was July of 2006.

Q. So that went in before the cap went in?

A. That went -- I'm sorry. I was thinking of the silt curtain.

Q. I'm sorry. Okay. I was going to ask you how they did it, but --

A. Yes. The silt curtain went in before the construction started. The log boom went in at the time construction of the cap was completed.

Q. So it would have gone in right after -- sometime in October or November of 2006?

A. I believe, yes, that was the time frame.

MR. PATTON: Okay. Thank you.

MR. SHAPIRO: If you're moving on to a new document, maybe we could take a five-minute break.

MR. PATTON: Sure. I am.

(Whereupon a short recess was taken.)

MR. PATTON: Back on the record.

I'm going to have a fact sheet dated September 1998 for the McCormick & Baxter superfund site marked as our next exhibit.

(Marked Plaintiff's Exhibit No. 19)

00100

of the sediment in the Mormon Slough?

A. I'd have to compare it with the feasibility study, but I assume that that's where these came from.

Q. And at least in this publication that is Exhibit 19, one of those was to reduce potential risk from the consumption of fish that came from the site?

A. Consumption of fish contaminated with site related chemicals.

Q. And another goal was to prevent exposure of humans and aquatic organisms to contaminated sediments, correct?

A. That's correct.

Q. And I think you talked about that. That was from pulling something up from the bottom of the slough, like an anchor, or from anybody that was swimming that came into contact or from -- examples like that, right?

A. That's correct. That was for direct contact.

Q. Then the last goal is allow restoration of the beneficial uses of surface water in the area of the site for fish and shellfish harvesting and protection of aquatic life and wildlife. Has the EPA, to your knowledge, come up with any kind of timetable for when fish or shellfish harvesting could be restored as a use for the Mormon Slough?

A. No, we haven't.

Q. Now would you turn to page 11. Is this a list of the nine criteria that you testified about earlier that are

00103

Q. And they were consultants for Union Pacific Railroad?

A. That's correct.

Q. And they were providing you their comments on the proposed remediation plan?

A. That's correct.

Q. Now, this was prior to the -- what's it called? -- the Record of Determination?

A. Record of Decision.

Q. Is this prior to the Record of Decision on this?

A. In between the proposed plan and the Record of Decision there's a public comment period. This was submitted by CH2MHill during that time.

Q. Were any revisions made to the proposed remediation as a result of the comments received from CH2MHill?

A. I don't recall any changes to the remedy being made based on these comments. We did respond to the comments as part of the Record of Decision, response to the summary, where our responses to this letter are included.

Q. I'm going to show you another fact sheet from EPA on the McCormick & Baxter superfund site. This is dated July 1999. And this will be Exhibit 21.

(Marked Plaintiff's Exhibit No. 21)

Do you recognize Exhibit 21?

A. Yes. It's a fact sheet for the McCormick & Baxter

00104

site.

Q. And were you also involved in preparing this fact sheet?

A. Yes, I was.

Q. And was this also you and Vicki Seemones?

A. I don't know for certain who the community involvement coordinator was that I worked with on this one.

Q. What does the community involvement coordinator do?

A. The community involvement coordinator acts as our liaison to community members near the site.

Q. Do you know whether the community involvement coordinator had dealings with either Dutra or CRV?

A. I'm not aware of any.

Q. Underneath Figure 1 it says, "After reviewing public comments, EPA signed a Record of Decision on March 31, 1999 to select the remedy for the site." Is that consistent with your recollection as to when the Record of Decision was finalized and issued?

A. Yes, it is.

Q. On the second page of Exhibit 21, on the left-hand column at the bottom, it says, "Land use restrictions that prohibit interference with the selected remedies." Do you know whether any land use restrictions have been issued with regard to the McCormick & Baxter project?

A. No final land use restrictions have been issued.

00108

part of the response to Dutra's request for dredging. Take a look at Exhibit 23 and see if you see anything that indicates there was some kind of analysis done of the impact of vessels or the potential impact of vessels on the sand cap.

MR. SHAPIRO: I thought she testified that that analysis would be in the feasibility study. I don't recall her saying it would be in a letter to Dutra. To the extent that mischaracterizes her previous testimony, then I'll --

MR. PATTON: I'll just shorten the question.

THE WITNESS: My response before referred to the analysis of the dredging alternative specific to the request from Dutra.

MR. PATTON: Q. Let me just ask you this: Do you see anything in Exhibit 23 that indicates that the EPA made an analysis as to the potential impact of vessels on the sand cap for the Mormon Slough?

A. Well, it refers to a response of November 30th, 2000. I don't know what's in that response. So it's referring to a response. I don't know if that response included information about the impact of vessels on the cap.

Q. My question is do you see anything in Exhibit 23 that tells you the EPA did an analysis of the potential impact of vessels on the sand cap?

A. I don't see a statement like that in this.

Q. And you're not aware of any such analysis, are you?

00109
A. I don't recall any specific analysis.
Q. And in your letter, Exhibit 23, you were pointing out to Mr. Smith that the partial dredging of the slough would result in a cost of more than 11 times the cost of just capping the slough?
A. That's what's stated in this letter.
Q. How did you determine that?
A. That would have been determined in the feasibility study for the dredging alternative that was done for Dutra.
Q. Was there actually a feasibility study done as to a partial dredging of the slough?
A. There was an analysis, a separate analysis done at the request of Dutra for that alternative.
Q. And that was done in the feasibility study?
A. That was done after the feasibility study. That was done after Dutra approached us with their concerns about the remedy and they requested that we do an evaluation of sediment, a modified dredging alternative, which we did.
Q. So was there a written document prepared --
A. Yes, there was.
Q. -- that made that analysis? Okay. I just have missed it I guess. I'll look for it.
Now, you're writing the letter to a fellow named Ken Smith. Who was he?
A. I don't know his title at Dutra, but he was

00114

was.

Q. Wasn't the main reason that Dutra's request for dredging was turned down was because of the cost?

A. I can't answer that. I don't have the answer to that.

Q. You don't know?

A. I don't have the -- no, I don't know that.

Q. How did you know when you wrote this letter that the long-term integrity of the cap would be compromised if the configuration of the log boom was altered?

A. Because if we change the configuration of the log boom, it would expose some of the capped area to being disturbed by vessels.

Q. How do you know the vessels would disturb the sand cap in that area?

A. If no vessels came in, there would be no disturbance of the cap. We're operating on the assumption, based on what we were told, that there would be vessels coming into that area.

Q. How did you know if vessels came in that they would, in fact, disturb the cap?

A. I'd have to review that report to be able to answer that, to see if it was addressed there.

Q. What report?

A. The evaluation of the sediment, modified sediment

00115

dredging alternative.

Q. You'd have to look at that to see if it even addressed whether vessels would disturb the cap, right?

A. Yes, I would.

Q. You copied your letter to a fellow named Thanne Cox.

A. That's a woman. That's an attorney at EPA.

Q. I'm sorry. Why did you copy her?

A. I believe she was the attorney for the site at that time.

Q. Why did you feel that you needed to copy an attorney for the site?

A. Because our attorneys had been involved in discussions with Dutra and in meetings with Dutra.

Q. So what was Ms. -- was Ms. Cox one of the attorneys who met and had discussions with Dutra?

A. Yes, I believe she was.

Q. What other attorneys met and had discussions with Dutra?

A. I don't recall offhand. I'd have to look at the attendance list for the meetings we had.

Q. Do you know whether Ms. Williams had met and had discussions with Dutra about this project?

A. Yes. She was involved in the meeting we had.

Q. And is this the meeting you were referring to where Mr. Smith was there?

00122

(Marked Plaintiff's Exhibit No. 27)

Q. Could you identify Exhibit 27 for us?

A. This is an Explanation of Significant Differences. This is changes to the record of -- since we've issued the Record of Decision.

Q. Were you involved in preparing Exhibit 27, this explanation?

A. Yes, I was.

Q. And is the purpose of this explanation essentially to deal with the fact that the EPA was doing bank remediation in connection with this project?

A. That's one of the purposes of it.

Q. Bank stabilization I guess they call it. And the second purpose was to discuss the need to relocate Mr. Miller?

A. That's correct.

MR. PATTON: All right. Let's take a break.

(Whereupon a short recess was taken.)

MR. PATTON: Back on the record.

I'm going to show you another fact sheet for this project. This will be Exhibit 28.

(Marked Plaintiff's Exhibit No. 28)

Q. Can you identify Exhibit 28 as a fact sheet issued by the EPA on the McCormick & Baxter superfund site in February of 2006?

00123

A. Yes, it appears to be that fact sheet.

Q. And were you the community involvement coordinator responsible for preparing this fact sheet?

A. Yes, we were.

Q. I'm going to show you next a document that came from the EPA's web site. And it's entitled "Superfund" and it concerns the McCormick & Baxter Creosoting Company. Let's get it marked and then I'll ask you about what it is.

(Marked Plaintiff's Exhibit No. 29)

First question is have you seen Exhibit 29 before, not necessarily in printed out form but on the EPA's web site?

A. No, I haven't seen this part of the web site.

Q. Looking it over, does this appear to be a listing of the actions that the EPA has taken with regard to the McCormick & Baxter site?

A. It appears to be.

Q. There's a document entitled "Consent Decree" on the first page that indicates a start date of September 28, 2006 and an end date of March 12, 2007. Do you know who the subject of that consent decree was?

A. Union Pacific.

Q. And was that concerning work that was going to be done at -- the Union Pacific site remediation work?

A. Union Pacific is going to be doing the entirety of

00126

Q. In fact, there's a pile detail with a red dot in it. Is that basically a representation of where the pile was supposed to be installed?

A. That's correct.

Q. And then the CRV property is just to the right or to the north of that pile detail, the red dot?

A. There's a dashed line identified as property line here.

Q. And so the log boom is attached to a pile that is located in the position of the red dot?

A. Yes.

Q. Is there a pile also on the other side of the slough to which the boom is attached?

A. Yes, there is.

(Marked Plaintiff's Exhibit No. 32)

Q. Do you recognize Exhibit 32 as being a photograph depicting the Mormon Slough and the log boom that was installed by the EPA in late 2006?

A. That's what this appears to be, yes.

Q. And that in the foreground, is that the piles that we were just discussing with regard to Exhibit 31?

A. Yes, it is.

Q. And the function of the log boom is to prevent watercraft from getting into the slough, correct?

A. That's correct.

00127

<u>Q. And how does that physically work?</u>

<u>A. It's a physical barrier that would damage most boats that tried to get in there. There is also signs on the pilings to indicate the log boom into -- warning traffic to keep out. I don't remember the exact wording, but it identifies the purpose of the log boom.</u>

<u>Q. And we can see the signs on the piling. They're white squares.</u>

<u>A. Yes.</u>

Q. And looking across the slough, we're actually looking at the McCormick & Baxter site, aren't we?

A. That actually is the Penny-Newman Grain Company. The building is --

Q. The building is --

A. -- not a McCormick & Baxter building.

Q. Is the McCormick & Baxter site to the left where we see the car in the very left-hand portion of the photograph?

A. No. That's still the Penny-Newman Grain Company.

Q. And looking across towards the right-hand corner of the page, we can see the pile that the other end of the log boom is attached to, right?

A. Yes.

Q. Does the log boom have any other function other than to keep vessels out of the Mormon Slough?

A. No, it doesn't.

00127

Q. And how does that physically work?

A. It's a physical barrier that would damage most boats that tried to get in there. There is also signs on the pilings to indicate the log boom into -- warning traffic to keep out. I don't remember the exact wording, but it identifies the purpose of the log boom.

Q. And we can see the signs on the piling. They're white squares.

A. Yes.

Q. And looking across the slough, we're actually looking at the McCormick & Baxter site, aren't we?

A. That actually is the Penny-Newman Grain Company. The building is --

Q. The building is --

A. -- not a McCormick & Baxter building.

Q. Is the McCormick & Baxter site to the left where we see the car in the very left-hand portion of the photograph?

A. No. That's still the Penny-Newman Grain Company.

Q. And looking across towards the right-hand corner of the page, we can see the pile that the other end of the log boom is attached to, right?

A. Yes.

Q. Does the log boom have any other function other than to keep vessels out of the Mormon Slough?

A. No, it doesn't.

00128

MR. PATTON: Let me just look at my notes. I think I'm just about done.

MR. SHAPIRO: Do you want to go off the record and take a couple minutes?

MR. PATTON: Yeah, why don't we do that. Take two or three minutes.

MR. SHAPIRO: Sure. Take your time.

MR. PATTON: Thanks.

(Whereupon a short recess was taken.)

MR. PATTON: Back on the record.

Q. At present are there any -- has there been any analysis -- an analysis done or are there any plans as to when the log boom will be removed from the Mormon Slough?

A. There are no plans to remove the log boom as long as the cap needs to be protected.

Q. But you qualified that when you said as long as the cap needs to be protected. Has there been any analysis or are there any plans for when the cap no longer needs to be protected?

A. No.

Q. So you can't tell me when the log boom, if ever, will be removed?

A. No, I can't.

Q. Do you think anybody in the EPA can tell me that?

A. No, I don't think so.