EXH. 1 DATE 10/23/07
WITNESS Lacey
LAURA A. REDING, CSR # 9711



- Our Mission
- Who We Are
- What We Do
- How We Are Organized
- Our Budget and Performance
- Contracting Opportunities
- Our History
- Visitors Guide

EPA is the first major federal agency to purchase green power equal to 100 percent of its estimated annual electricity use nationwide. Learn more about EPA's green power purchases.

**Highlights**

Employee Directory

Map of EPA Regional Offices

Frequent Questions

Terms of Environment

The Guardian: The Origins of EPA

## Our Mission

The mission of the Environmental Protection Agency is to protect human health and the environment. Since 1970, EPA has been working for a cleaner, healthier environment for the American people. View the Agency's complete strategic plan, annual report, and policy resources.

## Who We Are

EPA employs 17,000 people across the country, including our headquarters offices in Washington, DC, 10 regional offices, and more than a dozen labs. Our staff are highly educated and technically trained; more than half are engineers, scientists, and policy analysts. In addition, a large number of employees are legal, public affairs, financial, information management and computer specialists. EPA is led by the Administrator, who is appointed by the President of the United States.

- Organization Chart
  - Headquarters Offices
  - Regional Offices
  - Labs
- Careers at EPA Information
- Mailing Addresses for all EPA locations
- Employee Directory

EXHIBIT
tabbies
2

## What We Do

EPA leads the nation's environmental science, research, education and assessment efforts.

**Develop and enforce regulations:** EPA works to develop and enforce regulations that implement environmental laws enacted by Congress. EPA is responsible for researching and setting national standards for a variety of environmental programs, and delegates to states and tribes the responsibility for issuing permits and for monitoring and enforcing compliance. Where national standards are not met, EPA can issue sanctions and take other steps to assist the states and tribes in reaching the desired levels of environmental quality. More information

Offer [illegible] recent years, between 40 [illegible] of EPA's enacted budgets have provided direct support through grants to State environmental programs. EPA grants to States, non-profits and educational institutions support high-quality research that will improve the scientific basis for decisions on national environmental issues and help EPA achieve its goals.

- EPA provides research grants and graduate fellowships.
- The Agency supports environmental education projects that enhance the public's awareness, knowledge, and skills to make informed decisions that affect environmental quality.
- The Agency also offers information for state and local governments and small businesses on financing environmental services and projects.
- EPA also provides other financial assistance through programs as the Drinking Water State Revolving Fund, the Clean Water State Revolving Fund, and the Brownfields program.

**Perform environmental research:** At laboratories located throughout the nation, the Agency works to assess environmental conditions and to identify, understand, and solve current and future environmental problems; integrate the work of scientific partners such as nations, private sector organizations, academia and other agencies; and provide leadership in addressing emerging environmental issues and in advancing the science and technology of risk assessment and risk management. More information

**Sponsor voluntary partnerships and programs:** The Agency works through its headquarters and regional offices with over 10,000 industries, businesses, non-profit organizations, and state and local governments, on over 40 voluntary pollution prevention programs and energy conservation efforts. Partners set voluntary pollution-management goals; examples include conserving water and energy, minimizing greenhouse gases, slashing toxic emissions, re-using solid waste, controlling indoor air pollution, and getting a handle on pesticide risks. In return, EPA provides incentives like vital public recognition and access to emerging information. More information

**Further environmental education:** EPA advances educational efforts to develop an environmentally conscious and responsible public, and to inspire personal responsibility in caring for the environment. More information

**Publish information**: Through written materials and this Web site, EPA informs the public about our activities. Web publishing schedule

## How We Are Organized

Explore the Agency organization chart and access information about specific program offices, regional offices, and labs across the country.

## Our Budget and Performance

Access primary budget documents, information about performance measures, EPA's annual report, and various other management reports, including:

- Management Accomplishments and Challenges
- Government Performance and Results Act (GPRA)

## Contracting Opportunities

Access documents that describe the specifications and proposal due dates for supplies and services the government requires, information on contract awards, notifications of canceled procurements, and other information about contracting with EPA.

## Our History

In July of 1970, the White House and Congress worked together to establish the EPA in response to the growing public demand for cleaner water, air and land. Prior to the establishment of the EPA, the federal government was not structured to make a coordinated attack on the pollutants that harm human health and degrade the environment. The EPA was assigned the daunting task of repairing the damage already done to the natural environment and to establish new criteria to guide Americans in making a cleaner environment a reality. More Information

## Visitors Guide

Visit us at our Headquarters in Washington, DC.

- Headquarters at Federal Triangle
- Other Headquarters Buildings
  - EPA mailing addresses
- Regional Offices



Address: **Stockton, CA**

Send Google Maps to your phone
Text the word "GMAPS" to 466453




EXHIBIT
3

Address San Pablo Bay

Get Google Maps on your phone
Text the word "GMAPS" to 466453




EXHIBIT

4

tabbies

U.S. Environmental Protection Agency

# Superfund (CERCLIS)



EXH. 8 DATE 10/23/07
WITNESS Lacey
LAURA A. REDING, CSR # 9711

## Description Report

CERCLIS

Report An Error

EXHIBIT 5

## Site Description

SUPERFUND SITE ID: 0901129 SITE NAME: MCCORMICK & BAXTER CREOSOTING CO.

| Description Text |
| --- |
| The McCormick & Baxter Superfund Site (M&B Site) is a former wood treatment facility that occupies 29 acres in a predominantly industrial area near the Port of Stockton. The M&B Site includes the slough, which borders the northern portion of the Site, and connects to the Stockton Deepwater Channel on the San Joaquin River. McCormick & Baxter Creosoting Company operated a wood treating company at the Site from 1946 until 1991, when the company ceased operations. Various wood preservation processes were used at the M&B Site during its operational history. Chemical preservatives used at the M&B Site included creosote, pentachlorophenol (PCP), arsenic, chromium, copper and zinc. Most treatment processes at the M&B Site consisted of pressure impregnation of wood with preservative solutions in retorts (large pressure cylinders) located in the central portion of the M&B Site. Pressure-treated wood was removed from the retorts and allowed to dry in storage areas throughout the M&B Site. Waste preservative was stored in oily waste ponds in the northwestern portion of the M&B Site adjacent to the slough until 1981. Contaminant source areas at the M&B Site developed from the past release of wood-treating chemicals to surface soils, deeper soils and groundwater through past processing operations, spills, chemical handling practices and drippage from treated wood. The sediments in the slough became contaminated as a result of chemical process spills, surface runoff, direct discharge of stormwater through outfalls, and/or subsurface migration from other Operable Units (OUs) (e.g., seepages from the former oily waste pond area). M&B Site drainage was uncontrolled until 1978. Stormwater from all areas of the M&B Site discharged directly into the slough (from the early 1940's until approximately 1976) and from a portion of the M&B Site into New Mormon Slough (from approximately 1970 to 1978), located across the I-5 freeway. The former processing areas, tank farm and interi or roadways of the M&B Site are paved; the rest of the M&B Site surface is unpaved with limited vegetative cover. A layer of gravel between one and three feet thick is found across most of the M&B Site. Railroad tracks are located on many areas of the M&B Site. Most of the former facility structures have been removed. The office building, two storage sheds and the stormwater collection system lift station are the only remaining aboveground structures. Underground sump-like basement foundations and associated piping for the former pressure treatment units remain in the central portion of the M&B Site. The slough is approximately 2,500 feet (ft.) long and 180 ft. wide. Most of the slough is approximately 10 ft. deep, although the western portion near the mouth has historically been dredged for barge access. The slough is tidally influenced, with a maximum tidal range of approximately three feet. Stockton Channel, the Port of Stockton Turning Basin and the entrance to the slough are areas of net sediment deposition, and are periodically dredged to maintain depths appropriate for ship traffic. The chemicals of concern (COCs) identified for the M&B Site are PCP, carcinogenic polynuclear aromatic hydrocarbons (PAHs), arsenic, dioxins/furans and naphthalene. Dioxins and furans are believed to have originated as manufacturing impurities contained in the PCP solutions. Although relatively non-toxic, naphthalene is included as a COC because it is widely distributed throughout soil and groundwater at the M&B Site in relatively high concentrations and it serves as an indicator for the presence of non-carcinogenic PAHs. Sediment contamination related to the M&B Site appears to be limited to the slough, which is located directly adjacent to the McCormick & Baxter Creosoting Company facility. The primary COCs identified in sediments are PAHs and dioxin. Concentrations of PAHs and dioxin were elevated in the slough sediments relative to the Stockton Channel reference locat ion. Total PAH concentrations in the slough decrease with increasing depth in the western half of the slough, and increase with increasing depth in the eastern half of the slough. The sediment is also contaminated with metals. Fish in the area contain elevated levels of site-related contaminants and pose a risk to human and ecological receptors. Although warning signs are posted in the area and the county has conducted outreach programs to warn residents of the dangers of eating locally-caught fish, subsistence fishermen are known to currently fish in the area of the M&B Site. EPA divided the slough into four subareas based on the types and depths of contamination found at different parts of the M&B Site: the eastern end ("END"); the area adjacent to the M&B Site central processing area ("CPA"); the area adjacent to the oily waste ponds area ("OWP"); and the mouth of the slough ("MTH"). A Record of Decision (ROD) for the M&B Site was completed in March of 1999. An Explanation of Significant Differences (ESD) pertaining to the 1999 ROD was completed in September of 2005. |

EXH. 12 DATE 10/29/07
WITNESS Lacey
LAURA A. REDING, CSR # 9711



necessary is dependent on the choice of treatment/disposal options. The dewatered sediment would then be transferred to an onsite holding area for further treatment (e.g., solvent extraction) or placed directly into shipping containers for offsite disposal.

The recovered drainage water would be channeled to a collection cell where the water would be processed through a series of cascading settling tanks. The drainage would then proceed to hydrocyclone where it would remove suspended solids priar to draining back into the slough. upstream of the silt curtain. The strong sorption capacity and low water solubility of the primary COCs (PAHs and dioxin) suggests that most of the contamination would be associated with fine sediment particles and thus would be removed by filtering. The filtered water would be discharged back into the slough behind the silt curtain. A treatability test would be performed to ensure that the filtered water would meet acceptable criteria (e.g., AWQC) before discharge into the slough. If it dses not, then carbon adsorption could be added to the treatment train to further treat the water. The cost for this added treatment is expected to be minor relative to the overall cost of the offsite disposal or onsite treatment alternatives, so it has not been calculated. Recovered solids would be transferred back to the holdingldewatering cells.

Assuming a dredging rate of 1530$m^3$/day (2000 cylday) over an 8 h shift (Section 3.4), the dewatering system should be sized to handle this same volume over a 24 hr shift. Approximately five holding/dewatering celis would be constructed to hold 1530 $m^3$ (2C00 cy) each, allowing 5 to 7 days for gravity drainage (Table 4.4). The filter press system would be designed to handle 77 $m^3$/hr (100 cy/hr), with operaiions around the clock (24 hrs/day), and allowing for 20% maintenanceldowntime.

## 4.3 DESCRIPTION OF SEDIMENT REMEDIAL ACTION ALTERNATIVES

This section provides a description of each alternative developed for detailed analysis. The alternative descriptions identify tiie technologies, describe tiie representative process options, and present the design assumptions necessary to complete the detailed analysis. Information on the assumptions and calculations used in the estimation of sediment volumes for each alternative is provided in Appendix B. A detailed cost estimate for each alternative is provided in Appendix C.

### 4.3.1 SB-1 " No-Action

Under this alternative, the site would be abandoned as is, without any additional access controls or remedial actions to reduce the exposure to andlor toxicity of the COCs. A No-Action alternative would be taken to address the sediment contamination or the affected environmental receptors. This alternative does not actively reduce risks to human health and the environment related to contaminated sediment and aquatic organisms. However, over time some natural attenuation would gradually occur through deposition of new uncontaminated sediments and biological degradation of the organic contaminants. This alternative would not meet the RAOs,



EXHIBIT
6
tabbies

If the image of this document appears less sharp than this notice, it is due to the quality of the original.

but is retained for comparison with the other alternatives. The only cost associated with this alternative would be for sediment and biota monitoring.

4.3.2 SD-2 " In Situ Capping

The In Situ Capping alternative seeks to meet the RAOs by isolating contaminated sediments in the principal threat areas by blanketing them with a minimum of 60 cm (2 ft) of clean sand. Approximately three-fourths of the slough would *be* capped with clean, fine sand to isolate a preponderance of the PAH- and dioxin-contamiriatedsediment from the ecosystem. As discussed in Section 4.2.3,the sediment cap would consist of a minimum of 60 cm (2 ft) of clean, fine sand. These cap materials would be armored with rip-rap and gravel filter layer where needed to prevent erosion. The portion of the slough to be capped would run from just north of the OWP area, between sampling stations OMS-S8 and OMS-59 to the END of the slough (Figure 4.1). The dimensions of the cap, based on rough drawings from White and Kohn (1996), are estimated at approximately 710 m (2330 ft) long by approximately 51 m (i67 ft) wide. This cap would cover an estimated 3.6 hectares (8.8 acres) (Table 4.5). This portion of the slough contains nearly all of the PAH and dioxin concentrations exceeding the preliminary sediment cleanup levels and accounts for an estimated 99.5% of the mass of accessible (ce2.4 m [œ8 ft] deep) PAH contamination and 98% of the mass of dioxin contamination. The estimated volume of clean. fine sand needed for cap material (including a 10% safety factor) is estimated at 23,900 $m^3$ (31,200 $yd^3$).

A sand cap was selected as the representative in situ capping technology for Old Mormon Slough (see Subsection 4.2.3). However, localized armored capping may be necessary in areas of the slough susceptible to erosion. Two scenarios were used to estimate Alternative SD-3 costs. The expected cap is assumed to be a 90% sand/10% armored cap combination; for comparison purposes a cost estimate for a full armored cap was also prepared (*see* Appendix C).

As noted earlier, two apparent "hotspots," one of PAH contamination and one of dioxin contamination, are located in the mouth of the slough outside of the proposed capped area. As with all of the other alternatives, remediation of these two hot spots would be limited to the use of institutional controls to limit navigational access to the slough, provide more fencing and warning signs to fully encompass the area(s) of principal 2nd low-level threats, limit the future use of Old Mormon Slough and the upland portion of the site to appropriate uses, and control future dredging of the slough to prevent disturbance of residual sediment contamination in the mouth of the slough. Environmental monitoring would be conducted to assess the progress of natural attenuation processes for these two "hotspots."

Under Alternative SD-2. similar institutional controls would be implemented for the capped portion of Old Mormon Slough (OWP. CPA, and MTH) to prevent inadvertent erosion or other disruption of in situ sediment cap inztarials that would cause exposure of more highly



If the image of this document appears less sharp than this notice, it is due to the quality of the original.

Contaminated sediment under the cap. Short-term and long-term monitoring would be performed to assess the integrity and maintenance needs of the confined disposal facility and sediment cap.

Isolating the sediment COCs through capping would eliminate exposure to water column organisms and, over time, reduce concentrations in the fish population, including those species consumed by humans. The use of institutional controls as part of the overall slough remediation (see Subsection 4.2.1) would provide additional protectiveness. Access restrictions at Old Mormon Slough would reduce human exposure to contaminated fish and sediment until concentrations have been reduced to safe levels. Although capping would advarsely affect existing benthic organisms, recolonization is expected to occur. This alternative does not directly address the potentiai migration of contamination from slough sediments into groundwater beneath the site, although the cap would be somewhat effective in reducing the migration via infiltration.

4.3.3 SD-3 " Dredging and Confined Disposal Alternative

This alternative was developed to meet RAOs by removing and consolidating a preponderance of the PAH and dioxin contamination and isolating it in a confined disposal facility. Alternative SD-3 consists of the following combination of technologies/process options:

- selective removal of heavily contaminated sediment via mechanical dredging
- use of a silt curtain to contain disturbed sediment within Old Mormon Slough
- disposal of dredged materials into a CDF behind sheet piling, located at the END of the slough
- capping of residual contamination after dredging (either OWPICPA cap or CPA cap oniy)
- institutional controls (e.g., access controls, deed restrictions) and monitoring.

*k* discussion of those components that are common to more than one alternative (i.e., institutional controls, capping, dredging. silt curtain, and monitoring) was provided in Section 4.2

A silt curtain would be erected across the mouth of Old Msrmon Slough and contaminated sediments from designated principal threat areas would be removed via dredging and transferred to a CDF constructed in the END of the slough. Mechanical dredging would be conducted to remove contaminated sediment from the principal threat areas of the slough, starting at a small portion of the eastern MTH subarea to the END of the CPA portion, where the CDF would begin (Figure 4.2). This portion of the slough contains nearly all of the PAH



If the image of this document appears less sharp than this notice, it is due to the quality of the original.

and dioxin concentrations that exceed the preliminary sediment cleanup levels, except those located in the confined disposal area and the two hot spots located in the mouth of the slough.

The dimensions of the dredge area, based on rough drawings in White and Kohn (1996). is estimated to be a 406 in (1340 ft) long by 55 m (180 ft) wide (Figure 4.2, Table 4.7). Dredging would extend to a depth of 0.7 m (2.2 ft) in the principal threat area of the MTH and to 2.7 m (0.8 ft) (the maximum practical depth) from all but the eastern-most 69 m (225 ft) of the CFA. This incorporates a 10% overdig to ensure complete removal of the target contamination. The iesulting volume of dredged sediment is estimated to acccunt for 70% of the mass of the accessible (top 2.4 m [8 ft]) total PAH contamination and 47% of the dioxin contamination (see Appendix B). The rest of tile END of the slough (containing another approximately 35% of the PAH and 51% dioxin contamination) would be used for a CDF and thus would not be dredged. Dredging would remove an estimated 55,400 $m^3$ (72,500 $yd^3$) of contaminated sediment. Expansion during removal and handling (using a bulking factor of 20%) would produce an estimated 66,500 $m^3$ (87,000 $yd^3$).

A CDF in the slough is preferable to an upland disposal facility because sufficient capacity is not available upland and because disposal of sediments there could interfere with the expected soil and groundwater remediation. CDFs are commonly used for dredged material (Lincoff et al. 1994). In this disposal option a CDF would be constructed in the easternmost 293 m (960 ft) of the slough occupying all of the END and the easternmost 69 m (225 ft) of the CPA portions. This would result in an estimated disposal capacity of 74,300 $m^3$ (97,200 $yd^3$). This CBF would be constructed by installing sheetpiling across the slough and lining the inside of the sheet wall with high-density polyethylene or similar material. This structural wall would require en adequate foundation (deep installation, estimated at twice its height), tie backs, support pilings, anchor pilings, etc.

Contaminated sediment located within the CDF would remain in place (not dredged). Surface water retained in the CDF would be allowed to escape back into the slough through a silt curtain and overflow weir, as the remaining storage capacity of the CDF was filled with contaminated sediment from dredging operations. Dredged material would be filled to within approximately 0.6 m (2 ft) of the upland ground surface. After a period of consolidation the dredged material would be capped with a permeable geotextile fabric and an estimated 0.6 m (2 ft) of clean fill. Wick drains could be installed to reduce consolidation time (EPA 1994).

Following the completion of dredging activities and confirmatory sampling, a 150-m to 390-m (480-ft to 1280-ft)-long stretch of Old Mormon Slough would be capped with natural materials (fine sand) to isolate residual contamiriation left behind by dredging activities. The portion of the slough to be capped would be dependent on confirmatory sampling. If sampling confirms that total PAH concentrations in the OWP and western end of the CPA are at or below the preliminary sediment cleanup levels, then no cap will be installed there. However, the high concentrations of total PAH at depth in the eastern portion of the CPA indicates that this portion



If the image of this document appears less sharp than this notice, it is due to the quality of the original.

of the slough would require a cap after dredging. Thus, this alternative assumes that a CPA cap will be required, while an OWP area cap might be required if dredging alone does not meet the RAOs.

The CPA cap would run from just west of the CDF to the end of the CPA area (*see* Figure 4.2). The cap would cover an estimated 6,300 $m^2$ (67,800 $ft^2$), 0.6 ha (1.6 ac) of the slough. The OWP area cap (if required) would run from the CPA cap to the west end of the OWP area. This cap would cover an estinated 13,800 $m^2$ (149,000 $ft^2$), 1.4 ha (3.4 ac). General information regarding the design and installation of the sediment caps is provided in Subsection 4.2.3. Detsiled design assunlptions are provided in Table 4.6. Costs were estimated for both Alternative SD-3 capping scenarios (CPA/OWP Cap and CPA Cap Only) in Appendix C.

As with Alternatives SD-2, SD-4, and SD-5, Alternative SD-3 would address the two "hot spots" located in the mouth of the slough, outside oi iiii proposed dredge and cap areas, by the use of institutional controls rather than active remediation (*see* Subsection 4.21). Pemediation would be limited to the use of institutional controls to limit navigational access to the slough, provide more fencing and warning signs to fully encompass the area(s) of principal and low-level threats, limit the future use of Old Mormon Slough and the upland portion of the site to appropriate uses, and control future dredging of the slough to prevent disturbance of residual sediment contamination in the mouth of the slough. Environmental monitoring would be conducted to assess the progress of natural aitenuatian processes for the "hot spots."

Under Alternative SD-3, institutional controls would also be implemented for the capped portion of Old Mormon Slough and the CDF to prevent inadvertent erosion or other disturbance of in situ sediment cap materials and the CDF that would expose residual sediment cmtamination. Monitoring would be performed to assess the integrity and maintenance needs of the sediment cap and CDF.

Removal of the most heavily contaminated sediment from principal threat areas of the slough and isolation in a CDF would reduce the mass of contarnination available for exposure to and bioaccumulation in the aquatic organisms, including those species consumed by humans. Over time, this would lead to a reduction in the PAH and dioxin concentrations in the fish population. Implementation of institutional controls would restrict access to Old Mormon Slough, thereby reducing human exposure to contaminated fish and sediment until concentrations in fish and sediment have been reduced to safe levels. Alternative SD-3 reduces the threat to groundwater from sediment in the OWP and CPA portions of the slough. The CDF would contain dewatered sediment above the water table and would be covered to prevent infiltration, thus reducing the threat to groundwater from the END portion of the site.



If the image of this document appears less sharp than this notice, it is due to the quality of the original.

4.3.4 SD-4 - Dredging and Offsite Gisposal Alternative

This alternative was developed tu meet the RAOs by removing a preponderence of the PAH and dioxin contamination from the slough and tiansporting it for offsite disposal andlor treatment. Alternative SD-4 consists of the foliowing technologieslprocessoptions:

- selective removal of heavily contaminated sediment via mechanical dredging
- use of a silt curtain to contain disturbed sediment within Old Mormon Slough
- dewatering of dredged sediment
- transportationand offsite disposal at a permitted TSD facility
- capping of residual contamination after dredging (CPNEND Cap only or Full Cap)
- institutional controls (e.g., access controls, deed restrictionsj and monitoring.

A discussion of those components common to more than one alternative (i.e., institutional controls, capping, dredging, dewatering, silt curtain, and monitoring) was provided in Section 4.2.

A silt curtain would be erected across the mouth of Old Mormon Slough to prevent transport of sediment disturbed by dredging activities out of the slough. Mechanical dredging would be conducted to remove contaminated sediment from the principal threat areas of the slough, including a portion of the MTH sub-area and all of the O W , CPA, and END sub-areas. Dredging would be conducted to a depth of 0.7 m (2.2 ft) in the principal threat area of the MTH and to 2.7 m (8.8 ft) (the maximum practical depth for dredging operations) throughout the rest of the slough. This depth incorporates a 10% overdig to ensure complete removal of the target contamination. The resulting volume of dredged sediment is estimated to account for 99.5% of the mass of the accessible (top 2.4 m [8 ft]) total PAH contamination and nearly 100% of the dioxin contamination (see Appendix 6).

Dredging will remove an estimated 91,000 $m^3$ (119,000 $yd^3$) of contaminated sediment. With expansion during removal and handling (using a bulking factdr of 20%) this would produce an estimated 109,000 $m^3$ (143.000 $yd^3$). The contaminated dredge material removed from the slough would be dewatered, reducing the volume by 20%, producing an estimated 91,000 $m^3$ (119,000 $yd^3$) of solids, and an estimated 21,800,000 L (5,760,000 gal) of wastewater. As described in Subsection 4.2.6, the recovered water would be processed through a series of cascading settling tanks and hydrocyclones to remove suspended solids prior to draining back into the slough, upstream of the silt curtain. For cost estimating purposes, it is assumed that



If the imge of this document appears less sharp than this notice, it is due to the qizlity of the original.

most of the contamination would be associated with fine sediment particles and thus would be removed by filtering without additional treatment.

The dewatered sediment would be transported offsite to a TSDF for treatment, if necessary to comply with RCRA LDRs, andlor disposal. RCRA LDRs for listed wood preserving wastes F032. FOX. and F035, which are the expecled waste classifications for the Old Mormon Slodgh sedinients. became effective in August '1997. Thus, selection of the actual disposal facility is dependent on the final waste designation(s) for these dewatered sediments and their applicable LDRs. Transportation would be either by truck or rail depending on the selection of the TSDF.

To estimate a range of costs for this alternative. two different offsite disposal options were examined. which depend on the TSDF selected and the area of the slough requiring capping after dredging. The lower cost option assumes that the waste would not be subject to LDRs requiring treatment prior to disposal. In this case it is assumed that the waste would be shipped via truck to a TSDF for ciirect disposal, and that only the CPA and END areas of the slough would require capping. For the higher cost option it is assumed that the waste would have to be incinerated prior to disposal in order to comply with LDRs and that the entire slough (CPNEND Cap plus OWP Cap) would need to be capped. In this case, it was assumed the sediment would be shipped to the TSDF for treatment and disposal (see Appendix C). Note that ?herecurrently is a variance from the treatment requirement for F032. F034, and F035 listed wastes, but not for DO37 (PCP) characteristic wasie. Until May 1999, dredged sediment classified as F032. FOX, or F035 waste could be disposed offsite without treatment; after this time, the sediment would have to be treated fit (by incineration for F032 and FO34. and by stabilization for F035). However, even before May 1999, dredged sediment that exceeds the toxic characteristic leach procedure criterion for PCP (100 mg/l.) would have to be incinerated before offsite disposal.

Following the completion of dredging activities and confirmatory sampling, a 420 m to 664 m (1380 R to 2180 ft) section of Old Mormon Slough would be capped with natural materials (fine sand) to isolate residual contamination left behind by dredging activities. The portion ofthe slough to be capped would be dependent on confirmatory sampling in the OWP area and western end of the CPA area. If sampling confirms that total PAH concentrations in that portion of the slough are at or below the preliminary sediment cleanup levels no cap would be installed there. However, the relatively high concentrations of total PAH at depth in the eastern part of the CPA area and the END area indicate that these sections of the slough would require a cap after dredging. Thus, a CPNEND cap would be required while an additicnal OWP area cap may be required if dredging alone' does not meet the RAOs.

The CPNEND cap (Figure 4.3) would cover an estimated 9,500 $m^2$ (102,000 $ft^2$), 2.3 acres of the slough. The OWP cap (if required) would cover an estimated 13,800 $m^2$



If the image of this document appears less sharp than this notice, it is due to the quality of the original.

(149,000 $ft^2$), 3.4 acres. General information regarding the design and installation of the sediment caps is provided in Section 4.2.3. Detailed design assilmptions for Alternative SD-4 are provided in Table 4.7.

As with Alternatives SD-2, SD-3, and SD-5. Alternative SD-4 would address the two 'hot spots" located in the mouth of the slough, outside of the proposed dredge and cap areas. by the use of institutional controls rather than active remediation (see Subsection 4.2.1). Remediation would be limited to the use of instititional controls to limit navigational access to the slough, provide more fenciny and warning signs to fully encompass the area(s) of principal and low-level threats, limit the future use of Old Mormon Slough and the upland portion of the site to appropriate uses, and control future dredging of the slough to prevent disturbance of residual sediment contamination in the mouth of the slough. Environmental monitoring would be conducted to assess the progress of natural attenuation processes for the hot spots.

Under Alternative SD-4, institutional controls would also be implemented for the capped portion of Old Mormon Slough to prevent inadvertent erosion or other disturbance of in situ sediment cap materials that would expose residuzl sediment contamination. Monitoring would be performed to assess the integrity and maintenance needs of the sediment cap.

Removal of the most heavily contaminated sediment from principal threat areas of the slough would reduce the mass of contamination available for exposure to and bioaccumulation in the aquatic organisms, including those species consumed by humans. Over time, this would lead to a reduction in the PAH and dioxin concentrations in the fish popuiation. Implementation of institutional controls would restrict access to Old Mormon Slough, thereby reducing human exposure to contaminated fish and sediment until Concentrations in fish have been reduced to safe levels. Alternative SD-4 reduces the threat to groundwater from sediment in the END, CPA, and OWP portions of the slough.

### 4.3.5 SD-5 - Dredging and Onsite Treatment

This alternative was developed to meet the RAOs by removing a preponderence of the PAH- and dioxin-contaminated sediment from the slough and treating it onsite. Alternative SD-5 consists of tha following technologiedprocess options:

- selective removal of heavily contaminated sediment via mechanical dredging
- use of silt curtain to contain disturbed sediment within Old Mormon Slough
- dewatering of dredged sediment
- onsite ex situ treatment of dewatered sediment by solvent extraction
- onsite ex situ S/S of treated sediment as necessary prior to upland disposal
- capping of residual contamination after dredging (CPNEND Cap only or Full Cap)
- institutional controls (e.g., access controls, deed restrictions) and monitoring.



If the imge of this document appears less sharp tha? this notice, it is due to the quality of tho original.

Elements of this alternative common to the other sediment alternatives (i.e., institutional controls, capping, dredging, dewatering, silt curtain, and monitoring) were described in Section 4.2.

Dredging would be conducted from just north of the O W area to the END of the slough (Figure 4.4). This portion of the slough contains nearly all of the PAH and dioxin concentrations exceeding the preliminary sediment cleanup levels. A silt curtain would be erected across the mouth of the slough prior to dredging to contain any resuspended sediment. Mechanical dredging would be conducted along a 719 m (2330 ft) long portion of the slough. This would include the top 0.7 m (2.2 ft) from the OWP area and the top 2.7 m (8.8 ft) (maximum practical depth plus 10% overdig) from the O W, CPA, and END of the slough. This volume of sediment would account for an estimated 99.5% of the accessible (<=2.4 m [<=8 ft]) mass of total PAH contamination and approximately 100% of the mass of PCDD/PCDF contamination. Dredging would produce an estimated 109,000 $m^3$ (143,000 $yd^3$) of contaminated sediment (assuming a 20% bulking factor). This material would be dewatered, producing an estimated 91,000 $m^3$ (119,000 $yd^3$) of solids and 21,800 L (5,760,000 gal) of waste water. As described in Subsection 42.6, the recovered waste water will be processed through a series of cascading settling tanks and hydrocyclones to remove suspended solids prior to draining back into the slough, upstream of the silt curtain. For cost estimating purposes, it was assumed that most of the contamination would be associated with fine sediment particles and thus would be removed by filtering without additional treatment.

The dewatered dredge materials would be treated onsite by ex situ solvent extraction to address PAHs and dioxin, followed by S/S to address inorganic contamination as necessary. Offsite incineration/disposal of the concentrated organic contaminants from the solvent extraction process has also been factored into the cost estimates for this alternative (see Appendix C). Solidified residuals from this treatment train are expected to be disposed onsite, assuming sufficient upland capacity is available. The actual throughput and residual volumes generated will be determined in pilot-scale testing during the remedial design phase.

The selection of the final onsite treatment technology/process option for the dewatered sediments would likely be the same as that for the treatment of contaminated soils. Treatability tests conducted on site soils indicate that solvent extraction can be greater than 65% effective in reducing the concentration of dioxin, and greater than 67 to 98.9% effective in reducing PAH concentrations (see Subsections 3.1.3.2 and 3.2.6.3).

Following the completion of dredging activities and confirmatory sampling, a 420 m to 664 m (1380 ft to 2180 ft)-long stretch of Old Mormon Slough would be capped with natural materials (fine sand) to isolate any residual contamination that may be left behind by dredging activities. The portion of the slough to be capped would be dependent on confirmatory sampling in the OWP and western end of the CPA. If sampling confirms that total PAH concentrations in this portion of the slough are at or below the preliminary sediment cleanup levels, no



If the image of this document appears less sharp than this notice, it is due to the quality of the original.

cap will be installed there. However, the relatively high concentrations of total PAH at depth in the eastern portion of the CPA and END indicates that these poitions of the slough would require a cap after dredging. Thus, a CPA/END cap would be required while an O W area cap may be required if dredging alone does not meet the RACs.

The CPA/END cap would run from the END to the western end of the CPA area (see Figure 4.4). The cap would cover an estimated 9500 $m^2$ (102,000 $ft^2$), or 2.3 acres of the slough. The O W area cap, if required, would run from the CPNEND cap to the west end of the OWP area. This cap would cover an estimated 13,800$m^2$ (149,000 $ft^2$), or 3.4 acres. General infcnnation regarding the design and installation of the sediment caps was provided in Subsection 4.2.3. Detailed design assumptions for this alternative are provided in Table 4.8. Costs were estimated for both Alternative SD-5 capping scenarios (CPNEND Cap only or Full Cap).

As with Alternatives SD-2. SD-3. and SD-4, Alternative SD-5 would address the two "hot spots" located in the mouth of the slough, outside of the proposed dredge and cap areas, by the use of institutional controls rather than active renrediation [see Subsection 4.2.1). Remediation would be limiteci to the use of institutional controls to limit navigational access to the slough, provide more fencing and warning signs to fully encompass the area(s) of principal and low-level threats, limit future use of Old Mormon Slough and the upland portion of the site to appropriate uses, and control future dredging of the slough to prevent disturbance Qf residual sediment contamination in the mouth of the slough. Environmental monitoring would be conducted to assess the progress of natural attenuation processes for the hot spots.

Under Alternative SD-5, institutional controls would also be implemented for the capped portion of Old Mormon Slough to prevent inadvertent erosion or other disturbance of in situ sediment cap materials that would expose residual sediment contamination. Monitoring would be petiorrned to assess the integrity and maintenance needs of the sediment cap.

Removal of the most heavily contaminated sediment from principal threat areas of the slough would reduce the mass of contamination available far exposure to and bioaccumulation in aquatic organisms, including those species consumed by humans. Over time, this would lead to a reduction in the PAH and dioxin concentrations in the fish population. Implementation of institutional controls would restrict access to Old Mormon Slough, thereby reducing human exposure to contaminated fish and sediment until concentrations in fish and sediment have Seen reduced to safe levels. Alternative SD-5 reduces the threat to groundwater from sediment in the END, CPA, and OWP portions of the slough.



If the imge of this documnt appears less sharp than this notice, it is due to the quality of the original.

*CRV v. USA*

ALTERNATIVE SD-2

EXH. 14 DATE 10/23/07
WITNESS Lacey
LAURA A. REDING, CSR # 9711

July 1998 Public Comment Draft




Figure 4.1. Alternative SD-2, In Situ Capping



EXHIBIT
7

204682.1

July 1998

EXH. 18 DATE 10/23/
WITNESS Lacey
LAURA A. REDING, CSR # 9711

EXHIBIT 8

Public Comment Draft

Table ES.2. Comparison of Remedial Alternatives for Sediments in Old Mormon Slough

| Alternative | Overall Protection of Human Health and the Environment | Compliance with ARARS | Long-Term Effectiveness and Permanence | Reduction in Toxicity, Mobility, and Volume through Treatment | Short-Term Effectiveness | Implementability | Cost ($ Million) |
|---|---|---|---|---|---|---|---|
| SD-1: No-Action | Not protective. | Does not comply with ARARs. | Does not reduce long-term risks for hundreds to thousands of years. | Does not provide treatment. | Does not create any short-term risks | Not administratively feasible; would conflict with other environmental and public health objectives | Capital: $0<br>30 Year O&M: $0<br><br>Total Present Worth Cost: $0.33 (Monitoring only) |
| SD-2: In Situ Capping | Reduces risk to the aquatic ecosystem and to humans. Contaminated sediments continue to be a potential, though minor, threat to groundwater. | Expected to comply with ARARs. | Contaminated sediment remains in place; isolated by a sand cap. Long-term effectiveness depends on continued inspection and maintenance. | Does not provide treatment, but would reduce the mobility of contaminated sediment. | Some risks to workers installing the cap. Severe short-term impacts on the benthic community. Completion time for cap is estimated at 1 to 2 months. | Easiest to implement but a long-term inspection and maintenance program is necessary. | Capital: $1.21-2.37<br>30 Year O&M: $0.09-0.15<br><br>Total Present Worth Cost: $1.65-2.94 |
| SD-3: Dredging and Confined Disposal | Risk reduction is slightly greater than SD-2. Potential threats to groundwater would be reduced. | Expected to comply with ARARs. | Completely removes contaminated sediment from 114 of the slough. Deeper contamination may remain inplace in another areas but isolated by a sand cap. Requires long-term inspection and maintenance program | Does not provide treatment, but reduces the volume and mobility of contaminated sediment available for uptake by aquatic organisms. | Risks to workers are greater than for SD-2. Would have significant short-term impacts on the aquatic ecosystem. Habitat would be permanently lost by construction of the confined disposal facility. Time to complete SD-3 is estimated at 4 to 10 months. | SD-3 is more difficult to implement than SD-2. A long-term inspection and maintenance program is necessary. Filling a portion of Old Mormon Slough may not be acceptable to the communiv, adjacent landowners and regulatory agencies. | Capital: $2.01-2.46<br>30 Year O&M: $0.04-0.07<br><br>Total Present Worth Cost: $2.43-2.94 |
| SD-4: Dredging and Offsite Disposal | Provides a greater degree of protectiveness than SD-2 or SD-3 because all accessible sediment contamination would be removed and disposed off-site. Potential threats to groundwater would be reduced. | Expected to comply with ARARs. | Completely removes all accessible sediment contamination. Some deeper contamination may remain but isolated by a sand cap, requiring a long-term inspection and maintenance program. | Would not provide treatment unless requirzd by land band restrictions prior to disposal. However, the majority of contaminated sediment would be removed from the site | Risks to workers are approximately the same as for SD-3. There would be potential risks to the public from the transportation of hazardous material to the off-site treatment, storage and disposal facility. Time to complete is estimated at 4 months up to 10 months. | Implementation is similar to that for SD-3. However, excavated sediments would be transported from the site for off-site disposal and/or treatment. Depending on their waste classification and LDRs, there may be a limited number of facilities able to accept the sediment. A long-term inspection and maintenance program is necessary. | Capital: $39.1-350.5<br>30 Year O&M: $0.05-0.10<br><br>Total Present Worth Cost: $39.6-351.0 |

Table ES.2 (contd)

| Alternative | Overall Protection of Human Health and the Environment | Compliance with ARARS | Long-Term Effectiveness and Permanence | Reduction in Toxicity, Mobility, and Volume Through Treatment | Short-Term Effectiveness | Implementability | Cost ($ Million) |
|---|---|---|---|---|---|---|---|
| SD-5: Dredging and Onsite Treatment | SD-5 provides approximately the same degree of protectiveness as SD4. | Expected to comply with ARARs. May require treatment within the same area of contamination or designation of a CAMU. | As with SD4, completely removes all accessible sediment contamination from Old Mormon Slough. Some deeper contamination may remain inplace requiring a sand cap and long-term inspection and maintenance program. | Provides treatment of the Contaminated sediment, to reduce toxicity, mobility, and volume of organic contaminants; and to immobilize other hazardous constituents into a solid matrix. Some secondary wastes would be generated that would also require treatment and disposal. Use of stabilizing reagents increases the volume of treated soil. | Short-term risks to workers are higher than for SD-4 due to on-site treatment operations and increased handling of contaminated sediment. Potential for dust generation during treatment operations. Time to complete is estimated at 4 to 10 months. | Most technically complex alternative with the greatest implementation concerns. Availability of solvent extraction vendors may be limited. Extensive testing may be necessary to evaluate treatment efficiency. Treatment residuals would also need to be treated and disposed of. Treatment greatly increases sediment handling over the other alternatives. Volume would be increased during the S/S process, and upland disposal of the large volume of treated sediment may be a problem. | Capital: $66.7-67.1<br>30 Year O&M: $0.05-0.10<br><br>Total Present Worth Cost: $67.1-67.7 |

# McCormick & Baxter Superfund Site

EXH. 21 DATE 10/23/07
WITNESS Lacey
LAURA A. REDING, CSR# 971

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY • REGION 9 — JULY 1999

## *EPA Signs Record of Decision & Begins Remedy Design for Cleanup Plan*

### Introduction

This fact sheet gives you an update on what EPA has done at the McCormick & Baxter Superfund site since our last fact sheet in September 1998. At that time the EPA presented its Proposed Plan for cleaning up soil, groundwater and sediment contamination at the McCormick & Baxter Superfund site in Stockton, California. Also, EPA held a 30-day public comment period September 15 to October 15, 1998, which was extended upon request until November 16, 1998 and held a community meeting on September 28, 1998 to receive comments on the Proposed Plan.

WHAT'S INSIDE


| Topic | Page |
|---|---|
| • *Introduction* | 1 |
| • *The Record of Decision* | 1 |
| • *What's Happening This Summer* | 2 |
| • *What You'll See* | 2 |
| • *Highlights of EPA's Planned Acitivity* | 2 |
| • *Dates to be Set* | 3 |





Figure 1: *Site location map of the McCormick and Baxter Superfund site in Stockton, CA*

After reviewing public comments, EPA signed a Record of Decision (ROD) on March 31, 1999 to select the remedy for the site. The ROD includes final remedies for soil and sediment and an interim remedy for groundwater. These are explained below.

In addition to these remedies, this fact sheet also tells you about EPA's planned activities at the site.

### The Record of Decision

• *Soil remedy:* Dig up the shallow soil from the eastern end of the site and consolidate and cap it in the western end of the site. The cap will consist of a layer of asphalt/concrete over an aggregate (base rock) layer and a one-to-three-foot layer of clean imported fill.

*EXTRA FACT SHEETS: Copies of this fact sheet are available at the Boggs Tract Community Center, 533 South Los Angeles Avenue, Stockton, CA, phone Arlene Coffee at 209-468-3978*

EXHIBIT 9

- *Contingency soil remedy:* Place an asphalt cap over the entire site, without any excavation or consolidation of soil. The addition of the contingency soil remedy is the only difference between the ROD and the Proposed Plan. This was added based on a comment received at the public meeting about possible redevelopment of the site. Because EPA recognizes the importance of returning Superfund sites to beneficial uses in the community, we included this contingency soil remedy as an option for redevelopment of the site for future industrial use. Any redevelopment of the site would be overseen by EPA and the State, and would only be allowed if appropriate for site conditions.

  The contingency remedy uses the same type of soil capping technology as the selected remedy. With long-term maintenance of a site-wide cap, the contingency remedy is equally protective of human health and the environment as the selected remedy, and the cost is comparable.
- *Sediment remedy:* In-place capping of sediment in Old Mormon Slough. The cap will consist of a minimum of two feet of clean sand to isolate contaminated sediment.
- *Groundwater remedy (interim):* Install and operate a groundwater extraction and treatment system. Extracted groundwater will be treated by oil/water separation; biotreatment; filtration; and carbon adsorption. Treated groundwater will be discharged into nearby surface water, in combination with reuse for irrigation or industrial purposes at or near the site, if possible.
- *Monitoring* of the affected aquifer zones to verify that the extraction system is effective in containing the groundwater plume.
- *Access rights* are also included that permit EPA and the State to monitor and maintain the selected remedies.
- *Land use restrictions* that prohibit interference with the selected remedies.

> **RECORD OF DECISION**
>
> A copy of the ROD and the comments that were received on the Proposed Plan are available at the information center at the Stockton Public Library, 605 N. El Dorado Street, Stockton, CA 95203 (phone 209-944-8221).

## What's Happening This Summer

*(Early July until September)*

During the summer, the EPA will perform sampling and conduct studies in order to design the soil and sediment remedies. The following activities will be conducted:

- Site surveying and geophysical investigation
- Soil and groundwater sampling, including deep soil samples (up to 200 ft)
- Non-Aqueous Phase Liquids (NAPLs) investigation
- Old Mormon Slough bank sampling (by boat)
- Installation of new monitoring wells

## What You'll See

During the summer, there will be trucks and a drilling rig at the site. A small boat will be used to collect samples from the banks of the Old Mormon Slough. There will be no transport of contaminated soil from the site during these activities. Any dust generated during the sampling will be controlled by spraying the soil surfaces with water, and the air will be periodically monitored on-site. EPA does not anticipate any negative health effects, including noise, to the community resulting from these activities.

> **QUESTIONS AND CONCERNS**
>
> You may call Marie Lacey, Project Manager at 415-744-2136 or Vicky Semones, Community Involvement at 415-744-2184. You may also call EPA toll free at 1-800-231-3075.

## Highlights of EPA's Planned Activity

Spring 1999

- Sediment Cap Design = EPA began the design of the sediment cap for Old Mormon Slough.

Summer 1999

- Groundwater Remedy / Field Studies = EPA will conduct these studies to collect more information for selecting a final groundwater remedy.
- Sediment Cap / Sampling = Because the banks of the Old Mormon Slough have been found to be eroding at some locations, EPA will take samples there to determine if the banks need to be reinforced before the sediment cap is installed.

Fall 1999

- Groundwater Remedy / Lab studies = EPA will conduct laboratory studies to evaluate the potential

THE SUPERFUND PROCESS - WHERE WE ARE

| Site | NPL Ranking/ Listing | Remedial Investi-gation (RI) | Feasibility Study (FS) | Proposed Plan/ Public Comment Period | Record of Decision (ROD) | Remedial Design | Remedial Action |
|---|---|---|---|---|---|---|---|
| Completed | | | | | | We Are Here | To Be Completed |
| Contamination was first discovered in 1977; cleanup began by State and McCormick & Baxter; company closed in 1990. | Site placed on EPA's National Priorities List, becoming eligible for remedial action under Superfund. | Completed identification of the sources and areas of contamination. | Identified cleanup options for the contamination problems. | The public had the opportunity to comment on EPA's preferred cleanup option during 60-day public comment period. EPA considered these comments and responded to them in writing. | EPA documented the selected cleanup options for the Superfund site. | A detailed plan for the selected remedy is being developed. Enforcement activities with potentially responsible parties are being pursued. | A qualified contractor will be selected to begin the cleanup according to the detailed plan. |
| | October 1992 | 1994-1995 | 1994-1995 | 1998 | March 1999 | | |

of steam technology as a potential final groundwater remedy.

*Spring 2000*

- Groundwater Remedy / Evaluation = EPA will complete the first phase of its evaluation of steam technology as a potential final groundwater remedy.
- Sediment Cap Construction = EPA will begin construction of the sediment cap in Old Mormon Slough. (Because some endangered/threatened fish species may be in the area of the site, EPA is working with other federal and state environmental agencies to schedule this work at a time when there will be the least impacts to these fish. Therefore, this date could change.)

Note: Before work begins on the sediment cap, EPA will send out another public update and hold a public meeting or workshop, if necessary, to explain the activities that will be taking place at the site during the cap construction and to give a progress report on the soil and groundwater remedies.

## Dates to be Set

No start dates have been set at this time for constructing the soil cap or the interim groundwater pump and treat system. These will be scheduled after EPA has completed the steam technology evaluation and has evaluated the site's redevelopment potential.

In the meantime, there is no current human health risk from groundwater beneath the site because it is not used (and was not used in the past) for human consumption. EPA continues to monitor the groundwater regularly. The only known current risk from surface soil at the site is to trespassers who come in contact with contaminated soil.

### MAILING LIST

Call us at 1-800-231-3075 to add your name to EPA's mailing list or make corrections to your address.

| Inside: | En esta edición: |
| --- | --- |
| **McCormick and Baxter Superfund Site**<br>*EPA Signs Record of Decision & Begins Remedy Design for Cleanup Plan* | *La EPA comienzá a diseñar las medidas de corrección después de firmar el Acta de Decisión para el plan de limpieza* |

*Printed on Recycled/Recyclable Paper*

U.S. Environmental Protection Agency, Region IX
75 Hawthorne Street (SFD-3)
San Francisco, CA 94105
Attn: Vicky Semones

Official Business
Penalty for Private Use, $300

FIRST-CLASS MAIL
POSTAGE & FEES PAID
U.S. EPA
Permit No. G-35

EXH. 28 DATE 10/23/07
WITNESS Lacey
LAURA A. REDING, CSR # 5711

EPA

# McCormick & Baxter Superfund Site




UNITED STATES ENVIRONMENTAL PROTECTION AGENCY • REGION 9 • FEBRUARY 2006

# U.S. EPA Issues Changes to Sediment Cleanup Plan

EXHIBIT
10

The United States Environmental Protection Agency (EPA) has made changes to the sediment cleanup plan for the McCormick & Baxter Superfund Site in Stockton, California. The changes are detailed in a document known as an Explanation of Significant Differences (ESD). The ESD, signed in September 2005, describes changes to the original sediment remedy that was selected in the 1999 Record of Decision (ROD). You may view the ESD and the Administrative Record (the supporting documents) at the information repositories listed at the end of this fact sheet.

## How Has the Original Sediment Cleanup Plan Changed?

The sediment cleanup plan selected in the ROD was the placement of a two-foot thick cap of clean sand in Old Mormon Slough, which is part of the Site. The cap will isolate the contaminated sediment in the slough and eliminate the threats it poses to human health and the environment. The cap will cover about three-quarters of the slough and, after it is finished, a log boom will be installed at the outer end of the slough to prevent boat traffic from entering and damaging the cap.

Inspections conducted during the design of the cap showed that the banks along Old Mormon Slough were eroding. Tests showed that the northern shoreline was not contaminated, but the southern shoreline (along the McCormick & Baxter property) was. It was necessary to reinforce the southern bank before the cap was installed. Without this reinforcement, contaminated soil could fall into the slough and re-contaminate the clean sand. Therefore, EPA added bank stabilization to the remedy and divided the work into two separate phases: bank stabilization (Phase I) and construction of the cap (Phase II).

Phase I was completed in 2002, and Phase II was scheduled to begin in July 2003. However, the capping had to be delayed due to the presence of several vessels in the slough, including a large wooden barge that was being used as a residence. The vessels could not be temporarily moved out and then returned to the slough after construction, as moving them back in would damage the cap.

Because neither the owner nor EPA could find an alternate location for the barge where it could continue to be used as a live-aboard, it became necessary to relocate the owner. People displaced from their residences by federal projects, such as the cleanup of Superfund sites, may be eligible for relocation benefits under a federal law called the Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA). In this case, EPA felt it was appropriate to assist the owner in moving to a new location.

## What Is In the Explanation of Significant Differences (ESD) Document?

The ESD describes the two changes to the original cleanup remedy:

Bank Stabilization – Specific activities during the bank stabilization included clearing away concrete and debris, cutting back the slope of the bank, installing bank protection material, and building up a new berm with clean fill material. While this change increased the cost of the remedy, the result is an improvement in the long-term protection of the sand cap, and thus the effectiveness of the remedy.

Relocation – EPA can only construct the sediment cap once the vessels in Old Mormon Slough have been permanently removed. This involves relocating the owner/occupant into permanent housing away from the slough. This change adds to the total cost of the remedy, but allows it to be completed without further delays.

The California Department of Toxic Substances Control (DTSC), the State support agency for the Site, reviewed




*McCormick & Baxter Superfund Site*

the ESD and concurred with it. EPA and DTSC believe that the modified remedy remains protective of human health and the environment, complies with federal and state requirements that are applicable or relevant and appropriate to this remedial action, and is cost-effective.

## What's Next?

Two of the vessels in the slough will be moved to a new location as soon as possible. The large wooden barge will remain in the slough for a few more months while EPA makes arrangements to sell it for re-use or salvage it. In the meantime, EPA has begun preparations to construct the sand cap next summer. We will send you a fact sheet before then with information about the specific activities that will be occurring at the Site during the construction.

## Other Activities at the Site

Soil Cleanup: EPA is continuing to negotiate with Union Pacific Railroad (UPRR), which owns a portion of the Site, to complete the site-wide soil remedy. The soil remedy consists of moving contaminated surface soil from the eastern half of the site to the more contaminated western half of the site. After this, the eastern half will be back-filled with clean soil and the western half, where all the contaminated soil will be consolidated, will be covered with a permanent asphalt cap. A preliminary design has been completed, and we expect that the construction will be finished in a few years. EPA will provide information on the schedule for this work in a future fact sheet.

Groundwater Cleanup: EPA is continuing the regular sampling of monitoring wells to track the groundwater contamination plume at the site. Results show that the plume has not moved very far beyond the McCormick & Baxter property, and EPA will install additional off-site wells to confirm this. There is some evidence that contamination at the edges of the plume may be naturally breaking down. This process, called natural attenuation, might be able to contain the contaminant plume on the site without the need for active pumping. Because of this, EPA plans to collect at least two more years of data and conduct additional studies before proposing a final groundwater remedy for public comment. The contamination at the Site is not currently affecting any drinking water wells.

# SITE HISTORY

McCormick & Baxter Creosoting Company operated a wood treating facility from 1946 until 1990. Most operations involved treating wood with preservative solutions in large pressure vessels located in the central portion of the site. After treatment, workers would remove and dry the wood in storage areas. Waste from the treatment process was stored in waste ponds in the northwestern portion of the Site, next to the Old Mormon Slough.

These operations contaminated the soil, groundwater, and sediment in the slough. McCormick & Baxter filed for bankruptcy in 1988 and continued operating the facility until 1990. EPA added the site to the National Priorities List in 1992 and became the lead agency to complete the investigations and carry out a final cleanup remedy.

## For More Information

### Contact Persons



**Marie Lacey**, Remedial Project Manager
U.S. EPA
415-972-3163
lacey.marie@epa.gov

**André Villaseñor**, Community Involvement Coordinator
U.S. EPA
415-972-3238
800-231-3075
villasenor.andre@epa.gov

### Site Repositories for Viewing of Documents



**Cesar Chavez Central Library**
605 N. El Dorado St.
Stockton, CA 95202
209-937-8221
U.S. EPA

**Superfund Records Center**
95 Hawthorne St., Ste. 403S
Francisco, CA 94105
415-536-2000

### Internet



To find previous fact sheets on EPA's website, go to:

http://www.epa.gov/superfund/sites/npl/ca.htm

Scroll down to «San Joaquin County», then select «McCormick & Baxter Creosoting Co.» Select the date of the fact sheet you would like to see.

# U.S. EPA Issues Changes to Sediment Cleanup Plan

Printed on 30% Postconsumer
Recycled / Recyclable Paper

U.S. Environmental Protection Agency, Region IX
75 Hawthorne Street (SFD-3)
San Francisco, CA 94105
Attn: André Villaseñor (McCor & Baxt 2/06)

*Official Business*
*Penalty for Private Use, $300*

*Address Service Requested*

FIRST-CLASS MAIL
POSTAGE & FEES
PAID
U.S. EPA
Permit No. G-35

# U.S. EPA kicks off second phase of Superfund cleanup at Stockton, Calif. site; Property once housed creosote application facility for wood products

Release date: 08/18/2006

Contact Information: Mark Merchant, (415) 947-4297

(08/18/06 - ) The second phase of the ongoing federal Superfund cleanup of creosote waste from the McCormick & Baxter site in downtown Stockton has begun.

The 29-acre site, along the Old Mormon Slough in Stockton's deep water port area, was placed on the U.S. Environmental Protection Agency's National Priorities list – commonly know as the Superfund list – for cleanup in 1992.

From 1942 to 1990 the site was used to spray wood products such as railroad ties and utility poles with creosote to extend their lives. Phase II of the cleanup will involve stabilizing creosote waste at the river's bottom.

"Covering the contaminated sediments will protect the fish habitat and aquatic health of the slough," said Marie Lacey, the EPA's Superfund project manager for the Pacific Southwest region. "Next year we hope to begin soil cleanup on the land portion of the site."

Made from coal tar, creosote is a known carcinogen and both long and short term exposure are known to have resulted in skin cancer and cancer of the scrotum. Animal studies have also shown skin cancer from skin exposure to coal tar products.

Construction of the cap – which will cover approximately 8.8 acres, or about three-quarters of the slough — will require about 36,400 cubic yards of sand laid on the riverbed two feet thick. The work should be completed by November.

In conjunction with the start of sediment capping work, the EPA will hold an open house to explain Phase II activities taking place this year and answer questions from the community. The open house will run from 4 to 7 p.m. on Tuesday, Aug. 29 at the Boggs Tract Community Center at 533 South Los Angeles St.

The EPA completed Phase I of the site cleanup in late 2002. That phase involved stabilizing the southern shoreline of the slough to prevent contaminated soil along the bank from eroding into the slough. The work included clearing away concrete and debris, cutting back the slope of the bank, installing bank protection material and building a new berm with clean fill material.

For more information, visit http://www.epa.gov/region09/cleanup/index.html

Receive our News Releases Automatically by Email

EXHIBIT
tabbies
11