John H. Patton, California SBN 069261
Matthew K. Wisinski, California SBN 195535
SHAPIRO BUCHMAN PROVINE & PATTON LLP
1333 North California Boulevard, Suite 350
Walnut Creek, CA 94596
Telephone: (925) 944-9700
Facsimile: (925) 944-9701
E-mail: jpatton@sbllp.com

Attorneys for Plaintiff CRV Enterprises, Inc.
and C. Ryan Voorhees

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**CRV ENTERPRISES, INC.**, a **California corporation, C. Ryan Voorhees, an individual,**

Plaintiffs,

vs.

**THE UNITED STATES OF AMERICA,**

Defendant.

No. 06-660L

**DECLARATION OF C. RYAN VOORHEES IN SUPPORT OF PLAINTIFFS CRV ENTERPRISES, INC. AND C. RYAN VOORHEES' MOTION FOR ORDER GRANTING INTERLOCUTORY SUMMARY JUDGMENT ON LIABILITY ISSUES, DETERMINING THE OCCURRENCE OF A COMPENSABLE GOVERNMENT TAKING OF PRIVATE PROPERTY [RCFC 56(c)]**

Date: To be assigned by the Court
Judge George W. Miller

**DECLARATION OF C. RYAN VOORHEES**

I, C. Ryan Voorhees, state and declare as follows:

1. I am a plaintiff in the above-entitled action and make this Declaration in support of plaintiffs' motion for summary judgment and/or summary adjudication of liability issues, establishing that a compensable government taking of private property has occurred in this case. I have personal knowledge of the facts stated

herein, except for those matters that are stated on information and belief, and as to those matters I am informed and believe that they are true and correct.

2. I am a citizen of the State of California, and have been since the mid-1980's. I reside in Lodi, Sacramento County, California. I have since birth been a citizen of the United States of America. My business is generally the development of real estate, although I am involved in the construction business as well.

3. I am a Director, the President, and the primary managing officer for plaintiff CRV Enterprises, Inc., a California corporation that participates in the development of real estate ("CRV"). The title CRV was chosen by me and comes from my initials. My wife, Elizabeth, and I own and control all of CRV's issued shares of stock. CRV's principal offices are located at the same property at which we reside in Lodi. CRV and I are the named plaintiffs in the above-entitled action.

4. This action concerns approximately 9.54 acres of improved real property located in the City of Stockton, San Joaquin County, California, described as San Joaquin County Assessor's Parcel No. 145-190-08, and bearing a street address of 1404 West Weber Avenue, Stockton, CA 95203, sometimes called the "E Port Center," and sometimes called the "Stockton Maritime Center" ("the Subject Property"). Attached hereto, marked Exhibit 1, and incorporated herein by reference, is a true and correct copy of the Assessor's Parcel Map depicting the Subject Property, designated by the arrow labeled "SUBJECT", and highlighted in yellow (also identified as Deposition Exhibit 7 in this case).

5. Immediately adjacent to the Subject Property, on its southern and western sides, is a body of water known as the Old Mormon Slough ("OMS"), which connects with a larger body of water, the Stockton Deep Water Channel, within the San Joaquin River, just west of the Port of Stockton. The OMS is a dead-end waterway, and I am informed and believe that it is approximately 2,500 feet long and

180 feet wide. The prior owner of the Subject Property (Dutra) represented to me that the northwestern end of the Mormon Channel, near its mouth, was previously dredged to a depth of approximately sixteen (16) feet to facilitate barge access and the movement of vessels thereon, and that the majority of the remainder of the OMS is approximately ten (10) feet deep. These reported depths are consistent with my knowledge of the OMS. The approximate locations of the OMS, and its confluence with the Stockton Deep Water Channel, are depicted in the Assessor's Parcel Map attached as Exhibit 1. An accurate aerial photograph depicting the OMS, the Subject Property, and the Stockton Deep Water Channel (also identified as Deposition Exhibit 3) is attached hereto, marked Exhibit 2, and incorporated herein by reference.

6. From the Port of Stockton west, the Stockton Deep Water Channel and San Joaquin River are all navigable bodies of water, and ships and vessels of all types and sizes use those waters to travel between the Port of Stockton, and the San Joaquin Delta, the San Francisco Bay, and the Pacific Ocean to the west.

7. I became aware of the Subject Property by approximately the Summer of 2000. On August 2, 2000, CRV acquired for development from Catellus Development Corporation two parcels of commercial property immediately to the north and northeast of the Subject Property (APN's 145-90-16 and 17, "the Catellus Parcels"), and because of those acquisitions, CRV and I also became aware of and interested in the Subject Property. The Catellus Parcels are cross-hatched in blue on the Assessor's Parcel Map attached hereto as Exhibit 1.

8. As of the Summer of 2000, the OMS was freely navigable for and commonly used by commercial barges, as well small-to-medium sized vessels, such as motor boats, sailboats, recreational fishing boats, and houseboats. At that time, such vessels could easily sail or cruise from the Stockton Deep Water Channel into

the OMS, and then tie up or anchor at the Subject Property (which had valuable sheet pile walls), at any point along the edge of the Subject Property and the OMS. During the early 2000's, and prior to actions of the Government giving rise to this action, when I was at the Subject Property I routinely observed such vessels entering the OMS and anchoring or tying up along the sheet pile walls at and extending above the mean high water mark on the Subject Property, and persons and cargo disembarking or being offloaded from the OMS to the Subject Property, and vice versa.

9. The marine access to and from the Subject Property via the OMS, and the uses available to the Subject Property from such access, were the chief features that interested me in acquiring the Subject Property. While CRV has acquired the Catellus Parcels adjacent to and north of the Subject Property that is situated either at the confluence of the OMS and the Stockton Deep Water Channel, or on the Stockton Deep Water Channel proper, the OMS provides much more sheltered anchorage for smaller and medium-sized vessels, and is far more suitable for amenities for such vessels, such as slips, berths, docks, ramps, a fueling station, and other marina-type uses. Very large commercial ships frequently use the Stockton Deep Water Channel to get to and from the Port of Stockton, and these major vessels often create larger wakes, which, while not prohibitive, are not conducive to uses such as small-craft or barge mooring. But no oversized ships used the OMS, because of its relatively shallow depth, and because there was insufficient maneuvering space within the OMS for such oversized vessels, and for these reasons, among others, the OMS was more protected and suitable for medium-sized and recreational watercraft, and a marina-type use. This capability for marina-type use all along the southern boundary was another major plus for the Subject Property, and made that property more valuable than if it could not be used

or developed for marine uses, or if it were simply situated on the Deep Water Channel (which still could accommodate marine uses, but was not as desirable for that purpose). For example, small-craft slips in the protected OMS would be expected to command a higher rent rate or usage fee than those situated on the Deep Water Channel.

10. The Subject Property also had and still has 3 concrete-backed sheet pile walls installed for Dutra within the Subject Property's boundaries at the edge of the OMS for the mooring of vessels and loading and unloading, which were very attractive features. These walls extend above the mean high tide line and are part of the Subject Property, and not within the OMS. Similarly, the concrete bases behind them are situated above the mean high tide line and are part of the Subject Property. These amenities allow vessels of relatively significant size to dock next to and be loaded and unloaded from the Subject Property. Accurate Google™ Earth images depicting the Subject Property are attached hereto, marked Exhibits 3A and 3B, and incorporated herein by reference. These images (Exhibits 3A and 3B) depict the 3 sheet pile walls (Walls 1-3) that have existed at the Subject Property since I first learned of the property and became interested in its development in 2000. Walls 1 and 2 form the main barge slip for the property.

11. Sheet pile walls greatly increase the uses and value of a marine property, because they facilitate and allow docking and loading, as described above. Such walls are also very expensive and complicated to install, costing approximately $2,500 per lineal foot in construction costs, not including the costly and lengthy bureaucratic processing to obtain the entitlements to install them. But these entitlements and amenities were already in place and in use at the Subject Property as of 2000, and they greatly enhanced the property's use and value.

12. Based upon the capability of the Subject Property to provide for marine use and access for small and medium-sized watercraft and commercial barges (which have shallow draft) within the OMS as described herein, and because of the very attractive development potential for the Subject Property as a mixed-use marina relatively close to downtown Stockton, CRV and I decided to proceed with acquiring an option to purchase the Subject Property.

13. On October 2, 2000, and on behalf of CRV, I executed an Option Agreement for the purchase of the Subject Property from Bill T. Dutra ("Dutra") at a price of $1,315,000, a true and correct copy of which (Deposition Exhibit 44) is attached hereto, marked Exhibit 4, and incorporated herein by reference. Mr. Dutra was the main principal of Dutra Marine Construction, a company that had for years operated a construction-related business on the Subject Property, wherein barges would frequently load and unload heavy construction materials and cargos via the OMS. Escrow was opened for the transaction on or about that October 2, 2000, and valuable consideration ($25,000) was paid by me into the escrow for immediate release to Mr. Dutra.

14. Following execution of the Option Agreement (Exhibit 4), CRV and I promptly began efforts to further develop and entitle the Subject Property, with the intention and goal of fully utilizing and realizing its uses for a marina-type property, capitalizing on marine access and uses of the property from the adjoining OMS. These efforts continued through and beyond the purchase of the property, which was not consummated until the Fall of 2002, as set forth below.

15. As part of our investigation and due diligence, CRV and I hired engineers to evaluate the suitability of the Subject Property for development as a marina-type property, including determining whether the property contained significant amounts of hazardous materials or contaminants. As a result of their

investigations, and prior to the closing on the purchase, our engineering consultants reported to us that the Subject Property was free from any significant levels of hazardous materials or contaminants that might preclude development.

16. Subsequent to October 2, 2000, I personally paid additional amounts of valuable consideration into escrow to continue and extend its option rights to purchase the Subject Property, and additional sums paid in were released from escrow to Mr. Dutra in exchange. More than $200,000 in nonrefundable option consideration and deposits was delivered by me and CRV to Mr. Dutra, as the Seller, by October 1, 2001, toward acquisition of the Subject Property. Further, the Option Agreement was amended and extended on several occasions.

17. Attached hereto, marked Exhibit 5, and incorporated herein by reference, is a true and correct copy of a rendering of one of the potential development plans that CRV and I procured and worked on during the course of our development efforts for the Subject Property (including the adjoining Catellus Parcels to the north), depicting our intended development of the Subject Property as a marina-type property. This rendering (Exhibit 5) depicts small boat slips along the southern edge of the Subject Property, to the south and east of the southeastern sheet pile wall (Wall # 3).

18. On or about October 29, 2002, CRV and I exercised the option rights to purchase the Subject Property, and escrow closed on the purchase on or about November 8, 2002. I personally paid Mr. Dutra a purchase price of $1,315,000 to purchase the Subject Property, plus additional option payments that were made to Mr. Dutra prior to the closing. Although I now believe that all or most of the monetary consideration to purchase the Subject Property was paid by me, title to the Subject Property was recorded in plaintiff CRV's name, because CRV had been active in the development process for this and adjoining properties. A true and

correct copy of the Grant Deed for this transaction, recorded November 8, 2002, is attached hereto, marked Exhibit 6, and incorporated herein by reference.

19. In approximately the Fall of 2004, my accountant advised me that most or all of the funds used to purchase the Subject Property, and adjoining Catellus Parcels (not a subject of this action), had come from me personally, rather than from plaintiff CRV, and for that reason, it would be more appropriate for title to be held in my name personally, as opposed to CRV's. As a result, I caused CRV to convey the Subject Property, along with the Catellus Parcels, to myself by Grant Deed executed October 11, 2004, and recorded October 20, 2004. A true and correct copy of this Grant Deed is attached hereto, marked Exhibit 7, and incorporated herein by reference. I had forgotten about this transfer at the time that this action was filed in 2006, and did not specifically recall it until after I was deposed in this action.

20. Directly south of the OMS, and opposite the Subject Property, is located the former McCormick & Baxter ("M&B") creosoting facility. A Government-prepared diagram accurately depicting the M&B site (also identified as Deposition Exhibit 11) is attached hereto, marked Exhibit 8, and incorporated by reference. The M&B site can also be seen south of (below) the OMS in the aerial photograph attached as Exhibit 2.

21. Over the course of my involvement with the Subject Property, I have learned of the existence of contamination at the M&B site, reportedly caused by their creosoting operations. I have also learned of the United States Environmental Protection Agency's ("USEPA" and/or "the Government") designation of the M&B site as a USEPA "Superfund" site, designated for environmental remedial actions by the Government. I am also aware that as part of these remedial actions, prior to 2000, the Government installed a sheet pile wall of approximately 400 feet in length

along the northern bank of the M&B site to control the seepage of contaminants from the M&B site into the OMS.

22. I am further aware that as part of these remedial actions, sometime prior to 2005, the Government stabilized the remaining bank of the northern portion of the M&B site, and installed a clean earth berm and bank protection material at the bank where it meets the OMS, designed to reduce or eliminate the spread of contaminants from the M&B site into the OMS.

23. As part of the Government's activities to address the M&B site, the Government, through contractors, conducted tests, sampling and monitoring to determine the relative levels of contamination in the soil at the M&B site, in the subsurface sediment at the OMS itself, and on soils located on and around the Subject Property. I discussed these activities with Government representatives (USEPA employees) at various times in approximately 2002-03. It was reported to me by these Government representatives that the tests and sampling conducted by the Government at the Subject Property, including the northern shore of the OMS, demonstrated that no significant levels of contamination existed along the northern shore of the OMS or at the Subject Property.

24. I am also aware that in connection with its USEPA "Superfund" project related to the adjoining M&B site, the Government has conducted additional environmental actions designated by it as "remedial," by installing improvements within the OMS itself. By early 2003, representatives of the Government (USEPA) had informed me that the Government planned to install a 2-foot thick subsurface sand cap over the sediment bottom of the OMS (in the Summer of 2003), the ostensible purpose of which was to prevent the migration into the San Joaquin River and Stockton Deep Water Channel, of whatever contaminants remained in the sediment bottom of the OMS.

25. By early 2003, representatives of the Government (USEPA) had also informed me that in furtherance of its sand-capping project, the Government also planned to install a permanent log boom anchored by wood pilings ("log boom") across the mouth of the OMS as an adjunct of its sand capping measure, to protect the sand cap by preventing marine vessels from accessing the OMS, ostensibly because the Government claimed that such vessels might disturb the subsurface sand cap over the sediment bottom, even though that 2-foot thick sand cap was going to be a minimum of 8 feet or more below the surface. In essence, this planned installation of the sand-cap and log boom improvements within the OMS would take the OMS for the USEPA's exclusive use, in connection with its remediation of the adjoining M&B "Superfund" site.

26. I and others protested these proposed actions to the Government, because the installation of the sand cap would reduce the depth of the OMS and the sizes of vessels that might use it, and would significantly impact the Subject Property and its uses. I also protested the proposed installation of the log boom across the mouth of the OMS, and requested that the Government pursue alternative actions, but ultimately, to no avail. I explained to the Government representatives that the placement of a permanent log boom across the mouth of the OMS would shut down the OMS and all marine access, and destroy most of the value of the Subject Property as a marine property, because no vessels could get into the property via the OMS, except for the small northwestern portion of the property that would remain west of the Government's log boom.

27. I also requested that the Government place the sand cap and log boom further back (east) in the OMS, where it would not interfere with marine uses of the western portion of the OMS and the Subject Property. While I hoped and believed that the Government officials would reconsider their position regarding

installation of the sand cap and log boom, ultimately, it became apparent that they would not do so, and that they intended to take exclusive possession of the OMS. At that point I began requesting that the Government pay me just compensation for this taking, but they declined to do so.

28. As a result of the USEPA informing me of its plans to take the OMS in connection with its M&B "Superfund" project by installing the subsurface sand cap and permanent log boom in the OMS by the end of 2003, on April 30, 2003, CRV filed an action for inverse condemnation against the Government in this Court, for the taking of valuable maritime/riparian rights and access appurtenant to the Subject Property (Case No. 1:03-cv-00867-GWM). For reasons having nothing to do with me or CRV, the Government did not install its subsurface sand cap and permanent log boom in the Summer of 2003, and that aspect of its project was delayed. As a result, the Government and CRV later agreed to dismiss the prior action without prejudice because the physical taking had not yet occurred. The Court entered our stipulation to dismiss the prior case on or about May 16, 2005.

29. In the Fall of 2006, in approximately September, the Government finally completed constructing its improvements in the OMS, including installing the subsurface sand cap, and permanent log boom across the mouth of the OMS, which physically prevents watercraft and vessels from entering the OMS beyond (east of) the boom. I was present at the Subject Property during some of these activities, and observed part of the installation of the sand cap. Attached hereto, marked Exhibit 9, and incorporated herein by reference, is a true and correct copy of a page from worlddredging.com's website, depicting the installation of the Government's Sand Cap. Up until the installation of these improvements, the OMS and the entire foreshore of the Subject Property was completely navigable and usable by marine vessels. With the installation, all such use immediately was physically terminated.

30. A Government-produced diagram depicting the approximate location of the permanent log boom (Deposition Exhibit 30) is attached hereto, marked Exhibit 10, and incorporated herein by reference. Attached hereto, marked Exhibit 11, and incorporated herein by reference, is a photograph taken by me from the Subject Property facing south across the OMS (also identified as Deposition Exhibit 32), that accurately depicts the Government's permanent log boom, that is affixed to and stretches between two wooden pilings driven into the bottom of the OMS.

31. The Government's construction of these improvements within the OMS have taken the OMS (from the log boom east) for the exclusive use of the USEPA in connection with its remediation project on the adjoining M&B site. In connection with that installation and its exclusive use of the OMS, the USEPA has also erected a sign on the northernmost wood piling, affixed to the log boom, which states: "DANGER NO ENTRY – CAPPED SEDIMANTS (SIC) BEYOND THIS POINT – HAZARDOUS MATERIALS". Attached hereto, marked Exhibit 12, and incorporated herein by reference, is a photograph taken by me from the Subject Property facing south into the OMS, which depicts the USEPA's sign.

33. As a result of the Government's installation of its subsurface sand cap and permanent log boom (Exhibits 9-11) and taking of the OMS and riparian rights appurtenant to the Subject Property, on September 15, 2006, CRV filed the Complaint in this action. As I mentioned, at that time I had forgotten that CRV had previously granted the Subject Property to me, and did not remember that fact until later on in this litigation. On January 23, 2008, and with leave of the Court, CRV and I filed an amended Complaint, including me as a named plaintiff in this action.

34. The Government's installation of the subsurface sand cap and permanent log boom (Exhibits 9-11) physically deprives the Subject Property of any marine or riparian use beyond (east and south of) the log boom, because it

physically invades and appropriates the OMS for the USEPA, and prevents any vessels or watercraft from accessing the OMS and the Subject Property beyond (east of) the boom. I estimate that 60-65% of the foreshore of the Subject Property has been lost to maritime use because of the installation of the Government's improvements in the OMS. This greatly diminishes the uses and value of the Subject Property, although the parties have stipulated to litigate the issues concerning the amount of just compensation after the liability/takings phase has been heard on this motion, and on the Government's cross-motion. These installations do not serve or aid navigation in any way. They have no navigational purpose or use, but are instead part of the Government's activities to address contamination allegedly emanating from the M&B site across the OMS from the Subject Property, and to contain whatever contaminants might exist within the sediment bottom of the OMS.

35. As just one example of the harm caused by the Government's appropriation of the OMS by the installation of its subsurface sand cap and permanent log boom (Exhibits 9-11), the Google™ Earth images attached as Exhibits 3A and 3B, depict the 3 sheet pile walls that are installed on and within the Subject Property (and not part of the OMS). The southeastern wall (designated Wall #3) is approximately 150 feet long. It costs approximately $2,500 per lineal foot to construct such a wall, not including entitlement costs (permits, etc.). Thus, just in replacement cost, this wall alone adds $375,000 in value to the Subject Property. But because the southeastern wall is now behind (east and south of) the Government's permanent log boom (Exhibits 10 and 11), it cannot be used to moor vessels or load or unload cargo. That sheet pile wall is now completely useless, and adds no value to the Subject Property, because it cannot be used. The Government's actions in installing the subsurface sand cap and permanent log boom

for ostensible remedial purposes have taken that use and its value from the Subject Property. Of course, there are other amenities connected with marine use that can no longer be used because of the Government's taking that will need to be considered in the damage phase of this case, but this sheet pile wall is a good example.

36. Similarly, no other portions of the OMS or the Subject Property beyond (east and south of) the Government's permanent log boom (Exhibits 9 and 10), can be used for marine purposes, for the access and egress of vessels, for the docking of vessels, for boat slips, or for development and improvement of the property for such uses, because the Government's actions in installing its subsurface sand cap and log boom have taken that capability from the Subject Property. The potential development plan attached hereto as Exhibit 5 (including the boat slips depicted in the OMS), is now completely unfeasible for the Subject Property because of the Government's actions in installing the subsurface sand cap, and log boom across the mouth of the OMS, appropriating the OMS and precluding marine use of the Subject Property.

37. The Government has refused all requests by me and CRV (which has spent significant monies in efforts to develop the Subject Property) for payment of just compensation for the loss of the marine uses to the Subject Property caused by the installation of the Government's improvements in the OMS (Exhibit 9-11).

38. On this motion and in this action, CRV and I are respectfully requesting a finding and Order by this Court that the Government's actions in installing its subsurface sand cap, and permanent log boom across the mouth of the OMS, constitute a taking for which the Government must pay just compensation, as we believe is required by the United States Constitution.

39. I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct and of my own personal knowledge, except as to those matters stated on information and belief, and as to those matters, I believe them to be true and correct.

Executed this 8 day of April, at Lodi, California.

C. Ryan Voorhees