**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CRV ENTERPRISES, INC. and<br>C. RYAN VOORHEES, | ) | |
| Plaintiffs, | ) | Case No. 06-660L |
| v. | ) | |
| | ) | Judge George W. Miller |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**UNITED STATES' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS, OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** . . . . . . . . . . iv

**EXHIBIT LIST** . . . . . . . . . . ix

**QUESTIONS PRESENTED** . . . . . . . . . . xii

**MEMORANDUM** . . . . . . . . . . 1

**I. FACTUAL BACKGROUND** . . . . . . . . . . 1

**II. PROCEDURAL BACKGROUND** . . . . . . . . . . 7

**III. ARGUMENT** . . . . . . . . . . 8

**A. Standard of Review** . . . . . . . . . . 8

**B. Any Alleged Loss in Value was the Result of a Regulatory Act that Occurred Before Plaintiffs Acquired the Subject Property and Any Claim on this Basis Cannot be Assigned to Plaintiffs** . . . . . . . . . . 10

**C. Plaintiff CRV Lacks Standing to Sue** . . . . . . . . . . 13

**D. The Court Lacks Jurisdiction Over Plaintiffs' Collateral Challenge to EPA's Chosen Remediation Actions** . . . . . . . . . . 14

**E. Plaintiffs Cannot Establish that EPA's Actions Took Any Compensable Property Interest** . . . . . . . . . . 15

**1. The United States Has Neither Physically Occupied Any Part of the Subject Property nor Denied All Access to the Subject Property** . . . . . . . . . . 17

**2. Plaintiffs Have No Private Right to Navigation** . . . . . . . . . . 19

**3. Plaintiffs' Allegation that the United States Took the "Highest and Best Use" of the Subject Property Cannot Support a Takings Claim** . . . . . . . . . . 20

4. **The Rivers and Harbors Act Permit Pursuant to which Commercially-Meaningful Navigational Access to the Subject Property was Created is a Pre-Existing Limitation on Plaintiffs' Property Rights** . . . 21

5. **Plaintiffs Were Always Prohibited from Using Their Property to Create a Nuisance and EPA's Actions Were Taken to Abate a Public Nuisance** . . . 22

a. **Damaging the Sand Cap and Stirring Up Hazardous Chemicals in the Contaminated Slough Constitutes a Public Nuisance Pursuant to California Law** . . . 24

i. **California's General Law of Nuisance** . . . 24

ii. **Water Pollution is a Nuisance Under California Law** . . . 24

iii. **Damaging the Sand Cap and Stirring Up Hazardous Contaminants in a Polluted Waterway Constitutes a Public Nuisance Under California Law** . . . 26

b. **EPA's Actions to Abate the Nuisance Would Be Permitted Under California Law, Without Compensation** . . . 28

i. **EPA's Actions Would Be Permitted Under California's General Nuisance Laws** . . . 28

ii. **EPA's Actions Would Be Permitted Under Several State Water Pollution Laws** . . . 29

iii. **The State Agreed With EPA's Selected Remedy** . . . 32

6. **The California Public Trust Doctrine is a Pre-existing Limitation on Plaintiffs' Property Rights that Circumscribes Plaintiffs' Private Right of Riparian Access** . . . 33

**IV. CONCLUSION** . . . 35

## TABLE OF AUTHORITIES

### FEDERAL CASES

Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . 16

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Armijo v. United States, 229 Ct. Cl. 34 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Bd. of Regents of State Colls. v. Roth, 408 U.S. 564 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Bell Atl. Corp. v. Twombly, _ U.S. _, 127 S.Ct. 1955 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Boyle v. United States, 200 F.3d 1369 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Bradley v. Chiron Corp., 136 F.3d 1317 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Castle v. United States, 301 F.3d 1328 (Fed. Cir. 2002),
cert. denied, 539 U.S. 925 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Cavin v. United States, 956 F.2d 1131 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

City of Gettysburg v. United States, 64 Fed. Cl. 429 (2005),
aff'd, 173 Fed. Appx. 827 (Fed. Cir. Mar. 16, 2006),
cert. denied, _ U.S. _, 127 S. Ct. 405 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Cloutier v. United States, 19 Cl. Ct. 326 (1990),
aff'd, 937 F.2d 622 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Colvin Cattle Co. v. United States, 468 F.3d 803 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . 15

Creppel v. United States, 41 F.3d 627 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Deltona Corp. v. United States, 657 F.2d 1184 (Ct. Cl. 1981),
cert. denied, 455 U.S. 1017 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Friends of Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167 (2000) . . . . . . . . . . . . . . . . . 13

Goodrich v. United States, 434 F.3d 1329 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

Hanford Downwinders Coal., Inc. v. Dowdle, 71 F.3d 1469 (9th Cir. 1995) . . . . . . . . . . . . . . . 15

John R. Sand & Gravel Co. v. United States, 60 Fed. Cl. 230 (2004) . . . . . . . . . . . . . . . . . . 22, 23

Karuk Tribe v. Ammon, 209 F.3d 1366 (Fed. Cir. 2000), cert. denied, 532 U.S. 941 (2001) . . . . . 17

Kemp v. United States, 65 Fed. Cl. 818 (2005) . . . . . 8

Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470 (1987) . . . . . 22

Laney v. United States, 228 Ct. Cl. 519, 661 F.2d 145 (1981) . . . . . 18

Lingle v. Chevron U.S.A., Inc., 544 U.S. 528 (2005) . . . . . 15

Loveladies Harbor, Inc. v. United States, 21 Cl. Ct. 153 (1990) . . . . . 20-22

Lucas v. S. Carolina Coastal Council, 505 U.S. 1003 (1992) . . . . . 3, 16, 22, 23, 27, 32

Mingus Constructors, Inc. v. United States, 812 F.2d 1387 (Fed. Cir. 1987) . . . . . 10

Nw. La. Fish & Game Pres. Comm'n v. United States, 79 Fed. Cl. 400 (2007) . . . . . 17

Mount v. United States, 2 Cl. Ct. 717 (1983) . . . . . 18

Perez v. United States, 156 F.3d 1366 (Fed. Cir. 1998) . . . . . 9

Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746 (Fed. Cir. 1988) . . . . . 9

Roth v. United States, 73 Fed. Cl. 144 (2006) . . . . . 18

Scheuer v. Rhodes, 416 U.S. 232 (1974) . . . . . 9

Skip Kirchdorfer v. United States, 6 F.3d 1573 (Fed. Cir. 1993) . . . . . 16

Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560 (Fed. Cir. 1987) . . . . . 10

United States v. Diebold, Inc., 369 U.S. 654 (1962) . . . . . 10

United States v. Dow, 357 U.S. 17 (1958) . . . . . 13-14

**STATE CASES**

Beck Dev. Co. v. S. Pac. Transp. Co., 52 Cal. Rptr. 2d 518 (Cal. Ct. App. 1996) . . . . . 25

City of Burbank v. State Water Res. Control Bd., 108 P.3d 862 (Cal. 2005) . . . . . 29, 30

City of Lodi v. Randtron, 13 Cal. Rptr. 3d 107 (Cal. Ct. App. 2004) . . . . . . . . . . . . . . . . . . 25, 31

Colberg, Inc. v. State, 432 P.2d 3 (Cal. 1967),
cert. denied, 432 P.2d 3 (Cal. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 33, 34

County of Santa Clara v. Atl. Richfield Co., 40 Cal. Rptr. 3d 313 (Cal. Ct. App. 2006) . . . . . . 28

Diamond v. Gen. Motors Corp., 97 Cal. Rptr. 639 (Cal. Ct. App. 1971) . . . . . . . . . . . . . . . . . . 28

Selma Pressure Treating Co. v. Osmose Wood Preserving Co.,
271 Cal. Rptr. 596 (Cal. Ct. App. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26, 30

Flahive v. City of Dana Point, 85 Cal. Rptr. 2d 51 (Cal. Ct. App. 1999) . . . . . . . . . . . . . . . . . . 28

KFC Western, Inc. v. Meghrig, 28 Cal. Rptr. 2d 676 (Cal. Ct. App. 1994) . . . . . . . . . . . . . . . . 24

Leslie Salt Co. v. San Francisco Bay Conserv., 200 Cal. Rptr. 575 (Cal. Ct. App. 1984) . . . . . 24

Mangini v. Aerojet-Gen. Corp., 912 P.2d 1220 (Cal. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Marks v. Whitney, 6 Cal.3d 251 (Cal. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Nat'l Audubon Soc. v. Superior Ct., 658 P.2d 709 (Cal. 1983),
cert. denied, 464 U.S. 977 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33-35

Newhall Land & Farming Co. v. Superior Court, 23 Cal. Rptr. 2d 377 (Cal. Ct. App. 1993) . . 25

People v. Hadley Fruit Orchards, Inc., 130 Cal. Rptr. 287 (Cal. Ct. App. 1976) . . . . . . . . . . . . 32

People v. S. Pac. Co., 311 P.2d 200 (Cal. App. Dep't Super. Ct. 1957) . . . . . . . . . . . . . . . . . . . 24

People v. Truckee Lumber Co., 116 Cal. 397 (1897) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Scott v. City of Del Mar, 68 Cal. Rptr. 2d 317 (Cal. Ct. App. 1997) . . . . . . . . . . . . . . . . . . . . . 32

SWRCB Cases, 39 Cal. Rptr. 3d 189 (Cal. App. 2006),
cert. denied, _ U.S. _, 127 S.Ct. 318 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

**FEDERAL STATUTES**

31 U.S.C. § 372 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

33 U.S.C. § 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. § 9613(h) . . . . . . . . . . 15

42 U.S.C. §§ 9601, et seq. . . . . . . . . . . 1

**STATE STATUTES**

Cal. Civ. Code § 3479 . . . . . . . . . . 24

Cal. Civ. Code § 3480 . . . . . . . . . . 28

Cal. Civ. Code § 3483 . . . . . . . . . . 24

Cal. Civ. Code § 3491 . . . . . . . . . . 28

Cal. Civ. Code § 3494 . . . . . . . . . . 28

Cal. Civ. Code § 38771 . . . . . . . . . . 29

Cal. Civ. Code § 38773 . . . . . . . . . . 29

Cal. Fish & Game § 5650(a)(6) . . . . . . . . . . 32

Cal. Health & Safety Code § 25100 . . . . . . . . . . 32

Cal. Health & Safety Code §§ 25179.1, et seq. . . . . . . . . . . 32

Cal. Health & Safety Code §§ 25209, et seq. . . . . . . . . . . 32

Cal. Health & Safety Code § 25249.5 . . . . . . . . . . 32

Cal. Health & Safety Code §§ 25300, et seq. . . . . . . . . . . 31

Cal. Health & Safety Code § 25301(a) . . . . . . . . . . 31

Cal. Health & Safety Code § 25322 . . . . . . . . . . 31

Cal. Health & Safety Code § 25323 . . . . . . . . . . 31

Cal. Health & Safety Code § 25354 . . . . . . . . . . 31

Cal. Health & Safety Code § 25355.5 . . . . . . . . . . 31

Cal. Health & Safety Code § 25356.1.5 . . . . . . . . . . 31

Cal. Health & Safety Code § 25358.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Cal. Health & Safety Code § 25363 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Cal. Water Code §§ 13000, et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 29, 30

Cal. Water Code § 13304 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Cal. Water Code § 13305 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Cal. Water Code § 5650(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**FEDERAL RULES**

RCFC 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 13-16, 35

RCFC 41(a)(1)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

RCFC 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 13, 16, 35

**FEDERAL REGULATIONS**

40 C.F.R. § 300.430 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

40 C.F.R. § 300.515 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

33 C.F.R. § 320.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**OTHER AUTHORITIES**

Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure . . . . . . . . . . . . . . . . . . . . . 9

Cal. Civ. Practice, Environmental Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Miller & Starr, Cal. Real Estate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 28-32

**EXHIBIT LIST**

| Exhibit Number | Description | Page |
|---|---|---|
| 1 | Grant Deed, from Bill T. Dutra to CRV Enterprises, Inc., recorded Nov. 8, 2002 | DOJ1-DOJ3 |
| 2 | Grant Deed, from CRV Enterprises, Inc. to C. Ryan Voorhees, recorded Oct. 20, 2004 | DOJ4-DOJ8 |
| 3 | Map, showing Subject Property | DOJ9 |
| 4 | Map, showing Subject Property and New Mormon Slough | DOJ10 |
| 5 | Survey, showing Subject Property | DOJ11 |
| 6 | Violation Report | DOJ12 |
| 7 | Letter from Richard Rose to M&B, dated Dec. 23, 1977 | DOJ13-DOJ14 |
| 8 | Referral Order No. 78-17 | DOJ15 |
| 9 | Letter from California's Permits, Surveillance and Enforcement Section to Marian King, dated Sept. 28, 1983 | DOJ16-DOJ18 |
| 10 | Memorandum from J. Lawrence Pearson to William H. Crooks, dated Jan. 25, 1984 | DOJ19 |
| 11 | Hydrogeologic Investigation, dated May 14, 1984 (relevant portions only) | DOJ20-DOJ31 |
| 12 | News Release, dated March 1993 | DOJ32-DOJ35 |
| 13 | The McCormick-Baxter Community Relations Plan, dated April 1993 | DOJ36-DOJ50 |
| 14 | Field Sampling Plan for Sediment Sampling in the Old and New Mormon Sloughs, dated September 1993 (relevant portions only) | DOJ51-DOJ70 |
| 15 | Letter from Frank Lopez, California Department of Toxic Substances Control, to Marie Lacey, EPA, dated Dec. 17, 1997 | DOJ71-DOJ73 |

| | | |
|---|---|---|
| 16 | Letter from James Tjosvold, California Department of Toxic Substances Control, to John Kemmerer, EPA, dated Apr. 10, 1998 | DOJ74-DOJ76 |
| 17 | (Draft) Surface Water-Sediment Feasibility Study Report for the McCormick and Baxter Superfund Site, dated July 1998 (relevant portions only) | DOJ77-DOJ162 |
| 18 | EPA Proposed Plan, dated September 1998 | DOJ163-DOJ182 |
| 19 | EPA Announcement, dated Oct. 7, 1998 | DOJ183 |
| 20 | (Final) Surface Water-Sediment Feasibility Study Report for the McCormick and Baxter Superfund Site, dated January 1999 (relevant portions only) | DOJ184-DOJ302 |
| 21 | Record of Decision for McCormick and Baxter Superfund Site, dated Mar. 31, 1999 | DOJ303-DOJ366 |
| 22 | Letter from James Tjosvold to John Kemmerer, dated May 7, 1999 | DOJ367-DOJ368 |
| 23 | McCormick & Baxter Superfund Site, Analysis of Dredging Modification to Alternative SD-2a, dated October 2000 | DOJ369-DOJ390 |
| 24 | Sign In Sheet, dated Nov. 29, 2001 | DOJ391 |
| 25 | Final Design Analysis Report, dated December 2001 (relevant portions only) | DOJ392-DOJ425 |
| 26 | Letter from C. Ryan Voorhees to Bob Goodman, dated Jan. 21, 2002 | DOJ426 |
| 27 | Sign In Sheet, dated Aug. 26, 2002 | DOJ427 |
| 28 | Agenda from Aug. 26, 2002 Meeting | DOJ428 |
| 29 | Declaration of Kenneth Smith, Counsel to The Dutra Group, dated Dec. 22, 2007, with attachments | DOJ429-DOJ498 |
| 30 | Deposition of Ryan Voorhees, dated Nov. 27, 2007 (relevant portions only) | DOJ499-DOJ509 |
| 31 | Deposition of Marie Lacey, dated Oct. 23, 2007 (relevant portions only) | DOJ510-DOJ516 |
| 32 | Plaintiff's Response to Defendant's First Set of Interrogatories, dated June 12, 2007 | DOJ517-DOJ528 |

| | | |
|---|---|---|
| 33 | Plaintiff's Second Supplemental Response to Defendant's First Set of Interrogatories, dated July 2, 2007 | DOJ529-DOJ536 |
| 34 | Plaintiffs' Responses to Defendant's Second Set of Interrogatories, dated Mar. 5, 2008 | DOJ537-DOJ555 |
| 35 | Plaintiff CRV Enterprises, Inc.'s Third Supplemental Response to Defendant's First Set of Interrogatories, dated Mar. 5, 2008 | DOJ556-DOJ562 |
| 36 | Letter from EPA to Robert Goodman, dated Aug. 14, 2002 | DOJ563-DOJ564 |

## QUESTIONS PRESENTED

Pursuant to Rule 5.3(a)(1)(C), the United States hereby submits this statement of the questions involved in the United States' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment.

1. May Plaintiffs advance a physical takings claim in the Court of Federal Claims when a taking occurred, if at all, before Plaintiffs acquired the Subject Property? Relatedly, may Plaintiff CRV advance its claim where that claim is based on a voluntary assignment from the former owner of the Subject Property of a right to sue, in violation of the Assignment of Claims Act, 31 U.S.C. § 3727?

2. Does Plaintiff CRV Enterprises, Inc. have standing to sue in the Court of Federal Claims, given that it was not the owner of the Subject Property in October 2006, the alleged date of taking?

3. May Plaintiffs advance a claim in the Court of Federal Claims that seeks judicial review of the Environmental Protection Agency's actions, in violation of 42 U.S.C. § 9613(h)?

4. May Plaintiffs advance a physical takings claim in the Court of Federal Claims resulting from a partial interference with navigational access in a public waterway, when Plaintiffs did not own the affected riverbed or waters?

5. May Plaintiffs advance a takings claim in the Court of Federal Claims when the permit, pursuant to which commercially-meaningful navigational access to the Subject Property was created, specifically provided that it conveyed no property rights and waived compensation for any damages to the work performed thereunder by any future operations undertaken by the United States in the public interest?

6. May Plaintiffs advance a takings claim in the Court of Federal Claims when the alleged interference with navigational access was taken to abate a public nuisance under relevant state law, and Plaintiffs' continued use of the navigational access at issue in this case would have created a public nuisance under relevant state law?

7. May Plaintiffs advance a takings claim in the Court of Federal Claims when EPA's actions constituting the alleged interference with navigational access were taken within the public trust doctrine, a pre-existing limitation on Plaintiffs' property interests?

**MEMORANDUM**

## I. FACTUAL BACKGROUND

Plaintiffs C. Ryan Voorhees and CRV Enterprises, Inc. ("CRV") are the current and former owners, respectively, of a tract of land in Stockton, California, located at 1404 West Weber Avenue ("Subject Property"). See Def.'s Proposed Findings of Uncontroverted Fact ("PFF"), ¶ 1.[1/] The Subject Property is adjacent to a contaminated waterway known as the Old Mormon Slough (or "Slough"), which is part of the McCormick & Baxter Creosoting Company Superfund Site ("M&B Site"), a hazardous waste site listed on the National Priorities List ("NPL") pursuant to the Comprehensive Environmental Response Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601, et seq. (2000) ("CERCLA" or "the Superfund law"). See PFF, ¶ 6. Plaintiffs claim that the actions of the United States Environmental Protection Agency ("EPA") to address the threat from the hazardous chemicals embedded in the sediment of the Slough effected a physical taking of the Subject Property by interfering with their alleged right to unfettered navigational access in the Slough.

The Subject Property is located on the northern shore of the Slough. See PFF, ¶ 2. The M&B property is located across the Slough, bordering the southern edge of the waterway. See PFF, ¶ 6. Between 1942 and 1990, wood-preserving operations at the M&B property resulted in substantial releases of hazardous chemicals. See PFF, ¶¶ 7, 8. M&B's operators illegally discharged significant quantities of hazardous contaminants to the soil, surface water, and sediment, including dangerous levels of carcinogenic polynuclear aromatic hydrocarbons ("PAHs") and dioxins into the sediment underlying the Slough. See PFF, ¶¶ 9-11, 18, 24, 30-32,

---

[1/] There is one small structure on the Subject Property.

36-37.

In the mid-1970s, California agencies determined that M&B was illegally discharging waste into the Slough via storm drains. PFF, ¶¶ 10-11. In 1977, the California Department of Fish and Game ("California DFG") investigated a nearby fish kill, and concluded that contaminated stormwater runoff from the M&B Site was responsible. PFF, ¶ 12. California DFG issued M&B a notice of violation, citing California's Water Code Section 5650(f). See PFF, ¶ 13. In 1978, the California Regional Water Quality Control Board ("Regional Board") attempted to remedy the contamination by requiring M&B to abate the discharge of wastes and contain toxic materials. See PFF, ¶¶ 14-17. M&B made certain corrections, but continued to illegally discharge hazardous chemicals into the Slough. See PFF, ¶¶ 18-25. In 1988, M&B declared bankruptcy, and in 1990, M&B ceased operations at the M&B property. See PFF, ¶ 25.

In October 1992, at the request of the State of California, EPA added the M&B Site to the NPL. See PFF, ¶ 26. Listing the M&B Site on the NPL allowed EPA to assume lead agency responsibility and use CERCLA resources to cleanup the Site. See PFF, ¶ 26. Thereafter, EPA investigated the M&B property as well as the water and sediment in the Slough. See PFF, ¶¶ 27-37. EPA's studies showed extensive levels of carcinogenic PAHs and dioxins in the Slough sediment, as well as an "oily sheen on the water and banks of the" Slough. See PFF, ¶¶ 28, 31. In 1994, for example, EPA representatives observed a large oily sheen that began at the end of the Slough and extended three-quarters of the way to the mouth of the waterway, covering approximately 30% of the surface in some areas. See PFF, ¶ 28. The oily soils were found to extend deep into the bed of the Slough, as much as 29 feet below the sediment surface in one

boring. See PFF, ¶ 31. EPA also found that dioxin levels were 30 to 50 times higher than considered safe and PAH levels were nearly 80 times higher than considered safe. See PFF, ¶ 35. Based on its studies, EPA concluded that the contamination of the sediment in the Slough posed unacceptable risks to humans, who used the Slough for subsistence fishing, as well as unacceptable risks to certain fish species. See PFF, ¶¶ 32-36.

EPA analyzed a variety of alternative remedial actions to address the threat posed by the contaminated M&B Site, including the sediments in the Slough. See PFF, ¶ 37. In July 1998, EPA issued a Draft Surface Water-Sediment Feasibility Study Report for the M&B Site ("Draft FS"), in order to evaluate various remedial alternatives. See PFF, ¶ 38. Some of the possible remedies involved the installation of a sand cap – a layer of fine sand, approximately two feet thick, which would cover the bed of the Slough – to contain the contaminated sediment in the Slough. See PFF, ¶ 38. In addition, EPA considered "institutional controls (access restricts, deed notices, etc.) to restrict public access and future activities in the slough." PFF, ¶ 39. The Draft FS included maps showing the location of the sand cap and a "log boom," a physical barrier that would extend across the Slough in order to block navigational access to portions of the waterway. See PFF, ¶ 38-39. Under this proposal, the Draft FS showed that navigational access would be allowed from the Stockton Channel to the "notched" barge docking area on the Subject Property, but not permitted to that portion of the Slough lying southeast of the log boom. See PFF, ¶¶ 38-39.

In September 1998, EPA issued a Proposed Plan for the soil and sediment remedies for public comment. See PFF, ¶¶ 40, 41. In the Proposed Plan, EPA discussed its preliminary determination that "In Situ Capping" was the most appropriate remedy to address the sediment

contamination in the Slough. See PFF, ¶ 40. EPA published notice of a 60-day public comment period as well as a public meeting to explain and receive comments on the proposed remedy. See PFF, ¶¶ 40-42.

In January 1999, EPA issued a Final Surface Water-Sediment Feasibility Study Report ("Final FS"), which described EPA's extensive investigation of the contamination in the Slough, and evaluated the various remedial alternatives. See PFF, ¶ 43. The Final FS, like the Draft FS, discussed the sand cap and institutional controls in detail, including diagrams of the location of the sand cap and the log boom. See PFF, ¶¶ 44-45. As discussed in the Final FS, EPA determined that permitting boat traffic in the Slough over the sand cap would be detrimental to the cap, and could lead to re-surfacing or resuspension of the contaminated sediment, which could be harmful to humans and fish. See PFF, ¶ 46-47. In addition, EPA determined that restricting navigational access in the capped portion of the Slough would reduce "human exposure to contaminated fish and sediment." PFF, ¶ 48.

On March 31, 1999, EPA issued a Record of Decision ("ROD"), selecting remedial actions for the M&B Site, including "In Situ Capping" and restrictions on navigational access to address the contaminated sediment in the Slough. See PFF, ¶¶ 49-50.[2/] On May 7, 1999, the State, which participated in the remedy selection process as a support agency, formally concurred with EPA's selected remedy. See PFF, ¶ 51.

When EPA issued the ROD in 1999, Bill T. Dutra, principal of The Dutra Group (collectively, "Dutra"), owned the Subject Property. When Dutra purchased the Subject

---

[2/] A ROD is a public record of an EPA decision selecting a remedial action. See 40 C.F.R. § 300.430 and § 300.515(e).

Property, there was no commercially-meaningful navigational access to the Slough. See PFF, ¶ 3. Before 1986, the bed of the Slough adjacent to the earthen bank at the Subject Property was shallow, gradually increasing to approximately two feet deep, in the first several feet from the shoreline, and reaching depths of approximately ten to eleven feet in the deepest portions of the Slough. See PFF, ¶ 3. In 1986, the United States Army Corps of Engineers permitted Dutra to dredge the entire width of the portion of the Slough bordering the Subject Property to a uniform depth of sixteen feet and to construct approximately 1,400 feet of sheetpile wall and a bulkhead to permit the docking of large commercial vessels. PFF, ¶ 3. The permit stated, "this permit does not convey any property rights, either in real estate or material, or any exclusive privileges." Ex. 29 at DOJ481. In addition, the permit stated that Dutra "shall not be entitled to compensation for damage or injury to the structures or work authorized herein which may be caused by or result from existing or future operations undertaken by the United States in the public interest." Ex. 29 at DOJ483.

On September 22, 1999, EPA representatives met with Dutra representatives to discuss EPA's planned remedy in the Slough. See PFF, ¶ 52. Among the issues discussed was EPA's plan to halt navigational access in the southeastern portion of the Slough. See PFF, ¶¶ 53-55. Dutra clearly understood EPA's plans, including the eventual restriction on navigational access. After the meeting, for example, Dutra sent a letter to EPA, stating that EPA's selected remedy would deprive Dutra of its ability to access a portion of its property via the Slough, and result in "severe [economic] damage." See PFF, ¶ 56. Dutra suggested to EPA an alternative remedy that Dutra believed would allow it unfettered navigational access in the Slough. See PFF, ¶ 57. EPA considered Dutra's suggested alternative, but, following a detailed analysis, informed Dutra on

November 30, 2000, that "based on our analysis of the information available, EPA does not believe a change in the remedy selected is warranted." PFF, ¶¶ 58-59, 65-69.

Unbeknownst to EPA, in August 2000, Plaintiff CRV took initial steps to acquire the Subject Property by signing an Option Agreement with Dutra. See PFF, ¶¶ 60-62. The Option Agreement explicitly recognized the existence of the M&B Site "opposite the [Subject] Property, on Mormon Slough, the Slough itself, and the 'Hazardous Substances' located thereon and thereunder. . . ." PFF, ¶ 63. Plaintiff Voorhees testified that he "didn't read this contract very thoroughly before signing it." PFF, ¶ 64. It is undisputed that Dutra fully disclosed EPA's planned remedy to representatives of Plaintiff CRV before CRV entered into a contractual relationship with Dutra. See PFF, ¶ 61.

In October 2001, Dutra and Plaintiff CRV amended the Option Agreement, whereby Plaintiff CRV agreed to exercise its option on February 1, 2002. See PFF, ¶¶ 70-71. On November 29, 2001, representatives from EPA, Dutra, and Mr. Voorhees and his representative met to discuss EPA's remediation plans. See PFF, ¶ 73. At the November 2001 meeting, EPA repeated its plans to permanently block navigational access by installing a sand cap in the Slough as well as a log boom across the waterway to physically block boat traffic. Shortly after the November 2001 meeting, for example, Plaintiffs wrote a letter to Dutra complaining about EPA's selected remedy. See PFF, ¶ 74. On January 31, 2002, Dutra and Plaintiff CRV amended the Option Agreement again by extending the close of escrow until May 1, 2002, or "until Optionor and Optionee negotiate a mutually acceptable agreement with the United States [EPA] as to their remediation of contaminated sediment in the Slough, as it affects utilization of the Subject Property, whichever last occurs." PFF, ¶ 75. On August 26, 2002, EPA met with

representatives from Dutra and Plaintiff CRV again. See PFF, ¶ 76. At the August 2002 meeting, EPA again repeated its plans to block navigational access in the Slough. See PFF, ¶ 76. In October 2002, Dutra and Plaintiff CRV amended the Option Agreement again, and Plaintiff CRV agreed to close escrow on November 1, 2002. See PFF, ¶ 77.

On October 28, 2002, Dutra and Plaintiff CRV amended the Option Agreement again, explicitly recognizing that EPA had taken the position that it had "no legal obligation to reimburse [Dutra] for any damage or injury to the Subject Property, and [Dutra] has been unable to negotiate a mutually acceptable agreement with EPA as to the Remedy, and its effects on the utilization of the Subject Property. . . ." PFF, ¶ 78. As part of the October 2002 agreement, Dutra attempted to assign its legal rights to Plaintiff CRV against the United States for "any loss of use and/or taking of real property arising from or relating to EPA's implementation of the Remedy." PFF, ¶ 78. Despite clearly understanding EPA's position, Plaintiff CRV chose to complete its acquisition of the Subject Property in November 2002, at the original option price. See PFF, ¶¶ 79-80. Nearly two years later, on October 20, 2004, Plaintiff CRV deeded the Subject Property to Plaintiff Voorhees. See PFF, ¶ 81.

Between June and September 2006, EPA placed the sand cap in the Slough and installed the permanent log boom, adjacent to the Subject Property. PFF, ¶ 83. Neither the sand cap nor the log boom is located within the Subject Property boundaries. See PFF, ¶ 84.

## II. PROCEDURAL BACKGROUND

Plaintiff CRV first brought an inverse condemnation claim against the United States on April 30, 2003. See CRV v. United States, Case No. 03-867L (G. Miller, J.) (CRV I). When Plaintiff CRV filed its complaint in CRV I, EPA had not installed the sand cap or the log boom

in the Slough. Based, in part, on a concern that Plaintiff's physical takings claim was not ripe, the parties filed a Stipulation of Dismissal Without Prejudice on May 4, 2005. On the same date, the Court dismissed CRV I, pursuant to RCFC 41(a)(1)(ii). (Docket # 41 in CRV I).

Plaintiff CRV filed this case on September 15, 2006, shortly after EPA installed the sand cap and placed the permanent log boom across the Slough. The parties engaged in liability-related discovery, and on January 23, 2008, Plaintiff filed an Amended Complaint. See Am. Compl., dated Jan. 23, 2007 (Doc. No. 25). The Amended Complaint is nearly identical to the original complaint, except that it adds C. Ryan Voorhees as a plaintiff.

Plaintiffs allege only a physical taking, not a regulatory taking. See Am. Compl. ¶¶ 24, 27; see also Ex. 32 at DOJ522; Ex. 33 at DOJ531. More specifically, Plaintiffs allege that EPA's placement of the sand cap and the log boom in the Slough effected a physical taking of the Subject Property by interfering with an alleged right to unfettered navigational access along the entire length of the Subject Property's boundary with the Slough. See Ex. 32 at DOJ522; Ex. 33 at DOJ531. Plaintiffs allege that the physical taking accrued "[o]n or about October 2006," when EPA installed the permanent log boom across the Slough. Ex. 32 at DOJ521.

## III. ARGUMENT

### A. Standard of Review

This Motion seeks dismissal of claims and claimants pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the Court of Federal Claims. "When considering a motion to dismiss for lack of jurisdiction, the court assumes that all well-pleaded facts alleged in the complaint are true and draws all reasonable inferences in favor of plaintiff." Kemp v. United States, 65 Fed. Cl. 818, 820 (2005). The burden of proof rests on plaintiff, who must establish that the Court has

jurisdiction by a preponderance of the evidence. Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).

Rule 12(b)(6) governs dismissal of a claim for "failure to state a claim upon which relief can be granted." RCFC 12(b)(6). When evaluating a motion under Rule 12(b)(6), the Court must assume that all undisputed facts alleged in the complaint are true and draw all reasonable inferences in the plaintiff's favor. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Boyle v. United States, 200 F.3d 1369, 1372 (Fed. Cir. 2000). "A motion to dismiss under Rule 12(b) for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the claimant do not under the law entitle him to a remedy." Perez v. United States, 156 F.3d 1366, 1370 (Fed. Cir. 1998). When a defendant raises a Rule 12(b)(6) motion to dismiss, a plaintiff must provide grounds of his entitlement beyond "labels and conclusions." Bell Atl. Corp. v. Twombly, _ U.S. _, 127 S.Ct. 1955, 1964 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. at 1965. "Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim." Bradley v. Chiron Corp., 136 F.3d 1317, 1322 (Fed. Cir. 1998) (citing Epstein v. Wash. Energy Co., 83 F.3d 1136, 1140 (9th Cir. 1996)); Charles A. Wright & Arthur R. Miller, 5A Federal Practice & Procedure § 1357 at 315-18.

In the alternative, this Motion seeks relief pursuant to Rule 56 of the Rules of the Court of Federal Claims. Some of the arguments presented below refer to documents outside the pleadings. To the extent reference to such documents is necessary, the Court should grant the United States' Motion pursuant to Rule 56. Summary judgment is proper if:

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

RCFC 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). Although the facts "must be viewed in the light most favorable to the party opposing the motion," United States v. Diebold, Inc., 369 U.S. 654, 655 (1962), "a mere 'metaphysical doubt' will not prevent the granting of a summary judgment motion." Cloutier v. United States, 19 Cl. Ct. 326, 328 (1990) (quoting Matsushita Elect. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

Summary judgment is a "salutary method of disposition 'designed to secure the just, speedy and inexpensive determination of every action.'" Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562 (Fed. Cir. 1987) (quoting Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Summary judgment is proper here because there is no genuine issue as to any material fact, and the United States is entitled to judgment as a matter of law.

### B. Any Alleged Loss in Value was the Result of a Regulatory Act that Occurred Before Plaintiffs Acquired the Subject Property and Any Claim on this Basis Cannot be Assigned to Plaintiffs

EPA issued the ROD in March 1999, months before Plaintiff CRV entered into the Option Agreement with Dutra, and nearly three years before Plaintiff CRV exercised its option. Plaintiff Voorhees acquired the Subject Property from Plaintiff CRV nearly five years after EPA issued the ROD. The ROD, and the other CERCLA-related documents, describe EPA's plans to install a sand cap and a permanent log boom in the Slough. See, e.g., Ex. 20 at DOJ250 (showing eventual location of the log boom across the Slough). Moreover, it is undisputed that

EPA discussed its plans with Dutra, the owners of the Subject Property when EPA issued the ROD. See Ex. 29 (declaration of Dutra's attorney). Dutra fully understood EPA's plans, and claimed (in October 1999, before Plaintiff CRV signed the Option Agreement) that implementation of EPA's plans would result in "severe [economic] damage" to the Subject Property. See PFF, ¶ 56. Hence, by its regulatory action, EPA clarified that the impact of its actions long before Plaintiffs acquired the Subject Property. Although Plaintiffs have not alleged a regulatory taking of their property, it is clear that any such claim would have accrued before Plaintiffs acquired the Subject Property, and was not transferrable to Plaintiffs.

An analogous situation was presented in Goodrich v. United States, 434 F.3d 1329 (Fed. Cir. 2006). In that case, the Forest Service issued a Record of Decision ("ROD") that described the agency's plan to reduce the number of cattle that Mr. Goodrich could graze on a certain property and increase the number of cattle another individual could graze on that property. Although the ROD was issued in 1997, the Forest Service did not implement the ROD until 2000. See id. at 1332. The plaintiff filed a takings claim in 2004, alleging that the Forest Service's allowance of someone else's cattle to graze on the disputed property effected a taking of his water rights. See id. at 1333. Plaintiff alleged a physical taking that accrued in 2000, when the cattle first entered the disputed land. See id.

The Federal Circuit stated that the proper focus for statute of limitations purposes was the time of the government act, not at the time when the consequences of the act "became most painful." Id. at 1333-34. The Court noted that Mr. Goodrich participated in Forest Service meetings in which the proposal was discussed, and complained that the anticipated actions would "constitute an 'uncompensated taking' of [his] water rights." Id. at 1335. The Circuit stated that

the agency's issuance of a ROD (and an accompanying EIS) were "final agency statements of official position that are published only after years of analysis and consultation with affected parties. Given this court's precedent with respect to permits, it is only logical to conclude that a ROD issuance would be sufficient to accrue a takings claim." Id. The Court concluded that "[a]s between issuance of the ROD and the actual physical appropriation by cattle of water, we believe the former is a better place to deem any taking occurred." Id. at 1336.

The result in the instant case should be the same. Here, as in Goodrich, EPA issued the ROD after "years of analysis and consultation with affected parties." Id. at 1335. EPA provided public notice of its investigation and proposed remedy, and informed Dutra, the owners of the Subject Property when the ROD was issued, of the selected remedy shortly thereafter. See PFF, ¶¶ 52-59. As noted in Dutra's attorney's letter to EPA, dated October 20, 1999 (months before Plaintiff CRV signed the Option Agreement), Dutra clearly understood the impact of EPA's selected remedy. See Ex. 29 ¶ 10.

Moreover, it is undisputed that Dutra informed Plaintiff CRV's representatives of EPA's plans before Plaintiff CRV bought the Subject Property. See id. ¶ 6. For example, the Option Agreement signed in August 25, 2000, explicitly informed Plaintiff CRV of the contamination in the Mormon Slough, and the M&B Site. See id. at DOJ442. Plaintiff CRV's representative reviewed EPA's files, which included maps showing the location of the permanent log boom, before proceeding with the purchase of the Subject Property. See, e.g., Ex. 20 at DOJ268. Therefore, Plaintiffs knew, or should have known, of EPA's selected remedy before they bought the subject property. Plaintiff CRV decided to move forward with the purchase despite EPA's planned remedy. Plaintiff Voorhees acquired the Subject Property several years later, in 2004.

As in Goodrich, any takings claim with respect to the agency actions would have accrued at the time the agency made its final decision to partially block navigational access (no later than March 31, 1999, when EPA issued its ROD), rather than the subsequent date when the consequences of that act became "most painful" (October 2006, when EPA fully implemented the selected remedy). Plaintiffs did not own the Subject Property when EPA issued the ROD, and hence have no standing to complain about EPA's actions. Dutra's attempted assignment of its claim against the United States to Plaintiff CRV, see PFF, ¶ 78, is of no consequence. "It is well established . . . that the Assignment of Claims Act prohibits the voluntary assignment of a compensation claim against the Government for the taking of property." United States v. Dow, 357 U.S. 17, 20 (1958); 31 U.S.C. § 3727 (stating that an assignment "may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued").

Accordingly, Plaintiffs' Amended Complaint should be dismissed pursuant to Rule 12(b) or, in the alternative, the Court should grant summary judgment in favor of the United States pursuant to Rule 56(c).

**C. Plaintiff CRV Lacks Standing to Sue**

"Standing is a threshold jurisdictional issue, which implicates Article III of the Constitution and therefore may be decided without addressing the merits of a determination." Castle v. United States, 301 F.3d 1328, 1337 (Fed. Cir. 2002). In order to establish standing, a plaintiff must show (1) injury in fact, which is (2) fairly traceable to the defendant's action, and (3) that the injury would be redressed by a favorable decision. See Friends of Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 180-81 (2000). In takings jurisprudence, only the

owner of the property on the date of taking has standing to assert a viable takings claim. United States v. Dow, 357 U.S. 17, 20-21 (1958); Cavin v. United States, 956 F.2d 1131, 1134 (Fed. Cir. 1992).

Plaintiffs allege that their claims accrued on or about October 2006, when EPA placed the sand cap in the Slough and installed the log boom. See Ex. 32 at DOJ5215. Plaintiff CRV transferred the Subject Property to Plaintiff Voorhees on October 20, 2004. See Ex. 34 at DOJ540; Ex. 35 at DOJ558. Accordingly, Plaintiff CRV had no interest in the Subject Property on the date of the alleged taking, or after the date of alleged taking. Ex. 34 at DOJ553 (Plaintiff CRV admitting in a discovery response that it "did not retain any title interest in the Maritime Center Property after conveying such property to [Plaintiff] Voorhees on or about October 11, 2004").[3] Therefore, Plaintiff CRV was not an owner of the Subject Property on the alleged date of taking and must be dismissed for lack of standing, pursuant to Rule 12(b)(1).

### D. The Court Lacks Jurisdiction Over Plaintiffs' Collateral Challenge to EPA's Chosen Remediation Actions

Plaintiffs allege that in selecting the remediation actions in this case, EPA "considered, but ultimately rejected [taking] no [remedial] action [or other] potential remediation measures that would have eliminated and/or minimized the [remediation] project's interference with plaintiff CRV's use and enjoyment of the [Subject Property] while still accomplishing the EPA's stated objectives. . . ." Am. Compl. ¶ 28. This Court lacks jurisdiction over a collateral attack on EPA's remediation decision.

---

[3] Plaintiff CRV's discovery response suggests that Plaintiff CRV retained some interest in the "Maritime Center development project that will utilize the property." Id. at DOJ553-54. That alleged property interest is irrelevant for purposes of evaluating a physical takings claim of the Subject Property, the only claim Plaintiff CRV alleged in this case.

In 1986 Congress amended CERCLA by adding section 113(h), a bar on pre-enforcement review, which denies federal courts subject matter jurisdiction to hear challenges to EPA's remedial decisions until EPA files an action in federal court seeking to require implementation of the response action or to obtain cost recovery. See 42 U.S.C. § 9613(h); see also Hanford Downwinders Coal., Inc. v. Dowdle, 71 F.3d 1469, 1474 (9th Cir. 1995) ("once an activity has been classified as a CERCLA § 9604 removal or remedial action, § 9613(h) 'amounts to a blunt withdrawal of federal jurisdiction'") (citations omitted). Plaintiffs, therefore, cannot collaterally attack EPA's decision here, and to the extent Plaintiffs seek to do so, their claims should be dismissed.

Moreover, Plaintiff CRV's apparent belief that the environmental benefits arising from EPA's remedial action are not proportional to the associated burdens, see Am. Compl. ¶ 28, cannot support a takings claim. See Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 545 (2005) (holding that "the 'substantially advances' formula is not a valid takings test"). Hence, to the extent Plaintiffs intend to raise any claim related to the reasonableness of EPA's selected remediation action, such a claim should be dismissed pursuant to either Rule 12(b)(1) for lack of jurisdiction, or Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

**E. Plaintiffs Cannot Establish that EPA's Actions Took Any Compensable Property Interest**

This Court evaluates whether a claimant has stated a takings claim under a two-part test. First, the Court must determine whether Plaintiffs have established a property interest that is protected by the Fifth Amendment. Colvin Cattle Co. v. United States, 468 F.3d 803, 806 (Fed. Cir. 2006). Second, if Plaintiffs identify a property interest, the Court must determine whether the governmental action at issue amounts to a compensable taking of that property. Air Pegasus

of D.C., Inc. v. United States, 424 F.3d 1206, 1213 (Fed. Cir. 2005). Plaintiffs bear the burden of demonstrating that they have a property interest in the property allegedly taken. See Skip Kirchdorfer v. United States, 6 F.3d 1573, 1580 (Fed. Cir. 1993) ("[T]he plaintiff must show a legally-cognizable property interest."). Since the Constitution does not create or define the scope of property interests compensable under the Fifth Amendment, the Court should look to state law "to define the range of interests that qualify for protection as 'property' under the Fifth and Fourteenth Amendments." Lucas v. S. Carolina Coastal Council, 505 U.S. 1003, 1030 (1992); Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972).

Plaintiffs cannot establish that they possessed any compensable property interest taken by any federal action for several reasons: (1) EPA's actions did not physically encroach on the Subject Property, nor did those actions deny Plaintiffs all access to the Subject Property; (2) Plaintiffs have no compensable right to navigation in the Slough; (3) Plaintiffs' have no compensable property interest in the "highest and best use" of the Subject Property; (4) EPA's actions were within limitations in the Rivers and Harbors Act permit, pursuant to which commercially-meaningful navigational access to the Subject Property was created; (5) Plaintiffs have no right to use their property in a manner that created or exacerbated a public nuisance; and (6) the EPA's actions are within the public trust doctrine, a pre-existing limitation on Plaintiffs' property interest. This argument is made pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted; however, if the Court deems it necessary to consider documents outside the pleadings, the argument is made pursuant to Rule 56(c).

### 1. The United States Has Neither Physically Occupied Any Part of the Subject Property nor Denied All Access to the Subject Property

In a physical takings claim, the Court's inquiry is generally limited to whether the claimant can establish a physical occupation of his property by the government. See Karuk Tribe v. Ammon, 209 F.3d 1366, 1374 (Fed. Cir. 2000) (in order to prevail on a Fifth Amendment claim, a plaintiff must establish that he had a property interest that was effected by the alleged taking), cert. denied, 532 U.S. 941 (2001); Nw. La. Fish & Game Pres. Comm'n v. United States, 79 Fed. Cl. 400, 408 (2007). The agency action at issue here – the imposition of a sand cap and a permanent log boom in the Slough – did not physically occupy or invade the legal boundaries of the Subject Property.

The physical boundary of the Subject Property extends, at most, to the northern edge of the Slough. See Ex. 1 at DOJ1-2 (legal description, describing property as lying to the north of the bank of the Slough, and explicitly excepting any land below the line of ordinary high water mark prior to any "artificial or avulsive changes in the location of the bed of the slough"); Ex. 5 (survey of property, showing property does not extend into the Slough). Plaintiffs do not own, and have never owned, any portion of the contaminated bed of the Slough or the water in the Slough. The sand cap and the log boom are located in the bed and the waters of the Slough, respectively, not on the Subject Property itself. See id. (survey of property); see also Ex. 32 at DOJ525-26 (Plaintiffs' discovery response). Hence, the government's actions do not physically occupy any portion of the Subject Property.

Plaintiffs may argue that a complete denial of access to a property can effect a physical taking of that property, even without an actual physical invasion. See, e.g., Armijo v. United States, 229 Ct. Cl. 34, 37 (1981) ("the actual cutting off of access" represents one of "two well-

recognized situations where the government will be held to take without any formal expropriation or physical invasion"); Roth v. United States, 73 Fed. Cl. 144, 148-49 (2006). In order for this rule to apply, however, a complete denial of access is required. See Laney v. United States, 228 Ct. Cl. 519, 661 F.2d 145, 149 (1981) ("It has always been held that where the owner has access to his property on one, two, or three sides, that his access from the property to a street on one side is cut off is not a taking, even if the economic fruitfulness of the block is substantially impaired. On the other hand, if his access to his block on all four sides is cut off, that is a taking, and if authorized is compensable under the just compensation clause."); Mount v. United States, 2 Cl. Ct. 717 (1983) ("Even without physical invasion of private property, complete denial or deprivation of access thereto may constitute a taking of such property") (emphasis added).

Plaintiffs acknowledge that they can still bring barges to and from the Subject Property. See Ex. 30 at 190:12-15 ("Q: There's navigational access from the [Subject Property] to the Stockton Deep Water Channel? A: Yes."); id. at 194:10-11 (Mr. Voorhees stating "[o]bviously [the Subject Property is] not landlocked"). Even with the log boom and sand cap in place, Plaintiffs are still able to access the navigable portions of the Slough and they can still bring barges from the Stockton Channel to the barge loading area (the so-called "notched area") on the Subject Property (and back to the Stockton Channel). The agency actions at issue here, then, did not deny all marine access to the Subject Property. Consequently, the actions did not effect a physical occupation of the Subject Property, and Plaintiffs' takings claims should be rejected.

**2. Plaintiffs Have No Private Right to Navigation**

Given that the sand cap and the log boom are not physically located on the Subject Property, Plaintiffs argue that EPA's actions impacted other, non-corporal, perceived property rights. Plaintiffs' takings claims are premised first on a restriction of an alleged right to "bring empty barges . . . down the [entire length of] the [Slough]." Id. at 192:1 to 193:10. California property law is clear, however, that riparian owners do not have a compensable private right to navigate on public waters. See Colberg, Inc. v. State, 432 P.2d 3, 8 (Cal. 1967) (*in bank*) (citing several cases so holding). In Colberg, plaintiffs claimed that the state's planned construction of a freeway bridge over a portion of the Stockton Channel would impair their ability to access their property by ship. As here, the Colberg plaintiffs claimed that the government's impairment of access effected a taking of their property. See id. at 7. In considering the nature of plaintiffs' property interest, the California Supreme Court cited a plethora of state cases holding that plaintiffs have no private right of navigation. See id. at 7-8.

Therefore, Plaintiffs' claimed right to navigate in the Slough is a public, not private, right and cannot be a basis for compensation. Plaintiffs, therefore, have never had a private, compensable right to navigate the Slough, and the United States cannot have taken any such right. An interference with Plaintiffs' ability to "bring empty barges . . . down the [entire length of] the [Slough]," Ex. 30 at 192:1 to 193:10, therefore, is not compensable under the Fifth Amendment.[4/] Consequently, Plaintiffs' claims should be dismissed.

---

[4/] See also Floro v. United States, Case No. 01-538L (Fed. Cl. Sept. 13, 2005) (Allegra, J.) (unpublished) (analyzing the same issue under Ohio law, and concluding that since the public right to navigate on public waters was "exclusively a public right," plaintiffs could not maintain a physical takings claim against the United State).

### 3. Plaintiffs' Allegation that the United States Took the "Highest and Best Use" of the Subject Property Cannot Support a Takings Claim

Plaintiffs next argue that their claims are based on an allegation that EPA's actions make the Subject Property "less attractive to tenants or prospective tenants because you can only pull in one large barge at a time" and because EPA's actions negatively impact the "development potential of the site." Ex. 30 at 192:1 to 193:12. The gravamen of this argument is that the United States denied Plaintiffs the highest and best economic use of the Subject Property. See Ex. 32 (when asked to describe the impacts EPA's actions had on access to and from the Subject Property, Plaintiffs responded that EPA's actions "deprive[] the [Subject Property] of the highest and best use and value it would otherwise have. . .").

A property's "highest and best use," however, is not relevant to the existence of a state-created property interest or the liability analysis of a physical takings claim. The concept of "highest and best use" is a theoretical valuation concept, not a corporal aspect of real property. See Loveladies Harbor, Inc. v. United States, 21 Cl. Ct. 153, 156 (1990) (quoting the American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 269 (9th ed. 1987), in a discussion of highest and best use).[5] Because a property's "highest and best use" is not a physical component that could be physically occupied, it is self-evident that a physical takings claim cannot be premised on an alleged interference with a property's "highest and best use."

---

[5] Although Plaintiffs bring only a physical takings claim here, an allegation that the United States deprived a property of its highest and best use would also not support a regulatory takings claim. See Deltona Corp. v. United States, 657 F.2d 1184, 1193 (Ct. Cl. 1981) ("While plaintiff may very well be correct in its alternative assertion that it has been denied the highest and best economic use for its property, it is obvious from the Supreme Court tests we have cited that such an occurrence does not form a sufficient predicate for a taking").

### 4. The Rivers and Harbors Act Permit Pursuant to which Commercially-Meaningful Navigational Access to the Subject Property was Created is a Pre-Existing Limitation on Plaintiffs' Property Rights

Plaintiffs' argument is also flawed because Plaintiffs' perceived interest in commercially-meaningful navigational access from the Subject Property to the Slough are not compensable property rights. Dutra purchased the Subject Property without commercially-meaningful access to the Slough. In 1986, the United States Army Corps of Engineers issued Dutra a permit (Permit No. 9260), pursuant to the Rivers and Harbors Act. See PFF, ¶ 3. Permit No. 9260, however, explicitly stated that it conveyed no property rights to Dutra and required a waiver of any right to "compensation for damage or injury to the structures or work authorized herein which may be cause or result from existing or future operations undertaken by the United States in the public interest." See Ex. 29 at DOJ481 ("[T]his permit does not convey any property rights. . . ."); id. at DOJ483 (waiver of claims). Permit No. 9260, then, explicitly did not convey any compensable property rights, and Dutra (as the permittee) explicitly waived any claims resulting from any future operations undertaken by the United States in the public interest when the permit was issued.[6] See City of Gettysburg v. United States, 64 Fed. Cl. 429 (2005) (holding similar permit released United States from liability for damage to the work performed pursuant to the permit). Therefore, Plaintiffs (who acquired no more interest in the Subject Property than

---

[6] The permit itself does not define "public interest" in the waiver, but it would certainly include the EPA's actions taken here to abate a public nuisance. When evaluating the permit application for Permit No. 9260, for example, the Corps considered a variety of factors, including conservation, general environmental concerns, fish and wildlife values, water quality, safety, and, in general, the needs and the welfare of the people. See Ex. 29 at DOJ485; see also 33 C.F.R. § 320.4(a) (identifying these factors as relevant to the "public interest review" analysis of whether to issue a Rivers and Harbor Act permit).

Dutra had to sell) have no compensable property interest in commercially-meaningful navigational access from the Subject Property to the Slough, and cannot recover just compensation resulting from interference with such a right.

#### 5. Plaintiffs Were Always Prohibited from Using Their Property to Create a Nuisance and EPA's Actions Were Taken to Abate a Public Nuisance

Even if Plaintiffs could articulate a compensable property interest that was conceivably physically taken by EPA's actions, which they cannot, their takings claims fail because background principles of California state law prohibit the uses Plaintiffs now intend "in the circumstances in which the property is presently found." Lucas, 505 U.S. at 1031. It is well-settled that landowners have no right to engage in an action that would constitute a public nuisance, and the government's limitations of such actions cannot result in a taking. See Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 491-92 (1987) ("[A]ll property in this county is held under the implied obligation that the owner's use of it shall not be injurious to the community. . . . Courts have consistently held that a State need not provide compensation when it diminishes or destroys the value of property by stopping illegal activity or abating a public nuisance."); Loveladies Harbor, 28 F.3d at 1179 ("If [an] imposed restraint would have been justified under the state's traditional nuisance law, then the property owner's bundle of rights did not include the right claimed, and no taking could occur."); Creppel v. United States, 41 F.3d 627, 631 (Fed. Cir. 1994) ("If the regulation prevents what would or legally could have been a nuisance, then no taking occurred. The state merely acted to protect the public under its inherent police powers.").

In considering whether background principles of state law would prohibit an intended

activity "in the circumstances in which the property is presently found" in John R. Sand & Gravel Co. v. United States, 60 Fed. Cl. 230 (2004), Judge Hewitt described the Court's task as requiring a multi-step analysis. As part of this process, the Court should determine whether California state nuisance and property law would prohibit the use of the land Plaintiffs intend. See id. at 240. The pertinent question, then, is whether California state law would consider the damaging of a sand cap covering hazardous contaminants and the stirring up of those contaminants in a public waterway by boat traffic to be a nuisance. Plaintiffs essentially concede this point by acknowledging that the M&B Site is a public nuisance and that EPA's actions "may have helped to 'prevent the further spread of contaminants' from that site." Ex. 35 at DOJ561 (Plaintiffs' discovery response). As discussed in Section III(E)(5)(a), allowing Plaintiffs to damage the sand cap and stir up dangerous contaminants in this public waterway would clearly constitute a public nuisance under California state law.

If the Plaintiffs' intended use of the land constitutes a public nuisance, the Court next should consider whether the government's actions to abate the nuisance would be permitted under state law. See John R. Sand, 60 Fed. Cl. at 240. If the government action does "no more than duplicate the result that could have been achieved in the courts – by adjacent landowners . . . under the State's law of private nuisance, or by the State under its complementary power to abate nuisances that affect the public generally," there has been no interference with Plaintiffs' property rights and, therefore, can be no taking. Lucas, 505 U.S. at 1029. As discussed in Section III(E)(5)(b), California law permits a broad range of abatement actions to address public nuisances, including EPA's selected remedy here.

**a. Damaging the Sand Cap and Stirring Up Hazardous Chemicals in the Contaminated Slough Constitutes a Public Nuisance Pursuant to California Law**

**i. California's General Law of Nuisance**

California law has long informed property owners that their title does not include the right to create or maintain a public nuisance through the use of their property. The California legislature broadly defines "nuisance" as follows:

> Anything which is injurious to health . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, is a nuisance.

Cal. Civ. Code § 3479. "A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." Id. § 3480.

California law does not allow a landowner to maintain a nuisance on private property, even if the landowner had no role in, or duty to prevent, the creation of the nuisance on that property. See KFC Western, Inc. v. Meghrig, 28 Cal. Rptr. 2d 676, 683 (Cal. Ct. App. 1994) ("a landowner may state a cause of action for a private continuing nuisance against a previous owner whose activity contaminated the property"); Leslie Salt Co. v. San Francisco Bay Conserv., 200 Cal. Rptr. 575, 584-86 (Cal. Ct. App. 1984); People v. S. Pac. Co., 311 P.2d 200, 201 (Cal. App. Dep't Super. Ct. 1957). In addition, an individual may face legal liability for failing to abate a continuing nuisance. See Cal. Civ. Code § 3483.

**ii. Water Pollution is a Nuisance Under California Law**

"The pollution of water constitutes a public nuisance under common law, which has long

been codified by [California] state law." City of Lodi v. Randtron, 13 Cal. Rptr. 3d 107, 119-20 (Cal. Ct. App. 2004) (citing cases); Selma Pressure Treating Co. v. Osmose Wood Preserving Co., 271 Cal. Rptr. 596, 605-06 (Cal. Ct. App. 1990) ("Pollution of the ground and rivers waters is damage to public property, as well as a direct injury to public welfare."); Miller & Starr, California Real Estate 3d Vol. 8, § 22.2 at 11 ("Creation of water pollution" is a nuisance *per se*).[7]

> Plaintiffs concede that the M&B Site
>
> likely was a "nuisance," and that the EPA's clean–up efforts on that site may have helped to "prevent the further spread of contaminants" from that site. [Plaintiffs] are informed and believe that the EPA acted on behalf of the public in undertaking the [M&B] project, and that it intended that its actions would fulfill a public purpose by preventing or limiting the spread of environmental contamination.

Ex. 35 at DOJ561; see also Am. Compl. ¶ 26 (stating that EPA's actions were designed to protect "human health and the environmental from the risks presented by contaminated soil, groundwater and sediment"). The facts are undisputed that the sediment on the bed of the Slough are dangerously contaminated. See PFF, ¶¶ 30-36 (citing to evidence showing, *inter alia*, dioxin levels 30 to 50 times the level at which no adverse effects are predicted and PAH

[7] "The concept of a nuisance *per se* arises when a legislative body with appropriate jurisdiction, in the exercise of the police power, expressly declares a particular object or substance, activity, or circumstance, to be a nuisance." Beck Dev. Co. v. S. Pac. Transp. Co., 52 Cal. Rptr. 2d 518, 549 (Cal. Ct. App. 1996). "[W]here the law expressly declares something to be a nuisance, then no inquiry beyond its existence need be made and in this sense its mere existence is said to be a nuisance *per se*." Id. at 550. It is noteworthy that some courts in California have stated that "water pollution occurring as a result of treatment or discharge of wastes in violation of Water Code Section 13000 et seq. is a public nuisance per se." Newhall Land & Farming Co. v. Superior Court, 23 Cal. Rptr. 2d 377, 381 (Cal. Ct. App. 1993) (emphasis added); but see Beck Dev. Co., 52 Cal. Rptr. 2d at 549 (concluding that Cal. Wat. Code §13050(m)(3)) does not create nuisance *per se*).

levels at 80 times the estimated safe level). Therefore, the Court should conclude the M&B Site and the severely contaminated Slough constituted a public nuisance under California state law.

**iii. Damaging the Sand Cap and Stirring Up Hazardous Contaminants in a Polluted Waterway Constitutes a Public Nuisance Under California Law**

EPA addressed the existing public nuisance by placing a sand cap over the contaminants, a "fairly common and proven method of containing contaminated sediment." PFF, ¶ 45. In addition, EPA determined that continued marine traffic could jeopardize the integrity and effectiveness of the sand cap, and therefore restricted marine traffic over a portion of the Slough in order to protect the sand cap. See PFF, ¶¶ 46-48. As EPA noted, allowing boat traffic in the Slough would be "detrimental to the cap and could lead to re-surfacing and/or resuspension of the contaminated sediment." See Ex. 20 at DOJ285; id. at DOJ240 ("The integrity of the cap could also be destroyed by future activities in the slough (e.g., prop wash from barges, future dredging)"; "[S]and caps can be susceptible to erosion in a high-energy environment."); id. at DOJ253 (the log boom would "prevent inadvertent erosion (via boat prop wash) and resuspension of the surface sediment (and 'hot spots')").[8]

In addition, EPA determined that restricting boat access in the Slough would reduce "human exposure to contaminated fish and sediment." Id. at DOJ252; see also id. at DOJ238

---

[8] Dutra, too, recognized that barge traffic could not safely operate after EPA installed the sand cap since its barges operated with

> a draft of from 8 to 10 feet. The placement of a 2 foot sand cap on the bottom of the Slough adjacent to the bulkhead wall and, more importantly, the placement of a log barrier, on a straight line across the Slough from the East end of our berthing area, will deprive Dutra of an important and valuable commercial feature of its yard.

Ex. 29 at DOJ454.

("Access and use restrictions reduce the likelihood of exposure to contaminants arising from trespassing, future development, or excavation at the site."); Ex. 31 at 59:17-21 (EPA witness stating the purpose of the sand cap was to isolate the contamination so that it would not migrate); id. at 38:15-18 (explaining that humans could come into contact with contaminants in the Slough "if they were dropping an anchor in the slough and pulling it up, if they were fishing for crawdads with cages, pulling those up from the bottom").

In order to protect the sand cap and limit human exposure to contaminated fish and sediment, then, EPA determined that "log booms would be placed to limit water traffic (boats and barges) into all or portions of the slough. These supplemental access restrictions could reduce direct human exposure to contaminated sediments in Old Mormon Slough and indirect exposure via consumption of fish caught in the slough. . . ." Ex. 20 at DOJ239; see also Ex. 13 at DOJ46 (discussing findings that "many transients, homeless people, and low-income neighbors depend on catching fish from the Port of Stockton to supplement their diets"). If EPA had not remedied the contamination, the hazardous chemicals would "continue to present a risk to ecological receptors, and to human receptors who consume significant quantities of certain fish species." Ex. 20 at DOJ222.

Therefore, boat traffic in the Slough would damage the sand cap, stir up hazardous contamination in the Slough, and result in an increased likelihood of exposure of humans and wildlife to dangerous chemicals. Consequently, state law prohibits the use Plaintiffs now intend "in the circumstances in which the property is presently found." Lucas, 505 U.S. at 1031.

**b. EPA's Actions to Abate the Nuisance Would Be Permitted Under California Law, Without Compensation**

**i. EPA's Actions Would Be Permitted Under California's General Nuisance Laws**

The next question is whether the government's actions to abate the nuisance would be permitted under state law. California law provides a wide range of remedies to address public nuisances: (1) criminal penalties; (2) civil penalties; or (3) abatement. See Cal. Civ. Code § 3491; Flahive v. City of Dana Point, 85 Cal. Rptr. 2d 51, 54 (Cal. Ct. App. 1999) (same). Under California Civil Code § 3494, "[a] public nuisance may be abated by any public body or officer authorized thereto by law." "Except where there are constitutional considerations, such as purported obscenity, which requires a prior judicial determination, a public entity is free to choose any of the three options." Miller & Starr, California Real Estate 3d Vol. 8, § 22.28 at 100 (citing Flahive, 85 Cal. Rptr. 2d at 54)). "Ordinarily the abatement of [a public nuisance] is the business of the sovereign, acting through its law officers." Diamond v. Gen. Motors Corp., 97 Cal. Rptr. 639, 642 (Cal. Ct. App. 1971).

As a general matter, abatement of a nuisance in California is accomplished by a court of equity by means of an injunction proper and suitable to the facts of each case. County of Santa Clara v. Atl. Richfield Co., 40 Cal. Rptr. 3d 313, 329 (Cal. Ct. App. 2006). The state could bring an action to enjoin or abate the nuisance. See, e.g., Cal. Code of Civ. Proc. § 731 (1872) ("A civil action may be brought in the name of the people of the State of California to abate a public nuisance, as the same is defined in [Cal. Civ. Code § 3480], by the district attorney of any county in which such nuisance exists, or by the city attorney of any town or city in which such nuisance exists. . . ."). If the state considered this a nuisance (as it would), the state would have the power

to "abate it after affording the owner reasonable notice and a meaningful opportunity for a hearing." Miller & Starr, California Real Estate 3d Vol. 8, § 22.28 at 102 (citing Cal. Civ. Code §§ 38771, 38773).

Before selecting its remedy, EPA engaged in an extensive study of the contaminated waterway, as well as a lengthy public notice and comment period. See PFF, ¶¶ 26-51. EPA communicated its selected remedy to Dutra, the owner of the Subject Property, in two meetings. See PFF, ¶¶ 52-59, 76. EPA provided a "meaningful opportunity" to hear Dutra, and even prepared a detailed study of Dutra's proposed alternative remedy. See PFF, ¶¶ 65-69. In sum, EPA offered effected landowners an opportunity for notice and participation, just as the State would have done, and EPA's actions would be permitted under California's nuisance laws.

**ii. EPA's Actions Would Be Permitted Under Several State Water Pollution Laws**

In addition to its general law of nuisance, the California legislature has enacted several statutes to address the specific problem of contaminated public waters. The primary law in California regulating water quality is the Porter-Cologne Water Quality Control Act, Cal. Water Code §§ 13000, et seq. ("Porter-Cologne Act"). See City of Burbank v. State Water Res. Control Bd., 108 P.3d 862, 865 (Cal. 2005) (describing the Porter-Cologne Act in detail). The goal of the Porter-Cologne Act is "to attain the highest water quality which is reasonable, considering all demands being made and to be made on those waters and the total values involved, beneficial and detrimental, economic and social, tangible and intangible." Cal. Water Code § 13000; see also City of Burbank, 108 P.3d at 865. Like the federal Clean Water Act, the Porter-Cologne Act prohibits the discharge of waste materials which could affect the quality of California water unless a permit is first obtained.

The Porter-Cologne Act authorizes extensive procedures to allow the State to enforce and implement remedies to abate nuisances. See Cal. Water Code §§ 13300-13360.[9/] These powers include broad authority to order cleanup or abatement of hazardous chemicals in the State's waterways: if waters are polluted, the State may order "clean up [of] the waste or abate[ment of] the effects of the waste, or, in the case of threatened pollution or nuisance, take other necessary remedial actions, including, but not limited to, overseeing cleanup and abatement efforts." Cal. Water Code § 13304(a); see also Selma Pressure Treating Co., 271 Cal. Rptr. at 601 (citing Cal. Water Code § 13304(a), and discussing State's abatement order issued in remarkably-similar case). The State may abate the pollution itself in a way that "in its judgment, is required by the magnitude of the endeavor or the urgency for prompt action to prevent substantial pollution, nuisance, or injury to any waters of the state." Cal. Water Code § 13304(b)(1); see also id. § 13308(a) (State can order abatement). To ensure that different viewpoints are heard, California has adopted notice and hearing rules. See Cal. Water Code § 13305. Clearly, the State could have abated the existing nuisance and avoided further contamination by prohibiting navigational traffic in the Slough as EPA did in this case.[10/]

In addition, the state could have abated the public nuisance under the Carpenter-Presley-

---

[9/] "The task of accomplishing [the goals established by the Porter-Cologne Act] belongs to the State Water Resources Control Board (State Board) and nine Regional Water Quality Control Boards. . . ." City of Burbank, 108 P.3d at 865 (quoting Cal. Water Code § 13001).

[10/] Had the State opted to proceed under the Porter-Cologne Act, the State would have engaged in a similar investigation as EPA employed here. It bears noting that Plaintiffs' primary complaint about EPA's decision – that it should not have considered cost in reaching a cleanup decision – would have been unsuccessful under the State's rules since the "relative cost of the abatement is therefore an appropriate factor for determining the reasonableness of potential abatement." Miller & Starr, California Real Estate 3d Vol. 8, § 22:39 at 148 (citing Mangini v. Aerojet-Gen. Corp., 912 P.2d 1220, 1227-28 (Cal. 1996).

Tanner Hazardous Substance Account Act ("HSAA"), a state analog to the federal CERCLA legislation. See Cal. Health & Safety Code §§ 25300, et seq. (1984); Randtron, 13 Cal. Rptr. 3d at 115 (HSAA is California's "counterpart to CERCLA"). The intent of the HSAA is to "[e]stablish a program to provide for response authority for releases of hazardous substances, including spills and hazardous waste disposal sites that pose a threat to the public health or the environment." Cal. Health & Safety Code § 25301(a). Like CERCLA, liability under the HSAA is strict, and even current owners are designed as potentially-responsible parties. See Cal. Health & Safety Code § 25363 (discussing liability standards); id. § 25323.5 (discussing potentially-responsible parties). Among the remedies permitted under the HHSAA are "removal actions in the event of a release or threatened release of a hazardous substance into the environment" and any action "necessary to monitor, assess, and evaluate a release or a threatened release of a hazardous substance" or to minimize or mitigate damage resulting from a release or threatened release. Cal. Health & Safety Code §§ 25322, 25323. The HSAA establishes a fund for the clean up of listed contaminated sites, permits the state to force responsible parties to clean up sites and authorizes the state to sue responsible parties to recover cleanup costs. See Cal. Health & Safety Code §§ 25300, et seq.; Miller & Starr, Cal. Real Estate 3d, Vol. 8, § 23.43 at 23-115.

Under the HSAA, the State (generally acting through the Department of Toxic Substance Control) may compel responsible parties to clean up a contaminated site or it may clean up the site itself. See Cal. Health & Safety Code §§ 25354, 25355.5, 25358.3. The State may investigate the situation, perhaps by preparing a health or ecological risk assessment. See Cal. Health & Safety Code § 25356.1.5. When the State issues a Remediation Action Plan (a document similar to a ROD), it may order abatement. See Cal. Health & Safety Code §

25356.1(e); see also Cal. Civ. Practice, Environmental Litigation § 7:144 (discussing preparation of a Remedial Action Plan). EPA's selected remedy to abate the public nuisance in the instant case, therefore, would have been permitted under the HSAA.[11]

The government's action to abate the nuisance in this case would be permitted under California law. Consequently, Plaintiffs' takings claims must fail. Lucas, 505 U.S. at 1031.[12]

**iii. The State Agreed With EPA's Selected Remedy**

When analyzing whether EPA's selected remedy would have been permitted under State law, it is significant to note that the State concurred in EPA's remedy selection. For example, in its December 1997 comments on EPA's FS, the California Department of Toxic Substances Control recommended

---

[11] Although the above-discussion focuses on two California statutes, the selected remedy might have been allowed under other state laws, including: (1) The Safe Drinking Water and Toxic Enforcement Act of 1986, Cal. Health & Safety Code § 25249.5, et seq. (which applies if the chemicals are released into water or onto land where they will probably pass into a source of drinking water); (2) The Hazardous Waste Control Law, Cal. Health & Safety Code §§ 25100, et seq. (which prohibits the discharge of certain hazardous wastes without a permit); (3) The Hazardous Waste Treatment Reform Act of 1995, Cal. Health and Safety Code §§ 25179.1 et seq. (which bans and regulates the disposal of a broad variety of wastes); and (4) The Toxic Pits Cleanup Act of 1984, Cal. Health & Safety Code §§ 25209 et seq. (which regulates the release of liquid hazardous wastes). In addition, California's DFG would have jurisdiction to implement abatement procedures in order to protect wildlife. See Cal. Fish & Game § 5650(a)(6) ("[I]t is unlawful to deposit in, permit to pass into, or place where it can pass into the waters of this state any . . . substance or material deleterious to fish, plant life, mammals, or bird life."); People v. Truckee Lumber Co., 116 Cal. 397, 399 (1897) (the State owns "the right and power to protect and preserve [fish and wildlife] and preserve such property for the common use and benefit"). Indeed, California's violation report cited M&B under Section 5650 when the State began its inquiry of this contaminated site decades ago. See Ex. 6.

[12] California law, like federal law, is clear that an owner has no right of compensation when private property is taken to abate a public nuisance. Miller & Starr, California Real Estate 3d Vol. 8, § 22:28 at 107 (citing Scott v. City of Del Mar, 68 Cal. Rptr. 2d 317, 1305-06 (Cal. Ct. App. 1997); People v. Hadley Fruit Orchards, Inc., 130 Cal. Rptr. 287, 289 (Cal. Ct. App. 1976)).

> that the depth and construction of the [sand] cap be designed to insure maximum durability and limit future maintenance costs. We also note that implementation of this alternative will require ongoing coordination between local and state agencies to insure slough traffic does not damage cap integrity and future development of Old Mormon Slough remains regulated.

Ex. 15 at DOJ72-73; see also Ex. 16 at DOJ74 (April 1998 comment from the California Department of Toxic Substances Control that it concurred with "the capping of sediments in Old Mormon Slough"). On May 7, 1999, the State formally noted its concurrence with EPA's ROD, stating, "we look forward to proceeding with the Design for the Sediment Cap, implementation of the associated institutional controls, and execution of the State Superfund Contract." PFF, ¶ 51. This concurrence supports a conclusion that EPA acted within California's pre-existing limitations on property rights to protect its citizens from public nuisances.

**6. The California Public Trust Doctrine is a Pre-existing Limitation on Plaintiffs' Property Rights that Circumscribes Plaintiffs' Private Right of Riparian Access**

In addition to the above, California also has limitations on private rights of riparian access that originate in the State's public trust doctrine. Under California's public trust doctrine, a public trust easement exists and provides protection for "the values and uses of waterways." Nat'l Audubon Soc. v. Superior Ct., 658 P.2d 709, 719 (Cal. 1983), cert. denied, 464 U.S. 977 (1983); Colberg, 432 P.2d at 3 (State owns "all of its navigable waterways and the lands lying beneath them 'as trustee of a public trust for the benefit of the people'"). The doctrine, which is "sufficiently flexible to encompass changing public needs[,]" protects the public's interest in traditional uses of waterways such as navigation, commerce and fisheries, but also protects ecological and recreational values. Nat'l Audubon Soc., 658 P.2d at 719 (quoting Marks v. Whitney, 6 Cal.3d 251, 259-60 (Cal. 1971); SWRCB Cases, 39 Cal. Rptr.3d 189, 272 (Cal. App.

2006). California courts 'have construed the purposes of the trust with liberality to the end of benefitting all the people of the state." Colberg, 432 P.2d at 9. The State of California has "the sovereign power and duty to exercise continued supervision over the trust." Nat'l Audubon Soc., 658 P.2d at 721; Colberg, 432 P.2d at 9 (the "acts of the state with regard to its navigable waters are within trust purposes when they are done 'for purposes of commerce, navigation, and fisheries for the benefit of all the people of that state'"). Consequently, "parties acquiring rights in trust property generally hold those rights subject to the trust, and can assert no vested right to use those rights in a manner harmful to the trust." Nat'l Audubon Soc., 658 P.2d at 721; Colberg, 432 P.2d at 14-15 (rejecting a landowners' inverse condemnation claim because there was direct physical invasion of any compensable property interest resulting from "the state's power to regulate, control and deal with its navigable waters"). In holding that the Colberg plaintiffs had no valid claim for compensation, the California Supreme Court stated, "[w]hatever the scope of plaintiffs' right to riparian access as against other private persons, that right must yield without compensation to a proper exercise of the power of the state over its navigable waters." 432 P.2d at 15.[13/]

In the instant case, the State recognized the contaminated Slough posed a dangerous condition to humans and wildlife. See discussion, supra at III(E)(5). EPA's actions were taken to contain the hazardous chemicals and protect human and ecological health, and the State agreed with EPA's selected remedy. Id. Based on the same facts justifying the nuisance defense discussed above, EPA's actions accomplished no more than what the State could have

---

[13/] Enforcement of the public trust doctrine is not limited to action by the State of California. Instead, the Supreme Court of California has held that any member of the public has standing to sue to protect the public trust. Id. at 716, n.11.

accomplished under the public trust concept. See Nat'l Audubon Soc., 658 P.2d at 721 (public trust covers not just commerce and navigability, but the fishing and ecological values at issue in this case). Therefore, the public trust doctrine constitutes a pre-existing limitation on Plaintiffs' title and precludes recovery in this matter.

## IV. CONCLUSION

For the reasons discussed above, the Court should grant the United States' Motion and dismiss Plaintiffs' claims pursuant to Rule 12 or, in the alternative, grant summary judgment in favor of the United States pursuant to Rule 56.

Respectfully submitted this 15th day of April, 2008.

RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division

___/s/ William J. Shapiro________
WILLIAM J. SHAPIRO
Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
501 I Street
Suite 9-700
Sacramento, CA 95814
916-930-2207 (phone)
916-930-2210 (fax)

Attorney for Defendant

<u>Of Counsel</u>:

Laurie Williams
Assistant Regional Counsel
U.S. EPA Region 9
75 Hawthorne Street
San Francisco, CA 94105