RECORDING REQUESTED BY:
FIRST AMERICAN TITLE COMPANY
AND WHEN RECORDED MAIL TO:

CRV ENTERPRISES, INC
28082 NICHOLAS Rd.
GALT, CA 95632-8204

A.P. #145-190-08

INSTRUMENT NO. RECORDED BY
*First American Title Co. of Stockton*
RECORDED Nov 8, 2002
INST 2002-200300
OFFICIAL RECORDS OF SAN JOAQUIN COUNTY

WE HEREBY CERTIFY THIS TO BE A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL.
*First American Title Co. of Stockton*
By [signature]

THIS SPACE FOR RECORDER'S USE ONLY:

ESCROW NO. 163854RF

TITLE ORDER NO. 163854

## GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(s)
DOCUMENTARY TRANSFER TAX is $1446.50
[X] computed on full value of property conveyed, or
[ ] computed on full value less value of liens or encumbrances remaining at time of sale.
[ ] Unincorporated area [X] City of Stockton, AND

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

**BILL T. DUTRA, an Unmarried Man**

hereby GRANT(s) to:

**CRV ENTERPRISES, INC, a California Corporation**

The real property in the City of Stockton, County of San Joaquin, State of California, described as:
LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT A AND MADE A PART HEREOF

DATED October 29, 2002

[signature]
BILL T. DUTRA

STATE OF CALIFORNIA
COUNTY OF MARIN
On 31 OCTOBER 2002
before me, EDWARD E. WALTERS
a Notary Public in and for said State, personally appeared
BILL T. DUTRA

personally known to me (~~or proved to me on the basis of satisfactory evidence~~) to be the person(~~s~~) whose name(~~s~~) is/~~are~~ subscribed to the within instrument and acknowledged to me that he/~~she~~/~~they~~ executed the same in his/~~her~~/~~their~~ authorized capacity(~~ies~~), and that by his/~~her~~/~~their~~ signature(~~s~~) on the instrument the person(~~s~~), or the entity upon behalf of which the person(~~s~~) acted, executed the instrument.
WITNESS my hand and official seal.

Signature Edward E. Walters

EDWARD E. WALTERS
Commission # 1282166
Notary Public - California
Marin County
My Comm. Expires Oct 28, 2004

10-28-04

(This area for official notarial seal)

Mail tax statements to: CRV ENTERPRISES, INC, 28082 NICHOLS ROAD, GALT, CA 95632-8204

Exhibit 1 to the United States' Motion
DOJ 1
CRV00038

ORDER NO. 163854/RF

# LEGAL DESCRIPTION

THAT CERTAIN REAL PROPERTY SITUATED IN THE STATE OF CALIFORNIA, COUNTY OF SAN JOAQUIN, CITY OF STOCKTON, DESCRIBED AS FOLLOWS:

A PORTION OF SAN JOAQUIN COUNTY SURVEY NO. 2929 IN SECTION B OF C. M. WEBER GRANT, EL RANCHO DEL CAMPO DE LOS FRANCESES AND IN SECTION 9, TOWNSHIP 1 NORTH, RANGE 6 EAST, MOUNT DIABLO BASE AND MERIDIAN ACCORDING TO THE OFFICIAL PLAT THEREOF, PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE SOUTHERLY PROPERTY LINE OF WEBER AVENUE WITH THE WESTERLY PROPERTY LINE OF EDISON STREET IN THE CITY OF STOCKTON, CALIFORNIA; THENCE SOUTH 78° 20' WEST 501.90 FEET ALONG THE SOUTHERLY PROPERTY LINE OF WEBER AVENUE TO AN ANGLE POINT IN THE SOUTHERLY LINE OF WEBER AVENUE; THENCE SOUTH 88° 14' WEST 2154.51 FEET ALONG THE SOUTHERLY LINE OF WEBER AVENUE TO THE TRUE POINT OF BEGINNING AT THE NORTHEAST CORNER OF THE PROPERTY OF THE WESTERN PACIFIC RAILROAD COMPANY AS CONVEYED BY DEED RECORDED IN BOOK A OF DEEDS, BOOK 282, PAGE 147, SAN JOAQUIN COUNTY RECORDS, SAID TRUE POINT OF BEGINNING ALSO BEING THE NORTHWEST CORNER OF THE PROPERTY OF THE UNION ICE AND STORAGE COMPANY AS CONVEYED BY DEED RECORDED IN BOOK OF OFFICIAL RECORDS, BOOK 1871, PAGE 540, SAN JOAQUIN COUNTY RECORDS; THENCE ALONG THE COMMON LINE BETWEEN SAID THE WESTERN PACIFIC RAILROAD COMPANY PROPERTY AND THE SAID UNION ICE AND STORAGE COMPANY PROPERTY, THE FOLLOWING THREE COURSES:

[1] SOUTH 3° 55' EAST 426.00 FEET;

[2] THENCE SOUTH 35° 55' EAST 64.00 FEET;

[3] THENCE SOUTH 15° 10' WEST 234.95 FEET

TO THE NORTHERLY BANK OF MORMON CHANNEL; THENCE MEANDERING THE NORTHERLY BANK OF MORMON CHANNEL, THE FOLLOWING EIGHT COURSES:

ORDER NO. 163854/RF

[1] SOUTH 71° 50' WEST 30.85 FEET;

[2] THENCE SOUTH 80° 40' WEST 246.70 FEET;

[3] THENCE NORTH 79° 28' WEST 230.55 FEET;

[4] THENCE NORTH 55° 36' WEST 246.80 FEET;

[5] THENCE NORTH 53° 51' WEST 242.70 FEET;

[6] THENCE NORTH 36° 20' WEST 132.00 FEET;

[7] THENCE NORTH 16° 45' WEST 203.00 FEET;

[8] THENCE NORTH 4° 00' WEST 96.00 FEET

TO THE SOUTHERLY LINE OF WEBER AVENUE; THENCE NORTH 88° 14' EAST 1037.75 FEET ALONG THE SOUTHERLY LINE OF WEBER AVENUE TO THE TRUE POINT OF BEGINNING.

EXCEPTING THEREFROM THAT PORTION DESCRIBED IN DEED TO THE UNION ICE COMPANY RECORDED MARCH 2, 1970 IN BOOK OF OFFICIAL RECORDS, BOOK 3374, PAGE 486, SAN JOAQUIN COUNTY RECORDS.

ALSO EXCEPTING THEREFROM THAT PORTION DESCRIBED IN DEED TO THE UNION ICE AND STORAGE COMPANY RECORDED IN BOOK OF OFFICIAL RECORDS, BOOK 2701, PAGE 551, SAN JOAQUIN COUNTY RECORDS.

ALSO EXCEPTING THEREFROM ANY PORTION OF THE LAND BELOW THE LINE OF ORDINARY HIGH WATER MARK WHERE IT WAS LOCATED PRIOR TO ANY ARTIFICIAL OR AVULSIVE CHANGES IN THE LOCATION OF THE BED OF THE SLOUGH.

DOC # 2004-237762
10/20/2004 08:13A Fee:19.00
Page 1 of 5
Recorded in Official Records
County of San Joaquin
GARY W. FREEMAN
Assessor-Recorder-County Clerk
Paid by FIRST AMER TITLE CO

RECORDING REQUESTED BY:

AND WHEN RECORDED MAIL TO:
C Ryan Voorhees
28082 Nichols Rd.
Galt, CA 95632

THIS SPACE FOR RECORDER'S USE ONLY:

Title Order No.: Escrow No.: 219341VQ

## GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S)

**DOCUMENTARY TRANSFER TAX is $NONE**

[X] computed on full value of property conveyed, or
[ ] computed on full value less value of liens or encumbrances remaining at time of sale.
[ ] Unincorporated area [X ] City of Stockton, **AND**

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

**CRV Enterprises, Inc., a California Corporation**

hereby GRANT(s) to:

**C. Ryan Voorhees, a married man as his sole and separate property**

the real property in the County of San Joaquin, State of California, described as:
LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A" AND MADE A PART HEREOF
Also Known as: 145-190-08, 16, 17

THIS INSTRUMENT FILED FOR RECORD BY FIRST AMERICAN TITLE INSURANCE COMPANY AS AN ACCOMMODATION ONLY IT HAS NOT BEEN EXAMINED AS TO ITS EXECUTION OR AS TO ITS EFFECT UPON THE TITLE

**DATED October 11, 2004**
STATE OF CALIFORNIA
COUNTY OF SACRAMENTO
On 10/18/04
Before me, JANE MORONI
A Notary Public in and for said State, personally appeared
C. RYAN VOORHEES

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
**WITNESS** my hand and official seal.

Signature Jane Moroni

CRV Enterprises, Inc., a California corporation

By: [signature]
Name/Title: C. Ryan Voorhees, President.

By Elizabeth A. Voorhees
Name/Title: Elizabeth A. Voorhees, Vice President

JANE MORONI
COMM. # 1467889
NOTARY PUBLIC-CALIFORNIA
SACRAMENTO COUNTY
COMM. EXP. FEB. 11, 2008

(This area for official notarial seal)

MAIL TAX STATEMENTS TO PARTY SHOWN BELOW; IF NO PARTY SHOWN, MAIL AS DIRECTED ABOVE:

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of Sacramento } ss.

On October 19, 2004, before me, Tiphany Farris Notary Public
Date — Name and Title of Officer (e.g., "Jane Doe, Notary Public")

personally appeared Elizabeth A. Voorhees,
Name(s) of Signer(s)

☒ personally known to me
☐ proved to me on the basis of satisfactory evidence

to be the person(s) whose name(s) (is)/are subscribed to the within instrument and acknowledged to me that he/(she)/they executed the same in his/(her)/their authorized capacity(ies), and that by his/(her)/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

TIPHANY FARRIS
COMM. #1500792
Notary Public-California
SACRAMENTO COUNTY
My Comm. Exp. Aug 4, 2008
ESI1 ESI1

Place Notary Seal Above

WITNESS my hand and official seal.

Tiphany Farris
Signature of Notary Public

## OPTIONAL

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: ______

Document Date: ______ Number of Pages: ______

Signer(s) Other Than Named Above: ______

**Capacity(ies) Claimed by Signer**

Signer's Name: ______

☐ Individual
☐ Corporate Officer — Title(s): ______
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: ______

Signer Is Representing: ______

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

© 1999 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.nationalnotary.org Prod. No. 5907 Reorder: Call Toll-Free 1-800-876-6827

EXHIBIT A



# LEGAL DESCRIPTION

THAT CERTAIN REAL PROPERTY SITUATED IN THE STATE OF CALIFORNIA, COUNTY OF SAN JOAQUIN, CITY OF STOCKTON, DESCRIBED AS FOLLOWS:

PARCEL ONE:

A PORTION OF SAN JOAQUIN COUNTY SURVEY NO. 2929 IN SECTION B OF C. M. WEBER GRANT, EL RANCHO DEL CAMPO DE LOS FRANCESES AND IN SECTION 9, TOWNSHIP 1 NORTH, RANGE 6 EAST, MOUNT DIABLO BASE AND MERIDIAN ACCORDING TO THE OFFICIAL PLAT THEREOF, PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE SOUTHERLY PROPERTY LINE OF WEBER AVENUE WITH THE WESTERLY PROPERTY LINE OF EDISON STREET IN THE CITY OF STOCKTON, CALIFORNIA; THENCE SOUTH 78° 20' WEST 501.90 FEET ALONG THE SOUTHERLY PROPERTY LINE OF WEBER AVENUE TO AN ANGLE POINT IN THE SOUTHERLY LINE OF WEBER AVENUE; THENCE SOUTH 88° 14' WEST 2154.51 FEET ALONG THE SOUTHERLY LINE OF WEBER AVENUE TO THE TRUE POINT OF BEGINNING AT THE NORTHEAST CORNER OF THE PROPERTY OF THE WESTERN PACIFIC RAILROAD COMPANY AS CONVEYED BY DEED RECORDED IN BOOK A OF DEEDS, BOOK 282, PAGE 147, SAN JOAQUIN COUNTY RECORDS, SAID TRUE POINT OF BEGINNING ALSO BEING THE NORTHWEST CORNER OF THE PROPERTY OF THE UNION ICE AND STORAGE COMPANY AS CONVEYED BY DEED RECORDED IN BOOK OF OFFICIAL RECORDS, BOOK 1871, PAGE 540, SAN JOAQUIN COUNTY RECORDS; THENCE ALONG THE COMMON LINE BETWEEN SAID THE WESTERN PACIFIC RAILROAD COMPANY PROPERTY AND THE SAID UNION ICE AND STORAGE COMPANY PROPERTY, THE FOLLOWING THREE COURSES:

[1] SOUTH 3° 55' EAST 426.00 FEET;
[2] THENCE SOUTH 35° 55' EAST 64.00 FEET;
[3] THENCE SOUTH 15° 10' WEST 234.95 FEET

TO THE NORTHERLY BANK OF MORMON CHANNEL; THENCE MEANDERING THE NORTHERLY BANK OF MORMON CHANNEL, THE FOLLOWING EIGHT COURSES:

[1] SOUTH 71° 50' WEST 30.85 FEET;
[2] THENCE SOUTH 80° 40' WEST 246.70 FEET;
[3] THENCE NORTH 79° 28' WEST 230.55 FEET;
[4] THENCE NORTH 55° 36' WEST 246.80 FEET;
[5] THENCE NORTH 53° 51' WEST 242.70 FEET;
[6] THENCE NORTH 36° 20' WEST 132.00 FEET;
[7] THENCE NORTH 16° 45' WEST 203.00 FEET;
[8] THENCE NORTH 4° 00' WEST 96.00 FEET

TO THE SOUTHERLY LINE OF WEBER AVENUE; THENCE NORTH 88° 14' EAST 1037.75 FEET ALONG THE SOUTHERLY LINE OF WEBER AVENUE TO THE TRUE POINT OF BEGINNING.

EXCEPTING THEREFROM THAT PORTION DESCRIBED IN DEED TO THE UNION ICE COMPANY RECORDED MARCH 2, 1970 IN BOOK OF OFFICIAL RECORDS, BOOK 3374, PAGE 486, SAN JOAQUIN COUNTY RECORDS.

ALSO EXCEPTING THEREFROM THAT PORTION DESCRIBED IN DEED TO THE UNION ICE AND STORAGE COMPANY RECORDED IN BOOK OF OFFICIAL RECORDS, BOOK 2701, PAGE 551, SAN JOAQUIN COUNTY RECORDS.

ALSO EXCEPTING ANY PORTION OF THE LAND WITHIN THE NATURAL BED OF THE MORMON SLOUGH AND ITS TRIBUTARIES BELOW THE ORDINARY HIGH WATER MARK WHERE IT WAS LOCATED PRIOR TO ANY ARTIFICIAL OR AVULSIVE CHANGES IN THE LOCATION OF THE SHORELINE.

PARCEL TWO:

A PARCEL OF LAND BEING THOSE PORTIONS OF THE ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY'S PROPERTY, DESCRIBED AS FOLLOWS:

ALL THAT CERTAIN PARCEL OF LAND DESCRIBED IN DEED TO THE SAN FRANCISCO AND SAN JOAQUIN VALLEY RAILWAY COMPANY [PREDECESSOR IN INTEREST TO FIRST SAID RAILWAY COMPANY] RECORDED JULY 3, 1895 IN BOOK A OF DEEDS, BOOK 86, PAGE 201, SAN JOAQUIN COUNTY RECORDS, SAID PARCEL BEING DESCRIBED IN SAID DEED AS FOLLOWS:

PORTIONS OF SECTIONS 8 AND A OF C. M. WEBER GRANT EL RANCHO DE CAMPO DE LOS FRANCESES;

COMMENCING AT A POINT ON THE NORTH LINE OF WEBER AVENUE PRODUCED OF THE CITY OF STOCKTON AND 970 1/2 FEET WESTERLY FROM THE NORTHWEST CORNER FORMED BY THE INTERSECTION OF WEBER AVENUE AND TULE STREET IN THE SAID CITY OF STOCKTON; THENCE RUNNING SOUTH 3° 55' EAST [MAGNETIC VARIATION 17° 10' EAST] 28.8 FEET; THENCE SOUTH 88° 14' WEST 1465 FEET; THENCE NORTH 3° 55' WEST 110 FEET TO THE POINT OF BEGINNING OF THE LAND HEREIN CONVEYED; THENCE NORTH 3° 55' WEST 392 FEET TO A POINT ON THE SOUTH BANK OF THE STOCKTON CHANNEL; THENCE FOLLOWING THE MEANDERS OF SAID CHANNEL DOWNSTREAM NORTH 82° 7' WEST 290 FEET; THENCE NORTH 87° 19' WEST 674 FEET; THENCE SOUTH 56° 54' WEST 423 FEET TO A POINT AT THE JUNCTION OF STOCKTON AND MORMON CHANNELS; THENCE FOLLOWING THE MEANDERS OF SAID MORMON CHANNEL UPSTREAM SOUTH 9° 17' EAST TO A POINT ON THE RIGHT BANK OF SAID MORMON CHANNEL WHICH BEARS SOUTH 88° 14' WEST FROM THE POINT OF BEGINNING; THENCE RUNNING NORTH 88° 14' EAST TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM ALL THAT CERTAIN 0.08 ACRE PARCEL OF LAND DESCRIBED IN DEED DATED DECEMBER 1, 1918 FROM THE ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY TO STATE OF CALIFORNIA.

ALSO EXCEPT THEREFROM ALL MINERALS CONTAINED IN THE ABOVE DESCRIBED LAND INCLUDING WITHOUT LIMITING THE GENERALITY THEREOF OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AS WELL AS METALLIC OR OTHER SOLID MINERALS PROVIDED THAT SANTA FE SHALL NOT HAVE THE RIGHT TO GO UPON OR USE THE SURFACE OF SAID LAND OR ANY PART THEREOF FOR THE PURPOSE OF DRILLING FOR, MINING OR OTHERWISE REMOVING ANY OF SAID MINERALS.

SANTA FE MAY HOWEVER AND HEREBY RESERVE THE RIGHT TO REMOVE ANY OF SAID MINERALS FROM SAID LAND BY MEANS OF WELLS, SHAFTS, TUNNELS OR OTHER MEANS OF ACCESS TO SAID MINERALS WHICH MAY BE CONSTRUCTED, DRILLED OR DUG FROM OTHER LAND PROVIDED THAT THE EXERCISE OF SUCH RIGHTS BY SANTA FE SHALL IN NO WAY INTERFERE WITH OR IMPAIR THE USE OF THE SURFACE OF THE LAND CONVEYED OR OF ANY IMPROVEMENTS THEREON.

ALSO EXCEPTING ANY PORTION OF THE LAND WITHIN THE NATURAL BED OF THE STOCKTON CHANNEL AND MORMON CHANNEL AND ITS TRIBUTARIES BELOW THE ORDINARY HIGH WATER MARK WHERE IT WAS LOCATED PRIOR TO ANY ARTIFICIAL OR AVULSIVE CHANGES IN THE LOCATION OF THE SHORELINE.


Site
WEBER AVENUE
INTERSTATE ROUTE NO 5
POR SOUTH OF WAREHOUSES
STOCKTON CHANNEL
MORMON CHANNEL
WASHINGTON STREET
CITY OF STOCKTON
NOTE - Assessor's Parcel Numbers Shown in Circles
THIS MAP FOR ASSESSMENT USE ONLY
145-19

**EXHIBIT A**




McCORMICK AND BAXTER SUPERFUND SITE
STOCKTON, CALIFORNIA
**SITE VICINITY MAP**

FIGURE 1-2

P:\US_Army_COE-Sac\McCormick\Figures\1-2_Site_Vicinity 1102.cdr

# TOPOGRAPHIC SURVEY

## *PORT OF STOCKTON, SAN JOAQUIN COUNTY, CALIFORNIA*

### Overall Site Detail

*SCALE 1"=30'*




**GRAPHIC SCALE**
300 0 150 300
**FEET**

### Pile Detail

*SCALE 1"=2'*
*NOTE: DIMENSION IN INCHES*




### Boundary Detail

*SCALE 1"=100'*




### Title Report

*PREPARED WITHOUT THE BEBEFIT OF A TITLE REPORT.*

*PREPARED BY:*
*ORDER NO.*
*REPORT DATED:*

### Legal Description

*NOT AVAILABLE*

### Date of Survey

*JUNE 22, 2006*

### Basis of bearings

*THE BASIS OF BEARINGS IS SOUTH SIDE OF WEBER AVENUE; S 88°14'00" W THE CALIFORNIA COORDINATE SYSTEM OF 1983 (NAD83), CALIFORNIA ZONE 3*

### Bench mark

*CITY OF STOCKTON,*
*ELEVATION= XXX FEET. (NXVDXX)*




Vicinity Map

### *Legend*

| | | | |
|---|---|---|---|
| FS | FINISH SURFACE | (340) | EXISTING CONTOURS |
| NG | NATURAL GROUND | | LIGHT STANDARD |
| | CONCRETE PAVEMENT | | CHAIN LINK FENCE |
| FL | FLOWLINE | EV | ELECTRIC VAULT |
| TC | TOP OF CURB | CB | CATCH BASIN |
| | SEWER MANHOLE | | PROPERTY LINE |
| | TELEPHONE MANHOLE | | GUARD POST |
| | STORM DRAIN | | POWER POLE |
| WV | WATER VALVE | EPB | ELECTRIC PULL BOX |
| T-VLT | TELECOMMUNICATIONS VAULT | | TREE |
| | TRAFFIC SIGNALS | | PALM TREE |
| DI | DRAIN INLET | | PINE TREE |
| | STREET SIGN | | WATER RESERVOIR |

***Prepared For:***
***SCIENCE APPLICATIONS INTERNATIONAL CORPORATION***
1000 BROADWAY, SUITE 675
OAKLAND, CA 94607
PHONE (510) 466-7126
WWW.SAIC.COM

| NO. | DATE | REVISIONS | BY |
|---|---|---|---|
| | 06/26/06 | SUBMITTAL | TY/AS |

**CAL VADA**
LAND SURVEYING CIVIL ENGINEERING ENVIRONMENTAL SERVICES
411 JENKS CIRCLE, CORONA, CA. 92880
P:951-280-9960 F:951-280-9746 TOLL: 800-CALVADA
www.calvada.com JOB NO. 06489

SHEET 1 OF 1

Exhibit 5 to the United States' Motion
DOJ11

SFUND RECORDS CTR
88055920

SFUND RECORDS CTR
0820-90130

Violation Report

McCormick and Baxter

AR0005

Violation of Section 5650 (f) "It is unlawful to deposit in, permit to pass into, or place where it can pass into the waters of this State any of the following: (f) Any substance or material deleterious to fish, plant life, or bird life.

Pentachlorophenol from the McCormick and Baxter pole treating plant on Washington St. Stockton, was washed into storm drains of the city of Stocktonand thence into the new section of Mormon Slough on the East side of the Freeway and into the port of Stockton.

Pentachlorophenol is extremely toxic to fish, being lethal in amounts of 0.2 parts per billion of water.

On November 25, 1977 a reported fish kill was reported by Herman Miller. When contaced he advised that early the day before 11-24-1977 he had noticed fish in distress. Samples of the fish and the water were taken to the Polution Laboratory at Nimbus where a Bioassay determined that the water was indeed lethal, and the water sent to the Department of Fish and Game Field Station in Sacramento for pesticide analysis.

The polution laboratory determined that the port water with the polutant in its diluted state would kill fish. Report attached

The Pesticide section of the Field Station determined that the water contained a lethal amount of Pentachlorophenol.Report attached.

On receipt of these reports I took samples of water from both the old Mormon Slough that empties into the turning basin and the new section on the east side of the Freeway. Samples were taken at the mouth and at theeast end of both. The reports indicate that the water in the new section where the storm drain from the McCormick & Baxter properties contained lethal amounts of the Pentachlorophenol. Report Attached

Samples of the effluent have been taken from the storm drain catch basin in the McCormick and Baxter yard and at the catch basin in Washington St. where the drains from the property enter the City Storm Drain system, and at the pumping station basin at Orange St. This was done with the assistanee of Walter Witz and J. H. Foster of the Stockton Water Treatment Plant. They verified the direction of flow of water. These samples were taken on December 13, 1977 and delivered to the Field Station on that date.

Immediately following the rain samples were again taken from the 'New Mormon Slough'. These were delivered to the Field Station on 12, 16, 1977. They were taken on 12, 15, 1977. by Wardan Blake and WPA Emerick and delivered to me this date. They were then delivered to the Field station by Inspector Matthews.

On 12,19, 1977 the matter was investigated by Larry Nash of the Regional Water Quality Control Board, Central Valleys Division, 3201 S St. Sacramento, 95816. Samples of the effluent from the yard and catch basins were taken.



Exhibit 6 to the
United States' Motion
DOJ 12

SFUND RECORDS CTR
0820-90124

AR0006

23 December 1977

— Doane Hickman phoned 1/6/77 he has proposed report will mail today, should receive by Monday a.th

SFUND RECORDS CTR
88055916

Doane Hickman, General Superintendent
McCormick & Baxter Creosoting Company
Post Office Box 1728
Stockton, California 95201

Dear Mr. Hickman:

Enclosed for your review is a copy of a memorandum describing the investigation of a fish kill in the Port of Stockton and an inspection of the storm drainage at your Company's property on 19 December 1977 by Mr. Larry Nash, an engineer from our office.

It appears that pentachlorophenol and other pollutants, which were contained in the runoff from your plant site, were discharged to "new" Mormon Slough and the Port of Stockton via the City storm drains. The discharge was, at least partially, responsible for extremely high concentrations of pentachlorophenol in the Port waters and a [illegible] fish kill.

Your cooperation and efforts to temporarily prevent further discharges to surface waters by sealing the storm drains on 20 December 1977 are appreciated. However, as you recall, this problem was discussed with you during the inspection Mr. Nash conducted last year. We were assured that the storm water problem had been eliminated.

In order to assure a permanent solution to your storm drainage problems is obtained, you are hereby directed to submit, no later than 6 January 1977, a report describing the conceptual plan for containment and disposal of storm runoff. The report should include a proposed time schedule for completion of plans, beginning of construction, and completion of facilities. This report will be considered by the staff in determining appropriate enforcement action to recommend to the Board at the 27 January 1977 meeting. You will be notified at least two weeks in advance of any proposed enforcement proceedings.

Should you have any questions in this matter, they should be directed to Mr. Larry Nash.

Sincerely,

RICHARD P. ROSE
Acting Chief, Delta Watershed

LFN:ca
Enclosures
cc: DFG, Region II
Web Fisher
City of Stockton, James Foster

Rose

00222

Exhibit 7 to the
United States' Motion
DOJ 13

I informed him that our office was not previously aware of the existence of any storm drains other than those which had been sealed; and that the City storm drains merely conveyed the drainage to a discharge in the new Mormon Slough without treatment.

Our inspection of the approximately 20 acre site revealed several storm water drains which apparently flowed away from Mormon Slough towards Washington Street and into the City's storm drain system. A schematic is attached which indicates the general apparent drainage. The site is relatively level and not effectively graded for good drainage, as evidenced by the numerous ponded areas and muddy conditions. The existing storm drain inlets probably only service the immediate vicinity. Water samples were taken from ponded water in the west area (schematic location "A") and from manholes which appeared to receive drainage from the storage areas (locations "B" and "C").

Mr. Hickman and Mr. Tinker were very cooperative in discussing the problem and assisting in the inspection of the plant site. Mr. Hickman advised me that the remaining storm drains would be immediately sealed to prevent a recurrence of the discharge of pentachlorophenol and other pollutants to the City system. I replied that sealing of the drains would be an effective temporary measure, but that McCormick and Baxter would have to develop and implement a plan for a permanent drainage system which would adequately collect and contain all runoff from areas where treated products are stored. Mr. Hickman agreed to engage an engineering firm to develop such a plan.

After leaving the McCormick and Baxter Company, we contacted James Foster, Stockton Senior Industrial Waste Inspector, at the Stockton Main Water Quality Control Plant. Mr. Foster provided us with the attached map of the City's storm drainage system which apparently serves the McCormick and Baxter Company property. Mr. Foster indicated that the City would assist and cooperate with us in preventing the discharge of polluted storm water.

On 21 December 1977, Doane Hickman phoned our office to report that all known storm drains on the property were sealed on 20 December 1977. He has contacted R. W. Siegfried and Associates, consulting engineers, and expects to engage them to develop the drainage control plan with preliminary survey work to commence next week. The City is assisting them in locating the discharge locations of their drains. They expect to be doing some dye tests on 22 December 1977. Doane said the plant was started around 1941 and they are uncertain where all the drains go.

This inspection found the McCormick and Baxter Creosoting Company in threatened violation of Limitation E.3 of Board Order No. 74-407 that states:

> "The discharge shall not cause concentrations of any materials in the receiving waters which are deleterious to human, animal, aquatic, or plant life."

Larry F. Nash

LARRY F. NASH, Staff Engineer

00223

Exhibit 7 to the United States' Motion DOJ 14

cc: As per letter

12/23/77 LFN:ca

SFUND RECORDS CTR
88055910

SFUND RECORDS CTR
0820-90118

REFERRAL ORDER NO. 78-17

McCORMICK AND BAXTER CREOSOTING COMPANY AND THE CITY OF STOCKTON

AR0010

CHRONOLOGY OF EVENTS

| | |
|---|---|
| 13 Sep 1971 & 11 Aug 1972 | Original and revised applications for Refuse Act permit to discharge in navigable waters and their tributaries was submitted by McCormick & Baxter to the Department of the Army, Corps of Engineers. Revised application described three storm drains which discharged to (old) Mormon Slough (later identified as Discharges 003, 004, and 005), and stated that "treated wood (is) stored on portion of property draining into city sewer. Mostly green, untreated wood (is) stored on portion of property draining into (old Mormon) slough." |
| 06 Feb 1973 | Refuse Act permit applications sent by EPA to the State Water Resources Control Board for processing under the National Pollutant Discharge Elimination System. |
| 23 Aug 1974 | Regional Board adopted Waste Discharge Requirements for McCormick and Baxter Creosoting Company, Order No. 74-407, NPDES No. CA0004472. Permit includes limitations for storm drain discharges 003, 004, and 005 and time schedule to achieve full compliance by 1 October 1976. |
| 31 Oct 1974 thru 11 Nov 1976 | Self monitoring reported by McCormick and Baxter revealed continuous violations of storm drain discharge requirements. Pentachlorophenol concentrations range from 0.40 to 13.4 mg/l (or parts per million). Limitation for Pentachlorophenol is 0.01 mg/l. |
| 09 Nov 1976 | Larry Nash, Regional Board staff engineer, inspected McCormick and Baxter facilities. Storm drain discharge 005 could not be located and General Superintendent, Doane Hickman stated that he believes it does not exist. Mr. Hickman advised Mr. Nash that previously proposed storm water treatment facilities would be too expensive and that he was now considering storage tanks and land disposal in order to eliminate the discharge of storm runoff to "old" Mormon Slough. |
| 21 Dec 1976 | Letter from McCormick & Baxter to Regional Board advising that storm drains 003 and 004 had been permanently closed and would no longer discharge to Mormon Slough. |
| 25 Nov 1977 27 Jan 1978 | Chronology described in staff reports for 27 January 1978 and 23 February 1978 public hearings. |
| 27 Jan 1978 | Regional Board adopted a Clean-Up and Abatement Order for McCormick and Baxter Creosoting Company including a time schedule to assure adequate containment and disposal of storm runoff. |
| 23 Feb 1978 | Regional Board conducted a public hearing and adopted Order No. 78-17, referring the McCormick & Baxter Creosoting Company and the City of Stockton to the Attorney General for discharge of wastes without a permit. |

WDR = WASTE DISCHARGE REQ'T #

when renewed THIS # changes, NPDES # stays the same.

**State of California** **Department of Health Servic**

# Memorandum

To : Marian King
Legal Counsel

Via : James M. Pappas *JMP*
Senior Engineer

From : Permits, Surveillance and
Enforcement Section

Date : September 28, 1983

Subject: ISD and Title 22 Violati
at McCormick & Baxter, San Joaq
County

The following are violations of the Interim Status Document at McCormick & Baxter:

1. Appropriate hazardous waste warning signs are not posted in English and Spanish (Section II.1.(c)., II.10., and III.4.(c)., ISD).

2. No NFPA placards are posted on hazardous waste tanks (Section II.2.(d)., ISD).

3. No waterfowl barriers are used on hazardous waste storage ponds (Section II.3.(c)., ISD).

4. Empty hazardous materials containers not managed as hazardous waste (Section II.4.(d)., ISD).

5. The public water supply is not protected from cross contamination. This is currently scheduled for correction by 31 December 1983 (Section II.7., ISD).

6. A non-operational emergency shower/eyewash in the central yard was marked as servicable (Sections II.12. and II.13., ISD).

[illegible] in the waste analysis plan, analysis review/repetition is [illegible] III.3.(b).(4), ISD).

8. The hazardous waste storage ponds are not included in the inspection schedule (Section III.5.(a)., ISD).

9. An inspection log is not used (Section III.5.(d)., ISD).

10. Personnel training has been specified but is not in place at this time, including records, job descriptions, and reviews (Section III.6., ISD).

11. The work phone numbers of emergency coordinators are not specified in the contingency plan (Section III.13.(d)., ISD).

12. The emergency coordinator seemed unsure of his authority and/or responsibilitie and emergency procedures (Section III.16., ISD).

13. There is no written operating record for the facility, although the format for one has been prepared (Section IV.I., ISD).

S-B-V-1

14. All records were not available for inspection (Section IV.2.(a)., ISD).

15. The annual report for calendar year 1982 was not prepared (Section IV.3., ISD).

16. [illegible] and monitoring data were not available (Section [illegible].4.(b)., ISD).

17. Groundwater monitoring has not been implemented as of 19 November 1981, as required by the ISD, issued 30 March 1981 (Section VII, ISD).

18. The oily waste tanks are not inspected (Section VIII.3., ISD).

19. The surface impoundments (hazardous waste storage ponds) are not inspected (Section IX.4., ISD).

20. Hazardous waste container storage areas are not inspected (Section X.4., ISD).

21. Some waste containers were not closed (Section X.3.(a)., ISD).

22. Empty and full drums containing or previously containing a hazardous waste or material were stored in an unapproved location (Section II.(4),(d)., ISD).

23. Hazardous waste is stored over one year, and no fees are paid to the Department (Section II.(1).(a & b)., ISD).

24. Hazardous waste containers (drums) were not in condition to safely transport, handle, or move (Section II.(4).(a)., ISD).

25. Hazardous waste containers (drums) were not stored on an impervious base (Section II.(1).(a)., ISD).

26. No hazardous waste labels were applied to the containers stored over 90 days (Section 66535(g), CAC., II.(4).(c)).

27. Hazardous waste containers (drums) not stored within a secure enclosure (Section II.(1).(c)., II.(8)., & III.(4)).

28. Hazardous waste containers (drums) stored in area without safety shower and eyewash (Section II.(12 &13)).

29. Ignitable hazardous wastes (drums) stored within 50 feet of property line (Section X.(5)).

30. No double containment provided for hazardous waste storage tank (Section II.(2).(a)).

31. Extremely hazardous wastes stored in surface impoundments (Section II.(3).(a).(1)).

32. No Closure Plan, Financial Assurance, or Contingency Plan provided for hazardous waste surface impoundments (Sections III.(13)., V., & VI).

33. Disposal of hazardous wastes to land on site (Sections I.(1).(a)., II.(8)).

The following are further violations of the California Administrative Code, Title 22:

1. Unpermitted disposal of hazardous wastes to land (Sections 66490(a), 66525 (a), 66530 (a, c, & j), and 66555).

2. Handling and disposal of extremely hazardous wastes without a permit (Section 66570).

If there are any questions, please call me at 739-3142.

Gary Reents
Project Engineer

GAR:mlb

SFUND RECORDS CTR
0820-90194

OFFICE MEMORANDUM

TO: William H. Crooks WHC
Clifford C. Wisdom

DATE: 25 January 1984

FROM: J. Lawrence Pearson JLP

AR0017

SUBJECT: McCORMICK AND BAXTER, STOCKTON

SFUND RECORDS CTR
88055984

McCormick & Baxter (M&B) has used four wood preserving processes:

1. Chromated-Copper-Arsenate (discontinued about 10 years ago)
2. Amoniacal-Copper-Arsenate
3. Creosote
4. Pentachlorophenol

Soil sampling in 1983 showed serious contamination from all of the processes. M&B has just agreed to complete its soil investigation and to do extensive ground water sampling. M&B also agreed to submit a cleanup plan by June 1984.

This is one of the wood treaters that received an enforcement/settlement letter from the Department of Health Services (DOHS). DOHS has agreed to postpone the settlement until the problems are defined and the cleanup can be negotiated.

JLP:ljl

ICC

# McCORMICK AND BAXTER CREOSOTING COMPANY

## STOCKTON, CALIFORNIA

## HYDROGEOLOGIC INVESTIGATION

M11701.D0

The following technical report was prepared by Fritz Carlson (California Registered Geologist No. 3397) and Dan Dragan (California Registered Geologist No. 3809).

# CONTENTS


| | Page |
|---|---|
| INTRODUCTION | 1 |
| CONCLUSIONS | 1 |
| RECOMMENDATIONS | 2 |
| HYDROGEOLOGY | 2 |
| Regional Hydrogeologic Setting | 2 |
| Local Hydrogeologic Setting | 2 |
| AQUIFER CHARACTERISTICS | 3 |
| Transmissivity | 3 |
| Permeability | 3 |
| Groundwater Levels | 4 |
| Tidal and Barometric Pressure Influence on Water Levels | 4 |
| Direction of Groundwater Movement | 5 |
| Rate of Groundwater Flow | 5 |
| GROUNDWATER QUALITY | 6 |
| Distribution of Contamination | 6 |
| Contaminant Movement | 7 |
| SOIL | 7 |
| REFERENCES | |

APPENDIXES

| | |
|---|---|
| APPENDIX A | Geologic Logs and As-Recorded Construction Diagrams |
| APPENDIX B | Test Pumping Data, Plots and Calculations |
| APPENDIX C | Water Quality Data |
| APPENDIX D | Soil Analysis |

| TABLES | | Page |
|---|---|---|
| 1 | Summary of Transmissivity and Hydraulic Conductivity Values | 4 |

FIGURES


| | | Following Page |
|---|---|---|
| 1 | Generalized Geologic Fence Diagram | 3 |
| 2 | Base Map (Well Locations, Water Quality Data and Water Level Contours) | 4 |
| 3 | Hydrograph of Historic Groundwater Levels | 4 |
| 4 | Hydrographs of Barometric Pressure and Water Level Measurements | 4 |


RDR33/042

## INTRODUCTION

This report presents the results of a groundwater investigation at the McCormick and Baxter Creosoting Company in Stockton, California. The objectives of the study were to:

- Characterize the regional hydrogeology
- Characterize the subsurface geology at the site
- Determine if contaminants previously identified in the soils have reached aquifers beneath the site
- Characterize the hydraulic properties of the shallow aquifer beneath the site
- Determine if contaminants are leaving the site via the shallow aquifer
- Collect additional soil samples for analysis
- Provide permanent groundwater monitoring wells

The scope of work included:

- Drilling 10 boreholes
- Completing of the boreholes as groundwater monitoring wells
- Performing aquifer tests in the completed wells
- Surveying well heads for vertical and horizontal control
- Monitoring water level changes caused by fluctuating tides and barometric pressure
- Assessing historic changes in water table elevations
- Collecting and analyzing soil and water samples
- Compiling and analyzing data
- Writing report

## CONCLUSIONS

The following conclusions may be made as a result of the hydrogeologic study at the McCormick and Baxter site in Stockton, California.

- o Contaminants previously identified in the soils have reached a shallow aquifer beneath the site. These include arsenic, copper, chromium, pentachlorophenol, and napthalene.

- o The horizontal and vertical extent of contaminated groundwater have not been fully identified.

- o Aquifer hydraulic properties indicate groundwater in the shallow aquifer is currently moving to the east at an estimated rate of between 275 and 800 feet/year.

- o The shallow aquifer does not have a direct permeable hydraulic connection with surface water from Mormon slough.

- o The shallow aquifer appears to have been dewatered prior to 1980.

## RECOMMENDATIONS

Additional work is necessary to define the vertical and horizontal extent of contamination. Once the extent of contamination is defined, a study is necessary to determine the best method of contaminant control. Following is a general description of the necessary work to define the boundaries of contamination. A detailed work scope will be developed.

- o Construction of additional monitoring wells outside the perimeter of the previously constructed wells. These wells are necessary to define the lateral boundaries of contamination.

- o Construction of monitoring wells screened in deeper aquifers. These wells are necessary to define the vertical boundaries of contamination and to define the vertical hydraulic gradient.

## HYDROGEOLOGY

### REGIONAL HYDROGELOGIC SETTING

The McCormick and Baxter site lies within the Great Central Valley geomorphic province. This province consists of thick sedimentary sequences of gravel, sand, silt, and clay. These sediments, where permeable and saturated, provide a source of water supply, storage, and distribution.

### LOCAL HYDROGEOLOGIC SETTING

Geologic formations beneath the McCormick and Baxter site are recent alluvium, the Victor Formation and the Mehrten

Formation. These formations consist of thick sequences of gravel, sand, silt, and clay and are used as a water source. Thickness of the sediments beneath the site may exceed 1,000 feet (DWR Bulletin No. 146).

The field investigation conducted in March 1984 focused on the shallow hydrogeologic conditions beneath the site. Ten boreholes were drilled ranging from 34 to 45 feet deep. The subsurface geology in this zone consisted of layers of clay, silt, and sand that could be laterally correlated. The general sequence consisted of clays and silts ranging in thickness from 19 to 38 feet deep followed by an aquifer composed of unconsolidated fine to medium sands ranging from 3 to 18+ feet. Most boreholes bottomed in a few feet of clay or silty clay before drilling was terminated. Figure 1 is a generalized geologic fence diagram showing the subsurface geologic conditions encountered during the drilling program.

## AQUIFER CHARACTERISTICS

The March 1984 field investigation included construction and testing of monitoring wells completed in the boreholes. Well construction diagrams and individual geologic logs for each well are included in Appendix A. Following are descriptions of the aquifer hydraulic properties determined from the test pumping of the completed wells and measurement of static water levels.

### TRANSMISSIVITY

The transmissivity of the shallow aquifer beneath the McCormick and Baxter site was determined by analysis of data from eight constant discharge pumping tests. The results of the tests indicate the transmissivity of the aquifer ranges from of 300 to 3,000 gpd/ft. The calculated average transmissivity value is about 1,700 gpd/ft. Data, calculations, and graphical plots used in the determination of transmissivity values are shown in Appendix B.

### PERMEABILITY

Permeability in the shallow aquifer beneath the site ranges between 13 and 38 feet per day. Permeabilities of the aquifer were calculated from the transmissivity values obtained during the pumping tests and the thickness of the aquifer from the geologic logs. Table 1 is a summary of the transmissivity and permeability results obtained from the pumping tests and the geologic logs.

NO

PAGE 4

jrosci

(0.1 to 0.2 foot) could be directly correlated with changes in barometric pressure, with a barometric efficiency of 88 percent.

The absence of tidal influence on water levels in the wells suggests there is no direct permeable hydraulic connection between the shallow aquifer beneath the site and the waters of Mormon Slough. The high barometric efficiency indicates the shallow aquifer is artesian and the silts and clays overlying the aquifer act as a confining layer.

DIRECTION OF GROUNDWATER MOVEMENT

The hydraulic gradient was determined by measuring water levels on April 3, 1984. A water-level contour map developed from these data is shown in Figure 2. The contour map shows that groundwater flows generally west to east at about 6 feet per 1,000 feet for a gradient of 0.006 (drop in feet of water table surface divided by horizontal distance in feet). This direction of flow is generally consistent with the direction of flow estimated from historic water level data since 1952. No data were available to determine vertical hydraulic gradients.

RATE OF GROUNDWATER FLOW

The current calculated rate of groundwater flow beneath the site based on the pumping test data ranges from 140 to 800 feet per year. The flow rate estimates are based on the following form of Darcy's law:

$$V = \frac{Ki}{\Theta}$$

where: V = Groundwater velocity (feet per day)

K = Hydraulic conductivity (feet per day)

i = Hydraulic gradient (feet per foot)

$\Theta$ = Effective porosity of geologic materials (dimensionless)

Values for hydraulic conductivity (K) and hydraulic gradient (i) were obtained from the pumping tests and water level measurements. The effective porosity ($\Theta$) was estimated based on a characteristic value for fine to medium sands. Rates of groundwater flow were therefore calculated from:

K = 13 to 38 feet per day

i = 0.0058

$\Theta = 0.10$

Low estimate

$$V = \frac{13 \text{ feet per day} \times 0.0058}{0.10}$$

$$V = 0.754 \text{ feet per day} \times 365 = 275 \text{ feet per year}$$

High Estimate

$$V = \frac{38 \text{ feet per day} \times 0.0058}{0.10}$$

$$V = 2.20 \text{ feet per day} \times 365 = 800 \text{ feet per year}$$

GROUNDWATER QUALITY

Water samples collected from the ten monitoring wells were analyzed for contaminants associated with the chemicals used in the wood preserving operation. Additionally, samples collected from Wells B-2, B-6, and B-7 were analyzed for cadmium, lead, and zinc. These analyses were run because Monitoring Wells B-2, B-6, and B-7 were drilled near an area formerly occupied by a lead reclaiming operation. During our work, we identified this operation that appears to have been located east of the McCormick and Baxter site under the present location of Interstate 5. A listing of the water quality results is included in Appendix C. Following is a summary of the contaminants detected. Pentachlorophenol was detected in nine of the ten wells and napthalene was detected in three wells. Chromium above 0.05 mg/l and arsenic above 0.05 mg/l were detected in one well (B-8). Cadmium was detected above 0.01 mg/l in Wells B-7 and B2. Data for arsenic, copper, total chromium, and napthalene are shown on Figure 2.

DISTRIBUTION OF CONTAMINATION

Contaminants from the wood preserving operation were detected in nine of the ten monitoring wells. See Figure 2 for map showing distribution of contaminants. PCP concentrations in the nine wells ranged from 0.002 mg/l (Well B-2) to 67.4 mg/l (Well B-8). In Well B-1, PCP was not detected at the lower detection limit of less than 0.002 mg/l. Napthalene, (a major component of creosote) ranging in concentration from 0.01 mg/l to 9.3 mg/l was detected in three monitoring wells (Wells B-8, B-9, and B-10). Wells near the process areas (B-8, B-9), the old oily waste ponds (B-10), and the wastewater storage ponds (B-3, B-4, B-5) show the highest concentration of contamination. Well B-1 showed no contamination above the detection limits for PCP, napthalene, arsenic, and copper. Well B-1 appears to represent an upgradient well, unaffected by contamination.



Exhibit 11 to the
United States' Motion
DOJ 29

The full lateral extent of groundwater contamination cannot be determined with available data.

CONTAMINANT MOVEMENT

Above the water table, contaminants at the McCormick and Baxter site move vertically downward with limited lateral spreading. Below the water table, the movement of contaminants is controlled by the direction of groundwater movement.

Geologic materials above the water table at the McCormick and Baxter site are generally low permeability silts and clays. These materials normally inhibit the rate of downward migration of contaminants. However, the potential for movement of contaminants from the surface to the shallow aquifer would be enhanced in those areas where the natural low permeability soils were replaced by more permeable backfill.

Groundwater, and therefore contaminants, move in the direction of decreasing head. Generally, the groundwater flow vector has both a lateral and vertical component. Presently, the lateral direction of groundwater flow (as previously described in the groundwater movement section) is to the east. No data on vertical hydraulic gradients at the site are available. Additional data on the vertical hydraulic gradient would be necessary to assess the tendency for downward movement of contaminants.

The low concentrations of contaminants found in the downgradient well (B-2) suggest contaminant migration may be inhibited due to attenuation by biodegredation, sorption, dilution, dispersion, or other processes. Alternatively, contamination may be moving out of the shallow aquifer in response to downward vertical gradients or by diffusion.

SOIL

Analysis results of the soil samples were not available in time to complete a technical evaluation. Partial analysis results are in Appendix D.

RDR33/041



Exhibit 11 to the
United States' Motion
DOJ 30

## REFERENCES

1. California Department of Water Resources, San Joaquin County Groundwater Investigation, Bulletin No. 146. July 1967.

RDR33/043

SFUND RECORDS CTR
88056002

SFUND RECORDS CTR
0820 90216

EPA

# McCormick & Baxter Creosoting Company Superfund Site

AR0080

*United States Environmental Protection Agency, Region IX, San Francisco*

**Stockton, California** **March 1993**

# EPA Assumes Lead at New Superfund Site

## Site Background

The McCormick & Baxter Superfund site is located on 29 acres in an industrial area of Stockton, California, adjacent to Old Mormon Slough. McCormick & Baxter Creosoting Company operated a wood preserving company there from 1946 until 1990, when the company went out of business. Following a 1977 fish kill in the New Mormon Slough and the Port of Stockton that was attributed to chemicals from McCormick & Baxter, the company conducted investigations to determine the extent of contamination caused by operations at the site. These investigations found pentachlorophenol (PCP), creosote, arsenic, chromium and copper, all commonly used in wood preserving processes, in soil and shallow groundwater at the site.




*Figure 1 Site Location Map*

The California Environmental Protection Agency - Department of Toxic Substances Control (Cal-EPA/ DTSC), formerly the Department of Health Services, was the lead agency during the early phases of site cleanup at McCormick & Baxter. Following the proposal of the site to the National Priorities List (NPL) in February 1992, the federal Environmental Protection Agency (EPA) became the lead agency to complete investigations at the site and to carry out a final cleanup remedy. The site was added to the NPL on October 14, 1992, which allows EPA to use federal Superfund resources to conduct a cleanup of the site (see Figure 2).

Exhibit 12 to the United States' Motion
DOJ 32

## Current Status of the Site

EPA plans to conduct additional studies over the next several months to define the full extent of contamination at the site, including an evaluation of contaminated sediments in Mormon Slough, and to fully assess any potential risk to public health or the environment. The contaminants found in soil and shallow groundwater at the McCormick & Baxter site can be harmful to human health. However, no contaminated groundwater is currently used or has been used in the past for human consumption. Neighborhood water is supplied by deep wells over one mile from the site. A public health risk assessment completed in 1990 did not identify any significant risk to nearby workers or residents from surface soil contamination at the site. The only known exposure to hazardous substances that could occur today would be to trespassers at the site.

## What is Superfund?

Superfund is the commonly used name for the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), a federal law enacted in 1980 and amended in 1986. CERCLA enables EPA to respond to hazardous waste sites that threaten public health and the environment. EPA responds to a hazardous waste site by identifying parties responsible for site contamination and ordering the responsible parties to perform cleanup activities. If EPA is unsuccessful in identifying responsible parties, EPA may use Superfund resources to perform cleanup activities. Superfund resources are largely generated from taxes on petroleum and chemical industries, and an environmental tax placed on corporations.

EPA ranks sites according to the threat they pose to public health and the environment. Sites that score high enough are eligible for NPL long-term cleanup under Superfund. There are about 1,275 sites nationwide listed on the NPL.

## The Superfund Process

| Site Discovery | NPL Ranking/ Listing | Remedial Investigation (RI) | Feasibility Study (FS) | Public Comment Period | Record of Decision (ROD) | Remedial Design | Remedial Action |
|---|---|---|---|---|---|---|---|
| Contamination first discovered in 1977; cleanup began by State and McCormick & Baxter; company closes in 1990. | Site placed on EPA's National Priorities List, becoming eligible for remedial action under Superfund. October 1992. | Complete identification of the sources and areas of contamination. Current EPA activity | Identify cleanup options for the contamination problems. Projected for 1993. | The public will have the opportunity to comment on EPA's preferred clean-up option during a 30-day public comment period. EPA will consider these comments and respond to them in writing | EPA will document the selected clean-up option(s) for the Superfund site. | A detailed plan for the selected remedy will be developed. Enforcement activities with potentially responsible parties will be pursued. | A qualified contractor will be selected to begin the cleanup according to the detailed plan. |

Interim Cleanup Actions Occur When Necessary

*Figure 2: Public Involvement Activities Occur Throughout the Superfund Process*

Exhibit 12 to the
United States' Motion
DOJ 33

## Technical Assistance Grant: A Community Relations Opportunity

EPA has a community relations activity called the Technical Assistance Grants (TAG) Program. The purpose of the TAG Program is to assist community groups in interpreting technical information. Under this program, one eligible group at each Superfund site may obtain one grant of up to $50,000 in federal funds to provide technical assistance in understanding site documents. To be eligible, a group must be:

- Incorporated;
- Able to meet a 20 percent matching funds requirement (in-kind contributions - i.e., donated goods and services are permissible), or obtain a waiver of this requirement;
- Capable of preparing a plan to use technical assistance based on the schedule for preparing cleanup plans and carrying out the cleanup activities.

For more information about TAG, contact Vicky Semones at 1-800-231-3075 and leave a message. She will return your call.

## Community Involvement

This fact sheet is part of the community relations program for the site investigation and cleanup at the McCormick & Baxter Creosoting Company Superfund site. The fact sheet is being sent to you and other residents in the immediate area of the site. EPA's community relations program is designed to keep you informed about planned or ongoing activities at the site and to give you the opportunity to provide input into the decision-making process. EPA is developing a Community Relations Plan which identifies specific activities to be conducted during the investigation and cleanup. **If you are interested in receiving additional fact sheets and information on the site, please complete and return the coupon provided below.**

EPA places a high value on community involvement in the Superfund process. Your comments and questions are welcome. If you have any questions or comments about EPA activities at the McCormick & Baxter Creosoting Company site, please contact:

Vicky Semones
Community Relations Coordinator
U.S. EPA
75 Hawthorne St. (H-1-1)
San Francisco, CA 94105
(415) 744-2188

Marie Lacey
Remedial Project Manager
U.S. EPA
75 Hawthorne St. (H-6-3)
San Francisco, CA 94105
(415) 744-2234

Or, leave a message on EPA's TOLL FREE Line: (800) 231-3075 and your call will be returned.

## Mailing List

If you would like to be included on the permanent mailing list for the McCormick & Baxter Creosoting Company Superfund site, please fill out and return this coupon to Vicky Semones, U.S. EPA, 75 Hawthorne St. (H-1-1), San Francisco, CA 94105.

Name: ______________________________

Address: ______________________________

City/State: ____________________ Zip Code: ____________

Telephone Number: ______________________________

Exhibit 12 to the
~~United States' Motion~~
DOJ 34

# Information Centers

EPA maintains information centers at the locations shown below, which contain project documents, fact sheets and other reference materials relative to the McCormick & Baxter site. This information is available for public review at:

Boggs Tract Community Center
533 South Los Angeles Avenue
Stockton, CA 95203
(209) 948-068
Contact: Arlene Coffee
Hours: Monday through Friday, 8 a.m. - 5 p.m.

Stockton Public Library
605 N. El Dorado Street
Stockton, CA 95203
(209) 944-8221
Contact: Information Desk
Hours:

| | |
|---|---|
| Monday | 10 a.m. - 9 p.m. |
| Tuesday | 10 a.m. - 6 p.m. |
| Wednesday | 10 a.m. - 9 p.m. |
| Thursday | 10 a.m. - 9 p.m. |
| Friday | 10 a.m. - 5 p.m. |
| Saturday | 10 a.m. - 5 p.m. |
| Sunday | Closed |

**Inside: Update on activities at the McCormick & Baxter Company Superfund site**

United States Environmental Protection Agency
Region 9
75 Hawthorne Street (H-1-1)
San Francisco, CA 94105
Attn: Vicky Semones

FIRST CLASS MAIL
U.S. POSTAGE
PAID
U.S.EPA
Permit No.G-35

Official Business
Penalty for Private Use,
$300

Look for recycling symbols on products you buy. Such symbols identify recycled or recyclable products. Support recycling markets by buying products made from recycled material.

*Printed on Recycled Paper*

SFUND RECORDS CTR
0820-00148

EPA CONTRACT NUMBER: 68-W9-0059
WORK ASSIGNMENT NUMBER: 59-27-971E

AR0085

AR0040

# THE McCORMICK-BAXTER COMMUNITY RELATIONS PLAN

SFUND RECORDS CTR
88054895

McCORMICK-BAXTER SUPERFUND SITE
STOCKTON, CA

April 1993

Submitted to
EPA Region IX

Prepared by ICF Technology, Incorporated

# TABLE OF CONTENTS

1.0. INTRODUCTION . . . . . 1
1.1. Objectives . . . . . 1
1.2. Summary of Important Issues and Concerns . . . . . 1
1.3. Designated EPA Contacts . . . . . 2

2.0. SITE HISTORY . . . . . 2
2.1. Description of Contamination . . . . . 4
2.2. Agency and Technical Activity to Date . . . . . 4

3.0. COMMUNITY BACKGROUND . . . . . 7
3.1 Community Profile . . . . . 7
3.2 History of Community Involvement . . . . . 8
3.3 Community Concerns and Issues . . . . . 9

4.0 COMMUNITY RELATIONS PROGRAM . . . . . 10
4.1. Community Relations Activities . . . . . 10

FIGURES
1. Site Location Map . . . . . 3

TABLES
1. Agency Actions on McCormick-Baxter Site . . . . . 6
2. Community Relations Activities . . . . . 14
3. Community Relations Activities Timeline . . . . . 17

APPENDICES
A. List of Key Contacts
B. Information Repositories & Meeting Location
C. List of Acronyms & Abbreviations
D. Glossary

## 1.0. INTRODUCTION

The United States Environmental Protection Agency (EPA) is overseeing an investigation and cleanup of the McCormick and Baxter Creosoting Company (McCormick-Baxter), a former wood-preserving plant located in Stockton, California. This remedial action is being taken by EPA under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA, or Superfund) of 1980 and the Superfund Amendment and Reauthorization Act (SARA) of 1986. As required under CERCLA, EPA will supervise future community relations activities for the site.

The Department of Health Services, Toxic Substances Control Program* began investigations of the McCormick-Baxter site in September, 1981. The State produced a Community Relations Plan for McCormick-Baxter in February, 1989, that described the concerns of the community at that time and the activities it proposed to involve community members in the decision-making process. Because the State was unable to fund cleanup actions, EPA proposed in February, 1992, that the McCormick-Baxter site be added to the National Priorities List so that Superfund monies could be used for cleanup costs. In October 1992, EPA officially assumed responsibility from the State as lead agency for the cleanup and will supervise future community relations activities for the site.

This Community Relations Plan provides an overview of activity at the McCormick-Baxter site, describes community concerns and opinions, and presents a community relations program designed to address concerns and needs of the community for participation in the Superfund process. The document is divided into the five sections: Introduction; Site History; Community Background; Community Relations Program; and Appendices.

### 1.1. Objectives of the Community Relations Plan

This Community Relations Plan (CRP) is based on a review of the CRP for McCormick-Baxter developed by the State and information gathered during nine personal interviews conducted by EPA in October 1992, with residents of the nearby Boggs Tract residential area; industrial site neighbors; local officials; and agency representatives. Information from the Stockton Chamber of Commerce and EPA's McCormick-Baxter Work Plan was also used. The CRP takes into account the concerns and needs of the community that were expressed in these interviews and recommends activities to meet the community's needs. EPA has formulated these activities 1) to ensure two-way communication between the affected and interested community and EPA and 2) to keep the community informed of technical progress at the site.

### 1.2. Summary of Important Concerns and Issues

The major issues of concern expressed during the community interviews include the following, discussed in greater detail in Section 3.3:

- Potential health risks of eating fish from the slough and/or consuming fruits and vegetables from local gardens;
- Project work schedule and information distribution;
- Distrust of governmental agencies due to historical experience.

---

*On July 17, 1991, the Toxic Substances Control Program (TSCP), which was the initial State agency to work on the project, was transferred from the Department of Health Services (DHS) to the newly formed California Environmental Protection Agency (Cal EPA) and TSCP was accorded Departmental status. The new name for TSCP is the Department of Toxic Substances Control (DTSC). In order to avoid confusion, this document will use "State" when referring to these State agencies.

In general, few concerns were expressed by the interviewees regarding the site. A few community members were familiar with the issue of contamination at McCormick-Baxter, but had not discussed it since a public meeting held by the State in 1988. Although most interviewees were primarily concerned about health issues, some questioned EPA's credibility in sharing important information and in keeping its promises for the future.

Most elected officials and agency representatives were relieved that EPA would assume fiscal and management responsibility for the cleanup; during past City meetings, city planners had discussed how to develop the cleaned property in response to Stockton's increased industrial growth. In order to most effectively respond to inquiries and avoid unnecessary alarm by community members, some officials and agency representatives asked to be informed of site activities and work schedules; particularly when conspicuous protective suits are to be worn by cleanup workers.

### 1.3. Designated EPA Contacts for McCormick-Baxter Superfund Site

In order to provide the community with access to information about McCormick-Baxter, EPA has designated the following individuals as community contacts:

Vicky Semones
Community Relations Coordinator
EPA, Region 9
75 Hawthorne Street (H-1-1)
San Francisco, CA 94105
(415) 744-2188 or (800) 231-3075 (Message Line)

Marie Lacey
Remedial Project Manager
EPA, Region 9
75 Hawthorne Street (H-6-3)
San Francisco, CA 94105
(415) 744-2234 or (800) 231-3075

## 2.0. SITE HISTORY

The McCormick-Baxter Creosoting Company operated a wood-preserving plant in Stockton, California from 1946 to 1990. The 29-acre site is located at 1214 West Washington Street and is bounded by the Mormon Slough to the north, Washington Street and Interstate 5 (I-5) to the east, California Cedar Products to the south, and Continental Grain to the west. The Mormon Slough empties into the Port of Stockton turning basin on the San Joaquin River. The slough and the San Joaquin River are regularly used for recreational fishing activities.

The immediate area surrounding the site is industrial. The closest residential area is Boggs Tract, several blocks to the southwest of the facility. The Washington Elementary School is located within Boggs Tract at the northwest corner of the intersection of Sonora and Fresno Streets. See Figure 1 for a site location map.

The company produced pressure-treated wood products for residential, commercial, transportation, and utility industry users. The wood was treated in pressure cylinders where various preservative




FIGURE 1: McCORMICK-BAXTER SUPERFUND SITE AREA MAP

solutions were impregnated into the wood. Many of the plant processes changed through the years, but major plant operations continued in approximately the same locations. The southeastern portion of the site was previously owned and used by the Lippincott Lead Company to process spent batteries.

McCormick-Baxter filed for Chapter 11 bankruptcy in 1988; the bankruptcy court approved a Plan of Reorganization in November 1990. For various business and environmental reasons the Stockton facility discontinued wood-treating operations in September 1990. The State approved a site "Mothballing Plan" developed by McCormick-Baxter in July 1990 to close down the facility. Most, but not all, of the mothballing activities were carried out by McCormick-Baxter before the site's final closing in October 1991.

Groundwater in the area is too saline to be used for drinking water or for agricultural purposes. It is used for industrial process water. Drinking water in neighborhoods near the site is provided by California Water Service Company (Cal Water). All but one or two private wells in the vicinity of the Site were capped approximately ten years ago.

### 2.1. Description of Contamination

The facility operated from 1946 until 1990 using various wood preserving processes common to the industry. Wood treatment formulations typically containing creosote, pentachlorophenol (PCP), chromium, copper, arsenic, and zinc were used in the on-site processes. Various potential sources of contaminants are present at the site, including oily waste ponds, a concrete oily waste tank, a paved pole washing area, above-ground and underground storage tanks, oil/water separators, condensate storage tanks, storm water collection sumps, a blowdown tank, boiler room tanks and sumps, retort tanks, and contaminated soils. Over the facility's operational years, chemically treated wood was stored at various locations throughout the site.

The primary remedial issues at the site include soil and groundwater contamination. Four phases of soil sampling conducted between 1983 and 1987 identified PCP, polynuclear aromatic hydrocarbons (PAHs), arsenic, chromium, and copper in on-site soils. Additional soil sampling completed by the State in 1989 identified the presence of dioxin and furan isomers. A groundwater contaminant plume extends to a depth of at least 175 feet below ground surface and laterally approximately 1,500 feet toward the southeast. Constituents found in the plume include PCP and PAHs, along with metals. In addition, the deeper aquifer has shown low levels of PAH contamination based on samples collected from off-site wells located approximately 1,000 feet southeast of the site.

### 2.2. Agency and Technical Activity to Date

McCormick-Baxter first received attention as the source of surface water contamination in November, 1977. At that time, a fish kill occurred in Old Mormon Slough following an overflow of water from the Company's storm water drainage system. The water was contaminated with PCP. The California Department of Fish and Game investigated the situation and notified the State.

About two months later, in January, 1978, McCormick-Baxter was issued a Cleanup and Abatement Order by the Central Valley Regional Water Quality Control Board. The order required McCormick-Baxter to prevent future uncontrolled releases from the site and to remove an onsite, unlined, oily waste pond, believed to be the likely source of the surface water contamination. McCormick-Baxter complied with the order.

Table 1 summarizes agency actions undertaken to date on the site. Onsite soil contamination was first discovered in November 1982, during an inspection by regulatory officials. Inappropriate chemical storage and disposal were discovered during an August 1983 inspection.

In 1984, McCormick-Baxter entered into an agreement with the State and the California Regional Water Quality Control Board to clean up contamination at the site. Between 1983 and 1991, McCormick-Baxter conducted soil and groundwater sampling, and submitted soil and groundwater investigation reports, a Baseline Public Health Evaluation, a Feasibility Report, and a Remedial Action Plan to the State agencies. A Community Relations Plan was prepared in February 1989.

In 1988, McCormick-Baxter filed a voluntary petition for bankruptcy under Chapter 11. The bankruptcy was confirmed and has been in effect since December 1990. The Company ceased operations in 1990.

Because neither McCormick-Baxter nor the State was able to finance cleanup actions, EPA proposed in February 1992 that the McCormick-Baxter site be added to the National Priorities List so that Superfund monies could be used for the remedial action. In October 1992, EPA officially assumed responsibility from the State as lead agency for the cleanup and will supervise all community relations activities and remedial actions for the site.

**TABLE 1**

**AGENCY ACTIONS ON McCORMICK-BAXTER SITE**

| DATE | ACTION | AGENCY |
|---|---|---|
| January 1978 | Cleanup and Abatement Order to prevent future uncontrolled releases from the site and to remove unlined oily waste pond | RWQCB |
| September 1981 | Facility inspection | DHS, EPA |
| November 1982 | Interim Status Document Inspection. DHS requested an Operation Plan and Site Assessment of Contamination | DHS |
| August 1983 | Site inspection found improper chemical storage and disposal practices and resulted in improved plant practices | DHS |
| September/ October 1983 | Site inspection. Site determined to comply with Cal/OSHA standards | Cal/OSHA |
| May 1984 | Notice of public hearing | DHS |
| July 1984 | Settlement agreement signed | DHS, RWQCB, MB |
| August 1984 | Public notice of pending issuance of Hazardous Waste Facility Permit | DHS |
| July 1987 | Plan approved to complete Remedial Investigation and Feasibility Study | DHS, RWQCB |
| April 1988 | Revised plan to complete Remedial Investigation and Feasibility Study | DHS, RWQCB |
| August 1988 | Fact sheet distributed to the public | DHS |
| February 1989 | Community Relations Plan prepared by MB | DHS, MB |
| March 1989 | Public meeting held at Boggs Tract Community Center | DHS |
| June 1991 | Polymer dust suppressant applied to western portion of site | DHS |
| August 1991 | MB submits Remedial Action Plan to DHS for review | DHS |
| February 1992 | EPA proposes MB site to National Priorities List (NPL) | EPA |
| October 1992 | EPA adds site to NPL and assumes the role as lead agency for the site | EPA |

Cal/OSHA = California Occupational Safety and Health Administration
DHS = California Department of Health Services
EPA = U.S. Environmental Protection Agency
MB = McCormick-Baxter
RWQCB = California Regional Water Quality Control Board

## 3.0. COMMUNITY BACKGROUND

The following sections provide an overview of the Stockton community including demographics, historical community involvement and community concerns and issues.

### 3.1. Community Profile

In the following community profile, background on the Boggs Tract residential area has been summarized separately from the City of Stockton due to the neighborhood's unique characteristics and close proximity to the McCormick-Baxter site.

***Stockton:***
The McCormick-Baxter Superfund site is located in the southwest corner of Stockton. The City is located near the broad delta formed by the San Joaquin and Sacramento Rivers in the center of the Central Valley.

Stockton residents represent 44% (210,000) of San Joaquin County's total population of 480,000 people. By the year 2000, the City population is expected to increase to 230,000. According to the 1990 census, Stockton's ethnic mix is 48% Caucasian, 25% Hispanic, 18% Asian, 8% African-American, and 1% American Indian. The Asian population has almost doubled since 1980 with the Filipino community accounting for much of the growth.

San Joaquin County residents had a 1990 median income of $34,000 for a family of four. In June 1991, unemployment was almost 13%, compared to about 10% in June 1990.

Founded as a trading center in the 1840s, Stockton became a major California city with the advent of the Gold Rush in 1848. Today it is the business, political, cultural and financial center of San Joaquin County.

The City has an international seaport, a commercial airport, and several colleges. The City's ten largest employers include the following: San Joaquin County, Stockton Unified School District, St. Joseph's Health Care Corporation, City of Stockton, American Savings Bank, Del Monte Corporation, Pacific Gas & Electric Company, Diamond Walnut Growers, California Cedar Products, and American Moulding & Millwork.

San Joaquin County is one of the top ten crop producing counties in the nation. In 1990, fruit and nut crops accounted for 28% of the gross value of the county's crops, followed by livestock and poultry products (23%), field crops (19%), and vegetable crops (17%), according to the San Joaquin County Agricultural Report.

***Boggs Tract:***
Boggs Tract is the closest residential area to the McCormick-Baxter site. Although the McCormick-Baxter site falls within City limits, much of Boggs Tract is located in an unincorporated part of the county. Fresno Avenue is the dividing line between City and County jurisdictions. See Figure 1 for greater detail.

Interviewees estimated there to be about 700 people living in the County portion of Boggs Tract. The City portion of Boggs Tract (east of Fresno Avenue) has a population of roughly 1,000 people. Data from the Stockton Planning Department in 1988 showed that about 55% of the Boggs Tract community were Hispanic, 35% were African-American and the remaining 10% were Caucasian or of Asian descent. Interviewees said that there are many older (60+ years) residents in Boggs Tract.

Many people have lived in Boggs Tract for over 40 years. Some residents were forced to relocate to Boggs Tract from Eastern Stockton in 1951 by the Department of Housing and Urban Development as a result of a redevelopment project initiated by the agency.

The Boggs Tract Community Center serves an important role in the lives of many residents of Boggs Tract. The Center provides services such as free or inexpensive meals for adults and children, drug awareness programs and occasionally, medical advice and examinations. Many residents visit the Center daily to exchange news.

According to some of the interviewees, many people in the community are unemployed and on welfare. Homeless people and transients camp along the river near the McCormick-Baxter site and the Mormon Slough. Interviewees reported that drug use is a problem in the area.

Washington Elementary School is located within Boggs Tract at the northwest corner of the intersection of Sonora and Fresno Streets. About 260 students attend the school at levels from kindergarten through sixth grade. An ethnic diversity study (S.U.S.D. Racial and Ethnic Report, October 1992) reports students' ethnic backgrounds as follows: 54% Hispanic, 17% Afro-American, 17% Caucasian, 10% Asian/Pacific Islander and 1% American Indian. The school was used as an annex to El Dorado School during the mid-eighties. It was redesignated George Washington Elementary School in September, 1989. It then closed for a couple of years and reopened in the Fall of 1992. In previous years, the school was included under a court-ordered desegregation plan and Boggs Tract children were bused out of the area. Currently, only local neighborhood children attend the school. The school district is very large, stretching from Interstate-5 to Hazelton. The nearest school outside of the Boggs Tract area is Hazelton Charter Way School.

Since much of Boggs Tract falls outside of City limits, the community contracts for City police, fire, and other services. The nearest County medical clinic is about five miles away. The County Hospital is about eight miles away.

The Boggs Tract residential area is located near several industrial plants including California Cedar Products, Continental Grain, Gold Bond, Chevron, and many Port of Stockton businesses. A U.S. Navy Base also is located in the area.

**3.2. History of Community Involvement**

The Boggs Tract community has expressed minimal interest in the McCormick-Baxter site over the years. Some interviewees felt that this was due to the more imminent hardships faced by community members.

A few years ago, there was some concern by residents about the safety of drinking water as a result of the contamination at McCormick-Baxter and a large percentage of the community attended a public meeting held by the State in 1989 at the Boggs Tract Community Center. According to one interviewee, once the State assured residents that their drinking water was not contaminated since Cal Water supplied water to all homes in the area, residents lost interest in site activities.

Through the efforts of the Boggs Tract Advisory Board, the community is very organized and active. Public meetings are sometimes attended by the Sheriff due to the community's energetic response to some issues.

In past City meetings, city planners have discussed how to develop the cleaned McCormick-Baxter site in response to Stockton's increased industrial growth. Most elected officials and agency

representatives who were interviewed were relieved to hear that EPA would assume fiscal and management responsibility for the cleanup.

### 3.3. Community Concerns and Issues

Community concerns and issues were identified through nine personal interviews conducted by EPA in October 1992, with residents of Boggs Tract, industrial site neighbors, local officials, and agency representatives.

In general, few concerns were expressed by the interviewees regarding the site. A few community members were familiar with the site, but had not discussed it since the public meeting held by the State in 1989. The primary concerns expressed during the community interviews include the following:

- Potential health risk of eating fish from the slough and/or consuming fruits and vegetables from local gardens;
- Project work schedule and information distribution;
- Distrust of governmental agencies due to historical experience of the Boggs Tract Community.

**Potential health risk of eating fish from the Old Mormon Slough and/or consuming fruits and vegetables from local gardens.** The interviewees are concerned that fish taken from the slough and surrounding areas are contaminated. Many people fish and camp illegally near the slough for recreation. Also, many transients, homeless people, and low-income neighbors depend on catching fish from the Port of Stockton to supplement their diets. Interviewees believed that people from Stockton's downtown shelter, Delta Gate, and St. Mary's Dining Hall eat fish caught near the Port. No information was presented during the interviews relative to any health complaints associated with these activities.

Interviewees are also concerned about the health risk of consuming fruits and vegetables grown in local gardens. One community member said that a few years ago the State had told residents not to plant gardens in the area. Although most of the wells in the area had been capped, there was some concern that one or two wells were still being used for irrigation in Boggs Tract. One official was concerned that some capped wells could be illegally accessed in the future and asked if EPA could demolish the wells entirely.

**Project work schedule and information distribution.** Several interviewees requested that EPA keep them apprised of field activities so that they can effectively respond to community inquiries. Some interviewees felt that the protective gear worn by cleanup workers might alarm community members and people working in the area. Interviewees requesting work schedule information include County Supervisor William Sousa's office, the Environmental Health Division of the County's Public Health Service, the Executive Committee of the Boggs Tract Advisory Council, Stockton Unified School District and Washington Elementary School, and California Cedar Products.

In addition, these groups requested briefings prior to any major announcement regarding the site or public meetings. Interviewees felt that their informed responses to community inquiries could help prevent possible misinformation or undue alarm.

**Distrust of governmental agencies due to historical experience.** Some of the Boggs Tract community interviewees questioned whether or not EPA would share important information and keep

its promises in the future. This concern is rooted in some community interactions with other government agencies in the past. In 1951, the Department of Housing and Urban Development initiated a redevelopment project in Eastern Stockton. As a result, Eastern Stockton residents were forced to relocate and many settled in Boggs Tract. One City official believed that the community is still sensitive about the relocation and that they are suspicious that another move could happen in the future. In the recent past, there were rumors of a park to be built over part of Boggs Tract; also, resident interviewees said that there had been plans for a highway to be built through the area.

## 4.0 COMMUNITY RELATIONS PROGRAM

EPA has formulated the following objectives for the McCormick-Baxter community relations program:

1) Ensure two-way communication between the affected and interested community and EPA.

2) Keep the community informed of technical progress at the site.

### 4.1. Community Relations Activities

Communication methods and subject matter have been developed in response to the comments and concerns previously outlined and to other information provided by interviewees.

Interviewees strongly believe that meetings are the best means of providing information to the Boggs Tract community. They said that fact sheets and other written materials have limited value as an information source for Boggs Tract community members since some of the residents cannot read. Also, interviewees believed that some residents would not evaluate written information, but would take the time to attend a meeting. Community representatives estimated that some public meetings in the past have been attended by 80% of the community. The community center's staff offered to help set up meetings. Several interviewees recommended serving food and/or beverages at the end of the meeting to encourage people to attend.

Interviewees said that meetings tend to be better attended if flyers are delivered in-person a few days before the meeting. Flyers should also be posted at the Boggs Tract Community Center and the Sonora Market. Boggs Tract Advisory Board members and the County Supervisor's office offered to deliver flyers door-to-door and explain the purpose of the meetings to residents. This method was recommended by interviewees as the most effective means of encouraging people to attend meetings. One interviewee estimated there are 300 homes in Boggs Tract.

According to interviewees, residents rely heavily on an informal community grapevine for neighborhood news. As a result, EPA briefings with local officials and the Boggs Tract Advisory Board are very important. These groups can discuss new information about the site directly with residents, answer questions, and promote trust that EPA is sharing all information relevant to the community.

Interviewees estimated about half of the Boggs Tract residents would prefer Spanish version fact sheets; this represents about 350 people in the County portion of Boggs Tract or 850 people in both the City and County portions. They said that all written materials for the community should be translated into Spanish and that EPA should provide Spanish interpreters at meetings if recommended by the Boggs Tract Advisory Board.

A mailing list developed by the State contained about 830 names as of February 1989. The State established information repositories at the Boggs Tract Community Center and the Stockton Library in 1989.

Based on interviewee recommendations, the following provides an outline of community relations activities in relation to the objectives identified for the community relations program. Superfund technical milestones are referred to as "key points" and include the following phases of the remedial process: Remedial Investigation/Feasibility Study, Proposed Plan, Record of Decision, Remedial Design/Remedial Action.

**1. Ensure two-way communication between the affected and interested community and EPA.**

a) **Identify EPA contacts.** EPA will identify contacts who can respond to questions and concerns about the site. EPA has designated Vicky Semones and Marie Lacey as the contact people responsible for responding to the community's questions regarding the Superfund process at McCormick-Baxter. EPA will include Ms. Semones' and Ms. Lacey's names, EPA address, and telephone numbers in all fact sheets, public notices, and other information materials distributed as part of the Superfund program.

b) **Develop and provide briefings to a community information network group.** EPA will develop a community information network group that includes key officials, agencies, site neighbors and community leaders. EPA will provide briefings to the group prior to the release of new information to the media and public. EPA also will brief the group about work activities and schedules, particularly when conspicuous protective gear will be worn by workers at the site. As requested during the interview process, EPA will brief County Supervisor William Sousa's office, the Environmental Health Division of the County's Public Health Service, the Executive Committee of the Boggs Tract Advisory Council, Stockton Unified School District and Washington Elementary School, and California Cedar Products. Other parties, such as immediate site neighbors, can be added as requested in meetings, by phone, or written request. Briefings will enable these groups to more effectively answer questions from the community and inform them about EPA's activities. Briefing and updating the Boggs Tract Advisory Board is very important since some residents cannot read and will rely solely on the community's informal grapevine for information. Briefings will be conducted over the phone or in-person, if necessary.

c) **Hold public meetings.** EPA will hold a public meeting to explain the Superfund process and the agency's role as lead agency for the site; discuss the community's health concerns; and describe the Proposed Plan for remedial action and receive comments (see item e below). A transcript will be made of the Proposed Plan meeting held during the public comment period. Copies will be available to the community at the information repository and as requested. EPA will provide a Spanish interpreter at meetings, if deemed necessary by the Boggs Tract Advisory Council. Meetings will be held at the Boggs Tract Community Center.

d) **Prepare and distribute flyers.** EPA will arrange for door-to-door distribution of flyers to Boggs Tract residents to announce public meetings or informal community meetings. EPA will distribute flyers announcing any EPA meeting no more than a week in advance to the Boggs Tract community. EPA will contact the Boggs Tract Advisory Board and the County Supervisor's office regarding delivery of the flyers one to two weeks in advance of the distribution.

e) **Hold a minimum 30-day comment period on the Proposed Plan.** EPA will announce the comment period in a public notice and in a fact sheet that explains the Proposed Plan. EPA

will accept written and oral comments to EPA about the Proposed Plan for a period of at least 30 days. EPA will extend the comment period if public requests to do so are received. EPA will consider public comments before final selection of a remedial alternative.

f) **Hold informal meetings with community members, if needed.** Since written materials appear to be a less effective means of keeping the community informed than personal contact, informal meetings with community members may be necessary during the Superfund process to ensure that the community receives enough information regarding the site. In response to the concerns outlined in this CRP, these meetings might focus on health issues or other topics as requested by the Boggs Tract Advisory Council or members of the community. EPA will determine if an informal meeting is necessary based on recommendations by the Boggs Tract Advisory Council or concerns expressed directly to EPA by several members of the community.

g) **Reevaluate community interest and revise the Community Relations Plan, if necessary.** EPA will evaluate the Community Relations Plan after the Record of Decision is signed to determine whether a revision is needed to incorporate new information or reflect changes in community concern. If a revision is needed, EPA will adjust community relations activities to meet these changes.

2. **Keep the community informed of progress at the site.**

a) **Update the information repositories.** Repositories are located at the Boggs Tract Community Center and the Stockton Public Library. EPA will place copies of any McCormick-Baxter Superfund project documents available for public review in each repository. Information on the Technical Assistance Grant also will be provided. EPA will update the repositories as new information becomes available.

b) **Revise and update the site mailing list developed by the State.** EPA will review and update the mailing list on a continuing basis to incorporate address changes, add new names, and delete outdated listings. The mailing list will include individuals and organizations interested in receiving information about the project including local, State and federal agency representatives, elected officials and residents. Mailing list coupons will be included in every mailing so that anyone who wishes to be added to the list or would like to make name and address corrections may do so.

c) **Produce and distribute fact sheets.** EPA will distribute fact sheets in Spanish and English at key points during the Superfund process. Distribution of fact sheets in the Boggs Tract community may occasionally be conducted in-person, as needed. One or more short and simple fact sheets (two to six pages) will be used to describe: EPA's new role as lead agency for the McCormick-Baxter site and the Superfund process; community health concerns; information repositories and the Technical Assistance Grant; the Proposed Plan and public comment period; the final decision on the remedial action (Record of Decision) and the Remedial Design.

All English version fact sheets will include a note in Spanish asking if the recipient would prefer to receive a Spanish version of the fact sheet and refer to the EPA contact's name and message line number. Initially, English version fact sheets will be sent to names on the mailing list. Spanish version fact sheets will be distributed to the community in-person by members of the Boggs Tract Advisory Board, who can record addresses preferring the Spanish version. Future Spanish version fact sheets can be mailed out directly, as requested

by residents. Extra copies of both Spanish and English versions of the fact sheet will be made available at the Boggs Tract Community Center.

If community response indicates that residents are confused about site activities, an EPA designated representative may distribute fact sheets to Boggs Tract residents in-person in order to briefly explain important information. EPA may distribute additional fact sheets if requests are received for more information or if new developments arise during the Superfund process.

d) **Publish public notices.** EPA will publish a public notice at the commencement of the remedial investigation phase announcing the availability of the administrative record file. EPA also will publish a public notice to announce the issuance of the Proposed Plan and the final decision on the remedial cleanup alternative after the Record of Decision has been signed. In addition, public notices will be used to announce public meetings and the public comment period. Public notices will be published in the *Stockton Record*. Additional newspapers may be added if requested by the community.

e) **Prepare a Responsiveness Summary after the public comment period.** Following the public comment period, EPA will prepare a Responsiveness Summary that briefly describes and responds to all significant comments on the Proposed Plan. The document will specify which provisions of the Proposed Plan, if any, will be changed in the final remedial plan and provide reasons for the changes. The Responsiveness Summary will be sent to each person who submitted written comments on the Proposed Plan or who requests a copy of the document. EPA also will place the Responsiveness Summary in the information repositories.

The schedule for community relations activities, as they relate to the technical milestones for the site, is provided in Table 2. Table 3 provides a timeline for community relations activities.

***Additional Activities: Notifying the Public of Changes to the Cleanup Approach***
As required by Superfund law, if new findings or research suggest that a change in the cleanup approach is warranted, EPA will conduct either one of the two following activities:

**a. Prepare an Explanation of Significant Differences (ESD)** - If the cleanup approach differs significantly from the remedy selected in the ROD, but does not fundamentally alter the remedy with respect to cost, scope, or performance, EPA will publish an ESD. EPA will publish a notice summarizing the ESD in a major local newspaper of general circulation and make the ESD available in the Administrative Record.

**b. Amend the Record of Decision (ROD)** - If the cleanup approach fundamentally alters the remedy selected in the ROD, EPA will propose an amendment to the ROD. A public comment period will be held, along with a public meeting, if there is interest. Following the public comment period, EPA will prepare a Responsiveness Summary that provides EPA responses to comments received during the public comment period. The Responsiveness Summary will be made available to the public.