SFUND RECORDS CTR
0820-00283

# FIELD SAMPLING PLAN
# FOR
# SEDIMENT SAMPLING IN THE OLD AND NEW MORMON SLOUGHS, McCORMICK AND BAXTER SUPERFUND SITE
# STOCKTON, CA

AR0105

SFUND RECORDS CTR
88055024

SEPTEMBER 1993

PREPARED BY
STEWART SIMPSON
ENVIRONMENTAL SERVICES BRANCH
&
MARIE LACEY
REMEDIAL ACTION BRANCH
U.S. ENVIRONMENTAL PROTECTION AGENCY, REGION 9

Exhibit 14 to the
United States' Motion
DOJ 51

U.S. ENVIRONMENTAL PROTECTION AGENCY REGION 9

Sample Plan Title: SEDIMENT SAMPLING IN THE NEW AND OLD MORMON SLOUGHS McCormick and Baxter Superfund Site, September 1993 Stockton, California

Site Name: Mcormick and Baxter Creosoting Company

Site Location: 1214 West Washington Street

City/State/Zip: Stockton, California 95203

Site EPA ID#: CAD0009106527

Anticipated Sampling Dates: Sept. 27-30, 1993

Prepared by: Stewart Simpson 08/26/93
Date

Agency or Firm: U.S. EPA, Rg 9, Laboratory Support Section P-3-1

Address: 75 Hawthorne Street

City/State/Zip: San Francisco, CA 94105

Telephone: (415) 744-1487

EPA Project Manager: Marie Lacey Section: H-6-3 415/744-2234
Phone Number

QAPjP Approval Date: N/A

* * * * * * * * * * * * * * *

F O R

Received by Superfund Remedial Project Manager: ________
Date

Reviewed by: ____________________ ________
Date

APPROVED / NOT APPROVED ________
Date

F O R

* * * * * * * * * * * * * * *

E P A

Expedited Review? Yes/No

Received by Quality Assurance Management Section: ________
Date

Reviewed by: ____________________

APPROVED / NOT APPROVED ________
Date

E P A

U S E

Concurrence: ____________________ ________
Chief, Quality Assurance Management Section Date

U S E

Environmental Services Branch, OPM

Exhibit 14 to the
United States' Motion
DOJ 52

* * * * * * * * * * * * * * *

# TABLE OF CONTENTS


| CHAPTER | | |
|---|---|---|
| 1.0 | INTRODUCTION AND OBJECTIVES | 1 |
| 2.0 | SITE LOCATION AND BACKGROUND | 1 |
| | 2.1 PREVIOUS SEDIMENT SAMPLING | 4 |
| 3.0 | MAPS AND FIGURES | 5 |
| 4.0 | RATIONALE FOR SAMPLE LOCATIONS, NUMBER OF SAMPLES, AND ANALYSES | 6 |
| | 4.1 SEDIMENT SAMPLING LOCATIONS AND NUMBER OF SAMPLES | 6 |
| | 4.2 RATIONALE FOR ANALYSES | 7 |
| 5.0 | REQUEST FOR ANALYSES | 7 |
| 6.0 | FIELD METHODS AND PROCEDURES | 8 |
| | 6.1 SAMPLE COLLECTION | 8 |
| | 6.1.1 Gravity Core Sample Collection | 8 |
| | 6.2 DISPOSAL OF CONTAMINATED MATERIAL | 9 |
| | 6.3 DECONTAMINATION | 9 |
| | 6.4 SAMPLE CONTAINERS | 10 |
| | 6.5 SAMPLE PRESERVATION | 10 |
| | 6.6 SAMPLE SHIPPING AND PACKAGING | 10 |
| | 6.7 FIELD DOCUMENTATION | 11 |
| | 6.8 QUALITY CONTROL SAMPLES | 12 |
| | 6.8.1 Field Duplicates | 12 |
| | 6.8.3 Lab QC Samples | 12 |

Appendix A - SAS Requirements
Appendix B - Region 9 CLP Paperwork Instructions
Appendix C - Revised Health and Safety Plan




Exhibit 14 to the
United States' Motion
DOJ 53

## 1.0 INTRODUCTION AND OBJECTIVES

The Remedial Investigation/Feasibility Study (RI/FS) for the McCormick and Baxter Superfund site (M&B), located in Stockton, California, is being performed by EPA. The Laboratory Support Section of EPA's Environmental Services Branch will conduct sediment sampling from the Old Mormon Slough which extends along the north side of the site and the New Mormon Slough which is located to the east of the site. In addition, reference samples will be collected from three off-site locations. A total of nine sediment locations will be sampled. This Field Sampling Plan (FSAP) serves as a field guide and contains all the information necessary to complete the field activities in accordance with applicable regulations and to provide sufficient data to meet the objectives of the remedial investigation.

The overall objective of this sediment sampling event is to determine if the McCormick and Baxter Superfund site is having an adverse impact on human health and the surrounding ecological habitat and wildlife due to contamination in the sloughs. The data acquired will also help to evaluate the need for remedial action in the sloughs. Specific objectives of the sediment sampling include:

(1) Characterize the spatial extent and variability of dioxin, PCBs, PAHs, and metals contamination in the New and Old Mormon Sloughs;

(2) Confirm and validate data obtained from the New and Old Mormon Sloughs by earlier investigations, (e.g. CA Dept. of Fish and Game, CH2MHill, and CA Dept of Health Service).

## 2.0 SITE LOCATION AND BACKGROUND

The McCormick & Baxter wood preserving company operated on a 29-acre site at the intersection of Washington and Pershing Streets in Stockton, California, from 1942 until 1990. The site is located in an industrial area near the junction of the I-5 interchange (see Figure 1). The northern boundary of the site borders Old Mormon Slough, which empties into the Port of Stockton turning basin on the San Joaquin River. Local residents are known to fish in the vicinity of the site at Old Mormon Slough and the Port of Stockton. The shoreline is primarily composed of rip-rap, and vegetation surrounding the banks is limited.

According to the NOAA Coastal Hazardous Waste Site Review (December 1992), Natural Resource Trust species migrate to habitats near the site and reside there for extended periods during sensitive life stages. No endangered or threatened species utilize habitats near the site. Surface water near the



Exhibit 14 to the
United States' Motion
DOJ 54

site provides spawning, nursery and adult habitat for anadromous species. Five species of anadromous fish use the San Joaquin River for migratory and adult habitat. There are no invertebrate species of concern to NOAA occurring int he vicinity of the site.

Prior to 1970, Mormon Slough was a single body of water. In 1970, portions of Mormon Slough were filled when the Interstate 5/Highway 4 interchange was constructed. The portion of the slough adjacent to the M&B site was designated "Old Mormon Slough." The remaining section of the slough now on the eastern side of the freeway was connected to the Port of Stockton and called "New Mormon Slough."

McCormick & Baxter used various wood preservation processes standard in the industry, including processes using formulations of creosote, pentachlorophenol (PCP), and chromium, copper, arsenic and zinc. In the past, waste oils and drippage generated from the wood treatment process were disposed of in three unlined oily waste ponds located approximately 25 - 35 feet from the edge of Old Mormon Slough. A small pond was reported in use from 1942 until 1965, and larger ponds from 1965 until 1985 when they were closed.

Sources at the site include the old oily waste pond area, the concrete oily waste tank, a paved pole washing area, underground and above ground storage tanks, oil/water separators, condensate storage tanks, storm water collection sumps, a blowdown tank, boiler room sumps, and contaminated soils. Over the years, treated wood has been stored at various locations throughout the site.

Investigations at the site have identified PCP, PAHs, arsenic, copper and chromium in on-site soils. Most PCP and PAH soil contamination identified to date occurs in the western central processing area at depths of up to 40 feet. Varying levels of arsenic are found across the entire site.

Stormwater from the M&B site discharged into Old Mormon Slough from the early 1940's, when the plant was first constructed, until approximately 1976. M&B had an NPDES Discharge Permit issued in 1974 for cooling water, boiler blowdown water, and stormwater from the site into Old Mormon Slough. Discharges 003 and 004 drained portions of the eastern and north central plant site used for storage of treated and untreated wood. Discharges 001 and 002 drained the south central and southwest plant site areas.

After 1970, storm drainage from the south central and southwest plant site area (001 and 002) apparently was rerouted to New Mormon Slough in conjunction with the interchange construction. Storm drainage from the east and north central plant site (003 and 004) remained connected to Old Mormon Slough



Exhibit 14 to the
United States' Motion
DOJ 55

until late 1976, when M&B reported them closed. Self monitoring reported by M&B show continuing violations of storm drain discharge requirements between 10/31/74 and 11/11/76. PCP concentrations ranged from 0.40 to 13.4 mg/L, above the limitation of 0.01 mg/L.

In late 1977, the California Department of Fish & Game (DFG) investigated a fish kill involving both Mormon Slough and the Port of Stockton following a major storm event. The DFG study established that stormwater runoff from the M&B site, contaminated with PCP, was responsible. In response to a Regional Water Quality Control Board (RWQCB) Cleanup and Abatement Order, M&B installed two stormwater collection ponds and constructed a perimeter dike around most of the site. All known storm drains were sealed, and other drains were sealed by early 1978 as they were discovered.

Beginning in mid-1978 through the present the only discharge of stormwater from the plant site has been through the permitted stormwater control system that discharges to the Stockton sanitary sewer. McCormick & Baxter continued to have an NPDES Discharge Permit for cooling water and boiler blowdown water until they ceased operations.

The fish kill mentioned earlier was reported in both New Mormon Slough and the Port of Stockton. The initial DF&G report mentioned 100 catfish killed. Later observations were of many areas completed covered with dead fish. Many salmon were reported in distress and the warden observed several dead ones. The extent of the fish kill in Old Mormon Slough is not clear; however, the heavy rains and flooding reported at the site could have caused surface runoff directly into Old Mormon Slough and possibly form overflow of the oily waste ponds adjacent to the slough.

Samples taken by DF&G Warden Fisher after the fish kill on 12/12/77 indicated the following PCP concentrations in surface water:

3,900 ppb in New Mormon Slough
94 ppb in Port at mouth of New Mormon Slough
28 ppb in Port near Old Mormon Slough
0.2 ppb in Old Mormon Slough.

Sample taken by the DF&G on 12/13/77 indicated the following PCP concentrations in surface water:

6,200,000 ppb in storm drain basin, M&B site west area
56,000 ppb in city storm drain under Washington Street
310 ppb in city storm drain pump basin, Orange and Sonora Streets.

Sample taken by the DF&G on 12/14/77 indicated the following PCP concentrations in surface water:

440 ppb in New Mormon Slough at Sonora & South Lincoln Streets
250 ppb in New Mormon Slough between Weber and Sonora Streets
23 ppb in New Mormon Slough at Weber Street.

Sample taken by the DF&G on 12/19/77 indicated the following PCP concentrations in surface water:

1,000,000 ppb in pond water/mud from treated product storage area (west area)
7,900 ppb in drain from east area of site
62,000 ppb in drain from west area of site

## 2.1 PREVIOUS SEDIMENT SAMPLING

Old Mormon Slough: 5 samples (OMSI - OMSS) were collected by CH2M Hill in October 1987 from the center of Old Mormon Slough by K-B cores (maximum penetration of 2.5 feet). Samples were analyzed for phenols (EPA method 8040); PAHs (EPA method 8100); and copper, arsenic and total chromium (TTLC method). Organic compound concentrations in sample OMS3 were confirmed by GCMS (EPA method 8270). According to the report, sample OMS5 included wood chips that appeared to be creosote treated, which resulted in anomalous concentrations of PAHs for this location.

New Mormon Slough: Six samples were taken from New Mormon Slough during the same sampling event:

NMS1: location of stormwater discharge
NMS2: 100 feet downstream from stormwater discharge point
NMS3: 200 feet downstream from stormwater discharge point
NMS4: 400 feet downstream from stormwater discharge point
NMS5: 600 feet downstream from stormwater discharge point
NMS0: 600 feet upstream from discharge point - where depth of water limited further upstream access (Background)

The same sampling and analytical procedures were used, with GCMS confirmation of sample NMS3.

Port of Stockton: No data except for DHS study.

Exhibit 14 to the
United States' Motion
DOJ 57

## 3.0 MAPS AND FIGURES

Figure 1: Site Location Map

Figure 2: Sediment Core Location Map

Figure 3: Reference Sediment Core Locations



Exhibit 14 to the
United States' Motion
DOJ 58

Source: U.S.G.S. 7.5' Stockton West Quadrangle




ecology and environment, inc.

Figure 1

## SITE LOCATION
McCORMICK & BAXTER CREOSOTING COMPANY
Stockton, California

Exhibit 14 to the
United States' Motion
DOJ 59




**FIGURE 2**

**SEDIMENT CORE LOCATIONS** ⊙

OLD MORMON SLOUGH SEDIMENT CORES (OMC 1-4)
NEW MORMON SLOUGH SEDIMENT CORES (NMC 1&2) (CO-LOCATED CORES)
PORT OF STOCKTON TURNING BASIN SEDIMENT CORE (TBC 1)




**FIGURE 3**

**REFERENCE CORE LOCATIONS**
**NAVY DRIVE REFERENCE LOCATION (NDR)**
**LINCOLN STREET REFERENCE LOCATION (LSR)**

## 4.0 RATIONALE FOR SAMPLE LOCATIONS, NUMBER OF SAMPLES, AND ANALYSES

### 4.1 SEDIMENT SAMPLING LOCATIONS AND NUMBER OF SAMPLES

The sediment sampling will be a phased approach. This first phase will attempt to define the extent and variability of contamination by sampling in suspected worse-case drainage areas. A non-random, worse-case, gradient sampling scheme has been selected for the first phase to give the Regional Project Manager and the Ecological Assessment Coordinator a cost effective screen of the degree of contamination in the sloughs. If widespread or highly variable contamination is found during this phase, a more detailed second phase will likely follow.

A total of nine coring locations will be sampled during this field event, as shown in Figure 2. These coring locations are chosen to: define the extent of contamination horizontally away from the site; to define a gradient of contamination from known site drainage areas to out beyond the sloughs; to concentrate on areas of suspected drainage off-site; and to establish vertically (from the benthic surface down to 3 feet) increased or decreased historical contamination at depth.

Each sediment core will be divided into three samples for analyses. The procedure for dividing and homogenizing samples is explained in Section 6.0. Locations for three sediment cores in the Old Mormon Slough (OMC-1,2, and 3) will be directly in front of old discharge pipes in 10 to 15 feet of water (see Figure 2). Sediment core OMC-4 will be collected directly in front and at the center of the old waste pond locations. An attempt will be made collect the sample close to the site side of the slough to avoid areas that may have been consistently dredged historically. One core will be collected in the turning basin (TBC-1) near the shore in a area that is not dredged. The TBC-1 sample location was chosen to possibly define a gradient of contamination leading away from the site.

Sediment cores NMC-1 and 2 will be collocated in the New Mormon Slough at the M&B stormwater drain pipe were the suspected 1977 fish kill contaminants originated. These samples will also be collected directly in front of the outfall.

Two reference core samples, LSR and NDR, (see Figure 3) will be collected San Joaquin near the Navy Drive Bridge and in the Stockton channel in front of the Stockton Chamber of Commerce Building. These two sample locations are not expected to be indicators of pristine background conditions, but rather the locations are meant to reference the overall contaminant levels in the area.



Exhibit 14 to the
United States' Motion
DOJ 62

## 4.2 RATIONALE FOR ANALYSES

Sediment samples will be collected for all of the analyses listed in Table 5.1. All cores from each location will be analyzed for all the same parameters. Sediment samples will be analyzed for RAS: BNAs, pesticides and PCBs, dioxin and metals. The sediment samples will also be collected SAS total organic carbon (TOC) and grain size. The analyses chosen for this sampling event should sufficiently characterize the slough sediments for the contaminants found in previous studies by CH2MHill and CA DHS. The main contaminants found in the previous studies include: PAHs which will be tested for in the RAS BNA scan, PCBs will be covered by RAS pesticides and PCBs, and total dioxin will be analyzed for by the RAS dioxin statement of work. Metals data is lacking for the slough. Although the typical wood treatment facility contaminants include arsenic, chromium, copper, and lead, the RAS metals analyses will be run to further characterize the sloughs.

TOC and grain size (to be analyzed by SAS) are secondary parameters needed to answer questions about bioavailability of the sediment contaminants. Only the top six inches of sediment is normally considered the bioavailable portion of a sample, therefore these two analyses will be run only on the top six inch portion of each core.

## 5.0 REQUEST FOR ANALYSES

The field work is expected to last four days, and is scheduled to take place September 27 through September 30. There will be nine gravity cores collected, and because each 3 foot gravity core will be divided into three 12 inch samples there will be a total of 27 sample sets. Sediment analyses are to be as follows:

(1) 27 RAS BNAs
(2) 27 RAS Pesticides and PCBs
(3) 27 RAS Dioxin
(4) 27 RAS Metals
(5) 9 SAS Total Organic Carbon
(6) 9 SAS Grain Size

These analyses numbers include a duplicate set of cores and the laboratory QC samples which are shown in the Request for Analyses Table. The SAS requirements are included in Appendix A.

TABLE 5.1 - CLP ANALYSES REQUESTED

| CLP ANALYSES REQUESTED | ROUTINE ANALYTICAL SERVICES (RAS) | | | | SPECIAL ANALYTICAL SERVICE (SAS) | |
|---|---|---|---|---|---|---|
| CHEMISTRY TYPE | ORGANIC | | | INORGANIC | INORGANIC | |
| SPECIFIC ANALYSES REQUESTED | TCL SEMI VOA (low) | PESTICIDES PCBs (low) | TCL DIOXINS (low) | METALS only (low) | TOC (low) | GRAIN SIZE (low) |
| PRESERVATIVES | Chill with ice | Chill with ice | Chill with ice | Chill with ice | Chill with ice | None |
| ANALYTICAL HOLDING TIME (s) | Hold <14 days prior to extractions, 40 days after extraction | Hold <14 days prior to extractions, 40 days after extraction | Hold <28 days prior to extractions, 40 days after extraction | Hold to 4 months (28 days for Hg) | 28 days | 28 days |
| CONTRACT HOLDING TIME (s) | Hold <10 days prior to extractions, 40 days after extraction | Hold <10 days prior to extractions, 40 days after extraction | Hold <28 days prior to extractions, 40 days after extraction | Hold to 6 months (26 days for Hg) | 26 days | 25 days |
| SAMPLE x SAMPLE | NO. OF BOTTLES PER ANALYSIS | NO. OF BOTTLES PER ANALYSIS | NO. OF BOTTLES PER ANALYSIS | NO. OF BOTTLES PER ANALYSIS | NO. OF BOTTLES PER ANALYSIS | NO. OF BOTTLES PER ANALYSIS |

| SAMPLE NUMBER | SAMPLE LOCATION | SAMPLING SCHEDULE | CONCENTRATION LOW | CONCENTRATION MED. | 1 x 4 oz wide mouth glass jar | 1 x 4 oz wide mouth glass jar | 1 x 4 oz wide mouth glass jar | 1 x 4 oz wide mouth glass jar | 1 x 4 oz wide mouth glass jar | 1 x 4 oz wide mouth glass jar |
|---|---|---|---|---|---|---|---|---|---|---|
| | OMC11 | 9/27/93 | YES | | 1 | 1 | 1 | 1 | 1 | 1 |
| | OMC12 | | YES | | 1 | 1 | 1 | 1 | 1 | |
| | OMC13 | | YES | | 1 | 1 | 1 | 1 | 1 | |
| | OMC21 | | YES | | 1 | 1 | 1 | 1 | 1 | 1 |
| | OMC22 | | YES | | 1 | 1 | 1 | 1 | 1 | |
| | OMC23 | | YES | | 1 | 1 | 1 | 1 | 1 | |
| | OMC31 | | YES | | 1 | 1 | 1 | 1 | 1 | 1 |
| | OMC32 | | YES | | 1 | 1 | 1 | 1 | 1 | |
| | OMC33 | | YES | | 1 | 1 | 1 | 1 | 1 | |
| | OMC41 | (lab QC) | YES | | 1 | 1 | 1 | 1 | 1 | 1 |
| | OMC42 | (lab QC) | YES | | 1 | 1 | 1 | 1 | 1 | |
| | OMC43 | | YES | | 1 | 1 | 1 | 1 | 1 | |
| | TBC1 | | YES | | 1 | 1 | 1 | 1 | 1 | 1 |
| | TBC2 | | YES | | 1 | 1 | 1 | 1 | 1 | |
| | TBC3 | | YES | | 1 | 1 | 1 | 1 | 1 | |
| | NMC11 | | YES | | 1 | 1 | 1 | 1 | 1 | 1 |
| | NMC12 | | YES | | 1 | 1 | 1 | 1 | 1 | |
| | NMC13 | | YES | | 1 | 1 | 1 | 1 | 1 | |
| | NMC21 | dup of 11 | YES | | 1 | 1 | 1 | 1 | 1 | 1 |
| | NMC22 | dup of 12 | YES | | 1 | 1 | 1 | 1 | 1 | |
| | NMC23 | dup of 13 | YES | | 1 | 1 | 1 | 1 | 1 | |
| | LSR1 | | YES | | 1 | 1 | 1 | 1 | 1 | 1 |
| | LSR2 | | YES | | 1 | 1 | 1 | 1 | 1 | |
| | LSR3 | | YES | | 1 | 1 | 1 | 1 | 1 | |
| | NDR1 | | YES | | 1 | 1 | 1 | 1 | 1 | 1 |
| | NDR2 | | YES | | 1 | 1 | 1 | 1 | 1 | |
| | NDR3 | 09/30/93 | YES | | 1 | 1 | 1 | 1 | 1 | |
| TOTALS | | Low Conc | YES | | 27 | 27 | 27 | 27 | 27 | 9 |

Exhibit 14 to the United States' Motion

DOJ 64

## 6.0 FIELD METHODS AND PROCEDURES

### 6.1 SAMPLE COLLECTION

The Physical location of the sample stations will be located by first using the site maps and then using a compass to designate three visual triangulation points for future verifications. The two core locations in the New Mormon slough are collocated to serve as duplicate samples.

#### 6.1.1 Gravity Core Sediment Sample Collection

Sediment will be collected using a Wildco three foot gravity coring device with a removable plastic sleeve. Core sections will be three feet in length and approximately two inches in diameter. The corer free-fall height in water column will be calibrated prior to collecting the sample to ensure that the sediment corer has not over or underpenetrated the slough bottom. Sediment will be removed from the plastic liner using an extruder marked in inches. The sediment will be extruded in 12 inch lengths into a clean receptacles, homogenized and spooned using a disposable plastic spoon into the appropriate sample containers.

If the volume of sample is less than adequate from the top portion of the gravity corer for the TOC and grain size analyses, a 12 inch Ekman Dredge will be used to retrieve the surficial sediments from the same gravity corer drop point. If the Ekman dredge is used, after retrieval of the grab the top will be opened, overlying water will carefully be drained off, and a portion of the top sediments (< 6 inches deep) will be removed from the center of the grab using a disposable plastic spoon.

The co-located sample locations in the New Mormon Slough will not be assessable by boat. Depending on field conditions and the M&B drain pipe location, the gravity corer may be lowered from an adjacent overpass or samplers in waders may need to enter the slough and use a push sediment corer with an extension handle. Either method used will follow the same procedures described above once the coring device is pulled from the sediment.

All samples will be scooped into precleaned series 300 glass containers, and after collecting the samples samplers will:

1. Wipe the outside of the bottles with paper towels after collection.

2. Preserve all samples according to Section 6.5.

3. Complete documentation according to Section 6.7, and package and ship samples according to Section 6.6.



Exhibit 14 to the
United States' Motion
DOJ 65

## 6.2 DISPOSAL OF CONTAMINATED MATERIAL

All wastes generated during the field investigation will be collected and stored at the McCormick and Baxter site. The waste material brought up by coring or dredging will be placed initially in plastic buckets and then shoveled into a DOT-approved 55 gallon drum and labeled. The coring location numbers, from which the waste was accumulated, will be written on the drum with an indelible marker along with date of sampling and the container number.

Decontamination rinse water from sampling equipment decontamination will be collected in buckets and poured into a drum and treated as investigation derived waste. All efforts will be made to minimize the volume of generated rinse waters.

Disposable personal protective equipment (PPE) worn during sampling will be treated as investigation derived waste. Spent PPE will be double-bagged and placed in plastic trash bags and containerized in drums. These drums be segregated from the other investigation-derived waste drums.

All waste storage containers will be stored on site in the in the drum storage shed south and slightly west of the main office. This area is covered, paved, and has secondary containment features. This designated area will store the drums until data from the sampling event are available to guide EPA in chosing an appropriate disposal method.

## 6.3 DECONTAMINATION

Prior to sampling and between uses of sampling equipment, all equipment used during sampling will be decontaminated. Decontamination will be done in batches at the start or end of the sampling day. The sampling team will attempt to have on hand enough core liners so that any one core liner is only used once during a sampling day. The following decontamination procedure will be followed for all the equipment that touches the sediments:

1. Rinse with tap water to remove mud
2. Wash with tap water and phosphate-free detergent such as Liquinox
3. Rinse with tap water
4. Rinse with 10% nitric acid
5. Triple rinse with methyl alcohol (methanol) to remove organics. After final rinse, solvent will be allowed to evaporate completely before continuing.
6. Rinse two times with distilled or organic-free water.
7. Shake off excess water.
8. Wrap decontaminated equipment in aluminum foil or plastic bags.

The rinses from equipment decontamination will handled as explained in Section 6.2

Clean latex gloves over nitrile will be worn during decontamination.

6.4 SAMPLE CONTAINERS

The Request for Analysis Table (Table 5.1) lists all the containers that will be used for this sampling. All containers have been cleaned by the supplier and QC checked.

A total of 140 4-ounce glass jars are needed for all RAS and SAS analyses.

6.5 SAMPLE PRESERVATION

For all the analyses, except grain size which does not need to be preserved, cool sample jars to 4oC with ice immediately after sample collection.

6.6 SAMPLE SHIPMENT AND PACKAGING

The following sample packaging and shipment procedures will be followed for low level samples to ensure that samples are intact when they arrived at the designated laboratory:

1. Place a custody seal over each jar cap.

2. Place the bottles in the appropriate ice chest. If the samples are required to be chilled, add ice in a double-bag (to prevent leakage) to maintain the proper temperature inside the ice chest. Change the ice prior to shipment as needed. Store the ice chest in a shady location. Loose ice must not be poured into the cooler.

3. Fill empty spaces in the ice chest with either pelaspan (styrofoam popcorn) or bubble-pack wrap. If there is a lot of space in the cooler, the samples and ice can be placed inside a large trash bag to minimize movement of the samples during shipment.

4. Enclose the chain of custody form and other sample paperwork in the ice chest by placing it in a plastic bag and taping the bag to the inside of the ice chest lid.

5. Seal the ice chest shut with strapping tape. Place two custody seals on the front of the cooler so that the custody seals extend from the lid to the main body of the ice chest. Place clear tape over each custody seal on the outside of the ice

chest. Be sure the drain plug is closed and sealed shut if necessary.

6. Label ice chests with "Fragile" and "This End Up" labels. Include a label on each cooler with the laboratory address and the return address (Region 9 office).

7. Ship ice chests to the appropriate laboratory via express overnight delivery. If samples are shipped on Friday, arrangements must be made with the RSCC by Friday noon for Saturday delivery.

8. Call the RSCC within 24 hours after sample shipment to report the shipments made.

6.7 FIELD DOCUMENTATION

Field Log Sheets and Logbooks: A summary of sampling activities will be recorded in a bound Site Logbook, which will be the responsibility of the field team leader. Each individual sampling point will also have a field log sheet to record the sample collection. The log sheets will be kept in a ring binder by the field team leader. Entries to the notebook or log sheets must contain accurate and inclusive documentation of project activities. Language should be objective and factual. Entries will be made using permanent waterproof ink. Erasures are not permitted. Errors shall be single-lined out, and the error should not be obscured. Errors will be initialed and dated.

For logbook, each book will be assigned a log control number before going in the field. All pages will include the date at the top with the time of day in military time included in the left hand margin preceding each entry. The person making the entries will sign at the beginning and the end of the day's entries. A new page will be started for each day. If the last entry for a particular day does not end at the bottom of a page, a line is to be drawn diagonally down the rest of the page, and the bottom should be signed and dated. Language should be objective and factual.

The following entries will be made to the logbook and/or log sheets:

All personnel on the sampling team (notebook).
Signatures of persons making log entries.
General descriptions of weather conditions (notebook).
Location of each sampling point (log sheets).
Date and time of sample collection (log sheets).
Calibration of field instruments (notebook).
Reference to photographs taken .
Date and time of equipment decontamination (notebook).

Field observations and descriptions of problems encountered.
Duplicate sample location (log sheets).

<u>Photographs</u>: Photographs will be taken at each sampling point. The photo location and number will be recorded in the field notebook or on a sampling log sheet.

<u>CLP Paperwork</u>: CLP RAS Traffic Reports/, SAS Packing Lists/chain of custody forms and field QA/QC summary forms will be completed for all samples collected. The forms will be filled out according to the instructions in Appendix C, "US EPA Region 9 CLP Paperwork Instructions". A chain of custody form will be completed for each cooler. A RAS Traffic Report or the SAS Packing List will be completed for each laboratory shipment. The copies of each form will be distributed according to instructions in Appendix C. All chain of custody seals will be signed and dated by a member of the sampling team.

<u>Sample Labels</u>: Each bottle will be labeled with a preprinted CLP traffic report number or a SAS packing list number obtained from the RSCC. In addition, each bottle will contain a label that includes the CLP Case and/or SAS number, the station location, the analytical parameter, the date sampled, and any preservative added to the sample.

## 6.8 QUALITY CONTROL SAMPLES

### 6.8.1 Field Duplicates

Duplicate sample will be collected at a 10% frequency, or one duplicate per week, whichever is greater. Duplicates will be collected at sampling points which are known or suspected to be contaminated. Duplicates will be collected from two collocated sediment cores. The three different depth core sections from each of the collocated cores will provides for three duplicate sample sets. Each sample from a duplicate set will have a unique CLP sample number and station location number; the duplicates will be sent "blind" to the lab.

For this project the core duplicates will be collected from New Mormon Slough. This location is suspected of being contaminated in the 1970s when a storm drain from the McCormick and Baxter was routed to the New Mormon Slough.

### 6.8.2 Lab QC Sample

A field sample will be designated as "the lab QC sample" at a frequency of 1 per 20 samples (including blanks and duplicates) for all parameters. The lab QC sample will be a sample suspected of being contaminated and which is representative of other contaminated samples. In Table 5.1 the lab QC samples are



Exhibit 14 to the
United States' Motion
DOJ 69

designated. The top two sections of core OMC4 (1 and 2) are designated as Lab QC samples.

The sample bottles and paperwork will be labeled "Lab QC Sample".

SFUND RECORDS CTR
0820-90791

Cal/EPA

Department of Toxic Substances Control

10151 Croydon Way
Suite 3
Sacramento, CA
95827-2106

December 17, 1997

AR0320

SFUND RECORDS CTR
88056566

Pete Wilson
Governor

Peter M. Rooney
Secretary for Environmental Protection

Ms. Marie Lacey, Project Manager
U.S. EPA, Region IX
75 Hawthorne Street
San Francisco, California 94150

**COMMENTS TO THE FEASIBILITY STUDIES FOR THE SOILS-GROUNDWATER AND SURFACE WATER-SEDIMENT OPERATIONAL UNITS AT THE MCCORMICK AND BAXTER SITE IN STOCKTON**

Dear Ms. Lacey:

The Department of Toxic Substances Control (DTSC) has reviewed the two Feasibility Study Reports submitted by the United States Environmental Protection Agency (EPA) entitled, Soils and Groundwater Feasibility Study and Surface Water and Sediment Feasibility Study for the McCormick and Baxter Superfund site in Stockton.

Overall, both Feasibility Study (FS) reports were very thorough and well-written. They both provided detailed background information, clear descriptions of the remedial action objectives, identification and screening of the remedial technologies and process options, and detailed analysis of the remedial alternatives.

The options for remediation of deeper soils and groundwater in multiple water bearing zones appear to be expensive and limited due to extensive contamination and the presence of multiple contaminants (e.g., arsenic, dioxin isomers, and semi-volatile organic compounds) in particular, dense non-aqueous phase liquids (DNAPLs). Operation and Maintenance (O&M) costs are projected for the required 30 year period in the report. However, based on selection of remedial technologies in the FS, the duration of O&M and associated costs will likely far exceed the 30 year projection as a result of DNAPLs remaining in the soils and groundwater due to diffusion limited transport.

In part, to limit excessive O&M costs, DTSC recommends that innovative technologies such as dynamic underground striping (DUS), a steam injection/vapor extraction process, should continue to be evaluated as a process that has the potential to remove or greatly reduce the presence of DNAPLs in deep soils and groundwater. The Record of Decision (ROD) should be flexible and open to the inclusion of this and other alternative and/or innovative technologies that may more effectively reduce DNAPLs in on-site soils and groundwater. Until such technologies are implemented, the McCormick and Baxter site will be a groundwater control and containment site with minimal DNAPL removal.



Printed on Recycled Paper
FL law
m&bis let

The FS lists steam injection as an innovative technology in the discussion of Secondary NAPL Removal Technologies on page 3-32. The concluding paragraph suggests that if implemented inadequately, secondary NAPL removal technologies, including steam injection, will have only limited effectiveness. The FS additionally states that these technologies are expensive to install, have high, longterm O&M costs and are therefore, not retained for further evaluation. DTSC does not agree with this conclusion, and based on the documented success of DUS at Visalia Pole Yard, we believe this innovative technology represents a potential remedial alternative for the McCormick and Baxter site. Additional evaluation of DUS in consideration of site specific factors should be conducted. We recommend that a detailed treatability study be performed to determine if a soil vapor extraction system is conducive to site conditions. If results are encouraging, an appropriately scaled pilot study should follow. DUS and like technologies should not be eliminated from possible consideration nor considered only as a secondary removal option.

Evaluation of the Impracticability of Groundwater Restoration, Section 6 of the Soils and Groundwater FS, presents the basis for the determination that groundwater restoration is technically impracticable from an engineering perspective, and establishes an alternative remedial strategy for the groundwater. Results of the remedial alternative analysis and information presented in this section lead to the conclusion that there are no remedial technologies or combinations of technologies currently available that can achieve aquifer restoration at the site within a reasonable time period. This analysis is based on a combination of the geology and physical characteristics and the state of the groundwater contaminants, in particular DNAPLs. DTSC believes that closer scrutiny of innovative technologies such as DUS are warranted in the context of this analysis. We do not believe that aggressive efforts at contaminant removal within a containment zone should be precluded at this juncture.

EPA's preferred soil remedial alternative in the Soils and Groundwater FS specifies consolidation and capping of soils in Subarea B utilizing an asphaltic concrete (AC) cap design. Depending on the end use, AC caps can be designed for a variety of future uses. Since the site end use may not be determined for years to come, DTSC recommends that maximum flexibility should be incorporated into the AC cap design.

The EPA's recommended alternative addressing the contaminated sediment in Old Mormon Slough in the Surface Water and Sediment FS includes placement of a one-foot thick sand cap from the oily waste ponds to the east end of the slough to physically isolate the contaminants from the ecosystem. Institutional controls and physical barriers would be implemented to restrict public access to the capped portion of the slough in addition to two hot spot areas located near the mouth of the slough. DTSC recommends that the depth and construction of the cap be designed to insure maximum durability and limit

future maintenance costs. We also note that implementation of this alternative will require ongoing coordination between local and state agencies to insure slough traffic does not damage cap integrity and future development of Old Mormon Slough remains regulated.

If you have any questions or comments regarding this letter please call me at (916) 255 3700.

Sincerely,

Frank Lopez
National Priority List Unit



FL.law
m&bfs.let

SFUND RECORDS CTR
0820-90870

Cal/EPA

Department of
Toxic Substances
Control

10151 Croydon Way
Suite 3
Sacramento, CA
95827-2106

April 10, 1998

AR0326

SFUND RECORDS CTR
88056645

Pete Wilson
Governor

Peter M. Rooney
Secretary for
Environmental
Protection

Mr. John Kemmerer, Chief
Superfund Cleanup Branch
United States. Environmental Protection Agency
Region IX
75 Hawthorn Street
San Francisco, California 94105

DRAFT PROPOSED PLAN - MCCORMICK AND BAXTER SUPERFUND SITE

Dear Mr. Kemmerer:

The purpose of this letter is to provide the Department of Toxic Substances Control's (DTSC) position with respect to remedies identified in the draft Proposed Plan recently submitted for the McCormick and Baxter site. We concur with the capping of sediments in Old Mormon Slough. Also, we concur with the proposed pump and treat alternative, to the extent that it is a compatible element of a comprehensive effort to restore groundwater and provides for efficient capture of contaminants emanating from the site in groundwater. However, we are concerned that these remedies as well as the proposed excavation, consolidation and capping of contaminated soil, provide little benefit by way of reducing the mobility, toxicity, and volume of contaminants of concern. Further, the proposed approach relies heavily on the State to fund and ensure the effectiveness of perpetual operation and maintenance and institutional controls.

We request that an option that optimizes the reduction of mobility, toxicity, and volume of the contaminants remaining on site be implemented in order to enhance the project's likelihood of meeting Applicable or Relevant and Appropriate Requirements. Toward this end, we recommend a more thorough evaluation of in-situ fixation, removal and destruction technologies as a means of limiting contaminant loading to groundwater and concomitantly the extent and duration of pump and treat measures. DTSC has noted and expressed strong interest in emerging technologies with demonstrated potential to extract or destroy dense non-aqueous phase liquids (DNAPLs) in-situ.



m \smp-cccob\tjosvold\

Printed on Recycled Paper

Dynamic Underground Stripping with Hydrous Pyrolysis/Oxidation should be thoroughly investigated through bench and pilot studies, in concert with advanced techniques available for characterizing the extent of DNAPL migration.

In the absence of such efforts, DTSC cannot support the proposed Technical Impracticability,(TI) waiver on which the viability of the remedies identified in the proposed plan now depend. Finally, it is DTSC's position that restoration of the groundwater resource remains the proper objective of remedial measures implemented at the site and that pump and treat and aggressive DNAPL reduction measures must first be implemented and evaluated over time before the need for a TI waiver can be properly determined.

Thank you for the opportunity to review the Proposed Plan. If you have questions or comments please contact Mr. Richard Hume at (916) 255-3690 or Mr. Frank Lopez at (916) 255-3700.

Sincerely,

James L. Tjosvold, P.E., Chief
Northern California-Central Cleanup
Operations Branch

cc: Ms. Marie Lacey, U.S. EPA
United States Environmental Protection Agency
Region IX
75 Hawthorn Street (SFD-7-4)
San Francisco, California 94105

Mr. Dave Seter, U.S. EPA
United States Environmental Protection Agency
Region IX
75 Hawthorn Street(SFD-7-4)
San Francisco, California 94105

cc: Wendy Cohen
Central Valley Regional Water Quality Control Board
3443 Routier Road, Suite A
Sacramento, California 95827