PNNL-11931

SFUND RECORDS CTR
0820-00870

AR0333

SFUND RECORDS CTR
88055605

# SURFACE WATER-SEDIMENT FEASIBILITY STUDY REPORT FOR THE McCORMICK AND BAXTER SUPERFUND SITE, STOCKTON, CALIFORNIA

G. V. Last
L. M. Bagaasen
T. J Gilmore
N. P. Kohn
C. D. Johnson
D. C. Lanigan
T. L. Liikala
S. S. Teel

Staff
Environmental Protection Agency, Region 9

July 1998

Prepared for the U.S. Environmental Protection Agency Region 9
San Francisco, California
under a Related Services Agreement
with the U.S. Department of Energy
under Contract DE-AC06-76RLO 1830

PNNL-11931

Exhibit 17 to the
United States' Motion
DOJ 77

# EXECUTIVE SUMMARY

This Feasibility Study (FS) evaluates the remedial alternatives for the Surface Water-Sediment Operable Unit (OU) of the McCormick & Baxter (M&B) Superfund site in Stockton, California. A separate FS report was prepared for the Soil-Groundwater OU (ICF 1998). Past operations at the site had resulted in the release of wood-preserving chemicals to soils, groundwater, and surface water. Surface water bodies adjacent to and/or potentially affected by the M&B site are Old Mormon Slough, New Mormon Slough, and the Stockton Deepwater Channel (SDC). New Mormon Slough and SDC do not appear to be adversely affected by contamination from the M&B site. However, sediments in Old Mormon Slough were contaminated by chemical spills, stormwater runoff, and, at the oily waste ponds (OWP) area, by subsurface migration of non-aqueous phase liquids (NAPLs) from upland contamination sources.

## Nature and Extent of Contamination

The following Contaminants of Concern (COCs) have been identified:

- Low-molecular-weight polycyclic aromatic hydrocarbons (LPAHs)
- High-molecular-weight PAHs (HPAHs)
- Dioxin (2,3,7,8-tetrachlorodibenzo-p-dioxin/2,3,7,8-tetrachlorodibenzo-p-furan)
- Pentachlorophenol (PCP)
- Metals (chromium, arsenic, zinc, copper).

Total PAH concentrations decrease with increasing depth in the western half of Old Mormon Slough, and increase with increasing depth in the eastern half. The depth of contamination in Old Mormon Slough generally ranged from 0 to 2.4 m (0 to 8 ft) below mudline; however, PAH contamination was found deeper than 5.5m (18 ft) at two sampling locations next to the central processing area. PCP is not widely distributed and was detected in only six samples from the eastern half of Old Mormon Slough. Dioxin contamination is found at lower concentrations relative to the reference concentrations, and affects a smaller volume of sediment, than PAHs. Dioxin contamination was highest in shallower (upper 1.2 m [4 ft]) sediment in the vicinity of former discharge pipes.

Arsenic, copper , zinc, and chromium concentrations in Old Mormon Slough were not attributable to past M&B discharges.



Exhibit 17 to the
United States' Motion
DOJ 78

**Human Health Risks**

The M&B site and neighboring lands are zoned for heavy industrial uses. The nearest residences are located approximately 150 m (500 ft) to the southwest and west. Recreational and subsistence fishing is known to occur in all of the main surface water bodies surrounding the M&B site, including Old Mormon Slough. The baseline Human Health Risk Assessment (HHRA) found that potential risks to humans related to the Surface Water-Sediment OU are primarily through the ingestion of dioxin-contaminated fish. The average concentration of dioxin in fish tissue collected from Old Mormon Slough relates to an additional cancer risk of 8E-4 (assuming a consumption rate of 150 g/day, 350 days/year, for 30 years). The maximum concentration relates to a worst case risk of 1E-3 (assuming a consumption rate of 200 g/day for the same duration).

A second potential pathway to humans is the migration of contamination from sediments in Old Mormon Slough to groundwater beneath the site. However, any potential contribution from these deep sediments is expected to be very low and would be captured by the network of groundwater extraction wells being designed for the major groundwater plume emanating from upland sources.

**Ecological Risks**

The primary ecological risks posed to receptor species (e.g., catfish, aquatic avifauna) are from the occurrence of PAHs, dioxins, and, to a lesser extent, PCP. The current levels of dioxins in the surface sediments adjacent to the central processing area are 30 to 50 times higher than the site-specific maximum sediment concentrations (MSC) predicted to cause no adverse effects to aquatic biota (Thom et. al. 1997). The concentrations of PAHs near the OWPs were nearly 80 times higher than the site-specific MSCs. Metals were not found to be a risk factor to any of the assessment endpoints.

**Remedial Action Objectives (RAOs)**

The overall goal of the remedial action at the M&B site is to protect human health and the environment from the risks presented by contaminated soil, groundwater, and sediment. The focus of this feasibility study is directed at potential response actions for Old Mormon Slough, where surface water/sediment contamination and risks are the greatest and directly attributable to the M&B site. If sediment contamination in Old Mormon Slough is not addressed, it will continue to present a risk to ecological receptors, and to human receptors who consume significant quantities of certain fish species.

The primary goals for remediation of sediment contamination related to the M&B site are to accomplish the following:

- Reduce potential risks to human health from the consumption of fish contaminated with site-related chemicals.
- Prevent humans and aquatic organisms from direct contact with sediment having contaminants in excess of risk-based concentrations or that have been shown to be toxic to aquatic organisms.
- Prevent or minimize the migration of contaminants from Old Mormon Slough sediments into the surface-water column.
- Prevent or minimize the migration of contaminants from Old Mormon Slough sediments to groundwater.
- Allow full attainment of the beneficial uses of surface waters in the vicinity of the site. These beneficial uses include fish and shellfish harvesting and the protection of aquatic life and wildlife.

The preliminary cleanup levels for sediment contamination associated with the M&B site are summarized in **Table ES.1**. These preliminary cleanup levels are based on an anticipated future occupational use of the site consistent with current industrial zoning.

**Remedial Alternatives**

Potential remedial response actions, remedial technologies, and process options were screened to identify the most reasonable actions. The technologies and process options that were retained from the initial screening have been assembled into five remedial action alternatives:

- SD-1 - No-Action
- SD-2 - In Situ Capping
- SD-3 - Dredging and Confined Disposal (combined with limited in situ capping)
- SD-4 - Dredging and Offsite Disposal (combined with limited in situ capping)
- SD-5 - Dredging and Onsite Treatment, Solvent Extraction and Solidified/Stablized (S/S) (combined with limited in situ capping).



Exhibit 17 to the
United States' Motion
DOJ 80

Each of these alternatives is briefly described in the following paragraphs. Although the use of institutional controls was also considered, it was not developed as a stand-alone alternative for sediment because it would not meet the RAOs for protection of the environment.

SD-1 - No-Action

Under this alternative, the site would be abandoned as is without any additional access controls or remedial actions. Over time, some natural attenuation would gradually occur through deposition of new uncontaminated sediments and biological degradation of the organic contaminants. This alternative would not meet the RAOs, but is retained for comparison with the other alternatives. The only cost associated with this alternative would be for sediment and biota monitoring.

SD-2 - In Situ Capping

This alternative would meet the RAOs by placing a cap over approximately three-fourths of the slough to isolate the contaminated sediments. The cap materials would consist of a minimum of 60 cm (2 ft) of clean fine sand armored with rip-rap where needed to prevent erosion. Institutional controls would be implemented to prevent disruption of these cap materials and the two residual hotspots located in the mouth of the slough. Additional controls would restrict public access and fishing. Short-term and long-term monitoring would be performed to assess the integrity and maintenance needs of the sediment cap.

SD-3 - Dredging and Confined Disposal

This alternative meets the RAOs by removing and isolating a preponderance of the contamination in a confined disposal facility (CDF). Mechanical dredging would remove contaminated sediment from principal threat areas in the central and western portion of the slough. A CDF would be constructed using sheet piling to contain the dredged materials in the east end of the slough. After a period of consolidation, the dredged material would be capped with a permeable geotextile fabric and an estimated 0.6 m (2 ft) of clean fill. Following the completion of dredging activities and confirmatory sampling, a 150-m to 390-m (480-ft to 1280-ft) long stretch of Old Mormon Slough would be capped with fine sand to isolate residual contamination left behind by dredging activities.

As with Alternatives SD-2, SD-4, and SD-5, institutional controls and environmental monitoring would be used to protect the integrity of the cap materials, the two residual hotspots in the mouth of the slough, and would restrict public access and fishing.

SD-4 - Dredging and Offsite Disposal

This alternative also meets the RAOs by removing a preponderance of the contamination from the slough, but would transport it offsite for treatment and/or disposal. Mechanical dredging would remove contaminated sediment from all of the principal threat areas of the slough. The dredged material would be dewatered and transported offsite to a treatment, storage, and disposal facility (TSDF) for treatment and/or disposal. A 420 m to 664 m (1380 ft to 2180 ft) section of the slough would then be capped with fine sand to isolate residual contamination left behind by dredging activities. Institutional controls and environmental monitoring would be conducted to protect the integrity of the cap materials and the two residual hotspots in the mouth of the slough, and to restrict public access and fishing.

SD-5 - Dredging and Onsite Treatment

The Dredging and Onsite Treatment Alternative also meets the RAOs by removing a preponderance of the contaminated sediment, but would treat and dispose of it onsite. Dredging would be conducted throughout the slough except near its mouth. The dredged materials would be dewatered and treated onsite using solvent extraction to remove PAHs and dioxin from the sediment. The concentrated organic contaminants from the solvent extraction process would be shipped offsite for incineration/disposal. The sediment residuals would be solidified/ stabilized to address inorganic contamination as necessary, and then disposed onsite, assuming sufficient upland capacity is available. Following the completion of dredging activities and confirmatory sampling, a 420 m to 664 m (1380 ft to 2180 ft) long stretch of Old Mormon Slough would be capped with fine sand to isolate any residual contamination left behind by dredging activities. Institutional controls and environmental monitoring would be conducted to protect the integrity of the cap materials and the two residual hotspots in the mouth of the slough, and to restrict public access and fishing.

**Analysis of Alternatives**

Each of these remedial alternatives was evaluated independently against the two threshold and five balancing criteria listed in the National Oil and Hazardous Substances Pollution Contingency Plan (NCP). A comparative analysis of the alternatives was also conducted and is summarized in **Table ES.2**. The two "modifying" criteria will be evaluated in the record of decision (ROD).

Protection of Human Health and the Environment

Alternatives SD-4 and SD-5 provide the greatest level of protection to human health and the environment. The In Situ Capping alternative (SD-2) relies on physically isolating the contamination in place under a sand cap. However, long-term monitoring, maintenance, and institutional controls are required to ensure the integrity of the cap. The alternatives involving



Exhibit 17 to the
United States' Motion
DOJ 82

dredging (i.e., SD-3, SD-4 and SD-5), all provide additional protection by reducing the mass of contamination present in the slough. Alternatives SD-4 and SD-5 provide even greater protection by completely removing nearly all of the dioxin contamination and the accessible PAH contamination from the slough. However, all alternatives leave some deeper PAH contamination behind, and must still rely to some degree on in situ capping and long-term management.

Compliance with Applicable or Relevant and Appropriate Requirements (ARARs)

All of the alternatives would comply with applicable or relevant and appropriate requirements (ARARs), including the action-specific ARARs triggered by the dredging and construction activities proposed for Old Mormon Slough. Dredging and Onsite Treatment (SD-5) may require treatment within the same area of contamination or designation of a RCRA Corrective Action Management Unit (CAMU) in order to comply with land disposal restriction ARARs.

Long-Term Effectiveness and Permanence

Alternatives SD-4 and SD-5 provide the greatest long-term effectiveness and permanence relative to human health (i.e., removal of nearly all dioxin). However, all of the alternatives (except No-Action) ultimately rely on capping and long-term management to some degree to provide long-term effectiveness and permanence relative to protection of the environment (i.e, reduce exposure to PAHs). The No-Action alternative would not be effective in reducing current or future risks. Natural attenuation processes are expected to take hundreds or thousands of years. In situ capping of contaminated sediment (SD-2) is a proven and accepted technology, and is expected to be very effective in isolating these contaminants. However, long-term monitoring, maintenance, and institutional controls are required to ensure the integrity of the cap. Alternatives SD-3, SD-4, and SD-5 all provide additional permanence and long-term effectiveness by reducing the mass of contamination present in Old Mormon Slough. Alternatives SD-4 and SD-5 provide even greater permanence by removing nearly all of the dioxin contamination and the accessible PAH contamination from the slough. The dredged sediment would be disposed (and treated) offsite or treated onsite. This would provide an added measure of effectiveness and permanence for the protection of human health and the environment.

Reduction in Toxicity, Mobility, or Volume Through Treatment

Only one of the alternatives, SD-5, is designed to treat the contaminated sediment to reduce its toxicity, mobility, or volume. This treatment train is estimated to remove and destroy more than 85% to 94% of the dioxin contamination and more than 60% to 98% of the PAH contamination. However, land disposal restrictions (LDRs) may necessitate treatment of dredged materials prior to offsite disposal (Alternative SD-4). Offsite incineration of the contaminated sediment prior to disposal would reduce the organic contamination by an estimated



Exhibit 17 to the
United States' Motion
DOJ 83

90-99%. The other alternatives (SD-2 and SD-3) do not involve treatment and would not reduce the toxicity or volume of the slough sediments. However, they would reduce the mobility of the contamination through containment.

Short-Term Effectiveness

All of the alternatives, except No-Action, present some risk to workers, primarily from operation of heavy equipment and the hazards of working over water. All of the alternatives would also cause severe short-term impacts to the benthic community in the slough. The In Situ Capping alternative (SD-2) presents the least risk to workers and the fewest impacts to the slough ecosystem. All dredging alternatives would present increased industrial risk to the workers and even more detrimental ecological effects to the slough. The Dredging and Onsite Treatment alternative (SD-5) presents the greatest risk to workers, not only from the operation of heavy equipment associated with dredging and the industrial treatment processes, but also due to the potential for direct exposure and inhalation of contamination while handling and treating the dredged material. The Dredging and Confined Disposal alternative (SD-3) would cause the greatest environmental damage by permanently filling approximately 30% of the slough and its aquatic habitat.

Implementability

All of the alternatives are technically feasible, and all necessary equipment, materials, and expertise for dredging and the installation of sediment caps is readily available in the Stockton area. However, the presence of large debris or steep bottom slopes can complicate dredging and capping activities. Dewatering of the fine-grained sediments sufficiently for offsite transport can be difficult. The Dredging and Onsite Treatment alternative (SD-5) is the most technically complex alternative with the greatest implementation concerns. Onsite disposal of the large volumes of solid residuals from the solvent extraction/solidification treatment train would be difficult due to limited capacity in the upland OU. The availability and accessibility of an offsite TSDF permitted to receive the contaminated sediment (SD-4) could cause significant scheduling delays and increased costs. The acceptability of any of these alternatives to neighboring land owners, the community, and regulatory agencies is uncertain. In situ capping would raise the bottom of the slough and would restrict future activities in the slough (e.g., dredging, barge traffic) that might disrupt the cap and release the buried contamination. The Dredging and Confined Disposal alternative (SD-3) would fill approximately 30% of the slough and would eliminate the waterfront access of the property owner on the northern shore of Old Mormon Slough. However, the CDF alternative (along with the other dredging alternatives) would deepen the remainder of the slough. The CDF, depending on its design, could serve as a new wharf for future waterfront access, should future conditions in the slough allow resumption of normal slough uses. The Dredging and Offsite Disposal alternative (SD-4) could raise public concerns regarding the transportation and offsite treatment/disposal of hazardous waste from the site.



Exhibit 17 to the
United States' Motion
DOJ 84

Cost

Costs for the No-Action alternative are the lowest since it only involves monitoring sediment and biota for a 30-year period. The In Situ Capping and Dredging and Confined Disposal alternatives (SD-2 and SD-3) have the lowest capital and overall costs among the active remediation alternatives. The Dredging and Offsite Disposal (SD-4) alternative would likely be the most expensive of all the alternatives, due to transportation and pre-disposal treatment requirements.

**Table ES.1.** Preliminary Cleanup Levels for Surface-Water Sediment OU

| Medium | Contaminant of Concern | Exposure Route | Receptor | Cleanup Level |
|---|---|---|---|---|
| Fish Tissue | Dioxin | Food Chain | Human | 4.3E-6 µ/kg[(a)] |
| Sediment | Dioxin | Food Chain | Receptor Species | 21 µ/kg[(b)] |
| Sediment (By sub-area of Old Mormon Slough) | PAH | Food Chain | Receptor Species | 12,000 µ/kg[(b)] for east end; 5,000 µ/kg[(b)] for central processing area; 5,334 µ/kg[(b)] for OWP area; 3,667 µ/kg[(b)] for mouth of slough. |

(a) The cleanup level for fish tissue concentration was developed based on a back calculation for the fish tissue concentration that would produce a total excess cancer risk of less than $10^{-6}$ assuming a consumption rate of 150 g/day, 350 days/year for 30 years (ICF, personal communication).
(b) The cleanup levels for dioxin and PAH in sediment are based on the risk-based MSC developed in the Ecological Risk Assessment (Thom et al. 1997).



Exhibit 17 to the
United States' Motion
DOJ 86

**CONTENTS**

EXECUTIVE SUMMARY . . . . . iii

ACKNOWLEDGMENTS . . . . . xv

ACROYNMS . . . . . xvii

1.0 INTRODUCTION . . . . . 1.1

1.1 PURPOSE AND ORGANIZATION OF REPORT . . . . . 1.1

1.2 BACKGROUND INFORMATION . . . . . 1.2

1.2.1 Site Description . . . . . 1.2
1.2.2 Summary of Site Physical Characteristics . . . . . 1.3
1.2.3 Site History . . . . . 1.5
1.2.4 Nature and Extent of Upland Contamination . . . . . 1.7
1.2.5 Nature and Extent of Contamination in Surface-Water Sediment OU . . . . . 1.10
1.2.6 Contaminant Fate and Transport . . . . . 1.16
1.2.7 Potential Routes of Exposure . . . . . 1.18

2.0 REMEDIAL ACTION OBJECTIVES AND GENERAL RESPONSE ACTIONS . . . . 2.1

2.1 REMEDIAL ACTION OBJECTIVES FOR SEDIMENT . . . . . 2.1

2.1.1 General Remedial Goals for Sediment . . . . . 2.1
2.1.2 Numerical Cleanup Levels for Sediment . . . . . 2.2

2.2 GENERAL RESPONSE ACTIONS . . . . . 2.6

2.2.1 Principal and Low-Level Threats . . . . . 2.6
2.2.2 Sediment Volume Calculations . . . . . 2.8

2.3 GENERAL RESPONSE ACTIONS FOR SEDIMENT . . . . . 2.9

3.0 IDENTIFICATION AND SCREENING OF REMEDIAL TECHNOLOGIES AND PROCESS OPTIONS . . . . . 3.1



Exhibit 17 to the
United States' Motion
DOJ 87

3.1 IDENTIFICATION AND TECHNICAL SCREENING OF REMEDIAL TECHNOLOGIES FOR SEDIMENT . . . . 3.2

3.1.1 Presumptive Remedies . . . . 3.2
3.1.2 Innovative Technologies for Sediment . . . . 3.3
3.1.3 Treatability Testing . . . . 3.5
3.1.4 Summary of Sediment Remedial Technologies . . . . 3.8

3.2 INITIAL SCREENING OF REMEDIAL TECHNOLOGY PROCESS OPTIONS . . . . 3.9

3.2.1 No-Action . . . . 3.10
3.2.2 Institutional Controls . . . . 3.10
3.2.3 Containment/Isolation Technologies . . . . 3.11
3.2.4 In Situ Treatment Technologies . . . . 3.13
3.2.5 Sediment Removal Technologies . . . . 3.13
3.2.6 Ex Situ Treatment Technologies . . . . 3.15
3.2.7 Disposal Technologies . . . . 3.19

3.3 SUMMARY OF REMEDIAL PROCESS OPTIONS FOR SEDIMENT . . . . 3.21

4.0 DEVELOPMENT OF REMEDIAL ALTERNATIVES . . . . 4.1

4.1 DEVELOPMENT OF REMEDIAL ACTION ALTERNATIVES . . . . 4.2

4.2 COMMON ELEMENTS . . . . 4.3

4.2.1 Institutional Controls . . . . 4.3
4.2.2 Monitoring . . . . 4.4
4.2.3 Sediment Capping . . . . 4.5
4.2.4 Sediment Dredging . . . . 4.6
4.2.5 Silt Curtains . . . . 4.7
4.2.6 Sediment Dewatering . . . . 4.8

4.3 DESCRIPTION OF SEDIMENT REMEDIAL ACTION ALTERNATIVES . . . . 4.9

4.3.1 SD-1 - No-Action . . . . 4.9
4.3.2 SD-2 - In Situ Capping . . . . 4.10
4.3.3 SD-3 - Dredging and Confined Disposal Alternative . . . . 4.11
4.3.4 SD-4 - Dredging and Offsite Disposal Alternative . . . . 4.14
4.3.5 SD-5 - Dredging and Onsite Treatment . . . . 4.16



Exhibit 17 to the
United States' Motion
DOJ 88

5.0 DETAILED ANALYSIS OF ALTERNATIVES ..... 5.1

5.1 EVALUATION CRITERIA ..... 5.1

5.1.1 Overall Protection of Human Health and the Environment ..... 5.1
5.1.2 Compliance with ARARs ..... 5.1
5.1.3 Long-Term Effectiveness and Permanence ..... 5.3
5.1.4 Reduction of Toxicity, Mobility, or Volume Through Treatment ..... 5.3
5.1.5 Short-Term Effectiveness ..... 5.4
5.1.6 Implementability ..... 5.4
5.1.7 Cost ..... 5.5
5.1.8 State Acceptance ..... 5.6
5.1.9 Community Acceptance ..... 5.6

5.2 COMPLIANCE WITH APPLICABLE OR RELEVANT AND APPROPRIATE REQUIREMENTS ..... 5.6

5.2.1 Action-Specific Applicable or Relevant and Appropriate Requirements ..... 5.6
5.2.2 Location-Specific Applicable or Relevant and Appropriate Requirements ..... 5.9

5.3 INDIVIDUAL ANALYSIS OF ALTERNATIVES ..... 5.11

5.3.1 SD-1 - No-Action Alternative ..... 5.11
5.3.2 SD-2 - In Situ Capping ..... 5.13
5.3.3 SD-3 - Dredging and Confined Disposal Facility ..... 5.15
5.3.4 SD-4 - Dredging and Offsite Disposal ..... 5.19
5.3.5 SD-5 - Dredging and Onsite Treatment ..... 5.23

5.4 COMPARATIVE ANALYSIS OF SEDIMENT ALTERNATIVES ..... 5.27

5.4.1 Overall Protection of Human Health and the Environment ..... 5.27
5.4.2 Compliance with Applicable or Relevant and Appropriate Requirements ..... 5.28
5.4.3 Long-Term Effectiveness and Permanence ..... 5.28
5.4.4 Reduction in Toxicity, Mobility, or Volume Through Treatment ..... 5.29
5.4.5 Short-Term Effectiveness ..... 5.29
5.4.6 Implementability ..... 5.30
5.4.7 Cost ..... 5.30
5.4.8 State Acceptance ..... 5.31
5.4.9 Community Acceptance ..... 5.31



Exhibit 17 to the
United States' Motion
DOJ 89

6.0 REFERENCES ........ 6.1

APPENDIX A - NATURAL ATTENUATION OF PAHS ........ A.1
APPENDIX B - SEDIMENT VOLUME AND CONTAMINANT MASS ESTIMATES ..... B.1
APPENDIX C - REMEDIAL ACTION ALTERNATIVE COST ESTIMATES ........ C.1
APPENDIX D - DEVELOPMENT OF PRELIMINARY SEDIMENT CLEANUP LEVELS ........ D.1



Exhibit 17 to the
United States' Motion
DOJ 90

# 1.0 INTRODUCTION

## 1.1 PURPOSE AND ORGANIZATION OF REPORT

The purpose of this Feasibility Study (FS) is to evaluate the remedial alternatives for the Surface-Water Sediment Operable Unit (OU) at the McCormick & Baxter Superfund Site (M&B), a former woodtreating facility located in Stockton, California. Past activities at the site resulted in the release of hazardous substances to soils, groundwater, surface water, and sediment.

The site has been divided into two OUs: 1) upland soil and groundwater, and 2) surface water and sediment in the adjacent Old Mormon Slough. Remedial investigation and feasibility study (RI/FS) activities for both OUs are being conducted concurrently. This FS report addresses the Surface-Water Sediment OU. A separate FS report was prepared for the Soil-Groundwater OU (ICF 1998). The following is a list of other major reports prepared for EPA as part of the M&B RI/FS:

- M&B Soil and Groundwater Remedial Investigation Report (ICF 1998)
- M&B Surface Water and Sediment Remedial Investigation Report (White et al. 1996)
- Human Health Risk Assessment for the M&B Superfund Site (ICF 1997)
- Ecological Risk Assessment of the Surface Water Operable Unit, M&B Superfund Site, Stockton, California (Thom et al. 1997).

The RI and FS for the M&B site have been carried out in accordance with the requirements of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), as amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA). Specific guidance used in the preparation of this report is the *Guidance for Conducting Remedial Investigations and Feasibility Studies under CERCLA* (EPA 1988a).

This FS report is organized into six chapters. Chapter 1.0 provides background information about the M&B site, including a site description and history, a summary of previous investigations, contaminants of concern (COC), discussions of the nature and extent of contamination and contaminant fate and transport, and summaries of the human health and ecological risk assessments. (A more detailed site description and history can be found in the Soil-Groundwater OU RI report).

Chapter 2.0 presents the remedial action objectives for Old Mormon Slough sediments, the development of cleanup levels based on applicable or relevant and appropriate



Exhibit 17 to the
United States' Motion
DOJ 91

requirements (ARARs) and risk assessment findings, general response actions (GRAs), and the areas and volumes of sediment to which removal, containment, or treatment may be applied.

Chapter 3.0 presents the remedial technology types and process options potentially applicable to each GRA. These technologies are screened based on their effectiveness, implementability, and cost. This section also summarizes the results of treatability studies conducted for the M&B site.

Chapter 4.0 presents the development and screening of remedial alternatives based on combinations of the technology options retained from the screening process in Chapter 3.0. The rationale for development of the remedial alternatives, as well as a discussion and evaluation of each alternative, are included.

Chapter 5.0 presents individual and comparative analyses of the final alternatives. This analysis is conducted using seven of the nine evaluation criteria specified in the National Oil and Hazardous Substances Pollution Contingency Plan (NCP). The final two criteria, state and community acceptance, will be evaluated after comments are received on the proposed remedy.

References are provided in Chapter 6.0. Assumptions and calculations used in the detailed development and evaluation of alternatives (Chapter 5.0) are presented in Appendixes A and B. Detailed cost estimates for these remedial alternatives are presented in Appendix C.

## 1.2 BACKGROUND INFORMATION

This section presents background information describing the site, its characteristics and operational history, the nature and distribution of contaminants, potential fate and transport pathways, and findings of the Human Health and Ecological Risk Assessments.

### 1.2.1 Site Description

M&B is a defunct wood-preserving company that operated between 1942 and 1990 on a 29-acre site in an industrial area of Stockton, California (**Figure 1.1**). Site activities resulted in the release of wood-preserving chemicals to soils, groundwater, surface water, and sediment. Sediments in Old Mormon Slough have become contaminated as a result of chemical spills, stormwater runoff, direct discharge of stormwater through outfalls, non-point source stormwater runoff, and/or subsurface migration of non-aqueous phase liquids (NAPLs) from upland contamination sources (i.e., seepages from the former OWP area).

The M&B site is bordered by Old Mormon Slough to the north, Washington Street to the south, the Continental Grain property to the west, and the Interstate 5 (I-5) interchange to the



Exhibit 17 to the
United States' Motion
DOJ 92

east. The site is fenced and 24-hour security is maintained. Zoned areas within 600 feet of the site include heavy industrial, light manufacturing, general business, commercial manufacturing, and single-family residential districts. The nearest residential area is located approximately 150 m (500 ft) to the southwest. Additional residences are located across the I-5 freeway, approximately 750 feet southeast of the M&B site.

### 1.2.2 Summary of Site Physical Characteristics

This section summarizes the physical characteristics of the upland area and potentially important surface-water bodies.

#### 1.2.2.1 Upland Area (Soil-Groundwater OU)

Topography across the site is generally level, with elevations ranging from 3 m (10 ft) above mean sea level (msl) in the east and central areas to 4 m (13 ft) in the north. The main wood-treatment area was located in the central and northwest portion of the site (**Figure 1.2**). The southern and eastern areas were used primarily for storage of treated and untreated wood. A berm, approximately 1 m (3 ft) higher than the upland area, borders the south bank of Old Mormon Slough and prevents surface runoff into the slough. Stormwater is collected and stored in two ponds in the southwest corner of the site. Stormwater from the ponds is discharged under permit to the Stockton Regional Wastewater Control Facility.

Regional and local geology, hydrogeology, and groundwater quality are discussed in detail in the RI report for the Soil-Groundwater OU. The following is a list of the conclusions of that report that are relevant to this FS:

- Five interconnected water-bearing zones (A through E) have been defined beneath the site.
- No continuous confining layers have been identified between the zones.
- A downward vertical gradient exists between the five zones; however, localized deviations from this general trend are noted.
- Groundwater-flow direction in all zones ranges from east-southeast to southeast.
- Groundwater recharge is from nearby surface-water sources located to the northwest (Port of Stockton Turning Basin and Old Mormon Slough).
- Onsite infiltration is not considered to be a major contributor to groundwater recharge.



Exhibit 17 to the
United States' Motion
DOJ 93

- Shallow groundwater is brackish and non-potable; however, salinity decreases with depth.
- Naturally occurring arsenic is found in all zones; the concentration increases with depth.

The A-Zone extends from the surface to approximately 60 ft below ground surface (bgs). The B- through D-Zones have been divided into the following depth intervals: B-Zone, 60 ft to 100 ft bgs; C-Zone, 100 ft to 150 ft bgs; and D-Zone, 150 ft to 200 ft bgs. The underlying E-Zone is the uppermost regime of a deep aquifer system extending to at least 1000 ft bgs. For the purposes of the FS, the E-Zone is defined as the interval between 200 and 250 ft bgs.

#### 1.2.2.2 Surface Water and Sediment OU

The surface-water bodies adjacent to and/or potentially affected by the M&B site are Old Mormon Slough, New Mormon Slough, and the Stockton Deepwater Channel (SDC) (see Figure 1.1). Before 1970, Mormon Slough was a single channel into the SDC, near the Port of Stockton Turning Basin. When Interstate-5 was constructed, part of Mormon Slough was filled, and the portion of the slough adjacent to the M&B site was designated "Old Mormon Slough" (**Figure 1.3**). The remaining section of the slough, now on the eastern side of Interstate-5, was connected by a new channel to the SDC and named "New Mormon Slough." The SDC discharges to the San Joaquin River approximately 2 km (1.2 mi) downstream (west) of the Turning Basin, and terminates approximately 2 km (1.2 mi) upstream of the basin. The San Joaquin River joins the Sacramento River and discharges into San Francisco Bay approximately 150 km (93 mi) west of Stockton.

Both Old and New Mormon Sloughs are tidally influenced, with a maximum tidal range of approximately 1 m (3 ft). Salinities are generally 3 parts per thousand (ppt), but may fluctuate throughout the year from rainfall, saltwater intrusion, and agricultural runoff (NOAA 1993). Circulation in the SDC and Old Mormon Slough is driven by weak tidal currents, with a maximum current of about 1 knot. The SDC, the Turning Basin, and the mouth of Old Mormon Slough are areas of net sediment deposition, and are periodically dredged to maintain depths appropriate for ship traffic.

**Old Mormon Slough**. Old Mormon Slough is approximately 760 m (2500 ft) long and 55 m (180 ft) wide. The majority of the slough is approximately 3 m (10 ft) deep; the mouth of the slough was dredged in 1987 to a depth of approximately -5 m (-16 ft) mean lower low water (MLLW) (White and Kohn 1996). Dredge spoils were sampled and placed behind a sheetpile wall constructed on the northern shore of the slough. The bathymetry of the slough and part of SDC in late 1994 are shown in **Figure 1.4**. Old Mormon Slough enters SDC at the east end (END) of the Turning Basin. The Turning Basin is maintained by the Port of Stockton at a depth of -11 m (-35 ft) MLLW. Upstream of the Turning Basin, the SDC depth is approximately -7 m



Exhibit 17 to the
United States' Motion
DOJ 94

(-22 ft) MLLW. The shorelines of Old Mormon Slough and the SDC are composed primarily of rip-rap, piers, pilings, and sheetpile walls. Old Mormon Slough is also fringed with shrubby vegetation and some larger trees.

**New Mormon Slough**. New Mormon Slough consists of a steep-sided, concrete-and-rubble-lined channel. The slough is shallow (less than 1 m [3 ft]), and its silty and fine sand sediments are exposed at low tide. A discharge pipe from the City of Stockton storm drain system is located approximately 1 km upstream of the mouth of New Mormon Slough (see Figure 1.3). This discharge pipe carries runoff from the city storm drain system, which from approximately 1970 to 1978 included runoff from the M&B site. Wetland vegetation occurs approximately 1.6 km (1 mi) upstream from the mouth of New Mormon Slough, and continues upstream for approximately 100 m (328 ft). At this point, the New Mormon Slough enters an underground conduit that is connected to the Stockton Diverting Canal, east of Highway 99.

### 1.2.3 Site History

The main processing operations at M&B were located in the north-central area of the site, with the remainder of the site used primarily for storage of treated and untreated wood (see Figure 1.2). The central processing area (CPA) included the retorts, track pit, pole-washing area, and various storage tanks. Most treatment processes at the M&B site consisted of pressure impregnation of preservative solutions in retorts (large pressure cylinders) with various preservation solutions, including creosote, pentachlorophenol (PCP), and various compounds containing arsenic, chromium, copper, and zinc. Pressure-treated wood was removed from the retorts and allowed to dry in storage areas throughout the site. The Cellon process was used during a period of the site's operation to pressure treat wood with PCP in a solution of butane and ether solvent. For a brief period of time, pole ends were also dipped in an oil-PCP mixture at the butt tank area, located south of the main processing area.

Waste oils and drippage generated from the wood treatment process were stored in three unlined ponds (now referred to as the "oily waste ponds"[OWP]) located in the northwest corner of the site next to Old Mormon Slough. M&B operation's reports indicate that the ponds were periodically emptied and the contents disposed of offsite. A small pond was reportedly used from 1942 until 1965, and larger ponds from 1965 until 1985, when they were closed. When in operation, the ponds reportedly contained three layers of liquids: a floating oil layer, a layer of wastewater, and a more dense layer of heavy oil (CH2M Hill 1991). These ponds covered an area of 1700 $m^2$ (18000 $ft^2$) and were less than 12 m (40 ft) from Old Mormon Slough.

Stormwater from the M&B site was discharged into Old Mormon Slough from the early 1940s, when the plant was first constructed, until approximately 1978. M&B had a National Pollutant Discharge Elimination System (NPDES) permit issued in 1974 for the discharge of cooling water, boiler blowdown water, and stormwater from the site into Old Mormon Slough.



Exhibit 17 to the
United States' Motion
DOJ 95

At least two discharge points drained portions of the eastern and north central plant site used for storage of treated and untreated wood (Figure 1.2). Two other discharge points drained the south central and southwest plant areas. After 1970, storm drainage from the south central and southwest plant area was apparently rerouted to New Mormon Slough in conjunction with the construction of Interstate 5. Storm drainage from the east and north central plant site remained connected to Old Mormon Slough until late 1976 when M&B reported them closed. Self-monitoring reports by M&B indicated violations of storm drain discharge requirements. Between October 31, 1974, and November 11, 1976, for example, PCP concentrations ranged from 0.40 to 13.4 mg/L, exceeding the permitted limit of 0.01 mg/L.

In late 1977, the California Department of Fish and Game (CDFG) investigated a fish kill involving both New Mormon Slough and the Port of Stockton following a major storm event. The CDFG study established that PCP-contaminated stormwater runoff from the M&B site, discharged to New Mormon Slough via the City of Stockton storm drain system, was responsible. In response to a Regional Water Quality Control Board (RWQCB) Cleanup and Abatement Order against M&B, the company installed a stormwater collection system and constructed a perimeter dike around most of the site. M&B also sealed all storm drains known to carry stormwater from the site to the City of Stockton system. From mid-1978 through the present, the only discharge of stormwater from the plant site has been through the permitted stormwater control system. M&B continued to have an NPDES permit for cooling water and boiler blowdown water until operations ceased in 1991. Stormwater is currently collected and piped to two stormwater collection ponds in the southwestern corner of the site. After sampling, it is discharged under permit to the local wastewater control facility.

Several spills of small amounts of site-related chemicals into Old Mormon Slough have been documented. In June 1986, approximately 20 gal of 30% creosote and 70% heavy fuel oil were released from an effluent discharge pipe in the central processing area. In 1987, M&B reported a small oil/PCP pipe leak and spill (0.5% to 15% PCP) into the slough from the Cellon oil wash system through another discharge point in the CPA.

The OWP were closed in 1981, when approximately 635,000 kg (144 tons) of contaminated soil was removed from the ponds, and the area was covered with clean fill. However, later subsurface soil sampling conducted by U.S. Environmental Protection Agency (EPA) revealed that contaminated soils and oily waste remained in the area of the former OWP. In addition, oily seeps into Old Mormon Slough were observed along this section of the shoreline during sediment sampling conducted by EPA in 1995.

In 1984, M&B entered into an agreement with the California Department of Health Services (DHS), now the Department of Toxic Substances Control (DTSC), and the RWQCB to investigate and clean up contamination at the site. M&B conducted soil and groundwater sampling, and submitted site investigation reports, a Baseline Public Health Assessment, an



Exhibit 17 to the
United States' Motion
DOJ 96

FS report, and a Remedial Action Plan to the state agencies. None of these documents was approved. M&B declared bankruptcy in 1988 and ceased operations in 1990.

The M&B site was added to the EPA National Priorities List (NPL) in October 1992, at which time EPA became the lead agency for the site. EPA conducted several phases of soil, groundwater, NAPL, and sediment sampling between 1993 and 1996, as reported in the two RI reports. EPA also carried out several phases of removal actions to dispose of chemicals and sludges remaining at the site, to demolish above-ground tanks and buildings, and to improve site security. In 1996, EPA installed a sheetpiling wall along the shoreline of Old Mormon Slough to control seeps from the old OWP into the slough. In July 1997, approximately 12,000 cy of contaminated soil were excavated from behind the sheetpiling wall. The soil was moved to existing concrete sumps and to a newly constructed lined repository in the central portion of the site. The OWP area was backfilled with clean imported fill. The central area of the site was covered over with clean imported fill and an asphalt cap.

As of today, all wood treatment process units and tanks associated with historical operations at the M&B site have been emptied of chemicals, cleaned, and removed from the site. In addition, all above-ground structures at the site, with the exception of the office, two storage sheds, and the stormwater collection system pumping station, have been demolished.

### 1.2.4 Nature and Extent of Upland Contamination (Soil-Groundwater OU)

This section presents the current conceptual understanding of the nature and distribution of contaminants in the upland soils and groundwater.

#### 1.2.4.1 Soil Contamination

Five wood treatment-derived chemical contaminants, identified in the RI and risk assessment process as COCs, were used as indicator chemicals to define the nature and extent of soil and groundwater contamination: PCP; 2,3,7,8-tetrachlorodibenzo-*p*-dioxin/ 2,3,7,8-tetrachlorodibenzo-*p*-furan (2,3,7,8-TCDD/TCDF)[1]; carcinogenic polynuclear aromatic hydrocarbons (CPAHs) from creosote; arsenic (primarily as a soil COC); and naphthalene. The 2,3,7,8-TCDD/TCDF (hereafter identified as "dioxin" or "TCDD TEQ") originated as a contaminant (approximately 0.1 percent) in the technical-grade PCP used at the site. Naphthalene has been included as a COC because, even though it is relatively non-toxic, it is widely distributed at relatively high concentrations in soil and groundwater. It also serves as a good indicator for

---

[1]The International Toxicity Equivalency Factors (I-TEFs) methodology as developed by EPA was applied to the various subclasses of dioxin/furan congeners. Each non-2,3,7,8-TCDD congener is expressed in terms of an equivalent amount of 2,3,7,8-TCDD. Expressing the equivalent toxicity of all congeners in terms of 2,3,7,8-TCDD results in a sum total amount of 2,3,7,8-TCDD that can be considered equivalent (in terms of potency) to a unit amount of any dioxin and furan mixture. From this, a scaling factor (the TEQ) can be identified that, when multiplied by the concentration of the mix, represents the toxicity equivalent concentration of 2,3,7,8-TCDD (TCDD TEQ).



Exhibit 17 to the
United States' Motion
DOJ 97

non-carcinogenic PAHs. The nature and extent of soil contamination are described in detail in the RI report for the Soils-Groundwater OU. In summary, general findings regarding the extent of soil contamination are the following:

- Only shallow soils are contaminated in the eastern portion of the site, with the exception of a few small, isolated areas of deeper contamination.

- Deeper soil contamination is found in the western portion of the site.

- Arsenic and dioxin are found primarily in shallow soils.

- Benzo(a)pyrene (BAP) has the greatest vertical extent of the COCs (excluding naphthalene).

Arsenic is prevalent in very shallow soils throughout the site, but concentrations rapidly decrease with depth except at locations in the main processing area and the former OWP. In surface soils (0 to 1 ft bgs), arsenic was found above the preliminary soil cleanup level of 24 mg/kg at most sampled locations across the site. Below this depth, arsenic was found only at isolated locations in the eastern portion of the site; however, in the western portion of the site it was found to 13 ft bgs beneath the main processing area and at one location in the OWP area.

Dioxin is present at levels above the preliminary soil cleanup level of 1 ppb in very shallow soils throughout the site, but concentrations are higher in the western portion of the site. In the western end, concentrations of dioxin rapidly decrease with increasing depth, except for locations of high dioxin concentrations in the CPA and the OWP area.

Unlike dioxin and arsenic, PCP is not widely distributed across the site. Except for one sampling station in the eastern portion of the site, PCP above the preliminary soil cleanup level of 79 mg/kg is restricted to the western portion of the site, again primarily in the CPA and OWP area. Outside of these two areas, concentrations of PCP decrease rapidly with depth.

CPAHs are generally found in deeper samples than arsenic, dioxin, and PCP. CPAHs are found in surface soils throughout the western site from the OWP area to the CPA. The lateral extent of CPAHs diminishes with depth, but remains centered below the OWP area and CPA to 30 ft bgs or more.

#### 1.2.4.2 Groundwater Contamination

PCP and dioxin at levels above their respective Maximum Contaminant Levels (MCLs) are currently limited to the central portion of the site and is only present in the A-Zone. Concentrations of PCP in wells at this location were above the MCL of 1 mg/L, ranging from

26 mg/L to 36,000 mg/L. Dioxin contamination extends from the A-Zone to the C-Zone, primarily in the central and southeastern areas of the site. Concentrations range from the 2,3,7,8-TCDD MCL of 30 pg/L to 27,038 pg/L.

There is limited CPAH groundwater data because of analytical interferences due to high concentrations of naphthalene in many samples that raised the detection limits for the CPAHs. CPAHs (as BAP equivalents) have been detected above the BAP MCL (0.2 mg/L) in ground-water samples from only three wells, again in the central and southeastern areas. Maximum concentrations in these wells were 10 mg/L, 240 mg/L, and 2300 mg/L, respectively.

Naphthalene is widely distributed in groundwater beneath the site, and has been detected in two D-Zone and one E-Zone wells. Arsenic is a naturally occurring regional ground-water constituent and, with the exception of one well immediately downgradient from the retort area, it is not found at concentrations elevated above background levels in groundwater beneath the site.

#### 1.2.4.3 Non-Aqueous Phase Liquids (NAPLs)

NAPLs have been detected in soils and groundwater (as well as in Old Mormon Slough sediments, as described in Section 1.2.5) at the M&B site. Both dense NAPLs (DNAPLs) and light NAPLS (LNAPLs) have been detected. NAPLs are free-phase materials thought to be derived from the creosote and PCP wood-treatment solutions. The chemical components of LNAPL and DNAPL are similar, though proportions vary. PCP and at least some creosote were dissolved in petroleum carriers such as fuel oil, diesel fuel, or kerosene. Creosote is denser than water, while petroleum in less dense. However, waste solutions may have been allowed to mix before they were released.

The presence of NAPL in the upland portion of the M&B site was evaluated directly by measurement or visual inspection in groundwater monitoring wells, by the visual inspection of soil borings, and indirectly by interpretation of measured groundwater concentrations to deter-mine if concentrations exceeded the effective solubilities of NAPL component mixtures. Chemi-cal and physical analyses were performed on NAPL samples collected from monitoring wells. The presence of NAPL in Old Mormon Slough sediments was evaluated by visual observations of sediment cores collected for the RI. The following general conclusions were made in the Soil-Groundwater FS report regarding the nature and extent of NAPL in the upland portion of the M&B site:

- NAPL is considered to be the principal present-day source of contamination in the upland portion of the M&B site.

- LNAPL and DNAPL samples from M&B have densities very close to water.



Exhibit 17 to the
United States' Motion
DOJ 99

- LNAPL appears to be restricted to one A-Zone well; however, its extent has not been fully delineated.

- DNAPL has been measured in the A- and B-Zones, is suspected in the C- and D-Zones through observations and indirect methods, and may be in the E-Zone. The widespread occurrence of DNAPL presents a significant problem for source removal as a response action at the M&B site.

- The lateral and vertical extent of DNAPL is not fully delineated in the upland portion of the site. Because DNAPL migration pathways are intricate, particularly in complex hydrogeologic environments such as the M&B site, the resulting contaminant distribution is highly uniform and complex, and thus it typically is not possible to fully characterize the extent of DNAPL at a site.

### 1.2.5 Nature and Extent of Contamination in Surface-Water Sediment OU

The first phase of sediment sampling at and in the vicinity of the M&B site was conducted by EPA in the Surface-Water Sediment OU. The Phase I RI sediment sampling was part of a study conducted jointly by several state agencies (Petreas and Hayward 1994). The Phase II RI sampling for the Surface-Water Sediment OU was conducted in 1995 to 1996 (White and Kohn 1996). The objectives of the RI were to define the horizontal and vertical extent of sediment contamination, estimate contaminated sediment volumes, describe the subsurface geology of Old Mormon Slough, and evaluate contaminant fate and transport for the site.

Old Mormon Slough was divided into four subareas for purposes of the RI sampling: OMS-END (closed eastern end); OMS-CPA (portion adjacent to the upland central processing area); OMS-OWP (portion adjacent to the upland OWP); and OMS-MTH (mouth of the slough). The divisions were based on previous sediment data and the locations of known contaminant sources (e.g., discharge pipes). This usage is continued in this report for the discussion of Old Mormon Slough remediation areas.

Contaminant levels in New Mormon Slough were expected to be higher in the vicinity of the City of Stockton stormwater discharge pipe, and lower in the newer channelized section downstream of the discharge. Because of this, New Mormon Slough was divided into two sections, with five sampling stations in each: NMS-UPS (upstream portion of the slough, near the stormwater discharge pipe) and NMS-DNS (downstream channelized portion of the slough).

Sediment core samples were collected at 24 stations in Old Mormon Slough (six stations in each of the four sub-areas), three stations in SDC, and four stations in New Mormon Slough. Cores were collected to the maximum depth of penetration, which varied from about 1 m (3 ft) in New Mormon Slough to 3 m (11 ft) in SDC and up to 9 m (29 ft) in Old Mormon



Exhibit 17 to the
United States' Motion
DOJ 100

Slough. Samples were combined in a cost-effective, two-way (vertical and horizontal) compositing scheme designed to yield contaminant distribution data from analysis of fewer samples. All New Mormon Slough and SDC vertical composites and all Old Mormon Slough horizontal composites were analyzed for grain size, total organic carbon, PAHs, chlorinated phenols, metals, and dioxin. Vertical composites from Old Mormon Slough were also analyzed for dioxin.

Contaminant concentrations in the composites were compared with those in two reference sediment samples, one from the eastern end of SDC and one from the San Joaquin River upstream of the confluence with SDC.

The following COCs were identified in the RI report for the Surface-Water Sediment OU:

- LPAHs
- HPAHs
- Dioxin
- PCP
- Metals (chromium, arsenic, zinc, copper).

Based on the findings of the RI sampling, PAH contamination associated with the M&B site appears to be confined to Old Mormon Slough. PAH concentrations in Old Mormon Slough were elevated above those found in the Stockton Deepwater Channel Reference (SDCR). Total PAH concentrations decreased with increasing depth in the western half of Old Mormon Slough, and increased with increasing depth in the eastern half. The origin of PAHs in deeper sediments (>6 ft below mudline) appears to be from old discharges or spills. The full vertical extent of PAH contamination was not determined for part of Old Mormon Slough: PAH contamination extends deeper than 8.9 m and 5.5 m (29.2 ft and 18 ft) below mudline at two stations north of the former central processing area of the M&B site. The origin of PAHs at such depths at these two locations is not clear. At the western end of the slough, seepage from the upland area at the former OWP probably contributed PAHs to this portion of the slough until the seeps were controlled in 1996.

PCP was not widely distributed; it was detected in six samples, all from the eastern half of Old Mormon Slough. Chlorinated phenols were not detected in samples from New Mormon Slough, the SDC, or the reference locations.

Dioxin concentrations in Old Mormon Slough and in the New Mormon Slough background sample were elevated above the SDCR. Dioxin contamination in Old Mormon Slough occurred at lower concentrations relative to reference than did PAHs, and affected a smaller volume of sediment. Dioxin contamination in Old Mormon Slough was highest in shallower (upper 1.2 m [4 ft]) sediment in the vicinity of former discharge pipes. Dioxin was an impurity in PCP formulations and in sediment. There is a probability that this derived from spills or the



Exhibit 17 to the
United States' Motion
DOJ 101

direct discharge of stormwater into the slough. Higher dioxin concentrations in shallow sediments relative to deeper sediments in the western end of the slough may reflect the resuspension, transport, and deposition of contaminated surface sediments from the END of the slough. In addition, the higher concentrations are probably also related to ongoing seepage from the OWP into this portion of the site. Dioxin in New Mormon Slough was highest in the background (furthest upstream) sample and had different congener ratios, which suggests additional sources other than the past (1970-1978) M&B site stormwater discharge.

Coplanar PCB concentrations in sediment were measured as part of the ecological assessment sampling. Concentrations in the SDCR sample were higher than those in all but eight samples from the study area. Based on their distribution, they do not appear to be associated with activities at the M&B site.

Arsenic, copper, and zinc were highest in the New Mormon Slough background sample, not in Old Mormon Slough. These metals are more likely derived from runoff from adjacent roadways or industrial sources along the upgradient section of New Mormon Slough than from the past, short-term M&B site discharge. Chromium was slightly elevated (a maximum of 1.4 times reference) in six samples from the END of Old Mormon Slough, the background sample from New Mormon Slough, and two samples from the SDC. These concentrations may represent natural variations and also do not appear to be directly attributable to the M&B site.

New Mormon Slough and the SDC are waterways in highly developed areas that receive input from industry, shipping, runoff from streets and highways, and stormwater discharges. New Mormon Slough received stormwater discharge from the M&B site for only about eight years; it was combined with discharges from other sources in the area before entering New Mormon Slough, and no runoff from the M&B site has entered New Mormon Slough since 1978. As far as the movement of contamination out of Old Mormon Slough into the SDC, White and Kohn (1996) describe the rate of sediment transport out of Old Mormon Slough as very low, with a net sedimentation rate estimated at 3.6 cm/yr (1.4 in/yr). This rate would tend to bury and stabilize the contamination in place, rather than transport it outside of Old Mormon Slough.

During an October 1994 site visit, an oily sheen was observed on the water and banks of Old Mormon Slough (White and Kohn 1996). The sheen extended from the slough's END to three-quarters of the way to the mouth, and covered approximately 30% of the water's surface area at some locations. Active degassing was indicated by bubbles bursting at the water surface. The degassing area covered approximately 50% of the eastern end of the slough. During a low tide in June 1995, oily seeps were observed on the exposed bank of Old Mormon Slough near the former OWP (see Figure 1.2). As noted earlier, the source of these seeps was addressed by removal actions in 1996 to 1997.

Soil cores from the top five to ten feet of sediments underlying Old Mormon Slough were logged as being oily (White and Kohn 1996). Because the oil was encountered below the water

surface, it is believed to be a DNAPL. The relatively thin occurrence of the Old Mormon Slough DNAPL may be an indication that the oils are at residual saturation and therefore probably not mobile.

Two isolated borings in the slough (OMS-45 and OMS-48) had oily soils to deeper depths (29.2 ft below mudline and 18 ft below mudline, respectively). The presence of DNAPL at these depths is believed to be due to past direct releases from the upland process areas, and not due to migration from upland DNAPL sources. Evidence supporting the hypothesis of direct release to the slough as the source of DNAPLs in sediment includes 1) an oily sheen was observed in both borings throughout their entire lengths, 2) the DNAPL was often associated with wood fibers (which may be from the site wood-treatment process and deposited at the same time as the oil), and 3) DNAPL has not been detected in borings or wells between the upland site DNAPL locations and the deep slough borings.

#### 1.2.5.1 Nature and Extent of PAH Contamination

PAH contamination of sediments near the site is primarily confined to Old Mormon Slough. The maximum total PAH concentration measured in a sample from New Mormon Slough was 14.2 mg/kg, which is slightly higher than the SDCR concentration of 10.4 mg/kg. The difference in composition of the PAH mixtures suggests that the sources of PAHs at the reference sites and in New Mormon Slough are different than the sources in Old Mormon Slough. PAHs at the reference sites and in New Mormon Slough were predominately composed of HPAH compounds (87% to 100% of total PAHs). HPAHs are primarily the products of incomplete combustion, and were likely transported to the reference sites and New Mormon Slough in runoff from adjacent roadways. In Old Mormon Slough, PAHs were predominately composed of LPAH compounds, representing a range of 51% to 96% and an average of 74% of the total PAHs. The preponderance of LPAHs relative to HPAHs is typical of creosote or possibly the carrier oil for creosote or PCP.

**Lateral Extent in Old Mormon Slough**. PAH contamination in Old Mormon Slough was greatest adjacent to the CPA (OMS-CPA), where total PAH concentrations ranged from below detection to 1811 mg/kg in horizontally composited samples (**Figure 1.5**). PAH-contaminated sediments were also found adjacent to the OWP (OMS-OWP) where concentrations ranged from 15.5 to 1195 mg/kg. Concentrations of up to 123 mg/kg were found in the closed eastern end of the slough (OMS-END); contamination in this area was detected in sediments below 6 m (20 ft). Sediments at the mouth of the slough (OMS-MTH) were relatively free of PAH contamination, with the exception of two apparent "hot spots" in surface sediments (OMS-58 and OMS-61). This area was reported to have been dredged in 1987 to a maximum depth of -5 m (-16 ft) MLLW.

The most highly contaminated sediments were found at stations OMS-48, OMS-50, and OMS-45, which were located on the southern side or in the center of Old Mormon Slough



Exhibit 17 to the
United States' Motion
DOJ 103

directly north of the CPA (see Figure 1.5). The sediments from Station OMS-53 on the south side of Old Mormon Slough at the eastern end of the OMS-OWP subarea were the most contaminated in the sub-area.

**Vertical Extent in Old Mormon Slough**. PAH contamination increased with depth from mudline to -2.4 m (-8 ft) in OMS-END and OMS-CPA, and decreased with depth in OMS-OWP (Figure 1.5). The highest total PAH concentration of 1811 mg/kg was measured in the 1.8 to 2.4 m (6 to 8 ft) composite from OMS-CPA. Total PAH concentrations exceeded the SDCR in all but three samples from OMS-CPA and OMS-END: OMS-41E (2.4 to 3.0 m [8 to 10 ft]), and OMS-47D (1.8 to 2.4 m [6 to 8 ft]), and OMS-50F (3.0 to 3.6 m [10 to 11.7 ft]). Elevated PAH concentrations were measured in samples from the bottoms of two cores: OMS-45 (87 mg/kg total PAH from 8.2 to 8.9 m [27 to 29.2 ft] below the mudline) and OMS-48 (1573 mg/kg 4.9 to 5.5 m [16 to 18 ft] below mudline). PAH contamination may extend even deeper at those two stations. In OMS-OWP, total PAH concentrations decreased from 1195 mg/kg in the 0 to 0.6 m (0 to 2 ft) interval to 15.5 mg/kg in the 1.8 to 2.4 m (6 to 8 ft) interval. None of the samples from OMS-OWP had total PAH concentrations below the SDCR, although no samples from greater than 2.4 m (8 ft) below mudline were analyzed. The 1.8 to 2.4 m (6 to 8 ft) composite was 1.5 times reference.

**Sources of PAH Contamination in Old Mormon Slough**. Two different sources of contamination probably caused PAH contamination of shallow (0 to 1.8 m [0 to 6 ft]) and deep (>1.8 m [>6 ft]) sediments in Old Mormon Slough. The black, oily clayey silts generally found between 0.6 m (2 ft) and 1.8 m (6 ft) below the mudline probably originated from spills and stormwater discharges into Old Mormon Slough. The most highly contaminated sediments are found at sampling stations adjacent to the discharge pipes (OMS-53, OMS-50) and directly north of the CPA (OMS-48). An additional and ongoing source of contamination to shallow sediments was the observed oily seepage from the banks of Old Mormon Slough near the OWP. The shallow (<0.6 m [<2 ft]) sediments are less contaminated than buried sediments in OMS-END and OMS-CPA, possibly because direct discharges to the slough decreased over time, and then ceased when the site became inactive. The shallow (0 to 0.6 m [0 to 2 ft]) sediments in OMS-OWP may be more highly contaminated than the buried sediments, because this area was still receiving contamination from oily seeps along the bank of the slough until recently.

In deeper sediments (generally >1.8 m [>6 ft] below mudline) oil droplets and sheen were observed in the pore spaces of alluvial sediments, particularly in sandier layers. The source of this deep contamination is unknown. While some locations (OMS-46 and OMS-47) had deep PAH contamination, adjacent cores (OMS-46 and OMS-47) did not. In addition, there is no evidence of a migration pathway (i.e., continuous permeable layers, residue in soil borings, high concentrations in monitoring wells between the known upland source areas and the slough) from the upland soils to Old Mormon Slough sediment.



Exhibit 17 to the
United States' Motion
DOJ 104

### 1.2.5.2 Nature and Extent of Dioxin Contamination

Dioxin was present in samples from Old and New Mormon Sloughs at international toxicity equivalent concentrations (TEQs) exceeding reference. The TEQs in SDC samples were below reference. The highest TEQ in New Mormon Slough was 579 pg/g (7 times reference) at NMS-67, which is the background sample for New Mormon Slough. This indicates other sources of dioxin to New Mormon Slough in addition to the 1970 to 1978 stormwater discharges from the M&B site.

**Lateral Extent in Old Mormon Slough**. In Old Mormon Slough, TEQS decreased from east to west; from OMS-END (concentrations ranging from 1.03 to 1347 pg/g) to OMS-MTH (concentrations ranging from 58.3 to 0.0016 pg/g) (**Figure 1.6**). TEQS were above the SDCR concentration in some samples from OMS-END, OMS-CPA, and OMS-OWP.

**Vertical Extent in Old Mormon Slough**. In Old Mormon Slough, TEQ concentrations decreased with increasing depth from mudline to 2.4 m (8 ft), from 1347 to 1.03 pg/g in OMS-END, 1064 to 76.8 pg/g in OMS-CPA, 366 to 0.043 pg/g in OMS-OWP, and 39.9 to 0.0016 pg/g in OMS-MTH (Figure 1.6). TEQS were above reference in the 0 to 0.6 m (0 to 2 ft) composites from OMS-END, OMS-CPA, and OMS-OWP, and in the 0.6 to 1.2 m (2 to 4 ft) composites from OMS-END and OMS-CPA. The results of the two-way compositing scheme indicate that the most dioxin-contaminated sediments (>10 times SDCR in both horizontal and vertical composites) are in the upper 60 cm (2 ft) of sediment at stations OMS-40 and OMS-41, and in the upper 120 cm (4 ft) at OMS-48V and OMS-50V.

**Sources of Dioxin Contamination in Old Mormon Slough**. The source of dioxin to Old Mormon Slough sediments is most likely the PCP used at the M&B site. Dioxins are impurities in PCP formulations, where they are primarily composed of hepta- and octa-chlorinated congeners (Eisler 1989). Dioxins were most likely discharged to Old Mormon Slough via PCP spills and in PCP-contaminated stormwater from the M&B site. The two-way compositing scheme showed that shallow sediments at stations OMS-40, OMS-41, OMS-48, and OMS-50 contained the highest levels of dioxins. Stations OMS-40 and OMS-41 are adjacent to two stormwater discharge pipes at the END of the slough and OMS-50 is adjacent to a discharge pipe north of the CPA.

### 1.2.5.3 Nature and Extent of PCP Contamination

Chlorinated phenols were not detected in most of the sediment samples collected from the study area and reference locations. Although detection limits were raised in many samples because of analytical interferences, the maximum detection limit for all analytes was 550 µg/kg (2,4,5-trichlorophenol), and was 63 µg/kg for PCP. These detection limits are lower than those achieved in previous studies. Chlorinated phenols were not detected in samples from New Mormon Slough, the SDC, or the reference locations. Analytical interferences in the samples



Exhibit 17 to the
United States' Motion
DOJ 105

from New Mormon Slough and the SDCR prevented the positive identification and quantification of some compounds; they might have been present at or below the reported detection limits. In particular, samples collected from New Mormon Slough downstream of the discharge pipe that formerly carried runoff from the M&B site were expected to contain traces of PCP or its degradation products because of the documented PCP discharge that occurred in this area in 1977.

**Lateral Extent in Old Mormon Slough**. PCP was detected in samples from OMS-END at a maximum concentration of 120 µg/kg, and in samples from OMS-CPA at a maximum concentration of 5600 µg/kg. Several other chlorinated phenols were detected in samples from OMS-CPA. Chlorinated phenols were not detected in samples from OMS-OWP and OMS-MTH.

**Vertical Extent in Old Mormon Slough**. PCP was detected at concentrations of 40 and 120 µg/kg in the 0 to 0.6 m (0 to 2 ft) and 0.6 to 1.2 m (2 to 4 ft) composites, respectively, in OMS-END. It was not detected in deeper composites. PCP was detected in all composites from OMS-CPA, increasing by two orders of magnitude from the 1.2 to 1.8 m (4 to 6 ft) interval (47 µg/kg) to the 1.8 to 2.4 m (6 to 8 ft) interval (5600 µg/kg). The vertical extent of PCP contamination in OMS-CPA was not fully defined at two sampling locations.

**Sources of PCP Contamination in Old Mormon Slough**. The PCP from 0 to 1.2 m (0 to 4 ft) in OMS-END and 0 to 1.8 m (0 to 6 ft) in OMS CPA was most likely spilled or contained in stormwater discharged directly into Old Mormon Slough from discharge pipes, in addition to the observed seeps from the OWP area. PCP was the major contaminant present in stormwater runoff collected from the onsite stormwater collection ponds (CH2M Hill 1991) and in stormwater discharged directly into the slough prior to the construction of the ponds. In addition, NPDES permit violations for PCP in process wastewater were documented. These sediments also contained elevated levels of dioxin, which was present as an impurity in the PCP.

### 1.2.6 Contaminant Fate and Transport

The M&B site has been inactive for seven years, and contaminant levels in surface sediments are expected to decrease with time (White and Kohn 1996). In the absence of mixing and an ongoing source of contamination, contaminant levels in the surface sediments would gradually decrease as the previously contaminated sediment is buried by naturally occurring uncontaminated deposits. However, solid-phase contaminants may be mixed into the surface sediments by bioturbation and mechanical processes (i.e., boat traffic). Contaminants may also move vertically in the sediment by desorption, transport in porewaters, and subsequent adsorption (porewater diffusion). Bubbles formed as organic matter decays are also a means of vertical transport of contaminants from the sediment through the water column.

The origin, transport, and fate of anthropogenic organic contaminants in sediments from Old Mormon Slough are discussed in the following sections taken from the Surface-Water



Exhibit 17 to the
United States' Motion
DOJ 106

Sediment RI Report. As previously discussed, New Mormon Slough and the SDC do not appear to be adversely affected by contamination from the M&B site. One metal, chromium, occurs in some samples from Old Mormon Slough at concentrations exceeding the SDCR sample; however, the maximum concentration is only 1.4 times the reference.

### 1.2.6.1 Fate and Transport of PAHs

PAHs in Old Mormon Slough sediment are composed primarily of the LPAHs naphthalene, acenaphthene, fluorene, phenanthrene, and anthracene. Fluoranthene and pyrene are the dominant HPAHs. Potential sources of PAHs are spills of site-related chemicals directly into the slough, discharge of stormwater through outfalls, and the past migration of NAPLs from subsurface soils in the OWP area. Most of the sources of contamination to the slough ceased to exist when the site became inactive, with the exception of the OWP area seeps. These seeps were first observed during sampling in 1995, although it is not known when they first began. As noted earlier, they have been addressed and no longer represent a continuing source to the slough.

The physical and chemical properties of PAHs vary with molecular weight (**Table 1.1**). With increasing molecular weight, aqueous solubility decreases, and logs Kow (octanol-water partitioning coefficient) and Koc (organic carbon partitioning coefficient) increase. Therefore, HPAHs are less mobile and more persistent in aquatic environments and they tend to bioaccumulate in aquatic organisms more readily than LPAHs. PAHs that are dissolved in the water column will rapidly degrade by photo-oxidation (EPA 1980a); they can also evaporate or volatilize, disperse in the water column, undergo chemical oxidation, or biodegrade (Suess 1976). PAHs that are incorporated into the bottom sediments may biodegrade, although degradation rates are slow in the absence of radiation and oxygen (Suess 1976). PAHs may persist for long periods of time in anoxic sediments (Neff 1979). Low dissolved oxygen levels due to organic loading in Old Mormon Slough has been reported (NOAA 1993) and evidence of decomposing organic matter in the slough sediments was observed in October 1994 (White and Kohn 1996). Therefore, the PAHs present in the sediments from Old Mormon Slough are expected to persist for a long period of time under the current site conditions.

### 1.2.6.2 Fate and Transport of Dioxin

Dioxins and furans are hydrophobic, lipophilic, and extremely stable under most environmental conditions (Table 1.1). They persist in the environment long after PCP residues degrade (Petreas and Hayward 1994). They resist degradation by oxidation, hydrolysis, or biological activity (Stehl 1973; Miller and Zepp 1987; Arthur and Frea 1989). Photodegradation is the only significant path of destruction in natural environments (Koester and Hites 1992). In most aquatic environments, dioxins and furans are strongly sorbed to particulate and organic matter and are relatively immobile. Thus, their transport in the aquatic environment will occur primarily by the resuspension and migration of contaminated sediment.



Exhibit 17 to the
United States' Motion
DOJ 107

#### 1.2.6.3 Fate and Transport of PCP

PCP readily degrades in aquatic environments. It breaks down by chemical processes such as oxidation and dechlorination, and reductive dehalogenation (Williams 1982; Kaufman 1978). It also readily photodegrades (EPA 1980b). In estuarine sediments, aerobic, and anaerobic microbial degradation was found to be the major PCP breakdown process; tidal transport and photodegradation were minor (DeLaune et al. 1983). In the absence of a continuing source, PCP does not persist for long periods of time in aquatic environments.

#### 1.2.6.4 Sediment Transport Mechanisms

The dominant transport mechanism for contaminants that are strongly bound to sediment particles (dioxins and HPAHs) is the migration of fine-grained sediment. For transport to occur, the contaminated sediments must be resuspended and carried away by tidal currents. The current speeds in sloughs are slow and are probably incapable of eroding the sediments in the absence of other disturbances. Resuspension may be caused by boat wakes and propeller wash, dredging or construction activities, and biological activity (bioturbation, bioaccumulation, and degassing). Wind and wave action is probably insignificant because the slough is protected. Boat traffic is rare in the eastern (stagnant) end of the slough, but barges occasionally use the dredged western portion, which contains the least-contaminated sediment. Consequently, the rate of sediment transport out of Old Mormon Slough appears to be very low. This conclusion is supported by the absence of site-related contamination measured in samples collected near the mouth of Old Mormon Slough and in the SDC nearest the site.

The need for maintenance dredging in the Port of Stockton indicates that it is an area of net sediment deposition. The sedimentation rate depends upon the sediment load of the waters flowing in and out of the slough, the volume of water exchanged during each tidal cycle, and the settling velocity of the suspended sediment (Downing et al. 1987). White and Kohn (1996) estimated an average sedimentation rate of 3.6 cm/yr (1.4 in./yr) in Old Mormon Slough by dividing the average thickness of sediment overlying a marker bed, assumed to be associated with construction of Interstate 5, by the 25 years since its construction.

### 1.2.7 Potential Routes of Exposure

The primary source of risk from the Surface-Water Sediment OU is from contaminated sediments in Old Mormon Slough (White and Kohn 1996; Thom et al. 1997). Contamination in the water column is assumed to be a direct result of these contaminants partitioning into the surface water and as such surface water has not been evaluated separately.



Exhibit 17 to the
United States' Motion
DOJ 108

Baseline human health and ecological risk assessments have been conducted to evaluate the threat posed by contamination at the M&B site (ICF 1996; Thom et al. 1997). The results of these studies as they relate to the Surface-Water Sediment OU are summarized in the following subsections.

#### 1.2.7.1 Findings of the Human Health Risk Assessment

The baseline Human Health Risk Assessment (HHRA) (ICF 1997) primarily addressed the potential human health risks posed by hazardous substances in surface soils and groundwater at the M&B site. Human health risks associated with the Surface-Water Sediment OU that were evaluated in the HHRA focused on the consumption of locally caught fish.

The M&B site and neighboring lands are zoned for heavy industrial uses. The nearest residences are located approximately 150 m (500 ft) to the southwest and west. Additional residences are located approximately 230 m (750 ft) to the southeast and are separated from the site by Interstate 5 and Highway 4. Recreational and subsistence fishing is known to occur in Old Mormon Slough, New Mormon Slough, and in the SDC. In conducting the HHRA, the future land use of the M&B site was assumed to remain industrial. Four potential exposure pathways were evaluated:

- incidental ingestion and dermal adsorption of COCs in surface soils by onsite workers
- inhalation of fugitive dust from onsite surface soils by onsite workers and nearby offsite residents
- incidental ingestion and dermal adsorption of COCs in groundwater
- ingestion of fish by recreational and subsistence fishermen.

Potential receptors addressed in the HHRA were onsite industrial workers, offsite residents, and local fishermen and their families.

**Potential Risks from Soil and Groundwater Contamination**. The greatest excess carcinogenic risk from the M&B site is through exposure of onsite workers to soil contamination via incidental ingestion and dermal adsorption. The HHRA estimated a potential cumulative average and reasonable maximum exposure of 7E-4 and 3E-3, respectively, with TCDD TEQ contributing the vast majority to the carcinogenic risks. PAHs, PCP, metals, and TCDD TEQ have also been detected in groundwater beneath the site in excess of their corresponding MCL. A complete discussion of the human health risks associated with the Soils-Groundwater OU can be found in the HHRA.

**Potential Risks from the Consumption of Fish.** The impact on individuals eating contaminated fish from Old Mormon Slough and the SDC was evaluated using data on chemical concentrations in fish tissue taken from the 1994 Cal/DHS study (Petreas and Hayward 1994). The only site-related contaminants analyzed in local fish tissue from this study were dioxins and furans. The concentrations of TCDD TEQ in both fish fillets and whole body is shown in **Table 1.2**, compared to the CWA-derived fish tissue criterion of 7E-8 mg/kg. Table 1.2 also compares fish tissue concentrations with the Food and Drug Administration (FDA) standards (FDA 1981, 1983). Concentrations of TCDD TEQ in whole body fish samples collected from Old Mormon Slough (in the immediate vicinity of the M&B site) and the END of the SDC exceeded both the FDA Standard of 0.025 μg/kg (2.5E-5 mg/kg) and the CWA-derived fish tissue criterion (ICF 1997), while the concentrations of TCDD TEQ in fish fillets does not exceed the FDA standard. The mean TCDD TEQ concentrations in whole body fish collected during the Ecological Risk Assessment is presented in **Table 1.3** (Thom et al. 1997). These whole body fish concentrations appear to average about one order of magnitude lower than those from the Cal/DHS 1994 study.

**Table 1.4** presents the potential risks associated with the average and maximum TCDD TEQ concentrations observed in fish fillet from the 1994 Cal/DHS study as calculated in the HHRA. The consumption scenarios evaluated in this table assume a residential adult receptor and various consumption rates ranging from 6.5 g/day to a worst-case consumption rate of 200 g/day of fish fillet. Potential risks for subsistence fishing and worst-case scenarios exceed the carcinogenic risk range (1E-4 to 1E-6) considered acceptable by EPA. The average concentration of dioxin in fish tissue collected from Old Mormon Slough (Petreas and Hayward 1994) relates to an additional cancer risk to humans of 8E-4 (assuming a consumption rate of 150 g/day, 350 days/year, for 30 years). The maximum concentration relates to a worst-case risk of 1E-3 (assuming a consumption rate of 200 g/day for the same duration) (ICF 1997). In general, the potential risks associated with consumption of dioxin-contaminated fish are higher for Old Mormon Slough than for the SDC. However, these data alone are insufficient to determine if locally caught and consumed fish pose an unacceptable risk to local fishermen and their families. As noted earlier, fish samples collected for the ERA had TCDD TEQ concentrations one order of magnitude lower than those used for the HHRA. Thus, there is some uncertainty regarding the representativeness of the fish data used in the HHRA. These uncertainties include the degree of fish mobility, the method of collection, the distribution of fish sizes, ages, and species evaluated relative to the sizes, ages, and species caught and consumed by local fishermen, and the link between contaminant concentrations in fish and the concentrations of contaminants observed in Old Mormon Slough sediments (ICF 1997).



Exhibit 17 to the
United States' Motion
DOJ 110

### 1.2.7.2 Findings of the ERA

Because there are no known threatened or endangered terrestrial species and no sensitive terrestrial habitats at or in the vicinity of the M&B site, a screening level ecological assessment only was conducted for the upland portion of the site. No terrestrial impacts were identified related to the M&B site.

A full-scale ERA was performed for the aquatic ecosystem to determine whether contamination from the M&B site was affecting food web integrity and productivity (Thom et al. 1997). The exposure, effects, and risk from the COCs to the aquatic ecosystem were investigated. The receptor species of interest consisted of two resident fish, bluegill and white catfish, and two fish-eating birds, great blue heron and double-crested cormorant. Exposure was measured through analysis of COCs in surface sediments and tissues of fish, crayfish, and oligochaete worms. Effects were established through sediment toxicity tests with benthic invertebrates (an amphipod and larval insect), prediction of sediment toxicity based on COC concentrations in sediments, and prediction of toxicity to fish and birds based on measured or estimated COC body burdens. The presence of risk was assessed by comparing exposure and effects data for Old and New Mormon Sloughs with similar data for reference sites in the SDC and the San Joaquin River, and with published benchmark risk values. The relative degree of risk was assessed by a "weight of evidence" approach for each endpoint in which the level of exceedance of reference and benchmark values, data quality, and level of uncertainty were considered.

**Table 1.5** presents a summary of the ecological risk posed by each class of COC relative to the threshold for each assessment endpoint (Thom et al. 1997), while **Table 1.6** summarizes the relative ecological risks for each of the surface-water bodies and reference areas. The results from this study support the conclusion that ecological risk is greatest from contamination in Old Mormon Slough. In general, sediment contamination was greatest in the END, CPA, and the OWP areas of Old Mormon Slough. Contaminant concentrations were much lower near the mouth of the slough. PAHs were found to pose the greatest risk to all assessment endpoints, and threshold limits for PAHs were exceeded principally for fish and benthic fauna. Dioxins were estimated to be a potential low risk to birds and fish. Metals were not found to be a risk factor to any of the assessment endpoints. While some risk to receptor species was attributed to the presence of PAHs and dioxins, and possibly PCP, in surface sediments, there is no evidence of widespread impact to the aquatic ecosystem. However, Old Mormon Slough is a dead end slough that is not well flushed by river or tidal action, and thus, contamination in Old Mormon Slough sediment is likely to persist for a long time.

New Mormon Slough and the SDCR were less contaminated and posed less risk; however, both were contaminated relative to the San Joaquin River reference. Although ecological risk to aquatic communities from contamination in Old Mormon Slough is attributable to the



Exhibit 17 to the
United States' Motion
DOJ 111

M&B site, it is much more difficult to attribute contamination (and risk) in New Mormon Slough and the SDC to the M&B site, for reasons discussed in Subsection 1.2.5.

Several approaches were used in the ERA to estimate maximum sediment concentrations (MSCs) of COCs that were predicted to cause no adverse effect to receptor species. The use of equilibrium partitioning models that predict toxicity to aquatic biota was found to be the most useful approach. **Tables 1.7 through 1.10** provide estimates for (dry weight normalized) MSC of COCs that are predicted to be protective of aquatic biota based on literature values and toxicity tests reported in the HHRA. **Table 1.11** provides a comparison between the MSC and the measured concentrations of COCs in Old Mormon Slough. In the END and off the CPA of Old Mormon Slough, TCDD TEQ concentrations were approximately 30 to 50 times higher than the site-specific MSCs. In the vicinity of the OWP, sediment LPAHs were nearly 80 times higher than the estimated site-specific MSC. Whether a sub-area-specific MSC or a conservative MSC for the entire cleanup area is used, the COC with the highest magnification above the MSC could thus become the driver for setting cleanup criteria that are protective of the aquatic biota in the surface-water OU.

#### 1.2.7.3 Conclusions

Since Old Mormon Slough is not used for recreational purposes, potential risks to humans related to the Surface-Water Sediment OU are primarily through the ingestion of dioxin-contaminated fish taken from Old Mormon Slough and nearby waters. Fish accumulate contamination in their tissues through contact with the sediment and water, gill uptake from the water column, and ingestion of water and contaminated prey. Potential risks for subsistence fishing and worst-case scenarios exceeded the 1E-4 to 1E-6 acceptable risk range (ICF 1997).

A second potential pathway to humans related to the Surface-Water Sediment OU is the migration of contaminated sediments in Old Mormon Slough to groundwater beneath the site. Recharge of the A-Zone aquifer is believed to occur along the length of the slough, thereby providing a driving force for contaminant movement. However, concentrations and total mass of COCs in deep sediments are extremely low relative to the major source areas identified at the OWP area and the CPA in the upland portion of the site. In any event, because Old Mormon Slough is located upgradient from the main groundwater contamination plume, any contribution of contaminants from the deep sediment is expected to be captured by the network of groundwater extraction wells that will be designed to address the major groundwater plume emanating from upland sources.

The primary ecological risks posed to receptor species (e.g., catfish, aquatic avifauna) are from the occurrence of PAHs and dioxins, and to a lesser extent, PCP, in the sediments of Old Mormon Slough. The current levels of dioxins in the surface sediments adjacent to the CPA are 30 to 50 times higher than the site-specific MSC predicted to cause no adverse effects

to aquatic biota (Thom et al. 1997). The concentrations of PAHs near the OWP were nearly 80 times higher than the site-specific MSCs. Metals were not found to be a risk factor to any of the assessment endpoints.

Although site-related COCs (and their associated human health and ecological risks) have been detected in both Old and New Mormon Sloughs and along the south edge of SDC, only those contaminants found in Old Mormon Slough are directly attributable to the M&B site. The majority of contamination found in New Mormon Slough appears to be from sources other than the M&B site because concentrations are generally highest at the background location (upstream from the M&B outfall) (White and Kohn 1996). Both New Mormon Slough and the SDC receive input of chemical contaminants from industry, shipping, runoff from streets and highways, and stormwater discharges. The ratios of specific contaminants/congeners found in these surface waters are not consistent with those found in areas known to have been impacted by the M&B site (White and Kohn 1996).

These other sources of contamination to New Mormon Slough and the SDC are likely to have overwhelmed the COC contributions from M&B (Thom et al. 1997). In addition, New Mormon Slough received stormwater discharge from the M&B site for a period of only eight years; it was combined with discharges from other sources in the area before entering New Mormon Slough, and no runoff from the M&B site has entered New Mormon Slough since 1978.

In regard to the movement of contamination out of Old Mormon Slough into the SDC, White and Kohn (1996) describe the rate of sediment transport out of Old Mormon Slough as very low, with a net sedimentation rate estimated at 3.6 cm/yr (1.4 in./yr). This rate would bury and stabilize the contamination in place, rather than transport it outside of Old Mormon Slough. Sediments along the southern edge of SDC near the mouths of Old and New Mormon Sloughs does not appear to be affected by contaminants from the M&B site. Thus, the focus of this feasibility study is directed at potential response actions for remediation of Old Mormon Slough, where contaminant concentrations and risks are the greatest, and directly attributable to the M&B site.

If sediment contamination in Old Mormon Slough is not addressed, it will continue to present a risk to ecological receptors, and to human receptors who consume significant quantities of certain fish species. Although no direct ecological risks have been identified for the upland (Soil-Groundwater OU) portion of the M&B site, potential human health risks have been identified related to soil and groundwater contamination in that OU. If not addressed, contaminated soil and groundwater will continue to represent potential risks to site workers and nearby residents. Remedial actions to address the potential exposure pathways related to soil and groundwater are evaluated in the FS report for the Soil-Groundwater OU and are not discussed in this report, except where areas of overlap are noted.



Exhibit 17 to the
United States' Motion
DOJ 113




**Figure 1.1.** Location of McCormick & Baxter Superfund Site, Stockton, Californa




**Figure 1.2.** Old Mormon Slough and the McCormick & Baxter Site



Exhibit 17 to the
United States' Motion
DOJ 115




Figure 1.3. New Morman Slough







Exhibit 17 to the
United States' Motion
DOJ 116




**Figure 1.4.** Bathymetry of Old Mormon Slough and Stockton Deepwater Channel







Exhibit 17 to the
United States' Motion
DOJ 117




**Figure 1.5.** PAHs in Sediment Samples from Old Mormon Slough (after White and Kohn 1996)







Exhibit 17 to the
United States' Motion
DOJ 118




1998/DCL/OMS/002

**Figure 1.6.** PCDD/PCDF I-TEQs in Sediment Samples from Old Morman Slough (after White and Kohn 1996)

Exhibit 17 to the
United States' Motion
DOJ 119

# 4.0 DEVELOPMENT OF REMEDIAL ALTERNATIVES

The purpose of this section is to assemble, based on the screening of technologies and process options conducted in Section 3.0, a set of remedial action alternatives applicable to Old Mormon Slough sediments. The NCP (Section 300.430[e][1]) states that the lead agency shall include an alternative screening step (using the criteria of effectiveness, implementability, and cost) when needed to select a reasonable number of alternatives for detailed analysis. Because a reasonable number of sediment alternatives (i.e., five, including No-Action) were developed, this FS report proceeds directly from a description of the sediment alternatives in this section to their detailed analysis in Section 5.0 without a preliminary screening step.

Preliminary design assumptions were developed for each alternative, such as the extent and volume of contaminated material, the size of major technologies/process options, the time frames involved, and an estimated order-of-magnitude (+50% to -30%) cost. The design assumptions used here are not necessarily the same as the design basis that would be used for the final, detailed remedial design. In most cases, additional investigations or studies (e.g., treatability tests) would be necessary to allow final design.

It should be noted that there are some areas of overlap between the potential remedial actions for Old Mormon Slough sediments and for upland soils. Similar ex situ treatment and/or disposal technologies have been evaluated for both media. For cost-effectiveness during site remediation, implementation of similar treatment technologies, if selected for soil and sediment, would likely be carried out concurrently. However, remedial costs have been estimated separately for sediment and soil; soil remediation costs are not included in this FS report.

As noted earlier in this report, sediment contamination in Old Mormon Slough may represent a source to groundwater contamination beneath the site, although to a much lesser degree than the deep upland source areas. No direct evidence has been found that slough sediments are contributing to groundwater contamination at the M&B site; however, the sediments are considered a potential source to groundwater. If contaminated sediments are left in place and capped rather than removed, they could continue to serve as a source to groundwater, although the effect would be somewhat reduced because of the overlying cap. However, concentrations and total mass of COCs in deep slough sediments are low in relation to the significant upland sources that have been identified at the OWP and CPAs, which represent the primary sources to groundwater contamination. In any event, because Old Mormon Slough is located upgradient from the main groundwater contamination plume, any contribution of contaminants from the sediment is expected to be captured by the network of groundwater extraction wells that will be designed to address the major groundwater plume emanating from the upland sources. For this reason, groundwater remediation is not included in the scope of this FS report. The evaluation of alternatives for the remediation of groundwater at the M&B site is found in the Soils-Groundwater OU FS report (ICF 1998).



Exhibit 17 to the
United States' Motion
DOJ 120

## 4.1 DEVELOPMENT OF REMEDIAL ACTION ALTERNATIVES

Remedial alternatives, with the exception of No-Action, are developed to be protective of human health and the environment and to achieve RAOs to the extent practicable. The NCP requires that a range of alternatives be developed for source control actions such as those being considered for Old Mormon Slough sediments. The assembled alternatives represent different levels of control and risk reduction and are required to include

- a No-Action alternative, representing a baseline case, that does not include any action towards achieving site RAOs

- one or more alternatives that involve little or no treatment, but protect human health and the environment through the use of institutional controls and/or engineering controls

- one or more alternatives that use treatment to reduce the toxicity, mobility, or volume of contaminants. If appropriate, the range of alternatives should include an alternative that removes or destroys contaminants to the maximum extent feasible in order to eliminate or minimize the need for long-term site management. Other appropriate alternatives should treat the principal threats posed by a site, but vary in the degree of treatment employed and the quantities and characteristics of the treatment residuals and untreated waste that must be managed.

As identified in Section 3.0, the RAOs for the M&B site can be achieved by a number of GRAs including: isolating the contamination, treating it in place, removing and treating the contaminated sediment ex situ, or removing and disposing of the contaminated sediments. The technologies and process options that were retained from the initial screening conducted in Section 3.0 have been assembled into five remedial action alternatives:

- SD-1 - No-Action

- SD-2 - In Situ Capping

- SD-3 - Dredging and Confined Disposal (combined with limited in situ capping)

- SD-4 - Dredging and Offsite Disposal (combined with limited in situ capping)

- SD-5 - Dredging and Onsite Treatment (Solvent Extraction and S/S) (combined with limited in situ capping).

Although the use of institutional controls was considered, it was not developed as a stand-alone alternative for sediment because it would not meet the RAOs for protection of the environment. In addition, unlike the upland portion of the site, implementation of institutional



Exhibit 17 to the
United States' Motion
DOJ 121

controls is difficult for an aquatic environment. However, implementation of institutional controls was retained as a component of the other alternatives that involve containment or treatment.

## 4.2 COMMON ELEMENTS

Many of the components of individual alternatives are common to other alternatives, such as the use of institutional controls, monitoring, capping, dredging, silt curtains, and dewatering. These common elements are discussed in the following subsection to eliminate repetition in the discussion of individual alternatives.

### 4.2.1 Institutional Controls

Institutional controls would be used to restrict access to Old Mormon Slough, thereby reducing human exposure to contaminated fish and sediment. However, institutional controls would not meet the RAOs for protection of the environment, and so are not considered as a stand-alone alternative. At present, fencing and warning signs are already in place along the M&B shoreline of Old Mormon Slough. Under the No-Action alternative, these existing controls would remain but would not be maintained. Under all the other alternatives, the existing fencing and warning signs would be maintained and improved if necessary. In addition, other institutional controls, including proprietary and governmental controls, notification requirements, and physical controls would be included to some extent as a component of each remedy.

The use of additional institutional controls is dependent on the specific alternative, but could include all or portions of the following activities as a means for controlling exposure from the low-level threat area near the mouth of Old Mormon Slough that will not be addressed by capping or removal under any of the alternatives. These controls are directed primarily at reducing the potential for resuspension and transport of contaminated sediment found in localized "hot spots," as discussed in Subsection 2.2.1, while sediment accumulation and other natural attenuation processes reduce the exposure to and/or the contaminant concentrations of these hot spots (see Appendix A).

The two apparent "hot spots" near the mouth of the slough, one exceeding the MSC for PAHs at OMS-61 (see Figure 2.2) and the other exceeding the MSC for dioxin at OMS-60 (see Figure 2.3), are located in the uppermost sediments and so are not considered to pose a threat to groundwater. These "hot spots" represent less than 0.3% of the total PAH and only 2% of the dioxin mass in the slough sediments. There is no obvious spatial continuity between these high values and the surrounding values; thus, these values are unlikely to represent an area of contamination that could be located again. Such "hot spots" are extremely difficult to define in an aquatic environment for implementation of any active remedial action such as capping or dredging. Applying containment or dredging to the entire MTH portion of the slough for the sole purpose of remediating these two localized, low-level threat areas is not warranted based on the degree of risk reduction expected versus the anticipated remedial cost. Therefore, the only



Exhibit 17 to the
United States' Motion
DOJ 122

feasible GRA for the mouth area of the slough is to use institutional controls to control access to and limit the types of activities conducted in this area of Old Mormon Slough.

Specific institutional controls for the mouth area of Old Mormon Slough include the installation of a log boom and warning signs across the mouth of the slough to limit or restrict navigational access to the slough. This would prevent inadvertent erosion (via boat prop wash) and resuspension of the surface sediment (and "hot spots"). Deed notices would be promulgated to keep the site zoned for appropriate industrial and/or commercial uses only and to prohibit dredging in the slough without further study, use of proper controls (e.g., silt curtains, proper disposal and/or treatment of dredged material), or remediation. Environmental monitoring would be conducted to assess the progress of natural attenuation processes.

Under all of the sediment alternatives, except No-Action, similar institutional controls might be implemented for the other portions of Old Mormon Slough to prevent inadvertent erosion or other disruption of in situ sediment cap materials that would cause exposure of more highly contaminated older sediment. In addition, access controls (i.e., log booms, additional fencing, and warning signs to fully encompass the areas of principal and low-level threats) might be added under the other alternatives to reduce human exposure to contaminated sediment and fish by restricting access to the slough.

### 4.2.2 Monitoring

Monitoring is included as a component of all remedial action alternatives, including the No-Action alternative. Monitoring is generally conducted for both short-term (during remediation) and long-term (post-remediation) purposes. Short-term monitoring is conducted to 1) detect any negative impacts of the remedial actions, thereby allowing prompt mitigation; 2) evaluate the performance of the remedial action for comparison to design expectations; and 3) identify operation and maintenance concerns that need to be addressed to optimize remedial performance. Long-term monitoring is conducted primarily to allow timely maintenance of containment measures and to ensure that remedial actions are effective in achieving RAOs over the long term.

A general description of appropriate monitoring activities is presented here and a conceptual monitoring program is presented in **Table 4.1**. However, specific details of a monitoring program are dependent on the selected remedial action(s). Detailed monitoring plans will be developed for the selected remedial actions during the remedial design phase. In general, monitoring would begin with intensive efforts to establish the environmental baseline and to monitor active remedial measures. Following the construction and active remediation activities, the level of monitoring would be reduced to support long-term performance assessment of the remediation. Both physical and chemical monitoring would be performed to assess site conditions and monitor the fate and effects of residual contamination.



Exhibit 17 to the
United States' Motion
DOJ 123