Short-term monitoring would include sediment, water, and biota sampling and analyses. Sediment sampling would be conducted to more precisely define heavily contaminated areas for dredging (if applicable) and/or capping. Monitoring would also be performed during dredging and/or cap placement to evaluate the short-term effects on water quality and adjacent sediment quality and to ensure that the dredging and/or capping meet specifications for location, depth or thickness, material design, final bottom topography, etc. Biological monitoring would be performed to assess the short-term biological effects of dredging and/or capping, to assess the re-establishment of a healthy benthic community and ensure that biological activity will not damage the cap integrity.

Long-term monitoring would include sediment, water and biological sampling, and chemical analyses to monitor the long-term stability and natural degradation of residual contamination. This would include sediment core sampling and chemical analyses. Capped surfaces would be monitored for maintenance requirements to identify areas of scouring or suspension and redeposition, thereby identifying areas requiring additional cap materials or armoring. The cap surface would be sampled and analyzed to determine if adjacent uncapped areas are contaminating the cap. Sampling and analysis of water samples from Old Mormon Slough would determine compliance with EPA AWQC and other ARARs. Periodic biological monitoring would be conducted for comparison with the California State Mussel Watch program standards. Uncapped areas would be sampled and analyzed (both sediment and biota) to monitor the progress of natural attenuation.

### 4.2.3 Sediment Capping

Sediment capping is used to physically cover and isolate contaminated sediment. All of the sediment remedial alternatives (except No-Action) employ sediment capping to varying degrees to isolate PAH and dioxin-contaminated sediment from the ecosystem. A general discussion of design assumptions is presented here. Details for each alternative are provided in later subsections.

Capping would be performed using locally quarried clean fine sand as the cap material. An armored multilayer cap was also considered during the screening process in Section 3.0. However, the capital cost to install an armored cap was estimated to be two to three times that of the natural cap (EPA 1992), and conditions in Old Mormon Slough do not warrant an armored cap for the entire slough area. The quiescent nature of the slough, with limited erosion and net deposition of sediment, as well as the lack of navigational traffic, suggests that an armored multilayer cap is unnecessary. Localized armoring of the cap (with rip-rap and an underlying gravel filter layer) would be installed in areas found to be susceptible to erosion, based on data (such as nearshore wave action, bottom velocities, and barge/boat traffic patterns and frequencies) acquired during remedial design. For these reasons, a sand cap was selected as the representative in situ capping technology for the development of alternatives.



Exhibit 17 to the
United States' Motion
DOJ 124

Installation of the cap would be conducted when the tides are lowest and are incoming to ensure containment of any disturbed sediment and to prevent the release of contamination outside of the slough. Minimal preparation of the slough bed (removal of rubble, pilings, etc.) would be performed prior to installation of the cap. Thickness of the cap would be a minimum of 0.6 m (2 ft), which conservatively accounts for chemical, biological, and operational (i.e., placement accuracy and thickness irregularity) characteristics (**Table 4.2**). The cap would cover the entire targeted portion of the slough bottom. The use of a permeable sand cap would promote the re-establishment of a benthic community, yet bioturbation is estimated to be limited to the upper 2 cm of the cap material and thus would not affect the integrity of the cap. The permeable sand cap would also permit any gases formed during decomposition of organic mater to escape. A 10% safety factor is used in estimating the volume of material required.

### 4.2.4 Sediment Dredging

Three alternatives employ the use of selective dredging to remove the most heavily contaminated sediment from the slough and to reduce the mass of contamination available for bioaccumulation in the aquatic organisms. The areas identified for contaminant removal (dredging) vary, ranging from the portion of the slough just north of the OWP area to the END of the slough. Both mechanical and hydraulic vacuum dredging passed the technology screening process. However, mechanical dredging was selected as the representative process option because hydraulically dredged material would have a very high water to solids ratio (~5:1), which would make sediment handling, treatment, and/or disposal more difficult and costly.

The sediment to be dredged from Old Mormon Slough has been described as stratified clay, silt, and sand (White and Kohn 1996). The uppermost material in the OWP, CPA, and END sections of the slough consists of very soft, very dark gray to black homogeneous clayey silt ranging in thickness from 0.4 to 1.2 m (1.4 to 3.8 ft). Gas holes were commonly observed in core samples. Gravel fill was found at or near two of the sampling stations. Throughout the CPA and END sections this clayey silt is underlain by sticky, very soft dark gray clay, ranging in thickness from 0.3 to 0.7 m (0.9 to 2.2 ft). The TOC content of these upper sediments ranges from about 2.5 to 0.7%. The clayey silt and sticky gray clay units are underlain by soft to firm, very dark gray or dark olive gray silt, sand, and clay. These sediments are predominantly silt at the eastern end of the slough and sand at the western end. They contain some plant remains (roots and twigs). Buried trees that had apparently fallen into the slough were encountered at two sampling locations. A sharp contact separates these soft to firm alluvial sediments from an underlying hard, dry, dark gray to olive brown silt or silty clay at 3.0 to 6.4 m (9.7 to 20.9 ft) below mudline in the CPA and END portions of the slough, respectively.

Dredging would be conducted using a derrick barge and cable arm clamshell bucket to provide a level cut and to minimize turbidity (Chemical Waste Management, Inc. 1996). Sediments removed by the bucket would be placed into the barge or a scow. When the scow was loaded it would be moved to the designated offload point(s) (i.e., the CDF or the dewatering



Exhibit 17 to the
United States' Motion
DOJ 125

cells) and the dredge materials mechanically removed, either by positive displacement pump or clamshell. Any debris encountered during dredging would be placed in a holding area of the site for salvage or disposal. Free liquids in the scow would be pumped to a series of holding/settling basins where they would be treated and managed. Dredging would be conducted during incoming tides and on the upstream side of a silt curtain to contain any suspended sediment. Dredging would progress on a grid-by-grid pattern starting at the western end of the slough (in the MTH section) and working back and forth toward the END of the slough. This would keep undredged portions of the slough in front of the dredge crew and would minimize the spread of contamination to clean areas.

The estimated depth of dredging ranges from 0.6 to 2.4 m (2 to 8 ft), although contaminated sediment has been found at depths greater than 6 m (20 ft) at two locations in the CPA and END portions of the slough (**Table 4.3**). Thus, the maximum depth of contamination has not been defined for these locations. In any event, dredging to depths greater than 2.4 m (8 ft) in the slough is generally not considered practicable due to the instability of the sediments and high associated costs. Actual dredging depths will be adjusted during remedial design and field implementation. A 10% over dig factor is assumed to ensure complete removal of the target contamination. A bulking factor of 20% has also been assumed to account for expansion during the removal and handling process.

### 4.2.5 Silt Curtains

All three dredging alternatives employ the use of a silt curtain to prevent transport of sediment disturbed by dredging activities. The silt curtain would be erected across the mouth of Old Mormon Slough prior to dredging. This curtain would remain in place until removal of contaminated sediments is completed and the water turbidity has subsided to an acceptable level. However, there may be a need to move the silt curtain, once dredging has been completed in the lower (western) portion of the slough, to allow barge traffic into this area.

The curtain would be designed and placed to capture sediments generated during dredging activities, yet not be affected by tidal surges, wind waves, or wakes. A conceptual design for this curtain was taken from Chemical Waste Management, Inc. (1996). The curtain would extend from the water line down to the bottom of the slough and would be held in place by ropes to the shorelines, chains and anchors to the bottom, and a floating boom on the top. The estimated dimensions of the curtain are 73 by 10 m (240 x 34 ft). The detailed design would be developed during remedial design. A second curtain may be used to filter water escaping from the CDF under that alternative.

The curtain(s) would be monitored periodically (~3 times per day) to ensure that no tears or breaches have developed. Any tears or holes discovered in the silt curtain will be immediately repaired.



Exhibit 17 to the
United States' Motion
DOJ 126

### 4.2.6 Sediment Dewatering

Dewatering is a physical treatment technology used to reduce the moisture content of dredged sediment. The reduction in moisture content is necessary to enable handling and transport of the dredged material and to increase the efficiency of the treatment processes (particularly incineration). Both the offsite disposal and onsite treatment alternatives require some level of dewatering.

Four main process options are generally available to dewater solid waste streams: centrifugation, drying beds (gravity drainage), drying lagoons (percolation basins), and filtration (Delta Research Corporation 1996). Filter presses generally produce the driest filter cake, but are labor-intensive, generally operate in batches, and require regular maintenance (PNNL 1995). Vacuum filtration is effective at removing liquids in a continuous process. However, it is limited by the pressure drop induced across the filter and operating expenses are high. Centrifugation can also be performed in a continuous operation, but operating costs are high. Gravity drainage is the simplest dewatering technology process and has the lowest capital, operation, and maintenance costs. However, it generally produces the wettest filter cake, has the largest space requirements with the lowest throughput capacity. A chemical conditioner is often added to assist coagulation of the very fine sediment particles to improve yield and clarify the supernatant.

Recent experience at the United Heckathorn Superfund site indicates that gravity drainage of silty/clay materials can be an extremely slow process and can hold up large volume dredging operations. To increase the throughput at this site dewatering was supplemented with solidification technology (addition of sodium silicate and Portland cement). This simply ties up the moisture content in water of hydration making the sediment fairly dry and easier to handle and transport. However, this water of hydration can adversely affect the efficiency of thermal treatment processes. Thus, for this FS a combination of gravity drainage and filter pressing (i.e., belt filter press, recessed plate, and/or diaphragm plate filters) has been chosen as the representative dewatering technology process option. Recessed plate or diaphragm plate filters generally achieve the maximum solids content of mechanical dewatering processes (EPA 1994). The belt filter press was selected as the representative filter press option because more design and cost information is available.

Dredged sediment to be dewatered would be transferred from the scows using a clamshell bucket or positive displacement pump, mixed with a chemical conditioner (e.g., lime) to assist coagulation, and placed into a series of unlined holding/dewatering cells. Here, gravity drainage, percolation, and evaporation would partially dewater the sediment. The holding/dewatering cells would be designed such that a maximum amount of water will drain from the sediments as soon as possible. Once the sediments have been drained of free liquid they would be screened to remove oversize material and debris to produce a uniform feed material and conveyed to the filter press for further dewatering. The extent of dewatering that is



Exhibit 17 to the
United States' Motion
DOJ 127

necessary is dependent on the choice of treatment/disposal options. The dewatered sediment would then be transferred to an onsite holding area for further treatment (e.g., solvent extraction) or placed directly into shipping containers for offsite disposal.

The recovered drainage water would be channeled to a collection cell where the water would be processed through a series of cascading settling tanks. The drainage would then proceed to hydrocyclone where it would remove suspended solids prior to draining back into the slough, upstream of the silt curtain. The strong sorption capacity and low water solubility of the primary COCs (PAHs and dioxin) suggests that most of the contamination would be associated with fine sediment particles and thus would be removed by filtering. The filtered water would be discharged back into the slough behind the silt curtain. A treatability test would be performed to ensure that the filtered water would meet acceptable criteria (e.g., AWQC) before discharge into the slough. If it does not, then carbon adsorption could be added to the treatment train to further treat the water. The cost for this added treatment is expected to be minor relative to the overall cost of the offsite disposal or onsite treatment alternatives, so it has not been calculated. Recovered solids would be transferred back to the holding/dewatering cells.

Assuming a dredging rate of 1530 $m^3$/day (2000 cy/day) over an 8 h shift (Section 3.4), the dewatering system should be sized to handle this same volume over a 24 hr shift. Approximately five holding/dewatering cells would be constructed to hold 1530 $m^3$ (2000 cy) each, allowing 5 to 7 days for gravity drainage (**Table 4.4**). The filter press system would be designed to handle 77 $m^3$/hr (100 cy/hr), with operations around the clock (24 hrs/day), and allowing for 20% maintenance/downtime.

## 4.3 DESCRIPTION OF SEDIMENT REMEDIAL ACTION ALTERNATIVES

This section provides a description of each alternative developed for detailed analysis. The alternative descriptions identify the technologies, describe the representative process options, and present the design assumptions necessary to complete the detailed analysis. Information on the assumptions and calculations used in the estimation of sediment volumes for each alternative is provided in Appendix B. A detailed cost estimate for each alternative is provided in Appendix C.

### 4.3.1 SD-1 - No-Action

Under this alternative, the site would be abandoned as is, without any additional access controls or remedial actions to reduce the exposure to and/or toxicity of the COCs. A No-Action alternative would be taken to address the sediment contamination or the affected environmental receptors. This alternative does not actively reduce risks to human health and the environment related to contaminated sediment and aquatic organisms. However, over time some natural attenuation would gradually occur through deposition of new uncontaminated sediments and biological degradation of the organic contaminants. This alternative would not meet the RAOs,



Exhibit 17 to the
United States' Motion
DOJ 128

but is retained for comparison with the other alternatives. The only cost associated with this alternative would be for sediment and biota monitoring.

### 4.3.2 SD-2 - In Situ Capping

The In Situ Capping alternative seeks to meet the RAOs by isolating contaminated sediments in the principal threat areas by blanketing them with a minimum of 60 cm (2 ft) of clean sand. Approximately three-fourths of the slough would be capped with clean, fine sand to isolate a preponderance of the PAH- and dioxin-contaminated sediment from the ecosystem. As discussed in Section 4.2.3, the sediment cap would consist of a minimum of 60 cm (2 ft) of clean, fine sand. These cap materials would be armored with rip-rap and gravel filter layer where needed to prevent erosion. The portion of the slough to be capped would run from just north of the OWP area, between sampling stations OMS-58 and OMS-59 to the END of the slough (**Figure 4.1**). The dimensions of the cap, based on rough drawings from White and Kohn (1996), are estimated at approximately 710 m (2330 ft) long by approximately 51 m (167 ft) wide. This cap would cover an estimated 3.6 hectares (8.8 acres) (**Table 4.5**). This portion of the slough contains nearly all of the PAH and dioxin concentrations exceeding the preliminary sediment cleanup levels and accounts for an estimated 99.5% of the mass of accessible (œ2.4 m [œ8 ft] deep) PAH contamination and 98% of the mass of dioxin contamination. The estimated volume of clean, fine sand needed for cap material (including a 10% safety factor) is estimated at 23,900 $m^3$ (31,200 $yd^3$).

A sand cap was selected as the representative in situ capping technology for Old Mormon Slough (see Subsection 4.2.3). However, localized armored capping may be necessary in areas of the slough susceptible to erosion. Two scenarios were used to estimate Alternative SD-3 costs. The expected cap is assumed to be a 90% sand/10% armored cap combination; for comparison purposes a cost estimate for a full armored cap was also prepared (see Appendix C).

As noted earlier, two apparent "hot spots," one of PAH contamination and one of dioxin contamination, are located in the mouth of the slough outside of the proposed capped area. As with all of the other alternatives, remediation of these two hot spots would be limited to the use of institutional controls to limit navigational access to the slough, provide more fencing and warning signs to fully encompass the area(s) of principal and low-level threats, limit the future use of Old Mormon Slough and the upland portion of the site to appropriate uses, and control future dredging of the slough to prevent disturbance of residual sediment contamination in the mouth of the slough. Environmental monitoring would be conducted to assess the progress of natural attenuation processes for these two "hot spots."

Under Alternative SD-2, similar institutional controls would be implemented for the capped portion of Old Mormon Slough (OWP, CPA, and MTH) to prevent inadvertent erosion or other disruption of in situ sediment cap materials that would cause exposure of more highly



Exhibit 17 to the
United States' Motion
DOJ 129

contaminated sediment under the cap. Short-term and long-term monitoring would be performed to assess the integrity and maintenance needs of the confined disposal facility and sediment cap.

Isolating the sediment COCs through capping would eliminate exposure to water column organisms and, over time, reduce concentrations in the fish population, including those species consumed by humans. The use of institutional controls as part of the overall slough remediation (see Subsection 4.2.1) would provide additional protectiveness. Access restrictions at Old Mormon Slough would reduce human exposure to contaminated fish and sediment until concentrations have been reduced to safe levels. Although capping would adversely affect existing benthic organisms, recolonization is expected to occur. This alternative does not directly address the potential migration of contamination from slough sediments into groundwater beneath the site, although the cap would be somewhat effective in reducing the migration via infiltration.

### 4.3.3 SD-3 - Dredging and Confined Disposal Alternative

This alternative was developed to meet RAOs by removing and consolidating a preponderance of the PAH and dioxin contamination and isolating it in a confined disposal facility. Alternative SD-3 consists of the following combination of technologies/process options:

- selective removal of heavily contaminated sediment via mechanical dredging
- use of a silt curtain to contain disturbed sediment within Old Mormon Slough
- disposal of dredged materials into a CDF behind sheet piling, located at the END of the slough
- capping of residual contamination after dredging (either OWP/CPA cap or CPA cap only)
- institutional controls (e.g., access controls, deed restrictions) and monitoring.

A discussion of those components that are common to more than one alternative (i.e., institutional controls, capping, dredging, silt curtain, and monitoring) was provided in Section 4.2.

A silt curtain would be erected across the mouth of Old Mormon Slough and contaminated sediments from designated principal threat areas would be removed via dredging and transferred to a CDF constructed in the END of the slough. Mechanical dredging would be conducted to remove contaminated sediment from the principal threat areas of the slough, starting at a small portion of the eastern MTH subarea to the END of the CPA portion, where the CDF would begin (**Figure 4.2**). This portion of the slough contains nearly all of the PAH



Exhibit 17 to the
United States' Motion
DOJ 130

and dioxin concentrations that exceed the preliminary sediment cleanup levels, except those located in the confined disposal area and the two hot spots located in the mouth of the slough.

The dimensions of the dredge area, based on rough drawings in White and Kohn (1996), is estimated to be a 406 m (1340 ft) long by 55 m (180 ft) wide (Figure 4.2, Table 4.7). Dredging would extend to a depth of 0.7 m (2.2 ft) in the principal threat area of the MTH and to 2.7 m (8.8 ft) (the maximum practical depth) from all but the eastern-most 69 m (225 ft) of the CPA. This incorporates a 10% overdig to ensure complete removal of the target contamination. The resulting volume of dredged sediment is estimated to account for 70% of the mass of the accessible (top 2.4 m [8 ft]) total PAH contamination and 47% of the dioxin contamination (see Appendix B). The rest of the END of the slough (containing another approximately 35% of the PAH and 51% dioxin contamination) would be used for a CDF and thus would not be dredged. Dredging would remove an estimated 55,400 $m^3$ (72,500 $yd^3$) of contaminated sediment. Expansion during removal and handling (using a bulking factor of 20%) would produce an estimated 66,500 $m^3$ (87,000 $yd^3$).

A CDF in the slough is preferable to an upland disposal facility because sufficient capacity is not available upland and because disposal of sediments there could interfere with the expected soil and groundwater remediation. CDFs are commonly used for dredged material (Lincoff et al. 1994). In this disposal option a CDF would be constructed in the eastern-most 293 m (960 ft) of the slough occupying all of the END and the eastern-most 69 m (225 ft) of the CPA portions. This would result in an estimated disposal capacity of 74,300 $m^3$ (97,200 $yd^3$). This CDF would be constructed by installing sheetpiling across the slough and lining the inside of the sheet wall with high-density polyethylene or similar material. This structural wall would require an adequate foundation (deep installation, estimated at twice its height), tie backs, support pilings, anchor pilings, etc.

Contaminated sediment located within the CDF would remain in place (not dredged). Surface water retained in the CDF would be allowed to escape back into the slough through a silt curtain and overflow weir, as the remaining storage capacity of the CDF was filled with contaminated sediment from dredging operations. Dredged material would be filled to within approximately 0.6 m (2 ft) of the upland ground surface. After a period of consolidation the dredged material would be capped with a permeable geotextile fabric and an estimated 0.6 m (2 ft) of clean fill. Wick drains could be installed to reduce consolidation time (EPA 1994).

Following the completion of dredging activities and confirmatory sampling, a 150-m to 390-m (480-ft to 1280-ft)-long stretch of Old Mormon Slough would be capped with natural materials (fine sand) to isolate residual contamination left behind by dredging activities. The portion of the slough to be capped would be dependent on confirmatory sampling. If sampling confirms that total PAH concentrations in the OWP and western end of the CPA are at or below the preliminary sedliment cleanup levels, then no cap will be installed there. However, the high concentrations of total PAH at depth in the eastern portion of the CPA indicates that this portion



Exhibit 17 to the
United States' Motion
DOJ 131

of the slough would require a cap after dredging. Thus, this alternative assumes that a CPA cap will be required, while an OWP area cap might be required if dredging alone does not meet the RAOs.

The CPA cap would run from just west of the CDF to the end of the CPA area (see Figure 4.2). The cap would cover an estimated 6,300 $m^2$ (67,800 $ft^2$), 0.6 ha (1.6 ac) of the slough. The OWP area cap (if required) would run from the CPA cap to the west end of the OWP area. This cap would cover an estimated 13,800 $m^2$ (149,000 $ft^2$), 1.4 ha (3.4 ac). General information regarding the design and installation of the sediment caps is provided in Subsection 4.2.3. Detailed design assumptions are provided in **Table 4.6**. Costs were estimated for both Alternative SD-3 capping scenarios (CPA/OWP Cap and CPA Cap Only) in Appendix C.

As with Alternatives SD-2, SD-4, and SD-5, Alternative SD-3 would address the two "hot spots" located in the mouth of the slough, outside of the proposed dredge and cap areas, by the use of institutional controls rather than active remediation (see Subsection 4.2.1). Remediation would be limited to the use of institutional controls to limit navigational access to the slough, provide more fencing and warning signs to fully encompass the area(s) of principal and low-level threats, limit the future use of Old Mormon Slough and the upland portion of the site to appropriate uses, and control future dredging of the slough to prevent disturbance of residual sediment contamination in the mouth of the slough. Environmental monitoring would be conducted to assess the progress of natural attenuation processes for the "hot spots."

Under Alternative SD-3, institutional controls would also be implemented for the capped portion of Old Mormon Slough and the CDF to prevent inadvertent erosion or other disturbance of in situ sediment cap materials and the CDF that would expose residual sediment contamination. Monitoring would be performed to assess the integrity and maintenance needs of the sediment cap and CDF.

Removal of the most heavily contaminated sediment from principal threat areas of the slough and isolation in a CDF would reduce the mass of contamination available for exposure to and bioaccumulation in the aquatic organisms, including those species consumed by humans. Over time, this would lead to a reduction in the PAH and dioxin concentrations in the fish population. Implementation of institutional controls would restrict access to Old Mormon Slough, thereby reducing human exposure to contaminated fish and sediment until concentrations in fish and sediment have been reduced to safe levels. Alternative SD-3 reduces the threat to groundwater from sediment in the OWP and CPA portions of the slough. The CDF would contain dewatered sediment above the water table and would be covered to prevent infiltration, thus reducing the threat to groundwater from the END portion of the site.



Exhibit 17 to the
United States' Motion
DOJ 132

### 4.3.4 SD-4 - Dredging and Offsite Disposal Alternative

This alternative was developed to meet the RAOs by removing a preponderence of the PAH and dioxin contamination from the slough and transporting it for offsite disposal and/or treatment. Alternative SD-4 consists of the following technologies/process options:

- selective removal of heavily contaminated sediment via mechanical dredging
- use of a silt curtain to contain disturbed sediment within Old Mormon Slough
- dewatering of dredged sediment
- transportation and offsite disposal at a permitted TSD facility
- capping of residual contamination after dredging (CPA/END Cap only or Full Cap)
- institutional controls (e.g., access controls, deed restrictions) and monitoring.

A discussion of those components common to more than one alternative (i.e., institutional controls, capping, dredging, dewatering, silt curtain, and monitoring) was provided in Section 4.2.

A silt curtain would be erected across the mouth of Old Mormon Slough to prevent transport of sediment disturbed by dredging activities out of the slough. Mechanical dredging would be conducted to remove contaminated sediment from the principal threat areas of the slough, including a portion of the MTH sub-area and all of the OWP, CPA, and END sub-areas. Dredging would be conducted to a depth of 0.7 m (2.2 ft) in the principal threat area of the MTH and to 2.7 m (8.8 ft) (the maximum practical depth for dredging operations) throughout the rest of the slough. This depth incorporates a 10% overdig to ensure complete removal of the target contamination. The resulting volume of dredged sediment is estimated to account for 99.5% of the mass of the accessible (top 2.4 m [8 ft]) total PAH contamination and nearly 100% of the dioxin contamination (see Appendix B).

Dredging will remove an estimated 91,000 $m^3$ (119,000 $yd^3$) of contaminated sediment. With expansion during removal and handling (using a bulking factor of 20%) this would produce an estimated 109,000 $m^3$ (143,000 $yd^3$). The contaminated dredge material removed from the slough would be dewatered, reducing the volume by 20%, producing an estimated 91,000 $m^3$ (119,000 $yd^3$) of solids, and an estimated 21,800,000 L (5,760,000 gal) of wastewater. As described in Subsection 4.2.6, the recovered water would be processed through a series of cascading settling tanks and hydrocyclones to remove suspended solids prior to draining back into the slough, upstream of the silt curtain. For cost estimating purposes, it is assumed that

most of the contamination would be associated with fine sediment particles and thus would be removed by filtering without additional treatment.

The dewatered sediment would be transported offsite to a TSDF for treatment, if necessary to comply with RCRA LDRs, and/or disposal. RCRA LDRs for listed wood preserving wastes F032, F034, and F035, which are the expected waste classifications for the Old Mormon Slough sediments, became effective in August 1997. Thus, selection of the actual disposal facility is dependent on the final waste designation(s) for these dewatered sediments and their applicable LDRs. Transportation would be either by truck or rail depending on the selection of the TSDF.

To estimate a range of costs for this alternative, two different offsite disposal options were examined, which depend on the TSDF selected and the area of the slough requiring capping after dredging. The lower cost option assumes that the waste would not be subject to LDRs requiring treatment prior to disposal. In this case it is assumed that the waste would be shipped via truck to a TSDF for direct disposal, and that only the CPA and END areas of the slough would require capping. For the higher cost option it is assumed that the waste would have to be incinerated prior to disposal in order to comply with LDRs and that the entire slough (CPA/END Cap plus OWP Cap) would need to be capped. In this case, it was assumed the sediment would be shipped to the TSDF for treatment and disposal (see Appendix C). Note that there currently is a variance from the treatment requirement for F032, F034, and F035 listed wastes, but not for D037 (PCP) characteristic waste. Until May 1999, dredged sediment classified as F032, F034, or F035 waste could be disposed offsite without treatment; after this time, the sediment would have to be treated first (by incineration for F032 and F034, and by stabilization for F035). However, even before May 1999, dredged sediment that exceeds the toxic characteristic leach procedure criterion for PCP (100 mg/L) would have to be incinerated before offsite disposal.

Following the completion of dredging activities and confirmatory sampling, a 420 m to 664 m (1380 ft to 2180 ft) section of Old Mormon Slough would be capped with natural materials (fine sand) to isolate residual contamination left behind by dredging activities. The portion of the slough to be capped would be dependent on confirmatory sampling in the OWP area and western end of the CPA area. If sampling confirms that total PAH concentrations in that portion of the slough are at or below the preliminary sediment cleanup levels no cap would be installed there. However, the relatively high concentrations of total PAH at depth in the eastern part of the CPA area and the END area indicate that these sections of the slough would require a cap after dredging. Thus, a CPA/END cap would be required while an additional OWP area cap may be required if dredging alone does not meet the RAOs.

The CPA/END cap (**Figure 4.3**) would cover an estimated 9,500 $m^2$ (102,000 $ft^2$), 2.3 acres of the slough. The OWP cap (if required) would cover an estimated 13,800 $m^2$



Exhibit 17 to the
United States' Motion
DOJ 134

(149,000 $ft^2$), 3.4 acres. General information regarding the design and installation of the sediment caps is provided in Section 4.2.3. Detailed design assumptions for Alternative SD-4 are provided in **Table 4.7**.

As with Alternatives SD-2, SD-3, and SD-5, Alternative SD-4 would address the two "hot spots" located in the mouth of the slough, outside of the proposed dredge and cap areas, by the use of institutional controls rather than active remediation (see Subsection 4.2.1). Remediation would be limited to the use of institutional controls to limit navigational access to the slough, provide more fencing and warning signs to fully encompass the area(s) of principal and low-level threats, limit the future use of Old Mormon Slough and the upland portion of the site to appropriate uses, and control future dredging of the slough to prevent disturbance of residual sediment contamination in the mouth of the slough. Environmental monitoring would be conducted to assess the progress of natural attenuation processes for the hot spots.

Under Alternative SD-4, institutional controls would also be implemented for the capped portion of Old Mormon Slough to prevent inadvertent erosion or other disturbance of in situ sediment cap materials that would expose residual sediment contamination. Monitoring would be performed to assess the integrity and maintenance needs of the sediment cap.

Removal of the most heavily contaminated sediment from principal threat areas of the slough would reduce the mass of contamination available for exposure to and bioaccumulation in the aquatic organisms, including those species consumed by humans. Over time, this would lead to a reduction in the PAH and dioxin concentrations in the fish population. Implementation of institutional controls would restrict access to Old Mormon Slough, thereby reducing human exposure to contaminated fish and sediment until concentrations in fish have been reduced to safe levels. Alternative SD-4 reduces the threat to groundwater from sediment in the END, CPA, and OWP portions of the slough.

### 4.3.5 SD-5 - Dredging and Onsite Treatment

This alternative was developed to meet the RAOs by removing a preponderence of the PAH- and dioxin-contaminated sediment from the slough and treating it onsite. Alternative SD-5 consists of the following technologies/process options:

- selective removal of heavily contaminated sediment via mechanical dredging
- use of silt curtain to contain disturbed sediment within Old Mormon Slough
- dewatering of dredged sediment
- onsite ex situ treatment of dewatered sediment by solvent extraction
- onsite ex situ S/S of treated sediment as necessary prior to upland disposal
- capping of residual contamination after dredging (CPA/END Cap only or Full Cap)
- institutional controls (e.g., access controls, deed restrictions) and monitoring.

Elements of this alternative common to the other sediment alternatives (i.e., institutional controls, capping, dredging, dewatering, silt curtain, and monitoring) were described in Section 4.2.

Dredging would be conducted from just north of the OWP area to the END of the slough (**Figure 4.4**). This portion of the slough contains nearly all of the PAH and dioxin concentrations exceeding the preliminary sediment cleanup levels. A silt curtain would be erected across the mouth of the slough prior to dredging to contain any resuspended sediment. Mechanical dredging would be conducted along a 710 m (2330 ft) long portion of the slough. This would include the top 0.7 m (2.2 ft) from the OWP area and the top 2.7 m (8.8 ft) (maximum practical depth plus 10% overdig) from the OWP, CPA, and END of the slough. This volume of sediment would account for an estimated 99.5% of the accessible (<=2.4 m [<=8 ft]) mass of total PAH contamination and approximately 100% of the mass of PCDD/PCDF contamination. Dredging would produce an estimated 109,000 $m^3$ (143,000 $yd^3$) of contaminated sediment (assuming a 20% bulking factor). This material would be dewatered, producing an estimated 91,000 $m^3$ (119,000 $yd^3$) of solids and 21,800 L (5,760,000 gal) of waste water. As described in Subsection 4.2.6, the recovered waste water will be processed through a series of cascading settling tanks and hydrocyclones to remove suspended solids prior to draining back into the slough, upstream of the silt curtain. For cost estimating purposes, it was assumed that most of the contamination would be associated with fine sediment particles and thus would be removed by filtering without additional treatment.

The dewatered dredge materials would be treated onsite by ex situ solvent extraction to address PAHs and dioxin, followed by S/S to address inorganic contamination as necessary. Offsite incineration/disposal of the concentrated organic contaminants from the solvent extraction process has also been factored into the cost estimates for this alternative (see Appendix C). Solidified residuals from this treatment train are expected be disposed onsite, assuming sufficient upland capacity is available. The actual throughput and residual volumes generated will be determined in pilot-scale testing during the remedial design phase.

The selection of the final onsite treatment technology/process option for the dewatered sediments would likely be the same as that for the treatment of contaminated soils. Treatability tests conducted on site soils indicate that solvent extraction can be greater than 95% effective in reducing the concentration of dioxin, and greater than 67 to 98.9% effective in reducing PAH concentrations (see Subsections 3.1.3.2 and 3.2.6.3).

Following the completion of dredging activities and confirmatory sampling, a 420 m to 664 m (1380 ft to 2180 ft)-long stretch of Old Mormon Slough would be capped with natural materials (fine sand) to isolate any residual contamination that may be left behind by dredging activities. The portion of the slough to be capped would be dependent on confirmatory sampling in the OWP and western end of the CPA. If sampling confirms that total PAH concentrations in this portion of the slough are at or below the preliminary sediment cleanup levels, no



Exhibit 17 to the
United States' Motion
DOJ 136

cap will be installed there. However, the relatively high concentrations of total PAH at depth in the eastern portion of the CPA and END indicates that these portions of the slough would require a cap after dredging. Thus, a CPA/END cap would be required while an OWP area cap may be required if dredging alone does not meet the RAOs.

The CPA/END cap would run from the END to the western end of the CPA area (see Figure 4.4). The cap would cover an estimated 9500 $m^2$ (102,000 $ft^2$), or 2.3 acres of the slough. The OWP area cap, if required, would run from the CPA/END cap to the west end of the OWP area. This cap would cover an estimated 13,800 $m^2$ (149,000 $ft^2$), or 3.4 acres. General information regarding the design and installation of the sediment caps was provided in Subsection 4.2.3. Detailed design assumptions for this alternative are provided in **Table 4.8**. Costs were estimated for both Alternative SD-5 capping scenarios (CPA/END Cap only or Full Cap).

As with Alternatives SD-2, SD-3, and SD-4, Alternative SD-5 would address the two "hot spots" located in the mouth of the slough, outside of the proposed dredge and cap areas, by the use of institutional controls rather than active remediation (see Subsection 4.2.1). Remediation would be limited to the use of institutional controls to limit navigational access to the slough, provide more fencing and warning signs to fully encompass the area(s) of principal and low-level threats, limit future use of Old Mormon Slough and the upland portion of the site to appropriate uses, and control future dredging of the slough to prevent disturbance of residual sediment contamination in the mouth of the slough. Environmental monitoring would be conducted to assess the progress of natural attenuation processes for the hot spots.

Under Alternative SD-5, institutional controls would also be implemented for the capped portion of Old Mormon Slough to prevent inadvertent erosion or other disturbance of in situ sediment cap materials that would expose residual sediment contamination. Monitoring would be performed to assess the integrity and maintenance needs of the sediment cap.

Removal of the most heavily contaminated sediment from principal threat areas of the slough would reduce the mass of contamination available for exposure to and bioaccumulation in aquatic organisms, including those species consumed by humans. Over time, this would lead to a reduction in the PAH and dioxin concentrations in the fish population. Implementation of institutional controls would restrict access to Old Mormon Slough, thereby reducing human exposure to contaminated fish and sediment until concentrations in fish and sediment have been reduced to safe levels. Alternative SD-5 reduces the threat to groundwater from sediment in the END, CPA, and OWP portions of the slough.



Exhibit 17 to the
United States' Motion
DOJ 137




1998/DCL/OMS/005

**Figure 4.1.** Alternative SD-2, In Situ Capping







Exhibit 17 to the
United States' Motion
DOJ 138




1998/DCL/OMS/006

**Figure 4.2.** Alternative SD-3, Dredging and Confined Disposal







Exhibit 17 to the
United States' Motion
DOJ 139




**Figure 4.3.** Alternative SD-4, Dredge and Offsite Disposal







Exhibit 17 to the
United States' Motion
DOJ 140




**Figure 4.4.** Alternative SD-5, Dredging and Onsite Treatment



Exhibit 17 to the
United States' Motion
DOJ 141

## 5.3 INDIVIDUAL ANALYSIS OF ALTERNATIVES

This section presents an individual analysis of the five remedial alternatives for Old Mormon Slough sediments that were developed in Section 4.0. The alternatives are evaluated in detail against the two threshold and five primary criteria. An evaluation relative to the two modifying criteria will be presented in the ROD following receipt and review of public and state agency comments on the FS report and proposed plan. A brief description of the alternative and key points of the individual analysis are discussed below.

### 5.3.1 SD-1 - No-Action Alternative

The No-Action alternative provides a baseline for comparison with other alternatives. No active remedial measures would be implemented and, thus, no reduction in human health and environmental risk would occur.

Operations at the M&B site ended approximately eight years ago. The primary sediment COCs (PAHs and dioxin) are high molecular weight organic compounds with low solubility and high sorption partitioning coefficients and, thus, are generally not very mobile except through resuspension of sediments. Old Mormon Slough is an area of net sediment deposition where natural resuspension of sediment due to large tidal currents is not a major concern (assuming no disturbance and resuspension due to boat prop wash). This natural deposition of uncontaminated sediment can, over time, isolate contaminated sediment from the water column, reducing the bioavailability of the contaminants. This isolation can also reduce the natural biodegradation of these compounds by limiting the exchange of oxygen and other critical nutrients.

Natural attenuation of PAHs is evaluated in Appendix A. The appendix provides calculations estimating the potential for using natural attenuation as a stand-alone remedy. Results indicate that the time to degrade total PAHs (from an initial concentration of 1000 mg/kg to a cleanup level of 10 mg/kg) to a depth of 3 feet in the sediment would be 3,350 years. Using an initial total PAH concentration of 50 mg/kg, the cleanup time is reduced to 135 years. Consequently, it appears that, without outside assistance, oxygen limitations are too great for natural attenuation to treat the Old Mormon Slough sediment in a reasonable period of time. In addition, no calculations were attempted for dioxin, which is more persistent in the environment than the PAHs. Thus, the COCs are expected to persist for an indefinite period, and would continue to threaten fish and benthic fauna (particularly from PAH contamination) as well as human health through the ingestion of contaminated fish. Thus, the risks to human health and the environment are assumed to remain essentially the same as those identified in the baseline human health risk assessment (ICF 1996) and ecological risk assessment (Thom et al. 1997). Natural attenuation (No-Action) is inappropriate as a stand-alone alternative for the majority of Old Mormon Slough contamination. However, as previously discussed, natural attenuation (i.e., the use of institutional controls alone) for those portions of the slough that contain only a few



Exhibit 17 to the
United States' Motion
DOJ 142

isolated areas of contamination or areas of low concentrations of COCs may provide sufficient protection of human health and the environment.

An assessment of this alternative against the evaluation criteria follows.

Overall Protection of Human Health and the Environment

The No-Action Alternative provides no reduction in human and/or ecological exposure to, or toxicity of, the contaminated sediment and fish in the area. It also could potentially allow migration of the contaminants from sediment to groundwater through recharge, which could contribute to the degradation of the groundwater in addition to that from upland soils. However, as noted earlier, the sediments in Old Mormon Slough are not considered a significant source to groundwater contamination. Thus, this alternative is not protective of human health and the environment.

Compliance with Applicable or Relevant and Appropriate Requirements

Because No-Action is being taken, this alternative would not reduce the sediment contaminant concentrations to levels considered protective of human health and the environment and would not meet ARARs.

Long-Term Effectiveness and Permanence

This alternative would not remove contamination sources and so would not provide any source controls or exposure controls. All current and future risks would remain essentially unchanged for hundreds or thousands of years.

Reduction of T/M/V Through Treatment

This alternative does not involve any treatment and so there would be no reduction in T/M/V of the contaminated sediment.

Short-Term Effectiveness

This alternative would have no short-term impacts because no activity would be implemented. There would be no additional risks to the community, workers, or the environment as a result of this alternative.

Implementability

There are no implementability concerns associated with this alternative.



Exhibit 17 to the
United States' Motion
DOJ 143

Cost

The cost for 30 years of sediment and biota monitoring (sampling, analysis, and reporting) is estimated at $325,745.

### 5.3.2 SD-2 - In Situ Capping

As defined in Section 4.3.2, the in situ capping alternative relies on the use of a 0.6 m (2 ft) thick sand cap to contain contaminated sediment in the principal threat areas of the slough and institutional controls (access restrictions, deed notices, etc.) to restrict public access and future activities in the slough. The sand cap would blanket an area estimated at 8.8 acres and would cover nearly all of the known PAH and dioxin concentrations exceeding the preliminary sediment cleanup levels. Two hot spots of limited extent, one of PAH contamination and the other of dioxin contamination, located outside of the area of principal threat would not be capped, but would be addressed through the use of institutional controls.

An assessment of this alternative against the evaluation criteria follows.

Overall Protection of Human Health and the Environment

This alternative would be protective of human health and the environment by controlling human exposure to contaminated fish and isolating a preponderance of the contamination from the water column. It would have a limited effect on the potential migration of contamination from Old Mormon Slough into groundwater beneath the site. However, this is considered a minimal potential migration pathway in relation to the extensive deep soil and NAPL contamination in the upland portion of the site. In any event, any contribution of COCs from slough sediment to groundwater is expected to be captured by the proposed groundwater extraction system that was evaluated separately for the Soil-Groundwater OU FS report.

Compliance with Applicable or Relevant and Appropriate Requirements

This alternative would comply with ARARs. More particularly, the construction activities associated with this alternative would comply with the substantive requirements of the RHA because the activity would provide a benefit to the public by protecting human health and the environment. Construction would also comply with the substantive requirements of Section 404 of the CWA.

Long-Term Effectiveness and Permanence

All contamination would remain in place, but nearly all of it (except the two "hot spots") would be isolated from benthic and water column organisms via the sand cap. Remedial action objectives for protection of the aquatic environment would be achieved following the completion



Exhibit 17 to the
United States' Motion
DOJ 144

of the sediment cap, which is estimated to take a few (perhaps 4 to 8) weeks. Capping of contaminated sediment is a common and proven technology. Since the slough is an area of net sediment deposition, natural erosion from tidal action and other causes is not expected to be of concern. However, if areas of potential erosion (either natural or man-made, e.g., from boat prop wash) are identified during the remedial design stage, a rip-rap and gravel filter armoring will be placed over those areas of the cap. The expected continuation of natural sediment deposition in the slough (estimated by White and Kohn [1996] to be at a rate of 3.6 cm [1.4 in.] per year) is expected to further bury the contamination and protect the integrity of the cap. Periodic monitoring and maintenance (if needed) of the cap will ensure the long-term effectiveness and permanence of the remedial action.

Although existing warning signs and fencing have not completely prevented public access and fishing in the slough, additional physical and administrative controls (e.g., log booms, improved fencing, additional warning signs, and increased security) could be more effective. Additional institutional controls such as proprietary and governmental controls, including deed restrictions, would prohibit dredging or other uses of the slough that would be detrimental to the cap and could lead to re-surfacing and/or resuspension of the contaminated sediment.

Capping would have only a limited effect on preventing the potential migration of contaminants from slough sediment into the groundwater system. However, the low solubility and high sorption coefficients for the COCs suggests that such migration, if any, would be extremely slow.

<u>Reduction of T/M/V Through Treatment</u>

There is no treatment involved in this alternative, thus, there would be no reduction in toxicity or volume of the contaminated sediment. However, capping of the contaminated sediment would significantly reduce the potential for resuspension and transport of contaminated sediment and secondarily would somewhat reduce the potential for migration of contaminants from sediment into groundwater via recharge.

<u>Short-Term Effectiveness</u>

There would be some risk to workers installing the sediment cap. These short-term risks would be primarily from the hazards associated with operation of heavy equipment and work over water. Direct worker exposure to contamination would be minimal, limited to contaminated debris removed prior to installation of the cap materials.

Some short-term adverse effects on the aquatic ecosystem are expected from the placement of sand. Installation of the sediment cap is estimated to take 1 to 2 months and is expected to have severe short-term impacts on the benthic community in the slough. Burial of

the existing slough bottom under 0.6 m (2 ft) of sand will essentially destroy the existing benthic community. However, the new sand bottom is expected to provide a good substrate for the development of a new healthy and diverse benthic community. Thus, over the longer term, installation of the sand cap is thought to provide beneficial effects to aquatic organisms.

Isolating contaminated sediment would eliminate exposure to water column organisms and, over time, reduce concentrations in those species consumed by humans. The implementation of access controls should somewhat reduce human health risks in the short term by limiting catching and consumption of potentially contaminated fish until safe concentrations in fish are achieved. The implementation of stronger access controls would almost immediately reduce the risk to the community by limiting the catching and consumption of potentially contaminated fish.

Implementability

The installation of a sand cap in this type of environment is a fairly common and proven method of containing contaminated sediment. The necessary equipment, materials, and expertise is readily available in the area. However, the presence of large debris, steep slopes, and/or large areas of potential erosion (primarily through prop wash) could complicate installation of the cap and lead to increased implementation time and/or cost increases.

Installation of the sand cap will raise the bottom of the slough a minimum of 0.6 m (2 ft), which may reduce the future useability of the slough and thus may impact neighboring land owners who may wish to use the slough.

Cost

The 30 year present worth cost of this alternative, assuming 5% inflation, is estimated to be on the order of $1,848,597, with a capital cost of $1,207,025, and an annual O&M cost of $41,735. The capital cost is primarily for installation of the cap. The annual O&M costs are primarily for monitoring and maintenance of the cap. Cost estimates for the capping alternative have assumed the use of a 90% sand cap/10% armored cap combination. The total cost of an armored cap for the entire slough was estimated at $2.9 million.

### 5.3.3 SD-3 - Dredging and Confined Disposal Facility

The Dredging and Confined Disposal Facility alternative uses mechanical dredging to remove contaminated sediment from principal threat subareas of the slough and consolidate it with existing contamination in the END of the slough in an engineered CDF (refer to Section 4.3.3 for a detailed description). The CDF would be constructed by installing a sheetpiling wall across the slough approximately 244 m (800 ft) from its END, producing a volume sufficient to contain the dredged material (estimated 55,400 $m^3$ [72,500 $yd^3$]) and a 0.6 m (2 ft) cap of



Exhibit 17 to the
United States' Motion
DOJ 146

clean local backfill materials. Water initially present in the CDF would be allowed to drain back into the slough during backfilling after passing through a silt curtain or other passive filtering system. This water would be discharged into the area still being dredged behind the main silt curtain.

Dredging would be performed to a depth of 0.7 to 2.7 m (2.2 to 8.8 ft) leaving deeper contamination in place, which would be capped with 0.6 m (2 ft) of sand to isolate it from water column organisms. The size of this cap is estimated to range from 1.6 to 4.0 acres, depending on the results of confirmatory sampling conducted at the completion of dredging activities.

A silt curtain would be used during these remedial activities to prevent the uncontrolled release of resuspended sediment. Institutional controls would be implemented to prevent access and fishing in the slough to ensure the integrity of the sand cap and to isolate low-level threat areas from the public.

An assessment of this alternative against the evaluation criteria follows.

Overall Protection of Human Health and the Environment

This alternative would be protective of human health and the environment by removing and/or isolating a preponderance of the contaminated sediment from the slough. Remedial action objectives for protection of the aquatic environment would be achieved in most of the slough following completion of the remedial actions, which are estimated to take several months (perhaps on the order of 4 to 10). Natural attenuation and degradation processes may take hundreds to thousands of years to decrease the two "hot spots" and residual contaminant concentrations to acceptable levels. This alternative would also provide a reduction in the potential for migration of contamination into the groundwater by reducing the mass of contamination directly influenced by the hydraulic driving force of the slough. Contamination removed from the slough would be contained in an unsaturated condition above the water table. In addition, the cap over the confined disposal unit would further reduce infiltration.

Compliance with ARARs

This alternative would comply with ARARs. More particularly, the construction activities associated with this alternative would comply with the substantive requirements of the RHA because the activity would provide a benefit to the public by protecting human health and the environment. Construction would also comply with the substantive requirements of Section 404 of the CWA. The consolidation of contaminated sediments from principal threat subareas into the contaminated area in the eastern end of the slough would occur within the same area of contamination and therefore would not constitute placement for purposes of triggering LDRs.

Long-Term Effectiveness and Permanence

Approximately 30% of the accessible (top 2.4 [8 ft]) PAH contamination and 53% of the dioxin contamination would remain in place. However, nearly all of it (except the two "hot spots" in the mouth of the slough) would be contained inside the CDF and isolated from the slough. Deep residual PAH contamination not removed during dredging would be capped with 0.6 m (2 ft) of sand. Dredging and confined disposal of sediment, as well as capping are common and proven technologies. Since the slough is an area of net sediment deposition, natural erosion of cap materials due to tidal action or other means is not expected to be of concern. However, if areas of potential erosion (either natural or man-made, e.g., from boat prop wash) are identified during the remedial design stage, a rip-rap and gravel filter armoring will be placed over those areas of the cap. The expected continuation of natural sediment deposition in the slough (estimated by White and Kohn [1996] to be at a rate of 3.6 cm [1.4 in.] per year) is expected to further bury the deep residual contamination and protect the integrity of the cap. Periodic monitoring and maintenance (if needed) of the cap and CDF will ensure the long-term effectiveness and permanence of the remedial action.

Although existing warning signs and fencing have not completely prevented public access and fishing in the slough, additional physical and administrative controls (e.g., log booms, improved fencing, additional signs, and increased security) could provide additional safeguards as a component of this alternative. Institutional controls such as proprietary and governmental controls, including deed restrictions, would prohibit dredging or other uses of the slough and adjacent lands that would be detrimental to the cap and/or CDF and may lead to re-surfacing and/or resuspension of the contaminated materials.

Reduction of T/M/V Through Treatment

There is no treatment under this alternative, thus, there would be no reduction in toxicity or volume of the contaminated sediment. However, removal, confined disposal, and/or capping of nearly all of the contaminated sediment (except the two "hot spots") would significantly reduce the mobility of the contamination by isolating it in the CDF.

Short-Term Effectiveness

There would be some risk to the workers during the 4- to 10-month-long remedial operations, while constructing the CDF, performing dredge and fill activities, and installing the sediment cap. These risks would primarily result from the hazards associated with the operation of heavy equipment and working over water. Increased worker exposure to contamination would be expected through direct contact with contaminated debris and sediment during the dredge and fill operations. This could be mitigated by the use of proper protective clothing.



Exhibit 17 to the
United States' Motion
DOJ 148

Removing and isolating contaminated sediment would eliminate exposure to water column organisms and over time would reduce concentrations in those species consumed by humans. The implementation of access controls should somewhat reduce human health risks in the short term by limiting catching and consumption of potentially contaminated fish until safe concentrations in fish are achieved. The implementation of stronger access controls would almost immediately reduce the risk to the community by limiting the catching and consumption of potentially contaminated fish.

Although remedial actions would be conducted during incoming tides and behind silt curtains to contain potentially resuspended sediment, this alternative is expected to have severe short-term and long-term (permanent) impacts on the aquatic ecosystem. Creation of the CDF will eliminate approximately 3.4 acres of aquatic habitat, about 30% of the slough. Dredging and installation of the sand cap is expected to have severe short-term impacts on the benthic community over another 5.5 acres, approximately one-half of the slough. However, the sand cap materials are expected to provide a good substrate for the development of a new healthy and diverse benthic community. Thus, over the longer term, installation of the sand cap is thought to provide beneficial effects.

The removal, consolidation and confined disposal of nearly all of the accessible (top 2.4 m [8 ft]) will reduce the contaminant mass directly influenced by the hydraulic driving force of the slough. Thus, the potential migration of contaminants out of the slough sediment and into the groundwater system will be reduced. However, the low solubility and high sorption of the COCs, as well as the already highly degraded nature of the groundwater due to the major upland source areas, suggests this reduction will likely have little effect.

Implementability

Implementation of this alternative is technically feasible. Dredging, confined disposal, and capping are all fairly common practices and are proven methods for control of contaminated sediment. The necessary equipment, materials, and expertise is available in the local area. However, the presence of large amounts of debris, large areas of potential erosion (primarily through prop wash), and/or difficulties in consolidating the dredge material, could complicate these remedial actions and lead to increased implementation time and/or cost increases.

The acceptability of filling in a portion of the slough to the community, adjacent landowners, and regulatory agencies is unknown at this time. Creation of the CDF would destroy approximately 30% of the slough and its aquatic habitat. In addition, the adjacent land owner would lose its existing waterfront access. Dredging of the slough would deepen the channel making it more accessible to future water traffic, should monitoring indicate that this traffic would have no adverse impacts on the residual contamination. The CDF, if properly designed and constructed, could serve as a new wharf.



Exhibit 17 to the
United States' Motion
DOJ 149

Cost

The 30 year present worth cost of this alternative, assuming 5% inflation, is estimated to be on the order of $2.4 million, with a capital cost of $2.0 million, and an annual O&M cost of $27,442. The capital cost is primarily for construction of the CDF, dredging and filling operations, and installation of the sand cap. The annual O&M costs are primarily for monitoring and maintenance of the cap and CDF. This cost estimate assumes that only the CPA area of the slough would be capped. If necessary to cap both the OWP and CPA areas of the slough, the 30 year present worth cost was estimated at $2.9 million.

### 5.3.4 SD-4 - Dredging and Offsite Disposal

This alternative would remove contaminated sediment from principal threat portions of the slough by mechanical dredging. An estimated 91,000 $m^3$ (119,000 $yd^3$) would be removed accounting for an estimated 99.5% of the accessible (top 2.4 m [8 ft]) PAH contamination and nearly 100% of the dioxin contamination. This dredged material would be transferred to an upland dewatering facility constructed near the southeastern end of the slough. A combination of gravity drainage and filter press (or similar) technology would be used to dewater the sediment at a rate estimated at 77 $m^3$/h (100 $yd^3$/h). The recovered water (estimated at 2300 liters per minute [70 gpm]) would be filtered prior to draining back into the area of the slough being dredged above the silt curtain, unless treatment was required.

Once the dredged material was sufficiently dewatered and/or stabilized (if needed) it would be transported offsite for treatment (if necessary) and/or disposal. The choice of an offsite disposal facility, and the need for treatment prior to disposal, is dependent on the eventual waste designation of the dewatered dredge material, as discussed in Subsection 4.3.4.

Deep residual contamination (i.e., the areas of contaminated sediment not removed during dredging, principally areas below 8 ft below the mudline) would be capped with a 0.6 m- (2 ft)-thick sand cap. The size of this cap, estimated to be on the order of 2.3 to 5.7 acres, is dependent on the results of confirmation sampling.

A silt curtain would be used during dredging activities to prevent the uncontrolled release of resuspended sediment. Institutional controls would be implemented to prevent access to and fishing in the slough, to ensure the integrity of the sand cap, and to isolate low-level threat areas.

An assessment of this alternative against the evaluation criteria follows.



Exhibit 17 to the
United States' Motion
DOJ 150

Overall Protection of Human Health and the Environment

Remedial action objectives for sediment and the protection of the aquatic environment should be achieved in most areas of the slough following the completion of dredging and capping activities. This alternative would be protective of human health and the environment by removing or capping nearly all of the contamination. Removing contaminated sediment from the slough would eliminate exposure to water column organisms and over time reduce concentrations in those species consumed by humans. The implementation of stronger access controls could almost immediately reduce the risk to the community by preventing the catching and consumption of potentially contaminated fish until safe levels in fish are achieved. It would also provide a reduction in the potential for migration of contamination into the groundwater by reducing the mass of contamination directly influenced by the hydraulic driving forces from the slough. Two "hot spots" believed to be of limited extent, one of PAH contamination and one of dioxin contamination, would not be actively addressed, but would allow to be naturally buried by natural sedimentation processes or naturally degraded. Natural attenuation and degradation processes may take hundreds or thousands of years to decrease the "hot spot" and residual contaminant concentrations to acceptable levels. Short-term adverse effects are expected on the aquatic ecosystem from dredging and capping operations.

Compliance with ARARs

This alternative would comply with ARARs. More particularly, the construction activities associated with this alternative would comply with the substantive requirements of the RHA because the activity would provide a benefit to the public by protecting human health and the environment. Construction would also comply with the substantive requirements of Section 404 of the CWA. If water recovered from the dewatering facility requires treatment, the dewatering facility and the treatment facility would comply with the RCRA requirements set forth in Table 5.1.

Long-Term Effectiveness and Permanence

Virtually none of the accessible (top 2.4 [8 ft]) contamination would remain in place except the two "hot spots" in the mouth of the slough. Deep residual PAH contamination not removed during dredging would be capped with 0.6 m (2 ft) of sand. Dredging and capping are common and proven technologies. Since the slough is an area of net sediment deposition, further burial of the deep residual contamination and protection of the integrity of the cap are expected. Should the remedial design phase identify areas of potential erosion of the cap, those areas will be armored with rip-rap and gravel filter. Periodic monitoring and maintenance (if needed) of the cap will ensure the long-term effectiveness and permanence of the remedial action. Although existing warning signs and fencing have not completely prevented public access and fishing in the slough, additional physical and administrative controls (e.g., log

booms, improved fencing, additional warning signs, and increased security) should be more effective. Additional institutional controls such as proprietary and governmental controls, including deed restrictions, would prohibit dredging or other uses of the slough that would be detrimental to the cap. Natural attenuation and degradation processes are not expected to reduce residual contaminant concentrations to acceptable levels for hundreds or thousands of years (Appendix A).

Reduction of T/M/V Through Treatment

Dredged material from the principal threat areas, estimated 91,000 $m^3$ (119,000 $yd^3$), would be dewatered using gravity drainage and filter press technology (or similar) to make it acceptable for offsite shipping. This represents nearly 100% of the accessible (top 2.4 m [8 ft]) contamination in the slough. The need for offsite treatment prior to disposal is dependent on the eventual waste designation of the material; this could range from no treatment required to incineration.

While some degradation is likely to occur during dewatering through photodegradation, biodegradation, and volatilization, it is considered insignificant over the anticipated implementation period. Dewatering would produce a residual water stream which would be filtered, or treated if necessary, prior to release back into the slough.

Short-Term Effectiveness

There would be some risk to workers over a 4- to 10-month period during dredging, dewatering, and capping activities. These risks would be primarily from the hazards associated with operation of heavy equipment and working over water. Increased worker exposure to contamination would be expected through direct contact with contaminated debris and sediment during the dredge and dewatering operations. This could be mitigated by the use of proper protective clothing.

Although remedial actions would be conducted during incoming tides and behind silt curtains to contain potentially resuspended sediment, this alternative is expected to have severe short-term impacts on the aquatic ecosystem from dredging and capping activities. Dredging will remove and essentially destroy the existing benthic community over three-quarters of Old Mormon Slough. However, the new sand cap materials are expected to provide a good substrate for the development of a healthy and diverse benthic community. Re-establishment of a vigorous benthic community is expected to take only a few growing seasons (perhaps 1 to 3 years). Over the long-term, dredging and installation of the sand cap is thought to provide beneficial environmental effects.

The removal of nearly all accessible (top 2.4 m [8 ft]) contamination from the slough will greatly reduce the contaminant mass directly influenced by hydraulic driving forces in the



Exhibit 17 to the
United States' Motion
DOJ 152

slough. Thus, the potential migration of contaminants out of the slough sediment and into the groundwater system will be reduced. However, the low solubility and high sorption of the COC, and the already highly degraded nature of the groundwater due to the major upland source areas suggests that this reduction will likely have little obvious effect.

Implementability

Implementation of this alternative is technically feasible. Dredging and capping are fairly common practices and proven methods for controlling contaminated sediment. The necessary equipment, materials, and expertise for these activities is available in the local area. However, dewatering of the fine-grained (clay silt) sediment and the availability or accessibility of a commercial disposal facility may pose some difficulties. Based on recent experience at the United Heckathorn Superfund site, dewatering was found to be an extremely slow process that eventually had to be supplemented by solidification technology. Suitable dewatering technology may not be readily available, and could be quite costly. Dredging activities would likely be conducted at the same rate as the dewatering operations to limit the need for large-scale holding areas.

Completion of this alternative is expected to take between 4 and 10 months. Commercial TSDFs are available that are licensed to take the dredged material. However, the availability and accessibility of TSDFs for certain listed waste types could cause severe schedule and/or cost constraints. The presence of large amounts of debris, large areas of potential cap erosion (primarily through prop wash), and/or difficulties in arranging offsite transportation (particularly by rail) could also complicate these remedial actions and lead to increased implementation time and cost increases.

The acceptability of this alternative to neighboring land owners, the community, and regulatory agencies is unknown at this time. Dredging of the slough will deepen the channel, making it more accessible to future water traffic (should monitoring indicate that this traffic would have no adverse impacts on the residual contamination). There are potential risks to the public from the shipment of hazardous wastes from the site over long distances.

Cost

The cost for Alternative SD-4 depends on the location of the TSDF and the pre-disposal treatment requirements (see Subsection 4.3.4). Because of the uncertainties involved with this alternative, low-end and high-end costs were estimated. The low-end cost assumed that the waste could be shipped to a facility in California, and, based on its waste classification, it could be landfilled without treatment. However, LDRs for the expected waste classification of sediment from the M&B site (i.e., listed wood preserving wastes F032, F034, and F035) became effective in August 1997, and a treatment variance for these wastes expires in May 1999. In addition, if the dredged sediment exceeded the TCLP criterion for PCP, it would be

characterized as D037 waste and would be subject to treatment (incineration) before disposal. Thus, a high-end cost estimate is also included to comply with LDRs for offsite disposal. This limits the number of facilities that can accept the sediments, which greatly increases transportation costs and adds the high cost of incineration for this large volume of sediment to the total cost. Thus, the present worth value for offsite disposal could range from $39.6 million to as high as $351 million (see Appendix C). The low-end 30-year present worth cost of this alternative (assuming 5% inflation) is estimated to be on the order of $39.6 million with a capital cost of $39.1 million, and an annual O&M cost of $28,735. The high-end 30-year present worth cost of this alternative (assuming 5% inflation) is estimated to be on the order of $351 million, with a capital cost of $350.5 million, and an annual O&M cost of $28,735. However, as noted, the low-end value is no longer considered a realistic figure for offsite disposal since the LDRs recently became effective.

### 5.3.5 SD-5 - Dredging and Onsite Treatment

This alternative (described in detail in Section 4.3.5) would remove contaminated sediment from the principal threat area of the slough by mechanical dredging. As with the offsite disposal alternative, an estimated 91,000 $m^3$ (119,000 $yd^3$) would be removed, which accounts for an estimated 99.5% of the accessible (top 2.4 m [8 ft]) PAH contamination and nearly 100% of the dioxin contamination. This dredged material would be transferred to a dewatering facility where a combination of gravity drainage, percolation, and evaporation would partially dewater the sediment. The recovered water would be filtered prior to draining back into the area of the slough being dredged (above the silt curtain), unless additional treatment was necessary. Once the dredge material was suitably dewatered it would be treated using solvent extraction to remove the organic (PAH and dioxin) contamination. Solid residuals from this process would be solidified to address the remaining metals contamination and disposed onsite in the upland area of the site.

Deep residual contamination (not removed during dredging) would be capped with a 0.6-m- (2-ft)-thick sand cap. The size of this cap, estimated to be on the order of 1 to 2.4 ha (2.3 to 5.7 ac) is dependent on the results of confirmation sampling. A silt curtain would be used during dredging activities to prevent the uncontrolled release of resuspended sediment. Institutional controls would be implemented to prevent access to and fishing in the slough, to ensure the integrity of the sand cap, and to isolate lesser threat areas from the public.

An assessment of this alternative against the evaluation criteria follows.

<u>Overall Protection of Human Health and the Environment</u>

This alternative would be protective of human health and the environment by removing or capping nearly all of the contamination. Remedial action objectives for sediment and protection of the aquatic environment for most of the slough would be achieved following the



Exhibit 17 to the
United States' Motion
DOJ 154

completion of dredging and capping activities. The two "hot spots" at the mouth of the slough would not be actively remediated, but would be addressed by the use of institutional controls. Natural attenuation and degradation processes may take hundreds or thousands of years to decrease the "hot spots" and residual contaminant concentrations to acceptable levels. This alternative would provide a reduction in the potential for migration of contaminants from sediment into the groundwater by reducing the mass of contamination directly influenced by the hydraulic driving forces from the slough. Short-term adverse effects to the aquatic ecosystem are expected from dredging and capping operations.

Compliance with ARARs

This alternative would comply with ARARs. More particularly, the construction activities associated with this alternative would comply with the substantive requirements of the RHA because the activity would provide a benefit to the public by protecting human health and the environment. Construction would also comply with the substantive requirements of Section 404 of the CWA. The onsite dredging treatment facility would comply with the RCRA requirements set forth in Table 5.1. If water recovered from the dewatering facility requires treatment, the dewatering facility and the water treatment facility would comply with the RCRA requirements set forth in Table 5.1.

Long-Term Effectiveness and Permanence

Virtually none of the accessible (top 2.4 [8 ft]) contamination would remain in place, except the two "hot spots" at the mouth of the slough. Deep PAH contamination (greater than 2.7 m [8.8 ft]) would not be removed during dredging, but instead would be capped with 0.6 m (2 ft) of sand. Dredging and capping are common and proven technologies. Since the slough is an area of net sediment deposition, further burial of the deep residual contamination and protection of the integrity of the cap are expected. Should activities during the remedial design phase identify areas of the cap susceptible to erosion (most likely from barge traffic), those areas will be armored with rip-rap and a gravel filter layer. Periodic monitoring and maintenance (if needed) of the cap will ensure the long-term effectiveness and permanence of the remedial action.

Although existing warning signs and fencing have not completely prevented public access and fishing in the slough, additional physical and administrative controls (e.g., log booms, improved fencing, additional warning signs, and increased security) should provide more safeguards. Additional institutional controls such as proprietary and governmental controls, including deed restrictions, would prohibit dredging or other uses of the slough that would be detrimental to the cap. Natural attenuation and degradation processes are not expected to reduce residual contaminant concentrations to acceptable levels for hundreds or thousands of years (Appendix A).



Exhibit 17 to the
United States' Motion
DOJ 155

Reduction of T/M/V Through Treatment

This alternative would provide reduction of T/M/V for organic COCs (through solvent extraction) and reduction of mobility for inorganic COCs (through S/S). Dredged material from the principal threat areas, estimated at 91,000 $m^3$ (119,000 $yd^3$), would be dewatered using gravity drainage and treated using solvent extraction. This represents nearly 100% of the accessible (top 2.4 m [8 ft]) contamination in the slough.

Dewatering would produce a residual water stream that would require filtration and monitoring prior to release back into the slough. Solvent extraction is a separation technology that physically removes organic contamination from the sediments. Site-specific soil treatability tests (Section 3.3) have indicated that solvent extraction can be greater than 95% efficient in reducing the concentration of dioxin, and greater than 67% to 98.8% effective in reducing PAH concentrations. Solvent extraction can generate four primary residual streams; spent solvent, a recovered organic phase, a recovered aqueous phase, and solid residuals. The spent solvent and recovered organic would be destroyed via offsite incineration. The recovered aqueous waste stream would be filtered and treated using catalytic oxidation or similar technology (if needed), and the solid residuals would be treated using solidification technology and then disposed onsite in the upland area of the site. Treatability tests indicate that solidification of the solid residuals can reduce the mobility of residual organic and metal contamination by 73% to 98% (Section 3.3).

The removal of nearly all accessible (top 2.4 m [8 ft]) contamination from the slough will greatly reduce the contaminant mass directly influenced by hydraulic driving forces in the slough. Thus, the potential migration of contaminants out of the slough sediment and into the groundwater system will be reduced. However, the low solubility and high sorption of the COC, and the already highly degraded nature of the groundwater suggests this reduction will likely have little obvious effect.

Short-Term Effectiveness

There would be some risk to workers performing dredging, dewatering, treatment, disposal, and capping activities. These risks would be primarily from the hazards associated with operation of heavy equipment, industrial process equipment, and working over water. Increased worker exposure to contamination would be expected through direct contact with contaminated debris and sediment during the dredging, dewatering, and treatment operations. This could be mitigated with the use of proper protective clothing. Air emissions from the solvent extraction system and from the handling of the dewatered sediment could also cause short-term impacts at the site if not properly addressed.



Exhibit 17 to the
United States' Motion
DOJ 156

Dredging activities would likely be conducted in conjunction with the dewatering and treatment operations to limit the need for large-scale holding areas. Completion of this alternative is expected to take the same amount of time as alternatives SD-3 and SD-4, approximately 4 to 10 months.

Although remedial actions would be conducted during incoming tides and behind silt curtains to contain potentially resuspended sediment, this alternative is expected to have severe short-term impacts on the aquatic ecosystem from dredging and capping activities. Dredging would remove and essentially destroy the existing benthic community over three-quarters of the slough. However, the new sand cap materials are expected to provide a good substrate for the development of a healthy and diverse benthic community. Re-establishment of a vigorous benthic community is expected to take only a few growing seasons (perhaps 1 to 3 years). Thus, over the long-term, dredging and installation of the sand cap may have a beneficial effect.

Implementability

Implementation of this alternative is technically feasible, although it is the most complex alternative with the greatest implementation concerns. Dredging and capping are fairly common practices and proven methods for controlling contaminated sediment. The necessary equipment, materials, and expertise for these activities should be available in the local area. However, dewatering of the fine-grained (clay silt) sediment and the availability or accessibility of suitably sized solvent extraction systems may pose some difficulties. The implementation of the solvent extraction process is more difficult, and the availability of solvent extraction vendors may be limited. Onsite disposal of the solidified solid residuals from the solvent extraction process (91,000 $m^3$ [119,000 $yd^3$] plus a 20% bulking factor) may be somewhat difficult to implement. The disposal of this volume of material would require a disposal pit estimated at 91 m (300 ft) wide by 366 m (1200 ft) long and 2.7 m (9 ft) deep. This is expected to exceed available storage capacity in the upland portion of the site, and would also have an impact on implementation of the soil and groundwater remedies. The presence of large amounts of debris and/or large areas of potential cap erosion (primarily through prop wash) could complicate the implementation of this alternative, resulting in time and/or cost increases.

Residuals generated during solvent extraction would need to be treated and/or disposed of. The ex situ S/S process on solids from the solvent extraction process greatly increases soils-handling and technology requirements over the other alternatives.

The acceptability of this alternative to neighboring land owners, the community, and regulatory agencies is unknown at this time. Dredging of the slough will deepen the channel, making it more accessible to future water traffic (should monitoring indicate that this traffic would have no adverse impacts on the residual contamination).

Cost

The 30-year present worth cost of this alternative (assuming 5% inflation) is estimated to be on the order of $66.6 million, with a capital cost of $66.7 million, and an annual O&M cost of $28,735. The capital cost is primarily for treatment and includes dredging, dewatering, and installation of the sand cap. The annual O&M costs are primarily for monitoring and maintenance of the cap. This cost estimate assumes only the CPA and END areas of the slough would be capped. If the entire slough was capped, the 30-year present worth cost for this alternative would increase to $67.7 million (see Appendix C).

## 5.4 COMPARATIVE ANALYSIS OF SEDIMENT ALTERNATIVES

In the following analysis, the alternatives are evaluated in relation to one another using the same evaluation criteria. **Table 5.2** summarizes the key points from this analysis.

### 5.4.1 Overall Protection of Human Health and the Environment

All of the alternatives (except No-Action) rely on access controls to some extent to reduce human exposure to contaminated sediment and fish in the area. To reduce the risk to the environment, the In Situ Capping Alternative (SD-2) relies on physically isolating the contamination in place under a sand cap. This essentially buries the contamination to prevent direct contact to benthic organisms and resuspension of the sediment, thereby decreasing the bioavailability of the contamination to water column organisms. Given their low solubility and high sorption properties, these contaminants are expected to have low mobility in the aqueous phase, and thus can be adequately contained with a permeable cap. With the isolation afforded by a cap, the concentration of contamination in resident fish is expected to decrease over time, thus reducing the risk to humans. However, long-term monitoring, maintenance, and institutional controls are required to ensure the integrity of the cap. Less monitoring and maintenance would be necessary for an armored cap.

The alternative involving dredging, CDF (SD-3), Offsite Disposal (SD-4), and Onsite Treatment (SD-5), all provide additional protection by reducing the mass of contamination present in the slough. This would reduce the mass of contamination directly influenced by the hydraulic driving force of the slough and so provide a reduction in the potential for migration of contaminants into groundwater beneath the site. Alternatives SD-4 and SD-5 provide even greater protection by completely removing nearly all of the dioxin contamination and the accessible PAH contamination from the slough, and either disposing of it offsite or destroying it. However, both of these alternatives leave some deeper PAH contamination behind, and still must rely to some degree on in situ capping and long-term management. Thus, Alternatives SD-3, SD-4, and SD-5 provide a somewhat greater level of protection. However, as noted in earlier sections, migration of contamination from Old Mormon Slough sediments to groundwater is considered a minimal potential migration pathway in relation to the extensive deep soil and



Exhibit 17 to the
United States' Motion
DOJ 158

NAPL contamination in the upland portion of the site. In addition, any contribution of COCs from slough sediment to groundwater is expected to be captured by the proposed groundwater extraction system, which was evaluated separately for the Soil-Groundwater OU FS report.

### 5.4.2 Compliance with Applicable or Relevant and Appropriate Requirements

All of the alternatives would comply with ARARs, including the action-specific ARARs triggered by the dredging and construction activities proposed for the slough. Onsite treatment (SD-5) potentially may require treatment within the same area of contamination or designation of a RCRA CAMU in order to comply with LDR ARARs.

### 5.4.3 Long-Term Effectiveness and Permanence

The No-Action alternative would not be effective in reducing current or future risks. Natural attenuation processes are expected to take hundreds or thousands of years to reduce contaminant concentrations in sediment to acceptable levels.

Institutional controls, to be implemented as part of all but the No-Action alternative, do not provide long-term effectiveness and permanence alone. Stronger, enforceable, and effective controls could limit human exposure to potentially contaminated fish until sediment remediation efforts are complete, and natural metabolic and other processes reduce contaminant concentrations in the resident fish population. Institutional controls, however, would not reduce risk to ecological receptors.

To reduce risk to the environment and to protect human health over the long term, all of the alternatives (except No-Action) either isolate or remove a preponderance of the accessible contamination from Old Mormon Slough. Alternative SD-2 buries the contamination in place beneath a sand cap. This prevents resuspension of the sediment and reduces the bioavailability of the contamination to water column organisms. In situ capping of contaminated sediment is a proven and accepted technology. Given the low solubility and high sorption properties of the COCs, capping is expected to be effective in isolating these contaminants. However, long-term monitoring, maintenance, and institutional controls are required to ensure the integrity of the cap.

The CDF (SD-3), Offsite Disposal (SD-4), and Onsite Treatment (SD-5) alternatives all provide additional permanence and long-term effectiveness by reducing the mass of contamination present in Old Mormon Slough. Alternatives SD-4 and SD-5 provide even greater permanence by removing nearly all of the dioxin contamination and the accessible PAH contamination from the slough. The dredged sediment would be disposed of (and treated) offsite or treated onsite. This would provide an added measure of effectiveness and permanence for the protection of human health and the environment. However, all of these alternatives leave some deeper PAH contamination in the slough that is technically infeasible to dredge. Once exposed



Exhibit 17 to the
United States' Motion
DOJ 159

by dredging activities, this residual contamination must be capped to prevent its bioavailability to water column organisms and to benthic organisms that may re-establish in Old Mormon Slough over time. This further requires long-term management to maintain the integrity of the cap. In addition, this residual contamination may still represent a small potential source to groundwater contamination. Thus, while Alternatives SD-4 and SD-5 may provide greater long-term effectiveness and permanence relative to human health (i.e., removal of nearly all dioxin), all of the alternatives (except No-Action) ultimately rely on capping and long-term management to some degree to provide long-term effectiveness and permanence relative to protection of the environment (i.e, reduce exposure to PAHs).

### 5.4.4 Reduction in Toxicity, Mobility, or Volume Through Treatment

Only one of the alternatives, SD-5, is designed to treat the contaminated sediment to reduce its T/M/V. The Onsite Treatment Alternative would use solvent extraction to remove the organic contaminants from the sediment. The recovered organics are expected to then be destroyed by offsite incineration. This treatment train is estimated to remove and destroy more than 85% to 94% of the dioxin contamination and more than 60% to 98% of the PAH contamination. Solidification of the solid residuals (i.e., the scavenged sediment) is estimated to reduce the mobility of the residual organic and inorganic (metal) contamination by 73% to 98%.

Because LDRs for the expected waste classification of the dredged M&B sediment will be in place when the remedial action occurs, the Offsite Disposal Alternative (SD-4) would also involve treatment. Offsite incineration of the contaminated sediment prior to disposal would reduce the organic contamination by an estimated 90% to 99%.

The other alternatives (SD-2 and SD-3) do not involve treatment and would not reduce the toxicity or volume of the slough sediments. However, they would reduce the mobility of the contamination through containment. Migration of contaminants to groundwater would still be a potential pathway. Of these two alternatives, SD-3 provides the greater reduction in mobility by removing nearly all of the accessible contamination from the slough and isolating it away from the biological and hydraulic influences of the slough.

### 5.4.5 Short-Term Effectiveness

All of the alternatives, except No-Action, present some risk to workers, primarily from operation of heavy equipment and the hazards of working over water. All of the alternatives also would cause severe short-term impacts to the benthic community in the slough. The In Situ Capping Alternative (SD-2) presents the least risk to workers and the fewest impacts to the slough ecosystem. All dredging alternatives would present increased industrial risk to the workers and even more detrimental ecological effects to the slough. The Onsite Treatment Alternative (SD-5) presents the greatest risk to workers, not only from the operation of heavy equipment associated with dredging and the industrial treatment processes, but also due to the



Exhibit 17 to the
United States' Motion
DOJ 160

potential for direct exposure and inhalation of contamination while handling and treating the dredged material. The CDF alternative (SD-3) would cause the greatest environmental damage by permanently filling approximately 30% of the slough and destroying its aquatic habitat.

### 5.4.6 Implementability

All of the alternatives are technically feasible, and all necessary equipment, materials, and expertise for dredging and the installation of sediment caps is readily available in the Stockton area. However, the presence of large debris or steep bottom slopes can complicate dredging and capping activities. Dewatering of the fine-grained sediments sufficiently for offsite transport can be difficult. The Onsite Treatment Alternative (SD-5) is the most technically complex alternative with the greatest implementation concerns. It could be difficult to locate suitably sized solvent extraction systems necessary to meet effluent control standards. The ex situ S/S process on solids from the solvent extraction process greatly increases soils-handling and technology requirements over the other alternatives.

Onsite disposal of the large volumes of solid residuals from the solvent extraction/solidification treatment train would be difficult due to limited capacity in the upland OU. The availability and accessibility of an offsite TSDF permitted to receive the contaminated sediment, which is dependent on the waste designation and LDRs, could cause significant scheduling delays and increased costs.

The acceptability of any of these alternatives to neighboring land owners, the community, and regulatory agencies is uncertain. However, it is anticipated that all of the alternatives could be of some concern. In situ capping would raise the bottom of the slough by a minimum of 0.6 m (2 ft); this would restrict future activities in the slough (e.g., dredging, barge traffic) that might disrupt the cap and release the buried contamination. The CDF alternative (SD-3) would fill approximately 30% of the slough and would eliminate the waterfront access of the property owner on the northern shore of Old Mormon Slough. However, the CDF alternative (along with the other dredging alternatives) would deepen the remainder of the slough. The CDF, depending on its design, could serve as a new wharf for future waterfront access, should future conditions in the slough allow resumption of normal slough uses. The Offsite Disposal alternative (SD-4) could raise public concerns regarding the transportation and offsite treatment/disposal of hazardous waste from the site.

### 5.4.7 Cost

Costs for the No-Action alternative are the lowest ($325,745), since it only involves monitoring sediment and biota for a 30-year period. The In Situ Capping alternative (SD-2) has the lowest capital and overall costs among the active remediation alternatives, with an estimated 30-year present worth value on the order of $1.8 million (assuming 5% inflation). Cost estimates for the capping alternative have assumed the use of a 90% sand cap/10% armored



Exhibit 17 to the
United States' Motion
DOJ 161

cap combination. The total cost of an armored cap for the entire slough was estimated at $2.9 million. The CDF alternative (SD-3) has higher capital costs but lower annual costs, with a present worth value estimated to be on the order of $2.4 million. The Onsite Treatment alternative (SD-5) is estimated at a present worth value on the order of $67.2 million. The Offsite Disposal (SD-5) alternative could be the most expensive of all the alternatives, depending on the location of the TSDF and the pre-disposal treatment requirements. Because of the uncertainties involved with this alternative, low-end and high-end costs were estimated. The low-end cost assumed that the waste could be shipped to a facility in California, and that based on its waste classification, it could be landfilled without treatment. Thus, the present worth value for offsite disposal could range from $39.6 million to as high as $351 million (see Appendix C). However, as noted, the low-end value is no longer considered a realistic figure for offsite disposal since the LDRs recently became effective.

### 5.4.8 State Acceptance

This section will be completed after state agency reviews of the M&B FS report and Proposed Plan have been completed.

### 5.4.9 Community Acceptance

This section will be completed after receipt of public comments on the M&B Proposed Plan.



Exhibit 17 to the
United States' Motion
DOJ 162