


**Figure 1.2.** Old Mormon Slough and the McCormick & Baxter Site



Exhibit 20 to the
United States' Motion
DOJ 224




Figure 1.3. New Morman Slough




**Figure 1.4.** Bathymetry of Old Mormon Slough and Stockton Deepwater Channel



Exhibit 20 to the
United States' Motion
DOJ 226




**Figure 1.5.** PAHs in Sediment Samples from Old Mormon Slough (after White and Kohn 1996)

Exhibit 20 to the
United States' Motion
DOJ 227




1998/DCL/OMS/002

**Figure 1.6.** PCDD/PCDF I-TEQs in Sediment Samples from Old Morman Slough (after White and Kohn 1996)

Exhibit 20 to the
United States' Motion
DOJ 228

## 3.0 IDENTIFICATION AND SCREENING OF REMEDIAL TECHNOLOGIES AND PROCESS OPTIONS

The purpose of this section is to identify and evaluate a range of potentially applicable remedial technologies and process options for sediments in Old Mormon Slough that will achieve the RAOs identified in the previous section. "Technology" refers to general categories of technologies, such as chemical treatment or capping. The term "process option" refers to specific processes within each technology family, such as solvent extraction or use of a sand cap.

The potential technologies and process options identified in this section are those that are most appropriate for remediation of aquatic (brackish) sediments contaminated with dioxin, PAHs, PCP, and metals, taking into consideration the location of the M&B site in an active industrial area. The physical characteristics of the site, as well as ongoing activities in the area, influence the effectiveness and implementability of potential response actions and remedial technologies. Site-specific factors considered in the screening steps are listed as follows:

- Old Mormon Slough is currently rarely subject to barge traffic, but such traffic could cause resuspension of sediment.
- Old Mormon Slough is thought to recharge the groundwater system throughout the year over much of the slough's length.
- The strong sorption characteristics of dioxin and PAHs onto the fine-grained sediment of Old Mormon Slough, and the submerged nature of these contaminated sediments under 2.4 m to 4.3 m (8 to 14 ft) of standing water, limits the application of most in situ treatment technologies.
- Some institutional controls (e.g., signs, educational outreach programs) are already in place to limit public consumption of fish.
- The primary medium of concern for this OU is the sediment. Potential risks to humans through consumption of fish and to the environment can be mitigated through the remediation of sediment. Potential risks to groundwater will be addressed by remedial actions for the Soils-Groundwater OU.
- Old Mormon Slough sediments contain relatively high concentrations of dioxin.
- Sediment contamination is widespread in Old Mormon Slough.

- If similar ex situ treatment and/or disposal technologies are selected for both sediment and upland soil, they may be carried out in combination. However, they have been evaluated separately and remediation costs have been estimated separately.

Sediments of Old Mormon Slough are very fine grained, which can be detrimental to many remedial technologies. The sediments are described as stratified clay, silt, and sand (White and Kohn 1996). The uppermost sediments range from very soft, dark gray to black clayey silt to a sticky, very soft dark gray clay. The TOC content of these sediments ranges from about 2.5% to 0.7%. Deeper sediments are described as soft to firm, very dark gray or dark olive gray silt, sand, and clay. These sediments are predominantly silt at the eastern end of the slough and sand at the western end, and contain some plant remains (roots and twigs). A sharp contact separates these soft to firm alluvial sediments from an underlying hard, dry, dark gray to olive brown silt or silty clay.

## 3.1 IDENTIFICATION AND TECHNICAL SCREENING OF REMEDIAL TECHNOLOGIES FOR SEDIMENT

In this subsection, technologies and process options that are considered technically feasible for sediments at woodtreater sites are assembled for the remediation of M&B sediments. Among the information sources used in assembling these technologies and evaluating their application at the M&B site are EPA and other agency wood treater publications, presumptive remedy guidance documents, information on innovative technologies, and site-specific treatability testing.

### 3.1.1 Presumptive Remedies

A variety of technologies and process options is available for each of the GPAs identified for the M&B site. Potential remedial technologies considered for Old Mormon Slough sediments have been adapted from the universe of technologies presented in *Presumptive Remedies for Soils, Sediments, and Sludges at Woodtreater Sites* (EPA 1995) and *Contaminants and Remedial Options at Wood Preserving Sites* (EPA 1992). They represent technologies that have been consistently considered for the remediation of soils and sediments at sites similar to M&B and that were evaluated in selecting the wood treater presumptive remedies.

Since the enactment of CERCLA, EPA has acquired considerable experience in the evaluation and remediation of certain categories of sites that have similar characteristics, such as the types of contaminants present, disposal practices performed, or environmental media affected. For these groups of sites, including woodtreaters, the Superfund program has developed a “presumptive remedy” approach that uses the program’s past experience to streamline

site investigations and the selection of cleanup actions. The presumptive remedy approach is consistent with all of the requirements of the NCP; this approach has been incorporated into the FS process at the M&B site to the extent possible.

*Presumptive Remedies for Soils, Sediments, and Sludges at Woodtreater Sites* identifies bioremediation, thermal desorption, and incineration as the preferred technologies (presumptive remedies) for treating areas of principal threat consisting of organic contamination in soils, sediments, and sludges. The presumptive remedy for inorganic contamination is identified as immobilization. The applicability of these presumptive remedies is dependent on specific site characteristics; for example, if dioxin is present at high levels. While the presumptive technologies were not directly applicable to the M&B site, the presumptive remedy approach was employed in the M&B FS to limit the number of technologies to be evaluated and to streamline the analysis of alternatives. Thus, additional technologies were also considered for the M&B site, primarily to address dioxin contamination.

### 3.1.2 Innovative Technologies for Sediment

Section 300.430(a)(1)(iii)(E) of the NCP states that "EPA expects to consider using innovative technology when such technology offers the potential for comparable or superior treatment performance and implementability, fewer or lesser adverse impacts than other available approaches, or lower costs for similar levels of performance than demonstrated technologies."

The base catalyzed decomposition (BCD) dechlorination process was evaluated as an innovative technology for remediation of dioxin-contaminated soils, and potentially for dioxin-contaminated sediment. A pilot-scale medium temperature thermal desorption/base catalyzed decomposition (MTTD/BCD) treatability test was carried out at the site. The results of this test are summarized in Subsection 3.1.3.5.

Two other innovative technologies were identified as potential remedial technologies that might achieve the RAOs for Old Mormon Slough sediments. A brief description of each is presented below.

#### 3.1.2.1 In Situ Activated Sludge Bioremediation

An innovative approach to treating the sediment in Old Mormon Slough would be to operate an in situ activated sludge system to bioremediate the PAHs and PCP. The approach would segregate a section of the slough by installing barriers (e.g., silt curtains or sheetpilings) across the width of the slough. That section could then be operated as an aerobic treatment system. Such a system would require two key components: 1) the sediment would have to be well mixed and 2) the water would have to be aerated. PAHs and PCP have a low solubility and mixing the sediment would facilitate desorption of contaminants into the aqueous phase

where they could be biodegraded. Mixing also greatly increases the availability of oxygen to the deeper sediments. If the system were merely oxygenated without disturbing the sediments, the oxygen diffusion rate would be much too slow to stimulate bioremediation of even three feet of sediment in a practical time.

Mixing could be accomplished in several ways. A "rake" could be periodically dragged across the bottom of the slough to essentially till and mix the sediment. This has disadvantages, in that 1) the mixed depth will be limited if short tines are used and 2) if large objects are present (i.e., tree trunks, large boulders) the rake will be unable to mix through the objects. Another approach would be to use high pressure air/water injection through a slotted pipe that either laid on the bottom of the slough or was installed as a horizontal well. In the former case, it could be expected that the slotted pipe would dig itself down into the sediment as material was moved by the injected fluid. For horizontal wells, the pressure would have to be high enough to fluidize the overburden sediment. A third mixing method would be to use a hydraulic dredge, but redeposit the dredged material into the bioremediation system.

Other considerations for implementing this system include nutrient amendments, microbial culture, encapsulated microbes, use of surfactants, and byproducts of biodegradation. Nutrient amendment (nitrogen, phosphorous, etc.) may be appropriate to stimulate microbial growth and get higher degradation rates. The choice of microbial culture (indigenous, exogenous, bacterial, fungal, etc.) will have an effect on which compounds are biodegraded and at what rate. Growing an enrichment of microbes in an ex situ reactor may provide an inoculum with high numbers of organisms, but there could be concerns about effects on the native microbial population. Encapsulated bacteria have been shown to have improved degradation capability and may be desirable. However, it may not be appropriate to introduce the encapsulating material (polyurethane, vermiculite, agarose, etc.) into an environmental setting where they would not be easily recoverable. Surfactants can be important to use for dissolving the contaminants off of the sediment and into the aqueous phase, thus improving the contaminant bioavailability.

This technology is similar to an aerobic activated sludge basin at a wastewater treatment plant. However, this technology is not known to have been applied for in situ environmental remediation. Treatability testing would be required to determine effectiveness and design information. Because of poor results from bioremediation treatability studies conducted on site soils (see Subsection 3.1.3.3) and implementation concerns in the slough, this technology was not evaluated further.

#### 3.1.2.2 Ex Situ Vitrification (TerraVit™)

Terra-Vit™ is a melter/vitrification technology for ex situ treatment of low-level or non-radioactive waste. It can process 25 to 400 tons of contaminated soil, sludge, and combustible waste per day. It is a low-cost method of reducing waste volume, destroying organics, and



Exhibit 20 to the
United States' Motion
DOJ 232

immobilizing heavy metals and low-level radioactive materials for a wide range of nonhazardous and chemical, radioactive, and mixed hazardous wastes. The end product is a stable, chemically durable glass that will remain intact indefinitely. Vitrified non-radioactive waste is salable and recyclable. Terra-Vit can process different waste streams without requiring equipment changeover. It also can operate onsite, reducing costs associated with waste transportation and storage. However, its effectiveness has not been demonstrated for woodtreater wastes.

### 3.1.3 Treatability Testing

Site-specific treatability tests were conducted on the upland soils for several of the treatment technologies under consideration. The upland soils contain the same general contaminants as the slough sediments and, therefore, the test results are potentially applicable to the Surface-Water Sediment OU. However, the physical natures of the soils and sediments are likely to be significantly different. The sediments have a higher moisture content and a finer grain size; therefore, additional sediment-specific treatability studies would be needed for promising treatment technologies.

Bench-scale tests for the M&B site were conducted by the EPA National Risk Management Research Laboratory (NRMRL) in Cincinnati, Ohio. Soil treatability tests were conducted for solvent extraction, biotreatment (land farming, biotreatment with Fenton's reagent, and inoculated biotreatment), solidification/stabilization (S/S), and soil wet sieving/screening. Results from treatability studies (S/S and soil washing) that were conducted by NRMRL for similar EPA wood treater sites were also considered potentially applicable to the M&B site. In addition to the soil studies, NRMRL also conducted water treatment tests that may be relevant for management of treatment residuals. Bench-scale groundwater treatability tests were conducted for carbon adsorption and ultra-violet (UV) oxidation, and a pilot-scale test was conducted at the site for UV oxidation. Results of the treatability tests will be included with results from other NPL wood treater sites in a NRMRL report scheduled for release in Fall 1997. In addition, as mentioned in the discussion of innovative technologies, a pilot-scale MTTD/BCD treatability test was conducted at the site in June 1995 to evaluate a potential technology for dioxin-contaminated soils.

The results of the M&B treatability tests and their potential applicability to sediments are discussed below. (The tests are described in more detail in the Soils-Groundwater FS report.) The results of these treatability tests formed part of the decision to retain or reject these technologies for further evaluation. Conclusions regarding the tests are included in **Table 3.1**.

In general, the soil treatability test results indicated that S/S and solvent extraction might be useful for the sediments, while soils washing was not likely to be effective. The specific tests conducted on M&B soils also indicated that biodegradation was not an effective treatment. The results of the groundwater treatability tests generally indicated that carbon adsorption and $H_2O_2$/UV treatment might be effective treatments.

#### 3.1.3.1 Soil Washing Techniques

**Physical Separation (Wet Screening Analysis).** If a certain size fraction (usually the fine fraction) contains the majority of the contamination, physical soil washing techniques can be used to reduce waste volumes. Initial indications can be obtained from a wet screening analysis. Wet screening done on M&B END soils indicated that there was a 3 to 4 times higher contaminant concentration in the finer (-50+100 mesh) soils. However, the lower concentrations in the coarse fraction of the soil are still well above the required treatment levels so physical soil washing alone is probably not useful for soil treatment. The finer grain size of the sediments relative to the soils would make soil washing less effective.

**Soil Washing (Wet Screening Analysis).** The wet screening treatability study of M&B soils also showed that little of the contamination was with the water fraction, indicating that aqueous soil washing would require amendments if it were to be successful. Soil washing treatability studies from other sites indicated that water was not an effective washing agent. Amendments (3% Makon 12 and 3% Igepal CA-720) were shown to increase the concentration of contamination in the water but not by amounts large enough to indicate that soil washing would be a feasible option for these types of contaminants.

#### 3.1.3.2 Solvent Extraction

The CF System Dimethyl Ether Extraction Process uses pressurized dimethyl ether to extract contaminants from soils. This material is a gas at ambient pressure and temperatures but liquefies when pressurized. The liquid dimethyl ether is contacted with the contaminated soil in an extraction vessel and then transferred to a separation vessel. The pressure in the separation vessel is reduced to ambient and the solvent vaporizes leaving the removed contaminants and a portion of the soil moisture in the separation vessel. The concentrated contaminant/water mixture are collected for subsequent treatment/disposal.

The treatability studies conducted on M&B soils indicate that this may be an effective technology for removing dioxins, furans, and SVOCs. The technology will not remove metals. Two extractions were generally able to remove greater than 95% of the organic contamination present in the soils. This technology may be an effective treatment for sediment; however, the high moisture content of the sediments may be an issue.

#### 3.1.3.3 Bioremediation

Bioremediation (land farming) studies were conducted with M&B soils using the Utah Water Resource Laboratory Biotic Process to assess if a strong oxidizing agent such as manganese enhances biodegradation of PCP and PAHs in soil. One sample had 1000 mg/kg of MnO added to the sediment. Although significant contaminant concentration reductions using biodegradation processes have been shown at other wood treater sites (EPA 1992), both

of these tests showed minimal overall biodegradation after 91 days on M&B site soils. Contaminant concentrations in samples without manganese were no lower than pretreatment levels. For samples treated with manganese, BAP was decreased by 9%, BAP equivalence values by 16.2%, and PCP by 31%.

#### 3.1.3.4 Solidification/Stabilization

S/S treatability studies, two for M&B site soils, were conducted for NRMRL by three separate vendors. In one study, two M&B soil samples were tested with mixes containing activated carbon (5% and 7.5%, respectively), cement, and water. After 29 days; sampling by Synthetic Precipitation Leaching Procedure (SPLP) indicated that PCP was reduced by 99.4% and 99.8%, respectively, and arsenic was reduced by more than 89%. BAP was not detected in untreated soil; however, reductions of other PAH compounds were reduced by 79% to 98%. In each case, equivalent or better results were obtained with the mix containing more carbon.

In the other S/S study, M&B soils were treated with formulations containing a proprietary mixture of reagents and water, with and without cement. PCP was reduced by 98.7% for the formulation without cement, and by greater than 99.9% for formulations with cement. Zinc levels were reduced by 56% without cement and 89% or better with cement. BAP was not found in the untreated soils extract.

#### 3.1.3.5 Pilot-Scale BCD Test

Pilot-scale testing of an ETG Environmental, Inc. MTTD/BCD treatment system was performed at the M&B site in June 1995. The purpose of the test was to evaluate the effectiveness of the process as a potential treatment technology for organic COCs, particularly dioxin. MTTD/BCD is a physical and chemical process that thermally desorbs and decomposes chlorinate organic compounds from soil or sludge. The vapors emitted from the MTTD are collected by a vapor recovery system (VRS) that collects and condenses the desorbed organic compounds and water, followed by two-stage (a direct contact oil scrubber and a water scrubber) vapor scrubbing. Granular activated carbon (GAC) and polymer adsorber are used to polish the vapors prior to atmospheric discharge.

The organic contaminants recovered from the VRS are sent to a liquid tank reactor (LTR). Dechlorination of contaminants is effected in the LTR by heating from 610°F to 650°F in the presence of an added base (i.e., sodium bicarbonate), a catalyst, and a hydrocarbon source (specially formulated oil) that serves as the reaction medium and the hydrogen donor.

While the test plan called for six separate MTTD runs on soils from two different locations at the site (with and without the addition of sodium bicarbonate), followed by three BCD LTR runs, problems were encountered with the total hydrocarbon (TH) emissions from the stack and with the soil feed rate during the first run. Modifications were made to the scrubber system



Exhibit 20 to the
United States' Motion
DOJ 235

to reduce the TH emissions before a second run was attempted. During the second run, the soil feed rate (<25 lb/h) was again below the specified feed rate and TH emissions were again above acceptable levels; as a result, the second run was stopped.

The results from the first two test runs showed that TCDD TEQs were reduced from 272 mg/kg to 16.5 mg/kg (93.9% reduction) and to 2.5 mg/kg (99.1% reduction) for Run #1 and Run #2, respectively. Although the destruction rates were high, they did not achieve the preliminary soil cleanup level for dioxin. For this reason and because of the implementation problems with the MTTD/BCD unit, no further test runs of the process were performed for the M&B site and the technology was not carried forward in the FS as a potential technology.

#### 3.1.3.6 Water Treatment Systems

The following technologies would be applicable if dredged sediments were dewatered and the liquids required further treatment:

**Calgon Carbon Accelerated Tests.** This test evaluated the effectiveness of carbon adsorption for removing organic contaminants from water samples. The carbon was effective (concentrations were reduced to less than 10 µg/liter) for all of the COCs tested except PCP.

**Cav-Ox System.** This system destroys contaminants in aqueous streams through the addition of $H_2O_2$ and the use of UV light. Several tests were conducted with different $H_2O_2$ addition rates and different UV powers. The technology generally was not effective for PAHs.

**Vulcan Peroxidation Water Treatment.** This system destroys contaminants in aqueous streams through pH adjustments, the addition of $H_2O_2$ and the use of UV light. The main finding in this treatability study was that this technology was not very effective for treating water with suspended sediments. The technology was effective for destroying SVOCs, if the particles were removed with a 5-micron filter.

### 3.1.4 Summary of Sediment Remedial Technologies

Table 3.1 lists and describes the potential remedial technologies and process options for meeting sediment RAOs at the M&B site. Process options that were eliminated based on technical infeasibility are indicated on the table and are not carried forward for the initial screening.



Exhibit 20 to the
United States' Motion
DOJ 236

## 3.2 INITIAL SCREENING OF REMEDIAL TECHNOLOGY PROCESS OPTIONS

This evaluation considers those technologies that have been shown to be technically implementable for wood treater sites. It focuses on the process options screening according to the criteria of implementability, effectiveness, and cost. For screening purposes, these criteria are defined as follows (EPA 1988a):

- Implementability has two primary components:
  - Technical implementability - assessing whether the technology can effectively manage the wastes, specifically considering factors such as the chemical and physical nature of the waste and site-specific features (such as contamination at great depth) that could limit the application of the technology
  - Administrative feasibility - assessing whether legal or other requirements can be met or obstacles can be overcome, such as the ability to obtain permits for offsite actions, the availability of treatment services and/or disposal services (including disposal capacity), and the availability of the technology (including equipment and skilled workers).
- Effectiveness has three primary components:
  - Potential effectiveness of the process option in handling the estimated area or volume of affected media and meeting the RAOs
  - Potential impacts to human health and the environment during the construction and implementation phase
  - Reliability of the process with respect to the contaminants and conditions at the site.
- Relative costs are screened according to two primary cost components:
  - Relative capital cost
  - Relative operation and maintenance cost.

At this screening level evaluation, costs are given only limited weight in comparison to effectiveness and implementability. Relative costs are considered as "high," "medium," or "low" within a remedial technology group and are developed from readily available sources including EPA presumptive remedy guidance and engineering judgement and experience.

Results of this screening for M&B slough sediments are summarized in **Table 3.2**. Process options that were eliminated based on this screening are indicated on the table and are not carried forward for the detailed analysis in Section 4.0.

### 3.2.1 No-Action

The No-Action response does not include any remedial technologies or process options to actively remediate the site. This response action will not meet the RAOs, but is retained for comparison purposes as required by the NCP.

### 3.2.2 Institutional Controls

Institutional controls do not actively address the contamination, but do reduce the possibility of human and environmental exposure. Potential institutional controls consist of land use, access restrictions, and site monitoring. Access and use restrictions reduce the likelihood of exposure to contaminants arising from trespassing, future development, or excavation at the site. Proprietary and/or governmental restrictions and notifications can be used to ensure that the land use of the property is restricted; for example, to ensure maintenance and integrity of containment systems such as a cap. While these controls are unlikely to meet the RAOs by themselves, many of them are retained for use in combination with other general response actions.

#### 3.2.2.1 Land Use and Access Restrictions

Land use and access restrictions include the use of proprietary and/or governmental restrictions such as: deed restrictions, physical site access restrictions, and/or fishing advisories or restrictions.

**Deed and Land Use Restrictions.** These institutional controls would include proprietary and/or governmental (including enforcement) restrictions such as: limiting future land uses to appropriate industrial uses (and prohibiting other uses); restricting access to and use of upper aquifer groundwater to prevent exposure to contaminated groundwater; prohibiting activities that would disturb the integrity of the remedy, including appropriate prohibitions on activities that would disturb a cap placed over contaminated slough sediments; requiring appropriate handling of dredged materials (e.g., silt curtains would be required and dredge material would have to be properly treated and/or disposed); providing for appropriate notice (in land records and otherwise) that hazardous wastes remain on site; and prohibiting other activities that could cause a potential threat to human health or the environment.

**Site Access Controls.** The M&B site is currently completely fenced, posted with warning signs, and security service is maintained 24 hours. Old Mormon Slough is posted with



Exhibit 20 to the
United States' Motion
DOJ 238

signs stating that swimming and fishing are not recommended due to the presence of contaminated sediment. Additional physical site access restrictions for Old Mormon Slough would consist of strategically placed security fencing and warning signs along the slough. In addition, log booms would be placed to limit water traffic (boats and barges) into all or portions of the slough. These supplemental access restrictions could reduce direct human exposure to contaminated sediments in Old Mormon Slough and indirect exposure via consumption of fish caught in the slough; however, these restrictions would not be effective with respect to ecological receptors. Warning signs aimed at reducing boat/barge traffic and protective booms would also be effective in reducing the potential for resuspension of contaminated sediment.

**Fishing Advisories/Restrictions**. Promulgation of fishing advisories, restrictions and/or limitations (e.g., "Catch and Release") for Old Mormon Slough and other nearby water bodies would only be effective in reducing recreational fishing. These actions are unlikely to have much effect on subsistence fishing, because subsistence fishermen generally do not have valid fishing licenses and may not comply with current fishing regulations. This process option was not retained because it is unlikely to be effective.

#### 3.2.2.2 Monitoring

Periodic sampling and analysis would be conducted to monitor contaminant levels in resident fish populations and other representative biota and sediment. The physical system would also be monitored for changes in sedimentation/erosion rate, bottom stability, and sediment transport. Monitoring is not retained as a stand-alone option. However, it will be a component of the remedial alternatives to determine whether remedial action objectives are achieved and/or the effectiveness of containment structures or other remedial actions are confirmed.

### 3.2.3 Containment/Isolation Technologies

Containment and isolation technologies physically control or stabilize the contamination in place, thereby retarding and/or eliminating the migration and exposure pathways. Potential engineering controls for containment and isolation of the contaminated sediments include in situ capping, backfilling of the slough, vertical hydraulic barriers, and/or sedimentation controls.

#### 3.2.3.1 In Situ Capping

In situ capping would bury and stabilize the contaminated sediments in place, thereby isolating them from the ecosystem and human exposure. Two types of caps were examined; a single layer (sand) cap and a multilayer (armored) cap. Both types of cap would be effective in reducing the bioavailability of contaminated sediments. However, the installation of a submarine cap can be difficult, especially over soft unstable sediment. Thus, the cap design would have to consider the engineering properties of the bottom sediments to avoid mixing of cap materials with the contaminated sediment and to avoid slumping and/or other failure of the cap.



Exhibit 20 to the
United States' Motion
DOJ 239

The integrity of the cap could also be destroyed by future activities in the slough (e.g., prop wash from barges, future dredging). Capping would temporarily destroy the local benthic community; however, recolonization by a more diverse community is expected within 1 or 2 growing seasons. Regular monitoring and maintenance would be required to maintain the integrity of the cap.

**Sand Cap**. The single layer sand cap is expected to be less expensive and more easily installed and maintained than the armored cap. It is also expected to be thinner than an armored cap (thus not impacting the depth of the slough as much) and would better facilitate recolonization and regeneration of the benthic community. However, sand caps can be susceptible to erosion in a high-energy environment. Since Old Mormon Slough is a dead end slough with a low-energy water action, and a net deposition of sediment, the sand cap process option was retained for consideration as the primary capping technology.

**Armored Cap**. The cost of a high energy armored cap has been estimated at 3.5 times that of a low-energy sand cap (PTI 1995). The necessarily thicker cap would dramatically raise the bottom of the slough, thereby decreasing future uses of Old Mormon Slough. The coarser (rip-rap) surface material is also expected to retard re-establishment of benthic community. Thus, this process option was not retained for consideration as a principal component of potential remedial alternatives. However, localized armoring of the sand cap is considered where erosion protection may be an important consideration.

#### 3.2.3.2 Channel Filling

Another containment/isolation technology considered for Old Mormon Slough was to completely backfill portions of the slough with dredged and/or upland materials and top with clean soil. This would reduce the size of the slough and effectively isolate the contaminated sediment from the ecosystem and human exposure. This would also eliminate the hydraulic driving force for potential migration of aqueous phase contaminants from the slough into the groundwater system. Implementation would be relatively straightforward; however, it would permanently destroy portions of the existing aquatic habitat. This process option is retained for consideration in conjunction with construction of a CDF.

#### 3.2.3.3 Vertical Walls

Vertical barriers were considered to address the potential pathway of contaminated slough sediments as a source to groundwater contamination by preventing the horizontal movement of contaminants. Several types of vertical barriers were considered, including soil-bentonite slurry walls, cement-bentonite slurry walls, synthetic material sheet walls, and steel sheetpiling. All of these technology options can be effective in reducing potential threats to groundwater; however, their added benefit to the already low permeability Old Mormon Slough sediments and highly sorbing COCs is uncertain. Implementation and the practical depth limit

of the slurry wall and synthetic sheet wall options are not considered as favorable in this environment as that of sheetpiling (which has already been implemented at the site). In addition, the impermeability of cement-bentonite mixtures can be adversely affected by organic contaminants and/or soluble salts, requiring detailed treatability testing. Sheetpiling, on the other hand, is effective and relatively straightforward to implement. In addition to preventing the horizontal migration of contaminants, it can be designed to provide structural support in the form of a retaining wall. Thus, only sheetpiling has been retained for further consideration as a component of the slough remedial alternatives. (The use of vertical walls at the M&B site was evaluated in more detail in the FS for the Soil-Groundwater OU for potential applications for groundwater remediation.)

#### 3.2.3.4 Sedimentation Controls (Silt Curtains)

Silt curtains consist of permeable, fine-mesh geotextile fabric that is suspended from a metal framework and stretched across the slough to trap and contain potentially contaminated sediment that is resuspended. It can also be used for the same purpose during dredging or other disruptive remedial actions. This is a proven means of controlling the downstream movement of fine-grained sediment. It is not retained as a stand-alone option, but is retained for further evaluation in the development of the slough remedial alternatives.

### 3.2.4 In Situ Treatment Technologies

As described in Table 3.1, in situ treatment technologies for Old Mormon Slough include biological, chemical, and physical processes that reduce the toxicity, mobility, and/or volume (T/M/V) of contaminated sediment while left in place. However, the strong sorption characteristics of dioxin and PAHs onto the fine-grained sediment of Old Mormon Slough, and the submerged nature of these contaminated sediments under 2.4 to 4.3 m (8 to 14 ft) of standing water, limits the applicability of in situ treatment technologies. For these reasons, no in situ treatment technologies were retained for further analysis and are not evaluated according to the three screening criteria.

### 3.2.5 Sediment Removal Technologies

All ex situ treatment or disposal response actions require the removal of contaminated sediment from Old Mormon Slough. The most applicable sediment removal technology is dredging. Dredging is typically performed from a barge, by lowering removal equipment into the water and extracting the sediment. Dredged sediments are then typically loaded on a companion vessel or pumped by pipeline to shore. Dredged sediments are then transported to the treatment and/or disposal areas by pipeline, barge, railroad, or truck.



Exhibit 20 to the
United States' Motion
DOJ 241

Dredging is a proven and an effective method for sediment removal. However, dredging does result in short-term impacts from resuspension of contaminated sediment and the loss of existing benthic communities.

There are a variety of specific dredging processes to remove contaminated sediment; however, the two most common types of dredging are mechanical and hydraulic dredging. The selection of the appropriate dredging technique is dependent on the needs of the specific applications, operating conditions, sediment types and depth, and the need to minimize sediment disturbance and resuspension. Some processes are also more effective at recovering concentrated sediment, and reducing the need for additional dewatering.

#### 3.2.5.1 Mechanical Dredging

Mechanical dredging uses a clamshell bucket or other similar mechanism to extract the contaminated sediment. Substantial amounts of sediment can be resuspended during the dredging process from insertion and removal of the bucket, leakage from the bucket, and washing of the bucket as it passes through the water column. Closed clamshell buckets can reduce some of this resuspension. Silt curtains can also be used to reduce suspended sediment concentrations outside of the dredge area. Mechanical dredging is typically less efficient and less accurate than hydraulic dredging, but has a high solids content (similar to that of the in situ sediment). Mechanical dredging is retained because it is a proven, high-solids method for removing the contaminated sediment.

#### 3.2.5.2 Hydraulic Vacuum Dredging

Hydraulic vacuum dredging uses centrifugal pumps or similar mechanism to hydraulically vacuum the sediments up from the bottom in a liquid slurry. A mechanical cutting head is usually attached to the end of the vacuum line to break up the sediment and establish the slurry form. Less sediment is resuspended during hydraulic dredging. Hydraulic dredging is typically faster, more efficient, and easier to control than mechanical dredging. However, the slurry is typically 80% water. Depending on the preferred treatment/disposal technology, the slurry would require much more dewatering than mechanically dredged sediment and would produce large volumes of waste water that would require treatment. Hydraulic vacuum dredging is also retained for further evaluation because of its efficiency and ease of control.

#### 3.2.5.3 Temporary Dam, Dewatering, and Excavation

An alternative to dredging is the temporary damming and dewatering of Old Mormon Slough to excavate the slough sediments. Approximately 31 million gallons of water would have to be pumped from the slough once a temporary (sheetpile) dam was constructed. An additional 840,000 gal/day of water would have to be pumped to keep the sediments dry



Exhibit 20 to the
United States' Motion
DOJ 242

(assuming an infiltration rate of approximately 2 gpd/$ft^2$, which is a reasonable hydraulic conductivity for silt). Assuming a four-month operational period, this option would require the treatment (filtering) of approximately 260 million gallons of water. In addition, the cost of installing and removing a temporary dam, dewatering the sediment, and excavating the sediment was estimated at approximately $539,000 more than dredging alone. If treatment of the water from the dewatering process was necessary before discharging back into the slough, the cost would be even higher. Based on implementability and cost, this alternative is not retained for further analysis.

### 3.2.6 Ex Situ Treatment Technologies

The screening of ex situ treatment technologies for sediment is similar to that conducted for upland soils (ICF 1997). It is envisioned that the treatment of sediment would be conducted in conjunction with that of the upland soils if similar technologies were selected for both OUs. There may be some differences in the effectiveness and implementation of these technologies for sediment compared with soils due to the potential differences in organic content and water content. However, the characteristics of the sediment and soils, such as particle size and the types of contaminants, are similar enough that the screening of remediation technologies for soils is considered applicable to sediments.

The following four categories of ex situ treatment technologies are associated with this general response action: biological, thermal, chemical, and physical treatment processes. Sediment characteristics that can influence the effectiveness of these treatment options are the type of contaminant present, clay content, particle size, and water content.

#### 3.2.6.1 Ex Situ Biological Treatment

Biological destruction technologies use either aerobic or anaerobic methods that rely on microorganisms to chemically degrade organic contaminants. Two ex situ bioremediation processes are potentially applicable to remediation of Old Mormon Slough sediments: solid-phase bioremediation and slurry-phase bioremediation.

**Solid-Phase Bioremediation**. Solid-phase bioremediation (land farming) places the contaminated sediment in a lined bed to which nutrients (i.e., nitrogen and phosphorous) are added. Aeration and moisture content are also controlled to facilitate the development of the microorganisms. Composting is a variant of the solid-phase bioremediation process that mixes the contaminated sediment with straw, bark, manure, or wood chips to improve the texture, workability, and aeration of the waste materials.

Solid-phase bioremediation is one of the EPA presumptive remedies for treating organic contaminated soils and sediment at wood treater sites (EPA 1995), and can be very effective.



Exhibit 20 to the
United States' Motion
DOJ 243

EPA (1992) reported removal efficiencies on the order or 87% for PAHs and 74% for halogenated phenols and cresol; the effects on dioxin are uncertain. However, land farming treatability studies on M&B site soils showed minimal overall biodegradation after 91 days.

This process requires a relatively large land area and could interfere with other remediation at the M&B site. Degradation rates can be on the order of months; however, continued operator attendance is not required. Costs for landf arming are relatively low, generally in the range of $38-$60/m$^3$ ($50-$80/cy), while composting is on the order of $76/m$^3$ ($100/cy) (EPA 1992). However, because of the poor results of the site-specific treatability studies, this process is not retained for further evaluation.

**Slurry-Phase Bioremediation**. This process option is also an EPA wood treater site presumptive remedy for organics. Slurry-phase bioremediation mixes dredged sediment or slurry with water in a tank or lagoon, which is then mechanically agitated. Nutrients, oxygen, etc., are added in a controlled process. While degradation rates are typically much faster than the solid-phase (land farming) treatment, it is generally conducted in much smaller batches. This process has higher capital and operating costs than solid phase ($60-$115/m$^3$ [$80-$150/cy]) (EPA 1992). This option is not retained for further consideration.

#### 3.2.6.2 Ex Situ Thermal Treatment

Thermal treatment technologies can be used to extract (thermal desorption) and/or destroy (incineration and pyrolysis) organic contaminants in the soil, and to physically solidify/stabilize inorganic contamination (ex situ vitrification). The expected effectiveness of each process option on Old Mormon Slough sediments is discussed below, with the exception of ex situ vitrification, which was discussed in Subsection 3.1.2.2 as a potential innovative technology.

**Thermal Desorption**. Thermal desorption physically separates volatiles and some semi-volatile contaminants from excavated soils and sediment. It uses ambient air, heat, and/or mechanical agitation to volatilize the contaminants into a gas stream for further treatment. Typically, the contaminated sediments are heated in a low-temperature furnace. The organics are then collected from the off-gas (e.g., on activated carbon) for disposal or further treatment.

This is a proven technology and is an EPA presumptive remedy for treating organic contaminants (except dioxin) at wood treater sites (EPA 1995). It can be very effective; however, the high moisture content of sediments can increase operating costs. It also requires treatment/disposal of the off-gas, condensate, and solid residuals from the process. This process option was not retained due to its high cost ($90-$500/m$^3$) ($250-$650/cy) (EPA 1995), potential emissions concerns, and because it would not be effective for dioxin in the sediments.



Exhibit 20 to the
United States' Motion
DOJ 244

**Incineration**. Incineration destroys organic compounds by subjecting them to temperatures typically greater than 537°C (1000°F) in the presence of oxygen. Volatilization and combustion of the organic contaminants occurs converting them to carbon dioxide ($CO_2$), water ($H_20$), hydrogen chloride (HCl), and sulfur oxides ($So_x$) (EPA 1992).

Incineration is one of the EPA presumptive remedies for treatment of soils and sediments at wood treater sites. It is very effective for all organics, including dioxin. Residual solids would require further treatment for metals contamination. The high moisture content of dredged sediment can reduce the incinerator's capacity and thus increase the costs. The incinerator may also require a high degree of off-gas treatment to meet clean air standards (ARARs). Because of potential emission concerns, particularly due to the presence of dioxin in site soils, state agency and community acceptance is considered unlikely. The costs of setting up, permitting, and operating an onsite incinerator are very high. Estimated costs for incineration are on the order of \$370-\$1200/$m^3$ (\$480-\$1600/cy) (EPA 1992). Onsite incineration has not been retained for further analysis because of its high cost and implementation concerns.

**Pyrolysis**. Pyrolysis differs from incineration in that it uses high temperature in the absence of oxygen. It transforms long-chain organic compounds into gaseous components (CO, $H_2$, and methane) and a solid residue (coke) containing fixed carbon and ash. As with incineration, residual solids would require further treatment to address metals. Pyrolysis produces fewer emissions, allows more control, permits higher throughput, and operates at lower temperatures than incineration (EPA 1992). However, the process produces residuals that require further treatment. This technology has not been proven for wood treater wastes. Implementation and cost considerations are expected to be similar to those for incineration. Pyrolysis has not been retained for further analysis.

#### 3.2.6.3 Ex Situ Chemical Treatment

Potentially applicable chemical treatment technologies consist of those processes used to remove the contaminants from the sediment (conventional solvent extraction and supercritical fluid extraction) and those that will chemically destroy the contaminant (dehalogenation and chemical oxidation). The expected effectiveness of these process options on Old Mormon Slough sediment is discussed below.

**Conventional Solvent Extraction**. Conventional solvent extraction uses organic solvents to selectively extract the COCs, primarily organics (EPA 1992). The process may require several passes to reduce contamination to the desired levels. The extracted solvent can be stripped of the contaminant, condensed, recycled, and reused. Treatability studies on M&B site soils indicate that this technology can be >95% effective in reducing dioxin concentrations and 67% to 98.8% effective in reducing PAH concentrations. However, the high water content of Old Mormon Slough sediment can reduce the effectiveness of solvent extraction and increase its costs. The sediment would require additional treatment to address the inorganic

contaminants. Sufficient capacity may not be available in the upland portion of the site to dispose of the treated material. Solvent extraction generates concentrated contaminants and separated solvent that must be further treated and/or disposed. Estimated costs range from \$120-\$850/m$^3$ (\$160-\$1120/cy) (EPA 1992). Because of its demonstrated effectiveness for the organic COCs this process has been retained for further evaluation in conjunction with the potential treatment technologies identified for the upland soils.

**Dehalogenation**. Dehalogenation uses a chemical reaction to remove chlorine atoms from chlorinated molecules making them less toxic. Contaminated soil is placed in a reactor with reagents (i.e., potassium polyethylene glycol [KPEG]), mixed, and heated. This reaction replaces chlorine atoms with an ether or hydroxyl group. Soil and reagents are separated and the soil neutralized. There is a possibility that a more toxic end product could be formed, in which case further treatment would be necessary. The technology is applicable to chlorinated organics (e.g., PCP, dioxin); its effectiveness for PAHs is uncertain. The process generates reagent waste, other liquid wastes, and potentially contaminated residuals that require further treatment. The cost of dehalogenation is high. For these reasons it is not retained for further evaluation.

#### 3.2.6.4 Physical Treatment Technologies

Potential physical treatment options that were considered for Old Mormon Slough sediments were S/S, soil washing and solids classification, and dewatering. The expected effectiveness of each process option for the slough sediments are discussed below.

**Solidification/Stabilization**. S/S is a well-established technology for soils containing metals, and is the EPA wood treater site presumptive remedy for inorganic contaminants. However, ex situ S/S treatability studies on M&B site soils indicate that S/S is also effective in reducing the leachability of organics, including dioxin. Solidification processes reduce the mobility of contaminants by physically restricting their contact with a mobile phase (e.g., water) (EPA 1992). Solidification also refers to the use of binders for waste bulking to facilitate handling of liquid wastes. Stabilization chemically alters and/or binds the contaminants with cementatious and other proprietary materials to reduce their mobility (EPA 1992).

Volume would increase during the S/S process and sufficient capacity may not be available in the upland portion of the site to dispose of the solidified material. The effectiveness of these processes can be adversely affected by complex organic mixtures and/or soluble salts, thus additional sediment-specific treatability studies would be necessary. Ex situ S/S is fairly easy to implement and vendors are readily available. The relative cost is medium. Ex situ S/S is retained as a process option for metals contamination in sediments and/or treatment residuals.

**Soil Washing/Solids Classification.** Soil washing is a water-based process for mechanically scrubbing excavated soils/sediment to remove contaminants by either dissolving or suspending them in a wash solution, or by concentrating them into a smaller volume via particle size separation techniques (solids classification). Solids classification generally uses screens and/or cyclone separators to segregate fine-grained contaminated sediments from coarser, cleaner sediments. This is often used to prepare a uniform composite for further treatment or disposal. The coarser fractions (sand and gravel) are often washed with a detergent (or solvent) to aid the removal of contaminants.

This process option can be effective in reducing the volume of contaminated sediments; however, the fine-grained clayey nature of Old Mormon Slough sediments makes the effectiveness of these processes somewhat questionable. Contaminant extraction processes (e.g., solvent extraction) are generally more favorable, as demonstrated by the treatability studies conducted for the M&B site. Soil washing also generates liquid wastes and potentially contaminated residuals, which would require further treatment.

This option has not been retained as a stand-alone technology or as a primary component of any general response action. However, some solids classification may be used to remove large debris prior to other ex situ treatment processes.

**Dewatering**. Dewatering is a physical unit operation that reduces the water/moisture content of slurries or sludges to facilitate handling and to prepare the materials for treatment and/or disposal. Typical dewatering methods include drying beds, centrifugation, and filtration. Actual selection of the dewatering methodology depends on the volume to be treated, the solids content, availability of land area, and the degree of dewatering required. Dewatering is not retained as a stand-alone technology, but will be included in the development of alternatives as a pretreatment technology prior to further treatment or disposal.

### 3.2.7 Disposal Technologies

Disposal technologies for sediment and/or treatment residuals include near-shore disposal (in a CDF), onsite upland disposal (engineered landfill or used as fill if not hazardous), and offsite disposal in a commercial facility.

#### 3.2.7.1 Nearshore Confined Disposal

Nearshore confined disposal technology is commonly used for sediment disposal. CDFs are used to contain approximately 30% of the dredge material produced by the U.S. Army Corps of Engineers (U.S. ACE) Navigation Program (Lincoff et al. 1994). Implementation of this technology would consolidate dredged contaminated sediment from Old Mormon Slough behind a

dammed or diked structure (e.g., behind sheetpiling) located within or alongside the slough for disposal beneath an isolation cap. The CDF would be designed to permanently contain the dredged material.

CDFs are effective for isolation of contaminated sediment; however, they can severely impact and/or destroy portions of the aquatic habitat. Their construction could also have temporary effects on water quality. This process would also require long-term monitoring and maintenance to ensure its continued integrity in containing the waste materials. The relative cost for a CDF is low to medium. This technology has been retained for further evaluation in combination with partial backfilling of the slough, as discussed in Section 3.2.2.2.

#### 3.2.7.2 Onsite (Upland) Disposal

Dredged sediments from Old Mormon Slough and/or solid treatment residuals could be disposed in the upland portion of the site. Hazardous wastes would be disposed in a specially designed and constructed onsite landfill that would contain liners or leachate collection, as appropriate. Although contaminants are not destroyed (i.e., toxicity is not decreased) and their volume is not reduced, this process option prevents the migration of contaminants by isolating the waste within an impervious landfill. Other non-hazardous treatment residuals (such as the clean coarse fractions from the soil washing/classification process or other clean solid treatment residuals) could be used as fill or for other construction materials in the upland portion of the site. To the extent that dredged hazardous media is involved, this action would not be subject to the RCRA LDRs if 1) the hazardous media were returned to the "area of contamination" (AOC) from which they came, or 2) if not considered the same AOC, a corrective action management unit (CAMU) was designated.

Development and operation of an engineered landfill would require long-term monitoring and maintenance. The cost of onsite landfilling for the expected volume of dredged sediment is low to medium for construction and long-term maintenance. Although onsite upland disposal may be appropriate on a limited basis for disposal of sediment solid treatment residuals, because capacity problems in the upland portion of the site upland disposal has not been retained for further evaluation as a stand-alone remedy for sediment dredged from Old Mormon Slough.

#### 3.2.7.3 Offsite Disposal

Offsite disposal options for contaminated sediment (and possibly treatment residuals) would be dependent on the eventual waste designation of that material. Offsite disposal to a permitted hazardous waste landfill is appropriate for hazardous materials that are not subject

to LDRs. LDRs for F032-, F034-, and F035-classified sediments[1] require offsite treatment prior to disposal at an appropriate treatment, storage, and disposal facility (TSDF). Because of this costs can be very high. Offsite transportation and treatment/disposal costs range from \$89 to \$1,096/m$^3$ (\$116 to \$1,433/cy), depending on the waste designation and the location of suitable disposal facilities. There would be some significant short-term impacts from the excavation, handling, and transportation of the soil. Applicable laws and regulations relating to the transportation and disposal of hazardous material would have to be met. Offsite disposal removes contaminated material from the site but transfers it to another location where it would be managed. However, because this represents an effective and relatively easy-to-implement option for dredged sediment, offsite disposal is retained for further evaluation.

## 3.3 SUMMARY OF REMEDIAL PROCESS OPTIONS FOR SEDIMENT

Based on the EPA presumptive remedy guidance for wood treater site sediments and the site-specific screening summarized in Table 3.2, the following technologies and process options are retained for sediment remediation:

- Institutional controls
- Capping
- Dredging
- Ex situ solvent extraction (treatment for organics)
- Ex situ solidification/stabilization (treatment for inorganics)
- Confined disposal facility
- Offsite disposal.

[1]Sediments at the M&B site are contaminated with a variety of chemicals used in the wood treatment process, including the F032, F034, and F035 wastes listed pursuant to 40 CFR Part 261 of the RCRA regulations.

# 4.0 DEVELOPMENT OF REMEDIAL ALTERNATIVES

The purpose of this section is to assemble, based on the screening of technologies and process options conducted in Section 3.0, a set of remedial action alternatives applicable to Old Mormon Slough sediments. The NCP (Section 300.430[e][1]) states that the lead agency shall include an alternative screening step (using the criteria of effectiveness, implementability, and cost) when needed to select a reasonable number of alternatives for detailed analysis. Because a reasonable number of sediment alternatives (i.e., five, including No-Action) were developed, this FS report proceeds directly from a description of the sediment alternatives in this section to their detailed analysis in Section 5.0 without a preliminary screening step.

Preliminary design assumptions were developed for each alternative, such as the extent and volume of contaminated material, the size of major technologies/process options, the time frames involved, and an estimated order-of-magnitude (+50% to -30%) cost. The design assumptions used here are not necessarily the same as the design basis that would be used for the final, detailed remedial design. In most cases, additional investigations or studies (e.g., treatability tests) would be necessary to allow final design.

It should be noted that there are some areas of overlap between the potential remedial actions for Old Mormon Slough sediments and for upland soils. Similar ex situ treatment and/or disposal technologies have been evaluated for both media. For cost-effectiveness during site remediation, implementation of similar treatment technologies, if selected for soil and sediment, would likely be carried out concurrently. However, remedial costs have been estimated separately for sediment and soil; soil remediation costs are not included in this FS report.

As noted earlier in this report, sediment contamination in Old Mormon Slough may represent a source to groundwater contamination beneath the site, although to a much lesser degree than the deep upland source areas. No direct evidence has been found that slough sediments are contributing to groundwater contamination at the M&B site; however, the sediments are considered a potential source to groundwater. If contaminated sediments are left in place and capped rather than removed, they could continue to serve as a source to groundwater, although the effect would be somewhat reduced because of the overlying cap. However, concentrations and total mass of COCs in deep slough sediments are low in relation to the significant upland sources that have been identified at the OWP and CPAs, which represent the primary sources to groundwater contamination. In any event, because Old Mormon Slough is located upgradient from the main groundwater contamination plume, any contribution of contaminants from the sediment is expected to be captured by the network of groundwater extraction wells that will be designed to address the major groundwater plume emanating from the upland sources. For this reason, groundwater remediation is not included in the scope of this FS report. The evaluation of alternatives for the remediation of groundwater at the M&B site is found in the Soils-Groundwater OU FS report (ICF 1998).



Exhibit 20 to the
United States' Motion
DOJ 250

## 4.1 DEVELOPMENT OF REMEDIAL ACTION ALTERNATIVES

Remedial alternatives, with the exception of No-Action, are developed to be protective of human health and the environment and to achieve RAOs to the extent practicable. The NCP requires that a range of alternatives be developed for source control actions such as those being considered for Old Mormon Slough sediments. The assembled alternatives represent different levels of control and risk reduction and are required to include

- a No-Action alternative, representing a baseline case, that does not include any action towards achieving site RAOs
- one or more alternatives that involve little or no treatment, but protect human health and the environment through the use of institutional controls and/or engineering controls
- one or more alternatives that use treatment to reduce the toxicity, mobility, or volume of contaminants. If appropriate, the range of alternatives should include an alternative that removes or destroys contaminants to the maximum extent feasible in order to eliminate or minimize the need for long-term site management. Other appropriate alternatives should treat the principal threats posed by a site, but vary in the degree of treatment employed and the quantities and characteristics of the treatment residuals and untreated waste that must be managed.

As identified in Section 3.0, the RAOs for the M&B site can be achieved by a number of GRAs including: isolating the contamination, treating it in place, removing and treating the contaminated sediment ex situ, or removing and disposing of the contaminated sediments. The technologies and process options that were retained from the initial screening conducted in Section 3.0 have been assembled into five remedial action alternatives:

- SD-1 - No-Action
- SD-2 - In Situ Capping
- SD-3 - Dredging and Confined Disposal (combined with limited in situ capping)
- SD-4 - Dredging and Offsite Disposal (combined with limited in situ capping)
- SD-5 - Dredging and Onsite Treatment (Solvent Extraction and S/S) (combined with limited in situ capping).

Although the use of institutional controls was considered, it was not developed as a stand-alone alternative for sediment because it would not meet the RAOs for protection of the environment. In addition, unlike the upland portion of the site, implementation of institutional



Exhibit 20 to the
United States' Motion
DOJ 251

controls is difficult for an aquatic environment. However, implementation of institutional controls was retained as a component of the other alternatives that involve containment or treatment.

## 4.2 COMMON ELEMENTS

Many of the components of individual alternatives are common to other alternatives, such as the use of institutional controls, monitoring, capping, dredging, silt curtains, and dewatering. These common elements are discussed in the following subsection to eliminate repetition in the discussion of individual alternatives.

### 4.2.1 Institutional Controls

Institutional controls would be used to restrict access to Old Mormon Slough, thereby reducing human exposure to contaminated fish and sediment. However, institutional controls would not meet the RAOs for protection of the environment, and so are not considered as a stand-alone alternative. At present, fencing and warning signs are already in place along the M&B shoreline of Old Mormon Slough. Under the No-Action alternative, these existing controls would remain but would not be maintained. Under all the other alternatives, the existing fencing and warning signs would be maintained and improved if necessary. In addition, other institutional controls, including proprietary and governmental controls, notification requirements, and physical controls would be included to some extent as a component of each remedy.

The use of additional institutional controls is dependent on the specific alternative, but could include all or portions of the following activities as a means for controlling exposure from the low-level threat area near the mouth of Old Mormon Slough that will not be addressed by capping or removal under any of the alternatives. These controls are directed primarily at reducing the potential for resuspension and transport of contaminated sediment found in localized "hot spots," as discussed in Subsection 2.2.1, while sediment accumulation and other natural attenuation processes reduce the exposure to and/or the contaminant concentrations of these hot spots (see Appendix A).

The two apparent "hot spots" near the mouth of the slough, one exceeding the MSC for PAHs at OMS-61 (see Figure 2.2) and the other exceeding the MSC for dioxin at OMS-60 (see Figure 2.3), are located in the uppermost sediments and so are not considered to pose a threat to groundwater. These "hot spots" represent less than 0.3% of the total PAH and only 2% of the dioxin mass in the slough sediments. There is no obvious spatial continuity between these high values and the surrounding values; thus, these values are unlikely to represent an area of contamination that could be located again. Such "hot spots" are extremely difficult to define in an aquatic environment for implementation of any active remedial action such as capping or dredging. Applying containment or dredging to the entire MTH portion of the slough for the sole purpose of remediating these two localized, low-level threat areas is not warranted based on the degree of risk reduction expected versus the anticipated remedial cost. Therefore, the only



Exhibit 20 to the
United States' Motion
DOJ 252

feasible GRA for the mouth area of the slough is to use institutional controls to control access to and limit the types of activities conducted in this area of Old Mormon Slough.

Specific institutional controls for the mouth area of Old Mormon Slough include the installation of a log boom and warning signs across the mouth of the slough to limit or restrict navigational access to the slough. This would prevent inadvertent erosion (via boat prop wash) and resuspension of the surface sediment (and "hot spots"). Deed notices would be promulgated to keep the site zoned for appropriate industrial and/or commercial uses only and to prohibit dredging in the slough without further study, use of proper controls (e.g., silt curtains, proper disposal and/or treatment of dredged material), or remediation. Environmental monitoring would be conducted to assess the progress of natural attenuation processes.

Under all of the sediment alternatives, except No-Action, similar institutional controls might be implemented for the other portions of Old Mormon Slough to prevent inadvertent erosion or other disruption of in situ sediment cap materials that would cause exposure of more highly contaminated older sediment. In addition, access controls (i.e., log booms, additional fencing, and warning signs to fully encompass the areas of principal and low-level threats) might be added under the other alternatives to reduce human exposure to contaminated sediment and fish by restricting access to the slough.

### 4.2.2 Monitoring

Monitoring is included as a component of all remedial action alternatives, including the No-Action alternative. Monitoring is generally conducted for both short-term (during remediation) and long-term (post-remediation) purposes. Short-term monitoring is conducted to 1) detect any negative impacts of the remedial actions, thereby allowing prompt mitigation; 2) evaluate the performance of the remedial action for comparison to design expectations; and 3) identify operation and maintenance concerns that need to be addressed to optimize remedial performance. Long-term monitoring is conducted primarily to allow timely maintenance of containment measures and to ensure that remedial actions are effective in achieving RAOs over the long term.

A general description of appropriate monitoring activities is presented here and a conceptual monitoring program is presented in **Table 4.1**. However, specific details of a monitoring program are dependent on the selected remedial action(s). Detailed monitoring plans will be developed for the selected remedial actions during the remedial design phase. In general, monitoring would begin with intensive efforts to establish the environmental baseline and to monitor active remedial measures. Following the construction and active remediation activities, the level of monitoring would be reduced to support long-term performance assessment of the remediation. Both physical and chemical monitoring would be performed to assess site conditions and monitor the fate and effects of residual contamination.



Exhibit 20 to the
United States' Motion
DOJ 253

Short-term monitoring would include sediment, water, and biota sampling and analyses. Sediment sampling would be conducted to more precisely define heavily contaminated areas for dredging (if applicable) and/or capping. Monitoring would also be performed during dredging and/or cap placement to evaluate the short-term effects on water quality and adjacent sediment quality and to ensure that the dredging and/or capping meet specifications for location, depth or thickness, material design, final bottom topography, etc. Biological monitoring would be performed to assess the short-term biological effects of dredging and/or capping, to assess the re-establishment of a healthy benthic community and ensure that biological activity will not damage the cap integrity.

Long-term monitoring would include sediment, water and biological sampling, and chemical analyses to monitor the long-term stability and natural degradation of residual contamination. This would include sediment core sampling and chemical analyses. Capped surfaces would be monitored for maintenance requirements to identify areas of scouring or suspension and redeposition, thereby identifying areas requiring additional cap materials or armoring. The cap surface would be sampled and analyzed to determine if adjacent uncapped areas are contaminating the cap. Sampling and analysis of water samples from Old Mormon Slough would determine compliance with EPA AWQC and other ARARs. Periodic biological monitoring would be conducted for comparison with the California State Mussel Watch program standards. Uncapped areas would be sampled and analyzed (both sediment and biota) to monitor the progress of natural attenuation.

### 4.2.3 Sediment Capping

Sediment capping is used to physically cover and isolate contaminated sediment. All of the sediment remedial alternatives (except No-Action) employ sediment capping to varying degrees to isolate PAH and dioxin-contaminated sediment from the ecosystem. A general discussion of design assumptions is presented here. Details for each alternative are provided in later subsections.

Capping would be performed using locally quarried clean fine sand as the cap material. An armored multilayer cap was also considered during the screening process in Section 3.0. However, the capital cost to install an armored cap was estimated to be two to three times that of the natural cap (EPA 1992), and conditions in Old Mormon Slough do not warrant an armored cap for the entire slough area. The quiescent nature of the slough, with limited erosion and net deposition of sediment, as well as the lack of navigational traffic, suggests that an armored multilayer cap is unnecessary. Localized armoring of the cap (with rip-rap and an underlying gravel filter layer) would be installed in areas found to be susceptible to erosion, based on data (such as nearshore wave action, bottom velocities, and barge/boat traffic patterns and frequencies) acquired during remedial design. For these reasons, a sand cap was selected as the representative in situ capping technology for the development of alternatives.



Exhibit 20 to the
United States' Motion
DOJ 254

Installation of the cap would be conducted when the tides are lowest and are incoming to ensure containment of any disturbed sediment and to prevent the release of contamination outside of the slough. Minimal preparation of the slough bed (removal of rubble, pilings, etc.) would be performed prior to installation of the cap. Thickness of the cap would be a minimum of 0.6 m (2 ft), which conservatively accounts for chemical, biological, and operational (i.e., placement accuracy and thickness irregularity) characteristics (**Table 4.2**). The cap would cover the entire targeted portion of the slough bottom. The use of a permeable sand cap would promote the re-establishment of a benthic community, yet bioturbation is estimated to be limited to the upper 2 cm of the cap material and thus would not affect the integrity of the cap. The permeable sand cap would also permit any gases formed during decomposition of organic mater to escape. A 10% safety factor is used in estimating the volume of material required.

### 4.2.4 Sediment Dredging

Three alternatives employ the use of selective dredging to remove the most heavily contaminated sediment from the slough and to reduce the mass of contamination available for bioaccumulation in the aquatic organisms. The areas identified for contaminant removal (dredging) vary, ranging from the portion of the slough just north of the OWP area to the END of the slough. Both mechanical and hydraulic vacuum dredging passed the technology screening process. However, mechanical dredging was selected as the representative process option because hydraulically dredged material would have a very high water to solids ratio (~5:1), which would make sediment handling, treatment, and/or disposal more difficult and costly.

The sediment to be dredged from Old Mormon Slough has been described as stratified clay, silt, and sand (White and Kohn 1996). The uppermost material in the OWP, CPA, and END sections of the slough consists of very soft, very dark gray to black homogeneous clayey silt ranging in thickness from 0.4 to 1.2 m (1.4 to 3.8 ft). Gas holes were commonly observed in core samples. Gravel fill was found at or near two of the sampling stations. Throughout the CPA and END sections this clayey silt is underlain by sticky, very soft dark gray clay, ranging in thickness from 0.3 to 0.7 m (0.9 to 2.2 ft). The TOC content of these upper sediments ranges from about 2.5 to 0.7%. The clayey silt and sticky gray clay units are underlain by soft to firm, very dark gray or dark olive gray silt, sand, and clay. These sediments are predominantly silt at the eastern end of the slough and sand at the western end. They contain some plant remains (roots and twigs). Buried trees that had apparently fallen into the slough were encountered at two sampling locations. A sharp contact separates these soft to firm alluvial sediments from an underlying hard, dry, dark gray to olive brown silt or silty clay at 3.0 to 6.4 m (9.7 to 20.9 ft) below mudline in the CPA and END portions of the slough, respectively.

Dredging would be conducted using a derrick barge and cable arm clamshell bucket to provide a level cut and to minimize turbidity (Chemical Waste Management, Inc. 1996). Sediments removed by the bucket would be placed into the barge or a scow. When the scow was loaded it would be moved to the designated offload point(s) (i.e., the CDF or the dewatering

cells) and the dredge materials mechanically removed, either by positive displacement pump or clamshell. Any debris encountered during dredging would be placed in a holding area of the site for salvage or disposal. Free liquids in the scow would be pumped to a series of holding/settling basins where they would be treated and managed. Dredging would be conducted during incoming tides and on the upstream side of a silt curtain to contain any suspended sediment. Dredging would progress on a grid-by-grid pattern starting at the western end of the slough (in the MTH section) and working back and forth toward the END of the slough. This would keep undredged portions of the slough in front of the dredge crew and would minimize the spread of contamination to clean areas.

The estimated depth of dredging ranges from 0.6 to 2.4 m (2 to 8 ft), although contaminated sediment has been found at depths greater than 6 m (20 ft) at two locations in the CPA and END portions of the slough (**Table 4.3**). Thus, the maximum depth of contamination has not been defined for these locations. In any event, dredging to depths greater than 2.4 m (8 ft) in the slough is generally not considered practicable due to the instability of the sediments and high associated costs. Actual dredging depths will be adjusted during remedial design and field implementation. A 10% over dig factor is assumed to ensure complete removal of the target contamination. A bulking factor of 20% has also been assumed to account for expansion during the removal and handling process.

### 4.2.5 Silt Curtains

All three dredging alternatives employ the use of a silt curtain to prevent transport of sediment disturbed by dredging activities. The silt curtain would be erected across the mouth of Old Mormon Slough prior to dredging. This curtain would remain in place until removal of contaminated sediments is completed and the water turbidity has subsided to an acceptable level. However, there may be a need to move the silt curtain, once dredging has been completed in the lower (western) portion of the slough, to allow barge traffic into this area.

The curtain would be designed and placed to capture sediments generated during dredging activities, yet not be affected by tidal surges, wind waves, or wakes. A conceptual design for this curtain was taken from Chemical Waste Management, Inc. (1996). The curtain would extend from the water line down to the bottom of the slough and would be held in place by ropes to the shorelines, chains and anchors to the bottom, and a floating boom on the top. The estimated dimensions of the curtain are 73 by 10 m (240 x 34 ft). The detailed design would be developed during remedial design. A second curtain may be used to filter water escaping from the CDF under that alternative.

The curtain(s) would be monitored periodically (~3 times per day) to ensure that no tears or breaches have developed. Any tears or holes discovered in the silt curtain will be immediately repaired.



Exhibit 20 to the
United States' Motion
DOJ 256

### 4.2.6 Sediment Dewatering

Dewatering is a physical treatment technology used to reduce the moisture content of dredged sediment. The reduction in moisture content is necessary to enable handling and transport of the dredged material and to increase the efficiency of the treatment processes (particularly incineration). Both the offsite disposal and onsite treatment alternatives require some level of dewatering.

Four main process options are generally available to dewater solid waste streams: centrifugation, drying beds (gravity drainage), drying lagoons (percolation basins), and filtration (Delta Research Corporation 1996). Filter presses generally produce the driest filter cake, but are labor-intensive, generally operate in batches, and require regular maintenance (PNNL 1995). Vacuum filtration is effective at removing liquids in a continuous process. However, it is limited by the pressure drop induced across the filter and operating expenses are high. Centrifugation can also be performed in a continuous operation, but operating costs are high. Gravity drainage is the simplest dewatering technology process and has the lowest capital, operation, and maintenance costs. However, it generally produces the wettest filter cake, has the largest space requirements with the lowest throughput capacity. A chemical conditioner is often added to assist coagulation of the very fine sediment particles to improve yield and clarify the supernatant.

Recent experience at the United Heckathorn Superfund site indicates that gravity drainage of silty/clay materials can be an extremely slow process and can hold up large volume dredging operations. To increase the throughput at this site dewatering was supplemented with solidification technology (addition of sodium silicate and Portland cement). This simply ties up the moisture content in water of hydration making the sediment fairly dry and easier to handle and transport. However, this water of hydration can adversely affect the efficiency of thermal treatment processes. Thus, for this FS a combination of gravity drainage and filter pressing (i.e., belt filter press, recessed plate, and/or diaphragm plate filters) has been chosen as the representative dewatering technology process option. Recessed plate or diaphragm plate filters generally achieve the maximum solids content of mechanical dewatering processes (EPA 1994). The belt filter press was selected as the representative filter press option because more design and cost information is available.

Dredged sediment to be dewatered would be transferred from the scows using a clamshell bucket or positive displacement pump, mixed with a chemical conditioner (e.g., lime) to assist coagulation, and placed into a series of unlined holding/dewatering cells. Here, gravity drainage, percolation, and evaporation would partially dewater the sediment. The holding/dewatering cells would be designed such that a maximum amount of water will drain from the sediments as soon as possible. Once the sediments have been drained of free liquid they would be screened to remove oversize material and debris to produce a uniform feed material and conveyed to the filter press for further dewatering. The extent of dewatering that is

necessary is dependent on the choice of treatment/disposal options. The dewatered sediment would then be transferred to an onsite holding area for further treatment (e.g., solvent extraction) or placed directly into shipping containers for offsite disposal.

The recovered drainage water would be channeled to a collection cell where the water would be processed through a series of cascading settling tanks. The drainage would then proceed to hydrocyclone where it would remove suspended solids prior to draining back into the slough, upstream of the silt curtain. The strong sorption capacity and low water solubility of the primary COCs (PAHs and dioxin) suggests that most of the contamination would be associated with fine sediment particles and thus would be removed by filtering. The filtered water would be discharged back into the slough behind the silt curtain. A treatability test would be performed to ensure that the filtered water would meet acceptable criteria (e.g., AWQC) before discharge into the slough. If it does not, then carbon adsorption could be added to the treatment train to further treat the water. The cost for this added treatment is expected to be minor relative to the overall cost of the offsite disposal or onsite treatment alternatives, so it has not been calculated. Recovered solids would be transferred back to the holding/dewatering cells.

Assuming a dredging rate of 1530 $m^3$/day (2000 cy/day) over an 8 h shift (Section 3.4), the dewatering system should be sized to handle this same volume over a 24 hr shift. Approximately five holding/dewatering cells would be constructed to hold 1530 $m^3$ (2000 cy) each, allowing 5 to 7 days for gravity drainage (**Table 4.4**). The filter press system would be designed to handle 77 $m^3$/hr (100 cy/hr), with operations around the clock (24 hrs/day), and allowing for 20% maintenance/downtime.

## 4.3 DESCRIPTION OF SEDIMENT REMEDIAL ACTION ALTERNATIVES

This section provides a description of each alternative developed for detailed analysis. The alternative descriptions identify the technologies, describe the representative process options, and present the design assumptions necessary to complete the detailed analysis. Information on the assumptions and calculations used in the estimation of sediment volumes for each alternative is provided in Appendix B. A detailed cost estimate for each alternative is provided in Appendix C.

### 4.3.1 SD-1 - No-Action

Under this alternative, the site would be abandoned as is, without any additional access controls or remedial actions to reduce the exposure to and/or toxicity of the COCs. A No-Action alternative would be taken to address the sediment contamination or the affected environmental receptors. This alternative does not actively reduce risks to human health and the environment related to contaminated sediment and aquatic organisms. However, over time some natural attenuation would gradually occur through deposition of new uncontaminated sediments and biological degradation of the organic contaminants. This alternative would not meet the RAOs,

but is retained for comparison with the other alternatives. The only cost associated with this alternative would be for sediment and biota monitoring.

### 4.3.2 SD-2 - In Situ Capping

The In Situ Capping alternative seeks to meet the RAOs by isolating contaminated sediments in the principal threat areas by blanketing them with a minimum of 60 cm (2 ft) of clean sand. Approximately three-fourths of the slough would be capped with clean, fine sand to isolate a preponderance of the PAH- and dioxin-contaminated sediment from the ecosystem. As discussed in Section 4.2.3, the sediment cap would consist of a minimum of 60 cm (2 ft) of clean, fine sand. These cap materials would be armored with rip-rap and gravel filter layer where needed to prevent erosion. The portion of the slough to be capped would run from just north of the OWP area, between sampling stations OMS-58 and OMS-59 to the END of the slough (**Figure 4.1**). The dimensions of the cap, based on rough drawings from White and Kohn (1996), are estimated at approximately 710 m (2330 ft) long by approximately 51 m (167 ft) wide. This cap would cover an estimated 3.6 hectares (8.8 acres) (**Table 4.5**). This portion of the slough contains nearly all of the PAH and dioxin concentrations exceeding the preliminary sediment cleanup levels and accounts for an estimated 99.5% of the mass of accessible (œ2.4 m [œ8 ft] deep) PAH contamination and 98% of the mass of dioxin contamination. The estimated volume of clean, fine sand needed for cap material (including a 10% safety factor) is estimated at 23,900 $m^3$ (31,200 $yd^3$).

A sand cap was selected as the representative in situ capping technology for Old Mormon Slough (see Subsection 4.2.3). However, localized armored capping may be necessary in areas of the slough susceptible to erosion. Two scenarios were used to estimate Alternative SD-3 costs. The expected cap is assumed to be a 90% sand/10% armored cap combination; for comparison purposes a cost estimate for a full armored cap was also prepared (see Appendix C).

As noted earlier, two apparent "hot spots," one of PAH contamination and one of dioxin contamination, are located in the mouth of the slough outside of the proposed capped area. As with all of the other alternatives, remediation of these two hot spots would be limited to the use of institutional controls to limit navigational access to the slough, provide more fencing and warning signs to fully encompass the area(s) of principal and low-level threats, limit the future use of Old Mormon Slough and the upland portion of the site to appropriate uses, and control future dredging of the slough to prevent disturbance of residual sediment contamination in the mouth of the slough. Environmental monitoring would be conducted to assess the progress of natural attenuation processes for these two "hot spots."

Under Alternative SD-2, similar institutional controls would be implemented for the capped portion of Old Mormon Slough (OWP, CPA, and MTH) to prevent inadvertent erosion or other disruption of in situ sediment cap materials that would cause exposure of more highly



Exhibit 20 to the
United States' Motion
DOJ 259

contaminated sediment under the cap. Short-term and long-term monitoring would be performed to assess the integrity and maintenance needs of the confined disposal facility and sediment cap.

Isolating the sediment COCs through capping would eliminate exposure to water column organisms and, over time, reduce concentrations in the fish population, including those species consumed by humans. The use of institutional controls as part of the overall slough remediation (see Subsection 4.2.1) would provide additional protectiveness. Access restrictions at Old Mormon Slough would reduce human exposure to contaminated fish and sediment until concentrations have been reduced to safe levels. Although capping would adversely affect existing benthic organisms, recolonization is expected to occur. This alternative does not directly address the potential migration of contamination from slough sediments into groundwater beneath the site, although the cap would be somewhat effective in reducing the migration via infiltration.

### 4.3.3 SD-3 - Dredging and Confined Disposal Alternative

This alternative was developed to meet RAOs by removing and consolidating a preponderance of the PAH and dioxin contamination and isolating it in a confined disposal facility. Alternative SD-3 consists of the following combination of technologies/process options:

- selective removal of heavily contaminated sediment via mechanical dredging
- use of a silt curtain to contain disturbed sediment within Old Mormon Slough
- disposal of dredged materials into a CDF behind sheet piling, located at the END of the slough
- capping of residual contamination after dredging (either OWP/CPA cap or CPA cap only)
- institutional controls (e.g., access controls, deed restrictions) and monitoring.

A discussion of those components that are common to more than one alternative (i.e., institutional controls, capping, dredging, silt curtain, and monitoring) was provided in Section 4.2.

A silt curtain would be erected across the mouth of Old Mormon Slough and contaminated sediments from designated principal threat areas would be removed via dredging and transferred to a CDF constructed in the END of the slough. Mechanical dredging would be conducted to remove contaminated sediment from the principal threat areas of the slough, starting at a small portion of the eastern MTH subarea to the END of the CPA portion, where the CDF would begin (**Figure 4.2**). This portion of the slough contains nearly all of the PAH



Exhibit 20 to the
United States' Motion
DOJ 260

and dioxin concentrations that exceed the preliminary sediment cleanup levels, except those located in the confined disposal area and the two hot spots located in the mouth of the slough.

The dimensions of the dredge area, based on rough drawings in White and Kohn (1996), is estimated to be a 406 m (1340 ft) long by 55 m (180 ft) wide (Figure 4.2, Table 4.7). Dredging would extend to a depth of 0.7 m (2.2 ft) in the principal threat area of the MTH and to 2.7 m (8.8 ft) (the maximum practical depth) from all but the eastern-most 69 m (225 ft) of the CPA. This incorporates a 10% overdig to ensure complete removal of the target contamination. The resulting volume of dredged sediment is estimated to account for 70% of the mass of the accessible (top 2.4 m [8 ft]) total PAH contamination and 47% of the dioxin contamination (see Appendix B). The rest of the END of the slough (containing another approximately 35% of the PAH and 51% dioxin contamination) would be used for a CDF and thus would not be dredged. Dredging would remove an estimated 55,400 $m^3$ (72,500 $yd^3$) of contaminated sediment. Expansion during removal and handling (using a bulking factor of 20%) would produce an estimated 66,500 $m^3$ (87,000 $yd^3$).

A CDF in the slough is preferable to an upland disposal facility because sufficient capacity is not available upland and because disposal of sediments there could interfere with the expected soil and groundwater remediation. CDFs are commonly used for dredged material (Lincoff et al. 1994). In this disposal option a CDF would be constructed in the eastern-most 293 m (960 ft) of the slough occupying all of the END and the eastern-most 69 m (225 ft) of the CPA portions. This would result in an estimated disposal capacity of 74,300 $m^3$ (97,200 $yd^3$). This CDF would be constructed by installing sheetpiling across the slough and lining the inside of the sheet wall with high-density polyethylene or similar material. This structural wall would require an adequate foundation (deep installation, estimated at twice its height), tie backs, support pilings, anchor pilings, etc.

Contaminated sediment located within the CDF would remain in place (not dredged). Surface water retained in the CDF would be allowed to escape back into the slough through a silt curtain and overflow weir, as the remaining storage capacity of the CDF was filled with contaminated sediment from dredging operations. Dredged material would be filled to within approximately 0.6 m (2 ft) of the upland ground surface. After a period of consolidation the dredged material would be capped with a permeable geotextile fabric and an estimated 0.6 m (2 ft) of clean fill. Wick drains could be installed to reduce consolidation time (EPA 1994).

Following the completion of dredging activities and confirmatory sampling, a 150-m to 390-m (480-ft to 1280-ft)-long stretch of Old Mormon Slough would be capped with natural materials (fine sand) to isolate residual contamination left behind by dredging activities. The portion of the slough to be capped would be dependent on confirmatory sampling. If sampling confirms that total PAH concentrations in the OWP and western end of the CPA are at or below the preliminary sedliment cleanup levels, then no cap will be installed there. However, the high concentrations of total PAH at depth in the eastern portion of the CPA indicates that this portion

of the slough would require a cap after dredging. Thus, this alternative assumes that a CPA cap will be required, while an OWP area cap might be required if dredging alone does not meet the RAOs.

The CPA cap would run from just west of the CDF to the end of the CPA area (see Figure 4.2). The cap would cover an estimated 6,300 $m^2$ (67,800 $ft^2$), 0.6 ha (1.6 ac) of the slough. The OWP area cap (if required) would run from the CPA cap to the west end of the OWP area. This cap would cover an estimated 13,800 $m^2$ (149,000 $ft^2$), 1.4 ha (3.4 ac). General information regarding the design and installation of the sediment caps is provided in Subsection 4.2.3. Detailed design assumptions are provided in **Table 4.6**. Costs were estimated for both Alternative SD-3 capping scenarios (CPA/OWP Cap and CPA Cap Only) in Appendix C.

As with Alternatives SD-2, SD-4, and SD-5, Alternative SD-3 would address the two "hot spots" located in the mouth of the slough, outside of the proposed dredge and cap areas, by the use of institutional controls rather than active remediation (see Subsection 4.2.1). Remediation would be limited to the use of institutional controls to limit navigational access to the slough, provide more fencing and warning signs to fully encompass the area(s) of principal and low-level threats, limit the future use of Old Mormon Slough and the upland portion of the site to appropriate uses, and control future dredging of the slough to prevent disturbance of residual sediment contamination in the mouth of the slough. Environmental monitoring would be conducted to assess the progress of natural attenuation processes for the "hot spots."

Under Alternative SD-3, institutional controls would also be implemented for the capped portion of Old Mormon Slough and the CDF to prevent inadvertent erosion or other disturbance of in situ sediment cap materials and the CDF that would expose residual sediment contamination. Monitoring would be performed to assess the integrity and maintenance needs of the sediment cap and CDF.

Removal of the most heavily contaminated sediment from principal threat areas of the slough and isolation in a CDF would reduce the mass of contamination available for exposure to and bioaccumulation in the aquatic organisms, including those species consumed by humans. Over time, this would lead to a reduction in the PAH and dioxin concentrations in the fish population. Implementation of institutional controls would restrict access to Old Mormon Slough, thereby reducing human exposure to contaminated fish and sediment until concentrations in fish and sediment have been reduced to safe levels. Alternative SD-3 reduces the threat to groundwater from sediment in the OWP and CPA portions of the slough. The CDF would contain dewatered sediment above the water table and would be covered to prevent infiltration, thus reducing the threat to groundwater from the END portion of the site.



Exhibit 20 to the
United States' Motion
DOJ 262

### 4.3.4 SD-4 - Dredging and Offsite Disposal Alternative

This alternative was developed to meet the RAOs by removing a preponderence of the PAH and dioxin contamination from the slough and transporting it for offsite disposal and/or treatment. Alternative SD-4 consists of the following technologies/process options:

- selective removal of heavily contaminated sediment via mechanical dredging
- use of a silt curtain to contain disturbed sediment within Old Mormon Slough
- dewatering of dredged sediment
- transportation and offsite disposal at a permitted TSD facility
- capping of residual contamination after dredging (CPA/END Cap only or Full Cap)
- institutional controls (e.g., access controls, deed restrictions) and monitoring.

A discussion of those components common to more than one alternative (i.e., institutional controls, capping, dredging, dewatering, silt curtain, and monitoring) was provided in Section 4.2.

A silt curtain would be erected across the mouth of Old Mormon Slough to prevent transport of sediment disturbed by dredging activities out of the slough. Mechanical dredging would be conducted to remove contaminated sediment from the principal threat areas of the slough, including a portion of the MTH sub-area and all of the OWP, CPA, and END sub-areas. Dredging would be conducted to a depth of 0.7 m (2.2 ft) in the principal threat area of the MTH and to 2.7 m (8.8 ft) (the maximum practical depth for dredging operations) throughout the rest of the slough. This depth incorporates a 10% overdig to ensure complete removal of the target contamination. The resulting volume of dredged sediment is estimated to account for 99.5% of the mass of the accessible (top 2.4 m [8 ft]) total PAH contamination and nearly 100% of the dioxin contamination (see Appendix B).

Dredging will remove an estimated 91,000 $m^3$ (119,000 $yd^3$) of contaminated sediment. With expansion during removal and handling (using a bulking factor of 20%) this would produce an estimated 109,000 $m^3$ (143,000 $yd^3$). The contaminated dredge material removed from the slough would be dewatered, reducing the volume by 20%, producing an estimated 91,000 $m^3$ (119,000 $yd^3$) of solids, and an estimated 21,800,000 L (5,760,000 gal) of wastewater. As described in Subsection 4.2.6, the recovered water would be processed through a series of cascading settling tanks and hydrocyclones to remove suspended solids prior to draining back into the slough, upstream of the silt curtain. For cost estimating purposes, it is assumed that