most of the contamination would be associated with fine sediment particles and thus would be removed by filtering without additional treatment.

The dewatered sediment would be transported offsite to a TSDF for treatment, if necessary to comply with RCRA LDRs, and/or disposal. RCRA LDRs for listed wood preserving wastes F032, F034, and F035, which are the expected waste classifications for the Old Mormon Slough sediments, became effective in August 1997. Thus, selection of the actual disposal facility is dependent on the final waste designation(s) for these dewatered sediments and their applicable LDRs. Transportation would be either by truck or rail depending on the selection of the TSDF.

To estimate a range of costs for this alternative, two different offsite disposal options were examined, which depend on the TSDF selected and the area of the slough requiring capping after dredging. The lower cost option assumes that the waste would not be subject to LDRs requiring treatment prior to disposal. In this case it is assumed that the waste would be shipped via truck to a TSDF for direct disposal, and that only the CPA and END areas of the slough would require capping. For the higher cost option it is assumed that the waste would have to be incinerated prior to disposal in order to comply with LDRs and that the entire slough (CPA/END Cap plus OWP Cap) would need to be capped. In this case, it was assumed the sediment would be shipped to the TSDF for treatment and disposal (see Appendix C). Note that there currently is a variance from the treatment requirement for F032, F034, and F035 listed wastes, but not for D037 (PCP) characteristic waste. Until May 1999, dredged sediment classified as F032, F034, or F035 waste could be disposed offsite without treatment; after this time, the sediment would have to be treated first (by incineration for F032 and F034, and by stabilization for F035). However, even before May 1999, dredged sediment that exceeds the toxic characteristic leach procedure criterion for PCP (100 mg/L) would have to be incinerated before offsite disposal.

Following the completion of dredging activities and confirmatory sampling, a 420 m to 664 m (1380 ft to 2180 ft) section of Old Mormon Slough would be capped with natural materials (fine sand) to isolate residual contamination left behind by dredging activities. The portion of the slough to be capped would be dependent on confirmatory sampling in the OWP area and western end of the CPA area. If sampling confirms that total PAH concentrations in that portion of the slough are at or below the preliminary sediment cleanup levels no cap would be installed there. However, the relatively high concentrations of total PAH at depth in the eastern part of the CPA area and the END area indicate that these sections of the slough would require a cap after dredging. Thus, a CPA/END cap would be required while an additional OWP area cap may be required if dredging alone does not meet the RAOs.

The CPA/END cap (**Figure 4.3**) would cover an estimated 9,500 $m^2$ (102,000 $ft^2$), 2.3 acres of the slough. The OWP cap (if required) would cover an estimated 13,800 $m^2$



Exhibit 20 to the
United States' Motion
DOJ 264

(149,000 ft$^2$), 3.4 acres. General information regarding the design and installation of the sediment caps is provided in Section 4.2.3. Detailed design assumptions for Alternative SD-4 are provided in **Table 4.7**.

As with Alternatives SD-2, SD-3, and SD-5, Alternative SD-4 would address the two "hot spots" located in the mouth of the slough, outside of the proposed dredge and cap areas, by the use of institutional controls rather than active remediation (see Subsection 4.2.1). Remediation would be limited to the use of institutional controls to limit navigational access to the slough, provide more fencing and warning signs to fully encompass the area(s) of principal and low-level threats, limit the future use of Old Mormon Slough and the upland portion of the site to appropriate uses, and control future dredging of the slough to prevent disturbance of residual sediment contamination in the mouth of the slough. Environmental monitoring would be conducted to assess the progress of natural attenuation processes for the hot spots.

Under Alternative SD-4, institutional controls would also be implemented for the capped portion of Old Mormon Slough to prevent inadvertent erosion or other disturbance of in situ sediment cap materials that would expose residual sediment contamination. Monitoring would be performed to assess the integrity and maintenance needs of the sediment cap.

Removal of the most heavily contaminated sediment from principal threat areas of the slough would reduce the mass of contamination available for exposure to and bioaccumulation in the aquatic organisms, including those species consumed by humans. Over time, this would lead to a reduction in the PAH and dioxin concentrations in the fish population. Implementation of institutional controls would restrict access to Old Mormon Slough, thereby reducing human exposure to contaminated fish and sediment until concentrations in fish have been reduced to safe levels. Alternative SD-4 reduces the threat to groundwater from sediment in the END, CPA, and OWP portions of the slough.

#### 4.3.5 SD-5 - Dredging and Onsite Treatment

This alternative was developed to meet the RAOs by removing a preponderence of the PAH- and dioxin-contaminated sediment from the slough and treating it onsite. Alternative SD-5 consists of the following technologies/process options:

- selective removal of heavily contaminated sediment via mechanical dredging
- use of silt curtain to contain disturbed sediment within Old Mormon Slough
- dewatering of dredged sediment
- onsite ex situ treatment of dewatered sediment by solvent extraction
- onsite ex situ S/S of treated sediment as necessary prior to upland disposal
- capping of residual contamination after dredging (CPA/END Cap only or Full Cap)
- institutional controls (e.g., access controls, deed restrictions) and monitoring.

Elements of this alternative common to the other sediment alternatives (i.e., institutional controls, capping, dredging, dewatering, silt curtain, and monitoring) were described in Section 4.2.

Dredging would be conducted from just north of the OWP area to the END of the slough (**Figure 4.4**). This portion of the slough contains nearly all of the PAH and dioxin concentrations exceeding the preliminary sediment cleanup levels. A silt curtain would be erected across the mouth of the slough prior to dredging to contain any resuspended sediment. Mechanical dredging would be conducted along a 710 m (2330 ft) long portion of the slough. This would include the top 0.7 m (2.2 ft) from the OWP area and the top 2.7 m (8.8 ft) (maximum practical depth plus 10% overdig) from the OWP, CPA, and END of the slough. This volume of sediment would account for an estimated 99.5% of the accessible (<=2.4 m [<=8 ft]) mass of total PAH contamination and approximately 100% of the mass of PCDD/PCDF contamination. Dredging would produce an estimated 109,000 $m^3$ (143,000 $yd^3$) of contaminated sediment (assuming a 20% bulking factor). This material would be dewatered, producing an estimated 91,000 $m^3$ (119,000 $yd^3$) of solids and 21,800 L (5,760,000 gal) of waste water. As described in Subsection 4.2.6, the recovered waste water will be processed through a series of cascading settling tanks and hydrocyclones to remove suspended solids prior to draining back into the slough, upstream of the silt curtain. For cost estimating purposes, it was assumed that most of the contamination would be associated with fine sediment particles and thus would be removed by filtering without additional treatment.

The dewatered dredge materials would be treated onsite by ex situ solvent extraction to address PAHs and dioxin, followed by S/S to address inorganic contamination as necessary. Offsite incineration/disposal of the concentrated organic contaminants from the solvent extraction process has also been factored into the cost estimates for this alternative (see Appendix C). Solidified residuals from this treatment train are expected be disposed onsite, assuming sufficient upland capacity is available. The actual throughput and residual volumes generated will be determined in pilot-scale testing during the remedial design phase.

The selection of the final onsite treatment technology/process option for the dewatered sediments would likely be the same as that for the treatment of contaminated soils. Treatability tests conducted on site soils indicate that solvent extraction can be greater than 95% effective in reducing the concentration of dioxin, and greater than 67 to 98.9% effective in reducing PAH concentrations (see Subsections 3.1.3.2 and 3.2.6.3).

Following the completion of dredging activities and confirmatory sampling, a 420 m to 664 m (1380 ft to 2180 ft)-long stretch of Old Mormon Slough would be capped with natural materials (fine sand) to isolate any residual contamination that may be left behind by dredging activities. The portion of the slough to be capped would be dependent on confirmatory sampling in the OWP and western end of the CPA. If sampling confirms that total PAH concentrations in this portion of the slough are at or below the preliminary sediment cleanup levels, no

cap will be installed there. However, the relatively high concentrations of total PAH at depth in the eastern portion of the CPA and END indicates that these portions of the slough would require a cap after dredging. Thus, a CPA/END cap would be required while an OWP area cap may be required if dredging alone does not meet the RAOs.

The CPA/END cap would run from the END to the western end of the CPA area (see Figure 4.4). The cap would cover an estimated 9500 $m^2$ (102,000 $ft^2$), or 2.3 acres of the slough. The OWP area cap, if required, would run from the CPA/END cap to the west end of the OWP area. This cap would cover an estimated 13,800 $m^2$ (149,000 $ft^2$), or 3.4 acres. General information regarding the design and installation of the sediment caps was provided in Subsection 4.2.3. Detailed design assumptions for this alternative are provided in **Table 4.8**. Costs were estimated for both Alternative SD-5 capping scenarios (CPA/END Cap only or Full Cap).

As with Alternatives SD-2, SD-3, and SD-4, Alternative SD-5 would address the two "hot spots" located in the mouth of the slough, outside of the proposed dredge and cap areas, by the use of institutional controls rather than active remediation (see Subsection 4.2.1). Remediation would be limited to the use of institutional controls to limit navigational access to the slough, provide more fencing and warning signs to fully encompass the area(s) of principal and low-level threats, limit future use of Old Mormon Slough and the upland portion of the site to appropriate uses, and control future dredging of the slough to prevent disturbance of residual sediment contamination in the mouth of the slough. Environmental monitoring would be conducted to assess the progress of natural attenuation processes for the hot spots.

Under Alternative SD-5, institutional controls would also be implemented for the capped portion of Old Mormon Slough to prevent inadvertent erosion or other disturbance of in situ sediment cap materials that would expose residual sediment contamination. Monitoring would be performed to assess the integrity and maintenance needs of the sediment cap.

Removal of the most heavily contaminated sediment from principal threat areas of the slough would reduce the mass of contamination available for exposure to and bioaccumulation in aquatic organisms, including those species consumed by humans. Over time, this would lead to a reduction in the PAH and dioxin concentrations in the fish population. Implementation of institutional controls would restrict access to Old Mormon Slough, thereby reducing human exposure to contaminated fish and sediment until concentrations in fish and sediment have been reduced to safe levels. Alternative SD-5 reduces the threat to groundwater from sediment in the END, CPA, and OWP portions of the slough.




**Figure 4.1.** Alternative SD-2, In Situ Capping

Exhibit 20 to the
United States' Motion
DOJ 268

M&B FS
Surface Water OU

4.20




**Figure 4.2.** Alternative SD-3, Dredging and Confined Disposal

Exhibit 20 to the
United States' Motion
DOJ 269




**Figure 4.3.** Alternative SD-4, Dredge and Offsite Disposal

Exhibit 20 to the
United States' Motion
DOJ 270




**Figure 4.4.** Alternative SD-5, Dredging and Onsite Treatment

Exhibit 20 to the
United States' Motion
DOJ 271

# 5.0 DETAILED ANALYSIS OF ALTERNATIVES

In this section, the sediment remedial alternatives from Section 4.0 are evaluated in detail against the nine NCP criteria consistent with RI/FS guidance (EPA 1988a). The detailed evaluation is performed in two stages. In the first stage, the remedial alternatives are evaluated against the NCP criteria individually. The second stage is the comparative analysis in which the alternatives are evaluated relative to each other using the same criteria.

The following subsections present a description of the nine NCP criteria followed by the individual and comparative analysis of the sediment remedial alternatives.

## 5.1 EVALUATION CRITERIA

The NCP, 40 CFR Section 300.430(e)(9)(iii) sets forth nine criteria to be used for a detailed, comparative analysis of the alternatives retained after the initial screening portion of the FS. These criteria are further described in the EPA FS guidance.

The first two criteria are categorized as "threshold" criteria in that each alternative must meet them or, in the case of ARARs, any ARARs not met must be waived. The subsequent five criteria are "primary balancing" factors. The last two criteria address "modifying" considerations. The following nine subsections describe each of the nine criteria.

### 5.1.1 Overall Protection of Human Health and the Environment

Each alternative must be assessed to determine whether it can adequately protect human health and the environment, in both the short and the long term, from hazardous substances, pollutants, or contaminants present at the site by eliminating, reducing, or controlling exposures to levels established during the development of remediation goals. The evaluation of the overall protection of human health and the environment for each alternative draws upon the factors assessed under other evaluation criteria. The criteria specifically considered are long-term effectiveness and permanence, short-term effectiveness, and compliance with ARARs.

### 5.1.2 Compliance with ARARs

Each alternative must be evaluated to determine whether it complies with all ARARs. ARARs are those cleanup standards, standards of control, or other substantive environmental protection requirements promulgated under federal environmental or more stringent state or state subdivision environmental or facility siting laws that have been identified by the state in a timely manner. Because California may give enforcement authority for delegated federal programs to local agencies that develop implementing regulations, some apparently local

regulations can also be ARARs. Pursuant to CERCLA §121 and the NCP, only substantive, not administrative, requirements are ARARs and permits are not required for those portions of a CERCLA cleanup that are conducted entirely onsite, as long as those actions are selected and carried out in compliance with CERCLA §121.

"Applicable" requirements are those substantive environmental requirements that specifically address a hazardous substance, pollutant, contaminant, remedial action, or other circumstance found at a CERCLA site. "Relevant and appropriate" requirements are such standards that, while not applicable, address problems or situations sufficiently similar to those encountered at the site that their use is well suited.

ARARs are generally categorized as follows: 1) chemical-specific requirements, 2) action-specific requirements, and 3) location-specific requirements.

Chemical-specific ARARs are risk-based cleanup standards or methodologies that, when applied to site-specific conditions, result in the development of numerical cleanup standards for COCs. These standards must be achieved at the completion of the remedial action. Since no numerically set standards exist for sediments under federal or state law, risk-based cleanup standards for sediments have been developed for the M&B site. These were discussed in detail in Section 2.0.

Location-specific ARARs are restrictions placed on the concentration of hazardous substances or the conduct of activities at a site due to its special location, such as an area with important geographical, biological, or cultural features. Examples of special locations include wetlands, flood plains, sensitive ecosystems, and seismically active areas. Location-specific ARARs are summarized in **Table 5.1** and described below. Both location-specific and action-specific ARARs must be complied with during the design and implementation of the remedy as well as at the completion of the remedy.

Action-specific ARARs are technology-based or activity-based requirements or limitations on actions taken to handle hazardous substances. They are triggered by the particular remedial activities selected to accomplish a remedy. Consideration of a sediment capping, dredging, filling or onsite treatment, and/or disposal remedy trigger a number of action-specific ARARs that govern design, construction, and operation and maintenance of the remedy. These ARARs are summarized in Table 5.1 and described below.

When no ARAR exists for a given chemical, action, or location, EPA may consider non-promulgated federal or state advisories and guidance as TBC criteria. Although consideration of a TBC is not required, if standards are selected based on TBCs, those standards are legally enforceable as if the TBC were an ARAR. The preliminary sediment cleanup standards are based on a TBC, which in turn was developed using risk-based considerations.

ARARs compliance is one of the nine CERCLA evaluation criteria that are considered "threshold criteria" (i.e., they must be met unless they are waived). CERCLA Section 121(d)(4) allows for limited ARARs waivers where an ARAR cannot be met. A waiver is available where it is determined that it is "technically impracticable from an engineering perspective" to attain required cleanup standards. Where such a determination has been made, EPA must establish alternative, protective remedial strategies.

None of the alternatives being considered in this FS report would ensure compliance with the preliminary chemical-specific ARARs applicable to the groundwater underlying the site, including the groundwater beneath Old Mormon Slough. These ARARs were identified in the FS report prepared for the Soils-Groundwater OU (ICF 1997). The Evaluation of Technical Impracticability (TI Evaluation), included as part of the FS report, concludes that it would be technically impracticable to remediate M&B site groundwater impacted by DNAPLs to these ARARs.

### 5.1.3 Long-Term Effectiveness and Permanence

The evaluation of a remedial alternative relative to its long-term effectiveness and permanence is made considering the risks remaining at the site after the response objectives have been met and the degree of certainty that the alternative will prove successful. The assessment of long-term effectiveness is made considering the following three major factors:

- the magnitude of the residual risk to human and environmental receptors remaining from untreated waste or treatment residuals remaining at the completion of remedial activities

- an assessment of the type, degree, and adequacy of long-term management (including engineering controls, institutional controls, monitoring, and operation and maintenance) required for untreated waste or treatment residues remaining at the site

- the potential need for replacement of the remedy and the continuing need for repairs to maintain the performance of the remedy.

### 5.1.4 Reduction of Toxicity, Mobility, or Volume (T/M/V) Through Treatment

This evaluation criterion addresses the degree to which remedial actions employ treatment technologies that permanently and significantly reduce the T/M/V of hazardous substances at the site. The evaluation considers the following specific factors:

- the treatment processes

- the amount of hazardous substances, pollutants, or contaminants that will be destroyed, treated, or recycled

- the degree of expected reduction in T/M/V due to treatment, including the degree to which treatment reduces the inherent hazards posed by the principal threats at the site
- the degree to which the treatment will be irreversible
- the type and quantity of treatment residuals that will remain following treatment.

### 5.1.5 Short-Term Effectiveness

The short-term effectiveness of a remedial alternative is evaluated relative to its effect on human health and the environment during implementation of the remedial action. The short-term effectiveness assessment is based on four key factors

- short-term risks that might be posed to the community during implementation of an alternative
- potential impacts on workers during remedial action and the effectiveness and reliability of protective measures
- potential environmental impacts of the remedial action and the effectiveness and reliability of mitigative measures during implementation
- time until protection is achieved.

### 5.1.6 Implementability

Remedial alternatives must be evaluated to estimate the degree to which each can satisfy implementability criteria. Implementability refers to the ease or difficulty of implementing an alternative considering the following factors, as appropriate:

- technical feasibility, including technical difficulties and unknowns associated with the construction and operation of a technology, the reliability of the technology, the ease of undertaking additional remedial actions, and the ability to monitor the effectiveness of the remedy
- administrative feasibility, including activities needed to coordinate with other offices and agencies and the ability and time required to obtain any necessary approvals and permits from other agencies (for offsite actions)
- availability of services and materials, including the availability of adequate offsite TSD capacity and services; the availability of necessary equipment and specialists and

provisions to ensure any necessary additional resources; the availability of services and materials; and availability of prospective technologies.

### 5.1.7 Cost

For each remedial alternative, a detailed cost estimate is developed. Cost estimates for each alternative are based on conceptual engineering data, unit costs available from EPA guidance documents when available, costs developed based on treatability tests, other literature available, vendor quotes, and PNNL experience. The detailed cost estimates are presented in Appendix C. The cost estimate for a remedial alternative consists of three principal elements

- Capital Costs: Capital costs consist of direct (construction) and indirect (non-construction and overhead) costs. Direct costs include the cost for equipment, labor, and materials incurred to develop, construct, and implement a remedial action. Indirect costs are expenditures for engineering, financial, and other services that are not actually a part of construction but are required to implement a remedial alternative.

- Annual Operating and Monitoring (O&M) Costs: O&M costs refer to post-construction cost items necessary to ensure the continued effectiveness of a remedial action. This typically consists of long-term power and material costs (primarily applicable to the operational costs of a water treatment facility), equipment replacement costs, and long-term O&M costs.

- Present Worth Analysis: This analysis is used to evaluate the capital and O&M costs of a remedial alternative on a present worth basis. Present worth analysis is a method of comparing expenditures for various alternatives that occur over different time periods. By discounting all costs to a common base year, the costs for different remedial action alternatives can be compared on the basis of a single cost figure for each alternative. The total present worth for a given alternative is equal to the full amount of all capital and initial costs plus the series of expenditures in following years reduced by the appropriate future value/present worth discount factor. This analysis allows the comparison of remedial alternatives on the basis of a single cost representing an amount that, if invested in the base year and disbursed as needed, would be sufficient to cover all costs associated with the remedial action over its planned life.

As specified in the FS guidance, a 30-year performance period is assumed for all alternatives. For the sediment alternatives, the remedial alternatives would be implemented in a shorter time period, but cost estimates for institutional controls and maintenance activities will continue for 30 years. For cost comparison purposes, the cost of the institutional controls, including long-term monitoring, is calculated for a performance period of 30 years.



Exhibit 20 to the
United States' Motion
DOJ 276

A discount rate of 5% is assumed for base calculations consistent with the RI/FS guidance. The discount rate represents the anticipated difference between the rate of inflation and investment return. The alternatives have been developed conceptually in this FS and the cost estimates are intended to reflect the actual cost of the remedial alternative to within -30 to +50 percent.

#### 5.1.8 State Acceptance

This criterion evaluates the state's position and key concerns related to the alternatives and state comments on ARARs as the proposed use of waivers. The assessment of state concerns may not be completed until comments on the RI/FS are received.

#### 5.1.9 Community Acceptance

This criterion evaluates the issues/concerns raised by the public regarding each of the alternatives being considered. This assessment will not be completed until comments on the proposed plans are received. Comments may be submitted during the public comment period.

## 5.2 COMPLIANCE WITH APPLICABLE OR RELEVANT AND APPROPRIATE REQUIREMENTS

This section identifies potential ARARs for the sediment alternatives. Because a remedy for the M&B site has not yet been selected, all ARARs identified in this FS report are preliminary. Final determinations of the ARARs will be included as appropriate in the ROD.

### 5.2.1 Action-Specific Applicable or Relevant and Appropriate Requirements

Action-specific ARARs are primarily concerned with those activities that can have a detrimental effect on navigable water ways and/or wetlands, such as dredging, filling, installation of pilings construction of dams and piers, and/or point source discharges.

#### 5.2.1.1 Rivers and Harbors Act (33 USC, §403, Section 10)

The Rivers and Harbors Act (RHA) prohibits the unauthorized obstruction or alteration of any navigable water of the United States. Section 10 of the RHA regulates structures or work in, above, or under navigable waters. Navigable waters of the United States are defined as waters that are subject to the ebb and flow of the tide shoreward to the mean high water mark and/or are presently used, or have been used in the past or may be susceptible to use, to transport interstate or foreign commerce; Old Mormon Slough falls within the definition of a navigable water. Examples of regulated activities would include dredging, filling, installation of pilings, and construction of dams and piers. At non-CERCLA sites, the U.S. ACE is responsible for reviewing and approving applications for permits to conduct such activities. The standard of



Exhibit 20 to the
United States' Motion
DOJ 277

review for such applications generally may be described as an inquiry into whether the proposed action provides a benefit to the public. The procedures set forth in 33 CFR Parts 320 and 322 require an examination into the impact on the public interest.

Remedial alternative activities under consideration for the M&B site, that may be considered dredge and fill activities under Section 10 of the RHA, include capping (Alternative SD-2, SD-3, SD-4, and SD-5), backfilling (Alternative SD-3), installation of vertical barriers (Alternative SD-3), installation of silt curtains (Alternatives SD-3, SD-4, and SD-5), dredging (Alternatives SD-3, SD-4, and SD-5), dewatering (Alternatives SD-3, SD-4, and SD-5), and construction of a nearshore CDF in OMS (Alternative SD-3). The in situ capping alternative (SD-2) assumes that a permanent sand cap will be placed over most of the bottom area of Old Mormon Slough, with the exception of the mouth of the slough. In addition, the dredging alternatives (SD-3, SD-4, and SD-5) consider limited capping as a component of the alternative to address residual deep sediment contamination that is not technically feasible to remove from the slough, thus, the RHA would also apply to this limited capping (if a temporary dam was constructed to dewater Old Mormon Slough and excavate sediment as an alternative to mechanical dredging in the slough, the RHA would apply to that option also).

The RHA is also a location-specific ARAR.

#### 5.2.1.2 Clean Water Act (33 USC §1344, Section 404)

Section 404 of the CWA regulates the discharge of dredged or fill material to all waters of the United States, including wetlands. While Section 404 would not regulate proposed dredging activities in Old Mormon Slough, Section 404(b)(1) and the regulations promulgated thereunder, 40 CFR 230.10, would regulate the placement of dredged or fill materials in Old Mormon Slough. At non-CERCLA sites, U.S. ACE is responsible for reviewing and approving applications for permits to conduct such activities; EPA also reviews Section 404 permits. The substantive requirements of Section 404 regulations are potential action-specific ARARs.

Proposed sediment remedial alternative activities that would constitute discharge for the purposes of the Section 404 regulations include capping (Alternatives SD-2, SD-3, SD-4, and SD-5, since they all involve sediment capping to some degree), backfilling (Alternative SD-3), installation of vertical barriers (Alternative SD-3), installation of silt curtains (Alternatives SD-3, SD-4, and SD-5), dredging (Alternatives SD-3, SD-4, and SD-5), dewatering (Alternatives SD-3, SD-4, and SD-5), and construction of a nearshore confined disposal facility in OMS (Alternative SD-3).

The guiding principle of Section 404 regulations is that degradation or destruction of wetlands and other special aquatic sites should be avoided to the extent possible. EPA has developed the following guidelines for CERCLA response actions involving wetlands that have already been severely degraded by virtue of prior discharges of waste (EPA 1988b):

While part of the CERCLA remedy may be to fill in the wetland, the remedy would contemplate that the fill will serve an environmental benefit. Where the functioning of the wetland has already been significantly and irreparably degraded, mitigation would be oriented towards minimizing further adverse environmental impacts, rather than attempting to recreate the wetland's original value onsite or offsite.

Thus, the EPA guidance specifies that the remedial action plan may include filling of a wetland. That regulation provides that no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge that would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences. EPA believes that this rationale as applied to wetlands in many instances would also apply to other navigable waters, such as Old Mormon Slough. Therefore, Section 404 would be relevant and appropriate to proposed remedies involving discharge of dredged or filled material.

### 5.2.1.3 National Pollutant Discharge Elimination System Regulating Discharge of Pollutants to Surface Water

The substantive requirements of an NPDES permit are applicable to point source discharges such as those from a treatment system with an outfall to surface waters. The RWQCB issues WDRs where discharged waste could affect the quality of waters of the State. The WDRs typically include effluent discharge limitations and monitoring requirements based on Water Quality Standards set forth in the RWQCB's Basin Plan.

### 5.2.1.4 Resource Conservation and Recovery Act (as amended, 42 USC §6921 et seq.)

Action-specific ARARs relating to the TSD of hazardous wastes are applicable to dredged sediments containing hazardous wastes. All dredging of hazardous media undertaken in connection with the sediment remedy must comply with all applicable or relevant and appropriate RCRA requirements for the management of hazardous wastes. Sediments associated with the M&B site, in addition to containing characteristic hazardous wastes, contain wood treater listed wastes F032, F034, and/or F035. The RCRA LDRs for these listed wastes became effective on August 11, 1997, and would apply as of its effective date to the "placement" of these listed hazardous wastes on land (62 Fed. Reg. 25998; May 12, 1997).

Ex situ treatment activities that would trigger the RCRA requirements listed in Table 5.1 are solvent extraction (Alternative SD-5) and treatment of contaminated water from dewatering (Alternatives SD-3, SD-4, and SD-5). Where the treatment or handling of sediments is similar to that for the upland soils remediation, the potential action-specific ARARs identified in the



Exhibit 20 to the
United States' Motion
DOJ 279

Soil-Groundwater FS report would govern such activities. RCRA requirements may also be triggered by onsite or offsite land disposal of treated sediment or treatment residuals (Alternatives SD-4 and SD-5).

In addition, contaminated sediment shipped offsite must meet all applicable RCRA and U.S. Department of Transportation (DOT) requirements for offsite shipment, treatment, and disposal.

#### 5.2.1.5 SJVUAPCD Requirements for Potential Air Emissions from Sediment Alternatives

Air emissions from any onsite treatment system, excavation and/or transport of sediment, and/or construction activities may trigger the air emissions ARARs set forth in Table 5.1.

The Clean Air Act (CAA) regulates air emissions by controlling stationary and mobile sources through combined federal, state and local programs. Pursuant to the CAA, EPA promulgated National Ambient Air Quality Standards (NAAQS) and New Source Performance Standards, each of which may apply to a source depending on the pollutant involved. NAAQSs are implemented through State Implementation Plans (SIPs). Upon EPA approval, the SIP requirements become federal ARARs.

EPA has promulgated primary and secondary standards in the NAAQS, 40 CFR Part 50, for six criteria pollutants, including particulate matter equal to or less than 10 microns in particle size (PM10), and ozone that results from the photo-chemical oxidation of VOCs.

In general, only “major sources,” considering all sources of emissions at the site, are subject to NAAQS requirements. Stockton has been designated as a non-attainment area for PM10 and ozone NAAQS. In attainment areas, activities at a site will only be considered a major source if all of the activities are expected to emit 250 tons or more per year of regulated pollutant. If applicable, the source must use Best Available Control Technology (BACT).

As EPA has approved the State of California’s SIP, the San Joaquin Valley Unified Air Pollution Control District requirements set forth in Table 5.1 are federal ARARs for remediation activities at the site.

### 5.2.2 Location-Specific Applicable or Relevant and Appropriate Requirements

Location-specific ARARs are restrictions that are considered solely because of specific setting characteristics. Potential location-specific ARARs, such as requirements found in 40 CFR 264.18 (a) and (b) regarding siting of hazardous waste facilities, the ESA, the Executive Order on Protection of Wetlands, and the Archeological and Historic Preservation Act were considered.



Exhibit 20 to the
United States' Motion
DOJ 280

Both the upland and Old Mormon Slough areas of the M&B site were evaluated for unique site features, including requirements regarding floodplains, active earthquake fault zones, wetlands, endangered species habitat, and historically or culturally significant properties. While the slough portion of the site would be affected by actions related to capping, dredging and the CDF, the upland portion of the site would also be affected by construction and operation of dewatering and/or solvent extraction treatment units, by S/S activities, by activities related to the offsite transport of sediment, and/or by onsite land disposal. Unique characteristics of Old Mormon Slough and other surface water bodies in the area include wetlands habitat and endangered species.

Designed to conserve species of fish, wildlife, and plants designated as threatened, the ESA of 1973, 16 USC §§1531, et seq., is a potential location-specific ARAR at the M&B site. The ESA provides for the designation of critical habitats that are "specific areas within the geographical area occupied by the endangered or threatened species on which are found those physical or biological features essential to the conservation of the species..."

Substantive compliance with the ESA means that the lead agency must identify whether a threatened or endangered species, or its critical habitat, will be affected by a proposed response action. If so, the lead agency must avoid the action or take appropriate mitigation measures so that the action does not affect the species or its critical habitat. If the lead agency determines that endangered species are not present or will not be affected, no further action is required. Based on the findings of the ERA conducted for the M&B site, no threatened or endangered terrestrial species and no sensitive terrestrial habitats have been identified in Old Mormon Slough or in the vicinity of the M&B site. No federal endangered or threatened species have been found to utilize aquatic habitats at the site; however, delta smelt, a state threatened species, may be found in waters near the site.

The Archeological and Historic Preservation Act provides for the preservation of historical and archeological data that might otherwise be lost as a result of dam construction or alterations of the terrain. If any federal project might cause loss to significant scientific, prehistorical, or archeological data the act requires the lead agency to preserve the data or request the Department of Interior to do so. Old Mormon Slough and the SDC are man-made channels that were constructed within this century by dredging. No prehistoric or archeological artifacts are expected in any of these deposits and none were noted in any of the sampling that was conducted for the RI.

The only characteristic that would trigger location-specific ARARs related to the upland portion of the site is that it is located in a 100 year floodplain.



Exhibit 20 to the
United States' Motion
DOJ 281

## 5.3 INDIVIDUAL ANALYSIS OF ALTERNATIVES

This section presents an individual analysis of the five remedial alternatives for Old Mormon Slough sediments that were developed in Section 4.0. The alternatives are evaluated in detail against the two threshold and five primary criteria. An evaluation relative to the two modifying criteria will be presented in the ROD following receipt and review of public and state agency comments on the FS report and proposed plan. A brief description of the alternative and key points of the individual analysis are discussed below.

### 5.3.1 SD-1 - No-Action Alternative

The No-Action alternative provides a baseline for comparison with other alternatives. No active remedial measures would be implemented and, thus, no reduction in human health and environmental risk would occur.

Operations at the M&B site ended approximately eight years ago. The primary sediment COCs (PAHs and dioxin) are high molecular weight organic compounds with low solubility and high sorption partitioning coefficients and, thus, are generally not very mobile except through resuspension of sediments. Old Mormon Slough is an area of net sediment deposition where natural resuspension of sediment due to large tidal currents is not a major concern (assuming no disturbance and resuspension due to boat prop wash). This natural deposition of uncontaminated sediment can, over time, isolate contaminated sediment from the water column, reducing the bioavailability of the contaminants. This isolation can also reduce the natural biodegradation of these compounds by limiting the exchange of oxygen and other critical nutrients.

Natural attenuation of PAHs is evaluated in Appendix A. The appendix provides calculations estimating the potential for using natural attenuation as a stand-alone remedy. Results indicate that the time to degrade total PAHs (from an initial concentration of 1000 mg/kg to a cleanup level of 10 mg/kg) to a depth of 3 feet in the sediment would be 3,350 years. Using an initial total PAH concentration of 50 mg/kg, the cleanup time is reduced to 135 years. Consequently, it appears that, without outside assistance, oxygen limitations are too great for natural attenuation to treat the Old Mormon Slough sediment in a reasonable period of time. In addition, no calculations were attempted for dioxin, which is more persistent in the environment than the PAHs. Thus, the COCs are expected to persist for an indefinite period, and would continue to threaten fish and benthic fauna (particularly from PAH contamination) as well as human health through the ingestion of contaminated fish. Thus, the risks to human health and the environment are assumed to remain essentially the same as those identified in the baseline human health risk assessment (ICF 1996) and ecological risk assessment (Thom et al. 1997). Natural attenuation (No-Action) is inappropriate as a stand-alone alternative for the majority of Old Mormon Slough contamination. However, as previously discussed, natural attenuation (i.e., the use of institutional controls alone) for those portions of the slough that contain only a few

isolated areas of contamination or areas of low concentrations of COCs may provide sufficient protection of human health and the environment.

An assessment of this alternative against the evaluation criteria follows.

Overall Protection of Human Health and the Environment

The No-Action Alternative provides no reduction in human and/or ecological exposure to, or toxicity of, the contaminated sediment and fish in the area. It also could potentially allow migration of the contaminants from sediment to groundwater through recharge, which could contribute to the degradation of the groundwater in addition to that from upland soils. However, as noted earlier, the sediments in Old Mormon Slough are not considered a significant source to groundwater contamination. Thus, this alternative is not protective of human health and the environment.

Compliance with Applicable or Relevant and Appropriate Requirements

Because No-Action is being taken, this alternative would not reduce the sediment contaminant concentrations to levels considered protective of human health and the environment and would not meet ARARs.

Long-Term Effectiveness and Permanence

This alternative would not remove contamination sources and so would not provide any source controls or exposure controls. All current and future risks would remain essentially unchanged for hundreds or thousands of years.

Reduction of T/M/V Through Treatment

This alternative does not involve any treatment and so there would be no reduction in T/M/V of the contaminated sediment.

Short-Term Effectiveness

This alternative would have no short-term impacts because no activity would be implemented. There would be no additional risks to the community, workers, or the environment as a result of this alternative.

Implementability

There are no implementability concerns associated with this alternative.

Cost

The cost for 30 years of sediment and biota monitoring (sampling, analysis, and reporting) is estimated at $325,745.

### 5.3.2 SD-2 - In Situ Capping

As defined in Section 4.3.2, the in situ capping alternative relies on the use of a 0.6 m (2 ft) thick sand cap to contain contaminated sediment in the principal threat areas of the slough and institutional controls (access restrictions, deed notices, etc.) to restrict public access and future activities in the slough. The sand cap would blanket an area estimated at 8.8 acres and would cover nearly all of the known PAH and dioxin concentrations exceeding the preliminary sediment cleanup levels. Two hot spots of limited extent, one of PAH contamination and the other of dioxin contamination, located outside of the area of principal threat would not be capped, but would be addressed through the use of institutional controls.

An assessment of this alternative against the evaluation criteria follows.

Overall Protection of Human Health and the Environment

This alternative would be protective of human health and the environment by controlling human exposure to contaminated fish and isolating a preponderance of the contamination from the water column. It would have a limited effect on the potential migration of contamination from Old Mormon Slough into groundwater beneath the site. However, this is considered a minimal potential migration pathway in relation to the extensive deep soil and NAPL contamination in the upland portion of the site. In any event, any contribution of COCs from slough sediment to groundwater is expected to be captured by the proposed groundwater extraction system that was evaluated separately for the Soil-Groundwater OU FS report.

Compliance with Applicable or Relevant and Appropriate Requirements

This alternative would comply with ARARs. More particularly, the construction activities associated with this alternative would comply with the substantive requirements of the RHA because the activity would provide a benefit to the public by protecting human health and the environment. Construction would also comply with the substantive requirements of Section 404 of the CWA.

Long-Term Effectiveness and Permanence

All contamination would remain in place, but nearly all of it (except the two "hot spots") would be isolated from benthic and water column organisms via the sand cap. Remedial action objectives for protection of the aquatic environment would be achieved following the completion

of the sediment cap, which is estimated to take a few (perhaps 4 to 8) weeks. Capping of contaminated sediment is a common and proven technology. Since the slough is an area of net sediment deposition, natural erosion from tidal action and other causes is not expected to be of concern. However, if areas of potential erosion (either natural or man-made, e.g., from boat prop wash) are identified during the remedial design stage, a rip-rap and gravel filter armoring will be placed over those areas of the cap. The expected continuation of natural sediment deposition in the slough (estimated by White and Kohn [1996] to be at a rate of 3.6 cm [1.4 in.] per year) is expected to further bury the contamination and protect the integrity of the cap. Periodic monitoring and maintenance (if needed) of the cap will ensure the long-term effectiveness and permanence of the remedial action.

Although existing warning signs and fencing have not completely prevented public access and fishing in the slough, additional physical and administrative controls (e.g., log booms, improved fencing, additional warning signs, and increased security) could be more effective. Additional institutional controls such as proprietary and governmental controls, including deed restrictions, would prohibit dredging or other uses of the slough that would be detrimental to the cap and could lead to re-surfacing and/or resuspension of the contaminated sediment.

Capping would have only a limited effect on preventing the potential migration of contaminants from slough sediment into the groundwater system. However, the low solubility and high sorption coefficients for the COCs suggests that such migration, if any, would be extremely slow.

<u>Reduction of T/M/V Through Treatment</u>

There is no treatment involved in this alternative, thus, there would be no reduction in toxicity or volume of the contaminated sediment. However, capping of the contaminated sediment would significantly reduce the potential for resuspension and transport of contaminated sediment and secondarily would somewhat reduce the potential for migration of contaminants from sediment into groundwater via recharge.

<u>Short-Term Effectiveness</u>

There would be some risk to workers installing the sediment cap. These short-term risks would be primarily from the hazards associated with operation of heavy equipment and work over water. Direct worker exposure to contamination would be minimal, limited to contaminated debris removed prior to installation of the cap materials.

Some short-term adverse effects on the aquatic ecosystem are expected from the placement of sand. Installation of the sediment cap is estimated to take 1 to 2 months and is expected to have severe short-term impacts on the benthic community in the slough. Burial of

the existing slough bottom under 0.6 m (2 ft) of sand will essentially destroy the existing benthic community. However, the new sand bottom is expected to provide a good substrate for the development of a new healthy and diverse benthic community. Thus, over the longer term, installation of the sand cap is thought to provide beneficial effects to aquatic organisms.

Isolating contaminated sediment would eliminate exposure to water column organisms and, over time, reduce concentrations in those species consumed by humans. The implementation of access controls should somewhat reduce human health risks in the short term by limiting catching and consumption of potentially contaminated fish until safe concentrations in fish are achieved. The implementation of stronger access controls would almost immediately reduce the risk to the community by limiting the catching and consumption of potentially contaminated fish.

Implementability

The installation of a sand cap in this type of environment is a fairly common and proven method of containing contaminated sediment. The necessary equipment, materials, and expertise is readily available in the area. However, the presence of large debris, steep slopes, and/or large areas of potential erosion (primarily through prop wash) could complicate installation of the cap and lead to increased implementation time and/or cost increases.

Installation of the sand cap will raise the bottom of the slough a minimum of 0.6 m (2 ft), which may reduce the future useability of the slough and thus may impact neighboring land owners who may wish to use the slough.

Cost

The 30 year present worth cost of this alternative, assuming 5% inflation, is estimated to be on the order of $1,848,597, with a capital cost of $1,207,025, and an annual O&M cost of $41,735. The capital cost is primarily for installation of the cap. The annual O&M costs are primarily for monitoring and maintenance of the cap. Cost estimates for the capping alternative have assumed the use of a 90% sand cap/10% armored cap combination. The total cost of an armored cap for the entire slough was estimated at $2.9 million.

### 5.3.3 SD-3 - Dredging and Confined Disposal Facility

The Dredging and Confined Disposal Facility alternative uses mechanical dredging to remove contaminated sediment from principal threat subareas of the slough and consolidate it with existing contamination in the END of the slough in an engineered CDF (refer to Section 4.3.3 for a detailed description). The CDF would be constructed by installing a sheetpiling wall across the slough approximately 244 m (800 ft) from its END, producing a volume sufficient to contain the dredged material (estimated 55,400 $m^3$ [72,500 $yd^3$]) and a 0.6 m (2 ft) cap of



Exhibit 20 to the
United States' Motion
DOJ 286

clean local backfill materials. Water initially present in the CDF would be allowed to drain back into the slough during backfilling after passing through a silt curtain or other passive filtering system. This water would be discharged into the area still being dredged behind the main silt curtain.

Dredging would be performed to a depth of 0.7 to 2.7 m (2.2 to 8.8 ft) leaving deeper contamination in place, which would be capped with 0.6 m (2 ft) of sand to isolate it from water column organisms. The size of this cap is estimated to range from 1.6 to 4.0 acres, depending on the results of confirmatory sampling conducted at the completion of dredging activities.

A silt curtain would be used during these remedial activities to prevent the uncontrolled release of resuspended sediment. Institutional controls would be implemented to prevent access and fishing in the slough to ensure the integrity of the sand cap and to isolate low-level threat areas from the public.

An assessment of this alternative against the evaluation criteria follows.

Overall Protection of Human Health and the Environment

This alternative would be protective of human health and the environment by removing and/or isolating a preponderance of the contaminated sediment from the slough. Remedial action objectives for protection of the aquatic environment would be achieved in most of the slough following completion of the remedial actions, which are estimated to take several months (perhaps on the order of 4 to 10). Natural attenuation and degradation processes may take hundreds to thousands of years to decrease the two "hot spots" and residual contaminant concentrations to acceptable levels. This alternative would also provide a reduction in the potential for migration of contamination into the groundwater by reducing the mass of contamination directly influenced by the hydraulic driving force of the slough. Contamination removed from the slough would be contained in an unsaturated condition above the water table. In addition, the cap over the confined disposal unit would further reduce infiltration.

Compliance with ARARs

This alternative would comply with ARARs. More particularly, the construction activities associated with this alternative would comply with the substantive requirements of the RHA because the activity would provide a benefit to the public by protecting human health and the environment. Construction would also comply with the substantive requirements of Section 404 of the CWA. The consolidation of contaminated sediments from principal threat subareas into the contaminated area in the eastern end of the slough would occur within the same area of contamination and therefore would not constitute placement for purposes of triggering LDRs.

Long-Term Effectiveness and Permanence

Approximately 30% of the accessible (top 2.4 [8 ft]) PAH contamination and 53% of the dioxin contamination would remain in place. However, nearly all of it (except the two "hot spots" in the mouth of the slough) would be contained inside the CDF and isolated from the slough. Deep residual PAH contamination not removed during dredging would be capped with 0.6 m (2 ft) of sand. Dredging and confined disposal of sediment, as well as capping are common and proven technologies. Since the slough is an area of net sediment deposition, natural erosion of cap materials due to tidal action or other means is not expected to be of concern. However, if areas of potential erosion (either natural or man-made, e.g., from boat prop wash) are identified during the remedial design stage, a rip-rap and gravel filter armoring will be placed over those areas of the cap. The expected continuation of natural sediment deposition in the slough (estimated by White and Kohn [1996] to be at a rate of 3.6 cm [1.4 in.] per year) is expected to further bury the deep residual contamination and protect the integrity of the cap. Periodic monitoring and maintenance (if needed) of the cap and CDF will ensure the long-term effectiveness and permanence of the remedial action.

Although existing warning signs and fencing have not completely prevented public access and fishing in the slough, additional physical and administrative controls (e.g., log booms, improved fencing, additional signs, and increased security) could provide additional safeguards as a component of this alternative. Institutional controls such as proprietary and governmental controls, including deed restrictions, would prohibit dredging or other uses of the slough and adjacent lands that would be detrimental to the cap and/or CDF and may lead to re-surfacing and/or resuspension of the contaminated materials.

Reduction of T/M/V Through Treatment

There is no treatment under this alternative, thus, there would be no reduction in toxicity or volume of the contaminated sediment. However, removal, confined disposal, and/or capping of nearly all of the contaminated sediment (except the two "hot spots") would significantly reduce the mobility of the contamination by isolating it in the CDF.

Short-Term Effectiveness

There would be some risk to the workers during the 4- to 10-month-long remedial operations, while constructing the CDF, performing dredge and fill activities, and installing the sediment cap. These risks would primarily result from the hazards associated with the operation of heavy equipment and working over water. Increased worker exposure to contamination would be expected through direct contact with contaminated debris and sediment during the dredge and fill operations. This could be mitigated by the use of proper protective clothing.



Exhibit 20 to the
United States' Motion
DOJ 288

Removing and isolating contaminated sediment would eliminate exposure to water column organisms and over time would reduce concentrations in those species consumed by humans. The implementation of access controls should somewhat reduce human health risks in the short term by limiting catching and consumption of potentially contaminated fish until safe concentrations in fish are achieved. The implementation of stronger access controls would almost immediately reduce the risk to the community by limiting the catching and consumption of potentially contaminated fish.

Although remedial actions would be conducted during incoming tides and behind silt curtains to contain potentially resuspended sediment, this alternative is expected to have severe short-term and long-term (permanent) impacts on the aquatic ecosystem. Creation of the CDF will eliminate approximately 3.4 acres of aquatic habitat, about 30% of the slough. Dredging and installation of the sand cap is expected to have severe short-term impacts on the benthic community over another 5.5 acres, approximately one-half of the slough. However, the sand cap materials are expected to provide a good substrate for the development of a new healthy and diverse benthic community. Thus, over the longer term, installation of the sand cap is thought to provide beneficial effects.

The removal, consolidation and confined disposal of nearly all of the accessible (top 2.4 m [8 ft]) will reduce the contaminant mass directly influenced by the hydraulic driving force of the slough. Thus, the potential migration of contaminants out of the slough sediment and into the groundwater system will be reduced. However, the low solubility and high sorption of the COCs, as well as the already highly degraded nature of the groundwater due to the major upland source areas, suggests this reduction will likely have little effect.

<u>Implementability</u>

Implementation of this alternative is technically feasible. Dredging, confined disposal, and capping are all fairly common practices and are proven methods for control of contaminated sediment. The necessary equipment, materials, and expertise is available in the local area. However, the presence of large amounts of debris, large areas of potential erosion (primarily through prop wash), and/or difficulties in consolidating the dredge material, could complicate these remedial actions and lead to increased implementation time and/or cost increases.

The acceptability of filling in a portion of the slough to the community, adjacent landowners, and regulatory agencies is unknown at this time. Creation of the CDF would destroy approximately 30% of the slough and its aquatic habitat. In addition, the adjacent land owner would lose its existing waterfront access. Dredging of the slough would deepen the channel making it more accessible to future water traffic, should monitoring indicate that this traffic would have no adverse impacts on the residual contamination. The CDF, if properly designed and constructed, could serve as a new wharf.

Cost

The 30 year present worth cost of this alternative, assuming 5% inflation, is estimated to be on the order of $2.4 million, with a capital cost of $2.0 million, and an annual O&M cost of $27,442. The capital cost is primarily for construction of the CDF, dredging and filling operations, and installation of the sand cap. The annual O&M costs are primarily for monitoring and maintenance of the cap and CDF. This cost estimate assumes that only the CPA area of the slough would be capped. If necessary to cap both the OWP and CPA areas of the slough, the 30 year present worth cost was estimated at $2.9 million.

**5.3.4 SD-4 - Dredging and Offsite Disposal**

This alternative would remove contaminated sediment from principal threat portions of the slough by mechanical dredging. An estimated 91,000 $m^3$ (119,000 $yd^3$) would be removed accounting for an estimated 99.5% of the accessible (top 2.4 m [8 ft]) PAH contamination and nearly 100% of the dioxin contamination. This dredged material would be transferred to an upland dewatering facility constructed near the southeastern end of the slough. A combination of gravity drainage and filter press (or similar) technology would be used to dewater the sediment at a rate estimated at 77 $m^3/h$ (100 $yd^3/h$). The recovered water (estimated at 2300 liters per minute [70 gpm]) would be filtered prior to draining back into the area of the slough being dredged above the silt curtain, unless treatment was required.

Once the dredged material was sufficiently dewatered and/or stabilized (if needed) it would be transported offsite for treatment (if necessary) and/or disposal. The choice of an offsite disposal facility, and the need for treatment prior to disposal, is dependent on the eventual waste designation of the dewatered dredge material, as discussed in Subsection 4.3.4.

Deep residual contamination (i.e., the areas of contaminated sediment not removed during dredging, principally areas below 8 ft below the mudline) would be capped with a 0.6 m-(2 ft)-thick sand cap. The size of this cap, estimated to be on the order of 2.3 to 5.7 acres, is dependent on the results of confirmation sampling.

A silt curtain would be used during dredging activities to prevent the uncontrolled release of resuspended sediment. Institutional controls would be implemented to prevent access to and fishing in the slough, to ensure the integrity of the sand cap, and to isolate low-level threat areas.

An assessment of this alternative against the evaluation criteria follows.

Overall Protection of Human Health and the Environment

Remedial action objectives for sediment and the protection of the aquatic environment should be achieved in most areas of the slough following the completion of dredging and capping activities. This alternative would be protective of human health and the environment by removing or capping nearly all of the contamination. Removing contaminated sediment from the slough would eliminate exposure to water column organisms and over time reduce concentrations in those species consumed by humans. The implementation of stronger access controls could almost immediately reduce the risk to the community by preventing the catching and consumption of potentially contaminated fish until safe levels in fish are achieved. It would also provide a reduction in the potential for migration of contamination into the groundwater by reducing the mass of contamination directly influenced by the hydraulic driving forces from the slough. Two "hot spots" believed to be of limited extent, one of PAH contamination and one of dioxin contamination, would not be actively addressed, but would allow to be naturally buried by natural sedimentation processes or naturally degraded. Natural attenuation and degradation processes may take hundreds or thousands of years to decrease the "hot spot" and residual contaminant concentrations to acceptable levels. Short-term adverse effects are expected on the aquatic ecosystem from dredging and capping operations.

Compliance with ARARs

This alternative would comply with ARARs. More particularly, the construction activities associated with this alternative would comply with the substantive requirements of the RHA because the activity would provide a benefit to the public by protecting human health and the environment. Construction would also comply with the substantive requirements of Section 404 of the CWA. If water recovered from the dewatering facility requires treatment, the dewatering facility and the treatment facility would comply with the RCRA requirements set forth in Table 5.1.

Long-Term Effectiveness and Permanence

Virtually none of the accessible (top 2.4 [8 ft]) contamination would remain in place except the two "hot spots" in the mouth of the slough. Deep residual PAH contamination not removed during dredging would be capped with 0.6 m (2 ft) of sand. Dredging and capping are common and proven technologies. Since the slough is an area of net sediment deposition, further burial of the deep residual contamination and protection of the integrity of the cap are expected. Should the remedial design phase identify areas of potential erosion of the cap, those areas will be armored with rip-rap and gravel filter. Periodic monitoring and maintenance (if needed) of the cap will ensure the long-term effectiveness and permanence of the remedial action. Although existing warning signs and fencing have not completely prevented public access and fishing in the slough, additional physical and administrative controls (e.g., log



Exhibit 20 to the
United States' Motion
DOJ 291

booms, improved fencing, additional warning signs, and increased security) should be more effective. Additional institutional controls such as proprietary and governmental controls, including deed restrictions, would prohibit dredging or other uses of the slough that would be detrimental to the cap. Natural attenuation and degradation processes are not expected to reduce residual contaminant concentrations to acceptable levels for hundreds or thousands of years (Appendix A).

Reduction of T/M/V Through Treatment

Dredged material from the principal threat areas, estimated 91,000 $m^3$ (119,000 $yd^3$), would be dewatered using gravity drainage and filter press technology (or similar) to make it acceptable for offsite shipping. This represents nearly 100% of the accessible (top 2.4 m [8 ft]) contamination in the slough. The need for offsite treatment prior to disposal is dependent on the eventual waste designation of the material; this could range from no treatment required to incineration.

While some degradation is likely to occur during dewatering through photodegradation, biodegradation, and volatilization, it is considered insignificant over the anticipated implementation period. Dewatering would produce a residual water stream which would be filtered, or treated if necessary, prior to release back into the slough.

Short-Term Effectiveness

There would be some risk to workers over a 4- to 10-month period during dredging, dewatering, and capping activities. These risks would be primarily from the hazards associated with operation of heavy equipment and working over water. Increased worker exposure to contamination would be expected through direct contact with contaminated debris and sediment during the dredge and dewatering operations. This could be mitigated by the use of proper protective clothing.

Although remedial actions would be conducted during incoming tides and behind silt curtains to contain potentially resuspended sediment, this alternative is expected to have severe short-term impacts on the aquatic ecosystem from dredging and capping activities. Dredging will remove and essentially destroy the existing benthic community over three-quarters of Old Mormon Slough. However, the new sand cap materials are expected to provide a good substrate for the development of a healthy and diverse benthic community. Re-establishment of a vigorous benthic community is expected to take only a few growing seasons (perhaps 1 to 3 years). Over the long-term, dredging and installation of the sand cap is thought to provide beneficial environmental effects.

The removal of nearly all accessible (top 2.4 m [8 ft]) contamination from the slough will greatly reduce the contaminant mass directly influenced by hydraulic driving forces in the

slough. Thus, the potential migration of contaminants out of the slough sediment and into the groundwater system will be reduced. However, the low solubility and high sorption of the COC, and the already highly degraded nature of the groundwater due to the major upland source areas suggests that this reduction will likely have little obvious effect.

Implementability

Implementation of this alternative is technically feasible. Dredging and capping are fairly common practices and proven methods for controlling contaminated sediment. The necessary equipment, materials, and expertise for these activities is available in the local area. However, dewatering of the fine-grained (clay silt) sediment and the availability or accessibility of a commercial disposal facility may pose some difficulties. Based on recent experience at the United Heckathorn Superfund site, dewatering was found to be an extremely slow process that eventually had to be supplemented by solidification technology. Suitable dewatering technology may not be readily available, and could be quite costly. Dredging activities would likely be conducted at the same rate as the dewatering operations to limit the need for large-scale holding areas.

Completion of this alternative is expected to take between 4 and 10 months. Commercial TSDFs are available that are licensed to take the dredged material. However, the availability and accessibility of TSDFs for certain listed waste types could cause severe schedule and/or cost constraints. The presence of large amounts of debris, large areas of potential cap erosion (primarily through prop wash), and/or difficulties in arranging offsite transportation (particularly by rail) could also complicate these remedial actions and lead to increased implementation time and cost increases.

The acceptability of this alternative to neighboring land owners, the community, and regulatory agencies is unknown at this time. Dredging of the slough will deepen the channel, making it more accessible to future water traffic (should monitoring indicate that this traffic would have no adverse impacts on the residual contamination). There are potential risks to the public from the shipment of hazardous wastes from the site over long distances.

Cost

The cost for Alternative SD-4 depends on the location of the TSDF and the pre-disposal treatment requirements (see Subsection 4.3.4). Because of the uncertainties involved with this alternative, low-end and high-end costs were estimated. The low-end cost assumed that the waste could be shipped to a facility in California, and, based on its waste classification, it could be landfilled without treatment. However, LDRs for the expected waste classification of sediment from the M&B site (i.e., listed wood preserving wastes F032, F034, and F035) became effective in August 1997, and a treatment variance for these wastes expires in May 1999. In addition, if the dredged sediment exceeded the TCLP criterion for PCP, it would be

characterized as D037 waste and would be subject to treatment (incineration) before disposal. Thus, a high-end cost estimate is also included to comply with LDRs for offsite disposal. This limits the number of facilities that can accept the sediments, which greatly increases transportation costs and adds the high cost of incineration for this large volume of sediment to the total cost. Thus, the present worth value for offsite disposal could range from $39.6 million to as high as $351 million (see Appendix C). The low-end 30-year present worth cost of this alternative (assuming 5% inflation) is estimated to be on the order of $39.6 million with a capital cost of $39.1 million, and an annual O&M cost of $28,735. The high-end 30-year present worth cost of this alternative (assuming 5% inflation) is estimated to be on the order of $351 million, with a capital cost of $350.5 million, and an annual O&M cost of $28,735. However, as noted, the low-end value is no longer considered a realistic figure for offsite disposal since the LDRs recently became effective.

### 5.3.5 SD-5 - Dredging and Onsite Treatment

This alternative (described in detail in Section 4.3.5) would remove contaminated sediment from the principal threat area of the slough by mechanical dredging. As with the offsite disposal alternative, an estimated 91,000 $m^3$ (119,000 $yd^3$) would be removed, which accounts for an estimated 99.5% of the accessible (top 2.4 m [8 ft]) PAH contamination and nearly 100% of the dioxin contamination. This dredged material would be transferred to a dewatering facility where a combination of gravity drainage, percolation, and evaporation would partially dewater the sediment. The recovered water would be filtered prior to draining back into the area of the slough being dredged (above the silt curtain), unless additional treatment was necessary. Once the dredge material was suitably dewatered it would be treated using solvent extraction to remove the organic (PAH and dioxin) contamination. Solid residuals from this process would be solidified to address the remaining metals contamination and disposed onsite in the upland area of the site.

Deep residual contamination (not removed during dredging) would be capped with a 0.6-m- (2-ft)-thick sand cap. The size of this cap, estimated to be on the order of 1 to 2.4 ha (2.3 to 5.7 ac) is dependent on the results of confirmation sampling. A silt curtain would be used during dredging activities to prevent the uncontrolled release of resuspended sediment. Institutional controls would be implemented to prevent access to and fishing in the slough, to ensure the integrity of the sand cap, and to isolate lesser threat areas from the public.

An assessment of this alternative against the evaluation criteria follows.

<u>Overall Protection of Human Health and the Environment</u>

This alternative would be protective of human health and the environment by removing or capping nearly all of the contamination. Remedial action objectives for sediment and protection of the aquatic environment for most of the slough would be achieved following the



Exhibit 20 to the
United States' Motion
DOJ 294

completion of dredging and capping activities. The two "hot spots" at the mouth of the slough would not be actively remediated, but would be addressed by the use of institutional controls. Natural attenuation and degradation processes may take hundreds or thousands of years to decrease the "hot spots" and residual contaminant concentrations to acceptable levels. This alternative would provide a reduction in the potential for migration of contaminants from sediment into the groundwater by reducing the mass of contamination directly influenced by the hydraulic driving forces from the slough. Short-term adverse effects to the aquatic ecosystem are expected from dredging and capping operations.

Compliance with ARARs

This alternative would comply with ARARs. More particularly, the construction activities associated with this alternative would comply with the substantive requirements of the RHA because the activity would provide a benefit to the public by protecting human health and the environment. Construction would also comply with the substantive requirements of Section 404 of the CWA. The onsite dredging treatment facility would comply with the RCRA requirements set forth in Table 5.1. If water recovered from the dewatering facility requires treatment, the dewatering facility and the water treatment facility would comply with the RCRA requirements set forth in Table 5.1.

Long-Term Effectiveness and Permanence

Virtually none of the accessible (top 2.4 [8 ft]) contamination would remain in place, except the two "hot spots" at the mouth of the slough. Deep PAH contamination (greater than 2.7 m [8.8 ft]) would not be removed during dredging, but instead would be capped with 0.6 m (2 ft) of sand. Dredging and capping are common and proven technologies. Since the slough is an area of net sediment deposition, further burial of the deep residual contamination and protection of the integrity of the cap are expected. Should activities during the remedial design phase identify areas of the cap susceptible to erosion (most likely from barge traffic), those areas will be armored with rip-rap and a gravel filter layer. Periodic monitoring and maintenance (if needed) of the cap will ensure the long-term effectiveness and permanence of the remedial action.

Although existing warning signs and fencing have not completely prevented public access and fishing in the slough, additional physical and administrative controls (e.g., log booms, improved fencing, additional warning signs, and increased security) should provide more safeguards. Additional institutional controls such as proprietary and governmental controls, including deed restrictions, would prohibit dredging or other uses of the slough that would be detrimental to the cap. Natural attenuation and degradation processes are not expected to reduce residual contaminant concentrations to acceptable levels for hundreds or thousands of years (Appendix A).



Exhibit 20 to the
United States' Motion
DOJ 295

Reduction of T/M/V Through Treatment

This alternative would provide reduction of T/M/V for organic COCs (through solvent extraction) and reduction of mobility for inorganic COCs (through S/S). Dredged material from the principal threat areas, estimated at 91,000 $m^3$ (119,000 $yd^3$), would be dewatered using gravity drainage and treated using solvent extraction. This represents nearly 100% of the accessible (top 2.4 m [8 ft]) contamination in the slough.

Dewatering would produce a residual water stream that would require filtration and monitoring prior to release back into the slough. Solvent extraction is a separation technology that physically removes organic contamination from the sediments. Site-specific soil treatability tests (Section 3.3) have indicated that solvent extraction can be greater than 95% efficient in reducing the concentration of dioxin, and greater than 67% to 98.8% effective in reducing PAH concentrations. Solvent extraction can generate four primary residual streams; spent solvent, a recovered organic phase, a recovered aqueous phase, and solid residuals. The spent solvent and recovered organic would be destroyed via offsite incineration. The recovered aqueous waste stream would be filtered and treated using catalytic oxidation or similar technology (if needed), and the solid residuals would be treated using solidification technology and then disposed onsite in the upland area of the site. Treatability tests indicate that solidification of the solid residuals can reduce the mobility of residual organic and metal contamination by 73% to 98% (Section 3.3).

The removal of nearly all accessible (top 2.4 m [8 ft]) contamination from the slough will greatly reduce the contaminant mass directly influenced by hydraulic driving forces in the slough. Thus, the potential migration of contaminants out of the slough sediment and into the groundwater system will be reduced. However, the low solubility and high sorption of the COC, and the already highly degraded nature of the groundwater suggests this reduction will likely have little obvious effect.

Short-Term Effectiveness

There would be some risk to workers performing dredging, dewatering, treatment, disposal, and capping activities. These risks would be primarily from the hazards associated with operation of heavy equipment, industrial process equipment, and working over water. Increased worker exposure to contamination would be expected through direct contact with contaminated debris and sediment during the dredging, dewatering, and treatment operations. This could be mitigated with the use of proper protective clothing. Air emissions from the solvent extraction system and from the handling of the dewatered sediment could also cause short-term impacts at the site if not properly addressed.



Exhibit 20 to the
United States' Motion
DOJ 296

Dredging activities would likely be conducted in conjunction with the dewatering and treatment operations to limit the need for large-scale holding areas. Completion of this alternative is expected to take the same amount of time as alternatives SD-3 and SD-4, approximately 4 to 10 months.

Although remedial actions would be conducted during incoming tides and behind silt curtains to contain potentially resuspended sediment, this alternative is expected to have severe short-term impacts on the aquatic ecosystem from dredging and capping activities. Dredging would remove and essentially destroy the existing benthic community over three-quarters of the slough. However, the new sand cap materials are expected to provide a good substrate for the development of a healthy and diverse benthic community. Re-establishment of a vigorous benthic community is expected to take only a few growing seasons (perhaps 1 to 3 years). Thus, over the long-term, dredging and installation of the sand cap may have a beneficial effect.

Implementability

Implementation of this alternative is technically feasible, although it is the most complex alternative with the greatest implementation concerns. Dredging and capping are fairly common practices and proven methods for controlling contaminated sediment. The necessary equipment, materials, and expertise for these activities should be available in the local area. However, dewatering of the fine-grained (clay silt) sediment and the availability or accessibility of suitably sized solvent extraction systems may pose some difficulties. The implementation of the solvent extraction process is more difficult, and the availability of solvent extraction vendors may be limited. Onsite disposal of the solidified solid residuals from the solvent extraction process (91,000 $m^3$ [119,000 $yd^3$] plus a 20% bulking factor) may be somewhat difficult to implement. The disposal of this volume of material would require a disposal pit estimated at 91 m (300 ft) wide by 366 m (1200 ft) long and 2.7 m (9 ft) deep. This is expected to exceed available storage capacity in the upland portion of the site, and would also have an impact on implementation of the soil and groundwater remedies. The presence of large amounts of debris and/or large areas of potential cap erosion (primarily through prop wash) could complicate the implementation of this alternative, resulting in time and/or cost increases.

Residuals generated during solvent extraction would need to be treated and/or disposed of. The ex situ S/S process on solids from the solvent extraction process greatly increases soils-handling and technology requirements over the other alternatives.

The acceptability of this alternative to neighboring land owners, the community, and regulatory agencies is unknown at this time. Dredging of the slough will deepen the channel, making it more accessible to future water traffic (should monitoring indicate that this traffic would have no adverse impacts on the residual contamination).

Cost

The 30-year present worth cost of this alternative (assuming 5% inflation) is estimated to be on the order of $66.6 million, with a capital cost of $66.7 million, and an annual O&M cost of $28,735. The capital cost is primarily for treatment and includes dredging, dewatering, and installation of the sand cap. The annual O&M costs are primarily for monitoring and maintenance of the cap. This cost estimate assumes only the CPA and END areas of the slough would be capped. If the entire slough was capped, the 30-year present worth cost for this alternative would increase to $67.7 million (see Appendix C).

## 5.4 COMPARATIVE ANALYSIS OF SEDIMENT ALTERNATIVES

In the following analysis, the alternatives are evaluated in relation to one another using the same evaluation criteria. **Table 5.2** summarizes the key points from this analysis.

### 5.4.1 Overall Protection of Human Health and the Environment

All of the alternatives (except No-Action) rely on access controls to some extent to reduce human exposure to contaminated sediment and fish in the area. To reduce the risk to the environment, the In Situ Capping Alternative (SD-2) relies on physically isolating the contamination in place under a sand cap. This essentially buries the contamination to prevent direct contact to benthic organisms and resuspension of the sediment, thereby decreasing the bioavailability of the contamination to water column organisms. Given their low solubility and high sorption properties, these contaminants are expected to have low mobility in the aqueous phase, and thus can be adequately contained with a permeable cap. With the isolation afforded by a cap, the concentration of contamination in resident fish is expected to decrease over time, thus reducing the risk to humans. However, long-term monitoring, maintenance, and institutional controls are required to ensure the integrity of the cap. Less monitoring and maintenance would be necessary for an armored cap.

The alternative involving dredging, CDF (SD-3), Offsite Disposal (SD-4), and Onsite Treatment (SD-5), all provide additional protection by reducing the mass of contamination present in the slough. This would reduce the mass of contamination directly influenced by the hydraulic driving force of the slough and so provide a reduction in the potential for migration of contaminants into groundwater beneath the site. Alternatives SD-4 and SD-5 provide even greater protection by completely removing nearly all of the dioxin contamination and the accessible PAH contamination from the slough, and either disposing of it offsite or destroying it. However, both of these alternatives leave some deeper PAH contamination behind, and still must rely to some degree on in situ capping and long-term management. Thus, Alternatives SD-3, SD-4, and SD-5 provide a somewhat greater level of protection. However, as noted in earlier sections, migration of contamination from Old Mormon Slough sediments to groundwater is considered a minimal potential migration pathway in relation to the extensive deep soil and



Exhibit 20 to the
United States' Motion
DOJ 298

NAPL contamination in the upland portion of the site. In addition, any contribution of COCs from slough sediment to groundwater is expected to be captured by the proposed groundwater extraction system, which was evaluated separately for the Soil-Groundwater OU FS report.

### 5.4.2 Compliance with Applicable or Relevant and Appropriate Requirements

All of the alternatives would comply with ARARs, including the action-specific ARARs triggered by the dredging and construction activities proposed for the slough. Onsite treatment (SD-5) potentially may require treatment within the same area of contamination or designation of a RCRA CAMU in order to comply with LDR ARARs.

### 5.4.3 Long-Term Effectiveness and Permanence

The No-Action alternative would not be effective in reducing current or future risks. Natural attenuation processes are expected to take hundreds or thousands of years to reduce contaminant concentrations in sediment to acceptable levels.

Institutional controls, to be implemented as part of all but the No-Action alternative, do not provide long-term effectiveness and permanence alone. Stronger, enforceable, and effective controls could limit human exposure to potentially contaminated fish until sediment remediation efforts are complete, and natural metabolic and other processes reduce contaminant concentrations in the resident fish population. Institutional controls, however, would not reduce risk to ecological receptors.

To reduce risk to the environment and to protect human health over the long term, all of the alternatives (except No-Action) either isolate or remove a preponderance of the accessible contamination from Old Mormon Slough. Alternative SD-2 buries the contamination in place beneath a sand cap. This prevents resuspension of the sediment and reduces the bioavailability of the contamination to water column organisms. In situ capping of contaminated sediment is a proven and accepted technology. Given the low solubility and high sorption properties of the COCs, capping is expected to be effective in isolating these contaminants. However, long-term monitoring, maintenance, and institutional controls are required to ensure the integrity of the cap.

The CDF (SD-3), Offsite Disposal (SD-4), and Onsite Treatment (SD-5) alternatives all provide additional permanence and long-term effectiveness by reducing the mass of contamination present in Old Mormon Slough. Alternatives SD-4 and SD-5 provide even greater permanence by removing nearly all of the dioxin contamination and the accessible PAH contamination from the slough. The dredged sediment would be disposed of (and treated) offsite or treated onsite. This would provide an added measure of effectiveness and permanence for the protection of human health and the environment. However, all of these alternatives leave some deeper PAH contamination in the slough that is technically infeasible to dredge. Once exposed

by dredging activities, this residual contamination must be capped to prevent its bioavailability to water column organisms and to benthic organisms that may re-establish in Old Mormon Slough over time. This further requires long-term management to maintain the integrity of the cap. In addition, this residual contamination may still represent a small potential source to groundwater contamination. Thus, while Alternatives SD-4 and SD-5 may provide greater long-term effectiveness and permanence relative to human health (i.e., removal of nearly all dioxin), all of the alternatives (except No-Action) ultimately rely on capping and long-term management to some degree to provide long-term effectiveness and permanence relative to protection of the environment (i.e, reduce exposure to PAHs).

### 5.4.4 Reduction in Toxicity, Mobility, or Volume Through Treatment

Only one of the alternatives, SD-5, is designed to treat the contaminated sediment to reduce its T/M/V. The Onsite Treatment Alternative would use solvent extraction to remove the organic contaminants from the sediment. The recovered organics are expected to then be destroyed by offsite incineration. This treatment train is estimated to remove and destroy more than 85% to 94% of the dioxin contamination and more than 60% to 98% of the PAH contamination. Solidification of the solid residuals (i.e., the scavenged sediment) is estimated to reduce the mobility of the residual organic and inorganic (metal) contamination by 73% to 98%.

Because LDRs for the expected waste classification of the dredged M&B sediment will be in place when the remedial action occurs, the Offsite Disposal Alternative (SD-4) would also involve treatment. Offsite incineration of the contaminated sediment prior to disposal would reduce the organic contamination by an estimated 90% to 99%.

The other alternatives (SD-2 and SD-3) do not involve treatment and would not reduce the toxicity or volume of the slough sediments. However, they would reduce the mobility of the contamination through containment. Migration of contaminants to groundwater would still be a potential pathway. Of these two alternatives, SD-3 provides the greater reduction in mobility by removing nearly all of the accessible contamination from the slough and isolating it away from the biological and hydraulic influences of the slough.

### 5.4.5 Short-Term Effectiveness

All of the alternatives, except No-Action, present some risk to workers, primarily from operation of heavy equipment and the hazards of working over water. All of the alternatives also would cause severe short-term impacts to the benthic community in the slough. The In Situ Capping Alternative (SD-2) presents the least risk to workers and the fewest impacts to the slough ecosystem. All dredging alternatives would present increased industrial risk to the workers and even more detrimental ecological effects to the slough. The Onsite Treatment Alternative (SD-5) presents the greatest risk to workers, not only from the operation of heavy equipment associated with dredging and the industrial treatment processes, but also due to the

potential for direct exposure and inhalation of contamination while handling and treating the dredged material. The CDF alternative (SD-3) would cause the greatest environmental damage by permanently filling approximately 30% of the slough and destroying its aquatic habitat.

### 5.4.6 Implementability

All of the alternatives are technically feasible, and all necessary equipment, materials, and expertise for dredging and the installation of sediment caps is readily available in the Stockton area. However, the presence of large debris or steep bottom slopes can complicate dredging and capping activities. Dewatering of the fine-grained sediments sufficiently for offsite transport can be difficult. The Onsite Treatment Alternative (SD-5) is the most technically complex alternative with the greatest implementation concerns. It could be difficult to locate suitably sized solvent extraction systems necessary to meet effluent control standards. The ex situ S/S process on solids from the solvent extraction process greatly increases soils-handling and technology requirements over the other alternatives.

Onsite disposal of the large volumes of solid residuals from the solvent extraction/ solidification treatment train would be difficult due to limited capacity in the upland OU. The availability and accessibility of an offsite TSDF permitted to receive the contaminated sediment, which is dependent on the waste designation and LDRs, could cause significant scheduling delays and increased costs.

The acceptability of any of these alternatives to neighboring land owners, the community, and regulatory agencies is uncertain. However, it is anticipated that all of the alternatives could be of some concern. In situ capping would raise the bottom of the slough by a minimum of 0.6 m (2 ft); this would restrict future activities in the slough (e.g., dredging, barge traffic) that might disrupt the cap and release the buried contamination. The CDF alternative (SD-3) would fill approximately 30% of the slough and would eliminate the waterfront access of the property owner on the northern shore of Old Mormon Slough. However, the CDF alternative (along with the other dredging alternatives) would deepen the remainder of the slough. The CDF, depending on its design, could serve as a new wharf for future waterfront access, should future conditions in the slough allow resumption of normal slough uses. The Offsite Disposal alternative (SD-4) could raise public concerns regarding the transportation and offsite treatment/disposal of hazardous waste from the site.

### 5.4.7 Cost

Costs for the No-Action alternative are the lowest ($325,745), since it only involves monitoring sediment and biota for a 30-year period. The In Situ Capping alternative (SD-2) has the lowest capital and overall costs among the active remediation alternatives, with an estimated 30-year present worth value on the order of $1.8 million (assuming 5% inflation). Cost estimates for the capping alternative have assumed the use of a 90% sand cap/10% armored



Exhibit 20 to the
United States' Motion
DOJ 301

cap combination. The total cost of an armored cap for the entire slough was estimated at $2.9 million. The CDF alternative (SD-3) has higher capital costs but lower annual costs, with a present worth value estimated to be on the order of $2.4 million. The Onsite Treatment alternative (SD-5) is estimated at a present worth value on the order of $67.2 million. The Offsite Disposal (SD-5) alternative could be the most expensive of all the alternatives, depending on the location of the TSDF and the pre-disposal treatment requirements. Because of the uncertainties involved with this alternative, low-end and high-end costs were estimated. The low-end cost assumed that the waste could be shipped to a facility in California, and that based on its waste classification, it could be landfilled without treatment. Thus, the present worth value for offsite disposal could range from $39.6 million to as high as $351 million (see Appendix C). However, as noted, the low-end value is no longer considered a realistic figure for offsite disposal since the LDRs recently became effective.

### 5.4.8 State Acceptance

This section will be completed after state agency reviews of the M&B FS report and Proposed Plan have been completed.

### 5.4.9 Community Acceptance

This section will be completed after receipt of public comments on the M&B Proposed Plan.



Exhibit 20 to the
United States' Motion
DOJ 302