# McCormick & Baxter Superfund Site
# Stockton, California
# Surface Water & Sediment Operable Unit

## *Analysis of Dredging Modification to Alternative SD-2a*

**October 2000**

Exhibit 23 to the
United States' Motion
DOJ 369

## Table of Contents


1. Introduction ..... 1
   - 1.1 Purpose of this Report ..... 1
   - 1.2 Site Background ..... 2
   - 1.3 Scope of Report ..... 6
2. Conceptual Plan for Modification of Alternative SD-2a ..... 7
   - 2.1 Conceptual Design Elements ..... 7
   - 2.2 Overview of Modified Alternative ..... 9
   - 2.3 Dredging and Turbidity Management Methods ..... 10
   - 2.4 Transport/Treatment/Disposal of Sediments ..... 11
   - 2.5 Capping ..... 12
   - 2.6 Log Boom ..... 12
3. Nine Criteria Evaluation and Comparative Analysis ..... 12
   - 3.1 Overall Protection of Human Health and the Environment ..... 12
   - 3.2 Compliance with ARARs ..... 13
   - 3.3 Long-term Effectiveness and Permanence ..... 13
   - 3.4 Reduction in Toxicity, Mobility, and Volume Through Treatment ..... 14
   - 3.5 Short-Term Effectiveness ..... 14
   - 3.6 Implementability ..... 15
   - 3.7 Cost ..... 15
   - 3.8 State Acceptance ..... 16
   - 3.9 Community Acceptance ..... 16
4. References ..... 17

# 1. Introduction

## *1.1 Purpose of Report*

The purpose of this report is to update and re-evaluate the alternative selected as the remedy for the Surface Water-Sediment Operable Unit (OU) at the McCormick & Baxter Superfund site (M&B) in Stockton, California. This evaluation has been performed to address post-ROD concerns raised by the owner of property on the northern shoreline of Old Mormon Slough. This report incorporates by reference the Surface Water-Sediment Remedial Investigation Report (RI (EPA 1996); Feasibility Study Report (FS) (EPA 1998a); and the Record of Decision (ROD) (EPA 1998b) for the M&B Site.

## *1.2 Site Background*

Past operations at the M&B site have resulted in the release of wood-preserving chemicals to soils, groundwater and surface water. Surface water bodies adjacent to and/or potentially affected by the M&B site are Old Mormon Slough, New Mormon Slough and the Stockton Deepwater Channel (SDC). New Mormon Slough and the SDC do not appear to be adversely affected by contamination from the M&B site. However, sediments in Old Mormon Slough were contaminated by chemical spills, stormwater runoff, and, at least at the oily waste ponds (OWP) area, by subsurface migration of non-aqueous phase liquid (NAPLs) from upland contamination sources.

The following site contaminants of concern (COC) have been identified:

- Low molecular weight polycyclic aromatic hydrocarbons (LPAHs)
- High molecular weight polycyclic aromatic hydrocarbons (HPAHs)
- Dioxin (2,3,7,8-tetrachlorodibenzo-p-dioxin/2,3,7,8-tetrachlorodibenzo-p-furan)
- Pentachlorophenol (PCP)
- Metals (chromium, arsenic, zinc, copper).

Total PAH concentrations in sediment decrease with increasing depth in the western half of Old Mormon Slough, and increase with increasing depth in the eastern half. The depth of

Exhibit 23 to the
United States' Motion
DOJ 371

contamination in Old Mormon Slough generally ranged from 0 to 8 ft. below mudline; however, PAH contamination was found deeper than 18 ft. at two sampling locations next to the central processing area. PCP is not widely distributed and was detected in only six samples from the eastern half of Old Mormon Slough. Dioxin contamination is found at lower concentrations relative to the reference concentrations, and affects a smaller volume of sediment, than PAHs. Dioxin contamination was highest in shallower (upper 4 ft.) sediment in the vicinity of former discharge pipes. Arsenic, copper, zinc and chromium concentrations in Old Mormon Slough were not directly attributable to past M&B discharges.

The following alternatives were evaluated in the FS Report, based on the technologies and process options that were retained from the initial screening:

- SD-1: No Action
- SD-2: In Situ Capping
- SD-3: Dredging and Confined Disposal (combined with limited in situ capping)
- SD-4: Dredging of the Entire Slough and Off-Site Disposal (combined with limited in situ capping)
- SD-5: Dredging and On-Site Treatment, Solvent Extraction and Solidification/Stabilization (combined with limited in situ capping)

In September 1998, EPA issued a Proposed Plan (EPA 1998b), for the final soil and sediment remedies and an interim groundwater remedy, for public comment. After responding to the comments that were received on the Public Comment FS and the Proposed Plan, EPA, with the concurrence of the state of California, signed a ROD in March 1999 that selected a Surface Water-Sediment OU final remedy to address contaminated sediments in Old Mormon Slough:

> The selected sediment remedy consists of in-situ capping of contaminated Old Mormon Slough sediments in order to isolate areas of principal-threat wastes (approximately three-fourths of the slough) by blanketing them with a minimum of 2 ft of clean fine sand. The cap materials would be armored with rip-rap and gravel filter layer where needed to prevent erosion. The portion of the slough to be capped would run from just north of the oily waste ponds (OWP) area to the east end of the slough. The dimensions of the cap are estimated at approximately 2,330 ft long by approximately 167 ft wide. The cap would cover an estimated 8.8 acres. This portion of the slough contains nearly all of the PAH



Exhibit 23 to the
United States' Motion
DOJ 372

> and dioxin concentrations exceeding the preliminary sediment cleanup standards and accounts for an estimated 99.5% of the mass of accessible (≤ 8 ft deep) PAH contamination and 98% of the mass of dioxin contamination. The estimated volume of clean fine sand needed for cap material (including a 10% safety factor), is estimated at 31,200 $yd^3$.

> ...the mouth of Old Mormon Slough is considered a low-level threat area. The two isolated sample locations, or "hot spots," where concentrations exceeded sediment cleanup numbers would be addressed by the use of institutional controls to limit navigational access to the slough; provide more warning signs; limit future use of Old Mormon Slough to appropriate uses; and control future dredging of the slough to prevent disturbance of residual sediment contamination in the mouth of the slough. ...The rationale for not capping the MTH area is that there is no obvious spatial continuity between the two "hot spots"; because of their small size, they would be difficult to locate again and are difficult to define for implementation of any active remedial action such as capping or dredging; they are shallow compared to the rest of the slough; and the are located in a portion of the slough that historically has been occasionally used for barge traffic.

The selected remedy included a log boom to block boat traffic and prevent disturbance of the cap.

Remedial Design (RD) of the capping project has been completed, and consists of a Design Analysis (USACE, 2000) and Plans and Specifications.

After the ROD was signed, The Dutra Corporation, owners of shoreline property to the northwest of Old Mormon Slough, informed EPA of the company's concern that the sediment remedy, as selected, would "deprive Dutra of an important and valuable commercial feature of its yard" due to the raising of the slough bottom by two feet and the permanent placement of a log boom. Dutra requested that EPA look at an alternative plan that would allow them unrestricted access to their shoreline. This report evaluates the feasibility of modifying the selected remedy to include dredging of contaminated sediments in the reach adjacent to the Dutra property. The modification in this report consists dredging the portion of Old Mormon Slough along Dutra's sheet pile wall, dewatering of sediments, off-site transport/disposal of the dredged material, and relocation of the log boom. The selected alternative was designated SD-2a in the FS and ROD. The modification is designated SD-2a (Modified). This report does not evaluate any on-site treatment and/or disposal (landfilling) of the dredged material on the McCormick & Baxter property, which were included in the FS report.



Exhibit 23 to the
~~United States' Motion~~
DOJ 373

### *1.3 Scope of Report*

This report is divided into three sections, which are listed below. The evaluation of Alternative SD-2a (Modified) is done in comparison to SD-2a from the FS Report, updated with costs developed during RD.

- Section 2. Selection of the conditions for the modification, and a description of the conceptual dredging, treatment, and transportation/disposal technologies.

- Section 3. An analysis of the modified alternative using the nine FS evaluation criteria required under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA). The nine criteria are:
  - Overall protection of human health and the environment
  - Compliance with applicable, relevant, and appropriate requirements (ARARs)
  - Long-term effectiveness and permanence
  - Reduction in toxicity, mobility, and volume through treatment
  - Short-term effectiveness
  - Implementability
  - Cost
  - State Acceptance
  - Community Acceptance

- Section 4. This section presents the comparative analysis. Since the ROD already selected Alternative SD-2a, the comparison is conducted in relation to that alternative only.

Section 3 includes the results of an FS-level cost evaluation. The cost estimate has been prepared according to EPA guidance, and is intended to be comparable to the cost estimates prepared for the earlier FS report.

# 2. Conceptual Plan for Modification of SD-2a

## *2.1 Conceptual Design Elements*

Merely altering the location/configuration of the log boom, or redesigning the cap to armor it against erosion from barge traffic, as suggested as a solution by Dutra, would not meet human health and environmental protection requirements or achieve ARARs. Accordingly, in order to be a protective remedy, a modified alternative to provide full access to Dutra would have to include dredging a portion of Old Mormon Slough followed by capping over the dredged area, as described below. This following factors were considered in this evaluation:

- **Alternative SD-2a Design Elements**: The alternative selected in the ROD, which will be used for comparison purposes, consists of the in-situ capping, with fine to medium sand, of a 2330-foot long and 120-180 foot wide segment of Old Mormon Slough to two feet above the current sediment surface. The ROD indicated a cap of up to three feet of material. The Design Analysis for the selected remedy evaluated this depth and concluded that two feet of sandy cap is appropriate for effectively isolating the contaminated sediment in the slough. In addition to the two-foot cap, 0.5 feet of granular material (gravel) would be included for erosion protection along areas where there would be significant currents, including in the segment near Dutra's shoreline. To reduce turbidity during capping, a silt curtain would be erected during construction of the cap at the entrance to Old Mormon Slough near the right-angle bend in the Dutra sheet pile wall. During construction of the cap, Dutra would not have access to property east of the bend. After construction, a log boom would be placed to permanently prevent access of boat traffic to all capped areas of Old Mormon Slough to the east of the bend.

- **Depth of Old Mormon Slough:** The current depth of the slough along the Dutra sheet pile wall is 10-12 feet (at 0 feet Mean Lower Low Water [MLLW]) over most of the area east of

Exhibit 23 to the United States' Motion
DOJ 375

the bend. Standard tugs and barges would scour sandy cap materials at these water depths; a gravel component would be needed to resist such scour. However, the sand and gravel components together would decrease the channel depth by approximately 2.5 feet, reducing the navigable depth to approximately 7-10 feet. According to Dutra, this diminution of channel depth would adversely affect their maneuvering of tugs, barges and dredges in the slough.

- **Erosion Potential**: Propellor-caused erosion of the Alternative SD-2a gravel layer would likely occur should Dutra continue to use this segment of Old Mormon Slough. The solution to this would be a thicker erosion-protection layer; however, this could further diminish navigation depths. For this reason, modification of the SD-2a cap depth and composition only, without dredging, would not meet Dutra's stated need for site access.

- **Depth of Contamination**: All of the depth of PAH and dioxin contamination above ROD cleanup standards in the sediments along the Dutra sheet pile wall would not be removed by dredging only two or three feet of sediment, as suggested by Dutra. The RI report noted deeper sediment contamination, and a layer of nonaqueous phase liquids (NAPLs) at 6-8 feet below the current sediment surface has been confirmed by recent Corps of Engineers investigations in the center of the slough. Accordingly, capping, including an erosion protection layer, would still be required over the dredged area. That is, the capping of this segment of the slough would still need to occur as planned after the dredging was complete in order to be fully protective. The dredging modification to alternative SD-2a would approximately retain the existing navigable depths of the slough in the segment of interest by removing approximately as much sediment as replaced by the capping and erosion barrier.

- **Extent of Dredged Area**: It was considered impractical to only dredge the northern half of the channel in the segment, as suggested/requested by Dutra, since it would be difficult to prevent access to the southern shore, which would not be dredged. Also, the soft sediments in the undredged channel section would likely slough into the dredge cut from the contaminated southern side of the slough during dredging, making the dredging of the northern part difficult to accomplish.

- **Location of Log Boom:** After dredging and capping, the exclusionary log boom could be relocated to the east of the Dutra sheet pile wall, permitting Dutra (as well as recreational boaters) access to the slough segment in front of their property.

## *2.2 Overview of Modified Alternative*

Alternative SD-2a (Modified) consists of dredging three feet of sediment (i.e., two feet to accommodate the cap and one foot to accommodate over-dredge depth plus a gravel blanket for erosion protection for the cap) and capping. Implementation of Alternative SD2a (Modified) would require use of a sheetpile wall instead of a silt curtain to reduce particulate loss from the dredging. A log boom is included as in Alternative SD-2a, but at a position east of the Dutra sheet pile wall; this would permit continued access to the walled shoreline. The approximate dimensions and layout for this alternative are presented in Figure 1. Plate 1 shows project boundaries in relation to the SD-2a capping activity.

The dredged material would be transferred to an onshore dewatering facility constructed near the southwestern end of the slough on the McCormick and Baxter property. Gravity drainage would be used to dewater the sediment over an estimated four month period. The gravity dewatering technology was selected because it was of lower cost than a filter press array and water treatment train. Approximately 1.8 – 2 million gallons of water would infiltrate into the site soils during this period. The groundwater quality beneath the site has already been impacted, and will be addressed when the final groundwater remedy for the site is selected. However, a gravity dewatering activity would require concurrence from the State of California.

Once the dredged material was sufficiently dewatered, the material would be transported offsite for incineration and disposal. Deep residual contamination in the slough (consisting primarily of PAHs below 3 feet in this section) that is not affected by dredging would be capped with a 2-foot thick sand cap and armored with 6 - 12 inches of ½-inch diameter or larger gravel.

Incineration is assumed to be the treatment methodology because the sediments are administratively hazardous waste (F032/F034/F035), and the Land Disposal Restrictions (40 CFR

268.30) now apply to them. Alternative treatments (such as low-temperature thermal desorption, which might be somewhat cheaper) would have to clean the sediments to the very low Universal Treatment Standards for metals, semivolatile organics, PCBs, and pesticides. Use of an alternative treatment method would require further data and evaluation to determine their effectiveness, implementability, and associated cost.

## *2.3 Dredging and Turbidity Management Methodologies*

### 2.3.1 Sheet Pile Wall

The use of a silt curtain used for the capping alternative (SD-2a) was based on the expectation that with careful cap material placement, only low to moderate amounts of contaminated silts would become suspended in the water column. In the case of dredging, however, release of contaminated silt is expected to be much greater. Accordingly, a sheet pile wall is proposed for the dredging portion of the work included in this alternative. The sheet pile would be embedded deeply enough to withstand the anticipated 3-foot tidal head difference experienced in Old Mormon Slough. Since the dredge would need to leave the slough after dredging is completed, the wall would be extracted after dredging. Following that, a silt curtain would be deployed during the capping of the entire slough, equivalent to SD-2a.

### 2.3.2 Dredging and Dewatering.

*Dredging.* A barge-mounted mechanical clamshell or cable-arm bucket would be the likely method of dredging. This is because it would not be feasible to create an upland dewatering area that is large enough to accommodate hydraulically-dredged materials due to the higher amount of water entrained during dredging.

Key design assumptions for the modification are shown in Table 1.

Table 1. Design Assumptions for Alternative SD2a (Modified)

| | |
|---|---|
| Area to be dredged | 2.5 acres (ac) |
| Method for dredging | Barge mounted derrick crane with clamshell bucket (similar to FS) |
| Dredged volume prior to dewatering (includes 20% bulking factor during dredging) | 14,520 cubic yards ($yd^3$) |
| Sediment after dewatering | 10,454 $yd^3$ (final 28% water by weight, similar to FS) |
| Estimated period of time for gravity dewatering | 4 months |
| Amount for treatment (incineration) | 10,454 $yd^3$ |
| Dimensions of sheet pile wall (50% embedment below mud level (BML) | 270 ft * 40 ft = 10,800 $ft^2$ |
| Method for transport from dredge to dewatering area | Sealed, 10-cubic yard dump trucks |
| Dimensions and amount of berm materials | 60 yards on a side; approximately 24,000 $yd^3$ of imported granular materials for berm |
| Quantity of geotextile to line bermed area | 3,000 $yd^2$ |

*Dewatering.* A 7-foot high square or rectangular berm approximately 60 yards on a side (including berm materials) would accommodate five to six feet of material for dewatering. Prior to constructing the berm, a layer of gravel and a geotextile fabric would be placed over the ground. Dredged materials would be loaded on trucks by the dredge and conveyed to the bermed area for dewatering. With this material it should be possible to leave a truck access to the bermed area open until it is about three-quarters full to facilitate placement. To reduce the water content of the material, the surface soils would be tilled. Approximately four months would be required to reduce the moisture content to the maximum extent practicable

## 2.4 Transport/Treatment/Disposal of Sediments

Materials would be placed by front-end loader into twenty-one roll-off (Rollo) boxes, and would be shipped by train and truck to a treatment, storage and disposal facility (TSDF). It is assumed that trucking of boxes from the rail terminus to the TSDF would be needed. A one-way trip of 100 miles is assumed.



Exhibit 23 to the
United States' Motion
DOJ 379

Incineration costs of $1300 per cubic yard (cy), inclusive of all documentation, were suggested by the RACER cost-estimating program.

### *2.5 Capping*

Capping and erosion protection are similar to the SD-2a RD, and were described in paragraph 2.1 (first bullet).

### *2.6 Log Boom*

Following dredging and capping, a log boom would be placed along the eastern "transition area" (see Plate 1). The transition area refers to the dredging prism.

## 3. CERCLA Nine Criteria Evaluation and Comparative Analysis

Alternative SD-2a (Modified) was evaluated according to the CERCLA nine criteria analysis used for the other alternatives in the FS report. The findings were then compared to Alternative SD-2a. The results of both analyses for each criterion follow:

### *3.1 Overall Protection of Human Health and the Environment*

Alternative SD-2a (Modified) is expected to be protective of human health and the environment by removing contamination from a portion of the slough and capping the remainder of the contamination. It would control human exposure to contaminated fish and isolate contamination from the water column.

Compared to Alternative SD-2a, the modification would provide only a slightly greater level of protection of human health and the environment through the permanent removal of some contaminated sediments. Most of the contaminated sediments would remain and would be isolated under a cap as in Alternative SD-2a. Alternative SD-2a (Modified) would also provide a slightly greater reduction in the potential for migration of contamination into groundwater beneath the site by reducing the mass of contamination in the slough. However, the groundwater

contamination is already widespread from upland source areas, so benefits from this partial removal of contaminated sediments are relatively minor.

## *3.2 Compliance with ARARs*

This modification would comply with the ARARs identified in the ROD. Specifically, the construction activities associated with this alternative would comply with the substantive requirements of the Rivers and Harbors Act, because the activity would provide a benefit to the public by protecting human health and the environment. Construction would also comply with the substantive requirements of Section 404(b)(1) of the Clean Water Act. Incineration at a TSDF would comply with the RCRA requirements noted in 40 CFR 268.30. Department of Transportation (DOT) ARARs related to the transport of contaminated material from the site to the TSDF would have to be met for Alternative SD-2a (Modified). DOT ARARs are not triggered by Alternative SD-2a, since no contaminated sediment would be transferred from the site.

## *3.3 Long-term Effectiveness and Permanence*

Shallow (three feet) PAH and dioxin contamination would be permanently removed from a portion of the slough in front of the Dutra sheet pile wall. However, contaminated sediment would still remain deeper than three feet at this location. The remaining contaminated sediments would be capped with two feet of sand and up to 6 inches of gravel for armoring. The permanence of this alternative would be slightly greater than with capping alone (Alternative SD-2a), due to the reduced potential for cap erosion with a deeper channel. However, this improvement would be marginal. Long-term benthic recolonization and fish utilization, resulting in improved community structure and fish health, are expected to occur as a result of both alternatives.

### *3.4 Reduction in Toxicity, Mobility, and Volume Through Treatment*

Under Alternative SD-2a (Modified), an estimated 14,520 cy of contaminated dredged sediments from a principal threat area would be removed, dewatered using gravity drainage, and treated by off-site incineration to remove contaminants prior to land disposal. Alternative SD-2a does not involve any treatment of contaminated sediments. Both alternatives would reduce the mobility of the contaminants remaining in the slough sediments through containment.

Dewatering would produce approximately 1.8 - 2 million gallons of water that would be allowed to percolate into the ground (assuming state approval could be obtained). Groundwater beneath the site is already contaminated at or near levels expected to occur in this percolated water; however, a final groundwater remedy has not yet been selected for the site.

### *3.5 Short-Term Effectiveness*

Short-term effects on the aquatic ecosystem are expected from dredging and capping operations. Use of dredging would require mitigation measures such as a sheet pile wall. Some organisms would be killed or displaced in the 2.5-acre dredged and capped area, as they would in the other portions of the slough that will be capped. However, the new sand or sand-gravel cap materials are expected to provide a suitable substrate for the development of a healthy and diverse benthic community. Re-establishment of a vigorous benthic community is expected to take only a few growing seasons, perhaps one to three years.

There would be some risk to workers over a 4- to 6-month period during dredging, dewatering, and capping activities. These risks would be primarily from the hazards associated with operation of heavy equipment and working over water. Increased worker exposure to contamination would be expected through direct contact with contaminated debris and sediment during the dredge and dewatering operations. These exposures could be mitigated by the use of proper protective clothing and training. There are also significant potential risks to the public from the shipment of

hazardous wastes from the site over long distances in the modified alternative. Capping only (Alternative SD-2a) presents much less risk to workers and to the public.

Because only three feet of sediment would be dredged under Alternative SD-2a (Modified), another approximately three to five feet of contaminated sediment would remain below the cap in front of the Dutra sheetpile wall. This may require limitations on future maintenance dredging of this segment of the slough, even though it would be outside of the log boom.

### *3.6 Implementability*

Implementability of the modified alternative is technically feasible. Dredging and capping are well-known construction practices and proven methods for controlling contaminated sediment. The necessary equipment, materials, and expertise for these activities are available in the local area. Licensed TSDFs are available to receive the dredged material.

Dewatering of the fine-grained (i.e., clay silt) sediment may pose some difficulties. In recent experience at the United Heckathorn Superfund site, dewatering was found to be an extremely slow process. The quantity of water remaining in the soils that will require treatment is an uncertainty in the cost estimate for this modification. Also, state and community acceptance of an on-site dewatering facility is an uncertainty in the implementation of this alternative. This alternative is expected to take between 4 and 6 months to complete, longer than capping only.

Alternative SD-2a, capping only, is expected to be more easily implemented.

### *3.7 Cost*

The cost of capping alone (Alternative SD-2a), as developed during RD, is $1,883,123 (in 1999 dollars). The total costs for the modification are estimated at $21,659,915 (in 1999 dollars). This

is the capping cost plus the stand-alone modification cost of $19,776,792. The total cost of the modification is more than eleven times greater than that of capping alone. The major cost drivers are the transport and incineration of the sediment.

Table 2 provides cost evaluation information for the modification of Alternative SD-2a. The capping and erosion protection costs are considered in the basic SD-2a cost and were not re-visited in this evaluation. As conceived, the modification is additional cost to the basic capping alternative.

### *3.8 State Acceptance*

The acceptability of this alternative modification to the state of California is unknown at this time.

### *3.9 Community Acceptance*

The acceptability of this alternative modification to the community and neighboring facilities is unknown at this time. Dredging of a portion of the slough will retain the existing channel depths in the slough segment that would be dredged and capped. Because the log boom would be moved farther east, more of the slough would be accessible to the public.



Exhibit 23 to the
United States' Motion
DOJ 384

## 4. References

EPA 1988 [Aug]. CERCLA Compliance with Other Laws Manual: Draft Guidance. EPA 540/G-89-006.

EPA 1996 [Nov]. Remedial Investigation of the Surface Water Operable Unit, McCormick and Baxter Superfund Site, Stockton, California. Prepared by Pacific Northwest National Laboratory (PNNL), Battelle Memorial Institute.

EPA 1998a [July]. Surface Water-Sediment Feasibility Report for the McCormick and Baxter Superfund Site, Stockton, California. Prepared by PNNL.

EPA 1998b [Sept]. Proposed Plan for the McCormick and Baxter Superfund Site.

EPA 1999. (US EPA Region 9, 3/31/99 Record of Decision for the McCormick and Baxter Superfund Site, Stockton, California.

McCormick & Baxter

Table 2. Feasibility Level Cost Estimate for Alternative SD-2a (Modified to Include Dredging in DUTRA Segment of Waterway)

Note: this is additional to SD-2a cost estimate.

| Cost Component Description | Quantity | Unit | Unit Price | Cost Basis | Component Cost | Category Cost |
|---|---|---|---|---|---|---|
| **CAPITAL COSTS** | | | | | | |
| *Develop Suppl. RA Management Plan* | 1 | EA | $ 20,000.00 | SD-2a estimate | $ 20,000.00 | $ 20,000.00 |
| *Sheet Pile Wall, installed & removed* | 10,800 | SF | $ 20.00 | Kohn, 1996, in FS see note 1) | $ 216,000.00 | $ 216,000.00 |
| *Dredge and Place Material in Dewatering Area* | | | | | | $ 108,080.00 |
| Mobilize Barge and Mounted Dredge | 1 | EA | $ 40,000.00 | PTI, 1995 | $ 40,000.00 | |
| Dredge Contaminated Sediment | 14,520 | CY | $ 4.00 | Kohn, 1996 in FS | $ 58,080.00 | |
| Dredge Survey Verification | 1 | EA | $ 10,000.00 | | $ 10,000.00 | |
| *Dewatering Facility & Dewatering* | | | | | | $ 635,231.90 |
| Construction | | | | | | |
| Berm materials incl. Placement | 24,000 | CY | $ 12.00 | RACER | $ 120,000.00 | |
| Geotextile liner incl. Placement | 3,000 | CY | $ 3.00 | RACER | $ 9,000.00 | |
| Loading and Hauling | 10,454 | CY | $ 3.00 | RACER | $ 31,362.00 | |
| Management during dewatering | | | | | | |
| Soil Tilling, D3 Dozer with Tiller | 89 | HR | $ 84.97 | RACER | $ 7,562.33 | |
| Decontaminate Light Equipment | 1 | EA | $ 105.19 | RACER | $ 105.19 | |
| Decontaminate Medium Equipment | 1 | EA | $ 210.38 | RACER | $ 210.38 | |
| D3 Bulldozer with Tiller | 552 | EA | $ 846.00 | RACER | $ 466,992.00 | |
| Contractor Overhead Adjustment | | | 22% | RACER | $ 110,977.24 | $ 110,977.24 |
| *Transport* | | | | | | $ 1,209,190.00 |
| Rollo boxes ( 21 ton capacity) | 692 | EA | $ 170.00 | Vendor Quote | $ 117,640.00 | |
| Gondola railroad cars (at 3 per car) | 208 | EA | $ 3,900.00 | Vendor Quote | $ 811,200.00 | |
| Truck transport to incinerator | 623 | EA | $ 450.00 | Vendor Quote | $ 280,350.00 | |
| *Disposal/Treatment* | | | | | | $13,595,200.00 |
| Incineration | 10,454 | CY | $ 1,300.00 | RACER | $ 13,590,200.00 | |
| Nonhazardous waste disposal | $25 | CY | $ 200.00 | Vendor Quote | $ 5,000.00 | |



Exhibit 23 to the
United States' Motion
DOJ 386

**McCormick & Baxter**

| Cost Component Description | Quantity | Unit | Unit Price | Cost Basis | Component Cost | Category Cost |
|---|---|---|---|---|---|---|
| CONSTRUCTION COST SUBTOTAL | | | | | $ 15,894,679.14 | |
| Mobilization and General Req'mts at 15% | | NA | 15% | FS | $ 2,384,201.87 | |
| CONSTRUCTION COST SUBTOTAL | | | | | $ 18,278,881.01 | |
| Contingencies (excludes transport/ incineration) | | | | | | |
| Bid Contingency @10% | | NA | 10% | FS | $ 230,447.91 | |
| Scope Contingency @ 20% | | NA | 20% | FS | $ 460,895.83 | |
| Other Costs (excludes transport/incineration) | | | | | | |
| Administrative @ 5% | | NA | 5% | FS | $ 115,223.96 | |
| Services During Construction @ 10% | | NA | 10% | FS | $ 230,447.91 | |
| Legal @ 5% | | NA | 5% | FS | $ 115,223.96 | |
| IMPLEMENTATION COST TOTAL | | | | | $ 19,431,120.58 | |
| Engineering Design at 15% (excludes transport/incineration) | | | 15% | FS | $ 345,671.87 | |
| **CAPITAL COST TOTAL** | | | | | $ 19,776,792.45 | |
| ANNUAL O&M COST | | | | | (included in SD-2a) | |

| **PRESENT WORTH COSTS, MODIFICATION ONLY** | **Interest Rate** | |
|---|---|---|
| 30 Years, with Construction in 2 Years | 5% | $ 19,339,000.00 |

Note 1 $20 was stated in the FS, which did not include either salvage (which increases cost) and pulling (which increases it). This value assumes that they are about equal adjustments.



Exhibit 23 to the
United States' Motion
DOJ 387

NA Not Applicable
RACER Remedial Action Cost Evaluation Reporter, Talisman Software (2000 version)

Figure 1. Conceptual Dredging Plan for Modification to SD-2a. (Not to scale. See Plate 1 for scale drawing.)






Exhibit 23 to the
United States' Motion
DOJ 389




McCormick & Baxter

Exhibit 23 to the
United States' Motion
DOJ 390

Nov 29, 2001

| | |
|---|---|
| Thanne Cox, EPA | 972-3809 |
| MARIE LACEY, EPA | 972-3163 |
| DAVE WERNER | 415-258-6872 |
| Ken Smith, [illegible] | 415-25[illegible]-[illegible] |
| CHARLES SHOWDEN | 415-398 7878 / 209 462 3100 |
| Ryan Voorhees | 209-367-1706 |
| Ernest J. Pearson | 209-983-1111 |

SFUND RECORDS CTR
146027

# Final
# DESIGN ANALYSIS REPORT

# McCORMICK & BAXTER SUPERFUND SITE

## Surface Water Operable Unit
## Sediment Cap

December, 2001

Exhibit 25 to the
United States' Motion
DOJ 392

# TABLE OF CONTENTS

**Paragraph** **Page No.**

**SECTION 1. INTRODUCTION ........................................ 1**

1.1 PURPOSE ........................................ 1
1.2 PROJECT SUMMARY ........................................ 1
1.3 DESIGN PROCESS ........................................ 4

**SECTION 2. PERFORMANCE OBJECTIVES AND DESIGN APPROACH ........................................ 6**

2.1 CLEANUP STANDARDS IDENTIFIED IN THE RECORD OF DECISION ........................................ 6
*2.1.1 Identification of Applicable, or Relevant and Appropriate Requirements (ARARs), and To-Be-Considered (TBC) Criteria ........................................ 6*
*2.1.1.1 Chemical-Specific ARARs and TBCs ........................................ 6*
*2.1.1.2 Action-specific ARARs and TBCs ........................................ 7*
*2.1.1.3 Location-specific ARARs and TBCs ........................................ 20*
*2.1.2. Sediment Cleanup Standards ........................................ 21*
2.2 CHARACTERIZATION OF CONTAMINATED SEDIMENTS AND THE SITE ........................................ 22
*2.2.1. Waterway features ........................................ 22*
*2.2.2 Current Waterway Uses Related to Design ........................................ 23*
*2.2.3 Chemical characteristics of the in-place sediments. ........................................ 23*
*2.2.4 Areal extent of the area to be capped. ........................................ 24*
*2.2.5 Geotechnical Conditions ........................................ 24*
*2.2.6 Potential for Advective Loss of Contaminants Through Cap ........................................ 29*
*2.2.7 Potential for Recontamination of Cap from Stockton Deepwater Channel ........................................ 32*
*2.2.8 Determination on the Feasibility of In-situ Capping ........................................ 32*

**SECTION 3. BASIS FOR DESIGN ........................................ 33**

3.1 INTRODUCTION ........................................ 33
3.2 IN-PLACE SEDIMENT STRUCTURAL REQUIREMENTS ........................................ 33
*3.2.1 Geotechnical Considerations for In-Place Sediments ........................................ 33*
*3.2.2 Cap Composition and Testing ........................................ 33*
3.3 ACTIVITIES PRIOR TO CAPPING ........................................ 36
*3.3.1 Placement of a Temporary Cofferdam ........................................ 36*
*3.3.2 Side Slopes and Bank Stabilization ........................................ 37*
*3.3.2 Pile Piling and Timber Wall Removal ........................................ 37*
*3.3.3 Soil and Debris from Grubbing Excavation of Bank and Channel Clearance ........................................ 38*
*3.3.4 Submerged Structures and Obstacles. ........................................ 40*
*3.3.5 Environmental Measures to Reduce Surface Water Contamination ........................................ 40*
*3.3.6 Environmental Impacts Related to Construction ........................................ 42*
3.4 CAP MATERIAL TO BE USED ........................................ 45



Exhibit 25 to the
United States' Motion
DOJ 393

3.5 METHOD OF PLACEMENT OF SEDIMENT CAP ........ 46
*3.5.1 Performance Criteria for Construction Contractor* ........ *46*
*3.5.2 Cap Placement Technique Screening* ........ *47*

**SECTION 4. CONCEPTUAL MONITORING PROGRAM ........ 50**

4.1 MANAGEMENT GOALS ........ 50
4.2 SUGGESTED PROGRAM ........ 51
4.3 SAMPLING AND ANALYSIS REQUIREMENTS ........ 52
4.3 SAMPLING AND ANALYSIS REQUIREMENTS ........ 52
*4.3.1 Methods and Frequencies* ........ *52*
*4.3.2 Data Evaluation* ........ *54*

**SECTION 5. CONTRACT ACQUISITION STRATEGY ........ 55**

5.1 CONTRACTOR TECHNICAL REQUIREMENTS ........ 55
*5.1.1 Remedial Action Management Plan* ........ *55*
*5.1.2 Cost and Performance Report/Remedial Action Report* ........ *55*
5.2 CONTRACT ACQUISITION STRATEGY. ........ 56

**SECTION 6. PRELIMINARY HEALTH AND SAFETY EVALUATION ........ 58**

6.1 GENERAL INFORMATION ........ 58
6.2 PHYSICAL HAZARDS ........ 60
*6.3.1 Occupation of Site Buildings and Upland Facilities by Contractor During Construction* ........ *60*
*6.3.2 Capping and Bank Protection Safety Hazards* ........ *60*
6.3 SITE CONTAMINANTS ........ 60
*6.3.1 Potential Exposure to Vapors* ........ *60*
*6.3.2 Potential Exposure to Dust* ........ *61*
*6.3.3 Direct Contact and Indirect Ingestion* ........ *62*

**SECTION 7. WASTE HANDLING & DISPOSAL ........ 63**

7.1 WASTE TREATMENT, TRANSPORT AND DISPOSAL ........ 63
*7.1.1 Types of Waste Expected to Be Encountered During Construction* ........ *63*
7.2 STRATEGY FOR WASTE MINIMIZATION/TREATMENT AND REUSE ........ 65

**REFERENCES ........ 66**

**APPENDIX A. CALCULATIONS AND EVALUATIONS ........ 1**

**APPENDIX A-1. CALCULATIONS OF EFFECTIVE CAP THICKNESS ........ 1**

**APPENDIX A-2. CAP RECONTAMINATION POTENTIAL AND SUITABILITY OF CAP MATERIAL ........ 1**

A-2-1. CAP RECONTAMINATION POTENTIAL--LOADING CALCULATIONS ........ 1
A-2-2. INVESTIGATION OF BANK ........ 4
A-2-3. CAP MATERIAL INVESTIGATION ........ 9

**APPENDIX A-3. PHYSICAL TESTING AND CALCULATIONS OF LOAD BEARING STRENGTH AND CAP STABILITY ........ 1**



Exhibit 25 to the
United States' Motion
DOJ 394

A-3-1 GEOTECHNICAL ANALYSES ..... 1
*A-3-1.1 Sediment Sampling* ..... *1*
*A-3-1.2 Consolidation Testing and Analysis* ..... *2*
*A-3-1.3 Bearing Capacity Analysis* ..... *4*
A-3-2 CAP STABILITY ANALYSIS ..... 7
*A-3-2.1 Introduction.* ..... *7*
*A-3-2.2 Stability Analysis Methods.* ..... *7*
*A-3-2.2 Stability Analysis Results.* ..... *9*

**APPENDIX B -- COST ESTIMATE ..... 1**

TABLES

Table DA-1 Selection Criteria for Water Quality Protection Levels
Table DA-1(d). Values Near Or Below Practical Quantitation Limits
Table DA-2. Special Status Species with Potential to Occur in the Project Area
Table DA-3. Maximum Sediment Concentrations (Cleanup Levels) in the Sediment OU (from EPA 1998b, Table 2).
Table DA-4. Design Assumptions Used in FS (EPA 1998a.)
Table DA-5. Types of Waste By Activity and Fate
Table DA-6. Cap Gradation Criteria
Table DA-7. Conceptual Monitoring Program, Updated from FS (EPA 1998b)
Table DA-8. Frequencies of Construction Related Sampling by Construction Phase
Table DA-9. Relevant Respiratory Protection Standards and Other Criteria
Table DA-10. Potential Solid Waste Characterization Analyses
Table A-1-1. Effective Thickness of Cap and Flux Reduction to Four Site Contaminants.
Table A-2-1. Maximum Contamination Levels for Near-Embankment Upland Soils Compared to the the Cleanup Objectives, by Reach.
Table A-2-2. Calculations to Calculate Critical Loading Value for Data Collection
Table A-2-3. Target Semivolatile Organics in Bank Soils.
Table A-2-4. PCDD/F in Bank Soils
Table A2-5a/b. Grain Size Distribution and Cap Mineralogy
Table A-2-6. Metals in Prospective Cap Materials
Table A-2-7. Target Semivolatile Organics, Organochlorine Pesticide Compounds and Polychlorinated Biphenyls in Prospective Cap Material
Table A-2-8. PCDD/F Results for Prospective Cap Material
Table A-3-1. Sediment Sampling Program
Table A-3-2. Bearing Capacity Analysis

**FIGURES**

Figure 1. Old Mormon Slough Areas for Capping
Figure 2. Old Mormon Slough Bathymetry
Figure 3. Geological Cross Section Along Old Mormon Slough
Figure 4. Total PAH Concentrations in Old Mormon Slough
Figure 5. International Toxicity Equivalents (I-TEQ) for PCDD/F in Old Mormon Slough Cores



Exhibit 25 to the United States' Motion
DOJ 395

Figure A–2-1 **Sampling Locations for the June 1999 Bank Sampling**



Exhibit 25 to the
United States' Motion
DOJ 396

# SECTION 1. INTRODUCTION

## 1.1 PURPOSE

This Design Analysis presents the design considerations and describes the implementation approach for the McCormick and Baxter Superfund Site, Sediment and Surface Water Operable Unit remediation. The document was authored by the US Army Corps of Engineers through an interagency agreement with EPA Region 9, to assist in the design and execution of the remedial action for this site. The sediment cap design involves bank modification for protection of the cap, placement of cap material, environmental measures to protect the environment during construction, and access restrictions to protect the integrity of the remedy.

## 1.2 PROJECT SUMMARY

The McCormick and Baxter Superfund Site is located on 29 acres near the Port of Stockton, California (Fig. 1). To the north, this former industrial site borders Old Mormon Slough, which joins the Stockton Deepwater Channel on the San Joaquin River. The McCormick and Baxter Creosoting Company operated a wood treating company at the site from 1946 to 1990, when the company ceased operations. Wood treatment using creosote, pentachlorophenol (PCP), and chrome, copper, zinc, and arsenic occurred at the site, resulting in environmental contamination from a combination of spillage from retorts, drippage from treated lumber and disposal operations into oily waste ponds adjacent to the slough. In 1977, a fish kill in the New Mormon Slough and the Stockton Deepwater channel was attributed to the facility's storm-water discharges. The State of California provided oversight for a series of investigations on the part of the company, and measures to reduce releases from the facility. Measures included groundwater pumping, installation of a storm-water collection system, and levees to reduce runoff. EPA placed the site on the National Priorities List in 1992, and took the lead in directing the remediation. A Remedial Investigation (EPA 1996 [November]) and Feasibility Study (EPA 1998 [July]) have been completed, and a Record of Decision was signed on 31 March, 1999 that documents the selected remedies for the site.



Exhibit 25 to the
United States' Motion
DOJ 397

Surface water (which includes sediment) has been designated by EPA as a separate operable unit from the groundwater and soil operable units, and each has its own set of remedial activities. The sections of Old Mormon Slough adjoining the upland site have been divided into four separate areas (fig. 1): the eastern end (END), the reach next to the central processing area (CPA), the reach beside the oily waste ponds (OWP), and the mouth of the slough where it connects to the Stockton Deepwater Channel (MTH).

EPA's selected alternative, as portrayed in the ROD (EPA, 1999), follows. In the quotation, "principal threat wastes" refer to contaminated source materials considered to be highly toxic or highly mobile, or that might not be reliably contained under the conditions discovered in the RI/FS, or that would present a significant risk to human health or the environment should exposure occur. Low-level threat wastes are source materials that generally can be reliably self-contained and that would present only a low risk in the event of a release. Section 10.2.3 states, in part:

> "The selected sediment remedy consists of in-situ capping of contaminated Old Mormon Slough sediments in order to isolate areas of principal-threat wastes (approximately three-fourths of the slough) by blanketing them with a minimum of 2 ft of clean fine sand. The cap materials would be armored with rip-rap and gravel filter layer where needed to prevent erosion. The portion of the slough to be capped would run from just north of the oily waste ponds (OWP) area to the east end of the slough. The dimensions of the cap are estimated at approximately 2,330 ft long by approximately 167 ft wide. The cap would cover an estimated 8.8 acres. This portion of the slough contains nearly all of the PAH and dioxin concentrations exceeding the preliminary sediment cleanup standards and accounts for an estimated 99.5% of the mass of accessible ($\leq$ 8 ft deep) PAH contamination and 98% of the mass of dioxin contamination. The estimated volume of clean fine sand needed for cap material (including a 10% safety factor), is estimated at 31,200 $yd^3$.


Exhibit 25 to the
United States' Motion
DOJ 398

# Figure 1. Old Mormon Slough Areas for Capping

> "...the mouth of Old Mormon Slough is considered a low-level threat area. The two isolated sample locations, or "hot spots," where concentrations exceeded sediment cleanup numbers would be addressed by the use of institutional controls to limit navigational access to the slough; provide more warning signs; limit future use of Old Mormon Slough to appropriate uses; and control future dredging of the slough to prevent disturbance of residual sediment contamination in the mouth of the slough. ... The rationale for not capping the MTH area is that there is no obvious spatial continuity between the two "hot spots"; because of their small size, they would be difficult to locate again and are difficult to define for implementation of any active remedial action such as capping or dredging; they are shallow compared to the rest of the slough; and the are located in a portion of the slough that historically has been occasionally used for barge traffic. "

While not specifically called out by the ROD, it appears from information obtained during the remedial design (Appendix A-2) that bank protection will also be required to prevent recontamination of the cap from the south bank soils sliding into Old Mormon Slough through erosion and structural failure.

## 1.3 Design Process

This design follows the recommended sequence of steps for design of an in-situ capping project (EPA 1998c). Sections of this report are cross-referenced to the topics in the citation.

- Establish cleanup objectives for protection. *Section 2.1.*
- Characterize the contaminated sediments and the site. *Section 2.2.*
- Make a preliminary determination on the feasibility of in-situ capping based on information obtained about the site and sediments. *Section 2.3.*
- Identify potential sources of capping materials, including clean sediments that might be dredged and upland sites or commercial sources for soil,


Exhibit 25 to the
United States' Motion
DOJ 400

gravel and stone. *Sections 3.3-3.5*

- Design the cap composition and thickness. *Section 3.2*
- Select appropriate equipment and placement techniques for the capping materials. *Section 4.1-4.5.*
- Develop an appropriate monitoring and management program to include construction monitoring during cap placement and long-term monitoring following cap placement. *Section 5*

In addition, Section 5 discusses the preferred contract selection strategy, Section 6 discusses health and safety needs, and Section 7 discusses waste handling and disposal.

## 2.2 Characterization of Contaminated Sediments and the Site

### 2.2.1. Waterway features

Old Mormon Slough is about 2,500 ft long and 180 ft wide. The slough was originally part of a larger system including New Mormon Slough, but was cut off from the remainder by the construction of the Interstate 5 highway in 1970. The majority of the slough is about 10 ft deep; the mouth of the slough was dredged in 1987 to a depth of about –16 ft MLLW. The slough was dredged in 1987 to current depths. Dredged materials were placed in a confined disposal facility to the north of the slough near the mouth. Bathymetry of the slough in 1994 is shown in Figure 2. Old Mormon Slough enters the Stockton Deepwater Channel (SDC) at the eastern end (END) of the Turning Basin. The Turning Basin is maintained by the Port of Stockton at a depth of –35 ft MLLW. Upstream of the Turning Basin, the SDC depth is about –22 MLLW. The shorelines of Old Mormon Slough are composed of riprap, piers, pilings, and sheetpile walls.

Water flow in the Old Mormon Slough is driven primarily by tides and storm flows. Tides measured in the San Joaquin River have a mean tidal range of 3 ft MLLW (EPA 1997). The mean higher high water is approximately +4 ft MLLW and the tidal exchange period is 12.8 hours. Storm flows occur every few years, and appear to be influential in changing bank structure through undercutting.

Information on currents in Old Mormon Slough suggests that cap erosion is not likely except in the MTH reach. Vegetation surrounding Old Mormon Slough is sufficiently high to reduce wind energy, and thereby prevent significant wind-wave induced sediment transport or erosion except at times of severe storms. However, at the mouth of the slough, small boat and tug/scow traffic are possible outside of the final finished log boom, which could cause erosive forces to the depths there (12-16 ft MLLW), especially on low tides and with tugs in bollard pull situations.

An engineering survey of the banks of Old Mormon Slough conducted during the design provided substantial evidence of undercutting, ravelling, and bank failure along both the south and north sides of Old Mormon Slough. The slopes have received pieces of rock and concrete to assist stabilization, but this has not worked effectively. It appears likely that a significant route of contamination into Old Mormon Slough is soil slumping from bank failure where contaminated soils are present. Appendix A-2 shows the



Exhibit 25 to the
United States' Motion
DOJ 402

calculations of loading rates and results that support the need for bank protection as a part of the remediation on the south bank. Although there were no confirmation samples taken during this survey west of the south bank sheetpile enclosure in the vicinity of the former Oily Waste Ponds, the sparse uplands chemical data from borings presented in the RI also support bank protection in this section of OMS.

### 2.2.2 Current Waterway Uses Related to Design

Old Mormon Slough has historically been used for navigation, and pilings and piers are still present. The current northwestern slough landowner continues to use the north bank along its property to moor waterborne construction equipment such as hydraulic pipeline dredges and scows, but the use of this property could change in the future. Currently, tug propellor wash may affect sediments. Grain size is coarser and penetration of sediments by coring devices was more difficult in the area of active use according to sampling team observations during Spring, 1999. The northeastern landowner moors a tug on the slough, which will be permanently removed before construction.

EPA (1998a) indicated that boat traffic is currently rare in the eastern portion of the slough, and recreational boats only enter only infrequently because the area is posted with fishing advisories. The Feasibility Report (EPA 1998a) and Proposed Plan (EPA 1998b) indicate a log boom at the mouth of the slough would be included after cap construction to preclude boat access to the waterway. In addition, signs would be posted on the log boom indicating the presence of a cap over contaminated sediments.

No stormwater has been discharged from the site into Old Mormon Slough since 1978, when a stormwater collection system was installed at the site. Stormwater is discharged under permit to the Stockton Regional Wastewater Control Facility. No further discharges to the slough have been documented. As a feature of the design, a 2-ft berm will be engineered along the shoreline to stop sheet flow erosion from stormwater events from reaching either the protected bank or the cap.

### 2.2.3 Chemical characteristics of the in-place sediments.

Figures 3 and 4 display the concentrations of PAHs (mg/Kg) and PCDD/F toxicity equivalents (TEQ (mg/kg), expressed as equivalents of 2,3,7,8-tetrachlorodibenzo-*p*-dioxin's toxicity) in the surficial sediments of Old Mormon Slough.



Exhibit 25 to the
United States' Motion
DOJ 403

Chlorinated phenols such as PCP were not detected in most of the samples, although this may have been due to elevated quantitation limits. PCP was seen at END at a maximum value of 120 µg/kg, and at CPA at a maximum value of 5,600 µg/kg. PCP was detected in all composites from CPA. EPA 1998a states that the most likely source of PCP in Old Mormon Slough was stormwater discharge.

EPA 1998a also states that sources of PAHs, PCP, PCDD/F and dioxin to Old Mormon slough appear to have ceased.

### 2.2.4 Areal extent of the area to be capped.

Figure 1 shows the areas to be capped. Figure 2 shows the topology of the slough. The dimensions of the cap would be 2,330 ft with a mean width of 167 ft, covering approximately 8.8 acres. While it is not stated in the ROD or FS drawings, we have interpreted that +1 ft MLLW (mean lower low water) is the upper end of the cap. The cap design addresses effective short- and long-term chemical isolation of contaminants, including possible effects of bioturbation, consolidation, erosion, and other pertinent processes. EPA (1998a) assumed a minimum of 2 ft thickness.

### 2.2.5 Geotechnical Conditions

#### 2.2.5.1 Geology

The site geology (described in EPA 1998d) chiefly consists of flood deposits for the first two hundred feet below ground surface (bgs). Alluvial fan and fluvial floodplain deposits are derived from the Sierra Nevada range. These sediments were predominantly silty clay and micaceous silts, with fine to coarse-grained silty sand.

Figure 5 shows a cross section to about 40' below water surface (30' below slough bottom). Gray clayey silt predominates from 2-6' depth at the slough bottom. A portion of this may have come from loading of runoff waters associated with the construction of Interstate 5 (EPA 1998a).



Exhibit 25 to the
United States' Motion
DOJ 404

### 2.2.5.2 Hydrogeology

The hydraulic characteristics of the soils affecting Old Mormon Slough are described in EPA 1998d. The top several feet of adjacent land are typically coarse grained fill material composed of silts and gravels. Clay and silty clay occurs beneath this to 20-30 bgs. Beneath the clay, a sandy section occurs from 25-45 ft bgs, in an east-west trending pattern. This unit is called the A-Zone. The A-Zone aquifer is contaminated by leaching from the vadose zone and by dense, non-aqueous phase liquid (NAPL) flow. The A-Zone is hydraulically connected to Old Mormon Slough. Under static conditions, most of old Mormon Slough exhibits flows from the slough to the groundwater.

At places in the slough, sediment cores have shown an oily sheen. It is suggested (EPA 1998d, p 4-20) that this is from historic spills, and not from subsurface transport in the groundwater or on an aquitard.

### 2.2.5.2 Geotechnical Engineering Properties

The top 1-5 feet of sediment located on the bottom of Old Mormon Slough is classified as very soft, fine grained silty material that can be expected to consolidate from cap placement to some degree. The physical properties of the in-situ sediments have been determined during design phase of this project in order to evaluate the potential consolidation of the capped sediments. (See Section 3.2.1.)

### 2.2.5.3 Sediment Deposition and Transport

Sediment transport in Old Mormon Slough is slow and generally depositional (EPA 1997). The sedimentation rate was estimated to be 1.4 in/yr (3.5 cm/yr). Since boat traffic is rare and expected to be further reduced by the remedial activity, propeller-induced erosion is not anticipated to be significant. However, this statement may not hold for the north-east bank of the slough where dredges are sometimes moored currently. As noted above, penetration into the sediments is more difficult in the MTH reach, suggesting that the sediment may be altered by propellor wash and/or wave-induced scour.

### 2.2.6 Potential for Advective Loss of Contaminants Through Cap

In most in-situ caps constructed to date, granular materials, including gravel, sand, silt



Exhibit 25 to the
United States' Motion
DOJ 405

and clay, have been used for chemical isolation. Experience at several creosote-contaminated wood treatment sites in Puget Sound has included spreading of thin to thick layers of cap material over large areas. Techniques have included hydraulic washing of dredged material from flat barges, conveyor placement, and gradually opening a conventional split-hull barge while underweigh.

EPA 1998a indicated the need for a cap of a minimum of 2 ft of permeable clean sand. The PAH and PCDD/F contamination in the site sediments are of very low mobility. However, PCP may be somewhat mobile due to its higher solubility and lower association with sediment organic carbon. The hydrogeological investigation in EPA 1998e suggests that the area of the waterway where PCP is located is near equilibrium in terms of groundwater contribution to the slough and recharge from the slough. In one recent cap design (Thea Foss head of waterway, Commencement Bay/Nearshore Tideflats Superfund Site), a hybrid cap is currently being designed to intercept NAPL flow from sediments into the cap due in part to groundwater flux. Observations in OMS have not suggested that there is an upward flow of NAPL nor in fact of groundwater; therefore, special considerations to intercept NAPL do not appear to be required in the design of the cap

A screening analysis was accomplished to address the "effective thickness" of the cap to isolate underlying contaminant. A screening model assured that through-cap permeation does not form a fatal flaw for the cap. Per EPA 1998c:

"The ability of the cap to control advective contaminant losses is dependent upon several factors: If a cap has a properly designed physical isolation component, contaminant migration associated with the movement of sediment particulates should be controlled. Most contaminants of concern also tend to remain tightly bound to sediment particles. However, the movement of contaminants by advection (movement of porewater) upward into the cap is possible, while movement by molecular diffusion over long time periods is inevitable.

"Advection refers to the movement of porewater. Advection can occur as a result of compression or consolidation of the contaminated sediment layer or other layers of underlying sediment. Movement of porewater due to consolidation would be a finite, short-term phenomena, in that the consolidation process slows as time progresses and the magnitude of consolidation is a function of the loading placed on the compressible layer. The weight of the cap will squeeze the sediments, and as the porewater from the sediments moves upward, it displaces porewater in the cap. The result is that



Exhibit 25 to the
United States' Motion
DOJ 406

contaminants can move part or all the way through the cap in a short period of time. This advective movement can cause a short-term loss, or it can reduce the breakthrough time for long-term diffusive loss of contaminants at the cap surface."

EPA (1998c ) and the Corps of Engineers (1998) suggest that the thickness of a cap should consider the following components for the short and mid term:

---

Effective Thickness of Cap =
Original Thickness Following Placement, *minus*
Depth of Bioturbation, *minus*
Loss by Consolidation, *minus*
Advective Movement of Pore Water Up Into Cap

---

The following discussion synthesizes relevant information from Appendices A-1, A-2 and A-3, to derive an effective thickness. The initial cap is specified in the ROD as 61 cm (24 inches) deep after consolidation of its components. (This is virtually nil for fine to medium sands.) The consolidation of underlying sediment was taken to be 5 inches (12.7 cm) based upon a measurement (described later) from a consolidation test. The depth of bioturbation was set to be 10 cm (approximately 4 inches). Equilibrium partitioning was used to estimate the pore water concentration in the sediment for 4 chemicals, benzo(a)pyrene, phenanthrene, PCP, and 2,3,7,8-TCDD. The cap organic fraction was taken to be 1%, which set a retardation factor for each chemical based upon their maximum concentrations found in sediment, sediment carbon content, and their equilibrium partitioning coefficients. Erosion was assumed to be zero. For all compounds tested, effective cap thickness was 46 cm (18.1 inches). This supports a conclusion that a 2-foot cap will be sufficient effective thickness for Old Mormon Slough. Calculations are shown in Appendix A-1. With the consideration for the method of measurement, actually 29 inches of cap will be placed. As a result, the effective cap thickness will be 23.1 inches.

Longer term failure of the cap through porewater advection is not deemed likely, since the slough is losing water to the groundwater instead of it moving upwards through the cap. There is thus no "driver" for movement of contaminants apart from the initial expression of porewater during and from consolidation after placement.



Exhibit 25 to the
United States' Motion
DOJ 407

### 2.2.7 Potential for Recontamination of Cap from Stockton Deepwater Channel

This paragraph addresses a stated concern [1] that contaminated sediments in the Stockton Deepwater Channel will be the source for sedimentation in Old Mormon Slough since these other areas are believed to be more contaminated than the EPA cleanup objective for PAH and PCDD/F. The industrialized reference station at the Stockton Channel is not typical of the Stockton Channel. Data from dredging by the Corps of Engineers indicate low or nondetected PAH and PCP. Also, the sediment in the Stockton Reference Channel station would not fail the performance criteria for the remediation.

### 2.2.8 Determination on the Feasibility of In-situ Capping

The cap is considered feasible based upon the evaluations described or referenced above.

[1] Letter from Jeff Gentry, CH2M-Hill, on behalf of Union Pacific Railroad to Marie Lacey, USEPA Region 9, dated 13 Nov., 1998.



Exhibit 25 to the
United States' Motion
DOJ 408

# SECTION 3. BASIS FOR DESIGN

## 3.1 INTRODUCTION

In-place sediment structural properties and chemical composition of prospective cap materials were data gaps requiring further investigation during remedial design. Also, data were collected to support a decision whether a sufficient quantity of bank material could fall into the slough, thereby recontaminating the cap.

## 3.2 IN-PLACE SEDIMENT STRUCTURAL REQUIREMENTS

### 3.2.1 Geotechnical Considerations for In-Place Sediments

The physical characteristics of the contaminated sediment are key to developing cap design, refining cap material quantities, selecting the appropriate equipment for cap placement; and monitoring cap performance. During the design, an investigation was conducted to elucidate these conditions. The degree of potential consolidation was evaluated based on standard consolidation procedures (USACE, 1970) modified to account for the high water content of sediment samples (USACE, 1987). Detailed analysis and calculations are shown in Appendix A-3.

Shear strength of the contaminated sediment layer was considered for computation of cap material quantities and evaluation of the stability of the cap along the side slopes of Old Mormon Slough during placement. Bearing capacity was calculated by assuming the cap as a semi-infinite uniform load and using standard foundation bearing capacity computational methods (Bowles,1985). Slope stability analysis was performed for the slough bottom.

In summary, the in-situ sediments will consolidate by about 5 inches under the cap loading, and there is a sufficient margin of safety against load bearing failure.

### 3.2.2 Cap Composition and Testing

Table DA-4 lists the initial state of the design at the time of the FS.



Exhibit 25 to the
United States' Motion
DOJ 409

Table DA-4. Design Assumptions Used in Feasibility Study (EPA 1998a.)

| Element | Assumption |
|---|---|
| Cap Placement | ¾ of the slough; OWP, CPA, END sections |
| Length | 2,330 ft |
| Width | 120-180 ft |
| Cap Area | 35,600 $m^2$ |
| Cap Material | Locally quarried clean fine sand; armored with riprap and gravel filter layer as necessary |
| Cap Thickness | 2 ft minimum |
| Volume of Cap Materials, with 10% safety factor | 32,300 cy |

Further evaluations and testing were carried out, as described in subsequent paragraphs, to refine quantities and assure that cap materials meet minimum quality requirements to assure compliance with the intent of CWA Sections 404 and 401.

*Quantities.* It is proposed in this design that the cap material final performance be measured by differential bathymetry, that is, by before and after surveys of elevation of the bottom. Based upon the results of in-situ sediment consolidation at the loading expected from a sand cap (see previous paragraph), it appears that an additional 5 inches of material would be needed (21% over the FS' calculated volume before considering the safety factor). The modified FS volume, with 10% contingency, would be 38,100 c.y. During remedial design, the Corps of Engineers conducted bathymetric surveys of depths greater than approximately –4'or 5' MLLW. The shallows were not possible to measure with accuracy using the equipment available. In addition, land-based elevation surveys extended down to about –2' MLLW. The two surveys were synthesized to the extent possible and cap and bank excavation quantities calculated by the average-end method including an additional 5 inches of depth for consolidation. A key element in the uncertainty of the actual amount of cap material in the sloping margins of the slough. An added quantity of from 10 to 30% to the central slough values give resulting estimates from 24,000 to 28,000 cubic yards. This is somewhat lower than both the original and adjusted FS estimates. For the design specification, a value of 29,000 cubic yards was selected as a reasonable base (or "A" quantity) for placement; and an approximately 11% optional or "B" quantity of 3,240 cubic yards was added to accommodate extra material that may be needed for site specific reasons such as irregularities of the shoreline, excess consolidation, and inaccuracies in material placement during cap construction.

*Erosion Protection.* Need for a gravel layer (mentioned in the FS) was not carried forward for OMS, since review of the probable currents based on tidal exchange suggests low tidal currents (< 1 cm/sec) and consequently low potential for erosion throughout Old Mormon Slough. Assuming >2 mm diameter sands, this velocity is well below critical values for currents that would erode (van Rijn 1993 in Corps, 1998). At the MTH reach, where the cap is placed on a slope and the currents are highest, there is some potential for erosion during storm flows. As a conservative estimate of required operations and maintenance (O&M) one foot of additional material would be required about every 5-7 years for approximately 2 acres at the mouth. (This is the basis for the estimate of long term O&M of the cap.) That would reduce the erosive factors significantly since propellor wash from recreational boats is significantly less than for tugs. A mixture of medium and fine sand with a small amount of nonplastic silt should be suitable for protection at the mouth in the anticipated slough use scenario. See also paragraph 3.3.3, *Cap Material Selection.* Should erosion occur, an erosion-resistant layer may be added during Operation and Maintenance. The suggested erosion-protection layer would consist of 1 ft of unwashed predominantly 3"+ or 4"+ pit-run gravel.

*Chemistry.* A key element in the design was to identify and characterize a suitable source for cap materials. This identified source provided a level of assurance to EPA and the Natural Resource Trustees that sufficiently clean materials are available. Also, the testing provided a basis for the contractor to bid the work, since there would otherwise be significant uncertainty associated with haul distances and testing. It was not the intent of the designers to *require* the use of this borrow material as a sole source. Instead, the contractor would be permitted to propose and test other materials against the same set of criteria.

Physical and chemical testing of prospective cap materials occurred for the following parameters:

1. Grain size (ASTM D422)
2. Field Classification (D2487)
3. PAH and PCP (Method SW 846 8270c)
4. PCDD/F (EPA Method 1613b)\
5. Pesticides/PCBs (EPA Methods 8081/8082)
6. Selected Metals (EPA Method 6020--As, Cr, Cu, Se, Zn)

This testing addressed three data needs: (a) to determine the acceptability of materials

for placement in water; (b) to address physical stability and short-term chemical effects of the cap after placement; and (c) to provide a baseline for cap quality in the long-term monitoring program.

Material selection criteria were influenced by coordination between EPA and the Natural Resource Trustees. This coordination disclosed a reluctance to use dredged material for the cap, due to the widespread agricultural practices that have altered riverine sediment quality in the region. Accordingly, the designer team visited several upland borrow sites within 24 miles of the McCormick Baxter site. Sampling was conducted at one. This site is 24 miles by road from the site; and is a non-man-modified borrow source in a natural hillside being mined. Details of the physical and chemical decision-making procedures are provided in Appendix A-2, with final cap criteria shown in Tables A-2-6 through A-2-8. In summary, this site is a suitable borrow source meeting the consensus criteria. It was noted however, that the low MSC for PCCD/F was not greatly different than fire-affected surface range soils. Fortunately, deeper soils are considerably cleaner than that. This information can affect the strategy for obtaining borrow soils: the surface (A and B horizons) would be removed if present.

## 3.3 Activities Prior to Capping

### 3.3.1 Placement of a Temporary Cofferdam

A sheetpile wall will be used to close off OMS east of the western end of the northern shore sheetpile on the north bank. This is due to concerns for : a) potential impacts from invasive work during bank protection, b) sediment-invasive work during removal of debris and concrete from the slough to prepare for the cap, and c) very soft sediments within OMS east of the MTH reach, a sheetpile cofferdam will be used to reduce impacts from resuspended sediments in the eastern portion to the western, less contaminated portions, of the slough and Stockton Channel. Following completion of the activities in the eastern portion, and before the capping of the outer slough segment, the cofferdam shall be removed, using Best Management Practices (BMPs) to prevent recontamination of the adjacent capped area by the removal. Specific BMPs will be noted to the Contractor, and consist of placing a 2-ft sand blanket (in addition to the cap on the inner slough side) to reduce the migration of contamination to the top during removal, and use of a silt curtain. This portion of the design is under coordination with Endangered Species Act representatives from the National Oceanic and Atmospheric Administration and US Fish and Wildlife service due to the presence of threatened,

endangered, state sensitive, or candidate species in OMS.

### 3.3.2 Side Slopes and Bank Stabilization

Bank protection and removal of materials from the channel to the upland site will precede capping. Bank work will include clearing and grubbing, removal of stone and concrete (all which is deemed unsuitable for the bank protection system's riprap cover). Excavation of the bank to a grade of 2H on 1V will then occur. This finished grade was selected by a geotechnical engineer to represent a stable configuration for the types of fill and native soils present onsite. Thereafter, the dressed bank will be smoothed and compacted, and a filter blanket laid down. A minimum 1.5-ft interlocked riprap cover will protect the slope.

Rock and metallic objects may have encountered contaminated media and even listed wastes such as drippage and spent creosote and pentachlorophenol formulations. Table DA-5 shows the disposition of wastes and materials that could be generated. Excavated soils will be segregated into categories of not-visibly contaminated soils and visibly contaminated soils. Both category soils will be stockpiled in labelled stockpiles, tackified with a bituminous coating to prevent wind and rain erosion, and left onsite to be used or remediated in the final remedy for the Soil and Groundwater OU. Hazardous and nonhazardous debris will be segregated from these soils and stockpiled, and the latter category (at least) will be disposed at an offsite approved landfill. Whether additional hazardous debris from the bank excavation

An erosion berm 2 ft in height and with 2H on 1V side slopes will be placed along the south and eastern boundaries of OMS along the length of the bank excavation. (The berm will tie to the OMS asphaltic cap at a grade to be determined by the contractor, to be approved by the Contracting Officer.)

### 3.3.2 Pile Piling and Timber Wall Removal

Piles in the slough shall be removed throughout the length of the capped area. In addition posts and beams used for a retaining wall for the former bridge at the southeast corner of Old Mormon Slough shall be removed, since these could fail and place contaminated upland soils into the slough onto the completed cap. Piles and treated wood shall be evaluated by the contractor for upland construction; California prohibits reuse in water contact. If deemed unsuitable for reuse, the wood shall be landfilled. If

suitable for construction, wood washed of surface dirt may be recycled by the contractor.

### 3.3.3 Soil and Debris from Grubbing Excavation of Bank and Channel Clearance

Excavation along the banks to provide the bank protection system involves intrusion into soils that may contain contaminants, plant materials, and solid debris (e.g. metal and stone). Vegetation, soils and debris shall be stockpiled separately from materials brought onsite (e.g., the cap materials). Visibly contaminated soil with strong hydrocarbon odor or Photoionization Detector hits above 5 ppm shall be stockpiled separately visibly non-contaminated soil. Soils shall remain onsite in clearly-labelled stockpiles that may not exceed 10 ft in height or 2,000 cubic yards each.

Table DA-5. Types of Waste By Activity and Fate

| ***Activity*** | *Clear Channel* | *Clear & Grub Banks* | *Excavate Banks & Additional Clearance* | *Pull Piling* | *Place Cap (No Surplus Materials, No Wastes)* | *Restore Site (No Surplus Materials, No Wastes)* |
|---|---|---|---|---|---|---|

| **Category of Material or Waste Generated** | Rock & Nonferrous Materials (Ceramics, etc) | Brush | Visibly Contaminated Soil | Visibly Uncontami-nated Soil | Treated Wood and Nonhazar-dous Ferrous Metals | Hazardous Debris | HTW Materials Generated by Contractor: Sorbent Mat'ls, PPE, Decon Fluids |
|---|---|---|---|---|---|---|---|

| **Fate Under This Contract** | Remove Contaminating Soil and Land Fill Offsite | Remove Soil, Land Fill | Stockpile as Contaminated Soil, Label; Tackify | Stockpile Separately; Label; Tackify | Remove Soil. If Legally Reusable, Contractor May Offer for Reuse/Re-cycling | Treat or Land Fill at a CERCLA Offsite Rule Approved Subtle C Landfill | |
|---|---|---|---|---|---|---|---|



Exhibit 25 to the
United States' Motion
DOJ 415

### 3.3.4 Submerged Structures and Obstacles.

EPA 1998a states, "Buried trees that had apparently fallen into the slough were encountered at two sampling locations." If the trees are buried, they are no impedance to the cap effectiveness. If they protrude from the sediment, they could prevent completion of the cap layer. Visual reconnaissance at low water suggests that there are a few (approximately 5) limbs and small tree trunks that are emergent from the slough, mostly near the END. If warranted, site preparation could involve removal of sunken logs that could affect an isolation cap, by cherry picker or other means. This activity has the potential for disturbing contaminated sediments. However, a temporary cofferdam will be placed at the mouth of the slough (at a location corresponding to the westernmost edge of the cap) prior to removal. This will minimize the spread of contamination to clean areas.

### 3.3.5 Environmental Measures to Reduce Surface Water Contamination.

*Material Placement.* Sedimentary fines consisting of the silt (3.9-62.5 μm) and clay (<3.9 μm) fractions of Old Mormon Slough composite samples ranged from a low value of 23% (16% silt, 7 % clay) at MTH reach to a high value of 76% (45% silt, 31% clay) at the END reach. There is thus the possibility that finely-divided contaminated sediments could be come waterborne during placement. The design requires a non-disturbing method of placement, but the amount of resuspension of contaminated sediments may be significant. In general, water quality changes will be attributable to effects from the cap material plus effects from stirring the existing contaminated sediments. Cap material contribution to short-term water quality will be managed by selecting material of low human-induced impact (such as borrow material or clean dredged sands).

Engineering management options include methods to minimize disturbance and suspension of sediments through gentle placement methods including barge washoff or similar method (for which, see section 3.5), and use of silt curtains.

*Silt Curtain.* A silt curtain will be deployed while removing the temporary cofferdam. In addition, a silt curtain may be a BMP for capping in the outer region of the slough west of the temporary cofferdam. The determination of need

shall be based upon turbidity, dissolved oxygen, or other chemical measurements.

*Selection of cap material.* Based upon review of source areas, material containing fine to medium sand with non-plastic silt should be available. Medium sand is defined as soil with a particle size of 0.43 to 2.0 mm and fine sand as soil with a particle size of 0.08 to 0.43 mm. Non-plastic silt is between 0.005 and 0.08 mm and with a Plasticity Index less than 4. A gradation curve is shown in paragraph 3.4.

Some silts will be beneficial because they will settle at the same time as any contaminated particles that are raised by the cap material placement. When cap material is released in water, "zonal settling" occurs, with the sand fraction descending faster, on the order of seconds, followed by the silts and clays on the order of minutes (silts) to hours or days (clays). Thus, the suspended particles in the waterway will derive from both the cap material and the existing sediments, which will settle together. Based on observations from barge washoff placement and bench scale studies in Puget Sound, the cap material progressively immobilizes the original contaminated surface fines, and eventually encapsulates them under clean sediment. However, for a time, the suspended solids in the waterway could include some highly contaminated sediments.

*Sequencing.* The placement is envisioned as a wash-off by water jets of sandy-silty cap material from a barge moved by winch or small tug with minor propellor wash. The point of compliance for water quality standards will be measured at a distance of 300' from the silt curtain measured to the east, in the direction of the likely sequencing of work would be as follows:

- Cap the OWP first, since it has the highest concentrations of PAHs (1,195 mg/kg in the top 2 feet). To prevent spread of contamination to the SDC, a silt fence would be placed near the MTH. To prevent spread of contamination to the CPA and END reaches, a second fence would be placed to the east of the activity.
- Cap the CPA and END next. Since these reaches have lower surficial PAH (49.1 and 64.3 mg/kg respectively), there may only be a need for a silt fence on the SDC (east side of the working zone).
- Finally, cap the small MTH area. This area may not require a silt fence, since it is depleted in silt and clay relative to the eastern reaches of Old Mormon Slough. For this reach alone, water quality compliance may be accomplished

by reference to a fixed distance (usually 300 feet) from the point of discharge.

Turbidity will be used to the maximum extent practicable to accomplish real-time monitoring, after an initial sampling of the water to assure that this is protective.

The sheet pile wall on the north bank marks a confined disposal facility (CDF) owned by the northern landowner. This CDF contains sediments from dredging at the confluence of Old Mormon Slough with the Stockton Deepwater Channel, and from the deepening of the MTH reach. Accordingly, the CDF could include contaminated sediments. The CDF is protected with a sheet pile wall to the slough. A site engineering inspection from the water and review of the as-built records from this sheet pile wall indicates that the wall is properly constructed and will not be damaged by cap placement.

### 3.3.6 Environmental Impacts Related to Construction

The following is a brief summation of the potential biological resources issues that may occur as a result of the McCormick and Baxter Superfund Site project. The MCB site is a heavily contaminated and highly disturbed area, which has minimal habitat values for both fish and wildlife. The vegetation along the bank of MCB consists primarily of exotics, with small sections of native riparian vegetation, spread among large chunks of rock riprap. Old Mormon Slough is a dead end slough located at the end of the Port of Stockton Turning Basin, which is subject to heavy boat/barge traffic and accommodates other industrial uses. The slough's proximity to the turning basin acts to further degrade water quality and potential uses by aquatic organisms.

#### 3.3.6.1 Biological Resources in the Construction Area

A biological inventory was conducted on-site on August 14, 2001, to assess existing terrestrial and aquatic habitat, and to determine the potential for adverse impacts to endangered species resulting from construction activities. Visual observations of vegetation and wildlife were recorded and plotted onto a map. The following is a summary of findings:

- Constant noise from both sides of the slough was audible from construction and loading of heavy materials nearby.
- Two barges blocked much of the slough near the entrance to the survey area.
- The riverine habitat is degraded, consisting of many exotics and lacking a predominance of riverside riparian species.

- Mid-sized burrow holes and mammal scats containing fragmented bones and berry seeds were observed approximately 20 feet from the bank.
- Old beaver signs and freshwater clamshells were also identified.
- A few large black walnut trees located adjacent to the slough provided areas of shaded riverine aquatic (SRA) habitat (approximately 0.018 acre), which could potentially provide shelter for some fish species.
- An elderberry bush identified along the north bank of the slough is potential habitat for the Federally listed Valley elderberry longhorn beetle (VELB). Although there is no current proposal to modify the north bank, there could be indirect impacts associated with the work from increased noise, vibrations, and airborne particles on potential VELB habitat.
- The sediment cap project is located within designated critical habitat for delta smelt (Hypomesus transpacificus), and Central Valley ESU steelhead (Oncorhynchus mykiss).
- Observed along the north bank on exposed branches extending out of the slough were five turtles.

#### 3.3.6.2 Water Quality

The sediment cap construction may increase turbidity and suspended solids levels in the immediate vicinity of capping operations. Increased turbidity would result in a decrease in light penetration. However, high levels of turbidity should be localized and tend to dissipate rapidly. Cap placement activities would cause a disturbance and some redistribution of bottom sediments in the vicinity of the cap placement cells during the period of cap placement.

A temporary cofferdam will be constructed in accordance with these specifications to control the turbidity levels in Old Mormon Slough resulting from cap placement activities. Construction of the temporary cofferdam will constrict the flow of water in and out of the slough, decreasing dissolved oxygen to levels below that which support most aquatic life. However, the temperature of the enclosed slough during construction could rise to levels that kill vertebrate and invertebrate aquatic species that cannot avoid the water. No BMP has been identified to protect against oxygen depletion and temperature increase. Capping and bank protection in the slough outside of the temporary cofferdam will also occur. A silt curtain or turbidity barrier is the identified BMP for turbidity effects during this phase of construction.

### 3.3.6.3 Potential Effects to Biota and BMPs.

*Aquatic Vertebrates.* There could be potential impacts to the turtle (possibly Western Pond Turtle) and listed fish species (possible Sacramento Splittail, Delta Smelt, Chinook Salmon, and Steelhead) within the slough. Construction-related impacts to Federally listed fish species would be minimized by working within permitted construction windows, which are from July or August through November. Further preventative measures to minimize potential adverse impacts prior to construction may include exclusionary operations (netting or electroshocking to collect or crowd out fish or reptiles), and oversight by a biologist during the early phases of construction to assure listed species are not trapped within the slough prior to closing it off with the temporary cofferdam. For the work outside of the temporary cofferdam, a biologist will check for the presence of listed fish species, and turbidity BMPs may also be required.

*Aquatic Invertebrates.* Invertebrate populations damaged by the physical, temperature, or dissolved oxygen deficits associated with capping and bank excavation are expected to rapidly recover upon completion of the sediment cap project, although the distribution of species in the cap footprint may be somewhat altered because of the different physical and chemical nature of the cap material. To the extent the benthic organisms in the sediment cap area are serving as a mechanism for PCCD/F and polynuclear aromatic hydrocarbons (PAHs) in the sediments to enter the food chain, their elimination and replacement with organisms living in the cleaner cap material will have an overall beneficial effect on the marine ecosystem.

*Birds.* Although highly degraded, the project area provides some potential foraging habitat for listed bird species including the Swainson's Hawk, Bald Eagle, and Greater Sandhill Crane. The bank stabilization work would involve the removal of vegetation and riprap along the right (south) bank of the slough. This work would include the unavoidable removal of several large walnut trees overhanging the slough providing approximately (0.018 acre) of streamside riparian habitat. A biologist will provide work briefings to assure that these species are recognized and avoided if present.

*Terrestrial Insects.* A single elderberry tree is also located within the project vicinity, and has the potential to support the Valley elderberry longhorn beetle, VELB, which is Federally listed as a Threatened species. A biologist will survey for recent VELB exit holes, which could indicate species presence. If present, construction work will



Exhibit 25 to the
United States' Motion
DOJ 420

occur within 100 ft of the tree; however, specific instructions shall be given to the work crews to avoid direct contact with the tree and to work as little in this area as possible. Best management practices for noise and air quality, which will be part of overall site operations during construction, will also minimize potential adverse impacts to VELB.

#### 3.3.6.4 Overall Benefits of Construction.

The overall project benefits associated with cleanup activities would ultimately outweigh the potential impacts that may occur as a result of the work. Impacts to noise and air quality would be temporary, and would not be significantly higher than existing operations within the project vicinity. Water quality would be temporarily affected as a result of the installation of the temporary sheet pile wall and sediment cap construction. However, once completed, the contaminant levels within the slough would be reduced to less than significant, improving water quality for all aquatic organisms. There would also be some long-term beneficial effects to fish and wildlife habitat from the cleaning of contaminated soils along the south bank and capping of the slough floor with sediment.

### 3.4 CAP MATERIAL TO BE USED

*Physical criteria.* Materials to be used in the construction of an in-situ cap within Old Mormon Slough will consist of silty sand, which is available from a number of nearby sources. The principal component, sand, will be of fine to medium grain size to limit the permeability of the cap once placed.

Table DA-6. Cap Gradation Criteria.

| Particle Size (mm) | Particle Size (US sieve size) | % Passing (the % of particles finer than the stated size) |
|---|---|---|
| 75 | - | 100 |
| 7.5 | - | 70-80 |
| 2 | No. 10 | 40-70 |
| 0.043 | No. 40 | 15-40 |
| 0.008 | No. 200 | 0-20 |
| 0.005 | (Hydrometer) | 0-8 |

The physical tests to be required for acceptance of the cap material will be gradation analyses and total organic carbon. Sufficient flexibility are designed into these limits so as not to place unnecessary restrictions on the remediation contractor while, at the same time, meeting the needs of the project.

*Chemical Criteria* are detailed in Appendix A-2. In summary:

1. Borrow material may not be from an industrial site, nor suspected to have been modified by addition of man-made chemicals.
2. Borrow material shall consist of sand with no greater than 15% fines (materials passing a No. 200 sieve), and no particles greater than 8".
3. Total PAHs shall be less than 0.5 mg/kg (dry) by EPA Method 8270C.
4. PCDD/F by International Toxicity Equivalent Concentrations shall be less than 0.3 ng/kg (dry).
5. The maximum amount of the following metals is 125% of the San Joaquin River reference station listed in the FS: Arsenic, 8.9 mg/kg; Chromium, 105.3 mg/kg; Copper, 39.8 mg/kg; and Zinc, 102.7 mg/kg; all dry weight basis.
6. Organochlorine pesticides and polychlorinated biphenyls should not be detected using methods SW 846 8081 and 8082 typical detection limits as a guideline.

## 3.5 METHOD OF PLACEMENT OF SEDIMENT CAP

### 3.5.1 Performance Criteria for Construction Contractor

A key design parameter is that the method selected should minimize disturbance



Exhibit 25 to the
United States' Motion
DOJ 422

to the in-place sediments during placement. Depending upon the contractor's selection, this could involve barge-wash-off or a variant of it, or conveyor delivery of dry material. Primary constraints are the ability to place material from upland, the shallow depth of the slough in the middle and eastern reaches, and the presence of in-water structures such as pilings along one shoreline. The preliminary performance standards for the cap are >99.5% coverage as measured by bathymetric survey to greater than 2' of cap, measured from the difference of postplacement minus preplacement hydrosurvey, and meeting water quality criteria (see below). In addition, no payment will be made for cap material placed above 2.7 ft. This condition is to limit the tendency to mound and use a greater amount of material.

The Corps performed a preconstruction hydrosurvey during design. The Contractor will perform his own preconstruction and as-built survey. The sediment consolidation results must be considered by the Contactor in estimating his quantities required for achieving the 2' cap. Consolidation results, described below, indicate that a maximum consolidation of 5" may be expected.

### 3.5.2 Cap Placement Technique Screening

Mechanically dredged granular cap materials and soils excavated from an upland site or quarry have relatively little free water, and can be handled mechanically in a "dry" state until released into the water over the site. Granular cap materials can also be entrained in a water slurry, and carried to the cap site where they are discharged into the water column at the surface or at depth. These hydraulic methods offer the potential for a more precise placement, although the energy required for slurry transport may require dissipation to prevent resuspension of contaminated sediments.

General method screening is provided below.

*Direct mechanical placement of capping material with land-based equipment.* The capping material would likely be trucked to the site with this method, so access for the trucks and traffic should be considered. Land-based methods might include backhoes, clamshells, or end-dumping from trucks.

*Conveyoring.* Dry placement of material may occur by using a conveyor of

barged material to deliver the dredged material to the point of application or to a barge for later application. Conveyoring of trucked material to a fixed barge and hydraulic wash-off (see below) may be a viable composite technique that is logistically preferred.

*Spreading by Barge Movement.* A layer of capping material can be spread or gradually built up using bottom-dump barges if provisions are made for controlled opening or movement of the barges. This can be accomplished by slowly opening a conventional split-hull barge over a 30 to 60 minute interval, depending on the size of the barge. Such techniques have been successfully used for controlled placement of predominantly coarse-grained, sandy capping materials at sites in Puget Sound. The gradual opening of the split-hull or multi-compartmented barges allows the material to be released slowly from the barge in a sprinkling manner. However, the shallow depth, narrow width and short length constraints of Old Mormon Slough disallow this method. There is enough depth for barge draft and door openings, but the propeller wash from tug boats would likely disturb contaminated, in-place sediments.

*Spreading by Barge Wash-off.* This is the method that is preferred for placement at this site. A water jet pushes water into the dredged material placed on a flat-decked barge, causing the material to flow into the water and descend slowly to the bottom. This technique has been used effectively in Puget Sound (see prior references) for placing 2-5' of silty sands over a creosote-contaminated sediment. This does not depend upon a propeller driven vessel, except for positioning the barge, so does not cause much disturbance to the in place sediment.

*Hydraulic pumping* of slurried dredged material. Material is brought to the spreader by barge, whereupon water is added to slurry the sand. The spreader then pumps the slurried sand through a submerged pipeline. A winch and anchoring system is used to swing the spreader side to side. This method has value for placement under piers and in shallow water. It may be used in conjunction with a submerged diffuser to provide low speed delivery and good control. EPA 1998c notes that a small discharge barge is required to position the diffuser and pipeline vertically in the water column. By positioning the diffuser several feet above the bottom, the discharge is isolated from the upper water column. Movement of the discharge barge can serve to spread the discharge to cap larger areas. The diffuser can also be used with any hydraulic pipeline operation including hydraulic pipeline dredges, pump-out from hopper dredges, and reslurried pumpout from

barges.

A special high-technology instance of hydraulic pumping was used at Hamilton Harbor, Ontario in 1995 (Zeman and Patterson, 1997). This method is described below, but is not believed to be necessary due to the cofferdam approach to be used at OMS. It is a highly precise, although specialized, method with equipment which may not be readily available . A spreader barge was used for the transport and application of sand via after slurrying with water and vibrating the sand into a paddle wheel which fed a number of tremie tubes. Barge positioning was accomplished by 4 guide cables attached to the barge and deployed from tugs.

CRV ENTERPRISES INC.
28082 NICHOLS RD
GALT, CA 95632
PHONE 209-367-1706

Bob Goodman
177 post Street, suite 600
San Francisco, Ca 94108

January 21, 2002

Dear Mr. Goodman,

I wanted to follow up our conversation that we had last Friday, with a summary of the issues, as I see them, concerning the Dutra property in Stockton.

As you know, I have the property in contract to purchase. the cost of this property is to be $1,315,000. I have advanced $200,000 to the Dutras. $150,000 to be applied toward The purchase price. In addition to this, I have spent nearly $80,000 for planning and engineering work. This brings me to a basis of $1,445,000, or $3.60 per square foot.

Currently, I own the adjacent 13 acres of land. My intention is to develop these properties jointly with boat storage, and other commercial uses. The delay caused by the EPA has forced me into a position where I am unable to proceed with my plans on any of this property as the plot plans and overall use will vary dramatically if I am unable to utilize the Dutra property. This is why it is critical to resolve the EPA problem as soon as possible.

The value of this property is based largely upon its present marine use and barge site. The property is located on Mormon slough which is sheltered water off of the main channel. The neighboring property was purchased, by me, in 1999 for approximately $1.35 per square foot. This is waterfront property, although it is currently undeveloped. This value, in my opinion would be the maximum that the Dutra property would be worth if the EPA plans are allowed to proceed.

My basis in the Dutra property will be approximately $3.60 per square foot. The difference in value, based upon 406,000 square feet is approximately $913,500. This figure represents a conservative estimate of the loss in value.

The EPA indicated to me that the costs to dredge and dispose of the contaminated material would be nine million dollars. That is why they chose the approach they have in cutting of the water access to the Dutra property.

Thane Cox, the attorney for the EPA, indicated that the record of decision for the Mormon slough project was mailed to the Dutra people in March of 1999. I need to determine why this wasn't disclosed to me prior to my advancing funds.

I hope these points clarifies the issues as I see them, Please call me if you need additional information.

Sincerely,

C. Ryan Voorhees

EPA / Dutra Meeting
August 26, 2002
Sign-In Sheet

| Name | Phone Number |
| --- | --- |
| Janet Magnuson, Attorney EPA | 415-972-3887 |
| LAURIE WILLIAMS EPA Atty | 415 972-3867 |
| DAVE WERNER - DUTRA | 415-258-6876 |
| KEN SMITH - DUTRA | " " |
| Bob Goodman | 415.777.2210 |
| MARIE LACEY, EPA | 415-972-3163 |
| KIM MURATORE, EPA | (415) 972-3121 |
| Ryan Voorhees | 209-367-1706 |

GOVERNMENT EXHIBIT
CARDELS 800-783-0399
67

Exhibit 27 to the United States' Motion
DOJ 427

EXH. 33 DATE 1/14/08
WITNESS Lacey
LAURA A. REDING, CSR #9711

Agenda
August 26, 2002
EPA/Dutra Meeting
McCormick & Baxter Site

I. Introductions

II. Purpose of the Meeting

III. Sediment Remediation Description and Schedule

IV. Coordination for Phase I Activities

V. Coordination for Phase II Activities

VI. Permanent Post-Construction Impacts

VII. Dutra's request to bid on remediation work as a contractor

VIII. Takings Claim

IX. Next Steps