# Exhibit 12

# Appraisal of the Subject Property, dated February 27, 2002

**CRU Enterprises, Inc.**

RYAN VOORHEES
28082 Nichols Rd., Galt, CA 95632-8204
209 367-1706
CA Cont. Lic. # 662324

Eric Kapeller
9340 East Stockton Blvd
Elk Grove, Ca

Dear Eric, 10/29/02

Attached is a copy of the appraisal report that was done last winter for the property on Weber street in Stockton. This appraisal was done jointly by me and the current owner, The Dutra Group. The purpose of the appraisal was to substantiate a claim that the current owner has against the EPA. The EPA is considering a proposal to block water access to the approximately one half of the property.

This property is unique considering the freeway visibility, location relative to downtown and the Port of Stockon and water front access. For these reasons, there are very few meaningful comps. I am confident that the value is there and that is why I intend to close escrow.

Attached is a current lease contract showing monthly rental of $25,000 per month.

Keep in mind that the value of your existing collateral is much higher, due to continued development than is was in the past. Stockman's bank has the only lien on the Meadows ranchettes. This project is 100% pre sold. Thirteen of these homes are currently under construction. The sales contracts total approximately $7.5 million.

Hopefully you will be able to prepare loan docs soon.

Sincerely,

C. Ryan Voorhees

Copy

Exhibit 29 to the
United States' Motion
DOJ469A
CRV1227

# APPRAISAL OF

1404 WEST WEBER AVENUE
CONSISTING OF 9.54 ACRES
ON THE NORTH BANK OF THE
OLD MORMON CHANNEL
IN STOCKTON, CALIFORNIA

## AS OF

FEBRUARY 27, 2002

## APPRAISAL FOR

THE DUTRA GROUP
MR. BILL DUTRA
1000 POINT SAN PEDRO ROAD
SAN RAFAEL, CALIFORNIA, 94901

**STEPHEN R. CLARK**
**APPRAISER & CONSULTANT, INC.**

# Exhibit 13

# Third Amendment to Option to Purchase, dated October 14, 2002, and Fourth Amendment to Option to Purchase, dated October 28, 2002

# THIRD AMENDMENT TO OPTION TO PURCHASE

The following Third Amendment to Option to Purchase, ("Third Amendment") dated October 14, 2002 constitutes a part of the Option to Purchase between Bill T. Dutra, ("Optionor") and CRV Enterprises, Inc., ("Optionee") dated August 25, 2000 and amended by letter dated October 2, 2000 and Amendment to Option to Purchase dated October 1, 2001 and Second Amendment to Option to Purchase dated January 30, 2002 for the property commonly known as 1404 W. Weber Avenue, Stockton, California, 95203 ("Subject Property").

Escrow shall close on Friday, November 1, 2002 by payment by Optionee, into escrow the amount of $1,153,000.00. Said amount represents the balance of the Purchase Price as set forth below:

| | |
|---|---|
| Purchase Price: | $1,315,000.00 |
| Option Consideration: | <$ 50,000.00> |
| Deposit: | <$ 100,000.00> |
| Subtotal: | $1,165,000.00 |
| Discount: | <$ 12,000.00> |
| | $1,153,000.00 |

*Discount = Present value of $845,000.00 discounted at 5 3/4% for 3 months based on a payment on November 1, 2002, rather than the amended closing date of February 1, 2003.

Except as expressly changed by this Third Amendment to Option to Purchase, all other terms and conditions of the Option to Purchase shall remain the same and in full force and effect.

OPTIONOR: BILL T. DUTRA

By:__________________

Date:__________________

OPTIONEE: CRV ENTERPRISES, INC.

By: [signature]

Date: 10/15/02

# FOURTH AMENDMENT TO OPTION TO PURCHASE

The following Fourth Amendment to Option to Purchase (Fourth Amendment"), dated October __, 2002, constitutes a part of the Option to Purchase between Bill T. Dutra ("Optionor") and Roger Beck/CRV Enterprises, Inc as principal Owners(s) ("Optionee") dated August 25, 2000, and amended by letter dated October 2, 2000, Amendment to Option to Purchase dated October 1, 2002, Second Amendment to Option to Purchase dated January 30, 2002, and Third Amendment to Option to Purchase dated October 14, 2002, for the property known as 1404 W. Weber Avenue, Stockton, California 95203 ("Subject Property").

Whereas, on March 31, 1999, the United States Environmental Protection Agency, Region 9 ("EPA") issued a Record of Decision for the McCormick & Baxter Superfund Site that provided for, among other things, implementation of a remedy for said Superfund Site that included installation of a sediment cap on a portion of Old Mormon Slough and placement of a log boom that will prevent marine access to portions of the Subject Property ("the Remedy");

Whereas, Optionor and Optionee have advised the EPA that implementation of the Remedy will damage the Subject Property and diminish its value;

Whereas, EPA has to date taken the position that it has no legal obligation to reimburse Optionor for any damage or injury to the Subject Property, and Optionor has been unable to negotiate a mutually acceptable agreement with EPA as to the Remedy, and its effects on the utilization of the Subject Property, including without limitation an agreement concerning compensation for any damages suffered by Optionor; and

Whereas, notwithstanding the foregoing, Optionee desires that the close of escrow take place November 1, 2002.

Wherefore, Optionor and Optionee agree as follows:

1. Effective upon the close of escrow, Optionor transfers and assigns to Optionee all of Optionor's right, title and interest in and to a certain cause of action against the United States of America for damages, loss of use, and/or taking of real property arising from or relating to EPA's implementation of the Remedy, as set forth in the attached assignment. Optionor makes no warranty as to the validity of the assigned cause of action or of this assignment. Optionee, and each of them, agrees to indemnify, defend and hold Optionor harmless from any and all claims, suits, costs, liabilities, fees, fines, judgments, losses, damages (including consequential damages) or expenses relating to or arising out of Optionee's exercise of the assignment.

2. Optionee is aware that the United States has taken the position that it has no legal obligation to pay damages or compensation for damage or injury to the Subject Property resulting from implementation of the Remedy; that the owner of the Subject Property may be liable for remediation costs under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601, et seq. if the Subject Property extends into the Old Mormon Slough; and that the owner of the Subject Property may be subject to additional action by the United States if it fails to cooperate with implementation of the Remedy.

3. Optionee, on behalf of itself and its successors and assigns, and its and their affiliates, trustees, beneficiaries, parent corporations, subsidiary corporations, directors, officers, shareholders, representatives, employees, agents, and partners, releases Optionor, and his successors and assigns, and his and their parent corporations, subsidiary corporations, affiliates, trustees, beneficiaries, directors, officers, shareholders, representatives, employees, attorneys, agents, and partners, from any and all claims, costs, liabilities, fees, fines, judgments, losses, damages (including consequential damages) or expenses (including project delay costs) (collectively, "Claims") arising from or relating to: (i) the assignment set forth in paragraph 1 above and attached hereto as Exhibit A; (ii) any loss or damage to or limitations on the use of the Subject Property related in any way to the Remedy; and (iii) hazardous materials or hazardous substances located on, near or emanating from the Old Mormon Slough Agreeing to the releases in this paragraph 3, Optionee expressly waives any rights or benefits to it under the provisions of Section 1542 of the California Civil Code, which provides as follows:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

4. Optionee CRV Enterprises, Inc. represents that it is fully authorized to execute this Fourth Amendment on behalf of Optionee Roger Beck. Optionee CRV Enterprises, Inc. agrees to indemnify, defend and hold Optionor harmless from any and all Claims (as defined in paragraph 3) asserted by Roger Beck, his heirs, successors, assigns, executors, beneficiaries, or trustees relating to or arising out of (i) the Option to Purchase between Bill T. Dutra and Roger Beck/CRV Enterprises, Inc. dated August 25, 2000, as amended and/or (ii) the Subject Property.

| | |
|---|---|
| OPTIONOR: BILL T. DUTRA | OPTIONEE: ROGER BECK/ CRV ENTERPRISES, INC. |
| By:____________ | By: [signature] |
| Date:____________ | By:____________ |
| | Date: 10/28/02 |



Exhibit 29 to the United States' Motion
DOJ 473
CRV00068

# Exhibit 14

# EPA's September 24, 2002 letter regarding Dutra's takings claim

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION IX
75 Hawthorne Street
San Francisco, CA 94105

RECEIVED
SEP 2 4 2002
LAW OFFICES OF
ROBERT C. GOODMAN

September 24, 2002

**VIA FACSIMILE & E-MAIL ONLY**
Robert Goodman, Esq.
177 Post Street, Suite 750
San Francisco, CA 94108

Re: Bill T. Dutra (dba "Dutra Leasing") Claim of Fifth Amendment Taking
Based on McCormick & Baxter Superfund Site Remedial Activities

Dear Mr. Goodman,

In correspondence dated March 19, 2002 and May 20, 2002 on behalf of your client Bill T. Dutra (dba "Dutra Leasing") ("Dutra"), you have asserted that the Environmental Protection Agency's ("EPA") planned remedial activities with respect to the McCormick & Baxter Superfund Site will constitute a physical taking of Dutra's adjacent property under the Fifth Amendment of the U.S. Constitution. As we have discussed, EPA Region 9 is actively working with you and other Dutra representatives to attempt to minimize any negative impacts on Dutra's property or business as a result of the remediation. However, at this time, EPA is not able to agree that a taking will occur or that compensation is appropriate. EPA Region 9 has consulted with national experts in Fifth Amendment takings at the U.S. Department of Justice, the U.S. Army Corps of Engineers and EPA's Office of General Counsel. As explained in greater detail below, we have concluded that limitations in both the Section 10 permit (provided as Attachment A), pursuant to which Dutra developed the shoreline of the property, and background principles of California law, establish that the EPA's planned actions are within pre-existing limitations on Dutra's property rights.

As you are aware, EPA does not intend to intrude upon or occupy any portion of Dutra's fastland property for the planned remediation. Rather, EPA's remedial action for the McCormick & Baxter Superfund Site will involve capping contamination within the Old Mormon Slough in place and setting up a log boom that will prevent future navigation in the slough that might damage the cap. The result of this work is that Dutra will no longer have navigational access to a portion of the sheet piling wall on the property that is adjacent to the slough. EPA has received the February 27, 2002 appraisal prepared for Dutra, which indicated that this loss of navigational access would result in a $700,000 diminution in the value of the property.

Exhibit 29 to the
United States' Motion
DOJ475

Letter to Robert Goodman, Esq
September 24, 2002
Page 2

The Section 10 Permit Conveyed No Property Rights

EPA has reviewed the June 6, 1986 permit that the U.S. Army Corps of Engineers issued to Dutra Construction Company, Inc. pursuant to Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. Section 403 ("the Section 10 permit"). The Section 10 permit allowed dredging of 87,000 cubic yards of material, construction of 1400 feet of sheet pile bulkhead, and placement of dredge spoils behind bulkhead and upland. Dutra claims that the EPA remediation will result in a taking because the remedy will restrict navigational access to a portion of the Dutra property along the Old Mormon Slough. Based on our review of the Section 10 permit, EPA believes that the attributes of the property that Dutra contends will be impacted by the remediation all appear to be attributes that the Dutra property possesses *only* because of the permissions granted in the permit. Furthermore, the Section 10 permit contains several provisions explaining that no property rights are conferred by the issuance or implementation of the permit.

Additional navigational access was created pursuant to the Section 10 permit, which allowed dredging of the area of the slough adjacent to the Dutra property to a uniform depth of 16 feet. Prior to implementation of this permitted work, the maximum depth in the center of that area of the slough was 11 feet with sloping sides. The side adjacent to the Dutra property was sloped such that a depth of 8 feet was not reached until approximately one quarter of the way out into the slough from the Dutra property. The permit also allowed Dutra to enlarge the area of the slough closest to its point of exit to the Stockton Deep Water Channel and to install a bulkhead along the shoreline, enabling Dutra to maneuver and dock vessels. Without the work performed pursuant to the permit, docking and unloading of large vessels would not have been possible. It is the loss of this function that the appraisal ties to the loss in value for which Dutra seeks compensation.

The Section 10 permit contains the following clauses related to the effect of the permit and the permitted work on Dutra's property rights:

> (1) [T]his permit does not convey any property rights, either in real estate or material, or any exclusive privileges. . . .
> (2) [A]ny modification, suspension, or revocation of this permit shall not be the basis for any claim for damages against the United States.
> (3) [T]his permit does not authorize the interference with any existing or proposed Federal project and the permittee shall not be entitled to compensation for damage or injury to the structures or work authorized herein which may be caused by or result from existing or future operations undertaken by the United States in the public interest.

See Attachment A at pages 2-4.



Exhibit 29 to the
United States' Motion
DOJ476

Letter to Robert Goodman, Esq
September 24, 2002
Page 3

These provisions make it clear that Dutra has no claim for loss of any property rights as a result of the remedial actions EPA plans to take to address the contamination in the Mormon Slough. The only losses that Dutra will experience are losses of benefits obtained pursuant to the Section 10 permit. The United States' right to revoke the permit in whole or in part, without compensation, was an explicit limitation in the benefits conferred in the permit. See U.S. v. 5.96 Acres of Land, 593 F.2d 884 (9th Cir. 1979). As in 5.96 Acres of Land, Dutra has had a "mere license to build and maintain" the structures that allowed navigational access to the portion of his property along the slough. (Id. at 888.) Dutra does not have a property right in this improved access that can support a takings claim.

Pre-existing Limitations in Background Principles of California Law:

Independent of limitations in the Section 10 permit explained above, the law of the State of California provides an additional basis for EPA's determination that compensation is not appropriate in this case. As explained by the Supreme Court in Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1029 (1992), property rights are restricted by "background principles the State's law of property and nuisance already place upon land ownership." Even what would otherwise be a taking is not compensable if it is within such a pre-existing limitation on the property owner's rights. Id. at 1028-29.

In this case, applicable limitations are found in California law as recognized by the State Supreme Court. You have cited the California Constitution Article XIV, Section 3, for the proposition that, as a riparian land owner, Dutra has a vested legal right to use the slough. (Note the provisions of Article XIV, Section 3, which you cited, have been moved to Article X, Section 2, California Constitution (2002)). However, the California Supreme Court has clarified that all such uses are subject to the public trust doctrine. See People v. California Fish Co., 166 Cal. 576, 598-601 (1913); see also National Audubon Society v. Superior Court, 33 Cal. 3d 419, 435-41, cert. denied, 464 U.S. 977 (1983).

Specifically, in Colberg, Inc. et al. v. The State of California, Ex. Rel. Department of Public Works, 67 Cal. 2d 408 (1967), the California Supreme Court held that shipyard owners whose navigational access to the Stockton Channel was to be limited by a bridge building project had no right to compensation for this loss. The Court stated, "plaintiffs' right of access from their respective riparian properties to the waters of the channel, whatever its scope as against private parties, is burdened with a servitude in favor of the state and that, since there is here no direct physical invasion of, or encroachment upon, said properties by the state, plaintiffs are not entitled to compensation for the abridgment or diminution, if any, of such right of access as a result of the

lawful exercise of the state's power to regulate, control and deal with its navigable waters." Id. at 425-26. In addition, the Court found that these powers were not limited to projects undertaken to improve or facilitate navigation. In Colberg, the project at issue was a highway project. Id. at 418-19. The Court found no compensation was due where there was no direct physical encroachment upon or invasion of land riparian to the navigable waterway above the ordinary high-water mark. Id. at 420. The Colberg court concluded that although, as against a private party, a riparian owner of land bordering upon navigable waters may not be deprived of his right of access to such waters, no such right exists in favor of such riparian owners as against the state or its grantee in the exercise of a lawful use or purpose. Id. at 423.

As a result, in addition to the pre-existing limitations found in the Section 10 permit, Dutra's claim is precluded by background principles of California law as stated in Colberg, supra. EPA's analysis to date indicates that planned remedial actions will not constitute a taking of any compensable property rights.

While EPA is not able to offer any compensation to Dutra at this time, we would like to extend the opportunity for Dutra to alert us to any authorities that would lead to a different conclusion. As noted above, we hope to pursue a cooperative relationship during the coming months, with the goal of reducing the impact of the remediation on Dutra's business to the extent feasible and consistent with timely completion of the remediation. Please call me at (415) 972-3867 or Janet Magnuson at (415) 972-3887, if you have any questions.

Thank you for your consideration.

Sincerely,

Laurie Williams

Laurie Williams
Assistant Regional Counsel

cc: Susan Cook, U.S. DOJ
Matthew Fogelson, U.S. DOJ
Lance Wood, U.S. ACE
Martin Cohen, U.S. ACE
Dana Ott, U.S. EPA OGC
Janet Magnuson, U.S. EPA Region 9 ORC
Marie Lacey, U.S. EPA Region 9 RPM
Kim Muratore, U.S. EPA Region 9



Exhibit 29 to the
United States' Motion
DOJ478

# Attachment A

# U.S. Army Corps of Engineers Permit,

# dated June 6, 1986,

# and related materials

pplication No. 9260

ame of Applicant Dutra Construction Company, Incorporated

fective Date JUN 6 1986

piration Date *(If applicable)*

Department of the Army
Sacramento District, Corps of Engineers
650 Capitol Mall
Sacramento, CA 95814-4794

# DEPARTMENT OF THE ARMY PERMIT

ferring to written request dated February 27, 1986 for a permit to:

Perform work in or affecting navigable waters of the United States, upon the recommendation of the Chief of Engineers, rsuant to Section 10 of the Rivers and Harbors Act of March 3, 1899 (*33 U.S.C. 403*);

Discharge dredged or fill material into waters of the United States upon the issuance of a permit from the Secretary of the ny acting through the Chief of Engineers pursuant to Section 404 of the Clean Water Act (*33 U.S.C. 1344*);

~~Transport dredged material for the purpose of dumping it into ocean waters upon the issuance of a permit from the retary of the Army acting through the Chief of Engineers pursuant to Section 103 of the Marine Protection, Research and nctuaries Act of 1972 (86 Stat. 1052; P.L. 92-532);~~

Dutra Construction Company, Incorporated, Post Office Box 388, Rio Vista, alifornia 94571,

ereby authorized by the Secretary of the Army:

dredge about 67,000 cubic yards of material, construct 1400 feet of sheet pile ulkhead, and place dredge spoils behind bulkhead and on upland,

Mormon Channel (Mile 0.10),

San Joaquin County Assessor's Parcel Number 145-190-008 in the City of tockton,

ccordance with the plans and drawings attached hereto which are incorporated in and made a part of this permit (*on draw-, give file number or other definite identification marks.*)

Dutra Construction Stockton Office," dated January 15, 1985.

CRV1534

oject to the following conditions:

General Conditions:

a. That all activities identified and authorized herein shall be consistent with the terms and conditions of this permit; and t any activities not specifically identified and authorized herein shall constitute a violation of the terms and conditions of s permit which may result in the modification, suspension or revocation of this permit, in whole or in part, as set forth more cifically in General Conditions j or k hereto, and in the institution of such legal proceedings as the United States Govern-nt may consider appropriate, whether or not this permit has been previously modified, suspended or revoked in whole or in rt.

Exhibit 29 to the United States' Motion
DOJ 480

b. That all activities authorized herein shall, if they involve, during their construction or op... on, any discharge of ollutants into waters of the United States or ocean waters, be at all times consistent with applicable water quality standards, ffluent limitations and standards of performance, prohibitions, pretreatment standards and management practices establish-d pursuant to the Clean Water Act (33 *U.S.C. 1344*), the Marine Protection, Research and Sanctuaries Act of 1972 (*P.L. 92-532, 8 Stat. 1052*), or pursuant to applicable State and local law.

c. That when the activity authorized herein involves a discharge during its construction or operation, of any pollutant *ncluding dredged or fill material*), into waters of the United States, the authorized activity shall, if applicable water quality stan-ards are revised or modified during the term of this permit, be modified, if necessary, to conform with such revised or modified ater quality standards within 6 months of the effective date of any revision or modification of water quality standards, or as irected by an implementation plan contained in such revised or modified standards, or within such longer period of time as the istrict Engineer, in consultation with the Regional Administrator of the Environmental Protection Agency, may determine to e reasonable under the circumstances.

d. That the discharge will not destroy a threatened or endangered species as identified under the Endangered Species Act, r endanger the critical habitat of such species.

e. That the permittee agrees to make every reasonable effort to prosecute the construction or operation of the work uthorized herein in a manner so as to minimize any adverse impact on fish, wildlife, and natural environmental values.

f. That the permittee agrees that he will prosecute the construction or work authorized herein in a manner so as to minimize ny degradation of water quality.

g. That the permittee shall allow the District Engineer or his authorized representative(s) or designee(s) to make periodic in-spections at any time deemed necessary in order to assure that the activity being performed under authority of this permit is in ccordance with the terms and conditions prescribed herein.

h. That the permittee shall maintain the structure or work authorized herein in good condition and in reasonable ac-cordance with the plans and drawings attached hereto.

i. That this permit does not convey any property rights, either in real estate or material, or any exclusive privileges; and hat it does not authorize any injury to property or invasion of rights or any infringement of Federal, State, or local laws or regulations.

j. That this permit does not obviate the requirement to obtain state or local assent required by law for the activity authoriz-ed herein.

k. That this permit may be either modified, suspended or revoked in whole or in part pursuant to the policies and pro-cedures of 33 CFR 325.7.

l. That in issuing this permit, the Government has relied on the information and data which the permittee has provided in connection with his permit application. If, subsequent to the issuance of this permit, such information and data prove to be materially false, materially incomplete or inaccurate, this permit may be modified, suspended or revoked, in whole or in part, and/or the Government may, in addition, institute appropriate legal proceedings.

m. That any modification, suspension, or revocation of this permit shall not be the basis for any claim for damages against the United States.

n. That the permittee shall notify the District Engineer at what time the activity authorized herein will be commenced, as far in advance of the time of commencement as the District Engineer may specify, and of any suspension of work, if for a period of more than one week, resumption of work and its completion.

o. That if the activity authorized herein is not completed on or before 30th day of Dec., 19 88, (*three years from the date of issuance of this permit unless otherwise specified*) this permit, if not previously revoked or specifically extended, shall automatically expire.

p. That this permit does not authorize or approve the construction of particular structures, the authorization or approval of which may require authorization by the Congress or other agencies of the Federal Government.

q. That if and when the permittee desires to abandon the activity authorized herein, unless such abandonment is part of a transfer procedure by which the permittee is transferring his interests herein to a third party pursuant to General Condition t hereof, he must restore the area to a condition satisfactory to the District Engineer.

r. That if the recording of this permit is possible under applicable State or local law, the permittee shall take such action as may be necessary to record this permit with the Register of Deeds or other appropriate official charged with the responsibility for maintaining records of title to and interests in real property.

Exhibit 29 to the
United States' Motion
CRV1535 DOJ-481

s. That there shall be no unreasonable interference with navigation by the existence or use of the activity authorized herein.

t. That this permit may not be transferred to a third party without prior written notice to the District Engineer, either by the transferee's written agreement to comply with all terms and conditions of this permit or by the transferee subscribing to this permit in the space provided below and thereby agreeing to comply with all terms and conditions of this permit. In addition, if the permittee transfers the interests authorized herein by conveyance of realty, the deed shall reference this permit and the terms and conditions specified herein and this permit shall be recorded along with the deed with the Register of Deeds or other appropriate official.

u. That if the permittee during prosecution of the work authorized herein, encounters a previously unidentified archeological or other cultural resource within the area subject to Department of the Army jurisdiction that might be eligible for listing in the National Register of Historic Places, he shall immediately notify the district engineer.

II. Special Conditions: *(Here list conditions relating specifically to the proposed structure or work authorized by this permit):*

Exhibit 29 to the
United States' Motion
DOJ 482

CRV1536

The following Special Conditions will be applicable when appropriate:

STRUCTURES IN OR AFFECTING NAVIGABLE WATERS OF THE UNITED STATES:

a. That this permit does not authorize the interference with any existing or proposed Federal project and that the permittee shall not be entitled to compensation for damage or injury to the structures or work authorized herein which may be caused by or result from existing or future operations undertaken by the United States in the public interest.

b. That no attempt shall be made by the permittee to prevent the full and free use by the public of all navigable waters at or adjacent to the activity authorized by this permit.

c. That if the display of lights and signals on any structure or work authorized herein is not otherwise provided for by law, such lights and signals as may be prescribed by the United States Coast Guard shall be installed and maintained by and at the expense of the permittee.

d. That the permittee, upon receipt of a notice of revocation of this permit or upon its expiration before completion of the authorized structure or work, shall, without expense to the United States and in such time and manner as the Secretary of the Army or his authorized representative may direct, restore the waterway to its former conditions. If the permittee fails to comply with the direction of the Secretary of the Army or his authorized representative, the Secretary or his designee may restore the waterway to its former condition, by contract or otherwise, and recover the cost thereof from the permittee.

e. Structures for Small Boats. That permittee hereby recognizes the possibility that the structure permitted herein may be subject to damage by wave wash from passing vessels. The issuance of this permit does not relieve the permittee from taking all proper steps to insure the integrity of the structure permitted herein and the safety of boats moored thereto from damage by wave wash and the permittee shall not hold the United States liable for any such damage.

MAINTENANCE DREDGING:

~~a. That when the work authorized herein includes periodic maintenance dredging, it may be performed under this permit~~ for ____________________ years from the date of issuance of this permit (~~ten years unless otherwise indicated~~);

b. That the permittee will ~~advise the District~~ Engineer in writing at least two weeks before he intends to undertake any ~~maintenance dredging~~.

DISCHARGES OF DREDGED OR FILL MATERIAL INTO WATERS OF THE UNITED STATES:

a. That the discharge will be carried out in conformity with the goals and objectives of the EPA Guidelines established pursuant to Section 404(b) of the Clean Water Act and published in 40 CFR 230;

b. That the discharge will consist of suitable material free from toxic pollutants in toxic amounts.

c. That the fill created by the discharge will be properly maintained to prevent erosion and other non-point sources of pollution.

DISPOSAL OF DREDGED MATERIAL INTO OCEAN WATERS:

a. ~~That the disposal will be carried out in conformity with the goals, objectives, and requirements of the EPA criteria~~ established pursuant to Section 102 of the Marine Protection, Research and Sanctuaries ~~Act of 1972~~, published in 40 CFR 220-228.

b. That the ~~permittee shall place~~ a copy of this permit in a conspicuous place in the vessel to be used for the transportation ~~and/or disposal~~ of the dredged material as authorized herein.

This permit shall become effective on the date of the District Engineer's signature.

Permittee hereby accepts and agrees to comply with the terms and conditions of this permit.

______________________________ May 20, 1986

PERMITTEE DATE

DUTRA CONSTRUCTION COMPANY, INC.

BY AUTHORITY OF THE SECRETARY OF THE ARMY:

Art Champ 5/6/86

ART CHAMP, Chief, Regulatory Sec., CE for
WAYNE J. SCHOLL, Colonel, CE DATE
DISTRICT ENGINEER, Sacramento
U.S. ARMY, CORPS OF ENGINEERS

Transferee hereby agrees to comply with the terms and conditions of this permit.

______________________________ ____________________

TRANSFEREE DATE



U.S. GOVERNMENT PRINTING OFFICE : 1985 O - 474-110

# Public Notice

US Army Corps
of Engineers
Sacramento District
650 Capitol Mall
Sacramento, CA 95814

Public Notice No 9260

Date March 13, 1986

In Reply Refer to: SPKCO-O

Comments Due by: April 14, 1986

**TO WHOM IT MAY CONCERN:**

**Subject:** Application for a Department of the Army permit to construct a 1,400' bulkhead, dredge, and place dredge material behind the bulkhead, on Mormon Channel adjacent to the Stockton Deep Water Ship Channel.

**Applicant:** Dutra Construction Company, Inc., P.O. Box 388, Rio Vista, California 94571.

**Location:** The proposed project will be located in **Mormon Channel** (Mile 0.10), at Assessor's Parcel No. 145-190-08, City of Stockton, County of San Joaquin, California, as shown on the attached drawings.

**Purpose:** The bulkhead, dredging, and fill will provide docking facilities for dredge and crane rigs owned by Dutra Construction Company. The upland property will be used for office buildings and will be the future site of Dutra Construction's Stockton office.

**Project Description:** The applicant proposes to construct 1,400 feet of sheet pile bulkhead along Mormon Channel, 880 feet will be along the existing property line. A cut will be made in the existing bank at the downstream end of the site and about 520 feet of sheet pile bulkhead will be installed along this cut. A concrete cap will be placed along the top of the bulkhead.

The entire channel width will be dredged to a -16 feet USGS Datum. About 87,000 cubic yards of material will be dredged by suction dredge. The dredge spoils will be used to fill behind the bulkhead, on the project site, and to establish a building pad on the upland portion of the site. There is adequate space on the upland site to dispose of the spoil material without impacting the waterway or any adjacent wetland.

**Area Description:** Mormon Channel is located in an industrial area of the City of Stockton. It is bordered on the west by the Port of Stockton and on the east by vacant land, various industrial facilities, and warehouses. The I-5 Freeway is located further east of the site and the industrial area.

Vegetation along the banks of Mormon Channel at the proposed site consists of wild anise, wild mustard, milk thistle, foxtail, and grasses. There is a thin growth of bulrushes along the water's edge. There is one young cottonwood tree, one young walnut tree, and a small acacia tree along the bank near the downstream end of the site. At about the middle portion of the site there is one large willow tree and a large cottonwood tree.

**Additional Information:** The applicant has made applications for Regional Water Quality Certification, County of Sacramento Planning Approval, and a State Lands Lease for the area. The applicant has submitted a soils analysis to the California Regional Water Quality Control Board. A copy of the soils analysis is attached to this notice. A previous application for this work (No. 8976) was withdrawn until a soils analysis of the material to be dredged from the channel bottom could be completed.

For additional information, contact the applicant's agent, Gilbert Labrie, P.O. Box 183, Walnut Grove, California 95690, telephone (916) 776-1161, or Phyllis Petras, Corps of Engineers Regulatory Section, Room 6538, telephone (916) 551-2272.

The latest published version of the National Register of Historic Places and its monthly supplements have been reviewed and there are no places either listed or recommended as eligible which would be affected. No further cultural resources review is warranted because the permit area has been extensively modified by previous work. This activity would not affect any threatened or endangered species or their critical habitat. The District Engineer has made this determination based on information provided by the applicant and on the Corps' preliminary evaluation.

Interested parties are invited to submit written comments on or before **April 14, 1986**. Any person may request, in writing, within the comment period specified in this notice that a public hearing be held to consider this application. Requests for public hearings shall state, with particularity, the reasons for holding a public hearing

SPKCO-O
PUBLIC NOTICE NO. 9260

March 13, 1986

A permit issued by the Department of the Army does not give any property rights either in real estate or material or any exclusive privileges and does not authorize any injury of private property or invasion of private rights, or any infringement of Federal, State or local laws or regulations, nor does it obviate the necessity of obtaining State or local assent to the work authorized.

The decision whether to issue a permit will be based on an evaluation of the impact of this activity on the public interest under authority of **Section 10** Rivers & Harbors Act of 1899 and **Section 404** of the Clean Water Act (33 USC 1344). Evaluation of the probable impacts, including cumulative impacts, which the proposed activity may have on the public interest requires a careful weighing of all those factors which become relevant in each particular case. The benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments. The decision whether to authorize a proposal, and if so the conditions under which it will be allowed to occur, is therefore determined by the outcome of the general balancing process. That decision should reflect the national concern for both protection and use of important resources. All factors which may be relevant to the proposal must be considered including the cumulative effects. Among those are conservation, economics, aesthetics, general environmental concerns, wetlands, cultural values, fish-and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership, and, in general, the needs and the welfare of the people. For activities involving 404 discharges, a permit will be denied if the discharge does not comply with the Environmental Protection Agency's 404(b)(1) guidelines. Subject to the preceding sentence and any other applicable guidelines or criteria, a permit will be granted unless the district engineer determines it would be contrary to the public interest.

1 Encl
6 Drawings

**WAYNE J. SCHOLL**
**Colonel, CE**
**District Engineer**



Exhibit 29 t
United States' M
CRV1539 DO

REVISED

# LICATION FOR DEPARTMENT OF THE ARMY PERMIT
(33 CFR 325)

OMB APPROVAL NO. 0702-0036
Expires 30 June 1986

...partment of the Army permit program is authorized by Section 10 of the River and Harbor Act of 1899, Section 404 of the ...n Water Act and Section 103 of the Marine, Protection, Research and Sanctuaries Act. These laws require permits authorizing activities in or affecting navigable waters of the United States, the discharge of dredged or fill material into waters of the United States, and the transportation of dredged material for the purpose of dumping it into ocean waters. Information provided on this form will be used in evaluating the application for a permit. Information in this application is made a matter of public record through issuance of a public notice. Disclosure of the information requested is voluntary; however, the data requested are necessary in order to communicate with the applicant and to evaluate the permit application. If necessary information is not provided, the permit application cannot be processed nor can a permit be issued.

One set of original drawings or good reproducible copies which show the location and character of the proposed activity must be attached to this application *(see sample drawings and instructions)* and be submitted to the District Engineer having jurisdiction over the location of the proposed activity. An application that is not completed in full will be returned.

APPLICATION NUMBER *(To be assigned by Corps)*

9260 FEB 27 1986

NAME AND ADDRESS OF APPLICANT

Dutra Construction Co., Inc.
P.O. Box 388
Rio Vista, CA 94571

Telephone no. during business hours

A/C ( ) ________ *(Residence)*
A/C (707) 374-6333 *(Office)*

3. NAME, ADDRESS, AND TITLE OF AUTHORIZED AGENT

Gilbert Labrie, AIA, Architect
P.O. 183
Walnut Grove, CA 95690

Telephone no. during business hours

A/C ( ) ________ *(Residence)*
A/C (916) 776-1161 *(Office)*

Statement of Authorization: I hereby designate and authorize Gilbert Labrie, AIA to act in my behalf as my agent in the processing of this permit application and to furnish, upon request, supplemental information in support of the application.

SIGNATURE OF APPLICANT [signature] DATE 4-18-85

DETAILED DESCRIPTION OF PROPOSED ACTIVITY

ACTIVITY

To construct a steel sheet pile bulkhead (approximately 1400' in length), 880' of which will be along the existing property line as shown in drawing. The entire 100' channel width and area between channel and bulkhead will be dredged to a minus 16' USGS DATUM. A concrete cap will then be placed on the top of the bulkhead. Some of the dredged spoils will be used as fill on the land side of the bulkhead.

PURPOSE

The purpose of this bulkhead will be to provide docking facilities for the dredging and crane rigs owned by Dutra Construction. The site will be the future site of Dutra Construction Stockton Office.

DISCHARGE OF DREDGED OR FILL MATERIAL

Dredged material (approximately 86,650 cubic yards) will be used as fill on the project site; on the landward side of the bulkhead and the pad for the future office building.

Exhibit 29 to the United States' Motion
DOJ 486

ENG FORM 4345, Apr 83 EDITION OF 1 OCT 77 IS OBSOLETE

ADDRESSES OF ADJOINING PROPERTY OWNERS, LESSEES, ETC., WHOSE PROPERTY ALSO ADJOINS THE WATERWAY

North -- Topeka & Santa Fe Railroad
5200 E. Sheila Street
Los Angeles, CA 90040

East -- Coudert Bros., G.T. Yates III
4 Embarcadero
Suite 3550
San Francisco, CA 94111

6. WATERBODY AND LOCATION ON WATERBODY WHERE ACTIVITY EXISTS OR IS PROPOSED

Mormon Channel

7. LOCATION ON LAND WHERE ACTIVITY EXISTS OR IS PROPOSED

ADDRESS:

Webber Avenue
STREET, ROAD, ROUTE OR OTHER DESCRIPTIVE LOCATION

San Joaquin County, California 95203
COUNTY STATE ZIP CODE

Sec. Twp. Rge

Tax Assessors Description APN # 145-190-08

City of Stockton
LOCAL GOVERNING BODY WITH JURISDICTION OVER SITE

Map No. Subdiv No Lot No.

8. Is any portion of the activity for which authorization is sought now complete? ☐ YES ☒ NO
If answer is "Yes" give reasons, month and year the activity was completed. Indicate the existing work on the drawings.

9. List all approvals or certifications and denials received from other federal, interstate, state or local agencies for any structures, construction, discharges or other activities described in this application.

| ISSUING AGENCY | TYPE APPROVAL | IDENTIFICATION NO. | DATE OF APPLICATION | DATE OF APPROVAL | DATE OF DENIAL |
|---|---|---|---|---|---|
| State Lands Comm. -- | Lease | | | | |
| County of Stockton-- | Planning Approval | | | | |

10. Application is hereby made for a permit or permits to authorize the activities described herein. I certify that I am familiar with the information contained in this application, and that to the best of my knowledge and belief such information is true, complete, and accurate. I further certify that I possess the authority to undertake the proposed activities or I am acting as the duly authorized agent of the applicant.

[signature] SIGNATURE OF APPLICANT — 4-18-85 DATE

[signature] SIGNATURE OF AGENT — 4-18-85 DATE

*The application must be signed by the person who desires to undertake the proposed activity (applicant) or it may be signed by a duly authorized agent if the statement in Block 3 has been filled out and signed.*

18 U.S.C. Section 1001 provides that: Whoever, in any manner within the jurisdiction of any department or agency of The United States knowingly and willfully falsifies, conceals, or covers up by any trick, scheme, or device a material fact or makes any false, fictitious or fraudulent statements or representations or makes or uses any false writing or document knowing same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

Do not send a permit processing fee with this application. The appropriate fee will be assessed when a permit is issued.

Exhibit 29 to the
United States' Motion
DOJ 487
CRV1544

280 B -HO-3 CS 5-CE 5-6

## USS Steel Sheet Piling

WIDTH

| Profile | | Designation | District Rolled | Driving Distance per Pile | Weight Per Foot | Weight Per Square Foot of Wall | Web Thickness | Section Modulus (S) Per Pile | Section Modulus Per Foot of Wall | Area Per Pile | Moment of Inertia (I) Per Pile | Moment of Inertia Per Foot of Wall |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | In. | Lbs. | Lbs. | In. | In.³ | In.³ | In.² | In.⁴ | In.⁴ |
|   | Interlock with Each Other | PSX 32 | H. | 16½ | 44.0 | 32.0 | 29/64 | 3.3 | 2.4 | 12.94 | 5.1 | 3.7 |
| | | PS32* | H.S. | 15 | 40.0 | 32.0 | ½ | 2.4 | 1.9 | 11.77 | 3.6 | 2.9 |
| | | PS 28 | H.S. | 15 | 35.0 | 28.0 | ⅜ | 2.4 | 1.9 | 10.30 | 3.5 | 2.8 |
|   | Interlock with Each Other | PSA 28* | H. | 16 | 37.3 | 28.0 | ½ | 3.3 | 2.5 | 10.98 | 6.0 | 4.5 |
| | | PSA 23 | H.S. | 16 | 30.7 | 23.0 | ⅜ | 3.2 | 2.4 | 8.99 | 5.5 | 4.1 |
| | | PDA 27 | H.S. | 16 | 36.0 | 27.0 | ⅜ | 14.3 | 10.7 | 10.59 | 53.0 | 39.8 |
| | | PMA 22 | H.S. | 19⅝ | 36.0 | 22.0 | ⅜ | 8.8 | 5.4 | 10.59 | 22.4 | 13.7 |
|   | Interlock with Each Other and with PSA 23 or PSA 28 | PZ38 | H. | 18 | 57.0 | 38.0 | ⅜ | 70.2 | 46.8 | 16.77 | 421.2 | 280.8 |
| | | PZ32 | H. | 21 | 56.0 | 32.0 | ⅜ | 67.0 | 38.3 | 16.47 | 385.7 | 220.4 |
|   | Interlocks with Itself and with PSA 23 or PSA 28 | PZ 27 | H. | 18 | 40.5 | 27.0 | ⅜ | 45.3 | 30.2 | 11.91 | 276.3 | 184.2 |

*Sections PS32 and PSA 28 are infrequently rolled and we do not advise their use in a design unless an adequate tonnage can be ordered at one time to assure a minimum rolling.

Complete data regarding these sections will be found in a separate publication entitled "USS Steel Sheet Piling."

H—Homestead, Pa. (Eastern Steel Division)

S—South Chicago (Central Steel Division)

### Suggested Allowable Design Stresses—Sheet Piling

| Steel Brand or Grade | Minimum Yield Point, psi | Allowable Design Stress, psi* σa |
|---|---|---|
| ASTM A328 | 38,500 | 25,000 |
| ASTM A572 GR 50 (USS EX-TEN 50) | 50,000 | 32,000 |
| ASTM A690 (USS MARINER GRADE) | 50,000 | 32,000 |

*Based on 65% of minimum yield point. Some increase for temporary overstresses generally permissible.




Exhibit 29 to the United States' Motion Doc 489

CRV1546

No. 9260




Exhibit 29 to the
United States' Motion
DOJ 490
CRV1547

# Exhibit 15

## Dutra's October 16, 2002 letter regarding Dutra's takings claim

LAW OFFICES OF
ROBERT C. GOODMAN

ROBERT C. GOODMAN
ATTORNEY AT LAW

October 16, 2002

***VIA FACSIMILE***

Laurie Williams, Esq.
Assistant Regional Counsel
United States Environmental Protection Agency
Region IX
75 Hawthorne Street
San Francisco, CA 94105

Re: McCormick & Baxter Superfund Site Remediation / Dutra Leasing

Dear Ms. Williams:

I received your letter dated September 24, 2002, responding to my correspondence regarding the impact on property owned and operated by my client Bill T. Dutra dba Dutra Leasing Company ("Dutra") of remedial activities associated with the McCormick & Baxter Superfund Site. As you are aware, Dutra operates a marine facility in the Old Mormon Slough that EPA proposes to close to navigation as part of the remedy for the McCormick & Baxter site.

In your letter, you take the position that EPA's proposed action does not constitute a taking of my client's property, despite the fact that it will deprive my client of a substantial portion of the water access to its property. Your conclusion apparently is based on several standard conditions contained in Dutra's original permit to construct its bulkhead and an inappropriately expansive interpretation of California's public trust doctrine. The cases you cite in support of your position do not address the issues here and do not relieve the federal government of its obligation to compensate my client if it intends to proceed with its low-cost remedy at Dutra's expense.

First, Dutra's riparian right of access is a fundamental property right that cannot be taken or eliminated simply because it improved its property pursuant to a duly issued permit. Second, under California law, a riparian owner's right of access is limited, if at all, only to the extent that the State of California undertakes an action consistent with and in furtherance of the trust. EPA proposes to close the Old Mormon Slough to navigation which will both deny the public access to public trust lands and deny riparian owners' access to their property. I fail to see how this

177 POST STREET SUITE 750 | SAN FRANCISCO CALIFORNIA 94108 | TELEPHONE: 415.777.2210 FACSIMILE: 415.777.2215 | E-MAIL: RGOODMAN@RCG-LAW.COM

LAW OFFICES OF
ROBERT C. GOODMAN

federal action, which is antithetical to the public trust under state law, can be justified by a theoretical "pre-existing" state law limitation of my client's property rights.[1]

Conditions Imposed Under Dutra's Section 10 Permit

Your first argument rests on the notion that Dutra's property rights were created or only exist because of the permissions granted in Section 10 permit. Dutra's right of access is not an "attribute" of its Section 10 permit. It is a fundamental property right inherent in its ownership of its property. Riparian rights refer to a bundle of rights that pertain to property adjacent to a body of water. The right of access is the most fundamental right in that bundle of rights. Although a governmental agency may restrict or permit the development of structures within areas under its jurisdiction, the property rights in question are not dependent on or attributes of that governmental regulation.

To support your argument, you cite *U.S. v 5.96 Acres of Land*, 593 F. 2d 884 (9th Cir. 1979). That case dealt with a situation where a license had been issued to construct and maintain certain structures in navigable waters. Compensation was sought for federal interference with the activities licensed under the permit. Dutra is not a mere licensee. It owns the property in question and its property rights are not defined by a "mere license to build and maintain." The federal government may be able to license or restrict certain activities in navigable waterways, but that authority does not operate to extinguish or limit existing property rights.

Pre-Existing Limitations Under California Law

Your second argument relies on a rather tortured interpretation of public trust doctrine – an interpretation that you argue limits my client's riparian right of access to its property for the conduct of its navigational activities and supports the federal government's right to restrict access to navigation and to the very public trust lands that the doctrine is designed to protect for navigation and commerce.

The federal government's power under its so-called "navigational servitude" may be paramount to private property interests in the case of actions taken to promote and protect navigation. But here, where the purpose of the proposed action is unrelated to navigation, the federal government cannot avail itself of its powers to control navigable waterways. And it cannot "bootstrap" its authority using the State's public trust authority to take an action that is antithetical to the trust.

[1] It should be noted that my client's use of the property is entirely consistent with the public trust and as a navigational use, constitutes an activity encouraged under state law. Any infringement on navigation or commerce is disfavored.

LAW OFFICES OF
ROBERT C. GOODMAN

Your argument is premised on the notion that private property rights are restricted by "background principles the State's law of property...place upon landownership" under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992). Dutra has never argued that certain of its property rights would not, under appropriate circumstances, be subject to the public trust doctrine, which holds tidelands in trust for the people of California.[2] However, the public trust doctrine does not extinguish riparian rights of access and, as stated above, my client's use of its property is entirely consistent with and in fact favored under the trust.

Your argument is also premised on a misreading of *Colberg, Inc. et al. v. The State of California, Ex. Rel. Department of Public Works*, 67 Cal. 2d 408 (1967). The issue in *Colberg* was not whether a riparian right of access existed, but whether the State was required to compensate the landowner for the abridgement of that right in furtherance of the public trust. The holding in *Colberg* does not form the basis for some absolute "pre-existing limitation" on my client's property rights. The fact that the State may, without providing compensation, abridge certain rights consistent with the lawful exercise of its authority under the public trust, has no bearing on the right of the federal government to take an action outside the scope of its own navigational servitude without just compensation.[3]

The *Colberg* court declined to address the scope of the riparian right of access in relation to any party other than the State, holding only that the right of access must "yield without compensation to a proper exercise of the power of the state over its navigable waters." *Colberg* at 416 (emphasis added.)[4] Although the Court in *Colberg* was not presented with the question of the proper scope of federal authority, the court noted that the power of the federal government to regulate navigable waters, while paramount, is narrower in scope than the power of the State.

---

[2] It should be noted, however, that EPA has not established that the lands in questions are subject to the trust.

[3] You point out that the court in *Colberg* found that the State's powers were not limited to projects undertaken to improve or facilitate navigation. However, the Court concluded that the State action in question, a highway project, was in furtherance of commerce, a permissible purpose under the trust. You provide no support for the implicit assumption that the federal government's proposed remedial action is within the scope of its navigational servitude or even the State's authority under the public trust.

[4] The *Colberg* court also relied on the fact that the State action did not involve a physical invasion of the plaintiff's property. In fact, the action in *Colberg* did not impair actual access to the riparian property. Here, EPA proposes to erect a barricade, substantially limiting riparian access to Dutra's property. As stated in my letter of May 20, 2002, under *Tulare Lake Basin Water Storage District v. United States*, 49 Fed, Cl. 313 (2001), EPA's action to place a physical restriction barring access effects a physical taking.

LAW OFFICES OF
ROBERT C. GOODMAN

Any attempt by the federal government to expand its own power by "piggybacking" on the State would no doubt be rejected, particularly where the federal government's purpose falls outside even the reach of the State's broader servitude under the public trust doctrine.

As I stated in my previous correspondence, we believe the United States is obligated to compensate Dutra for the loss of its property as a result of the proposed remedy. The remedy selected may indeed save the federal government millions of dollars. However, these savings impose an unacceptable and disproportionate economic impact on my client. It is a fundamental principal of takings law that the government may take action that deprives a party of its property for the larger benefit of the public. However, the cost of that government action cannot and should not be imposed on an individual property owner without just compensation.

Very truly yours,

ROBERT C. GOODMAN

RCG:af

cc: Ken Smith, Esq.

# Exhibit 16

# EPA's December 10, 2002 letter regarding Dutra's takings claim

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION IX
75 Hawthorne Street
San Francisco, CA 94105

DEC 10 2002

VIA U.S. MAIL

RECEIVED
DEC 12 2002
LAW OFFICES OF
ROBERT C. GOODMAN

Robert Goodman, Esq.
177 Post Street, Suite 750
San Francisco, CA 94108

Re: McCormick & Baxter Superfund Site
Dutra Claim for Compensation

Dear Mr. Goodman:

This letter is in response to your October 16, 2002, letter regarding compensation requested by your client, Bill T. Dutra d.b.a. Dutra Leasing Company ("Dutra"), in connection with Dutra's ownership of property adjacent to the McCormick & Baxter Superfund Site. Our understanding is that the property owned by Dutra located adjacent to the Old Mormon Slough has been sold. Craig Rasmussen, the attorney for the new property owner, has contacted EPA and requested certain information, including the Record of Decision, EPA's September 24, 2002, letter to you, and your October 16 response, which we have forwarded to him.

Accordingly, we assume that it is now appropriate for us to communicate and coordinate with the counsel for the current owner, with respect to the property and the matters addressed in your October 16, 2002, correspondence. If this is incorrect, please advise me at your earliest convenience.

Thank you for your attention to this matter.

Sincerely,

Janet A. Magnuson
Assistant Regional Counsel

cc: Craig Rasmussen, Counsel for Ryan Voorhees
Laurie Williams, EPA ORC

# Exhibit 17

# Escrow Instructions associated with the purchase of Subject Property, transfer date November 8, 2002