IN THE UNITED STATES COURT OF FEDERAL CLAIMS

```
------------------------------x
CRV ENTERPRISES, INC.         :
                              :
          Plaintiff,          :
                              :
         v.                   :  No. 06-660L
                              :
THE UNITED STATES,            :
                              :
          Defendant.          :  Volume 2
------------------------------x
```

Walnut Creek, California

Tuesday, November 27, 2007

Deposition of

RYAN VOORHEES

a witness, called for examination by counsel for [party] pursuant to notice and agreement of counsel, beginning at approximately 9:19 a.m. at the Law Offices of Shapiro, Buchman, Provine, Patton, LLP, 1333 N. California Boulevard Suite 350, Walnut Creek, California, before Ora B. Kohn, a Certified Shorthand Reporter for the State of California, when were present on behalf of the respective parties:

2

APPEARANCES:

On behalf of Plaintiff:

JOHN H. PATTON, ESQUIRE
Shapiro, Buchman, Provine, Patton, LLP

1333 N. California Boulevard, Suite 350
Walnut Creek, California 94596

On behalf of Defendant:

WILLIAM SHAPIRO, ESQUIRE
U.S. Department of Justice
501 I Street, Suite 9-700
Sacramento, California 95814

ALSO PRESENT:

Laurie Williams, Esquire

* * * * *





C O N T E N T S

| EXAMINATION BY: | PAGE |
| --- | --- |
| Counsel for Defendant | 10 |
| DEPOSITION EXHIBITS: | |
| No. 38 - Letter dated 9/9/99 to Mr. Smith from Ms. Lacey | 14 |
| No. 39 - September 22, 1999 Agenda for the | 17 |

P R O C E E D I N G S

Whereupon,

RYAN VOORHEES

was called as a witness and, having been first duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. SHAPIRO:

Q Good morning, Mr. Voorhees.

A Good morning.

Q We're here to finish up your deposition that we started last week. You're now under oath again. The same rules apply as applied during the last deposition. Is there any reason you can't testify honestly, truthfully and completely this morning?

A No.

Q Also in the room with us are your attorney, Mr. Patton and an attorney with the EPA, Laurie Williams.

Mr. Voorhees, we ended up our discussion last time, as I recall, talking about the Record of Decision which was

B site was a Superfund site. Correct?
A Based on this contract, I probably -- well, let me back up. I wouldn't have known. Says, "Superfund site." But I obviously didn't read this contract very thoroughly before signing it.
Q Paragraph E talks about Governmental Approvals.
MR. PATTON: Which paragraph? I'm sorry. E?
BY MR. SHAPIRO:
Q Give me just a minute here. CRV EPA -- turn to page one under 7A. Seven is talking about Contingencies, and eight talks about Disclosure. 7A says, "Optioner," which is the Dutra Group, "shall disclose to Optionee" -- CRV -- "any matters required by applicable law and provide Optionee with a completed property information sheet concerning the property duly executed by or on behalf of Optioner in the current form or equivalent that is published by the AIR

for identification.)

BY MR. SHAPIRO:

Q Exhibit 48 is titled, "Option To Purchase Amendment." Signed by Mr. Dutra on September 18th 2001. And there's no signature for Optionee, CRV. Do you know if this proposal was ever signed by CRV?

A I don't know.

Q It states in the first paragraph that "The Option to Purchase Amendment constitutes a part of the Option to Purchase between Dutra and CRV dated August 25th 2000." And then it says, "An amendment by letter dated October 2nd 2000." What is the amendment by letter dated October 2nd 2000?

A I don't know.

Q You don't have any idea what was





included in that amendment?

A No.

Q "The party's desire to amend the option as follows:" And then it says that "Payment must be made of $20,000." Do you know if CRV paid that $20,000?

A I don't know.

Q Exhibit 49.

(Deposition Exhibit 49 was marked
for identification.)

BY MR. SHAPIRO:

Q Signed copy of the Amendment to Purchase. The only version I have of this is your signature on page 58. The next page, CRV 59, appears to be the same document signed by someone from the Dutra Group. This was apparently signed on October 1st, 2001. I take it that's your signature and Mr. Beck's signature.

A That's correct.

Q The purpose of entering into this amendment to the Option Agreement is, I think





you testified earlier, was because you still needed to get certain entitlements from the City.

A That's correct.

Q This talks about the amount of $100,000 which would be applicable to the purchase price. "This option shall be exercised by Option E on October 1st 2001 by payment of $100,00 applicable to the purchase price." Did CRV pay that $100,000?

A Well, that's what's agreed, so I'm

a month?

MR. PATTON: I think there were more than one.

THE WITNESS: I just don't know the names.

BY MR. SHAPIRO:

Q Was that a lease with CRV, or was that a lease with Dutra?

A There was a couple of them with CRV and a couple with -- and one we assumed that Dutra had.

Q Were each of those leases for $20,000 a month?

A Approximately. I believe there was one tenant that paid more than that.

Q And then after the EPA blocked navigational access down the Mormon Slough, is there just the one lease that's at $12,000?

A Yeah, one tenant in there for the last year or so. Only been one, but there is one lease.

Q Who is that lease with?
A ACC.
Q Can you remember the name of any lessees where they were paying $20,000?
A Not off the top of my head, no.
Q Give me a minute. You can still bring barges to 1404 West Weber, correct?
A Yes.
Q So you still have navigational access?
A Yes.
Q There's navigational access from the 1404 property to the Stockton Deep Water Channel?
A Yes.
Q How, if at all, other than what you've just discussed about being unable to bring empty barges down the Mormon Slough, has the access from 1404 to the Stockton Deep Water Channel been affected by the EPA's Remedy?
A No.





Q You would not consider this property landlocked?
A No.

Q And you can still develop this property with navigational access. It's just it would not have all the navigational access that you would wish?
A That's correct.
Q Would you say that this is essentially landlocked?
A Landlocked, no.
Q All uses that would rely on navigational access, those have not been denied to you, correct?
A No, but they've been limited.
Q Let's look at Exhibit 84.
(Deposition Exhibit 84 was marked for identification.)
BY MR. SHAPIRO:
Q I'd ask you just to look at this document for a minute. Before I ask you a question about this document, other than





being unable to bring empty barges from that point A to point B down the Mormon Channel, on that last document we were looking at, how has EPA's blocking of navigational access impacted your ability to use the property?
A Two ways. Currently it makes it

less attractive to tenants or prospective tenants because you can only pull in one large barge at a time. No staging area or place to park empty barges.

Long term, it significantly impacts the development potential of the site because instead of having a waterfront amenity with wet slips all across the front of the property, now you've got a stagnant piece of water that you've got to figure out a way to deal with and make it attractive when you're doing high-density housing next to it.

Q Besides those two impacts, are there any other ways in which the EPA's blocking of navigational access has impacted your ability to use this property?





A You know, during the course of the construction, there was impact.

Q Temporary impacts?

A Yes.

Q Which have now ended?

A Right. That's correct.

Q What about -- you mentioned two things, and then the temporary construction. Anything else?

A No.

Q I take it that answer would include any impacts on your ability to develop the property?

A Well, yes. I explained that, didn't I? It affects the way the property is developed long term.

Q What about any impact on your ability to sell the property?

A Doesn't impact the ability to sell it. It impacts the sales price. It's a much more attractive project if you can show a water amenity rather than trying to explain





to potential developers or builders, you know, how they've got to deal with a piece of stagnant water you can't allow access to or any kind of boat traffic on.

Q But just to clarify, you would agree that EPA's action here has not in any sense landlocked this property?

MR. PATTON: He said that several times.

THE WITNESS: Obviously not landlocked.

BY MR. SHAPIRO:

## Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---oOo---

CRV ENTERPRISES, INC., )
)
Plaintiff, )
)
vs. ) Case No. 06-6607L
) Judge: George W. Miller
THE UNITED STATES OF )
AMERICA, )
)
Defendant. )

---oOo---

DEPOSITION OF MARIE N. LACEY

Tuesday, October 23, 2007

---oOo---

REPORTED BY: LAURA A. REDING, CSR NO. 9711

## Page 2

BE IT REMEMBERED that pursuant to Notice, and on Tuesday, the 23rd day of October, 2007, commencing at the hour of 10:00 a.m. thereof, at SHAPIRO, BUCHMAN, PROVINE & PATTON, 1333 North California Boulevard, Suite 350, Walnut Creek, California, before me, LAURA A. REDING, a Certified Shorthand Reporter in and for the State of California, there personally appeared

MARIE N. LACEY,

called as a witness herein, who, being by me first duly sworn, was examined and testified as is hereinafter set forth.

---oOo---

A P P E A R A N C E S

SHAPIRO, BUCHMAN, PROVINE & PATTON, 1333 North California Boulevard, Suite 350, Walnut Creek, California 94596, represented by JOHN H. PATTON, Attorney at Law, appeared as counsel on behalf of Plaintiff, CRV Enterprises, Inc.

U.S. DEPARTMENT OF JUSTICE, Environment & Natural Resources Division, 501 I Street, Suite 9-700, Sacramento, California 95814, represented by WILLIAM SHAPIRO, Attorney at Law, appeared as counsel on behalf of Defendant, The United States of America.

## Page 3

Also Present: Laurie Williams with the U.S. EPA, Region IX

---oOo---

## Page 4

i

I N D E X


| EXAMINATION BY: | PAGE |
|---|---|
| MR. PATTON | 6 |


---oOo---

E X H I B I T S


| PLAINTIFF'S FOR IDENTIFICATION | DESCRIPTION | PAGE/LINE |
|---|---|---|
| 1 | Document from the EPA web site | 18/11 |
| 2 | One-page document titled "Wasting Away" at the top | 21/04 |
| 3 | Copy of a Google aerial photograph | 21/18 |
| 4 | Copy of a Google aerial photograph | 23/16 |
| 5 | Copy of a Google aerial photograph | 31/14 |
| 6 | Copy of a Google aerial photograph | 31/22 |
| 7 | Assessor's Parcel Map | 32/08 |
| 8 | Site Description | 33/11 |
| 9 | Copy of page iv of the Surface Water Sediment Feasibility Study Report | 49/03 |
| 10 | Page from an investigation report | 51/02 |
| 11 | Document showing site location and wells | 52/04 |
| 12 | Excerpt from a document dated July 1998 | 53/14 |
| 13 | Figure 4.2, Alternative SD-3 | 62/20 |
| 14 | Figure 4.1, Alternative SD-2 | 65/18 |
| 15 | Figure 4.3, Alternative SD-4 | 73/18 |

Page 29

**A. Mr. Dutra came into our office and I explained the clean-up to him. That was basically the point of the meeting.**
Q. Did you have discussions about what uses -- about his use of -- not his use but Dutra's use -- and I believe Dutra is a company -- about Dutra's use of this property? Did you have any discussions about what they could and couldn't do with their property?
**A. We discussed that it would be a problem for the cap that we intended to put down if they brought large vessels into the area of the cap.**
Q. And what do you recall Dutra saying about that?
**A. My general recollection is that he felt that it would be a problem if they couldn't bring their vessels into that area.**
Q. And what do you recall telling Mr. Dutra in response to that, his expressing that it would be a problem?
**A. I'm not sure if it was at the meeting or following the meeting. Mr. Dutra asked if we would evaluate the feasibility of dredging the area in front of his property as part of the remediation so that he could continue to bring vessels into that area.**
Q. And did the EPA evaluate the possibility of doing that?
**A. Yes, we did.**

Page 30

Q. And who was involved in that evaluation besides yourself?
**A. The draft of the document was prepared by the Corps of Engineers.**
Q. Do you recall who specifically at the Corps of Engineers was involved in that?
**A. The main designer was John Wakeman.**
Q. Blakeman?
**A. Wakeman, W-a-k-e-m-a-n.**
Q. Thank you. And do you recall anybody else being involved in that evaluation besides yourself and Mr. Wakeman?
**A. I don't remember anyone else.**
Q. What was the upshot of the evaluation on this possibility of dredging the Mormon Slough for Dutra?
**MR. SHAPIRO:** I'll object on the grounds that it's a vague question.
**MR. PATTON:** Q. What was the outcome?
**MR. SHAPIRO:** I'll object again.
**MR. PATTON:** Okay. You've objected.
Q. Please tell me what determination did the EPA make in response to Mr. Dutra's request that the slough be dredged?
**A. I believe we sent him a letter summarizing the findings of the report where we evaluated the feasibility of dredging a portion of the slough.**

Page 31

Q. I'm pretty sure I have that letter, and I'll ask you about it when we get there, but would it be fair to say that the letter told Mr. -- told Dutra that the EPA was not going to be dredging the slough?
**MR. SHAPIRO:** I'll object as the letter speaks for itself.
**THE WITNESS:** I would need to look at the letter to refresh my memory.
**MR. PATTON:** **Q.** But let's put it this way: The EPA has not had that slough dredged, has it?
**A. That's correct.**
Q. Here's another one. This is going to be -- have to be marked on the back. This will be Exhibit 5.
**(Marked Plaintiff's Exhibit No. 5)**
Ms. Lacey, do you recognize Exhibit 5 as being an even closer-in view than Exhibit 4 of the McCormick & Baxter remediation site?
**A. Yes. That is what this appears to be.**
Q. I'm going to ask you to identify one more photograph and then we'll be done with the photographs. This will be Exhibit 6.
**(Marked Plaintiff's Exhibit No. 6)**
Now, Ms. Lacey, would you please look at Exhibit 6. And if you can, can you also identify this as a photograph depicting the McCormick & Baxter remediation site?

Page 32

**A. Yes, that's what this appears to be.**
Q. And the difference between 5 and 6, just so you know, is Exhibit 6 is a little more of a tilted view of the site, just so you can see some of the relief from the buildings and structures at the site. That's why -- that's the only difference between 5 and 6.
I'll show you what's going to be marked Exhibit 7.
**(Marked Plaintiff's Exhibit No. 7)**
Exhibit 7 is a copy of an assessor's parcel map. And do you see the arrow that says "Subject" and it's pointing to a circle with the number 8 inside of it?
**A. Yes.**
Q. Does that appear to be the property that was owned by Dutra and is now owned by CRV that was the subject of your discussions with both Dutra and Mr. Voorhees?
**A. Yes. That's my understanding of the limits of the property.**
Q. And Weber Avenue, at least in plan, runs all the way to the mouth of the slough, doesn't it?
**A. Yes, it does.**
Q. And the property that we're talking about is to the south of Weber Avenue, right?
**A. Subject property?**
Q. Yes, ma'am.
**A. Yes, it is.**

Exhibit 31 to the United States' Motion

Page 33

Q. I'm going to call that the CRV property. Okay?
**A. (Witness nods head.)**
**MR. SHAPIRO:** Just the property to the south of Weber?
**MR. PATTON:** Just to the south. We all know that he owns the property to the north as well. Or it, not he.
**Q.** Let me show you something else that came from the EPA web site. This one is entitled "Site Description" for superfund site for McCormick & Baxter Creosoting. This will be Exhibit 8.
**(Marked Plaintiff's Exhibit No. 8)**
Do you recognize Exhibit 8?
**A. I don't recognize it in this format.**
**Q.** Did you have anything to do with preparing the site description, the text that we see for this site description that is Exhibit 8?
**A. No, I didn't.**
**Q.** Do you know who prepared this?
**A. I believe it was prepared by EPA headquarters.**
**Q.** And where would they get the information to prepare this, or where did they get the information to prepare this site description?
**A. I believe their source -- I don't know what time this was prepared, so I'm not certain what documents were available at that time. But they would have looked at site**

Page 34

**documents.**
**Q.** I will represent to you that I printed this out yesterday from their site. I don't know when it was prepared originally, but this is what's on their site now.
I'm interested in some of the comments in the site description. And I'm going to try to direct your attention to the upper third of the page. There's a sentence that starts with "The sediments in the slough." I'm sorry. I probably should have marked yours up for you.
I'll read it into the record. Says, "The sediments in the slough became contaminated as a result of chemical process spills, surface runoff, direct discharge of stormwater through outfalls, and/or subsurface migration from other Operable Units, e.g., seepages from the former oily waste pond area."
Is that your -- is that consistent with your understanding as to how there got to be contamination in the slough?
**A. That explains in general ways that the sediment became contaminated.**
**Q.** Now, what did the EPA do to determine whether there was contamination of the sediments in the slough?
**A. We conducted several different series of sampling in the Mormon Slough.**
**Q.** And how did you go about -- can you tell me the

Page 35

mechanics of what the sampling did? In other words, how did you actually do the sampling?
**A. There were several different sampling events that were done. Some focused on surface contamination of the sediment. Others brought in a drill rig to collect deeper soil samples.**
**Q.** And did you have -- did the EPA contract with some business or firm to do that sampling for it?
**A. Yes.**
**Q.** Do you recall who did the sampling?
**A. There were several different contractors and several different funding mechanisms used for that sampling.**
**Q.** What contractors do you remember were involved with the sampling for the sediments in the slough?
**A. I can only remember the more recent ones, which was a contractor for the Corps of Engineers. It was not an EPA contractor. I can't remember the name.**
**Q.** You don't remember any of the names of the contractors?
**A. Of the individual contractors for the Corps of Engineers, no, I don't.**
**Q.** How about for the EPA that did work in the slough as far as sampling?
**A. I can't remember those right now.**
**Q.** And were there -- were like borings done in the

Page 36

slough?
**A. Yes, there were.**
**Q.** And how deep were the borings?
**A. The borings were at least eight feet below the surface. There were several -- I think there were more -- I can't remember the exact -- but the maximum depth we sample**
**Q.** And were borings done in various locations in the slough?
**A. Yes.**
**Q.** And was an attempt made to have borings done at both ends of the slough and areas in between?
**A. Yes.**
**Q.** And then samples were taken of the actual sediment that were done in these borings?
**A. That's correct.**
**Q.** And then they were analyzed in some kind of a lab?
**A. Yes.**
**Q.** Do you recall who did the analysis?
**A. I don't recall the name of the lab.**
**Q.** And based on those samplings, the EPA determined that there was contamination in the sediments of the slough I take it.
**A. That's correct.**
**Q.** And can you describe for me what the contamination was?

Exhibit 31 to the United States' Motion
DOJ 512

Page 37

**A. The type of contamination?**
Q. Yes, ma'am.
**A. The contaminants were constituents of creosote, which includes what are called PAHs, polynuclear aromatic hydrocarbons.**
Q. What are those?
**A. That's a general term for type of contaminants. And the other contaminant we looked at was dioxin.**
Q. What is dioxin?
**A. Dioxin is a contaminant that's formed when pentachlorphenol is manufactured.**
Q. And what is the harm that is caused by dioxin?
**MR. SHAPIRO:** I'll object to the extent you're asking for any sort of expert opinion. She can certainly testify about her --
**MR. PATTON:** **Q.** I just want your understanding. I don't think you're an engineer. I didn't hear anything. Or a chemist or anything. But I want -- since you work at the EPA, I'd like to know what your understanding is as to the harm that results from dioxin.
**A. Dioxin is a carcinogen.**
Q. And if that's in sediment in water, what is -- what I want to know is what aspects of the environment are harmed by that?
**MR. SHAPIRO:** I'll raise the same objection.

Page 38

**MR. PATTON:** **Q.** And again, my question is your understanding.
**A. My understanding of the risk from the contaminated sediment is that it can be harmful to humans who came in contact with the sediment. It can also accumulate -- the contamination can accumulate in fish, either causing ecological impacts to the fish or causing risks to humans who eat fish that are contaminated.**
Q. Sediment is at the bottom of the slough, right, under water?
**A. That is correct.**
Q. So in the case of the Mormon Slough, for humans to come into contact with that, they would have to be swimming in the slough, right?
**A. They could also come in contact with it if they were dropping an anchor in the slough and pulling it up, if they were fishing for crawdads with cages, pulling those up from the bottom.**
Q. I assume that the EPA made an effort to determine the level or concentration of the contaminants in the slough.
**A. Yes, we did.**
Q. Is there some -- what I'm trying to get from you is was there a determination made as to the threat of human contact with these contaminants as the level of the threat in terms of the concentration of these contaminants?

Page 39

**MR. SHAPIRO:** I'll object to the question as vague.
**MR. PATTON:** **Q.** Did the EPA ever quantify just how much the potential threat was to humans coming into contact with these contaminants in the slough?
**MR. SHAPIRO:** I'll raise the same objection.
**MR. PATTON:** **Q.** Okay. I'd like an answer.
**A. My understanding is that we did not do a quantitative estimate of risk from direct contact with sediment. We evaluated risk from humans consuming contaminated fish.**
Q. And with regard to that evaluation, can you tell me what risk the EPA determined with regard to humans consuming fish that were in the slough?
**A. I don't recall the exact risk numbers.**
Q. Do you believe, for instance, we would find that in the Record of Determination?
**A. It would be summarized there. And the details would be in the risk assessment, the Human Health Risk Assessment Report.**
Q. I know you won't be able to tell me the quantity, but if you were to look at the Human Health Risk Assessment Report, would we be able to get an idea as to how much fish a human would have to eat that came out of the slough in order to have some kind of a risk of a health problem? Would we be able to find that out?

Page 40

**A. That's included in the report.**
Q. Have you seen anybody fishing in the slough?
**A. Yes, I have.**
Q. Did you talk to them about it?
**A. Yes, I have.**
Q. And did you warn them not to eat the fish from the slough?
**A. Yes.**
Q. I'm going to read to you another segment from Exhibit 8. Some of this stuff is just -- I want to confirm it's accurate so that I have some of the basic facts and we can easily establish them. This is towards the middle, a little bit below the middle of the page. It says, "The slough is approximately 2,500 feet long and 180 feet wide." Are you following me?
**A. Yes. I have it.**
Q. Can I ask you is that consistent with your understanding of the dimensions of the slough?
**A. I would have to check those figures.**
Q. As you sit here right now, do you have any reason to think that those are inaccurate?
**A. No, I don't.**
Q. And then it goes on to say, "Most of the slough is approximately ten feet deep, although the western portion near the mouth has historically been dredged for barge

Exhibit 31 to the United States' Motion DOJ 395

Page 57

these gentlemen an alternative, which alternative you'd prefer?
**A. I would have summarized the findings of the feasibility study for them and laid out the pros and cons of each alternative.**
Q. Did you do that in a memo?
**A. I don't recall doing that in a memo.**
Q. Do you believe you just briefed Mr. Seter?
**A. I believe that probably is -- my understanding is that probably was a briefing that I gave to him.**
Q. And during that briefing, did you make it -- I know you gave the pros and cons. Do you recall that you made a recommendation as to any of the particular alternatives?
**A. I believe I recommended this as the preferred alternative based on the findings of the feasibility study.**
Q. And this would be SD-2, in situ capping?
**A. Yes.**
Q. Now tell me why you made that recommendation.
**A. When we evaluate alternatives in a feasibility study, we look at nine different alternatives and do a comparative analysis based on those nine criteria. And my recollection is that of the comparative analysis for all of those alternatives, for all of those nine criteria, this was the alternative that met most of those criteria.**
Q. Is cost one of the criteria?

Page 58

**A. Yes, it is.**
Q. Are the nine different criteria given equal weight?
**A. There are two criteria that have to be met by all and then the others I believe -- yes, I would say they have equal weight.**
Q. What are the two criteria that have to be met?
**A. I would have to look at the feasibility study report to see that section of the comparative analysis. I don't recall all the nine criteria.**
Q. And you don't recall the two that have to be met?
**A. Generally they relate to protection of human health and the environment.**
Q. Okay. And the alternative SD-2, in situ capping, essentially was going to put sand over the bottom of the slough?
**A. That's correct.**
Q. And it was going to be approximately two feet of sand?
**A. The finished depth was to be two feet, yes.**
Q. Who actually put the sand -- the project has been done, right?
**A. That's correct.**
Q. Who actually put the sand on the -- the sand cap on the slough?
**A. The sand cap was placed by a contractor for the**

Page 59

**Corps of Engineers.**
Q. Do you recall who that was?
**A. Montgomery Watson Harza was the main contractor.**
Q. And how did they physically do that, put the sand cap down?
**A. They brought the sand material in by barge from another location and they used a clamshell to pick up sand, place it on the surface of the water, and it settled in on the bottom.**
Q. Clamshell, is that like a --
**A. Similar to a bucket for picking up objects.**
Q. And it's on a crane?
**A. It's on a crane, yes.**
Q. Now, that alternative doesn't remove the contaminants from the site, right?
**A. That's correct.**
Q. I guess the -- well, you tell me. Is the concept that the contaminants will not spread via the water if the sand is on top of them? Is that the concept?
**A. The concept is that the sand cap isolates the contamination so it can't migrate anymore.**
Q. Has there been any study as to how long it will take before -- let me start over with the question. Has there been any kind of study or evaluation as to how long it will take from the installation of the sand cap before the risk

Page 60

would be acceptable for people to eat fish from the Mormon Slough?
**A. We haven't determined that yet.**
Q. And I take it you haven't made -- nobody has done any work in that regard to make that determination?
**A. We will be doing that work in the future. We have not started that yet.**
Q. Let's flip to 4.3.3, which is alternative SD-3, the dredging and confined disposal alternative. This is the third alternative that the EPA was considering back in 1998, correct?
**A. Yes.**
Q. And this would involve some dredging of the site?
**A. That's correct.**
Q. Of the slough itself, not the site. I'm sorry. The slough. Okay. Do you remember how much this alternative -- how much dredging this alternative encompassed?
**A. No, I don't. I'd have to look at the detailed report.**
Q. First bullet point says selective removal of heavily contaminated sediment via mechanical dredging. Was this going to be dredging only in the most contaminated areas?
**A. I'd have to read the entire section to be able to answer that. I don't recall just from that one sentence.**
Q. You mean you'd have to read all of 4.3.3 to give me

Exhibit 31 to the United States' Motion
DOJ 514

Page 125

another exhibit.
(Marked Plaintiff's Exhibit No. 30)
Take a look at Exhibit 30. And my first question to you is whether this depicts the approximate location of the log boom that was installed at the mouth of the Old Mormon Slough sometime in late 2006.
**A. This looks like the approximate position of the permanent log boom.**
**Q.** You've been out to the site since the log boom was put in, haven't you?
**A. Yes, I have.**
**Q.** And now I'm going to show you another exhibit.
**(Marked Plaintiff's Exhibit No. 31)**
Exhibit 31 is entitled "Topographic Survey, Port of Stockton, San Joaquin County, California." Have you seen this document before?
**A. I've seen this figure, yes.**
**Q.** Why was this document prepared?
**A. We had a survey done of the CRV property since we needed to place piling for the log boom. And we wanted to ensure that it was placed -- it was not placed on CRV property.**
**Q.** So you had a survey done before the piling was put in to be sure that the piling wasn't on CRV's property?
**A. That's correct.**

Page 126

**Q.** In fact, there's a pile detail with a red dot in it. Is that basically a representation of where the pile was supposed to be installed?
**A. That's correct.**
**Q.** And then the CRV property is just to the right or to the north of that pile detail, the red dot?
**A. There's a dashed line identified as property line here.**
**Q.** And so the log boom is attached to a pile that is located in the position of the red dot?
**A. Yes.**
**Q.** Is there a pile also on the other side of the slough to which the boom is attached?
**A. Yes, there is.**
**(Marked Plaintiff's Exhibit No. 32)**
**Q.** Do you recognize Exhibit 32 as being a photograph depicting the Mormon Slough and the log boom that was installed by the EPA in late 2006?
**A. That's what this appears to be, yes.**
**Q.** And that in the foreground, is that the piles that we were just discussing with regard to Exhibit 31?
**A. Yes, it is.**
**Q.** And the function of the log boom is to prevent watercraft from getting into the slough, correct?
**A. That's correct.**

Page 127

**Q.** And how does that physically work?
**A. It's a physical barrier that would damage most boats that tried to get in there. There is also signs on the pilings to indicate the log boom into -- warning traffic to keep out. I don't remember the exact wording, but it identifies the purpose of the log boom.**
**Q.** And we can see the signs on the piling. They're white squares.
**A. Yes.**
**Q.** And looking across the slough, we're actually looking at the McCormick & Baxter site, aren't we?
**A. That actually is the Penny-Newman Grain Company. The building is --**
**Q.** The building is --
**A. -- not a McCormick & Baxter building.**
**Q.** Is the McCormick & Baxter site to the left where we see the car in the very left-hand portion of the photograph?
**A. No. That's still the Penny-Newman Grain Company.**
**Q.** And looking across towards the right-hand corner of the page, we can see the pile that the other end of the log boom is attached to, right?
**A. Yes.**
**Q.** Does the log boom have any other function other than to keep vessels out of the Mormon Slough?
**A. No, it doesn't.**

Page 128

**MR. PATTON:** Let me just look at my notes. I think I'm just about done.
**MR. SHAPIRO:** Do you want to go off the record and take a couple minutes?
**MR. PATTON:** Yeah, why don't we do that. Take two or three minutes.
**MR. SHAPIRO:** Sure. Take your time.
**MR. PATTON:** Thanks.
**(Whereupon a short recess was taken.)**
**MR. PATTON:** Back on the record.
**Q.** At present are there any -- has there been any analysis -- an analysis done or are there any plans as to when the log boom will be removed from the Mormon Slough?
**A. There are no plans to remove the log boom as long as the cap needs to be protected.**
**Q.** But you qualified that when you said as long as the cap needs to be protected. Has there been any analysis or are there any plans for when the cap no longer needs to be protected?
**A. No.**
**Q.** So you can't tell me when the log boom, if ever, will be removed?
**A. No, I can't.**
**Q.** Do you think anybody in the EPA can tell me that?
**A. No, I don't think so.**

Exhibit 31 to the United States' Motion

Page 129

**MR. PATTON:** Okay. You're done. Thank you.
**THE WITNESS:** Okay.
**(Whereupon a discussion was held off the record.)**
**MR. SHAPIRO:** We're back on the record.
We would just note for the record that Ms. Lacey would like to read her deposition and sign it.
**MR. PATTON:** And I think the court reporter will send a copy to you and it will be up to you to get it to her to read it and sign.
**MR. SHAPIRO:** Okay.
**(Whereupon the deposition concluded at 3:45 p.m.)**
---oOo---

Signature of Witness________________________________

Page 130

CERTIFICATION

I, the undersigned, a Certified Shorthand Reporter of the State of California, hereby certify that the witness in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was reported by me, a Certified Shorthand Reporter and a disinterested person, and was thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said testimony; and that the witness was given an opportunity to read and, if necessary, correct said deposition and to subscribe the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause names in said action.

IN WITNESS WHEREOF, I have hereunto set my hand this ______ day of ________________, 20____.

________________________________
LAURA A. REDING, CSR NO. 9711

John H. Patton, California SBN 069261
Bruce A. McIntosh, California SBN 175607
SHAPIRO BUCHMAN PROVINE & PATTON LLP
1333 North California Boulevard, Suite 350
Walnut Creek, CA 94596
Telephone: (925) 944-9700
Facsimile: (925) 944-9701
E-mail: jpatton@sbllp.com
Attorneys for Plaintiff CRV Enterprises, Inc.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **CRV ENTERPRISES, INC.,**<br>Plaintiff,<br>v.<br>**THE UNITED STATES OF AMERICA,**<br>Defendant. | No. 06-6607L<br>Judge: George W. Miller |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S FIRST SET OF <u>INTERROGATORIES</u>**

Pursuant to Rule 33 of the Rules of the United States Court of Federal Claims (RCFC), plaintiff CRV Enterprises, Inc. (CRV) hereby responds to defendant United California States of America's (USA) Special Interrogatories, Set No. 1 ("Interrogatories") propounded on April 16, 2007, as follows:

## GENERAL OBJECTIONS

The following General Objections are hereby incorporated by reference into each and every individual response set forth below.

1. These responses are being provided subject to any and all evidentiary objections that may be asserted at trial or at any hearing in this action, and without prejudice to any such objection. Further, the fact that any response is made or any document produced shall be without waiver of any right to assert any objection to same, and shall not constitute agreement or concession that such response or the inquiry made are relevant or admissible, or that any document produced is relevant or admissible.

2. To the extent any interrogatory that is the subject of this discovery seeks confidential information and communications between attorney and client, and/or the work product of responding parties' attorneys, such information is protected from discovery and will not be provided. Any response provided herein, or document identified or produced in connection herewith, is provided without waiver of such protections, and without the intention of disclosing any privileged or protected information. Further, responding party objects to identifying or listing the contents of its attorneys' files concerning this matter, or listing communications between responding party and its counsel, as being unduly burdensome and oppressive, and as not being reasonably calculated to lead to the discovery of relevant or admissible evidence. Based upon these objections, responding party will not undertake such identification.

3. Responding party provides this information based upon its present knowledge, information and belief, and after a reasonable inquiry; however responding party has not completed its investigation of the facts regarding this case, and these responses are based only on such information and evidence as are presently available and known to responding party.

4. Responding party reserves all rights to amend, correct, or supplement the information provided in the event additional information becomes known to it. The above objections are incorporated by reference into each of the following responses and answers:

## INDIVIDUAL RESPONSES

Subject to and including each of the General Objections noted above, responding party responds as follows:

**INTERROGATORY NO. 1:**

CRV Enterprises, Inc. (CRV); C. Ryan Voorhees (Voorhees), 28082 Nichols Road, Galt, CA 95632-8204 (209) 367-1706; John H. Patton, c/o Shapiro Buchman Provine & Patton, LLP, 1333 North California Boulevard, Suite 350, Walnut Creek, CA 94596 (925) 944-9700.

**INTERROGATORY NO. 2:**

(a) Approximately 9.54 acres, 1404 West Weber Avenue, Stockton, CA 95203; Assessor's Parcel No. 145-190-08; see map and legal description attached as Exhibit A ("Maritime Center property").

(b) All portions of the Maritime Center property which are located to the south and east of the US Environmental Protection Agency's (EPA) permanent log boom, and which adjoin and formerly had maritime access via the Mormon Slough; see attached Exhibit B.

**INTERROGATORY NO. 3:**

CRV originally acquired a written option and entered into a written purchase and sale agreement to purchase the Maritime Center property on August 25, 2000, and on or before October 1, 2001, delivered nonrefundable option consideration and deposits to the Seller of at least $200,000 toward acquisition of said property. On or about November 8, 2002, and pursuant to the above-alleged contract rights and obligations CRV completed acquisition of the Maritime Center property, at a purchase price of $1,315,000. Copies of the relevant documents within CRV's possession are being produced to defendant.

**INTERROGATORY NO. 4:**

Pursuant to Rule 33(d) of the RCFC, please see title reports for the Maritime Center property that are being produced to defendant. In addition, the following

leases have existed with regard to the Maritime Center property, and copies of the relevant documents concerning same within CRV's possession, will be produced to defendant:

(a) Leases/tenants: ACC, Mike Brenner, 3701 Mallard Drive, Benicia, CA 94510 (707) 746-8028; A1 Materials, Rod Lawley, 2720 Loomis Rd, Stockton, CA (telephone unknown); Pacific Ag, Bob Whitaker , 1732 Barcelona, Ave, Stockton, CA 95209 (209) 607-5268.

**INTERROGATORY NO. 5:**

On or about October 2006, the EPA completed installation of its log boom across the mouth of the Mormon Slough, taking maritime access away from virtually all of the Maritime Center property. See attached Exhibits B and C, depicting the EPA's log boom.

**INTERROGATORY NO. 6:**

The EPA took from CRV the valuable maritime access that the Maritime Center property enjoyed, and all uses of the Maritime Center property that were related to such access, essentially land-locking the property. See attached Exhibit B.

**INTERROGATORY NO. 7:**

CRV objects to this interrogatory on the grounds that it is vague, ambiguous, and unintelligible as to the meaning of the terms "you became aware," "that

Defendant intended to undertake," and "Remediation Project Improvements." CRV further objects to this interrogatory on the grounds that it has no relevance or materiality to the subject matter or issues in this case. Without waiving any objection, CRV answers as follows:

On or about August of 2000, CRV was informed by Bill Dutra, that the EPA was processing a remediation project for the McCormick & Baxter Creosoting Co. property located across the Mormon Slough from the Maritime Center property, and that such project might include various remediation measures that the EPA had authorized and/or was considering. CRV subsequently became aware in approximately the Summer/Fall of 2006 that this project was actually proceeding, and that the EPA intended to and was installing a log boom across the mouth of the Mormon Slough. Copies of the relevant documents within CRV's possession are being produced to defendant.

**INTERROGATORY NO. 8:**

The EPA's installation of the log boom physically barring maritime access and egress is a physical taking. EPA regulations, directives, and orders prohibiting entry beyond the log boom may constitute a regulatory taking, but are essentially actions in support of its physical taking.

**INTERROGATORY NO. 9:**

CRV is endeavoring to respond to this interrogatory. Pursuant to discussions with the Court, it will do so shortly, and will produce the responsive documents.



Exhibit 32 to the United States' Motion Case No. 06-660L DOJ 522

**INTERROGATORY NO. 10:**

The EPA's erection of its log boom across the mouth of the Mormon Slough precludes maritime traffic from access to or egress from the Maritime Center property from the Mormon Slough, except only a small portion of the property that is located to the north and west of the EPA's log boom. Thus, the erection and existence of the EPA's log boom interferes with, and deprives the Maritime Center property of the highest and best use and value it would otherwise have pursuant to the development plan, which is based upon free maritime access and egress for the Maritime Center property. Please see Exhibits B and C attached hereto. As to the Stockton Deep Water Channel, the only nautical way to get between the Stockton Deep Water Channel and to the Maritime Center property is via the Mormon Slough. The existence of the EPA's log boom precludes such access, except only a small portion of the property that is located to the north and west of the EPA's log boom.

**INTERROGATORY NO. 11:**

The EPA is part of the United States government, and thus, its actions are public actions. CRV is a private entity, and its Maritime Center property is private property, including free maritime access and egress. The EPA has erected its log boom across the mouth of the Mormon Slough as part of a public project ostensibly intended to confer environmental benefits upon the general public. The EPA's erection of its log boom across the mouth of the Mormon Slough precludes maritime traffic from access to or egress from the Maritime Center property from the Mormon Slough, except only a small portion of the property that is located to the north and

west of the EPA's log boom. Thus, the erection and existence of the EPA's log boom interferes with, and deprives the Maritime Center property of the highest and best use and value it would otherwise have pursuant to the development plan, which is based upon free maritime access and egress for the Maritime Center property. Copies of the relevant documents within CRV's possession are being produced to defendant.

**INTERROGATORY NO. 12:**

(a) CRV did not know for a fact that the EPA irrevocably intended to and was going to halt navigational access to the Mormon Channel at the time that CRV entered into the purchase and sale agreement.

(b) CRV and Voorhees. Discovery is continuing.

(c) No responsive documents are known to CRV. Discovery is continuing.

(d) N/A.

**INTERROGATORY NO. 13:**

(a) CRV objects to this interrogatory on the grounds that it is compound, argumentative, and calls for legal conclusion, as well as the protected work product of CRV's counsel. Without waiving any objection, CRV answers as follows:

CRV believes that the 5th Amendment requires the EPA/USA to pay just compensation for its actions depriving CRV of the highest and best use of its Maritime Center property, which is why it filed this action seeking such

compensation, as alleged in the Complaint. The 5th Amendment provides: "nor shall private property be taken for public use, without just compensation."

(b) CRV and Voorhees. Discovery is continuing.

(c) Complaint; United States Constitution and Bill or Rights thereto. Discovery is continuing.

(d) Complaint is on file with the Court.

**INTERROGATORY NO. 14:**

(a) The EPA's postponement of its remediation project effectively postponed consummation of the taking until the project was completed, and therefore had bearing on the issues of ripeness and taking. That was the reason the prior action was dismissed without prejudice.

(b) CRV, Voorhees, EPA. Discovery is continuing.

(c) See Exhibit C attached confirming consummation of the taking. Discovery is continuing.

(d) Please see item 14(c) above.

**INTERROGATORY NO. 15:**

(a) The EPA's erection of its log boom across the mouth of the Mormon Slough precludes maritime traffic from access to or egress from the Maritime Center property from the Mormon Slough, except only a small portion of the property that is located to the north and west of the EPA's log boom. Thus, the erection and existence of the EPA's log boom interferes with, and deprives the Maritime Center

property of the highest and best use and value it would otherwise have pursuant to the development plan, which is based upon free maritime access and egress for the Maritime Center property. Please see Exhibits B and C attached hereto. As to the Stockton Deep Water Channel, the only nautical way to get between the Stockton Deep Water Channel and to the Maritime Center property is via the Mormon Slough. The existence of the EPA's log boom precludes such maritime access, except only a small portion of the property that is located to the north and west of the EPA's log boom.

(b) CRV, Voorhees, EPA, and anyone who visits the Maritime Center property or the Mormon Slough. Discovery is continuing.

(c) Please see Exhibits B and C attached hereto. Discovery is continuing.

(d) Please see item 15(c) above.

**INTERROGATORY NO. 16:**

(a) CRV objects to this interrogatory on the grounds that it has no relevance or materiality to the subject matter or issues in this case. Without waiving any objection, CRV answers as follows:

CRV has no information that the EPA's log boom aids in the prevention of the further spread of contaminants. CRV is informed and believes that the EPA's log boom does not in any way protect the navigational characteristics of the Mormon Channel. In fact, the EPA's log boom completely deprives the Mormon Channel of any navigational characteristics, which characteristics existed prior to the erection of the log boom. CRV is informed and believes that the EPA's log boom has no effect

whatsoever upon the navigational characteristics of the Stockton Deep Water Channel.

(b) CRV, Voorhees, EPA, and anyone who visits the Maritime Center property, the Mormon Slough, or the Stockton Deep Water Channel. Discovery is continuing.

(c) Please see Exhibits B and C attached hereto. Discovery is continuing.

(d) Please see item 16(c) above.

**INTERROGATORY NO. 17:**

(a) CRV objects to this interrogatory on the grounds that it has no relevance or materiality to the subject matter or issues in this case. Without waiving any objection, CRV answers as follows:

CRV has no information that the EPA's project actually did or does what RFA No. 6 states, whether the McCormick & Baxter site was a "nuisance," whether the EPA's project has been effective "to prevent the further spread of contaminants," or whether a "threat to human health" existed. CRV is informed and believes that the EPA acted on behalf of the public in undertaking the McCormick & Baxter project, and that it intended that its actions would fulfill a public purpose by preventing or limiting the spread of environmental contamination. CRV also believes that there were more effective means of accomplishing that goal that were available to the EPA without the taking of private property.

(b) CRV, Voorhees, EPA, and anyone involved in the EPA's McCormick & Baxter project. Discovery is continuing.

(c) No responsive documents are known to CRV. Discovery is continuing.

(d) N/A.

Dated: June 12, 2007

SHAPIRO BUCHMAN PROVINE & PATTON LLP

By: ______________________
John H. Patton
Attorneys for Plaintiff CRV Enterprises, Inc.

John H. Patton, California SBN 069261
Bruce A. McIntosh, California SBN 175607
SHAPIRO BUCHMAN PROVINE & PATTON LLP
1333 North California Boulevard, Suite 350
Walnut Creek, CA 94596
Telephone: (925) 944-9700
Facsimile: (925) 944-9701
E-mail: jpatton@sbllp.com
Attorneys for Plaintiff CRV Enterprises, Inc.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**CRV ENTERPRISES, INC.,**

Plaintiff,

v.

**THE UNITED STATES OF AMERICA,**

Defendant.

No. 06-6607L
Judge: George W. Miller

**PLAINTIFF'S 2ND SUPPLEMENTAL RESPONSE TO DEFENDANT'S**
**FIRST SET OF INTERROGATORIES**

Pursuant to Rule 33 of the Rules of the United States Court of Federal Claims (RCFC), plaintiff CRV Enterprises, Inc. (CRV) hereby supplements and amends its prior responses to defendant United California States of America's (USA) Special



Exhibit 33 to the
United States' Motion
DOJ 529

Interrogatories, Set No. 1 ("Interrogatories") propounded on April 16, 2007, as follows:

## GENERAL OBJECTIONS

The following General Objections are hereby incorporated by reference into each and every individual response set forth below.

1. These responses are being provided subject to any and all evidentiary objections that may be asserted at trial or at any hearing in this action, and without prejudice to any such objection. Further, the fact that any response is made or any document produced shall be without waiver of any right to assert any objection to same, and shall not constitute agreement or concession that such response or the inquiry made are relevant or admissible, or that any document produced is relevant or admissible.

2. To the extent any interrogatory that is the subject of this discovery seeks confidential information and communications between attorney and client, and/or the work product of responding parties' attorneys, such information is protected from discovery and will not be provided. Any response provided herein, or document identified or produced in connection herewith, is provided without waiver of such protections, and without the intention of disclosing any privileged or protected information. Further, responding party objects to identifying or listing the contents of its attorneys' files concerning this matter, or listing communications between responding party and its counsel, as being unduly burdensome and oppressive, and as not being reasonably calculated to lead to the discovery of

relevant or admissible evidence. Based upon these objections, responding party will not undertake such identification.

3. Responding party provides this information based upon its present knowledge, information and belief, and after a reasonable inquiry; however responding party has not completed its investigation of the facts regarding this case, and these responses are based only on such information and evidence as are presently available and known to responding party.

4. Responding party reserves all rights to amend, correct, or supplement the information provided in the event additional information becomes known to it. The above objections are incorporated by reference into each of the following responses and answers:

**INDIVIDUAL RESPONSES**

Subject to and including each of the General Objections noted above, responding party supplements and amends its responses as follows:

**SUPPLEMENTAL & AMENDED RESPONSE TO INTERROGATORY NO. 8:**

The EPA's installation of the log boom physically barring maritime access and egress to the Maritime Center Property, and supporting activities constitute a physical taking.

**SUPPLEMENTAL & AMENDED RESPONSE TO INTERROGATORY NO. 10:**

The EPA's erection of its log boom across the mouth of the Mormon Slough precludes maritime traffic from access to or egress from the Maritime Center property from the Mormon Slough, except only a small portion of the property that is located to the north and west of the EPA's log boom. Thus, the erection and existence of the EPA's log boom interferes with, and deprives the Maritime Center property of the highest and best use and value it would otherwise have, as a mixed use master plan development involving a marina with office, recreational, and retail commercial facilities, such as boat slips, dry boat storage facilities, marine sales and service facilities, restaurants, hotel/motel, and other planned and potential amenities ("the development plan"). Please see Exhibits B and C attached hereto. As to the Stockton Deep Water Channel, the only nautical way to get between the Stockton Deep Water Channel and to the Maritime Center property (except only a small portion of the property that is located to the north and west of the EPA's log boom) is via the Mormon Slough. The existence of the EPA's log boom precludes such access, except only a small portion of the property that is located to the north and west of the EPA's log boom.

**SUPPLEMENTAL & AMENDED RESPONSE TO INTERROGATORY NO. 11:**

The EPA is part of the United States government, and thus, its actions are public actions. CRV is a private entity, and its Maritime Center property is private property, including free maritime access and egress. The EPA has erected its log boom across the mouth of the Mormon Slough as part of a public project ostensibly

intended to confer environmental benefits upon the general public. The EPA's erection of its log boom across the mouth of the Mormon Slough precludes maritime traffic from access to or egress from the Maritime Center property from the Mormon Slough, except only a small portion of the property that is located to the north and west of the EPA's log boom. Thus, the erection and existence of the EPA's log boom interferes with, and deprives the Maritime Center property of the highest and best use and value it would otherwise have pursuant to the development plan (see supplemental response to Interrogatory No. 10 above), which is based upon free maritime access and egress for the Maritime Center property. Copies of the relevant documents within CRV's possession are being produced to defendant.

**SUPPLEMENTAL & AMENDED RESPONSE TO INTERROGATORY NO. 13:**

(a) CRV objects to this interrogatory on the grounds that it is compound, argumentative, and calls for legal conclusion, as well as the protected work product of CRV's counsel. Without waiving any objection, CRV answers as follows:

The EPA has erected its log boom across the mouth of the Mormon Slough as part of a public project ostensibly intended to confer environmental benefits upon the general public. The EPA's erection of its log boom across the mouth of the Mormon Slough precludes maritime traffic from access to or egress from the Maritime Center property from the Mormon Slough, and thus, to or from the Stockton Deep Water Channel via the Mormon Slough, except only a small portion of the property that is located to the north and west of the EPA's log boom. CRV believes that the 5th Amendment requires the EPA/USA to pay just compensation for its

actions depriving CRV of the highest and best use of its Maritime Center property, including such access and egress, which is why it filed this action seeking such compensation, as alleged in the Complaint. The 5th Amendment provides: "nor shall private property be taken for public use, without just compensation."

(b) CRV and Voorhees. Discovery is continuing.

(c) Complaint; United States Constitution and Bill or Rights thereto. Discovery is continuing.

(d) Complaint is on file with the Court.

**SUPPLEMENTAL & AMENDED RESPONSE TO INTERROGATORY NO. 15:**

(a) The EPA's erection of its log boom across the mouth of the Mormon Slough precludes maritime traffic from access to or egress from the Maritime Center property from the Mormon Slough, except only a small portion of the property that is located to the north and west of the EPA's log boom. Thus, the erection and existence of the EPA's log boom interferes with, and deprives the Maritime Center property of the highest and best use and value it would otherwise have pursuant to the development plan (see supplemental response to Interrogatory No. 10 above), which is based upon free maritime access and egress for the Maritime Center property. Please see Exhibits B and C attached hereto. As to the Stockton Deep Water Channel, the only nautical way to get between the Stockton Deep Water Channel and to the Maritime Center property is via the Mormon Slough. The existence of the EPA's log boom precludes such maritime access, except only a

small portion of the property that is located to the north and west of the EPA's log boom.

(b) CRV, Voorhees, EPA, and anyone who visits the Maritime Center property or the Mormon Slough. Discovery is continuing.

(c) Please see Exhibits B and C attached hereto. Discovery is continuing.

(d) Please see item 15(c) above.

Dated: July 2, 2007

SHAPIRO BUCHMAN PROVINE & PATTON LLP

By: ______________________
John H. Patton
Attorneys for Plaintiff CRV Enterprises, Inc.

John H. Patton, California SBN 069261
Matthew K. Wisinski, California SBN 195535
SHAPIRO BUCHMAN PROVINE & PATTON LLP
1333 North California Boulevard, Suite 350
Walnut Creek, CA 94596
Telephone: (925) 944-9700
Facsimile: (925) 944-9701
E-mail: jpatton@sbllp.com
Attorneys for Plaintiff CRV Enterprises, Inc.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **CRV ENTERPRISES, INC., a California corporation, C. Ryan Voorhees, an individual,**<br><br>Plaintiffs,<br><br>vs.<br><br>**THE UNITED STATES OF AMERICA,**<br><br>Defendant. | No. 06-660L<br><br>**PLAINTIFFS CRV ENTERPRISES, INC. AND C. RYAN VOORHEES' RESPONSES TO DEFENDANT UNITED STATES OF AMERICA'S ADDITIONAL DISCOVERY**<br><br>Judge George W. Miller |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S SECOND SET OF INTERROGATORIES**

Pursuant to Rule 33 of the Rules of the United States Court of Federal Claims (RCFC), plaintiffs CRV Enterprises, Inc. (CRV) and C. Ryan Voorhees (Voorhees) hereby respond to defendant United California States of America's (USA) Special Interrogatories, Set No. 2 ("Interrogatories") propounded on February 22, 2008, as follows:

## GENERAL OBJECTIONS

The following General Objections are hereby incorporated by reference into each and every individual response set forth below.

1. These responses are being provided subject to any and all evidentiary objections that may be asserted at trial or at any hearing in this action, and without prejudice to any such objection. Further, the fact that any response is made or any document produced shall be without waiver of any right to assert any objection to same, and shall not constitute agreement or concession that such response or the inquiry made are relevant or admissible, or that any document produced is relevant or admissible.

2. To the extent any interrogatory that is the subject of this discovery seeks confidential information and communications between attorney and client, and/or the work product of responding parties' attorneys, such information is protected from discovery and will not be provided. Any response provided herein, or document identified or produced in connection herewith, is provided without waiver of such protections, and without the intention of disclosing any privileged or protected information. Further, responding parties object to identifying or listing the contents of their attorneys' files concerning this matter, or listing communications between responding parties and their counsel, as being unduly burdensome and oppressive, and as not being reasonably calculated to lead to the discovery of relevant or admissible evidence. Based upon these objections, responding parties will not undertake such identification.

3. Responding parties provide this information based upon their present knowledge, information and belief, and after a reasonable inquiry; however responding parties have not completed their investigation of the facts regarding this case, and these responses are based only on such information and evidence as are presently available and known to responding parties.

4. Responding parties reserve all rights to amend, correct, or supplement the information provided in the event additional information becomes known to them. The above objections are incorporated by reference into each of the following responses and answers:

**INDIVIDUAL RESPONSES**

Subject to and including each of the General Objections noted above, responding parties respond as follows:

**INTERROGATORY NO. 18:**

Please state the name, address, telephone number, position and employer of the Person(s) answering these interrogatories, and identify any and all Persons providing information for the purpose of answering these interrogatories.

**RESPONSE:**

CRV Enterprises, Inc. (CRV); C. Ryan Voorhees (Voorhees), 28082 Nichols Road, Galt, CA 95632-8204 (209) 367-1706; John H. Patton, c/o Shapiro Buchman Provine & Patton, LLP, 1333 North California Boulevard, Suite 350, Walnut Creek, CA 94596 (925) 944-9700.

**INTERROGATORY NO. 19:**

Identify the date and means by which Plaintiff Ryan Voorhees acquired Plaintiffs' Property, and the amount of consideration paid for that Property. Attach copies of all Documents relative to the response noted in Your answer, including deeds or other conveyance Documents.

**RESPONSE:**

On or about October 11, 2004, plaintiff CRV conveyed the Maritime Center property to plaintiff C. Ryan Voorhees (Voorhees), a married man, as his separate property, by Deed recorded on October 20, 2004, a true and correct copy of which is attached hereto, marked Exhibit 1, and incorporated herein by reference. No consideration was paid for this transfer from the corporation, owned and controlled by Voorhees.

**INTERROGATORY NO. 20:**

Please describe, in detail (a) each and every reason why Plaintiff CRV Enterprises, Inc. sold Plaintiffs' Property to Plaintiff Ryan Voorhees and (b) each and every reason why Plaintiff Ryan Voorhees bought Plaintiffs' Property from Plaintiff CRV Enterprises, Inc. If Your answer includes some tax benefit (or perceived tax benefit) to either Plaintiff, please identify, with particularity, the nature of the tax benefit, the amount of the tax benefit received, and the relevant tax code provision.



Exhibit 34 to the United States' Motion DOJ 540

**RESPONSE:**

CRV did not sell the Maritime Center property to Voorhees; and Voorhees did not buy the Maritime Center property from CRV. CRV conveyed the Maritime Center property to Voorhees because Voorhees, who owned and controlled CRV, determined that the funds used for the purchase had been personal funds rather than CRV funds, therefore a change in vesting was appropriate. This was upon the advice of Voorhees' accountant.

**INTERROGATORY NO. 21:**

If Your Answer to Request for Admission No. 11 is anything other than an unqualified admission, please state:

Each and every fact upon which You base Your response;

Identify the Person(s) who has (have) knowledge of said fact(s);

Identify each Document(s) which contains said fact(s); and

Identify the custodian of said Document(s).

Describe Plaintiff C. Ryan Voorhees' disagreement with the answer previously provided by Plaintiff CRV Enterprises, Inc., for each and every discovery response where a disagreement exists.

**RESPONSE:**

RFA 3:

a) On or about October 11, 2004, plaintiff CRV conveyed the Maritime Center property to plaintiff C. Ryan Voorhees (Voorhees), a married man, as his



Exhibit 34 to the
United States' Motion
DOJ 541

separate property, by Deed recorded on October 20, 2004, a true and correct copy of which is attached hereto, marked Exhibit 1, and incorporated herein by reference.

b) CRV, Voorhees, San Joaquin County Recorder.

c) Deed, attached as Exhibit 1.

d) San Joaquin County Recorder.

RFA 6:

a) The USA, through its agency, the EPA, erected a permanent log boom across the mouth of the Mormon Slough in or about September/October of 2006, terminating all maritime access to and uses for the Maritime Center Property, and then failed to pay just compensation for its taking.

b) CRV, Voorhees, USA, EPA, Marie Lacey, and all EPA employees and agents involved in the erection of the permanent log boom and the decision not to compensate plaintiffs for the taking.

c) See, e.g., Exhibit B to Complaint; Exhibit C to June 12, 2007 Interrogatory Responses; Exhibits 14, 31 and 32 to October 23, 2007 Marie Lacey Deposition.

d) The parties to this action.

RFA 7:

a) On or about August of 2000, CRV was informed by Bill Dutra and/or his company ("Dutra"), that the EPA was processing a remediation project for the McCormick & Baxter Creosoting Co. property located across the Mormon Slough from the Maritime Center Property, and that such project might include various remediation measures that the EPA had authorized and/or was considering.

Subsequently, at various points believed to be over the course of 2002, and possibly late 2001, CRV and Voorhees came to understand that the EPA was considering possible remediation measures within the Mormon Slough itself, although the details of those measures, and of their understandings at these various points, are difficult for plaintiffs to recall or segregate. Deposition Exhibits 52 and 53 to the CRV/Voorhees Deposition indicate that in January of 2002, CRV and Voorhees became aware of the potential that the EPA might interfere with maritime access to the Maritime Center Property, and obtained Dutra's commitment to negotiate a resolution to that potential. In or about approximately late 2002 or early 2003, CRV and Voorhees became aware that the EPA's remediation very likely would include the placement of a log boom across the entrance to the Mormon Slough, and that such measures, if and when undertaken, would likely adversely impact littoral/maritime access rights to and uses for the Maritime Center Property, unless altered. CRV and Voorhees subsequently became aware in approximately the Summer/Fall of 2006 that this project within the Mormon Slough was actually proceeding, and that the EPA intended to and was installing a permanent log boom across the mouth of the Mormon Slough, which it completed in approximately September/October of 2006.

b) CRV, Voorhees.

c) Deposition of CRV/Voorhees; Exhibits 52, 53 to CRV/Voorhees Deposition; Exhibits 30-32 to October 23, 2007 Marie Lacey Deposition.

d) The parties to this action.

RFA 11:

a) Voorhees is a citizen of the United States, and an owner of the Maritime Center Property.

b) CRV, Voorhees.

c) See Exhibit 1 attached.

d) The parties to this action.

RFA 12:

a) CRV and Voorhees signed the original option and purchase agreement back in 2000, and then signed several amendments to same. As numerous deposition exhibits show, Dutra and its counsel, as well as CRV were negotiating and interacting with the EPA to seek a solution that would not interfere with marine access or use of the Mormon Slough up into early 2003 (see, e.g., CRV/Voorhees Deposition Exhibit 78). Voorhees and CRV did not know for a fact that the EPA irrevocably intended to and was going to halt navigational access to the Mormon Slough until late 2002 or early 2003. Navigational access was not halted until the Fall of 2006.

b) CRV, Voorhees, Ernie Pearson, Craig Rasmussen, Dutra Construction, Ken Smith, Bob Goodman, Marie Lacey, Thane Cox, Janet Magnuson.

c) Deposition of CRV/Voorhees; Exhibits 44, 48, 49, 52, 53, 71, 72, and 78 to CRV/Voorhees Deposition.

d) The parties to this action.

RFA 17:

a) The EPA's Record of Decision (CRV/Voorhees Deposition Exhibit 37B), indicates that the McCormick & Baxter was a nuisance, and that the EPA's

clean-up efforts on that site may have helped to prevent the further spread of contaminants from that site. CRV and Voorhees are informed and believe, and the EPA's Record of Decision and publications (see, e.g., Lacey Deposition Exhibit 28) indicate, that the EPA's actions included measures to prevent contaminants from migrating from the McCormick & Baxter site into the Mormon Slough, and that those measures have been effective to keep additional contamination out of the Slough.

However, the EPA's Record of Decision, numerous other EPA documents (see, e.g., Lacey Deposition Exhibits 11-20), and Marie Lacey's deposition testimony, all indicate that the EPA's selected "remedy" for the Mormon Slough itself (capping the sediment and erecting a permanent log boom) did not remove any contaminants from the Slough or reduce the level of contaminants in the Slough, but rather left those contaminants in place. These sources are unable to provide any prediction or estimate of any reliability as to if or when the level of contamination in the Slough will be appreciably reduced. These sources also indicate that the EPA could have pursued remedies to remove or reduce the level of contamination (see, e.g., Lacey Deposition Exhibits 13, 15 and 16) in the Slough, while still allowing full or substantial marine access to the Maritime Center Property, or could have done nothing about the Slough and allowed dissipation of the contaminants to occur naturally, but elected not to do so.

b) CRV, Voorhees, Ernie Pearson, Craig Rasmussen, Dutra Construction, Ken Smith, Bob Goodman, Marie Lacey, Thane Cox, Janet Magnuson, and all EPA employees and agents involved in the selection of the so-called remedy.

c) Deposition of CRV/Voorhees; Exhibits 44, 48, 49, 52, 53, 71, and 72 to CRV/Voorhees Deposition; Exhibits 11-20, 28, Lacey Deposition.

d) The parties to this action.

e) Please see Subparts (a)-(d) above, as well as plaintiffs' responses to RFA 11 below.

**INTERROGATORY NO. 22:**

If Your answer to Request for Admission No. 12 is anything other than an unqualified admission, please state:

Each and every fact upon which You base Your response;

Identify the Person(s) who has (have) knowledge of said fact(s);

Identify each Document(s) which contains said fact(s); and

Identify the custodian of said Document(s).

Describe Plaintiff C. Ryan Voorhees' response to each discovery request for which his answer is not identical to the answer previously provided by Plaintiff CRV Enterprises, Inc.

**RESPONSE:**

Plaintiffs incorporate their response to Interrogatory No. 21 set forth above.

**INTERROGATORY NO. 23:**

If Your answer to Request for Admission No. 13 is anything other than an unqualified admission, please state:

Each and every fact upon which You base Your response;

Identify the Person(s) who has (have) knowledge of said fact(s);

Identify each Document(s) which contains said fact(s); and

Identify the custodian of said Document(s).

**RESPONSE:**

a) CRV has, through its investment of time, monies and effort, an interest in the Maritime Center development project that will utilize the property. The property was conveyed to Voorhees, but there was no sale involved.

b) CRV, Voorhees.

c) See Exhibit 1 attached, as well as Exhibit 82 to the CRV/Voorhees deposition.

d) The parties to this action.

## PLAINTIFFS' RESPONSE TO DEFENDANT'S THIRD SET OF REQUESTS FOR ADMISSIONS

Pursuant to Rule 36 of the Rules of the United States Court of Federal Claims (RCFC), plaintiffs CRV Enterprises, Inc. (CRV) and C. Ryan Voorhees (Voorhees) hereby respond to defendant United California States of America's (USA) Requests for Admissions, Set No. 3 ("RFA's") propounded on February 22, 2008, as follows:

## GENERAL OBJECTIONS

The following General Objections are hereby incorporated by reference into each and every individual response set forth below.

1. These responses are being provided subject to any and all evidentiary objections that may be asserted at trial or at any hearing in this action, and without prejudice to any such objection. Further, the fact that any response is made or any document produced shall be without waiver of any right to assert any objection to same, and shall not constitute agreement or concession that such response or the inquiry made are relevant or admissible, or that any document produced is relevant or admissible.

2. To the extent any RFA that is the subject of this discovery seeks confidential information and communications between attorney and client, and/or the work product of responding parties' attorneys, such information is protected from discovery and will not be provided. Any response provided herein, or document identified or produced in connection herewith, is provided without waiver of such protections, and without the intention of disclosing any privileged or protected information. Further, responding parties object to identifying or listing the contents of its attorneys' files concerning this matter, or listing communications between

responding parties and their counsel, as being unduly burdensome and oppressive, and as not being reasonably calculated to lead to the discovery of relevant or admissible evidence. Based upon these objections, responding parties will not undertake such identification.

3. Responding parties provide this information based upon their present knowledge, information, and belief, and after a reasonable inquiry; however responding parties have not completed their investigation of the facts regarding this case, and these responses are based only on such information and evidence as are presently available and known to responding parties.

4. Responding parties reserve all rights to amend, correct, or supplement the information provided in the event additional information becomes known to them. The above objections are incorporated by reference into each of the following responses and answers:

**INDIVIDUAL RESPONSES**

Subject to and including each of the General Objections noted above, responding parties respond as follows:

**RFA NO. 11:**

Please admit that Plaintiff Ryan Voorhees agrees with each and every discovery response made by Plaintiff CRV Enterprises, Inc., during the course of this litigation.

**RESPONSE:**

Admitted as to Interrogatory Nos. 1, 2, 4, 5, 8, 9, 10, 13, 14, 15, and 16. Denied, as to Interrogatory Nos. 3, 6, 7, 11, 12, and 17. As to Interrogatory Nos. 3, 6, 7, 11, 12 and 17, the prior responses (dated June 12 and 14, 2007) are admitted, subject to the following amendments to the responses:

(a) As to Interrogatory No. 3, the following supplemental information is added to the response: On or about October 11, 2004, plaintiff CRV conveyed the Maritime Center property to plaintiff C. Ryan Voorhees (Voorhees), a married man, as his separate property, by Deed recorded on October 20, 2004, a true and correct copy of which is attached hereto, marked Exhibit 1, and incorporated herein by reference.

(b) As to Interrogatory No. 6, the first sentence of the response is amended to read: The USA, through its agency, the EPA, took from CRV and Voorhees the valuable littoral rights and maritime access that the Maritime Center property enjoyed, and all uses of the Maritime Center property that were related to such littoral rights and access, such as the ability for marine vessels and traffic to access or dock at the property, essentially land-locking the property, and then failed to pay just compensation for its taking.

(c) As to Interrogatory No. 7, the second paragraph of the response is amended to read: On or about August of 2000, CRV was informed by Bill Dutra and/or his company, that the EPA was processing a remediation project for the McCormick & Baxter Creosoting Co. property located across the Mormon Slough from the Maritime Center Property, and that such project might include various



Exhibit 34 to the United States' Motion
DOJ 550

remediation measures that the EPA had authorized and/or was considering. Subsequently, at various points believed to be over the course of 2002, and possibly late 2001, CRV and Voorhees came to understand that the EPA was considering possible remediation measures within the Mormon Slough itself, although the details of those measures, and of their understandings at these various points, are difficult to recall or segregate. Deposition Exhibits 52 and 53 to the CRV/Voorhees Deposition indicate that in January of 2002, CRV and Voorhees became aware of the potential that the EPA might interfere with maritime access to the Maritime Center Property, and obtained Dutra's commitment to negotiate a resolution to that potential. In or about approximately late 2002 or early 2003, CRV and Voorhees became aware that the EPA's remediation very likely would include the placement of a log boom across the entrance to the Mormon Slough, and that such measures, if and when undertaken, would likely adversely impact littoral/maritime access rights to the Maritime Center Property, unless altered. CRV and Voorhees subsequently became aware in approximately the Summer/Fall of 2006 that this project within the Mormon Slough was actually proceeding, and that the EPA intended to and was installing a permanent log boom across the mouth of the Mormon Slough, which it completed in approximately September/October of 2006. Copies of the relevant documents within CRV's possession have been produced to defendant.

(d) As to Interrogatory No. 11, the second sentence of the response is amended to read: CRV is a private entity, and Voorhees is a private person, and their Maritime Center Property is private property, including free maritime access and egress.

(e) As to Interrogatory No. 12, subpart (a) of the response is amended to read: CRV and Voorhees did not know for a fact that the EPA irrevocably intended to and was going to halt navigational access to and in the Mormon Channel at the time that CRV entered into the purchase and sale agreement.

(f) As to Interrogatory No. 17, the second paragraph of subpart (a) of the response is amended to read: CRV and Voorhees answer as follows with regard to the EPA's actions on the McCormick & Baxter site: CRV and Voorhees now believe that the McCormick & Baxter site itself likely was a "nuisance," and that the EPA's clean-up efforts on that site may have helped to "prevent the further spread of contaminants" from that site. CRV and Voorhees are informed and believe that the EPA acted on behalf of the public in undertaking the McCormick & Baxter project, and that it intended that its actions would fulfill a public purpose by preventing or limiting the spread of environmental contamination.

(g) As to Interrogatory No. 17, a third paragraph is added, as follows: As to the EPA's actions within the Mormon Slough (capping the sediment and erection of a log boom), which were not on the McCormick & Baxter site, CRV and Voorhees answer as follows: Based on discovery, including the Record of Decision (CRV Deposition Exhibit 37B), and the exhibits and deposition testimony from Marie Lacey's deposition, there appears to be no evidence that: 1) the EPA's actions have eliminated or reduced any nuisance or contamination in the Mormon Slough or will do so in the future; and 2) that the EPA's actions have significantly prevented or reduced any spread of contaminants, or will do so in the future. In short, there appears to be no evidence that the EPA's actions within the Mormon Slough have

achieved any public benefit. CRV and Voorhees also believe that there were more effective means of addressing any contamination within the Mormon Slough that were available to the EPA without the taking of private property.

(h) As to Interrogatory No. 17, subpart (c) of the response is amended to read: Transcript for October 23, 2007 Deposition of Marie Lacey; Exhibits 11-20, Marie Lacey Deposition; Exhibit 37B, CRV/Voorhees Deposition.

**RFA NO. 12:**

Please admit that Plaintiff Ryan Voorhees gives the identical answer to each and every discovery response made by Plaintiff CRV Enterprises, Inc., during the course of this litigation.

**RESPONSE:**

Plaintiffs incorporate their response to RFA No. 11 set forth above.

**RFA NO. 13:**

Please admit that Plaintiff CRV Enterprises, Inc., retained no property interest in Plaintiffs' Property after it sold Plaintiffs' Property to Plaintiff C. Ryan Voorhees on or about October 20, 2004.

**RESPONSE:**

Admit that CRV did not retain any title interest in the Maritime Center Property after conveying such property to Voorhees on or about October 11, 2004. Deny that

CRV has not retained an interest in the Maritime Center development project that will utilize the property. Deny there was a sale of the property to Voorhees.

Dated: March 5, 2008

Respectfully Submitted,

SHAPIRO BUCHMAN PROVINE & PATTON LLP

By: ______________________
John H. Patton
Attorneys for Plaintiffs CRV Enterprises, Inc. and
C. Ryan Voorhees

CRV ENTERPRISES, INC.

______________________
C. Ryan Voorhees

By: ______________________
C. Ryan Voorhees

207250.1



Exhibit 34 to the
United States' Motion
DOJ 555

John H. Patton, California SBN 069261
Matthew K. Wisinski, California SBN 195535
SHAPIRO BUCHMAN PROVINE & PATTON LLP
1333 North California Boulevard, Suite 350
Walnut Creek, CA 94596
Telephone: (925) 944-9700
Facsimile: (925) 944-9701
E-mail: jpatton@sbllp.com
Attorneys for Plaintiff CRV Enterprises, Inc.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **CRV ENTERPRISES, INC., a California corporation, C. Ryan Voorhees, an individual,**<br><br>Plaintiffs,<br><br>vs.<br><br>**THE UNITED STATES OF AMERICA,**<br><br>Defendant. | No. 06-660L<br><br>**PLAINTIFF CRV ENTERPRISES, INC.'S THIRD SUPPLEMENTAL RESPONSES TO FIRST SET OF INTERROGATORIES**<br><br>Judge George W. Miller |

**PLAINTIFF CRV ENTERPRISES, INC.'S THIRD SUPPLEMENTAL RESPONSE TO DEFENDANT'S FIRST SET OF INTERROGATORIES**

Pursuant to Rule 33 of the Rules of the United States Court of Federal Claims (RCFC), and pursuant to General Instruction II of defendant United States of America's (USA) First Set of Interrogatories, plaintiff CRV Enterprises, Inc. (CRV) hereby supplements its responses, as follows:

## GENERAL OBJECTIONS

The following General Objections are hereby incorporated by reference into each and every individual response set forth below.

1. These supplemental responses are being provided subject to any and all evidentiary objections that may be asserted at trial or at any hearing in this action, and without prejudice to any such objection. Further, the fact that any response is made or any document produced shall be without waiver of any right to assert any objection to same, and shall not constitute agreement or concession that such response or the inquiry made are relevant or admissible, or that any document produced is relevant or admissible.

2. To the extent any interrogatory that is the subject of this discovery seeks confidential information and communications between attorney and client, and/or the work product of any responding party's attorneys, such information is protected from discovery and will not be provided. Any response provided herein, or document identified or produced in connection herewith, is provided without waiver of such protections, and without the intention of disclosing any privileged or protected information. Further, responding party objects to identifying or listing the contents of its attorneys' files concerning this matter, or listing communications between responding party and its counsel, as being unduly burdensome and oppressive, and as not being reasonably calculated to lead to the discovery of relevant or admissible evidence. Based upon these objections, responding party will not undertake such identification.

3. Responding party provides this information based upon its present knowledge, information and belief, and after a reasonable inquiry; however plaintiffs have not completed their investigation of the facts regarding this case, and these responses are based only on such information and evidence as are presently available and known to plaintiffs.

4. Plaintiffs reserve all rights to amend, correct, or supplement the information provided in the event additional information becomes known to them. The above objections are incorporated by reference into each of the following responses and answers:

**INDIVIDUAL RESPONSES**

Subject to and including each of the General Objections noted above, this responding party supplements its responses (as previously supplemented) as follows:

**INTERROGATORY NO. 3:**

As to Interrogatory No. 3, the following supplemental information is added to the response: On or about October 11, 2004, plaintiff CRV conveyed the Maritime Center property to plaintiff C. Ryan Voorhees (Voorhees), a married man, as his separate property, by Deed recorded on October 20, 2004, a true and correct copy of which is attached hereto, marked Exhibit 1, and incorporated herein by reference.

**INTERROGATORY NO. 6:**

As to Interrogatory No. 6, the first sentence of the response is amended to read: The USA, through its agency, the EPA, took from CRV and Voorhees the valuable littoral rights and maritime access that the Maritime Center property enjoyed, and all uses of the Maritime Center property that were related to such littoral rights and access, such as the ability for marine vessels and traffic to access or dock at the property, essentially land-locking the property, and then failed to pay just compensation for its taking.

**INTERROGATORY NO. 7:**

As to Interrogatory No. 7, the second paragraph of the response is amended to read: On or about August of 2000, CRV was informed by Bill Dutra and/or his company, that the EPA was processing a remediation project for the McCormick & Baxter Creosoting Co. property located across the Mormon Slough from the Maritime Center Property, and that such project might include various remediation measures that the EPA had authorized and/or was considering. Subsequently, at various points believed to be over the course of 2002, and possibly late 2001, CRV and Voorhees came to understand that the EPA was considering possible remediation measures within the Mormon Slough itself, although the details of those measures, and of their understandings at these various points, are difficult to recall or segregate. Deposition Exhibits 52 and 53 to the CRV/Voorhees Deposition indicate that in January of 2002, CRV and Voorhees became aware of the potential that the EPA might interfere with maritime access to the Maritime Center Property,



Exhibit 35 to the
United States' Motion
DOJ 559

and obtained Dutra's commitment to negotiate a resolution to that potential. In or about approximately late 2002 or early 2003, CRV and Voorhees became aware that the EPA's remediation very likely would include the placement of a log boom across the entrance to the Mormon Slough, and that such measures, if and when undertaken, would likely adversely impact littoral/maritime access rights to the Maritime Center Property, unless altered. CRV and Voorhees subsequently became aware in approximately the Summer/Fall of 2006 that this project within the Mormon Slough was actually proceeding, and that the EPA intended to and was installing a permanent log boom across the mouth of the Mormon Slough, which it completed in approximately September/October of 2006. Copies of the relevant documents within plaintiffs' possession have been produced to defendant.

**INTERROGATORY NO. 11:**

As to Interrogatory No. 11, the second sentence of the response is amended to read: CRV is a private entity, and Voorhees is a private person, and their Maritime Center Property is private property, including free maritime access and egress.

**INTERROGATORY NO. 12:**

As to Interrogatory No. 12, subpart (a) of the response is amended to read: CRV and Voorhees did not know for a fact that the EPA irrevocably intended to and was going to halt navigational access to and in the Mormon Channel at the time that CRV entered into the purchase and sale agreement.

**INTERROGATORY NO. 17:**

As to Interrogatory No. 17, the second paragraph of subpart (a) of the response is amended to read: CRV and Voorhees answer as follows with regard to the EPA's actions on the McCormick & Baxter site: As a result of discovery, CRV and Voorhees now believe that the McCormick & Baxter site itself likely was a "nuisance," and that the EPA's clean-up efforts on that site may have helped to "prevent the further spread of contaminants" from that site. CRV and Voorhees are informed and believe that the EPA acted on behalf of the public in undertaking the McCormick & Baxter project, and that it intended that its actions would fulfill a public purpose by preventing or limiting the spread of environmental contamination.

As to Interrogatory No. 17, a third paragraph is added, as follows: As to the EPA's actions within the Mormon Slough (capping the sediment and erection of a log boom), which were not on the McCormick & Baxter site, CRV and Voorhees answer as follows: Based on discovery, including the Record of Decision (CRV Deposition Exhibit 37B), and the exhibits and deposition testimony from Marie Lacey's deposition, there appears to be no evidence that: 1) the EPA's actions have eliminated or reduced any nuisance or contamination in the Mormon Slough or will do so in the future; and 2) that the EPA's actions have significantly prevented or reduced any spread of contaminants, or will do so in the future. In short, there appears to be no evidence that the EPA's actions within the Mormon Slough have achieved any public benefit. CRV and Voorhees also believe that there were more effective means of addressing any contamination within the Mormon Slough that were available to the EPA without the taking of private property.

As to Interrogatory No. 17, subpart (c) of the response is amended to read: Transcript for October 23, 2007 Deposition of Marie Lacey; Exhibits 11-20, Marie Lacey Deposition; Exhibit 37B, CRV/Voorhees Deposition.

Dated: March 5, 2008

Respectfully Submitted,

SHAPIRO BUCHMAN PROVINE & PATTON LLP

By: ______________________
John H. Patton
Attorneys for Plaintiffs CRV Enterprises, Inc. and C. Ryan Voorhees

CRV ENTERPRISES, INC.

By: ______________________
C. Ryan Voorhees

207333 1

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION IX
75 Hawthorne Street
San Francisco, CA 94105

August 14, 2002

**VIA FACSIMILE AND U.S. MAIL**
Robert C. Goodman
177 Post Street
Suite 600
San Francisco, CA 94108

Re: McCormick & Baxter Superfund Site
Remediation Activities and Request for Compensation

Dear Mr. Goodman:

I appreciated the opportunity to speak with you yesterday regarding the McCormick & Baxter Superfund Site ("Site"). As I mentioned to you on that call, the Environmental Protection Agency ("EPA") plans to begin performing an initial phase ("Phase I") of the remediation work selected in EPA's 1999 Record of Decision at the Site at the end of September this year. This first phase of work is scheduled to take approximately three months and to be completed by the end of December 2002. EPA would like to work with you and your client, Dutra Group, to mitigate any potential impacts that the construction of Phase I of the remedy might otherwise have on Dutra's business interests. Additionally, as we discussed, EPA is in the process of evaluating your request for compensation as a result of potential impacts on Dutra's property due to construction of the remedy for the Site. We hope to get back to you with a response to this request in the near future.

In order to facilitate our discussion of the best way to mitigate any impacts on Dutra's business interests, we would like to provide you with an updated description of the planned remediation and to schedule a meeting with you and your client. There have been some changes to the project plans since our letter to you on October 26, 2001. EPA intends to deliver the cap material to the Site by barge instead of by truck as previously planned. To allow barge delivery, EPA plans to place a silt curtain, instead of a sheetpile wall, across Old Mormon Slough during construction. This will still block access to a portion of the Dutra property during construction activities, but it will also allow some flexibility to occasionally open or close the silt curtain during construction to accommodate Dutra's access needs during this time.

The remediation activities will be conducted in two separate phases. Phase I will primarily involve bank stabilization and, as noted above, this is anticipated to take place from the end of September 2002 to December 2002. Phase II will include capping of contaminated materials in Old Mormon Slough and is anticipated to take place from July 2003 to December 2003.

Major Phase I activities will include:

- Removal of old pilings in Old Mormon Slough.
- Installation of new pilings, including one adjacent to the Dutra property. One or more of the pilings will be permanent. The pilings will be used to anchor temporary silt curtains during bank stabilization/cap construction and to anchor the permanent log boom after construction is completed.
- Collection of water quality samples via boat when work is taking place in the water.
- Installation of a temporary silt curtain.
- Installation of an additional silt curtain, as a contingency, if water quality standards are exceeded.
- Removal of rip-rap and cutting back of southern shoreline.
- Removal of temporary silt curtain.

Major Phase II activities will include:

- Mobilization of barges at Old Mormon Slough.
- Installation of temporary silt curtain(s).
- Clearing of debris on slough bottom.
- Collection of water quality samples via boat when work is taking place in the water.
- Placement of sediment cap. The cap material is expected to be brought to the Site by barge.
- Bathymetric surveying of slough bottom.
- Removal of temporary pilings.
- Removal of temporary silt curtain(s) and placement of permanent log boom.

EPA would like the opportunity to discuss our activities and our anticipated work schedule with you in the near future in order to explore the best way for EPA to minimize the impacts on your business interests, consistent with timely completion of the project. More detailed information on the project will be sent to you later this week in order to assist you in understanding EPA's plans. Please advise us as to whether you and the appropriate Dutra representatives will be able to meet with us on August 21st or 22nd. If this is not convenient, please provide us with alternative meeting dates that would be convenient for you. My telephone number is 415-972-3887. We look forward to working with you.

Thank you for your consideration.

Sincerely,

Janet A. Magnuson
Assistant Regional Counsel

cc: Marie Lacey
Laurie Williams