**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| CRV ENTERPRISES, INC. and C. RYAN VOORHEES, Plaintiffs, v. THE UNITED STATES, Defendant. | Case No. 06-660L<br>Judge George W. Miller |

**UNITED STATES' PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56(h)(1) of the Rules of the Court of Federal Claims, the United States hereby submits these Proposed Findings of Uncontroverted Fact in Support of its Motion to Dismiss or, in the Alternative, Motion for Summary Judgment.

**Description of the Subject Property**

1. Plaintiffs C. Ryan Voorhees and CRV Enterprises, Inc. ("CRV") are the current and former owners, respectively, of the "Subject Property." See Ex. 1 (Deed of Subject Property from Bill Dutra to Plaintiff CRV, dated Nov. 8, 2002); Ex. 2 (Deed of Subject Property from Plaintiff CRV to Plaintiff Voorhees, dated Oct. 11, 2004).

2. The Subject Property is adjacent to the Old Mormon Slough (also referred to as "the Slough"), a man-made waterway approximately 2,500-feet long and 180-feet wide. See Ex. 20 at DOJ203.[1/] The Subject Property is bounded by, but does not extend into,

[1/] Page number references are to the DOJ Bates number stamped in the bottom right corner of each exhibit.

the Old Mormon Slough. See Ex. 1 at DOJ2-3 (legal description of the Subject Property, describing the southwest border of the tract as the "northerly bank of the Mormon Channel" and excepting any portion of the bed of the slough); see also Ex. 3 (map).

3. "The majority of the slough is approximately [10 feet] deep; the mouth of the slough was dredged in 1987 to a depth of approximately [-16 feet] mean lower low water." Ex. 20 at DOJ203. See also Exs. 3, 4 (maps). Before 1986, the bed of the Slough adjacent to the earthen bank at the Subject Property was shallow, gradually increasing to two feet deep, several feet from the shoreline, and reaching depths of approximately ten to eleven feet in the deepest portions of the Slough. See Ex. 29 at DOJ490. In 1986, the United States Army Corps of Engineers issued a permit, pursuant to the Rivers and Harbors Act of 1899, 33 U.S.C. § 403 ("Permit" or "Permit No. 9260"), which allowed the owner of the Subject Property (Bill Dutra) to dredge a portion of the Slough bordering the Subject Property to a uniform depth of sixteen feet and to construct approximately 1,400 feet of sheetpile wall and a bulkhead to permit the docking of large commercial vessels. See id. at DOJ480. The Permit did "not convey any property rights, either in real estate or material, or any exclusive privileges." Id. at DOJ481, 483. In addition, the Permit stated that Dutra "shall not be entitled to compensation for damage or injury to the structures or work authorized herein which may be caused by or result from existing or future operations undertaken by the United States in the public interest." Id. at DOJ483.

4. Before 1970, the Old Mormon Slough was part of a larger waterway system. See Ex. 20 at DOJ203. In 1970, portions of the larger waterway system were filled due to construction of Interstate Highway I-5. See id. at DOJ203; Ex. 4 (map). The portion of

the waterway adjacent to the Subject Property is designated "the Old Mormon Slough." The remaining section of the waterway, now on the eastern side of I-5 is named "New Mormon Slough." See id. at DOJ203; Ex. 4 (map).

5. The Subject Property includes a barge slip in the Old Mormon Slough, on the northwest corner of the tract. See Ex. 5. Maps of the Subject Property, showing the barge slip and the sheetpile wall and bulkhead, are attached as Exhibits 3, 4, and 5.

**Description of the McCormick and Baxter Superfund Site**

6. South of the Old Mormon Slough, opposite the Subject Property, is an Environmental Protection Agency ("EPA") Superfund site known as the McCormick & Baxter Creosoting Co. Site ("M&B Site"). See Compl., ¶¶ 6, 19; Ex. 4 (map).

7. The source property that comprises most of the M&B Site was used for wood-preserving operations between 1942 and 1990. Ex. 20 at DOJ201.

8. Past site activities on the M&B Site resulted in the release of wood-preserving chemicals to soils, groundwater, surface water, and the sediment of the Old Mormon Slough. Id. at DOJ201.

**California's Involvement with the M&B Site**

9. For several decades, M&B discharged stormwater from the M&B property into the adjacent Old Mormon Slough and the New Mormon Slough. See id. at DOJ204-05.

10. In 1974 the California State Regional Water Quality Control Board ("Regional Board") issued M&B Order No. 74-407, which limited M&B's effluent discharge. See Ex. 8 at DOJ15.

11. Following their investigation, the Regional Board, the California Department of Fish and

Game ("California DFG"), and the City of Stockton determined that M&B was discharging waste into the New Mormon Slough via storm drains, which were not permitted under Order No. 74-407. Id.; see also Ex. 20 at DOJ205 (discussing M&B's violations of storm drain discharge requirements).

12. In 1977, California DFG investigated a fish kill in the New Mormon Slough, and concluded that contaminated stormwater runoff from the M&B Site was responsible. See Ex. 20 at DOJ205.

13. Following its investigation of the fish kill, California DFG issued a Violation Report to M&B, noting a violation of Cal. Water Code § 5650(f). See Ex. 6 (stating that pentachlorophenol, which is "extremely toxic to fish" was washed into the New Mormon Slough and into the port of Stockton).

14. On December 23, 1977, the Regional Board informed M&B that the State's inspection found M&B "in threatened violation of" Order No. 74-407. See Ex. 7.

15. In January 1978, the Regional Board issued a Cleanup and Abatement Order against M&B. See Ex. 20 at DOJ205.

16. The 1978 Cleanup and Abatement Order required M&B to abate the discharge of wastes and comply with a time schedule to assure adequate containment and disposal of all stormwater runoff containing toxic materials. See Ex. 8.

17. In February 1978, the Regional Board conducted a public hearing and adopted Order No. 78-17, which referred the M&B case to the California Attorney General for discharge of wastes without a permit. See id.

18. Although M&B made certain corrections, it continued to make unpermitted discharges in

violation of California law. See Ex. 9 (September 28, 1983 and August 25, 1983 letters detailing M&B's numerous violations).

19. Among other early cleanup efforts, the oily waste ponds ("OWPs") were closed in 1981, "when approximately 635,000 kg (144 tons) of contaminated soil was removed from the [OWPs], and the area was covered with clean fill." Ex. 20 at DOJ205.

20. In 1984, California's Department of Health Services ("DHS") (now known as the Department of Toxic Substances Control ("DTSC")) noted "serious contamination" in its analysis of soil samples from the M&B Site. Ex. 10.

21. In 1984, M&B entered into an agreement with the State of California, which allowed the Regional Board and DHS to investigate and begin clean up activities. See Ex. 20 at DOJ205.

22. California's DHS prepared a hydrogeologic investigation in May 1984, which showed significant contamination and the need for additional investigation. See Ex. 11.

23. M&B's efforts to remedy the contamination were unsuccessful. See Ex. 20 at DOJ205-06.

24. Several documented spills of site-related chemicals, including creosote and heavy fuel oil, into the Old Mormon Slough occurred between 1986 and 1987. See id. at DOJ205.

25. In 1988, M&B declared bankruptcy, and in 1990, M&B ceased operations at the M&B Site. See id. at DOJ206.

**EPA's Activities with respect to the M&B Site**

26. In October 1992, EPA added the M&B Site to the National Priorities List ("NPL"), pursuant to the Comprehensive Environmental Response Compensation and Liability Act

of 1980 ("CERCLA"), 42 U.S.C. §§ 9601, et seq., which allowed EPA to assume lead agency responsibility and use federal Superfund resources to cleanup the Site. See Ex. 12 at DOJ32 (March 1993 News Release); Ex. 20 at DOJ206. The contaminated portion of the Slough is part of the M&B Site pursuant to CERCLA, which specifies that the term "facility" for the proposed implementation of the remedy includes all locations where hazardous substances associated with the site "come to be located." 42 U.S.C. § 9601(9).

27. EPA conducted several phases of investigation on the property between 1993 and 1996, and sampled soil, groundwater, and sediment. See Ex. 20 at DOJ206.

28. In 1994, EPA representatives observed a large oily sheen that began at the end of the Old Mormon Slough and extended three-quarters of the way to the mouth of the waterway, covering approximately 30% of the surface in some areas. See id. at 205, 211.

29. In 1996, EPA installed a sheet-piling wall along a part of the shoreline of the M&B Site to prevent further chemical releases from the OWPs into the Old Mormon Slough. See id. at DOJ206 (describing these activities). In 1997, EPA removed contaminated soil from behind the sheet-piling wall and replaced it with clean fill. EPA also covered the OWPs and central area of the M&B Site with clean fill and an asphalt cap. See id. at DOJ206 (describing these activities).

30. EPA's investigation showed elevated levels of carcinogenic polynuclear aromatic hydrocarbons ("PAHs") and dioxins in the sediment bed of the Old Mormon Slough. See id. at DOJ211; see also id. at DOJ212-214 (describing the nature and extent of PAH and dioxin contamination in the Old Mormon Slough); id. at DOJ227-28 (map showing sample locations).

31. EPA investigators determined that the depth of the oily soil in the Old Mormon Slough was between five and ten feet at most locations, but as deep as 18 to 29 feet below the sediment surface in some borings. See id. at DOJ211-12.

32. EPA had earlier conducted a Human Heath Risk Assessment ("HHRA"), to address the potential human health risks posed by hazardous substances associated with the M&B Site, as well as an ecological risk assessment ("ERA"), to determine whether contamination from the M&B Site was affecting food web integrity and productivity. See id. at DOJ218 (discussing the HHRA study); id. at DOJ220 (discussing the ERA study).

33. EPA relied, in part, on interviews with residents of a nearby community, which showed that "[m]any people fish and camp illegally near the slough for recreation. Also, many transients, homeless people, and low-income neighbors depend on catching fish from the Port of Stockton to supplement their diets. Interviewees believed that people from Stockton's downtown shelter, Delta Gate and St. Mary's Dining Hall eat fish caught near the Port." Ex. 13 at DOJ46.

34. Based on its extensive studies, EPA concluded that the contamination of the sediment in the Old Mormon Slough posed unacceptable risks to humans, who might use Old Mormon Slough for subsistence fishing, as well as unacceptable risks to certain fish species (termed "ecological receptors"). See Ex. 20 at DOJ221.

35. EPA found that dioxin was present in the Old Mormon Slough sediment at 30 to 50 times the level at which no adverse effects were predicted to occur, and that PAHs were present at nearly 80 times the estimated safe level of contamination. See id. at DOJ221-22.

36. Based on the high levels of contamination in the Old Mormon Slough sediments, EPA determined that "[i]f sediment contamination in the Old Mormon Slough is not addressed, it will continue to present a risk to ecological receptors, and to human receptors who consume significant quantities of certain fish species." Id. at DOJ222.

**EPA's Selection of a Remedy for the Contaminated Sediment in the Old Mormon Slough**

37. EPA analyzed a variety of alternative remedial actions to address the threat posed by the contamination at the M&B Site and in the Old Mormon Slough. See, e.g., Ex. 17 at DOJ126-35 and DOJ142-62; Ex. 20 at DOJ258-67; see also 40 C.F.R. § 300.430(e)(9)(iii) (identifying criteria required for review of alternative remedies).

38. In July 1998, EPA issued a Draft Surface Water-Sediment Feasibility Study Report for the M&B Site ("Draft FS"), to evaluate various remedial alternatives. See Ex. 17 at DOJ78. Some of the possible remedies identified by EPA in the Draft FS, including "Alternative SD-2: In Situ Capping," involved installation of a sand cap – a layer of fine sand, approximately two feet thick, which would physically cover approximately three-fourths of the bottom of the Old Mormon Slough – in order to contain the contaminated sediment in the Slough. See id. at DOJ129; see also id. at DOJ138 (map depicting "Area to be Capped").

39. In addition, the Draft FS included discussion of possible "institutional controls . . . for the capped portion of the Old Mormon Slough . . . to prevent inadvertent erosion or other disruption of in situ sediment cap materials that would cause exposure to more highly contaminated sediment under the cap." Id. at DOJ129-30; see also id. at DOJ138 (map depicting location of the log boom).

40. In September 1998, EPA issued a Proposed Plan for the final soil and sediment remedies and an interim ground water remedy for a 30-day public comment period. See Ex. 18. The Proposed Plan discussed EPA's preliminary determination that "SD-2: In Situ Capping" was the most appropriate remedy to address the contamination in the Old Mormon Slough. See id. at DOJ180.

41. EPA conducted a public meeting on September 28, 1998, and granted a 30-day extension of the public comment period until November 16, 1998. See Ex. 19 at DOJ183.

42. EPA provided public notice of the Proposed Plan on October 7, 1998, and specifically noted the proposed installation of the sand cap and the restrictions on the use of the Slough. See Ex. 19.

43. In January 1999, EPA issued a Final Surface Water-Sediment Feasibility Study Report ("Final FS"), which described EPA's extensive investigation of the contamination in the Old Mormon Slough, and evaluated the remedial alternatives. See Ex. 20.

44. The Final FS, like the Draft FS, discussed the sand cap and institutional controls in detail, including diagrams of the location of the sand cap and the log boom. See id. at DOJ254-56, DOJ259-60, and DOJ284-86 (discussing sand cap); id. at DOJ284-86 (institutional controls); id. at DOJ268 (map, showing location of the log boom and the "Area to be Capped").

45. In the Final FS, EPA explained that sand caps in these type of environments are a "fairly common and proven method of containing contaminated sediment." Id. at DOJ286.

46. Although a sand cap can isolate hazardous contaminants in place, EPA recognized that it was essential to protect the integrity of the cap by restricting boat access in the Old

Mormon Slough. See id. at DOJ298 ("[L]ong-term monintoring, maintenance, and institutional controls are required to ensure the integrity of the cap.").

47. EPA determined that permitting boat traffic in the Old Mormon Slough over the sand cap would be detrimental to the cap, and could lead to re-surfacing or resuspension of the contaminated sediment. See id. at DOJ285 (access controls were needed to prevent "dredging or other uses of the slough that would be detrimental to the cap and could lead to re-surfacing and/or resuspension of the contaminated sediment"); see also Ex. 20 at 3.12 ("The integrity of the cap could also be destroyed by future activities in the slough (e.g., prop wash from barges, future dredging)"; "[S]and caps can be susceptible to erosion in a high-energy environment."); id. at DOJ253 (the log boom would "prevent inadvertent erosion (via boat prop wash) and resuspension of the surface sediment (and 'hot spots')"); Ex. 31 at 59:20-21 (Marie Lacey testifying that "the sand cap isolates the contamination so it can't migrate anymore"); see also Ex. 25 (EPA's Final Design Analysis Report, discussing, *inter alia*, performance objectives of the Sediment Cap).

48. EPA also recognized that restricting boat access in the Old Mormon Slough would reduce "human exposure to contaminated fish and sediment." Ex. 20 at DOJ252; see also id. at DOJ238 ("Access and use restrictions reduce the likelihood of exposure to contaminants arising from trespassing, future development, or excavation at the site."); id. at DOJ239 ("log booms would be placed to limit water traffic (boats and barges) into all or portions of the slough. These supplemental access restrictions could reduce direct human exposure to contaminated sediments in Old Mormon Slough and indirect exposure via consumption of fish caught in the slough. . . ." ); Ex. 31 at 59:17-21 (the purpose of

the sand cap was to isolate the contamination so that it would not migrate); id. at 38:15-18 (explaining that humans could come into contact with contaminants in the channel "if they were dropping an anchor in the slough and pulling it up, if they were fishing for crawdads with cages, pulling those up from the bottom").

49. On March 31, 1999, EPA issued a Record of Decision ("ROD") to present EPA's selected remedial action for the M&B Site, including EPA's action with respect to the contaminated sediment in the Old Mormon Slough. See Ex. 21. As discussed in the ROD, EPA selected alternative "SD-2: In Situ Capping" as the most appropriate remedy. See id. at DOJ358-59.

50. As noted in the ROD, the sand cap was expected to extend "approximately 2,330 ft long by approximately 167 ft wide [and] cover an estimated 8.8 acres." Id. at DOJ358. The ROD described that "institutional controls would be implemented for the capped portion of Old Mormon Slough to prevent inadvertent erosion or other disruption of in-situ sediment cap materials that would cause exposure of more highly contaminated sediment under the cap." Id. at DOJ359.

51. On May 7, 1999, the Chief of California's Department of Toxic Substances Control indicated the State's "concur[rence] with the selection of the final remedies for vadose soil and Old Mormon Slough sediments and the interim remedy for groundwater presented in the ROD. Also, we look forward to proceeding with the Design for the Sediment Cap, implementation of the associated institutional controls, and execution of the State Superfund Contract." Ex. 22.

**EPA's Discussion of the ROD with Dutra, the Owner of the Subject Property**

52. On September 22, 1999, representatives from EPA met with representatives of The Dutra Group ("Dutra"), the owner of the Subject Property at that time, to discuss EPA's planned remedy in the Old Mormon Slough. See Ex. 29 at ¶ 3; Ex. 31 at 29:1-3.

53. One of the issues discussed during the September 1999 meeting was EPA's decision to install a "permanent log boom after cap construction is completed." See Ex. 29 at ¶3; see also Ex. 31 at 29:4-15.

54. During the September 1999 meeting, EPA gave Kenneth Smith, counsel for Dutra, maps of the Subject Property that showed, *inter alia*, the "approximate location of the permanent log boom placed by EPA and the relative locations of the Subject Property and the [M&B Site]." Ex. 29, ¶ 3; Ex. 29 at DOJ437.

55. The log boom currently in place is in the same location identified in the map provided to Dutra at the September 1999 meeting. Compare Ex. 29 at DOJ435 with Ex. 5.

56. On October 20, 1999, Mr. Smith (writing on behalf of Dutra), sent EPA a letter about EPA's selected remedy. See Ex. 29, ¶ 10; id. at DOJ453. In his letter, Mr. Smith argued that EPA's selected remedy would deprive Dutra of its ability to access a portion of its property via the Old Mormon Slough, and result in "severe [economic] damage." Id. at DOJ454.

57. Mr. Smith requested EPA consider an alternative remedy, which Mr. Smith believed would be more beneficial to Dutra. See id. at DOJ453.

58. When Mr. Smith sent his letter in late 1999, EPA was preparing to investigate possible deep subsurface migration of contaminants from the M&B Site, northward under the Old

Mormon Slough to the Subject Property. See id. at DOJ455.

59. EPA agreed to consider Dutra's proposal, but informed Dutra that EPA intended to first investigate the possible spread of contaminants. See id. at DOJ455.

**Plaintiffs' Acquisition of the Subject Property**

**The August 2000 Option Agreement**

60. Approximately a year-and-a-half after EPA issued the March 1999 ROD, Plaintiff CRV took steps to acquire the Subject Property from Dutra. See, e.g., id., ¶ 5.

61. "Dutra representatives fully disclosed the existence of the [M&B] Site, as well as EPA's planned remedy in the Old Mormon Slough . . . to CRV representatives, including Roger Beck and Ernie Pearson, before Dutra [] and CRV entered into a contractual relationship." Id., ¶ 6.

62. Plaintiff CRV entered into an Option Agreement with Dutra on August 25, 2000. See id. at DOJ440.

63. The Option Agreement explicitly recognized the existence of the M&B Site "opposite the [Subject] Property, on Mormon Slough, the Slough itself, and the 'Hazardous Substances' located thereon or thereunder. . . ." Id. at DOJ442.

64. Plaintiff Voorhees "didn't read this contract very thoroughly before signing it." Ex. 30 at 52:2-6.

65. On November 30, 2000, EPA responded to Dutra's proposed alternative remedy, stating that "based on our analysis of the information available, EPA does not believe a change in the remedy selected is warranted." Ex. 29 at DOJ461; see also id. ¶ 14. The EPA concluded that Dutra's proposal "would not meet human health and environmental

protection requirements" or satisfy EPA's obligations under its CERCLA mandates. See Ex. 23 at DOJ375.

66. In analyzing Dutra's proposal, EPA determined that "[s]tandard tugs and barges would scour sandy cap materials at these water depths [10-12 feet]," and efforts to counteract that scouring effect would require a decrease in the channel depth, which would "adversely affect [Dutra's] maneuvering of tugs, barges and dredges in the slough." Id. at DOJ376. Accordingly, EPA concluded that Dutra's proposal would "not meet Dutra's stated need for site access." Id.

67. In addition, EPA determined that dredging only a portion of the channel, as proposed by Dutra, was not practical, resulting in sediment slough into any dredge cut. See id. at DOJ376.

68. EPA also determined that Dutra's proposal would pose additional risks to workers and to the public as wastes were transported from the site for incineration. See id. at DOJ382-83.

69. EPA estimated that the cost of Dutra's proposal would be more than $21.6 million, compared to an estimated $1.9 million under Alternative SD-2. See id. at DOJ383.

**Amendments to the Option Agreement and Purchase of the Subject Property**

70. On October 1, 2001, Dutra and Plaintiff CRV amended the Option Agreement, by which Plaintiff CRV agreed to immediately exercise its option, and close escrow on February 1, 2002. See id. at DOJ466.

71. Plaintiff CRV signed the October 1, 2001 amendment in order to obtain certain entitlements from the City of Stockton. See Ex. 30 at 98:21 to 99:4.

72. On October 26, 2001, EPA reiterated its position that Dutra's proposal was unacceptable by transmitting to Dutra a proposed schedule for implementation of the ROD. See Ex. 29 at DOJ462.

73. On November 29, 2001, representatives from EPA, Dutra, and Plaintiffs met to discuss EPA's remediation plans. See Ex. 24.

74. On January 21, 2002, Plaintiff CRV wrote a letter to Dutra's attorney, Bob Goodman, indicating that implementation of "EPA plans" would reduce the value of the Subject Property. Ex. 26.

75. On January 31, 2002, Dutra and Plaintiff CRV entered into a Second Amendment to Option to Purchase, which extended the close of escrow was extended until May 1, 2002 "or until Optionor and Optionee negotiate a mutually acceptable agreement with the United States [EPA] as to their remediation of contaminated sediment in Old Mormon Slough, as it affects utilization of the Subject Property, whichever last occurs." Ex. 29 at DOJ468.

76. On August 26, 2002, EPA met with representatives from Dutra and Plaintiffs again. See Ex. 27. Among the issued discussed during the August 2002 meeting was the "[p]ermanent [p]ost-[c]onstruction [i]mpacts," and Dutra's "Takings Claim." Ex. 28.

77. On October 15, 2002, Plaintiff CRV and Dutra signed a Third Amendment to the Option Agreement, in which Plaintiff CRV and Dutra agreed that escrow would close on November 1, 2002. See Ex. 29 at DOJ470.

78. On October 28, 2002, Plaintiff CRV and Dutra signed a Fourth Amendment to the Option Agreement, in which the parties recognized that EPA had taken the position that it had

"no legal obligation to reimburse Optionor for any damage or injury to the Subject Property, and Optionor has been unable to negotiate a mutually acceptable agreement with EPA as to the Remedy, and its effects on the utilization of the Subject Property. . . ." . See id. at DOJ472. In addition, in the Fourth Amendment to the Option Agreement, Dutra attempted to transfer and assign its rights to Plaintiff CRV against the United States for "any loss of use and/or taking of real property arising from or relating to EPA's implementation of the Remedy. . . ." Id. at DOJ473.

79. On October 29, 2002, Plaintiffs wrote a letter to Eric Kapeller, a business associate, indicating that Plaintiffs and Dutra had prepared an appraisal to "substantiate a claim that the current owner [Dutra] has against the EPA." Id. at DOJ469A. Plaintiffs' October 29, 2002 letter indicated that Plaintiffs were "confident that the value is there and that is why [they] intend to close escrow." Id.

80. Notwithstanding EPA's decision to block navigational access in the Mormon Channel, Plaintiff CRV closed escrow and completed its acquisition of the Subject Property on October 29, 2002. See Ex. 1 (deed).

81. On October 20, 2004, Plaintiff CRV deeded the Subject Property to Plaintiff Voorhees. See Ex. 2 (deed); Ex. 34 at DOJ540 (Plaintiffs' discovery response).

82. In the fall of 2002, EPA performed bank stabilization activities in order to implement Phase I of the sediment remedy selected in the ROD. See Ex. 36.

83. Between June and September 2006, EPA implemented Phase II of the sediment remedy selected in the ROD by placing the sand cap in the Old Mormon Slough and installing the permanent log boom, which blocks navigational access to that portion of the Old

Mormon Slough lying south of the log boom. See Am. Compl., ¶ 24; Ex. 31 at 125:2-8 (describing these actions).

84. No part of the sand cap or the log boom is actually located on the Subject Property. See Ex. 5.

85. But for EPA's cleanup activities on the M&B Site, including EPA's cleanup activities to address the contamination in the Old Mormon Slough, contamination from the M&B Site would continue to leach into the waters of the Old Mormon Slough. See Ex. 21 at DOJ315; Ex. 18 at DOJ180.

Respectfully submitted this 15th of April, 2008.

RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division

/s/ William J. Shapiro
WILLIAM J. SHAPIRO
Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
501 I Street
Suite 9-700
Sacramento, CA 95814
916-930-2207 (phone)
916-930-2210 (fax)

Attorney for Defendant

Of Counsel:
Laurie Williams
Assistant Regional Counsel
U.S. EPA Region 9
75 Hawthorne Street
San Francisco, CA 94105