John H. Patton, California SBN 069261
Matthew K. Wisinski, California SBN 195535
SHAPIRO BUCHMAN PROVINE & PATTON, LLP
1333 North California Boulevard, Suite 350
Walnut Creek, CA 94596
Telephone: (925) 944-9700
Facsimile: (925) 944-9701
E-mail: jpatton@sbllp.com

Attorneys for Plaintiffs CRV Enterprises, Inc.
and C. Ryan Voorhees

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**CRV ENTERPRISES, INC., a California corporation, C. Ryan Voorhees, an individual,**

Plaintiffs,

vs.

**THE UNITED STATES OF AMERICA,**

Defendant.

No. 06-660L

**PLAINTIFFS CRV ENTERPRISES, INC. AND C. RYAN VOORHEES' RESPONSE TO PROPOSED FINDINGS OF UNCONTROVERTED FACT RE DEFENDANT UNITED STATES' MOTIONS FOR DISMISSAL OR SUMMARY JUDGMENT**

Date: To be assigned by the Court
(Telephonic scheduling conference requested)
Judge: George W. Miller

Pursuant to Rule 56(h)(2) of the Rules of the Court of Federal Claims ("RCFC"), plaintiffs C. Ryan Voorhees and CRV Enterprises respectfully submit the following response to the proposed findings of uncontroverted fact submitted by defendant The United States of America ("the Government") in support of its motions for dismissal or summary judgment.

## Description of the Subject Property

| Finding No. | Proposed Fact/Response[1] |
|---|---|
| 1. | Plaintiffs C. Ryan Voorhees and CRV Enterprises ("CRV") are the current and former owners, respectively, of the "Subject Property." |
| | **Agreed.** |
| 2. | a) The Subject Property is adjacent to the Old Mormon Slough (also referred to as "the Slough"), a man-made waterway approximately 2,500-feet long and 180-feet wide.<br><br>**Agreed.**<br><br>b) The Subject Property is bounded by, but does not extend into, the Old Mormon Slough.<br><br>**Partially Disagreed. Most of the Subject Property is bounded by the OMS, except perhaps its northwesternmost portion, which may be beyond the mouth. Agreed that the Subject Property boundaries do not include the actual waters of the OMS.**<br><br>**BASIS FOR DISAGREEMENT: See Exhibits 1 and 8, 4/11 Voorhees Declaration; Exhibit 7, 4/11 Patton Declaration.** |
| 3. | a) "The majority of the slough is approximately [10 feet] deep; the mouth of the slough was dredged in 1987 to a depth of approximately [-16 feet] mean lower low water."<br><br>**Agreed that portions of the OMS, to the east of the Subject Property, were and are approximately 10 feet deep.**<br><br>**Partially Disagreed. All portions of the OMS adjacent to the Subject Property were dredged to a depth of approximately 16 feet in 1987, to serve Dutra Maritime Construction's ("Dutra") marine terminal.**<br><br>**BASIS FOR DISAGREEMENT: Figure 1.4, page 1.27 from (Final) January 1999 Surface Water Feasibility Study Report for the McCormick & Baxter Superfund Site ("M&B Site") [¶ 17, Exhibit 8, to Patton Opposition Declaration.]** |

[1] Plaintiffs' responses and additional undisputed material facts are shown in bold type for purposes of clarity.

| | |
|---|---|
| | b) Before 1986, the bed of the Slough adjacent to the earthen bank of the Subject Property was shallow, gradually increasing to two feet deep, several feet from the shoreline, and reaching depths of approximately ten to eleven feet in the deepest portions of the Slough.<br><br>**Agreed that prior to 1986, the deepest portions of the OMS were approximately 10-11 feet.**<br><br>**Partially Disagreed. Depending on where one was located along the bank of the Subject Property, the slope of the bed of the OMS varied, and the depth of the bed in relation to the shoreline varied. The two known profiles show varying slopes. The two known profiles indicate feasibility for use for small crafts (hull drafts < 3').**<br><br>**BASIS FOR DISAGREEMENT: See Cross-Section Profiles, page 2 of 12 from Dutra dredging plans, ¶ 14, Exhibit 6 to Patton Opposition Declaration; ¶ 9, Voorhees Opposition Declaration; ¶ 19, Benoit Opposition Declaration.**<br><br>c) In 1986, the United States Army Corps of Engineers issued a permit, pursuant to the Rivers and Harbors Act of 1899, 33 U.S.C. § 403 ("Permit" or "Permit NO. 9260"), which allowed the owner at the Subject Property (Bill Dutra) to dredge a portion of the Slough bordering the Subject Property to a uniform depth of sixteen feet and to construct approximately 1,400 feet of sheetpile wall and a bulkhead to permit the docking of large commercial vessels.<br><br>**Agreed. However, immaterial to plaintiffs' rights to just compensation for taking. See Voorhees Opposition Declaration, ¶ 14.**<br><br>d) The Permit did "not convey any property rights, either in real estate or material, or any exclusive privileges.<br><br>**Agreed.**<br><br>e) In addition, the Permit stated that Dutra "shall not be entitled to compensation for damage or injury to the structures or work authorized herein which may be caused by or result from existing or future operations undertaken by the United States in the public interest."<br><br>**Agreed. However, immaterial to plaintiffs' rights to just compensation for taking. See Voorhees Opposition Declaration, ¶ 14.** |
| 4. | Before 1970, the Old Mormon Slough was part of a larger waterway system. In 1970, portions of the larger waterway system were filled due to construction of Interstate Highway 1-5. The portion of the waterway adjacent to the Subject Property is designated "the Old Mormon Slough." The remaining section of the waterway, now on the eastern side of 1-5 is named "New Mormon Slough." |
| | **Agreed.** |

| | |
|---|---|
| 5. | The Subject Property includes a barge slip in the Old Mormon Slough, on the northwest corner of the tract. |
| | **Agreed.** |

**Description of the McCormick and Baxter Superfund Site**

| Finding No. | Proposed Fact/Response |
|---|---|
| 6. | South of the Old Mormon Slough, opposite the Subject Property, is an Environmental Protection Agency ("EPA") Superfund site known as the McCormick & Baxter Creosoting Co. Site ("M&B Site"). |
| | **Agreed.** |
| 7. | The source property that comprises most of the M&B Site was used for wood-preserving operations between 1942 and 1990. |
| | **Agreed.** |
| 8. | Past site activities on the M&B Site resulted in the release of wood-preserving chemicals to soils, groundwater, surface water, and the sediment of the Old Mormon Slough. |
| | **Agreed.** |

**California's Involvement with the M&B Site**

| Finding No. | Proposed Fact/Response |
|---|---|
| 9. | For several decades, M&B discharged stormwater from the M&B property into the adjacent Old Mormon Slough and the New Mormon Slough. |
| | **Agreed.** |
| 10. | In 1974, the California State Regional Water Quality Control Board ("Regional Board") issued M&B Order No. 74-407, which limited M&B's effluent discharge. |

| | |
|---|---|
| | **Agreed.** |
| 11. | Following their investigation, the Regional Board, the California Department of Fish and Game), and the City of Stockton determined that M&B was discharging waste into the New Mormon Slough via storm drains, which were not permitted under Order No. 74-407. |
| | **Agreed. However, fish kills in the New Mormon Slough are irrelevant to Government action in the OMS.** |
| 12. | In 1977, California DFG investigated a fish kill in the New Mormon Slough, and concluded that contaminated stormwater runoff from the M&B Site was responsible. |
| | **Agreed. However, fish kills in the New Mormon Slough are irrelevant to Government action in the OMS.** |
| 13. | Following its investigation of the fish kill, California DFG issued a Violation Report to M&B, noting a violation of Cal. Water Code § 5650(f). |
| | **Agreed. However, fish kills in the New Mormon Slough are irrelevant to Government action in the OMS.** |
| 14. | On December 23, 1977, the Regional Board informed M&B that the State's inspection found M&B "in threatened violation of" Order No. 74-407. |
| | **Agreed. However, fish kills in the New Mormon Slough are irrelevant to Government action in the OMS.** |
| 15. | In January 1978, the Regional Board issued a Cleanup and Abatement Order against M&B. |
| | **Agreed.** |
| 16. | The 1978 Cleanup and Abatement Order required M&B to abate the discharge of wastes and comply with a time schedule to assure adequate containment and disposal of all stormwater runoff containing toxic materials. |
| | **Agreed.** |
| 17. | In February 1978, the Regional Board conducted a public hearing and adopted Order No. 78-17, which referred to M&B case of the California Attorney General for discharge of wastes without a permit. |
| | **Agreed.** |
| 18. | Although M&B made certain corrections, it continued to make unpermitted discharges in violation of California law. |

| | |
|---|---|
| | **Agreed.** |
| 19. | Among other early cleanup efforts, the oily waste ponds (OWPs") were closed in 1981, "when approximately 635,000 kg (144 tons) of contaminated soil was removed from the [OWPs], and the area was covered with clean fill." |
| | **Agreed.** |
| 20. | In 1984, California's Department of Health Services ("DHS") noted "serious contamination" in its analysis of soil samples from the M&B Site. |
| | **Agreed.** |
| 21. | In 1984, M&B entered into an agreement with the State of California, which allowed the Regional Board and DHS to investigate and begin clean up activities. |
| | **Agreed.** |
| 22. | California's DHS prepared a hydrogeologic investigation in May 1984, which showed significant contamination and the need for additional investigation. |
| | **Agreed.** |
| 23. | M&B's efforts to remedy the contamination were unsuccessful. |
| | **Agreed.** |
| 24. | Several documented spills of site-related chemicals, including creosote and heavy fuel oil, into the Old Mormon Slough occurred between 1986 and 1987. |
| | **Agreed.** |
| 25. | In 1988, M&B declared bankruptcy, and in 1990, M&B ceased operations at the M&B Site. |
| | **Agreed.** |

EPA's Activities with respect to the M&B Site

| Finding No. | Proposed Fact/Response |
|---|---|
| 26. | a) In October 1992, EPA added the M&B Site to the National Priorities List ("NPL"), pursuant to the Comprehensive Environmental Response Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601, et seq., which allowed EPA to assume lead agency responsibility and use federal Superfund resources to cleanup the Site.<br><br>**Agreed.**<br><br>b) The contaminated portion of the Slough is part of the M&B Site pursuant to CERCLA, which specifies that the term "facility" for the proposed implementation of the remedy includes all locations where hazardous substances associated with the site "come to be located." 42 U.S.C. § 9601(9).<br><br>**Partially Disagreed. Plaintiffs do not contest whether CERCLA permits EPA activity within the OMS as "part of the M&B Site"; however plaintiffs do not agree that the OMS is physically part of the M&B Site, and it is important and material to differentiate between the M&B Site, which was a *source* of contamination, and the OMS, which was a *recipient, rather than a source*, of such contamination.** |
| 27. | EPA conducted several phases of investigation on the property between 1993 and 1996, and sampled soil, groundwater, and sediment. |
| | **Agreed.** |
| 28. | In 1994, EPA representatives observed a large oily sheen that began at the end of the Old Mormon Slough and extended three-quarters of the way to the mouth of the waterway, covering approximately 30% of the surface in some areas. |
| | **Agreed.** |
| 29. | In 1996, EPA installed a sheet-piling wall along a part of the shoreline of the M&B Site to prevent further chemical releases from the OWPs into the Old Mormon Slough. In 1997, EPA removed contaminated soil from behind the sheet-piling wall and replaced it with clean fill. EPA also covered the OWPs and central area of the M&B Site with clean fill and an asphalt cap. |
| | **Agreed, subject to additional proposed finding below.** |

| | |
|---|---|
| 29A. | **The EPA's 1996 activities listed in Proposed Finding No. 29 contained and prevented a substantial majority of the contamination from migrating into the OMS from the M&B Site after 1996.**<br><br>**Benoit Opposition Declaration, ¶ 9.** |
| 30. | EPA's investigation showed elevated levels of carcinogenic polynuclear aromatic hydrocarbons ("PAHs") and dioxins in the sediment bed of the Old Mormon Slough. |
| | **Agreed, subject to additional proposed finding below.** |
| 30A. | **The EPA's investigations listed in Proposed Finding No. 30 demonstrated that the contamination levels of PAHs and dioxins were far greater and more concentrated in the eastern portion of the OMS and along the southern shoreline adjacent to the M&B Site; and that areas closer to the Subject Property, on the northern side of the OMS, and moving west toward the mouth, had far lower levels of contaminants.**<br><br>**¶ 11, Benoit Opposition Declaration.** |
| 31. | EPA investigators determined that the depth of the oily soil in the Old Mormon Slough was between five and ten feet at most locations, but as deep as 18 to 29 feet below the sediment surface in some borings. |
| | **Agreed, subject to additional proposed finding below.** |
| 31A. | **The depth of contamination below the sediment surface indicated in Proposed Finding No. 31 is consistent with the fact that PAHs and dioxins do not readily dissolve; and sink, rather than float, and are thus unlikely to migrate.**<br><br>**¶ 12, Benoit Opposition Declaration.** |
| 32. | EPA had earlier conducted a Human Health Risk Assessment ("HHRA"), to address the potential human health risks posed by hazardous substances associated with the M&B Site, as well as an ecological risk assessment ("ERA"), to determine whether contamination from the M&B Site was affecting food web integrity and productivity. |
| | **Agreed, subject to additional proposed finding below.** |
| 32A. | **The HHRA was conducted in 1997.**<br><br>**Feasibility Report, Govt. Ex. 20, ¶ 1.2.7.1, page 1.19.** |

| | |
|---|---|
| 33. | EPA relied, in part, on interviews with residents of a nearby community, which showed that "[m]any people fish and camp illegally near the slough for recreation. Also, many transients, homeless people, and low-income neighbors depend on catching fish from the Port of Stockton to supplement their diets. Interviewees believed that people from Stockton's downtown shelter, Delta Gate and St. Mary's Dining Hall eat fish caught near the Port." |
| | **BASIS FOR DISAGREEMENT: Admission at ¶ 3.3 of 1993 Community Relations Plan, page 9 (Govt. Ex. 13, at DOJ046) that "No information was presented during the interviews relative to any health complaints associated with these activities."**<br><br>ADDITIONAL BASIS FOR DISAGREEMENT: **Admission at §1.2.6.3, page 1.18 of Feasibility Study (Govt. Ex. 20, at DOJ217) that "Boat traffic is rare in the eastern (stagnant) end of the slough, but barges occasionally use the dredged western portion, which contains the least-contaminated sediment."**<br><br>**Also disagreed, and object to as nonproven, irrelevant, and lacking necessary foundation, including numerous factors, such as quantities of people that fished in the OMS; frequency of fishing in the OMS; quantities of fish found in the OMS; frequency of fish being caught in the OMS; lack of connection of fish caught in the Port of Stockton to the OMS; levels of contamination found in fish; number of fish tested; date of fish testing (1994);and numerous other factors.**<br><br>BASIS FOR DISAGREEMENT: *See, e.g.*, ¶ 15, Benoit Opposition Declaration.<br><br>ADDITIONAL BASIS FOR DISAGREEMENT: Admission at ¶1.1 of 1993 Community Relations Plan, page 1 (Govt. Ex. 13 at DOJ038) that the Proposed Finding was "developed from" information gathered by the EPA during 9 personal interviews conducted in October of 1992.<br><br>ADDITIONAL BASIS FOR DISAGREEMENT: Admission at ¶1.2.7.2, Page 1.21, of Feasibility Report (Govt. Ex. 20) concerning Ecological Risk Assessment Findings: **"While some risk to receptor species was attributed to the presence of PAHs and dioxins, and possibly PCP, in surface sediments, there is no evidence of widespread impact to the aquatic ecosystem."** |
| 34. | Based on its extensive studies, EPA concluded that the contamination of the sediment in the Old Mormon Slough posed unacceptable risk to humans, who might use Old Mormon Slough for subsistence fishing, as well as unacceptable risks to certain fish species (termed "ecological receptors"). |

| | |
|---|---|
| | Disagreed, and object to as nonproven, irrelevant, and lacking necessary foundation, including numerous factors, such as quantities of people that fished in the OMS; frequency of fishing in the OMS; quantities of fish found in the OMS; frequency of fish being caught in the OMS; lack of connection of fish caught in the Port of Stockton to the OMS; levels of contamination found in fish; number of fish tested; date of fish testing (1994); and numerous other factors.<br><br>BASIS FOR DISAGREEMENT: *See, e.g.*, ¶ 15, Benoit Opposition Declaration.<br><br>ADDITIONAL BASIS FOR DISAGREEMENT: Admission at ¶1.2.7.2, Page 1.21, of Feasibility Report (Govt. Ex. 20) concerning Ecological Risk Assessment Findings: "While some risk to receptor species was attributed to the presence of PAHs and dioxins, and possibly PCP, in surface sediments, there is no evidence of widespread impact to the aquatic ecosystem."<br><br>ADDITIONAL BASIS FOR DISAGREEMENT: Admission at §1.2.6.3, page 1.18 of Feasibility Study (Govt. Ex. 20, at DOJ217) that "Boat traffic is rare in the eastern (stagnant) end of the slough, but barges occasionally use the dredged western portion, which contains the least-contaminated sediment." |
| 35. | EPA found that dioxin was present in the Old Mormon Slough sediment at 30 to 50 times the level at which no adverse effects were predicted to occur, and that PAHs were present at nearly 80 times the estimated safe level of contamination. |
| | Disagreed, and object to as irrelevant and immaterial to condition of OMS west of the property line for the Subject Property or at or near the Subject Property.<br><br>BASIS FOR DISAGREEMENT: Admission at ¶1.2.7.2, Page 1.22, of Feasibility Report (Govt. Ex. 20) concerning Ecological Risk Assessment Findings that presence of dioxin at levels indicated in Proposed Finding were found solely at "the END and off the CPA of Old Mormon Slough," which, respectively, were the east (stagnant) end of the slough (END), and M&B Central Processing Area (CPA), on the south side of the slough and well east of the Subject Property.<br><br>ADDITIONAL BASIS FOR DISAGREEMENT: Admission at ¶1.2.7.2, Page 1.22, of Feasibility Report (Govt. Ex. 20) concerning Ecological Risk Assessment Findings that presence of sediment LPAHs at levels indicated in Proposed Finding were found solely at "in the vicinity of the OWP," which was the south side of the slough directly adjacent to the M&B waste ponds, and at the opposite shore from the Subject Property. |

| | |
|---|---|
| | **ADDITIONAL BASIS FOR DISAGREEMENT: Admission at ¶1.2.7.2, Page 1.21, of Feasibility Report (Govt. Ex. 20) concerning Ecological Risk Assessment Findings: "While some risk to receptor species was attributed to the presence of PAHs and dioxins, and possibly PCP, in surface sediments, there is no evidence of widespread impact to the aquatic ecosystem."**<br><br>**ADDITIONAL BASIS FOR DISAGREEMENT: Admission at §1.2.6.3, page 1.18 of Feasibility Study (Govt. Ex. 20, at DOJ217) that "Boat traffic is rare in the eastern (stagnant) end of the slough, but barges occasionally use the dredged western portion, which contains the least-contaminated sediment."**<br><br>**ADDITIONAL BASIS FOR DISAGREEMENT: *See, e.g.,* ¶ 15, Benoit Opposition Declaration.** |
| 36. | Based on the high levels of contamination in the Old Mormon Slough sediments, EPA determined that "[i]f sediment contamination in the Old Mormon Slough is not addressed, it will continue to present a risk to ecological receptors, and to human receptors who consume significant quantities of certain fish species." |
| | **Disagreed, and object to as nonproven, irrelevant and lacking necessary foundation, including lack of evidence that "human receptors" consume sufficient quantities of sufficiently contaminated fish from the OMS to reach the level of significance demonstrated by the EPAs' standards (based on consumption of 1 whole fish 350 days per year for 30 years, based upon 1994 sampling of fish).**<br><br>**BASIS FOR DISAGREEMENT: Admission at ¶1.2.7.2, Page 1.21, of Feasibility Report (Govt. Ex. 20) concerning Ecological Risk Assessment Findings: "While some risk to receptor species was attributed to the presence of PAHs and dioxins, and possibly PCP, in surface sediments, there is no evidence of widespread impact to the aquatic ecosystem."**<br><br>**ADDITIONAL BASIS FOR DISAGREEMENT: Admission at §1.2.6.3, page 1.18 of Feasibility Study (Govt. Ex. 20, at DOJ217) that "Boat traffic is rare in the eastern (stagnant) end of the slough, but barges occasionally use the dredged western portion, which contains the least-contaminated sediment."**<br><br>**ADDITIONAL BASIS FOR DISAGREEMENT: *See, e.g.,* ¶¶ 6-15, Benoit Opposition Declaration; Feasibility Report, Govt. Ex. 20, ¶ 1.2.7.1, page 1.20, discussing Table 1.4.**<br><br>**Also irrelevant, as not proven that EPA's actions installing sand cap and log boom will in any way significantly reduce the "present a risk to ecological receptors, and to human receptors who consume significant quantities of certain fish species."** |

| | |
|---|---|
| | **BASIS FOR DISAGREEMENT:** ***See, e.g.,*** **¶¶ 6-15, Benoit Opposition Declaration; Lacey Deposition, Page 100, ¶ 15, Ex. 1, 4/11 Patton Declaration.** |

**EPA's Selection of a Remedy for the Contaminated Sediment in the Old Mormon Slough**

| Finding No. | Proposed Fact/Response |
|---|---|
| 37. | EPA analyzed a variety of alternative remedial actions to address the threat posed by the contamination at the M&B Site and in the Old Mormon Slough. |
| | **Agreed.** |
| 38. | In July 1998, EPA issued a Draft Surface Water-Sediment Feasibility Study Report for the M&B Site ("Draft FS"), to evaluate various remedial alternatives. Some of the possible remedies identified by EPA in the Draft FS, including "Alternative SD-2: In Situ Capping," involved installation of a sand cap - a layer of fine sand, approximately two feet thick, which would physically cover approximately three-fourths of the bottom of the Old Mormon Slough - in order to contain the contaminated sediment in the Slough. |
| | **Agreed, subject to additional proposed finding below.** |
| 38A. | **While the EPA issued the Feasibility Report listed in Proposed Finding No. 38, there is no evidence that it provided the report to plaintiffs or plaintiffs' predecessor, or were known to either, at any time relevant to the takings claim.** |
| 39. | In addition, the Draft FS included discussion of possible "institutional controls…for the capped portion of the Old Mormon Slough…to prevent inadvertent erosion or other disruption of in situ sediment cap materials that would cause exposure to more highly contaminated sediment under the cap." |
| | **Agreed, subject to additional proposed finding below.** |
| 39A. | **While the EPA issued the Feasibility Report listed in Proposed Finding No. 39, there is no evidence that it provided the report to plaintiffs or plaintiffs' predecessor, or were known to either, at any time relevant to the takings claim.** |

| | |
|---|---|
| 40. | In September 1998, EPA issued a Proposed Plan for the final soil and sediment remedies and an interim ground water remedy for a 30-day public comment period. The Proposed Plan discussed EPA's preliminary determination that "SD-2: In Situ Capping" was the most appropriate remedy to address the contamination in the Old Mormon Slough. |
| | **Partially agreed that EPA issued a proposed plan for final remedies in September 1998 that discussed alternative SD-2.**<br><br>**Disagreed, and object to as irrelevant and lacking necessary foundation, including evidence that EPA provided the proposed plan or notified the then-owner of the Subject Property of such proposed plan; as well as evidence that issuance of the proposed plan has any material relevance to the Government's physical taking of plaintiffs' property rights in 2006.** |
| 41. | EPA conducted a public meeting on September 28, 1998, and granted a 30-day extension of the public comment period until November 16, 1998. |
| | **Partially agreed that EPA conducted a meeting on September 28, 1998 and granted an extension for public comment.**<br><br>**Disagreed, and object to as irrelevant and lacking necessary foundation, including evidence that EPA notified the then-owner of the Subject Property of such public meeting, public comment, or extension thereof; as well as evidence that comment on the proposed plan has any material relevance to the Government's physical taking of plaintiffs' property rights in 2006.** |
| 42. | EPA provided public notice of the Proposed Plan on October 7, 1998, and specifically noted the proposed installation of the sand cap and the restrictions on the use of the Slough. |
| | **Disagreed, and object to as irrelevant and lacking necessary foundation, including evidence if or how the EPA provided the then-owner of the Subject Property "public notice" of its proposed plan; if or how the EPA notified plaintiffs' predecessor of the proposed plan; as well as evidence that notice of the proposed plan has any material relevance to the Government's physical taking of plaintiffs' property rights in 2006.** |
| 43. | In January 1999, EPA issued a Final Surface Water-Sediment Feasibility Study Report ("Final FS"), which described EPA's extensive investigation of the contamination in the Old Mormon Slough, and evaluated the remedial alternatives. |
| | **Agreed, subject to additional proposed finding below.** |

| | |
|---|---|
| 43A. | **While the EPA issued the Feasibility Report listed in Proposed Finding No. 38, there is no evidence that it provided the report to plaintiffs or plaintiffs' predecessor, or were known to either, at any time relevant to the takings claim.** |
| 44. | The Final FS, like the Draft FS, discussed the sand cap and institutional controls in detail, including diagrams of the location of the sand cap and the log boom. |
| | **Agreed, subject to additional proposed finding below.** |
| 44A. | **While the EPA issued the Feasibility Report listed in Proposed Finding No. 44, there is no evidence that it provided the report to plaintiffs or plaintiffs' predecessor, or were known to either, at any time relevant to the takings claim.** |
| 45. | In the Final FS, EPA explained that sand caps in these type of environments are a "fairly common and proven method of containing contaminated sediment." |
| | **Disagreed, and object to as irrelevant and lacking necessary foundation, including evidence that contaminated sediment 16' under the surface of the OMS required any further action, such as a sand cap, to remain contained.**<br><br>**BASIS FOR DISAGREEMENT:** ***See, e.g.*, Benoit Opposition Declaration, ¶ 14.** |
| 46. | Although a sand cap can isolate hazardous contaminants in place, EPA recognized that it was essential to protect the integrity of the cap by restricting boat access in the Old Mormon Slough. |
| | **Disagreed, and object to as an inadmissible and speculative conclusion of law, and as irrelevant, unproven, and lacking necessary foundation, including evidence that restricting boat access in the OMS was "essential" to protect the integrity of the cap.**<br><br>**BASIS FOR DISAGREEMENT:** ***See, e.g.*, Benoit Opposition Declaration, ¶¶ 6-30; Lacey Deposition, Pages 66-68, 108-109, 114-15, ¶ 12, Ex. 1 to 4/11 Patton Declaration.**<br><br>**ADDITIONAL BASIS FOR DISAGREEMENT: Admission at §1.2.6.3, page 1.18 of Feasibility Study (Govt. Ex. 20, at DOJ217) that "Boat traffic is rare in the eastern (stagnant) end of the slough, but barges occasionally use the dredged western portion, which contains the least-contaminated sediment."** |
| 47. | EPA determined that permitting boat traffic in the Old Mormon Slough over the sand cap would be detrimental to the cap, and could lead to re-surfacing or resuspension of the contaminated sediment. |

| | |
|---|---|
| | Disagreed, and object to as an inadmissible and speculative conclusion of law, and as irrelevant, unproven, and lacking necessary foundation, including evidence that permitting boat traffic in the OMS would be "detrimental" to the cap, or could lead to re-surfacing or resuspension of the contaminated sediment.<br><br>BASIS FOR DISAGREEMENT: *See, e.g.,* Benoit Opposition Declaration, ¶¶ 6-30; Lacey Deposition, Pages 66-68, 108-109, 114-15, ¶ 12, Ex. 1 to 4/11 Patton Declaration.<br><br>ADDITIONAL BASIS FOR DISAGREEMENT: Admission at §1.2.6.3, page 1.18 of Feasibility Study (Govt. Ex. 20, at DOJ217) that "Boat traffic is rare in the eastern (stagnant) end of the slough, but barges occasionally use the dredged western portion, which contains the least-contaminated sediment." |
| 48. | EPA also recognized that restricting boat access in the Old Mormon Slough would reduce "human exposure to contaminated fish and sediment." |
| | Disagreed, and object to as an inadmissible and speculative conclusion of law, and as irrelevant, unproven, and lacking necessary foundation, including evidence that restricting boat access in the Old Mormon Slough would reduce "human exposure to contaminated fish and sediment."<br><br>BASIS FOR DISAGREEMENT: *See, e.g.,* Benoit Opposition Declaration, ¶¶ 6-30; Lacey Deposition, Pages 66-68, 100, 108-109, 114-15, 128, ¶¶ 12, 15, 18, Ex. 1 to 4/11 Patton Declaration.<br><br>ADDITIONAL BASIS FOR DISAGREEMENT: Admission at ¶1.2.7.2, Page 1.21, of Feasibility Report (Govt. Ex. 20) concerning Ecological Risk Assessment Findings: "While some risk to receptor species was attributed to the presence of PAHs and dioxins, and possibly PCP, in surface sediments, there is no evidence of widespread impact to the aquatic ecosystem."<br><br>ADDITIONAL BASIS FOR DISAGREEMENT: Admission at ¶ 3.3 of 1993 Community Relations Plan, page 9 (Govt. Ex. 13, at DOJ046) that "No information was presented during the interviews relative to any health complaints associated with these activities [fishing]."<br><br>ADDITIONAL BASIS FOR DISAGREEMENT: Admission at §1.2.6.3, page 1.18 of Feasibility Study (Govt. Ex. 20, at DOJ217) that "Boat traffic is rare in the eastern (stagnant) end of the slough, but barges occasionally use the dredged western portion, which contains the least-contaminated sediment." |

| | |
|---|---|
| 49. | On March 31, 1999, EPA issued a Record of Decision ("ROD") to present EPA's selected remedial action for the M&B Site, including EPA's action with respect to the contaminated sediment in the Old Mormon Slough. As discussed in the ROD, EPA selected alternative "SD-2: In Situ Capping" as the most appropriate remedy. |
| | **Partially agreed that the EPA issued a ROD on March 31, 1999, subject to objection below, and additional proposed findings below.**<br><br>**Disagreed, and object to as irrelevant, and lacking necessary foundation, including evidence that the ROD was published in the Federal Register; evidence that plaintiffs or their predecessor were put on notice, actual or constructive, of the ROD at any time relevant to the takings claim; and the fact that the issuance of the ROD is itself irrelevant to a physical takings claim.** |
| 49A. | ***CRV I*, a takings claim against the Government for the same property on the same legal theory, was timely filed on April 30, 2003.**<br><br>**¶ 3, Patton Opposition Declaration.** |
| 49B. | **Beginning in the Spring of 2004, and continuing through May 4, 2005, the Government took the position in *CRV I* that plaintiffs' takings claim was premature and not ripe because "CRV has not suffered a concrete injury because it has not been denied access to either the Old Mormon Slough or the Stockton Channel, and in fact still maintains access to the Old Mormon Slough via the Maritime Facility."**<br><br>**Exs. 1-5, ¶¶ 3-13, Patton Opposition Declaration.** |
| 49C. | **Because of and relying on the Government's position that *CRV I* was premature and not ripe because "CRV has not suffered a concrete injury," and to conserve resources, plaintiff CRV stipulated with the Government to dismiss *CRV I* without prejudice on May 4, 2005, which stipulation was entered May 18, 2005.**<br><br>**Ex. 5, ¶¶ 11-13, Patton Opposition Declaration.** |
| 49D. | **The Government did not complete installation of its sand cap and log boom within the OMS until September of 2006.**<br><br>**¶ 29, 4/11 Voorhees Declaration.** |

| | |
|---|---|
| 50. | As noted in the ROD, the sand cap was expected to extend "approximately 2,330 feet long by approximately 167 ft wide [and] cover an estimated 8.8 acres." The ROD described that "institutional controls would be implemented for the capped portion of Old Mormon Slough to prevent inadvertent erosion or other disruption of in-situ sediment cap materials that would cause exposure of more highly contaminated sediment under the cap." |
| | **Partially agreed that the EPA issued a ROD on March 31, 1999, which stated the items listed in Proposed Finding No. 50, subject to objection below.** |
| | **Disagreed, and object to as irrelevant, and lacking necessary foundation, including failure of evidence that the ROD was published in the Federal Register; failure of evidence that plaintiffs or their predecessor were put on notice, actual or constructive, of the ROD at any time relevant to the takings claim; and the fact that the issuance of the ROD is itself irrelevant to a physical takings claim.**<br><br>**Further, the undisputed facts set forth in Items 49A-49D also establish issuance of the ROD to be irrelevant and immaterial to determination of plaintiffs' right to just compensation, or to the Government's statute of limitations.** |
| 51. | On May 7, 1999, the Chief of California's Department of Toxic Substances Control indicated the State's "concur[rence] with the selection of the final remedies for vadose soil and Old Mormon Slough sediments and the interim remedy for groundwater presented in the ROD. Also, we look forward to proceeding with the Design for the Sediment Cap, implementation of the associated institutional controls, and execution of the State Superfund Contract." |
| | **Partially agreed only that the chief of a *branch* of the Dept. of Toxic Substances Control indicated *the Department's* concurrence with the selected remedies.** |
| | **Disagreed that such concurrence establishes any fact relevant to determination of plaintiffs' right to just compensation. Such concurrence does not establish any consideration, let alone determination, by any state governmental entity that plaintiffs' uses or intended uses of the Subject Property constituted or would constitute a public or private nuisance.** |

## EPA's Discussion of the ROD with Dutra, the Owner of the Subject Property

| Finding No. | Proposed Fact/Response |
|---|---|
| 52. | On September 22, 1999, representatives from EPA met with representatives of The Dutra Group ("Dutra"), the owner of the Subject Property at that time, to discuss EPA's planned remedy in the Old Mormon Slough. |
| | **Agreed, subject to the following reservation, and additional undisputed material facts set forth below. This fact is irrelevant and immaterial to determination of plaintiffs' rights to just compensation. If offered for purposes of the Government's statute of limitations defense, it is irrelevant and immaterial, as occurring within 6 years of the filing of the Complaint in the above-entitled action (as well as *CRV I*).** |
| 52A. | **Plaintiffs had no knowledge or participation in this meeting at any time material to determination of plaintiffs' rights to just compensation.**<br><br>**Voorhees Opposition Declaration, ¶ 7.** |
| 53. | One of the issues discussed during the September 1999 meeting was EPA's decision to install a "permanent log bloom after cap construction is completed." |
| | **Agreed, subject to the following reservation, and additional undisputed material facts set forth above in Item 52A. This fact is irrelevant and immaterial to determination of plaintiffs' rights to just compensation for a physical taking. If offered for purposes of the Government's statute of limitations defense, it is irrelevant and immaterial, as occurring within 6 years of the filing of the Complaint in the above-entitled action, on September 19, 2006 (as well as *CRV I*).** |
| 54. | During the September 1999 meeting, EPA gave Kenneth Smith, counsel for Dutra, maps of the Subject Property that showed, *inter alia*, the "approximate location of the permanent log boom placed by EPA and the relative locations of the Subject Property and the [M&B Site]." |

| | |
|---|---|
| | **Agreed, subject to the following reservation, and additional undisputed material facts set forth above in Item 52A. This fact is irrelevant and immaterial to determination of plaintiffs' rights to just compensation for a physical taking. If offered for purposes of the Government's statute of limitations defense, it is irrelevant and immaterial, as occurring within 6 years of the filing of the Complaint in the above-entitled action on September 19, 2006 (as well as *CRV I*).** |
| 55. | The log boom currently in place is in the same location identified in the map provided to Dutra at the September 1999 meeting. |
| | **Agreed, subject to the following reservation, and additional undisputed material facts set forth above in Item 52A. This fact is irrelevant and immaterial to determination of plaintiffs' rights to just compensation for a physical taking. If offered for purposes of the Government's statute of limitations defense, it is irrelevant and immaterial, as occurring within 6 years of the filing of the Complaint in the above-entitled action on September 19, 2006 (as well as *CRV I*).** |
| 56. | On October 20, 1999, Mr. Smith (writing on behalf of Dutra), sent EPA a letter about EPA's selected remedy. In his letter, Mr. Smith argued that EPA's selected remedy would deprive Dutra of its ability to access a portion of its property via the Old Mormon Slough, and result in "severe [economic] damage." |
| | **Agreed, subject to the additional undisputed material facts set forth above in Item 52A.** |
| 57. | Mr. Smith requested EPA consider an alternative remedy, which Mr. Smith believed would be more beneficial to Dutra. |
| | **Agreed, subject to the additional undisputed material facts set forth above in Item 52A.** |
| 58. | When Mr. Smith sent his letter in late 1999, EPA was preparing to investigate possible deep subsurface migration of contaminants from the M&B Site, northward under the Old Mormon Slough to the Subject Property. |
| | **Agreed, subject to the following reservation, and additional undisputed material facts set forth above in Item 52A. This fact is irrelevant and immaterial to determination of plaintiffs' rights to just compensation for a physical taking.** |
| 59. | EPA agreed to consider Dutra's proposal, but informed Dutra that EPA intended to first investigate the possible spread of contaminants. |
| | **Agreed, subject to the following reservation, and additional undisputed material facts set forth above in Item 52A and below.** |

| | |
|---|---|
| 59A. | **By asserting that the EPA agreed to consider Dutra's proposal, the Government admits that it continued to negotiate with Dutra and later with plaintiffs for alternatives to its planned log boom and sand cap measures in the OMS.** |

**Plaintiffs' Acquisition of the Subject Property**

**The August 2000 Option Agreement**

| Finding No. | Proposed Fact/Response |
|---|---|
| 60. | Approximately a year-and-a-half after EPA issued the March 1999 ROD, Plaintiff CRV took steps to acquire the Subject Property from Dutra. |
| | **Agreed, subject to the undisputed additional material facts set forth below.** |
| 60A. | **At the time plaintiff CRV took steps to acquire the Subject Property from Dutra, plaintiffs CRV and Voorhees were unaware of and had not been informed of any ROD.**<br><br>**Voorhees Opposition Declaration, ¶ 7.** |
| 61. | "Dutra representatives fully disclosed the existence of the [M&B] Site, as well as EPA's planned remedy in the Old Mormon Slough…to CRV representatives, including Roger Beck and Ernie Pearson, before Dutra [] and CRV entered into a contractual relationship." |
| | **Disagreed.**<br><br>**No foundational evidence establishing that disclosure to Roger Beck or Ernie Pearson constituted authorized disclosure to CRV or Ryan Voorhees.**<br><br>**No foundational evidence establishing that Dutra, Roger Beck, or Ernie Pearson made disclosure to CRV or Ryan Voorhees.**<br><br>**BASIS FOR DISAGREEMENT: Voorhees Opposition Declaration, ¶¶ 4-7.** |
| 62. | Plaintiff CRV entered into an Option Agreement with Dutra on August 25, 2000. |
| | **Agreed.** |

| | |
|---|---|
| 63. | The Option Agreement explicitly recognized the existence of the M&B Site "opposite the [Subject] Property, on Mormon Slough, the Slough itself, and the "Hazardous Substances' located thereon or thereunder…" |
| | **Agreed.** |
| 64. | Plaintiff Voorhees "didn't read this contract very thoroughly before signing it." |
| | **Agreed that the cited deposition testimony was given.**<br><br>**Disagreed that this fact has any relevance or materiality to determination of plaintiffs' rights to just compensation for a physical taking.** |
| 65. | On November 30, 2000, EPA responded to Dutra's proposed alternative remedy, stating that "based on our analysis of the information available, EPA does not believe a change in the remedy selected is warranted. The EPA concluded that Dutra's proposal "would not meet human health and environmental protection requirements" or satisfy EPA's obligations under its CERCLA mandates. |
| | **Agreed that EPA sent the November 30, 2000 letter to Dutra, as reflected above.**<br><br>**Disagreed that this fact has any relevance or materiality to determination of plaintiffs' rights to just compensation for a physical taking.**<br><br>**No foundation or evidence that this communication was provided or known to plaintiffs at any time relevant to their claim for just compensation.**<br><br>BASIS FOR DISAGREEMENT: Voorhees Opposition Declaration, ¶¶ 4-7.<br><br>**No underlying foundation provided for EPA's conclusions about meeting human and environmental protection requirements or satisfying EPA obligations.**<br><br>BASIS FOR DISAGREEMENT: Benoit Opposition Declaration, ¶¶ 6-30; Lacey Deposition, Pages 66-68, 100, 108-109, 114-15, 128, ¶¶ 12, 15, 18, Ex. 1 to 4/11 Patton Declaration. |

| | |
|---|---|
| 66. | In analyzing Dutra's proposal, EPA determined that "[s]tandard tugs and barges would scour sandy cap materials at these water depths [10-12 feet]," and efforts to counteract that scouring effect would require a decrease in the channel depth, which would "adversely affect [Dutra's] maneuvering of tugs, barges and dredges in the slough." Accordingly, EPA concluded that Dutra's proposal would "not meet Dutra's stated need for site access." |
| | **Agreed that EPA sent the November 30, 2000 letter to Dutra, as reflected above.**<br><br>**Disagreed that this fact has any relevance or materiality to determination of plaintiffs' rights to just compensation for a physical taking.**<br><br>**No foundation or evidence that this communication was provided or known to plaintiffs at any time relevant to their claim for just compensation.**<br><br>BASIS FOR DISAGREEMENT: **Voorhees Opposition Declaration, ¶¶ 4-7.**<br><br>**No underlying foundation provided for EPA's conclusions about a water depth of 10-12 feet, when established that water depth in OMS was 16 feet to east edge of Subject Property as of 2000.**<br><br>BASIS FOR DISAGREEMENT: **Figure 1.4, page 1.27 from (Final) January 1999 Surface Water Feasibility Study Report for the McCormick & Baxter Superfund Site ("M&B Site") [¶ 17, Exhibit 8, to Patton Opposition Declaration.]**<br><br>**Irrelevant and immaterial to plaintiffs' use and planned use of the Subject Property's shoreline as a small boat marina.**<br><br>BASIS FOR DISAGREEMENT: **Voorhees Opposition Declaration, ¶ 9, Exhibit 1.**<br><br>**No underlying foundation provided for EPA's conclusions of potential damage to sand cap.**<br><br>BASIS FOR DISAGREEMENT: **Benoit Opposition Declaration, ¶¶ 6-30; ; Lacey Deposition, Pages 66-68, 108-109, 114-15, ¶ 12, Ex. 1 to 4/11 Patton Declaration.** |
| 67. | In addition, EPA determined that dredging only a portion of the channel, as proposed by Dutra, was not practical, resulting in sediment slough into any dredge cut. |
| | **Agreed that EPA sent the November 30, 2000 letter to Dutra, as reflected above.** |

| | |
|---|---|
| | **Disagreed that this fact has any relevance or materiality to determination of plaintiffs' rights to just compensation for a physical taking.**<br><br>**No foundation or evidence that this communication was provided or known to plaintiffs at any time relevant to their claim for just compensation.**<br><br>**BASIS FOR DISAGREEMENT: Voorhees Opposition Declaration, ¶¶ 4-7.** |
| 68. | EPA also determined that Dutra's proposal would pose additional risks to workers and to the public as wastes were transported from the site for incineration. |
| | **Agreed that EPA sent the November 30, 2000 letter to Dutra, as reflected above.**<br><br>**Disagreed that this fact has any relevance or materiality to determination of plaintiffs' rights to just compensation for a physical taking.**<br><br>**No foundation or evidence that this communication was provided or known to plaintiffs at any time relevant to their claim for just compensation.** |
| 69. | EPA estimated that the cost of Dutra's proposal would be more than $21.6 million, compared to an estimated $1.9 million under Alternative SD-2. |
| | **Agreed.** |

Amendments to the Option Agreement and Purchase of the Subject Property

| | |
|---|---|
| 70. | On October 1, 2001, Dutra and Plaintiff CRV amended the Option Agreement, by which Plaintiff CRV agreed to immediately exercise its option, and close escrow on February 1, 2002. |
| | **Agreed.** |
| 71. | Plaintiff CRV signed the October 1, 2001 amendment in order to obtain certain entitlements from the City of Stockton. |
| | **Agreed that the cited deposition testimony was given.** |

| | |
|---|---|
| | **Disagreed that this fact has any relevance or materiality to determination of plaintiffs' rights to just compensation for a physical taking.** |
| 72. | On October 26, 2001, EPA reiterated its position that Dutra's proposal was unacceptable by transmitting to Dutra a proposed schedule for implementation of the ROD |
| | **Agreed.** |
| 73. | On November 29, 2001, representatives from EPA, Dutra, and Plaintiffs met to discuss EPA's remediation plans |
| | **Agreed, subject to the following additional undisputed material facts set forth below.** |
| 73A. | **By asserting that the EPA met to discuss its plans, the Government admits that it continued to negotiate with Dutra and plaintiffs for alternatives to its planned log boom and sand cap measures in the OMS.** |
| 74. | On January 21, 2002, Plaintiff CRV wrote a letter to Dutra's attorney, Bob Goodman, indicating that implementation of "EPA plans" would reduce the value of the Subject Property. |
| | **Agreed.** |
| 75. | On January 31, 2002, Dutra and Plaintiff CRV entered into a Second Amendment to Option to Purchase, which extended the close of escrow was extended until May 1, 2002 "or until Optionor and Optionee negotiate a mutually acceptable agreement with the United States [EPA] as to their remediation of contaminated sediment in Old Mormon Slough, as it affects utilization of the Subject Property, whichever last occurs." |
| | **Agreed, subject to the following additional undisputed material facts set forth below.** |
| 75A. | **At the time Dutra and plaintiffs entered into the Second Amendment to the Option Agreement, Dutra, CRV and Voorhees all believed that Dutra would be able to negotiate a resolution with the EPA that would permit continued total marine access to the Subject Property for smaller recreational boats, consistent with plaintiffs' development plans for the property.**<br><br>**Voorhees Opposition Declaration, ¶ 10.** |
| 76. | On August 26, 2002, EPA met with representatives from Dutra and Plaintiffs again. Among the issued discussed during the August 2002 meeting was the [p]ermanent [p]ost-[c]onstruction [i]mpacts, and Dutra's "Taking Claim." |

| | |
|---|---|
| | **Agreed, subject to the following additional undisputed material facts set forth below.** |
| 76A. | **At the time Dutra, plaintiffs and the EPA were communicating in an effort to reach a resolution permitting continued marine access to the Subject Property, they raised the topic of just compensation, in the context of preferring to reach such a resolution for continued access via the OMS, with taking and compensation only as a last resort.**<br><br>**Voorhees Opposition Declaration, ¶ 10 (*sic* – This is the 2nd ¶ 10 in this Declaration).** |
| 77. | On October 15, 2002, Plaintiff CRV and Dutra signed a Third Amendment to the Option Agreement, in which Plaintiff CRV and Dutra agreed that escrow would close on November 1, 2002. |
| | **Agreed.** |
| 78. | On October 28, 2002, Plaintiff CRV and Dutra signed a Fourth Amendment to the Option Agreement, in which the parties recognized that EPA had taken the position that it had "no legal obligation to reimburse Optionor for any damage or injury to the Subject Property, and Optionor has been unable to negotiate a mutually acceptable agreement with EPA as to the Remedy, and its effect on the utilization of the Subject Property.....". In addition, in the Fourth Amendment to the Option Agreement, Dutra attempted to transfer and assign its rights to Plaintiff CRV against the United States for "any loss of use and/or taking of real property arising from or relating to EPA's implementation of the Remedy...." |
| | **Agreed, subject to the following additional undisputed material facts set forth below.** |
| 78A. | **CRV requested assignment of Dutra's rights against the Government, still hoping that the EPA could be convinced to alter its planned improvements in the OMS to permit continued marine access. CRV subsequently learned that this assignment is likely invalid. Plaintiffs do not rely upon the assignment as a basis for the lawsuit because title to the Subject Property was transferred to them long prior to the physical taking of their riparian rights by the installation of the Government's improvements in September of 2006.**<br><br>**Voorhees Opposition Declaration, ¶¶ 12, 13.** |
| 79. | On October 29, 2002, Plaintiffs wrote a letter to Eric Kapeller, a business associate, indicating that Plaintiffs and Dutra had prepared an appraisal to "substantiate a claim that the current owner [Dutra] has against the EPA." |
| | **Agreed.** |

| | |
|---|---|
| 80. | Notwithstanding EPA's decision to block navigational access in the Mormon Channel, Plaintiff CRV closed escrow and completed its acquisition of the Subject Property on October 29, 2002. |
| | **Agreed, subject to the following additional undisputed material facts set forth below.** |
| 80A. | **At the time that plaintiffs closed escrow on the purchase of the Subject Property from Dutra, they had already devoted and committed substantial time, nonrefundable money, and effort into the acquisition and development process.**<br><br>**Voorhees Opposition Declaration, ¶ 7.** |
| 80B. | **After plaintiffs closed escrow on the purchase from Dutra, they continued to negotiate with the EPA in an effort to keep full marine access open for the Subject Property.**<br><br>**Voorhees Opposition Declaration, ¶ 15.** |
| 81. | On October 20, 2004, Plaintiff CRV deeded the Subject Property to Plaintiff Voorhees. |
| | **Agreed.** |
| 82. | In the fall of 2002, EPA performed bank stabilization activities in order to implement Phase I of the sediment remedy selected in the ROD. |
| | **Agreed.** |
| 83. | Between June and September 2006, EPA implemented Phase II of the sediment remedy selected in the ROD by placing the sand cap in the Old Mormon Slough and installing the permanent log boom, which blocks navigational access to that portion of the Old Mormon Slough lying south of the log boom. |
| | **Partially agreed. Agreed that the above facts are true, however, the permanent log boom also blocks navigational access to that portion of the OMS that lies east of the log boom.** |
| 84. | No part of the sand cap or the log boom is actually located on the Subject Property. |
| | **Agreed that the improvements are not located within the property boundary lines for the Subject Property.**<br><br>**Disagreed to the extent the Government seeks to argue that the improvements do not physically and adversely impact riparian/littoral property rights attached to the Subject Property.** |

| | |
|---|---|
| | But for EPA's cleanup activities on the M&B Site, including EPA's cleanup activities to address the contamination in the Old Mormon Slough, contamination from the M&B Site would continue to leach into the waters of the Old Mormon Slough. |
| | **Partially agreed that the EPA's cleanup activities *on* the M&B site, which started in the 1990's, addressed and terminated the leaching of contamination *from* the M&B Site *into* the OMS.**<br><br>**Disagreed that EPA installed any improvements or conducted any activities *within the OMS itself* to terminate leaching, or that there is any admissible evidence that it did so. The sand cap and log boom do not remove or diminish contamination within the OMS.**<br><br>**Disagreed that the activities described above, on the M&B Site, 180+' away from the shoreline of the Subject Property, have any relevance or materiality to the determination of plaintiffs' rights to just compensation for a physical taking of their riparian/littoral property rights.** |

In addition to the above facts, plaintiffs rely upon and incorporate those undisputed material facts set forth in their Proposed Findings filed April 11, 2008, in support of plaintiffs' Motion for Interlocutory Summary Judgment.

Dated: May 30, 2008

Respectfully Submitted,

SHAPIRO BUCHMAN PROVINE & PATTON, LLP

By: ______________________________
John H. Patton
Attorneys for Plaintiffs CRV Enterprises, Inc.
and C. Ryan Voorhees

209316.1