John H. Patton, California SBN 069261
Matthew K. Wisinski, California SBN 195535
SHAPIRO BUCHMAN PROVINE & PATTON, LLP
1333 North California Boulevard, Suite 350
Walnut Creek, CA 94596
Telephone: (925) 944-9700
Facsimile: (925) 944-9701
E-mail: jpatton@sbllp.com

Attorneys for Plaintiffs CRV Enterprises, Inc.
and C. Ryan Voorhees

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **CRV ENTERPRISES, INC., a California corporation, C. Ryan Voorhees, an individual,**<br><br>Plaintiffs,<br><br>vs.<br><br>**THE UNITED STATES OF AMERICA,**<br><br>Defendant. | No. 06-660L<br><br>**DECLARATION OF J. MICHEL BENOIT, Ph.D., IN SUPPORT OF OPPOSITION TO UNITED STATES' MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**<br><br>Date: To be assigned by the Court (Telephonic scheduling conference requested)<br>Judge George W. Miller |

**DECLARATION OF J. MICHEL BENOIT, Ph.D.**

I, J. Michel Benoit, declare:

1. I am a California licensed professional engineer. I make this Declaration in support of plaintiffs' opposition to defendant United States of America's ("the Government") motion for summary judgment. I have personal knowledge of the facts stated in this Declaration, and hold the opinions stated herein, and if called upon to testify to those facts and opinions, I could and would do so competently.

2. I received a B.S. in Civil Engineering, with emphasis in geotechnical, structures, and soil mechanics, from Liege University, Belgium in 1963; a M.S. in Civil Engineering from Stanford University, with some emphasis in foundation design, in 1966; and in 1971 a Ph.D. in Aero-Astro Structures from Stanford University. I have over forty years of experience in the geotechnical and structural engineering fields, and related engineering principles. I have lectured to civil engineers, and have been qualified to testify, and testified as an expert witness in engineering matters in the Superior Courts for the State of California, and elsewhere.

3. I currently am Staff Supervising Engineer with Moffatt & Nichol Engineers in Walnut Creek, California, and two of my current assignments are: 1) as construction engineering consultant to the State of California for the construction of the main tower foundations and erection for the main suspension span for the new San Francisco Bay Bridge (between Oakland and San Francisco, California); and 2) as a design engineering consultant to the Port of Los Angeles for a major new marine oil terminal at Pier 400 in Los Angeles Harbor. I also teach graduate engineering courses at the University of California, Berkeley, and previously taught undergraduate and graduate engineering courses in Belgium at Liege University. A true and correct copy of my most current *Curriculum Vitae* is attached hereto, marked Exhibit 1, and incorporated herein by reference.

4. I have considerable experience in engineering concerning marine projects, such as the new Bay Bridge and Los Angeles Harbor pier/terminal mentioned above. As examples, I participated in: the design of several offshore petroleum platforms in the North Sea; seismic design of the "New Vasco Da Gama" Bridge across the Tagus Estuary in Lisbon, Portugal; concept design of

the cable-stayed "Ottmarscheim" Bridge across the Rhine river between France and Germany; the independent design check of the 8-mile long "Confederation Bridge" crossing of the Northumberland Strait of the Gulf of St. Lawrence in Canada; the retrofit of the Bixby Bridge near Big Sur, California; reconstruction of the Amports pier/terminal project on San Pablo Bay in Benecia, California (downstream from the San Joaquin Delta); concept and design work for the Piedra del Aguila Dam in Argentina, and the Itaipu Dam in Brazil; concept development, final design, and construction engineering for the Cerrejon Coal Project for a complete marine facility coal berth in Columbia; final design review and construction monitoring for the Union Oil Pier terminal in San Luis Obispo, California; sheetpile pier wall design for a number of marine facilities including Seattle, Guam, Oakland, as well as serving as the principal consultant for the inspection and accident reconstruction project and report for Schlumberger concerning the disaster involving the *Alexander Kielland,* a Semi Submersible platform that capsized in the North Sea off of Norway in 1980. I have also participated in environmental engineering projects, such as the Bay Area Delta Flood Control System to prevent excessive Salinization of the fresh water supply by means of mobile gates and levees. This work for the Department of Water Resources is still on-going.

5. As a result of these and other engineering experiences over the years, I have knowledge and expertise concerning hydrology as it impacts engineering concerns, including the pressures and flows of waters, and all manner of physical properties, characteristics, and ramifications that are associated with such matters. I believe that I am qualified to render the opinions that are set forth below in this Declaration.

6. I have reviewed the Surface Water-Sediment Feasibility Study Report dated January 1999 for the McCormick and Baxter Superfund Site, in Stockton, California ("Feasibility Report"), a partial copy of which is Government Exhibit 17 on this motion. From that review, as well as my review of the Government's papers on this motion, and other Government publications and site photographs provided to me, I have determined that the property owned by plaintiff C. Ryan Voorhees that is the subject of this action ("Subject Property") is located adjacent to and north of the Old Mormon Slough ("OMS") in Stockton, California, on the opposite side of the OMS from the McCormick and Baxter Superfund Site ("M&B Site").

7. From my review of these materials, I understand that the OMS is approximately 2,500 feet long and 180 feet wide, and that the OMS terminates on its eastern end, to the west of Interstate 5. These materials also indicate that the maximum tidal range for the OMS is approximately 3 feet, taking Mean Lowest Low Water as the water level reference, and that circulation is driven by weak tidal currents, with a maximum current of about 1 knot, (or 1.688 ft. per sec.) which is almost certainly less as one moves eastward into the OMS toward its eastern (stagnant) end. A simple calculation based on water flows leads to an averaged cyclic flow velocity of 0.0236 ft/sec at Station OMS-53 which is located at 1700 ft. from the east end of the OMS. The maximum velocity can be estimated at 0.2 ft/sec on the basis of accelerating and decelerating flows and on the basis of spatial variations. The Feasibility Report states that "current speeds in sloughs are slow and are probably incapable of eroding the sediments in the absence of other disturbances." It also states that "wind and wave action is probably insignificant because the slough is protected."

8. The materials I have reviewed also indicate that at some point in the late 1980's, the OMS was dredged to a fairly uniform depth of 16 feet from the mouth of the OMS to near or beyond the eastern property line for the Subject Property. Since these materials do not state whether this was at high or low tide, I believe it is logical to assume that this is from the standard Mean Lower Low water elevation or mean tide, however, that determination is not material to my opinions in this case.

9. From my review of these materials, it is my understanding that the Government has undertaken activities to remediate contamination on the M&B Site, and to stem the spread of contaminants into the OMS from the M&B Site. The Site History in the Feasibility Report indicates M&B generated contaminants from its creosoting operations from 1942 until ceasing operations in 1990. That Site History also indicates that stormwater from the M&B Site was discharged into the OMS until approximately 1978, and that from 1978 to the present the only discharge of stormwater from the site has been through a permitted stormwater collection and control system and that a perimeter dike was constructed around most of the site to prevent contaminated storm water from getting into the OMS. The Site History and other EPA publications also indicate that in 1996, the U.S. Environmental Protection Agency ("EPA") installed sheet pile walls along the shoreline of the OMS to prevent seepages of contamination into the OMS, and that subsequently the EPA installed clean-dirt berms along the shoreline for that same purpose. Based on this information, it is my opinion that a substantial majority of the contamination that migrated into the OMS from the M&B site did so prior to 1996.

10. From my review of these materials, I am aware of the nature of the contaminants that have been found in the OMS, and where those contaminants

are concentrated. The principal contaminants found in the OMS were polynuclear aromatic hydrocarbon (PAH) and Dioxin, and to a lesser extent, pentachlorophenol (PCP), which, as the Feasibility Report states, degrades by chemical processes in aquatic environments (such as the OMS), and in the absence of a continuing source, does not persist for long periods of time in such environments.

11. The Feasibility Report and its Tables and Figures indicate that the contamination levels of PAH and Dioxin are far greater and more concentrated in the areas of the OMS that are in the eastern (stagnant) portion of the OMS, to the east of the Subject Property, and along the southern shoreline adjacent to the M&B Site, and that the areas of the OMS that are closer to the Subject Property, on the northern side of the slough, particularly as one moves west toward the mouth, have far lower levels of contaminants. This is not surprising for several reasons, including the proximity of the M&B Site to the south side of the OMS, the much shallower nature of the OMS in the eastern portions, and the greater tidal and current activity in the western portion of the OMS nearer to its mouth.

12. The Feasibility Report also confirms that relatively insignificant levels of these contaminants have migrated out of the OMS into the Stockton Deep Water Channel ("SDC"). In my opinion this is due to and consistent with the above reasons; as well as the fact that PAH and Dioxin are materials that do not readily dissolve, nor do they float. Because PAH and Dioxin are materials that have low solubility and high sorption properties (as the Feasibility Report indicates), they do not easily dissolve, and they have a tendency to absorb other materials, which makes them heavier. Because of these properties, as well as the low tidal activity at the site, these materials sink fairly rapidly into the sediment bottom, rather than migrate along with the minimal tides and current.

As such, these contaminants do not tend to travel far from their source, especially absent significant currents.

13. From my review of the materials discussed above, including a development plan for the site, and communication with plaintiff Ryan Voorhees, I am aware that at the time of its acquisition, the plaintiffs planned to utilize the Subject Property for a small boat marina, providing docking and other marina-related amenities along the south side of the property that abuts the OMS. A copy of that development plan is attached hereto, marked Exhibit 2, and incorporated herein by reference. The development plan (Exhibit 2) shows numerous small boat slips along the southern shoreline of the Subject Property, and no facilities for larger vessels, such as barges. This is significant, because it indicates that the southern shore of the Subject Property and the OMS were going to be used by small recreational vessels which have very little draft, wake, prop wash, and cavitation, as opposed to large vessels, which often do.

14. From my review of the materials discussed above, it is my understanding that in 2006, the EPA installed a 2-foot thick sand cap over the sediment bottom of the OMS, all the way from the eastern end of the slough to the area near the mouth of the slough, roughly where the barge slip is presently located on the Subject Property, or at the "notch" shown on the attached development plan (Exhibit 2). These materials indicate that the purpose of the sand cap was to bury and trap (confine) the contaminants that were deposited in the sediment bottom of the OMS, and to prevent them from migrating or getting mixed in with the water above. In my professional opinion, given the nature of the PAH and Dioxin contaminants, which sink and do not float or dissolve, the minimal tidal and current influence, the depth of the OMS (which provides a major protection against any prop-wash effect and which exerts enormous

pressure on the sediment bottom), and the findings of the Feasibility Study that the contaminants have not spread in any significant way beyond the OMS since M&B first began operations in 1942, it is unlikely that the any significant level of contaminants deposited in the sediment bottom were likely to migrate or get mixed in with the water above, even with boat traffic in the OMS, and even without the 2-foot sand cap.

15. I understand that the sand cap may also had a secondary purpose to prevent fish, such as carp and catfish, from coming into contact with the sediment bottom and contaminants near the surface of the sediment bottom. I was unable to determine the significance of that purpose from the Feasibility Report however, as it contains no information or findings about material matters, such as the quantities of fish that visit the OMS (which is a dead end body of water), how far they travel into the slough toward the stagnant eastern end (which has higher concentrations of contaminants in the sediment), how long they remain there, how long they live, how many are caught by fishermen, or what levels of contamination the typical fish could be expected to have, if any. The only data I could find on this in the Feasibility Report indicated that the EPA's fish samplings were taken in 1994, at a time when the EPA's sheet pile walls and clean-earth berms had not yet been installed to isolate the OMS from drainage and seepages from the M&B Site. Further, there was no indication as to what level of samplings was conducted, or the quantity of fish that were sampled at that time. Nothing indicated the quantity of fish that could be expected to be found in the OMS at any point in time. Without this information, I was unable to determine, and would not expect anyone to be able to determine, whether the sand cap provides any real or significant environmental benefit with

regard to reducing the levels of contaminants in fish visiting the OMS, or for humans that might catch and consume such fish.

16. Putting the efficacy of the sand cap aside, from my review of the materials discussed above, I also understand that in 2006, the EPA installed a permanent log boom across the OMS, roughly at the location of the "notch" shown on the attached development plan (Exhibit 2). My understanding is that the purpose of the log boom is to prevent marine vessels from entering the OMS because of the perception that boat traffic might damage the sand cap and/or stir up or cause the release or spread of contaminants buried in the sediment beneath the sand cap. I could find no studies or statistics in the Feasibility Report that discussed any analysis, calculations, or statistics to determine whether this perception was valid. The Feasibility Report states at Section 1.2.6.4 (page 1.18):

> "Boat traffic is rare in the eastern (stagnant) end of the slough, but barges occasionally use the dredged western portion, which contains the least-contaminated sediment. Consequently, the rate of sediment transport out of the Old Mormon Slough appears to be very low. This conclusion is supported by the absence of site-related contamination measured in samples collected near the mouth of the Old Mormon Slough and in the SDC [Stockton Deepwater Channel] nearest the site."

17. The area of the OMS abutting the Subject Property prior to installation of the EPA's sand cap was generally at a uniform depth of 16 feet, according to the materials I have reviewed. Water exerts significant pressure, and is very heavy. The calculation of such pressure/weight is a simple mathematical calculation, based on the formula $p = w \times d$ where w is the water unit weight (62.4 lbs./cu.ft.) and d is the water depth (ft.) under consideration. Just the ordinary garden pail containing approximately 3 gallons, weighs 25 lbs. The pressure exerted by 16 feet of water is roughly $16 \times 62.4 = 998.4$ psf.

18. Even assuming a maximum low tide of three feet, which in my opinion is likely a more sizeable tide change than the OMS actually experiences, the depth of the OMS at the subject property would have been 13 feet prior to installation of the EPA's sand cap. The pressure exerted by 13 feet of water is roughly 811 psf.

19. The recreational vessels that would access the OMS to travel to and from the Subject Property under the marina use depicted in the development plan (Exhibit 2) would of necessity be small craft, and would have minimal drafts, in most cases 2 feet or less (perhaps 3 feet for larger sailboats). But even assuming a very large draft for such craft, such as 4 feet, the bottoms of those vessels would have been no less than 9 feet above the sediment bottom of the OMS adjacent to the Subject Property during the lowest of tides, and 12 feet or more at the highest of tides.

20. Assuming the minimum of 9 feet of water between the hull of a vessel and the top of the sediment, there would be approximately 561.6 psf of differential pressure on the sediment between it and the water surface, not including the pressure of the 4 feet of water above the bottom of the hull. Assuming 12 feet, there would be approximately 748.8 psf of differential pressure on the sediment between it and the water surface, again not including the pressure of the 4 feet of water above the bottom of the hull.

21. The sand cap erosion or scour can only occur for significant water velocities along the sand cap surface. The larger the sand grain, the larger the velocity requirement. Also, it can be argued that the sand cap has undergone some consolidation since its installation so that individual grains of sand cannot be as easily dislodged as if the cap was in a loose state. The "settling" velocity (velocity at and below which the sand grain settles and is not entrained anymore)

for a 2mm (0.08 inch) diameter sand grain is estimated by Stokes law (extrapolated) which gives a velocity of 12.6 ft/sec. Note that for a 1mm particle, this velocity drops to 3.2 ft/sec. Given that an average sand grading provides for a minimum of 50% sand particle size above 1mm diameter, there is hardly a probability for sand transport or scour of the sand cap. Indeed, even the most powerful recreational boat engine would not produce a water flow velocity of 3 ft/sec at a water depth of 7 ft. below the maximum-depth hull, where the top surface of the sand cap is encountered at the lowest tide.

22. The facts and principles discussed above, indicate to me that localized surface waves of 1ft or so generated by small boat traffic in the OMS in the areas adjacent to the Subject Property on the one hand and, and on the other hand, the "prop wash" water-turbulence (turbulent water-flow plume originating at propeller and essentially surficial within the upper 4.0 feet of the water surface with an estimated length defined by the relative boat speed), would not in any significant way impact or disturb the sediment under the water even without the EPA's 2-foot sand cap, and there was no likelihood of such small boat traffic causing the release or migration of any significant level of PAH and Dioxin contaminants into the waters of the OMS, or into adjoining waters, even without the sand cap. Even if any such materials could be and were stirred up such that they escaped the sediment, they would almost immediately sink back down into the sediment because of their own properties and because of the pressure down at that level. In my professional opinion, small boat traffic would not in any way cause PAH and Dioxin contaminants to mix with the waters or to migrate within the OMS, even without the sand cap. It is also my professional opinion that small boat traffic would not in any way harm or threaten the environment with respect to the existing contamination in the OMS, even without the sand cap.

23. Because the EPA installed a 2-foot thick layer of sand on the sediment bottom, the depth of the OMS at the subject property would have been 14 feet after installation of the EPA's sand cap. The pressure of 14 feet of water is roughly 873.6 psf.

24. Even assuming a maximum low tide of three feet, which in my opinion is likely a more sizeable tide change than the OMS experiences, the depth of the OMS at the subject property would have been 11 feet after installation of the EPA's sand cap. The hydrostatic pressure of 11 feet of water is roughly 686.4 psf.

25. As noted above, the draft for most vessels using the Subject Property for a marina would have been 2 feet or less. But even assuming a very large draft for such craft, such as 4 feet, the bottoms of those vessels would have been no less than 7 feet above the sand cap of the OMS adjacent to the Subject Property during the lowest of tides, and 10 feet or more at the highest of tides.

26. Assuming the minimum of 7 feet of water between the hull of a vessel and the top of the sand cap, there would be approximately 436.8 psf of hydrostatic pressure on the sand cap between it and the water surface, not including the pressure of the 4 feet of water above the bottom of the hull. Assuming 10 feet, there would be approximately 624.0 psf of hydrostatic pressure on the sand cap between it and the water surface, again not including the pressure of the 4 feet of water above the bottom of the hull.

27. Based upon these facts, and the significant vertical distance from the propeller generated turbulent water flow plume, it is my professional opinion that small boat traffic in the OMS in the areas adjacent to the Subject Property would not in any significant way impact or disturb the EPA's 2-foot thick sand cap under the water, and there was no likelihood of such small boat traffic causing

the release or migration of any significant level of contaminants into the waters of the OMS, or into adjoining waters, which are buried beneath the sand cap. Even if such vessels could disturb the sand cap, the disturbed sand would almost immediately sink back into place due to its own weight, and the significant water pressure above it.

28. Further, the 2-foot thick sand cap, lying at a depth of no less than 11 feet adjacent to the Subject Property at the lowest of tides, and of at least 14 feet at the highest of tides, exerts a confining effective pressure equal to its buoyant weight which is estimated at p (2 ft.buoyant sand cap) = 45.0 x 2.0 = 90.0 psf effective pressure on the sediment below it. The absolute pressure of the water and sand cap on the sediment at 13 feet (low tide) would be the sum of the absolute hydrostatic pressure and the sand cap effective pressure.= 811.2 + 90.0 = 901.2 psf, and the pressure at 16 feet (high tide) would be 998.4 + 90.0 = 1088.4 psf.

29. In my professional opinion, it is extremely unlikely, if not impossible, that vessels with drafts of 4 feet or less would be able to disturb the sand cap at these depths to such an extent that PAH, Dioxin, or PCP contaminants would mix with the waters of the OMS or migrate within the OMS. Small boat traffic would not in any way harm or threaten the environment with respect to the existing contamination in the OMS, especially with the sand cap in place. Indeed, the prop wash induced flow velocities at the sand cap surface, (at a vertical depth of at least 7 ft. below the propeller) are insignificantly small and could not cause entrainment of sand particles resulting in scour of the sand cap. The same observation holds true for the surface waves generated by small craft traffic. Small boat traffic would not in any way harm the 2-foot thick sand cap. It is my professional opinion that the EPA's log boom is completely unnecessary to

protect the sand cap or the sediment bottom from small boat traffic, which is the principal marine use intended by the development plan (Exhibit 2). I hold the same opinion as to all areas of the OMS, including the shallower eastern (stagnant) end of the slough.

30. It is also my professional opinion that notwithstanding the existence of the levels of contaminants existing in the sediment bottom of the OMS, with or without the sand cap, small boat traffic operating within the OMS (consistent with the uses depicted in the attached development plan) would not in any way constitute a nuisance or threat to public health or safety, certainly no more than it does in any other location along the San Joaquin River, where small watercraft operate in abundance.

31. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and of my own personal knowledge, except for those matters which are stated on information and belief, or as my opinions. As to matters stated on information and belief, I believe them to be true and correct. As to those opinions expressed, I believe them to be true and correct and based upon correct facts, scientific principles, and logical assumptions.

Executed this 28th day of May, 2008, at Walnut Creek, California.

J. Michel Benoit

J. Michel Benoit

209222.1