John H. Patton, California SBN 069261
Matthew K. Wisinski, California SBN 195535
SHAPIRO BUCHMAN PROVINE & PATTON LLP
1333 North California Boulevard, Suite 350
Walnut Creek, CA 94596
Telephone: (925) 944-9700
Facsimile: (925) 944-9701
E-mail: jpatton@sbllp.com

Attorneys for Plaintiffs CRV Enterprises, Inc.
and C. Ryan Voorhees

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **CRV ENTERPRISES, INC.**, a **California corporation, C. Ryan Voorhees, an individual,**<br><br>Plaintiffs,<br><br>vs.<br><br>**THE UNITED STATES OF AMERICA,**<br><br>Defendant. | No. 06-660L<br><br>**DECLARATION OF C. RYAN VOORHEES IN OPPOSITION TO DEFENDANT UNITED STATES'S MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**<br><br>Date: To be assigned by the Court (Telephonic scheduling conference requested)<br>Judge George W. Miller |

## DECLARATION OF C. RYAN VOORHEES

I, C. Ryan Voorhees, state and declare as follows:

1. I am a plaintiff in the above-entitled action, and the President of plaintiff CRV Enterprises, Inc. ("CRV"). I make this Declaration in opposition to defendant United States of America's ("the Government") motion to dismiss, or in the alternative, for summary judgment. I have personal knowledge of the facts stated herein, except for those matters that are stated on information and belief, and as to those matters I am informed and believe that they are true and correct.

2. I hereby reaffirm, and incorporate by reference, each of the statements made in my Declaration filed April 11, 2008 in support of plaintiffs' motion for summary judgment ("April 11 Declaration").

3. I have read the Declaration of Kenneth Smith, which is Government Exhibit 29 on this motion. It is not entirely accurate, as discussed below.

4. In 2000, at the time plaintiff CRV and I became interested in the property that is the subject of this action ("Subject Property"), Roger Beck, who died in approximately 2003, was neither an officer, director, nor shareholder of CRV. Mr. Beck had no interest whatsoever in CRV, and his association with me and CRV in 2000, and at all times thereafter, was as a potential development partner with CRV and/or me personally, in various properties, wherein he might, under appropriate circumstances, acquire a co-ownership interest. Mr. Beck never acquired or had any position or interest in CRV or the Subject Property, and he passed away without ever seeking to acquire such an interest.

5. In this regard, Mr. Beck referred CRV and me to the Subject Property in 2000, and had meetings and discussions concerning the Subject Property with its owner, Bill Dutra, and with personnel affiliated with Mr. Dutra's company, which I believe was called Dutra Marine Construction (collectively, "Dutra"), including Ken Smith.

6. At the time that CRV entered into the Option Agreement for the purchase of the Subject Property (Exhibit 4 to my April 11 Declaration) in October of 2000, neither Roger Beck, Ernie Pearson, Bill Dutra, Ken Smith, nor any other person, had informed me or CRV that the U.S. Environmental Protection Agency ("EPA") had any plans to install any improvements or perform any substantial work in the Old Mormon Slough ("OMS") which is immediately adjacent to the Subject

Property, on its southern shoreline. CRV and I were then unaware of any such plans.

7. CRV and I were not informed about the EPA's plans in the OMS until much later on in the acquisition process, and after CRV and I had already devoted and committed substantial time, nonrefundable money, and effort into the acquisition and development process pursuant to the Option Agreement. For example, CRV and I were not told about, and did not know of the existence of the Record of Decision ("ROD") for the EPA's project concerning the OMS, until sometime between year-end 2001 and 2003. I do not believe that that I first learned that the EPA was considering installing a sand cap and log boom in the OMS until late 2001 at the very earliest, and more probably not until 2002, although I then understood that this was not a final decision, and that the EPA was willing to discuss alternative measures, and did thereafter continue to discuss alternatives.

8. After learning this information, I and my prior counsel, Craig Rasmussen, engaged in communications with representatives of Dutra and the EPA in efforts to convince the EPA to either not install a sand cap and log boom in the OMS, or to position the sand cap and/or log boom so that at least the log boom would be positioned further back in the slough, to the east of the Subject Property, thereby allowing the full marina access and uses for which the Subject Property was amenable. Up until approximately early 2003, I believed that we would be successful in reaching an acceptable resolution with the Government in that regard.

9. For example, in our Second Amendment to the Option Agreement dated January 30, 2002 (attached as Exhibit 11 to Ken Smith's Declaration), Dutra, CRV, and I agreed to extend the close of escrow while Dutra negotiated an acceptable resolution with the EPA as to its remediation activities within the OMS. At that time, Dutra, CRV, and I all believed that Dutra would be able to negotiate a

resolution with the EPA that would permit continued total marine access to the Subject Property for smaller recreational boats, consistent with CRV's and my development plans for the property.

10. Attached hereto, marked Exhibit 1, and incorporated herein by reference, is a true and correct copy of one of the development plans that were prepared on CRV's and my behalf for development and use of the Subject Property, as well as the adjacent Catellus Parcels to the north, which are also owned by me. This is also attached as Exhibit 5 to my April 11 Declaration. This development plan evidences CRV's and my intention to develop the Subject Property and use its shoreline along the OMS as a marina solely for small boat uses for recreational boating. These boats typically have shallow drafts, of less than three feet, usually two. We did not intend to develop or use the Subject Property to accommodate larger vessels, which often have deeper drafts. I know of no nuisance or significant harm to public health or safety that is or would be posed by such recreational boats in the OMS, which vessels, of course, are found operating up and down the San Joaquin River, and all over in navigable waterways of the United States.

10. As noted above, CRV, Dutra, and I, and our lawyers, continued to communicate with officials of the EPA in an effort to reach accommodation as to its course of action in the OMS. Although we raised the topic of just compensation with the EPA, it was always in the context that we would prefer to reach a resolution that would allow continued access to the Subject Property via the OMS, with compensation only as a last resort in the event we could not reach such a resolution. Attached hereto, marked Exhibits 2 and 3 respectively, and incorporated herein by reference, are true and correct copies of letters written to the EPA to that effect on March 19 and May 20, 2002, by Dutra's outside lawyer, Robert C. Goodman, copies

of which were provided to CRV shortly after they were written. These letters were marked Exhibits 57 and 59 to my deposition in this case.

11. In August of 2002, Dutra sent me a letter that was very encouraging about the prospects of reaching a resolution, based on communications between EPA counsel and Dutra's counsel. Dutra's letter, which was marked Exhibit 65 at my deposition in this case, informed me that "We would like to believe that this signals a willingness to negotiate" on the part of the EPA. A true and correct copy of this letter is attached hereto, marked Exhibit 4, and incorporated herein by reference. I was very encouraged about the possibilities of reaching a resolution with the Government preserving marine access to the Subject Property based on this letter (Ex. 4).

12. As I became more aware of the potential that the Government might not change its position about potentially installing improvements in the OMS that might limit or reduce marine access to the Subject Property, I realized that if not successful, the value of the property likely would be adversely affected by any such installation. As such, CRV and I requested that Dutra assign whatever rights it had to claim damages against the Government, and that assignment was included in the Fourth Amendment to the Option Agreement, attached as Exhibit 13 to Ken Smith's Declaration. Although that assignment was made, I still remained hopeful that Dutra, myself, or the lawyers, could convince the EPA not to impair or limit marine access to the OMS and for the Subject Property, and our intention was in part to convince the Government that it would be less expensive to reach a resolution than to pay compensation for a taking.

13. Since acquiring the Subject Property (escrow closed in November of 2002), I have been advised that Dutra's assignment of claims and rights against the Government is probably not valid under United States laws. CRV and I did not and

do not rely upon that assignment as a basis for this lawsuit, because title to the Subject Property had already been conveyed to CRV, and from CRV to me, by the time the EPA actually physically took our riparian rights, in or about September of 2006.

14. At the time that escrow closed on the purchase of the Subject Property in November of 2002, no permits, notices, or other documents were recorded against the property title that purported to relinquish or waive any riparian rights for the Subject Property, or to waive compensation for the loss of riparian rights with regard to the Subject Property, or to in any way bind the Subject Property in that regard. CRV and I were not aware of any such waiver or relinquishment, and we never agreed to any such waiver or relinquishment, nor did we ever authorize anyone to make such a waiver or relinquishment on our behalf.

15. After acquiring the Subject Property, my previous lawyer (Mr. Rasmussen) and I continued to negotiate with the EPA in an effort to keep full marine access open for the Subject Property, and in particular, to convince the EPA to not place a log boom near the mouth of the OMS, but instead, if at all, beyond (inland and east of) the Subject Property. In early 2003, I finally realized that the EPA was most likely not going to entertain our requests and that the taking was inevitable, when the EPA informed us that it planned to install its sand cap and log boom in the Summer of 2003. For that reason, I caused CRV to file the original lawsuit on April 30, 2003 (Case No. 1:03-cv-00867-GWM).

16. For reasons having nothing to do with CRV or myself, the EPA did not install its sand cap or log boom in 2003 or 2004. Its lawyers then asserted that the lawsuit (Case No. 1:03-cv-00867-GWM) was premature because the Government had not yet taken any property rights from the Subject Property, because no marine access or use had yet been taken. As a result, and with the concurrence and urging

of the Government's lawyers, we agreed to dismiss the prior action without prejudice, and re-file a new action (which is this action) for just compensation only after the EPA installed these improvements and actually took property rights from the Subject Property. No one ever suggested that some statute of limitations was running, at any time when we were considering this course of action (dismissal without prejudice), and had they done so, CRV and I would not have agreed to dismiss the prior litigation.

17. CRV's and my intent has always been to use and develop the Subject Property as a small boat marina, consistent with the development plans attached as Exhibit 1. Such use is to my knowledge a lawful, allowed, and productive use of the Subject Property, and one for which officials from the City of Stockton have shown and expressed serious interest and enthusiasm in direct communications with me. Until the Government filed this motion, no one ever suggested that such use and development of the Subject Property, or use of the navigable waters of the OMS for small boats, would in any way constitute a nuisance, or a threat to public health and safety. I do not believe that the use of the Subject Property as a marina to accommodate small boat traffic, or the operation of small boat traffic within the OMS, would in any way constitute a nuisance, or a threat to public health and safety, or a threat to the effectiveness of the EPA's sand cap in the OMS.

18. At no time has the State of California ever asserted the Public Trust Doctrine, nuisance law, or any other statute, law, or argument in an attempt to limit or affect CRV's or my rights, uses, or riparian access to the southern shoreline of the Subject Property, or our riparian rights with regard to the adjoining OMS.

18. The EPA's maintenance of its log boom across the OMS, at approximately the barge slip "notch" depicted in the attached development plans (Exhibit 1), precludes and prevents all marine use and access to the majority of the

shoreline for the Subject Property, which is all of the shoreline to the east and south of the log boom. The Government has refused all requests by me that it pay just compensation for that taking. CRV and I would prefer that the Government simply move its log boom to the east of the Subject Property and agree not to further interfere with our use and development of the property and the OMS, but in lieu of that, and because the Government refuses to do so, I seek just compensation for that deprivation.

19. I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct and of my own personal knowledge, except as to those matters stated on information and belief, and as to those matters, I believe them to be true and correct.

Executed this 28 day of May, at Lodi, California

C. Ryan Voorhees

209208.1