John H. Patton, California SBN 069261
Matthew K. Wisinski, California SBN 195535
SHAPIRO BUCHMAN PROVINE & PATTON, LLP
1333 North California Boulevard, Suite 350
Walnut Creek, CA 94596
Telephone: (925) 944-9700
Facsimile: (925) 944-9701
E-mail: jpatton@sbllp.com

Attorneys for Plaintiffs CRV Enterprises, Inc.
and C. Ryan Voorhees

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **CRV ENTERPRISES, INC., a California corporation, C. Ryan Voorhees, an individual,**<br><br>Plaintiffs,<br><br>vs.<br><br>**THE UNITED STATES OF AMERICA,**<br><br>Defendant. | No. 06-660L<br><br>**PLAINTIFFS CRV ENTERPRISES, INC. AND C. RYAN VOORHEES' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO UNITED STATES' MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**<br><br>Date: To be assigned by the Court (Telephonic scheduling conference requested)<br>Judge: George W. Miller |

Accompanying Papers: Declarations of C. Ryan Voorhees; J. Michel Benoit; John H. Patton; Response to Government's Proposed Findings; Request for Judicial Notice; Evidentiary Objections

# TABLE OF CONTENTS

Page(s)

I. PRELIMINARY STATEMENT ..... 1

II. SUMMARY OF THE ISSUES RAISED BY GOVERNMENT'S MOTION ..... 2

A. Procedural Issues. ..... 2

B. Substantive issues. ..... 2

III. SUMMARY OF THE RELEVANT MATERIAL FACTS ..... 3

A. The Old Mormon Slough ("OMS"). ..... 3

B. The Subject Property. ..... 4

C. Plaintiffs' Acquisition/Ownership of the Subject Property. ..... 6

D. The McCormick & Baxter ("M&B") Superfund Site. ..... 8

E. Plaintiffs learn of the EPA's intended project. ..... 11

F. *CRV I*. ..... 11

G. The Government's improvements are installed in Fall, 2006. ..... 13

IV. STANDARD OF REVIEW ..... 14

A. Defendant's motions to dismiss under RCFC Rule 12(b). ..... 14

B. Defendant's motion for summary judgment under RCFC Rule 56. ..... 15

V. LEGAL ARGUMENT ..... 15

A. The USEPA's Record of Decision was not a taking, and if it were the Government is estopped to assert the statute oflimitations as a defense to compensation. ..... 15

B. Ownership and standing reside with plaintiff C. Ryan Voorhees ..... 19

## TABLE OF CONTENTS

Page(s)

C. This takings claim does not seek to challenge the USEPA's decisions with regard to its remedy; rather, it simply points out the equity of affording compensation where the Government has chosen to take private property as opposed to more expensive, but less drastic remedies. .......................................... 20

D. Under California law, which governs the property owner's bundle of rights, a riparian owner owns extensive property rights connected with adjacent waters; and the taking of such rights requires just compensation. ................................................... 20

1. The fact that the Government has not occupied the bounds of the Subject Property is legally irrelevant; as is the fact that limited navigable access remains .....................21

2. Plaintiffs owned riparian access rights that extended into the waters, as recognized by multiple authorities.....................24

3. The Government has taken plaintiffs' riparian rights, which are compensable; their connection to the highest and best use of the Subject Property is a matter to be determined in the compensation phase.................................28

4. The COE dredging permit does not limit plaintiffs' property rights or their Constitutional right to receive just compensation for their taking ...............................................29

5. Plaintiffs have not and were not "creating a nuisance" in their use of their riparian rights; nor was the taking of those rights an abatement of any nuisance created or maintained by plaintiffs .......................................................32

a. The maritime usage of navigable waters is not inherently harmful or a nuisance........................................32

TABLE OF CONTENTS

Page(s)

b. The Government's assumptions of nuisance do not constitute evidence. .......... 33

c. The Government has no evidence that plaintiffs' maritime uses were harmful .......... 34

d. Plaintiffs have never conceded that the OMS was a public nuisance, that the Government's activities in the OMS abated anything, or that the taking of plaintiffs' riparian rights was necessary to abate a nuisance, none of which is true. .......... 35

e. It is the Government's burden to prove nuisance. .......... 36

f. There is no evidence that plaintiffs' activities would damage the sand cap or stir up hazardous chemicals .......... 37

6. California's Public Trust Doctrine has no application where the State has never asserted it to the exclusion of plaintiffs' riparian rights prior to the taking .......... 41

VI. CONCLUSION .......... 42

# TABLE OF AUTHORITIES

Page(s)

Cases

*Aerojet-General Corp. v. Superior Court* (1988) 211 C.A.3rd 216, Cal.Rptr. 621 .......... 26

*Aetna Ins. Co. v. Kennedy* (1937) 301 U.S. 389, 57 S.Ct. 809 .......... 6, 31

*Aetna Life Ins. Co. v. Alla Medical Services, Inc.*, 855 F.2nd 1470 (9th Cir. 1988) .......... 14

*Aptos Seascape Corp. v. County of Santa Cruz* (1982) 138 C.A.3rd 484, 188 Cal.Rptr. 191 .......... 42

*Ball v. U.S.*, 1 Fed.Cl. 180 (1982) .......... 27

*Banks v. U.S.*, 76 Fed.Cl. 698 (2007) .......... 16

*Colberg, Inc. v. State ex rel. Dept. of Public Works* (1967) 67 Cal.2nd 408, 432 P.2d 3 .......... 24, 25

*Curtis v. U.S.*, 168 F.Supp. 213 (Ct. Claims. 1958) .......... 15

*Davis v. Wakelee*, 156 U.S. 680, 15 S.Ct. 555, 39 L.Ed. 578 (1895) .......... 12, 18

*George F. Miller Farms, Ltd. v. U.S.*, 27 Fed. Cl. 672 (1993) .......... 18

*Goodrich v. United States*, 434 F.3rd 1329 (Fed Cir. 2006) .......... 15, 16

*In re Waters of Long Valley Creek Stream System* (1979), 25 Cal.3rd 339 P.2nd 656 .......... 27, 36

*International Paper Co. v. United States*, 282 U.S. 399, 51 S.Ct. 176, 75 L.Ed. 410 (1931) .......... 27

*Jenson v. Kenneth I. Mullen, Inc.* (1989) 211 C.A.3rd 653, 259 Cal.Rptr. 552 .......... 32

*John R. Sand & Gravel Co. v. United States*, 60 Fed.Cl. 230 (2004) .......... 37

*Johnson v. Zerbst* (1938) 304 U.S. 458, 58 S.Ct. 1019 .......... 6, 31

*Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383 (1979) .......... 44

*Laney v. United States* (1981) 661 F.2nd 145 .......... 22

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164 (1982) .......... 22, 23, 24

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Lovett v. West Va. Central Gas Co.*, 65 W.Va. 739, 65 S.E. 196 (1909) ....................... 23

*Marks v. Whitney* (1971) 6 Cal.3rd 261, 491 P.2nd 374 ................................ 2, 26, 27, 41

*McKay v. U.S.*, 199 F.3rd 1376 ........................................................................... 23

*Meyers v. Asics Corp.*, 974 F.2nd 1304 (Fed.Cir. 1992) ............................................. 37

*New Hampshire v. Maine* (2001) 532 U.S. 742, 121 S.Ct. 1808 ............................ 12, 19

*Pathman Const. Co., Inc. v. U.S.*, 817 F.2nd 1573 (Fed. Cir. 1987) ............................. 18

*Pegram v. Herdrich*, 530 U.S. 211, n. 8, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000) ....... 18

*Portsmouth Harbor Land & Hotel Co. v. United States*, 260 U.S. 327,
43 S.Ct. 135 (1922) ........................................................................................... 23

*San Carlos Irr. & Drainage Dist. v. United States*, 111 F.3rd 1557 (Fed. Cir. 1997)...... 15

*San Francisco Sav. Union v. R.G.R. Petroleum & Min. Co.* (1904) ......................... 25, 26

*Shirley v. Bishop* (1885) 67 Cal. 543, 8 P. 82 ............................................................ 25

*Smith v. Municipal Court* (1988) 202 C.A.3rd 685, 245 Cal.Rptr. 300 ............................ 26

*Sohio Transp. Co. v. U.S.*, 5 Fed.Cl. 620 (1984) ........................................................ 15

*Southwestern Bell Telephone Co. v. Webb*, 393 S.W.2d 117 (Mo.App.1965).............. 23

*Squire v. City of Cleveland* (1948) 150 Ohio St. 303, 82 N.E.2nd 709 ........................... 28

*Tulare Lake Basin Water Storage Dist. v. United States*,
49 Fed.Cl. 313 (2001) ................................................................... 22, 27, 42

*U.S. v. 50 Foot Right of Way of Servitude In, Over and Across Certain Land in the City of Bayonne, Hudson County, N.J.*,
337 F.2nd 956 (3rd Cir. 1964) ................................................................... 22, 28

*United States v. 412.715 Acres of Land, Contra Costa County, Cal.*,
53 F.Supp. 143 (N.D. Cal.1943) ................................................................. 2, 42

TABLE OF AUTHORITIES
(continued)

Page(s)

*United States v. Ahtanum Irrigation District*,
124 F.Supp. 818 (D.C.E.D. Wash. 1953)....................27

*United States v. Alexander*, 148 U.S. 186, 13 S.Ct. 529, 37 L.Ed. 415 (1893)....................27

*United States v. Causby*, 328 U.S. 256, 66 S.Ct. 1062 (1946)....................22, 23, 44

*United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 70 S.Ct. 955 (1950)....................2, 42

*United States v. River Rouge Improvement Co.*, 269 U.S. 411, 46 S.Ct. 144 (1926)......2

*Yates v. Milwaukee* (1870) 77 U.S. 497, 10 Wall. 497, 19 L.Ed. 984....................26, 31

**Statutes**

28 U.S.C. § 2501....................18

42 U.S.C. § 9601....................9

42 U.S.C. § 9613(h)....................2, 43

67 Cal.2nd 415, 432 P.2nd 8....................25

Cal. Const., Art. X, § 2....................36

Rules of the Federal Court of Claims 56....................14

Rules of the Federal Court of Claims Rule 12(b)....................2

Rules of the Federal Court of Claims Rule 12(b)(1)....................2, 14

Rules of the Federal Court of Claims Rule 12(b)(6)....................2, 14

TABLE OF AUTHORITIES
(continued)

Page(s)

**Other Authorities**

56 Am.Jur. Waters, § 233 .......... 26, 28

65 C.J.S., Navigable Waters, §§ 61-69 .......... 26, 28

Coulson & Forbes on Waters (6th ed. 1952) pp. 69 .......... 26

Miller & Starr, *California Real Estate* (3rd Ed., updated October 2007) § 15.2 .......... 30

18 Moore's Federal Practice § 134.30, p. 134 (3d ed. 2000) .......... 18

2 Nichols on Eminent Domain, § 5.79, p. 5-302 (Rev. Ed. 1981) .......... 27

2 J. Sackman, Nichols' Law of Eminent Domain § 6.21 (rev. 3d ed. 1980) .......... 23

18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4477, p. 782 (1981) .......... 19

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs C. Ryan Voorhees and CRV Enterprises, Inc. ("CRV") respectfully submit the following Memorandum in opposition to the defendant United States of America's motion to dismiss, or in the alternative, for summary judgment.

## I. PRELIMINARY STATEMENT

This is an inverse condemnation case arising out of the defendant United States of America's ("the Government") appropriation of the Old Mormon Slough ("OMS") in Stockton, San Joaquin County, California for the exclusive use of the Environmental Protection Agency ("USEPA"). That appropriation was carried out through the construction of public improvements within the OMS, erected solely in connection with the USEPA's "Superfund" cleanup project on adjoining property, the McCormick & Baxter site ("M&B site"). [See Patton Exs. 3 and 4 for site location.[1]]

The Government has refused to provide compensation for its taking, and now filed a dispositive motion. Based on its moving papers, it appears not to understand the takings clause of the 5th Amendment, or the rights claimed by the plaintiffs. Boiled down to its essentials, and with a few wrinkles discussed herein, the Government's position is simple: Any private littoral/riparian rights located anywhere adjacent to navigable waters within the State of California are supposedly fair game for the Government to take without affording just compensation. But fortunately, *that is not the law* under the United States Constitution, or under California's Public Trust Doctrine. Governmental power to take such property without compensation is limited to "the control thereof for the purpose of navigation", or for public access and

---

[1] For purposes of brevity, the Declaration of John H. Patton, filed April 11, 2008, in support of plaintiffs' interlocutory summary judgment motion, is referred to as "Patton Declaration." That of Ryan Voorhees, also filed April 11, is referred to as "Voorhees Declaration." The various Declarations filed herewith in opposition, are referred to as "Opposition Declaration," referencing and dependant on the identity of each declarant.

uses of the citizens of California. *See, e.g., United States v. River Rouge Improvement Co.*, 269 U.S. 411, 419, 46 S.Ct. 144, 147 (1926); *United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 70 S.Ct. 955 (1950); *United States v. 412.715 Acres of Land, Contra Costa County, Cal.*, 53 F.Supp. 143 (N.D. Cal.1943); *Marks v. Whitney* (1971) 6 Cal.3rd 261, 491 P.2nd 374.

## II. SUMMARY OF THE ISSUES RAISED BY GOVERNMENT'S MOTION

### A. Procedural Issues.

1. Can defendant make a motion to dismiss under Rule 12(b)(1) or 12(b)(6) of the Rules of the Federal Court of Claims (RCFC) after it has filed its answer, when RCFC Rule 12(b) provides: "A motion making any of these defenses shall be made *before pleading* if a further pleading is permitted?" [Emphasis added.]

### B. Substantive issues.

The following are the principal substantive issues are raised by the Government on its motions:

1. When did the taking occur, and was the takings claim timely filed?

2. Is plaintiffs' claim for just compensation dependent upon an assignment of claims from the former owner (Dutra)?

3. Does plaintiff CRV now have standing to sue, based on its 2004 conveyance of the Subject Property to plaintiff C. Ryan Voorhees?

4. Is the claim one that seeks judicial review of the Government's actions, and thus barred under 42 U.S.C. § 9613(h)?

5. Do plaintiffs' own any protectable property rights when they do not own title to the riverbed or the navigable waters?

6. Does the 1986 grant of a dredging permit by the Army Corps of Engineers ("COE") to a prior non-party owner, allowing construction of sheet pile walls, forfeit the littoral owner's rights to just compensation for a subsequent taking?

7. Is the Government's erection of a log boom precluding navigational use exempt from a takings claim, as an "abatement of a nuisance?"

8. Does California's Public Trust Doctrine exempt the Government from paying just compensation?

## III. SUMMARY OF THE RELEVANT MATERIAL FACTS[2]

### A. The Old Mormon Slough ("OMS").

The OMS is a finger of navigable water, approximately 180 feet wide and 2,500 feet long, connected to the Stockton Deep Water Channel ("SDC") within the San Joaquin River in Stockton, California. As of 2000, the slough had been dredged to a depth of approximately 16 feet from the eastern edge of the Subject Property to its mouth near its confluence with the river. The eastern (stagnant) portion was approximately 10 feet deep. [Patton Ex. 5.] The OMS experiences minimal tidal and current influence. [*See, e.g.,* Feasibility Report, Govt. Ex. 20, at ¶ 1.2.2.2, p. 1.4.]

The Port of Stockton ("the Port") is located on the SDC, northeast of the OMS. Large ships and vessels of all sorts reach the Port via the San Joaquin River, which flows westward from the Port, first through the SDC, then through the San Joaquin Delta and into the Suisun and San Pablo Bays, the eastern arms of the San Francisco Bay. [Voorhees Dec., ¶¶ 5, 6, Exs. 1, 2; Patton Exs. 3, 4.]

As of 2000, and because of its depth and size configurations, the OMS was navigable for craft such as commercial barges (western portion), and medium and

---

2 Most facts material to this motion are set forth in plaintiffs' motion for interlocutory summary judgment filed April 11, 2008. Moreover, the Government has set forth its version of the complete area history, only some of which is material and accurate. For example, the history concerning the events that occurred long before the selection of the Government's remedy is not particularly germane. The contamination that existed during McCormick & Baxter's ongoing operations (between 1942 and 1990), is obviously different than that today, after the discharges were eliminated, and containment implemented throughout the 1990's. But there is no need to argue these facts—they are backdrop to the issue, which is simply whether a compensable taking occurred. Plaintiffs devote their attention in this discussion to those facts germane to that issue, so that the Court has a complete and accurate picture.

small-sized vessels, such as smaller recreational motorboats, sailboats, and the like (all portions). The western portion of the OMS was not infrequently used by such craft, and by commercial vessels and barges seeking to load and unload materials at the Subject Property, that was then owned by Bill Dutra, the principal of Dutra Marine Construction ("collectively, "Dutra"), a business located on the northern side of the OMS. [Voorhees Dec., ¶¶ 5-18, 29.]

**B. The Subject Property.**

The Subject Property and its relationship to the OMS and adjoining properties is depicted below in Voorhees Exhibit 1, a copy of the San Joaquin County Assessor's Map (the Subject Property is shown in yellow.




As the Government notes, Dutra was instrumental in improving navigational access in the OMS for larger commercial boats. Contrary to the Government's position, however, the Subject Property was accessible to shallow-draft craft prior to Dutra's work. [*See,* Exhibit 6 to Patton Opposition Declaration.] The two cross-sections in the dredging plans on which the Government relies, are shown on the following page:




SECTION A-A




SECTION B-B

Accurately interpreted, the cross-sections show that the Subject Property was amenable and developable for small boat marina use (such craft have drafts of less than 3 feet), even before Dutra's dredging work, which was designed to afford larger-scale marine construction use.[3] [Voorhees Opposition Declaration, ¶ 10.]

---

[3] The Government misconstrues the profiles shown in the dredging plans to suggest the Subject Property was landlocked. The profiles are Sections A-A and B-B, pages 489-90 to Exhibit 14 to Government Exhibit 29 to this motion [Document 36-13, pages 23 and 24 of 32 on the Court's electronic system, and Exhibit 6 to the Patton Opposition Declaration]. But the cross-sections show the channel bottom was mostly 8-12 feet deep. They also show a steady approximate slope of 30° near the mouth (section B-B), and lesser slope (approximately 18°) near the east end of the Subject Property (section A-A). At the mouth (section B-B), the bottom dropped off to approximately 5 feet in depth within approximately 7 feet of the shoreline. Well back in the property (Section A-A), the slope was less steep, but within approximately 9 feet, had reached 3.5 feet in depth, where the slope then steepened to approximately 25°. Of course, these are only 2 cross-sections, but they indicate that the Subject Property was then reasonably accessible for small marina craft and pleasure boats with drafts of less than 3 feet. [*See, e.g.*, Benoit Opposition Declaration, ¶ 19.]

In 1986, with a permit from the U.S. Army Corps of Engineers ("COE"), Dutra dredged the width of the OMS fronting the Subject Property to a uniform depth of 16 feet, and constructed approximately 1,400 lineal feet of sheetpile walls and bulkhead to accommodate barge traffic. [Govt. Brief, Page 5; Patton Opposition Declaration, ¶ 17, Exhibit 8.] The permit did not convey any title. The permit contained a boiler-plate provision reciting what is essentially the Government's navigational servitude: that Dutra would not be entitled to compensation for damage to the structures or work authorized by the permit resulting from future operations "undertaken by the United States in the public interest." [Ex. 14 to Govt. Ex. 29, DOJ 481-83.][4] Thereafter, Dutra actively utilized the Subject Property for commercial marine use.

### C. Plaintiffs' Acquisition/Ownership of the Subject Property.

Plaintiffs Ryan Voorhees and his company, CRV, are real estate developers operating in the Sacramento/Stockton areas of Northern California. They became aware of the Subject Property in mid- 2000, in connection with acquiring the Catellus parcels to its north. Plaintiffs were attracted by the property's marine amenities and development potential, including lengthy frontage on the OMS, and the existence of 3 valuable sheet pile walls. In October of 2000, CRV entered into a written Option to purchase the Subject Property, and plaintiffs opened escrow, deposited funds, and began due diligence for development. [Voorhees Dec., [¶¶ 2-17, Exs. 3A, 3B, and 4.] At the time they did so, plaintiffs were unaware of any Record of Decision ("ROD"), and any plans for Government activity in the OMS. [Voorhees Opposition Declaration, ¶¶ 6-7.] There is no evidence that the ROD was ever published in the

---

[4] Plaintiffs had no involvement or knowledge of the interactions between Dutra and the COE. But certainly, the boilerplate statement that compensation would not be afforded for "future operations" contemplated the COE's role in regulating navigation, *not the EPA's activities in Superfund cleanups.* Courts will not presume waivers of important Constitutional rights unless compelled to do so. *See, e.g., Aetna Ins. Co. v. Kennedy* (1937) 301 U.S. 389, 393, 57 S.Ct. 809, 811-12; *Johnson v. Zerbst* (1938) 304 U.S. 458, 464, 58 S.Ct. 1019.

Federal Register. In fact the evidence shows that it was not. [Patton Opposition Declaration, ¶ 15.]

CRV's engineering consultants verified that the Subject Property was free from significant contamination during the due diligence process. Plaintiffs and their consultants also formulated various development plan alternatives for use of the Subject Property along with the Catellus properties to the north, as a small boat marina. Voorhees Exhibit 5 depicts one such formulation:




The option period and escrow for the purchase were extended several times while plaintiffs and Dutra worked through various development issues. At some point around 2002, and after investing significant amounts of time, effort, and money into the property's development, plaintiffs became aware of the potential that the Government was going to install improvements within the OMS, although plaintiffs believed and were told that the Government was open to discussion about the nature, extent, and location of these improvements. Dutra, plaintiffs, and their counsel conducted continuing negotiations with the EPA in that regard. [*See, e.g.,* Voorhees Opposition Declaration, ¶¶ 7-9.]

By 2002, Voorhees and CRV had committed hundreds of thousands of dollars toward the property and its development. On October 29, 2002, plaintiffs exercised the option rights; escrow closed November 8. Ryan Voorhees personally paid the $1,315,000 purchase price, plus additional option payments made prior to closing. [Voorhees Dec., ¶¶ 8, 9, Exs. 4, 6.] After closing, plaintiffs were still discussing with the Government the possibility that it would compromise on its planned actions within the OMS, although by this point Voorhees and CRV had obtained an assignment of Dutra's rights in that regard, a fact irrelevant to plaintiffs' takings claim in this case. [Voorhees Opposition Declaration, ¶¶ 10-15.]

**D. The McCormick & Baxter ("M&B") Superfund Site.**

Directly across (south) the OMS from the Subject Property is the site of former operations by the McCormick & Baxter Creosoting Company ("M&B"). M&B operated a wood treatment facility on that site from 1946 to 1991, which resulted in the release of various contaminants (chiefly from creosote) into surface soils, deeper soils, and groundwater. Further, according to the USEPA, stormwater from the site discharged into the OMS until approximately 1976-78, at which time M&B installed a perimeter dike and stormwater collection system to eliminate runoff. The relevant portions of the M&B site are well-depicted in Voorhees Exhibit 10 (shown below):



Through monitoring, the USEPA determined that the M&B site constituted a threat to the environment, and throughout the 1990's investigated various remediation measures. In approximately 1992, it designated the M&B site as an active "Superfund" site under CERCLA, 42 U.S.C. §§ 9601, *et seq.* By 1996, the USEPA had installed a sheet pile wall (approximately 400 feet long) along the southwestern edge of the OMS to control contaminant seepages from waste ponds that had been located on the M&B Site. By 2003, the Government also stabilized the remaining bank of the northern portion of the M&B site that was not protected by its sheet pile wall, and installed a clean earth berm and bank protection material, designed to eliminate seepages of contaminants from the M&B site into the OMS. [Patton Exs. 5, 9, 10, 11.]

As part of its investigations, the Government also conducted sampling on the Subject Property to determine whether contamination had spread beyond the M&B site. Those investigations confirmed that the Subject Property was free of any significant level of contamination, and that the northern side of the OMS (near the Subject Property) was relatively free of contamination, especially as compared to the southern side (adjacent to the M&B site). [Lacey Deposition, pp. 45-46 (Patton Ex. 1); Voorhees Dec., ¶ 23; Benoit Opposition Declaration, ¶ 11.]

In March of 1999, but unknown to plaintiffs, the Government completed its ROD, which contained selected "remedies" for both the M&B site and for the OMS.[5] While the focus of the Government's actions deservedly addressed the M&B site itself, the Government also planned activities in the OMS. In essence, that plan

---

[5] Plaintiffs place the term "remedies" in quotes because that is the Government's characterization of its actions. Plaintiffs do not agree that these actions have had any "remedial" effect, particularly in the OMS. For example, in the OMS, instead of dredging the allegedly contaminated sediments from the bottom of the slough and improving the quality of the environment, the Government elected instead to leave whatever contaminants that existed in the sediment, and bury them under a layer of sand. [See also, Benoit Opposition Declaration, at ¶¶ 9-30.]

called for the installation of two sets of improvements within the OMS. The primary improvement was the deposit of a layer of clean sand ("cap") approximately 2 feet thick, over the sediment bottom of the OMS, from a location near its mouth (at the "notch" in the Subject Property), east to the terminus of the slough. The chief proclaimed purpose of this sand cap was to trap whatever contaminants had seeped or run off from the M&B site into the OMS sediment bottom, and prevent them from migrating westward into the San Joaquin River. [Lacey Deposition, pp. 59, 65-66, 92-95, 103-04, 126-27 (Patton Ex. 1); Patton Exs. 5-10.]

As an adjunct to this plan, the Government also planned to erect two pilings within the OMS near its mouth, one adjacent to each bank (north and south), and then install a permanent log boom stretching between the pilings. The purpose of the log boom was solely to protect and serve the 2-foot thick sand cap, by walling off the OMS to any marine traffic which potentially might disturb the sand cap, well below the surface.[6] In essence, the USEPA's selected plan was to permanently appropriate the OMS from its mouth eastward, for its exclusive use as a vacant property. [Lacey Deposition, pp. 59, 65-66, 126-27 (Patton Ex. 1); *see also,* Patton Exs. 5-10.]

The Government also ostensibly considered several other alternatives, including scenarios that provided for dredging and capping a portion of the OMS to remove all contamination in the sediment, and eliminating the log boom or placing it

---

6 At her deposition, the USEPA official who managed the M&B project, was unable to point to any evidence or studies suggesting, let alone showing, that vessels capable of entering the OMS would disturb the 2-foot thick cap of sand on its bottom to the extent that any significant level of contaminants might escape from the sediment buried beneath. [See Lacey Deposition, 66-68, 108-109, 114-15, Patton Ex. 10.] To the contrary, the only evidence is that the type of boat traffic plaintiffs were going to have would have no effect on the contaminants or the sand cap. The Government Project Manager was also unable to articulate any evidence to suggest, let alone establish, that the level of contamination in the OMS sediment was or is likely to pose any realistic threat to human health, or that placement of the sand cap would materially reduce any such threat or significantly improve the quality of the water within the OMS. [See pp. 38-39, Patton Ex. 10.] This is why plaintiffs do not agree with the Government's characterization of its actions as a "remedy."

much further back (east) in the OMS. Most of these alternatives would have preserved full marine access to the western portion of the OMS, and the properties adjoining it, and would have removed far more contaminants from the OMS. [Patton Exs. 6, 8.] But dredging the sediment to remove the contaminants was far more expensive than burying them under two feet of sand. [Patton Dec., ¶ 16, Lacey Deposition, pp. 108-09 (Patton Ex. 1); Patton Ex. 8.]

**E. Plaintiffs learn of the EPA's intended project.**

By 2002, and after investing significant time, effort, and capital into their development plan, plaintiffs became aware of the USEPA's project at the M&B Site, as well as potential action within the OMS itself. Plaintiffs requested and obtained assistance from DMC employees and counsel to try to ensure that whatever actions were taken in the OMS did not interfere with their development of the Subject Property, and a series of communications and discussions ensued between plaintiffs, DMC, counsel for DMC, and representatives of the USEPA on that topic. [Voorhees Dec., ¶¶ 20-26; Voorhees Opposition Declaration, ¶¶ 3-15.]

F. *CRV I.*

By 2003, however, it had become apparent to plaintiffs that notwithstanding their protestations, the Government was definitely going to install a sand cap, and curtain off the OMS near its mouth with a permanent log boom, forever closing down the slough, and all marine access and amenities within it. With this realization, plaintiffs requested they be paid compensation for the anticipated deprivation of their property. When the Government refused, Ryan Voorhees caused CRV to file its initial inverse condemnation action (1:03-cv-00867-GWM) on April 30, 2003, believing the sand cap and log boom were going to be installed that Summer, as had been advised by the EPA. [Voorhees Dec., ¶¶ 26-28.] That action is referred to as *CRV I*, and it was also before The Honorable George W. Miller.

For reasons beyond plaintiffs' control (had they control, no improvements would have been installed), the Government's installations were delayed (due to barges owned by other owners). No improvements were installed in 2003. On March 8, 2004, a year into the action, the Government filed a motion for judgment on the pleadings in *CRV I*.[7] One of the primary grounds for the motion was presented in Section 1C, at pages 16-19, that "CRV's Takings Claim is Not Ripe for Review." In that argument, and among other things, the Government told this Court:

> "CRV also fails to prove that withholding judicial decision would work undue hardship upon the parties. As explained above, CRV has not suffered a concrete injury because it has not been denied access to either the Old Mormon Slough or the Stockton Channel, and in fact still maintains access to the Old Mormon Slough via the Maritime Facility." [Patton Opposition Declaration, ¶ 5, Exhibit 1, at Page 19.]

As a result of this contention, CRV and the Government filed a joint motion to stay proceedings in *CRV I* on May 18, 2004, representing to this Court:

> "Accordingly, CRV acknowledges (and Defendant concurs) that unless and *until the EPA undertakes activities that Plaintiff believes blocks its navigational access, in part or in whole, to the Old Mormon Slough and the Stockton Channel, Plaintiff's claims as pled in this action are not ripe.*" [Patton Opposition Declaration, ¶ 8, Exhibit 2 (emphasis added).]

On May 24, 2004, the Court granted the stay, ordering the parties to file periodic status reports. They did so for months, indicating that a motion to lift the stay would be filed once the Government installed its improvements cutting off navigational access. [Patton Opposition Declaration, ¶ 10, Exhibit 4.] In the Spring of 2005, it became apparent that the improvements would not be installed during that year either, and the parties agreed that it would be more efficient to simply

---

[7] The history of *CRV I* and its dismissal are relevant only because the Government apparently has forgotten its position back in 2005 that the taking had not yet occurred, and now seeks to reverse that position to its advantage by asserting the statute of limitations in this action. As discussed below, it is judicially estopped to do so. *See, e.g., New Hampshire v. Maine* (2001) 532 U.S. 742, 749-51, 121 S.Ct. 1808, 1814–15; *Davis v. Wakelee* (1895) 156 U.S. 680, 689, 15 S.Ct. 555, 558.

dismiss the *CRV I* without prejudice, allowing re-filing when the action became ripe – *when a taking had occurred*. Accordingly, on May 4, 2005, the parties filed a Stipulation for Dismissal *without prejudice* reciting those agreements, which the Court entered that same date. [Patton Opposition Declaration, ¶¶ 11-13, Ex. 5.]

**G. The Government's improvements are installed in Fall, 2006.**

By the next Summer, the Government had cleared the barges from the OMS and begun laying its sand cap over the sediment bottom. The work was completed in September, with two pilings driven in at the mouth of the slough, and the permanent log boom strung between the pilings, permanently closing off the OMS to marine traffic and appropriating it to the USEPA's exclusive "use" as vacant property. [Voorhees Dec., ¶¶ 29-31.] Shortly thereafter, plaintiff shot a photograph from the Subject Property depicting the boom in place, stretching southward across the mouth of the OMS (Voorhees Exhibit 11), shown below:



It is no different than if the Government had built a dam or a fence across the mouth of the OMS. With the installation of the Government's improvements in the OMS, *all* maritime and riparian rights and uses of the OMS have ceased beyond

(east of) the log boom. The majority of the foreshore of the Subject Property can no longer receive or provide access to any marine traffic, and is now completely useless as marina-type property or for any maritime use. The USEPA has taken the OMS, and the foreshore along it, to build itself a vacant lot for the USEPA's own purposes. [Voorhees Dec., ¶¶ 29-34.]

This taking has obviously damaged the Subject Property, by depriving it of most of its navigable access and other riparian amenities, and thus most of its highest and best use, maritime use. While the damage phase has not yet been litigated in this case, the loss is a substantial diminution in fair market value. The Government also refused all requests that it provide just compensation for the taking. [Voorhees Dec., ¶¶ 34-36.] On September 19, 2006, CRV filed its second Complaint in inverse condemnation, seeking just compensation for the taking. Ryan Voorhees was added as a plaintiff in the First Amended Complaint filed January 23, 2008. Plaintiffs seek Judgment confirming award of just compensation based on the Government's 2006 actions in the OMS.

## IV. STANDARD OF REVIEW

### A. Defendant's motions to dismiss under RCFC Rule 12(b).

Defendant answered the First Amended Complaint months ago (February 5, 2008). Under RCFC Rule 12(b), which uses the word "shall" and is thus mandatory, if the Government intended to make a motion to dismiss, it was required to make such a motion "before pleading." *See, e.g., Aetna Life Ins. Co. v. Alla Medical Services, Inc.*, 855 F.2nd 1470, 1474 (9th Cir. 1988). As such, the motions under RCFC Rules 12(b)(1) and 12(b)(6) are untimely, and must be denied. To the extent defendant is permitted to argue them here, they must be decided under the standards applicable to RCFC 56, governing summary judgments.

**B. Defendant's motion for summary judgment under RCFC Rule 56.**

The standard on an RCFC 56 motion is well documented by precedent, and this Court is undoubtedly familiar with the requirements. As the moving party on its motion, the Government bears the burden of demonstrating the absence of genuine issues of material fact. *San Carlos Irr. & Drainage Dist. v. United States*, 111 F.3rd 1557, 1562 (Fed. Cir. 1997). "A material fact is one that will make a difference in the result of the case." *Curtis v. U.S.*, 168 F.Supp. 213, 216 (Ct. Claims. 1958). "Moreover, any doubts, inferences, or issues of credibility must be resolved against the moving party." *Sohio Transp. Co. v. U.S.*, 5 Fed.Cl. 620, 625 (1984).

## V. LEGAL ARGUMENT

**A. The USEPA's Record of Decision was not a taking, and if it were, the Government is estopped to assert the statute of limitations as a defense to compensation.**

The Government's first argument is that its ROD was issued in March of 1999, and that the issuance purportedly constituted the taking of plaintiffs' rights, triggering the statute of limitations. This argument is based wholly on *Goodrich v. United States*, 434 F.3rd 1329 (Fed Cir. 2006). But *Goodrich* is factually distinct from the situation before this Court for several material reasons. First, the taking in *Goodrich* was *regulatory* (authorization of another rancher to use water from a private grazing allotment), not a physical taking, as we have in our case. 434 F.3rd 1331-32. As held by the *Goodrich* trial court, the regulatory action took place when the Government announced its decision; and the Federal Circuit affirmed that finding. 434 F.3rd 1333-34. In our case, *nothing* was taken when the Government issued its ROD. Indeed, marine vessels continued to access the OMS and subject property for more than seven years after the ROD issued, before the Government's log boom was erected in September of 2006, physically terminating that access.

Second, in *Goodrich*, the plaintiff participated in and opposed the regulatory taking in the ROD, including appeal pursuant to 36 C.R.R. § 215, and in district court proceedings. 434 F.3rd 1332. "Goodrich was extensively involved [in] each step of the pre-decision process." 434 F.3rd 1335. But plaintiffs here not only had no involvement in the ROD process, they were unaware one had even occurred until years later, after committing significant time, effort, and nonrefundable monies to the property. [Voorhees Opposition Declaration, ¶ 7.] Indeed, no evidence shows Dutra knew of or had opportunity to oppose or participate in the ROD at the time issued. No evidence indicates that the ROD, or even a summary, was published in the Federal Register, a requirement of constructive notice. *See, e.g., Banks v. U.S.,* 76 Fed.Cl. 698, 700 (2007). Plaintiffs have been unable to find any mention in the Federal Register prior to 2006 for the ROD. [Patton Opposition Declaration, ¶ 15.]

Third, the Government, Dutra, and plaintiffs, as well as their attorneys, participated in extensive negotiations for modification of the USEPA's activities in the OMS, wherein Dutra's commercial barge usage, and later plaintiffs' small boat usage, could be preserved, before any physical taking took place, and in an effort to avoid litigation. As early as the initial meeting between the USEPA and Dutra in September of 29, the parties were discussing alternatives to preserve marine access. [Ex. 5 to Smith Declaration, Govt. Ex. 29.] Indeed, in its May 22, 2000 response to Mr. Smith's October 20, 1999 letter, the USEPA stated:

> "After the new investigation has been completed, EPA will be able to consider the issues raised in your letter of October 20, 1999 regarding the sediment cap design and potential impacts to Dutra's shoreline access." [Ex. 6 to Smith Declaration, Govt. Ex. 29.]

In 2002, Dutra's counsel was still writing letters to the Government. On August 15, 2002, Dutra sent a letter to plaintiffs indicating that the USEPA's attorney had recently apologized for its handling of the matter, and the EPA was procuring its

own appraisal of the Subject Property. Dutra characterized this encouraging development as follows: "We would like to believe that this signals a willingness to negotiate." [Voorhees Opposition Declaration, Ex. 4.]

These efforts continued up until early 2003, when the Government finally informed plaintiffs that it intended to place its improvements into the OMS notwithstanding their requests for less drastic action, and confirmed that they would not provide compensation for the taking. [Voorhees Opposition Declaration, ¶ 15.] CRV, then the owner of the Subject Property, filed suit in this Court (*CRV I*) on April 30, 2003, seeking payment of just compensation, in anticipation of the installation.

The Government itself concedes that: "when Plaintiff CRV filed its complaint in CRV I, EPA had not installed the sand cap or the log boom in the Slough. Based, in part, on a concern that Plaintiff's physical takings claim was not ripe, the parties filed a Stipulation for Dismissal Without Prejudice on May 4, 2005." [Govt. Brief, pp. 7-8.] Indeed, the first assertion that the takings claim was not yet ripe came from the Government, in a motion for judgment on the pleadings made on that very ground! [Patton Opposition Declaration, ¶ 5.] *CRV I* was filed April 30, 2003, well within six years of the ROD. [Patton Opposition Declaration, ¶ 3.] It was dismissed *without prejudice* only because the Government took the position that a takings claim was not yet ripe, *because access to the OMS had not yet been taken*. [Patton Opposition Declaration, ¶¶ 11-13.] No one breathed a word about there having been a taking with the issuance of the ROD, or that the 6-year statute of limitations had commended to run. [Voorhees Opposition Declaration, ¶ 16; Patton Opposition Declaration, ¶ 12.] When the Government's deliberate actions are the cause of a party's failure to file within the statutory deadline, "it would simply be unfair and in equitable to allow the Government to use its own [conduct] as a shield to protect

itself. The law does not contemplate such an absurd result." *Pathman Const. Co., Inc. v. U.S.*, 817 F.2nd 1573, 1579 (Fed. Cir. 1987).

In a situation very much like this case, this Court has ruled that the timely filing of the initial takings action against the Government *equitably tolls* the running of the statute of limitations. The Court held that after dismissal of the initial action (for lack of jurisdiction), the filing of a second action seeking the same relief on the same legal theory, although more than 6 years after the taking, was not barred by 28 U.S.C. § 2501. *George F. Miller Farms, Ltd. v. U.S.*, 27 Fed. Cl. 672, 673-76 (1993). And in the *Miller Farms* case, there was no action by the Government asserting that a taking had not yet occurred -- exactly the converse of what transpired in our case.

Moreover, the Government cannot blow hot and cold on this claim. Having brought about the dismissal of the then-pending action (*CRV I*) because its taking had not yet occurred, the Government cannot now be allowed to turn around and now assert that the taking occurred back in 1999, when the ROD issued, and claim that the present action, filed immediately after the actual taking occurred (with installation of the log boom), is barred by the statute of limitations. The doctrine of judicial estoppel prevents the Government from now asserting this defense. The United States Supreme Court describes that doctrine as follows:

> "'[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *Davis v. Wakelee*, 156 U.S. 680, 689, 15 S.Ct. 555, 39 L.Ed. 578 (1895). This rule, known as judicial estoppel, "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Pegram v. Herdrich*, 530 U.S. 211, 227, n. 8, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000); see 18 Moore's Federal Practice § 134.30, p. 134-62 (3d ed. 2000) ("The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding"); 18 C.

> Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4477, p. 782 (1981) (hereinafter Wright) ("absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory")."
> [*New Hampshire v. Maine*, *supra,* 532 U.S. 742, 749-51, 121 S.Ct. 1808, 1814-15 (2001).]

In this case, the only reason *CRV I* was dismissed was because the physical taking had not yet occurred, was not going to occur until some point in the future, and the parties agreed that the action was not ripe and should be dismissed *without prejudice*. If "without prejudice" means anything, it means that the Government agreed not to assert a limitations defense if its physical taking occurred more than 6 years after the ROD. The Government is judicially estopped to assert this defense, where its own actions lulled plaintiffs into the prior dismissal. It is also judicially estopped to assert that the taking occurred when the ROD was issued (although never published), where it has already taken the position (one relied upon by plaintiffs) that the taking did not occur until its improvements were installed.

**B. Ownership and standing reside with plaintiff C. Ryan Voorhees.**

Both CRV and its principal, C. Ryan Voorhees, have actively participated in and expended considerable resources in the development of the Subject Property. CRV originally took title. Subsequently, it was pointed out that title should be in Mr. Voorhees name personally, since he contributed the bulk of the actual purchase funds. For that reason, in October of 2004, and *prior to the taking,* CRV conveyed the Subject Property and adjoining properties to plaintiff Voorhees, who since that time has been record holder of title. [Voorhees Dec., ¶ 19, Ex. 7.]

When counsel for plaintiffs discovered this transfer in late 2007, he sought and obtained leave to file the First Amended Complaint herein, adding Mr. Voorhees in as a party plaintiff. Mr. Voorhees, the owner at the time of the taking in 2006, is clearly a proper party plaintiff. Out of an abundance of caution, and to prevent this

procedural mistake from being the basis for any tactical or other prejudice to the compensation claims in this case, CRV remained in the case as a plaintiff, even though it no longer owned an interest in the Subject Property at the time of the taking. To the extent there is no prejudice to plaintiff Voorhees' claims in this action, and subject to that reservation, plaintiffs will not assert that CRV has continued standing to pursue the claim. But Mr. Voorhees clearly does.

### C. This takings claim does not seek to challenge the USEPA's decisions with regard to its remedy; rather, it simply points out the equity of affording compensation where the Government has chosen to take private property as opposed to more expensive, but less drastic remedies.

The Government either misunderstands or misconstrues this takings claim. It argues that this Court lacks jurisdiction to consider a collateral attack on the USEPA's decision making process for its Superfund Project. Fine. This lawsuit is to recover just compensation for the taking of plaintiffs' property rights for public use. While there certainly is fertile ground for criticism of the USEPA's decision to shut down the OMS and bury alleged contaminants in sediment 16 feet beneath the surface under 2 feet of sand, that is not what plaintiffs seek to do, *except* as relevant to their takings claim seeking just compensation.[8] This is just another of the Government's phantom arguments, and not grounds for any action by this Court.

### D. Under California law, which governs the property owner's bundle of rights, a riparian owner owns extensive property rights connected with adjacent waters; and the taking of such rights requires just compensation.

---

[8] Again, the Government cannot have it both ways. In one breath it says the wisdom of its decisional process is irrelevant to the takings inquiry. In another, it urges its actions have "abated a nuisance," and attempts to justify its log boom as preventing "damage to the sand cap," when there is absolutely no evidence that the sand cap, some 14 feet below the surface, was ever exposed to any damage. The Government cannot avoid paying just compensation to an innocent and law-abiding property owner simply by blaming the victim, especially where it saved millions of dollars at the victim's expense.

This appears to be the Government's only sincerely held argument to avoid the Fifth Amendment's requirement for payment of just compensation. It is a multi-pronged argument, that bears a central thrust – that plaintiffs supposedly did not have a compensable property interest that was taken. But even if the argument is really sincere, it is in fact nonsense – riparian rights in navigable waters are acknowledged as valuable property rights in the riparian owner, normally requiring just compensation when they are taken. The situation before this Court is precisely that situation, much as the Government would wish it otherwise. Plaintiffs address each prong of the Government's argument in their sequential (rather than logical) order, to demonstrate why compensation is required.

**1. The fact that the Government has not occupied the bounds of the Subject Property is legally irrelevant; as is the fact that limited navigable access remains.**

There is no dispute but that plaintiffs do not own the bed of the OMS, or the waters that rise 16 feet above it. They have never claimed such ownership, in this proceeding or otherwise. There is also no dispute but that the Government's installation of "improvements" within the OMS do not actually encroach within the boundaries of the Subject Property (the northern piling for the log boom is inches to the south of plaintiffs' southern shoreline). The Government mistakenly assumes that this ends the inquiry.

But it is also uncontroverted that the Government's exclusive occupation of the OMS has physically interfered with plaintiffs' ability to physically access and use the OMS for marine purposes to and from the majority of the shoreline of the Subject Property, which rights are valuable and protectable property, as discussed below. Any physical invasion of property rights, whether it be above or below the surface, and whether it be temporary or permanent, is a *physical taking*, such as constructing

pipes, tunnels, bridges, or telephone wires. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 425, 429-30, 102 S.Ct. 3164, 3173 (1982), citing *United States v. Causby*, 328 U.S. 256, 261, 265-66, 66 S.Ct. 1062, 1065, 1067-68 (1946). Indeed, in the *Causby* case, the Supreme Court noted that frequent flights of airplanes over and near a property constituted a physical taking because such an invasion is no different than "if the United States had entered upon the surface of the land and taken exclusive possession of it." 328 U.S. 256, 261, 66 S.Ct. 1062, 1066 (1946)[9]; *see also, Tulare Lake Basin Water Storage District v. United States, supra,* 49 Fed.Cl. 313, 319-20 (2001) (deprivation of water rights is a physical taking). Such physical interference is a *physical, not regulatory*, taking. *See, e.g., U.S. v. 50 Foot Right of Way of Servitude In, Over and Across Certain Land in the City of Bayonne, Hudson County, N.J.*, 337 F.2nd 956, 959-61 (3rd Cir. 1964) (construction of underwater pipeline in navigable waters). That distinction, one that the Government glosses over, is fundamental to the takings inquiry in this case.

The Government also points out that its actions have not completely destroyed maritime access and use of the Subject Property, pointing out that it still remains accessible to vessels for the relatively small portion northwest of its log boom. Because *total* riparian access has not been destroyed, it tells us that it need not provide compensation for its destruction of most of that access, relying on a quote from *Laney v. United States* (1981) 661 F.2nd 145, 149. First, *Laney's* statement of the law on whether a non-categorical denial of access is a taking is pure *dicta,* and not a holding of the case. Moreover, *Laney* involved an alleged *regulatory* taking, the COE's denial of a permit to erect a pier. 661 F.2nd 146. The

---

9 The property owner in *Causby* did not own the navigable air space above or near his land. The physical taking was not of the air itself, but the property rights attached to the land. It is no different here, though we are talking about navigable water instead of air.

law is different when there is a *physical* taking, as is the case here. *See, e.g., McKay v. U.S.*, 199 F.3rd 1376, 1382.

A host of cases clearly establish that permanent occupations of land, such as installations of telegraph and telephone lines, rails, and underground pipes, or wires, are takings even if they occupy only relatively insubstantial amounts of space and do not seriously interfere with the landowner's use of the rest of his land or property rights. See, *e.g., United States v. Causby*, *supra,* 328 U.S. 256, 261, 262 (noting the taking did not completely destroy all uses of the property), 66 S.Ct. 1062, 1066 (1946); *Portsmouth Harbor Land & Hotel Co. v. United States*, 260 U.S. 327, 329, 43 S.Ct. 135, 136 (1922) (holding deprivation of profitable use as a resort may constitute a taking); *Lovett v. West Va. Central Gas Co.*, 65 W.Va. 739, 65 S.E. 196 (1909); *Southwestern Bell Telephone Co. v. Webb*, 393 S.W.2d 117, 121 (Mo.App.1965). See generally 2 J. Sackman, Nichols' Law of Eminent Domain § 6.21 (rev. 3d ed. 1980). In *Loretto v. Teleprompter Manhattan CATV Corp.*, *supra,* 458 U.S. 419, 102 S.Ct. 3164 (1982), the U.S. Supreme Court held that "constitutional protection for the rights of private property cannot be made to depend on the size of the area permanently occupied." 458 U.S. 436, 102 S.Ct. 3176-77; *see also McKay v. U.S., supra,* 199 F.3rd 1376, 1381-82 (compensation required no matter how minute the physical invasion). And *Loretto* squarely holds as follows:

> 1. "Later cases, relying on the character of a physical occupation, clearly establish that permanent occupations of land by such installations as telegraph and telephone lines, rails, and underground pipes or wires are takings *even if they occupy only relatively insubstantial amounts of space and do not seriously interfere with the landowner's use of the rest of his land.*" [458 U.S. 430, 102 S.Ct. 3173 (emphasis added).]
>
> 2. "Although this Court's most recent cases have not addressed the precise issue before us, they have emphasized that physical *invasion* cases are special and have not repudiated the rule that any permanent physical *occupation* is a taking. The cases state or imply that a physical invasion is

subject to a balancing process, but they do not suggest that a permanent physical occupation would ever be exempt from the Takings Clause."
[458 U.S. 432, 102 S.Ct. 3174 (emphasis in original).]

3. ". . . a permanent physical occupation is a government action of such a unique character that it is a taking without regard to other factors that a court might ordinarily examine."
[458 U.S. 432, 102 S.Ct. 3174 (emphasis in original).]

In our case, the taking stems from the Government's permanent physical occupation of the OMS, maintaining a log boom barrier that forever forecloses riparian use and access to all of the Subject Property's shoreline east of the boom (most of its foreshore). Because this is a physical takings case, the Government does not get a free pass due to the fact that there has not been a total taking of riparian access, or a total land-locking of the property. It must still provide just compensation for the loss of those riparian property rights it has taken.

**2. Plaintiffs owned riparian access rights that extended into the waters, as recognized by multiple authorities.**

The Government's papers try to trivialize plaintiffs' takings claim as merely being for the right to "bring empty barges down the length of the OMS," pointing to selected deposition testimony. [Govt. Brief, 19.] That utterly mischaracterizes the claim, which is for loss of all littoral/riparian rights, *including* access and use, for the majority of the shoreline of the Subject Property.[10] Defendant then urges that an owner has no right to navigate on public waters, and this principle disposes of the claim, citing *Colberg, Inc. v. State ex rel. Dept. of Public Works* (1967) 67 Cal.2nd 408, 415, 432 P.2d 3, 8. That is not a full and accurate statement of the law. It is

---

[10] This is neither a fair characterization of Mr. Voorhees' deposition testimony, nor of plaintiffs' takings claim. As to the deposition testimony, the Court should read the entirety on the topic rather than the snippet cited by the Government. The entire testimony in this regard is found in Government Exhibit 30, at 191:1-194:11. [Document 36-14, pages 8-11 of 65 in the Court's electronic file.] As to the takings claim in general, please see ¶¶ 34-36 of the Voorhees Declaration, and ¶¶ 34 and 35 of the First Amended Complaint.]

not even a fair reading of the *Colberg* case, which while holding that navigation itself is a public (not private) right, acknowledged the important riparian right of access:

> "Instead, they must have recourse to the private right of an owner riparian to a navigable waterway to have access to the channel. (See *San Francisco Sav. Union v. R.G.R. Petroleum Co., supra*, 144 Cal. 134, 139, 77 P. 823; *Shirley v. Bishop* (1885) 67 Cal. 543, 8 P. 82; 56 Am.Jur., Waters, s 216, p. 677.)"
>
> 67 Cal.2nd 415, 432 P.2nd 8.

Rather than hurt plaintiffs' case, *Colberg* helps it. The situation in *Colberg* also involved the SDC, to which the plaintiffs' properties had navigable access, just like our case. When the State sought to construct twin bridges for Interstate 5 across the SDC, plaintiffs claimed a taking, because the bridges prevented larger ships from ultimately reaching plaintiffs' upstream docks. The court refused compensation, because the right of navigation up and down a river is a public right, analogizing that if a private taking were found, any riparian owner anywhere on the San Joaquin River (or any other river) would own private navigation rights to any other place on the river, all the way to the San Francisco Bay. *See* fn. 8, 67 Cal.2nd 415, 432 P.2nd 8. But in *Colberg*, unlike our case, the bridges did not cut off navigable access to the SDC, which the California Supreme Court stated would be a taking. [*See quote cited immediately above* at 67 Cal.2nd 415, 432 P.2nd 8.]

In our case, plaintiffs are not seeking compensation because the Government built an improvement down or up river that somehow limits the types of vessels that can reach their property. Rather, before the installation of the Government's log boom, plaintiffs and their predecessors enjoyed, used, and benefited from unfettered navigable access from the entire foreshore of the their property into the OMS and SDC for years. When the Government erected its log boom in 2006, all access to

navigation *completely* ended for most of the usable shoreline of the property.[11] *Colberg* is plain authority that plaintiffs' private property rights *were taken*.

Under California law, the riparian right of access to the navigable part of waters is a valuable and protectable property right of the property owner. *See, e.g., San Francisco Sav. Union v. R.G.R. Petroleum & Min. Co.* (1904), *supra*, 144 Cal. 134, 135-36, 77 P. 823, 824-25. Water in its natural state is a part of the land, and therefore real property. *Smith v. Municipal Court* (1988) 202 C.A.3rd 685, 689-90, 245 Cal.Rptr. 300, 303. The riparian or littoral owner, of course, does not own title to the waters (the State does, in public trust), but rather owns the rights to use it. *Aerojet-General Corp. v. Superior Court* (1988) 211 C.A.3rd 216, 229, 257 Cal.Rptr. 621, 629. But these rights are not trivial. For example:

> "A littoral owner has a right in the foreshore adjacent to his property separate and distinct from that of the general public (Gould on Waters, 3d ed., s 149). This is a property right and is valuable, and although it must be enjoyed in due subjection to the rights of the public, it cannot be arbitrarily or capriciously destroyed. (*Yates v. Milwaukee* (1870) 77 U.S. 497, 504, 10 Wall. 497, 504, 19 L.Ed. 984.) A littoral owner can enjoin as a nuisance interference by a private person with this right. (*San Francisco Sav. Union v. R.G.R. Petroleum & Mining Co.* (1904) 144 Cal. 134, 135-49, 77 P. 823. A littoral owner has been held to have the right to build a pier out to the line of navigability; a right to accretion; a right to navigation (the latter right being held in common with the general public) (see 65 C.J.S. Navigable Waters ss 61--69; 56 Am.Jur. Waters, s 233); and a right of access from every part of his frontage across the foreshore (see Coulson & Forbes on Waters (6th ed. 1952) pp. 69--70). This right of access extends to ordinary low tide both when the tide is in and when the tide is out. (*San Francisco Sav. Union v. R.G.R. Petroleum & Mining Co., supra,* 144 Cal. 134, 77 P. 823."
>
> *Marks v. Whitney* (1971) 6 Cal.3rd 261, 262-63, 491 P.2nd 374, 382.

A riparian owner's right to reasonable and beneficial use of the State's waters is protected by the California Constitution. Cal. Const., Art. X, § 2; *see, e.g., In re*

---

[11] As discussed above in Subpart D(1), the fact that *limited* access remains is not relevant in a physical taking – compensation is required. Certainly, the issue of what access remains is relevant to the *amount* of compensation that is just. We are not there yet.

*Waters of Long Valley Creek Stream System* (1979) 25 Cal.3rd 339, 351, 599 P.2nd 656, 663. These riparian rights, of course, are burdened by a servitude in favor of the State in the exercise of its public trust powers over navigable waters. *Marks, supra,* 6 Cal. 3rd 251, 262-63, 491P.2nd 374, 382. However, as in *Marks*, the State has not exercised its powers in our case. [*See* discussion below in Subpart D(6).]

The Federal Courts also recognize the protected nature of riparian rights. The United States Supreme Court has always recognized riparian and littoral rights as valuable and protectable property rights. *See, e.g., Yates v. City of Milwaukee, supra,* 77 U.S. 497, 503-07, 1879 WL 12827, 19 L.Ed. 984 (1870). In *Ball v. U.S.*, 1 Fed.Cl. 180 (1982), this Court stated: "In general terms, water rights in surface waters, whether riparian or appropriative, constitute property, and, under familiar principles, cannot be taken 'except for the public use and upon payment of just compensation.' 2 Nichols on Eminent Domain, § 5.79, p. 5-302 (Rev. Ed. 1981); *see also International Paper Co. v. United States,* 282 U.S. 399, 51 S.Ct. 176, 75 L.Ed. 410 (1931); *United States v. Alexander,* 148 U.S. 186, 13 S.Ct. 529, 37 L.Ed. 415 (1893); *United States v. Ahtanum Irrigation District,* 124 F.Supp. 818, 827 (D.C.E.D. Wash. 1953), *rev'd on other grounds,* 236 F.2d 321 (9th Cir.1956), *cert. denied,* 352 U.S. 988, 77 S.Ct. 386, 1 L.Ed.2d 367 (1957)." And not long ago, this Court discussed private water rights at length, in *Tulare Lake Basin Water Storage Dist. v. United States, supra,* 49 Fed.Cl. 313, 319-21 (2001) (holding that deprivation of water rights under the Endangered Species Act amounts to a physical taking).

Thus, plaintiffs, as riparian owners, had rights in the foreshore of their property adjacent to the OMS, rights of access for navigation, rights of access from every part of their frontage on the OMS across the foreshore, rights to build piers,

dock slips, or other amenities,[12] and rights of reasonable and beneficial use of the OMS. Those rights added value to the Subject Property, and were the chief reason for plaintiffs' acquisition. The Government's "spin" of plaintiffs' claims and the *Colberg* holding are nothing more than sophistry.

**3. The Government has taken plaintiffs' riparian rights, which are compensable; their connection to the highest and best use of the Subject Property is a matter to be determined in the compensation phase.**

Once again, the Government misstates plaintiffs' position, and is dreaming up arguments that have no real bearing on the takings issue. This time, it maintains that plaintiffs' claim is for the taking of the highest and best use of the Subject Property. Again, defendant misstates plaintiffs' claim, and mischaracterizes the deposition testimony to do so. But the Government's own brief makes clear that this argument is makeweight. On Page 20 of it brief, the Government correctly states:

> "(when asked to describe the impacts EPA's actions had on access to and from the Subject Property, Plaintiffs responded that EPA's actions 'deprive[] the [Subject Property] of the highest and best use and value it would otherwise have . . .')."

That is exactly true; the *impact* of the EPA's actions has been to deprive the property of its highest and best use, which will be an important consideration in determining the amount of compensation that is just. But that is the *impact* of the taking. The taking itself is the deprivation of navigational access and related riparian rights. This argument is much ado about nothing.

---

[12] Plaintiffs realize that the right to install wharfs or slips is subject to regulation and control by state and federal governments, but nonetheless, such rights exist and have value, and such permission had previously been provided, in the case of the sheet pile walls. *See, e.g., State ex rel. Squire v. City of Cleveland* (1948) 150 Ohio St. 303, 323, 82 N.E.2nd 709, 729; *U.S. v. 50 Foot Right of Way of Servitude In, Over and Across Certain Land in the City of Bayonne, Hudson County, N.J., supra,* 337 F.2nd 956, 959 (3rd Cir. 1964); 65 C.J.S., Navigable Waters, §§ 61-69; 56 Am.Jur., Waters, § 233.

**4. The COE dredging permit does not limit plaintiffs' property rights or their Constitutional right to receive just compensation for their taking.**

The Government also urges that plaintiffs' rights were limited by the dredging permit (No. 9260) that was issued to Dutra in 1986. The Government, of course, bears the burden of proving the absence of a genuine issue of fact on this point.

First, it is asserted that when Dutra purchased the property, it had no "commercially-meaningful access to the Slough." *No evidence supports that claim*, even if it were relevant to the takings issue. The only thing the Government has come up with are two cross-section profiles of the OMS prior to Dutra's dredging activities, which only show the profile of the OMS, and its juxtaposition with the Subject Property, at two particular locations, along a shoreline that is more than 1,000 linear feet in length. [*See*, Exhibit 6 to Patton Opposition Declaration.] Even these demonstrate that prior to Dutra's dredging activities, the Subject Property was reasonably accessible for small craft and pleasure boats, particularly at the northern profile section, which showed a 30° slope from shoreline into the OMS (section A-A).

But it does not matter. At the time of the Government's taking in 2006, the entire shoreline of the Subject Property was fully accessible to and usable for all manner of marine traffic, Dutra having dredged the OMS to a depth of 16 feet, as the Government concedes. Plaintiffs enjoyed and used their entire shoreline for those purposes, and were developing it for even greater use and enjoyment. [Voorhees Opposition Declaration, ¶ 17.] It is immaterial what the shoreline looked like in 1986, or in 1886, for that matter.

Nor does the COE's 1986 dredging permit get the Government anywhere. The permit (Ex. 14 to Government Ex. 29, DOJ 481-83) was *personal* to Dutra. It merely allowed Dutra, before December 30, 1988 (¶ (o), General Conditions), to dredge the OMS (to a depth of 16 feet) and to erect 1,400 lineal feet of sheet pile

walls. The permit specifically states *that it did not convey any property rights* (¶ (i), General Conditions), nor did it purport to run with the land, or to in any way bind Dutra's successors and assigns. There is no evidence that this permit was ever recorded. [Voorhees Opposition Declaration, ¶ 14.] Indeed, the permit specifically stated it could not be transferred to a third party without prior writing from the transferee to the COE, agreeing to comply with all of its terms and conditions and/or "subscribing to this permit." [¶ (t), General Conditions.] Plaintiffs never subscribed to or agreed to any of the conditions or limitations of the permit. [Voorhees Opposition Declaration, ¶ 14.] In short, *this revocable dredging permit had and has no impact whatsoever on the rights enjoyed by plaintiffs when they purchased the Subject Property*, or at the time of the Government's taking in 2006.[13]

The Government claims that the COE's boilerplate provision in Special Condition (a) of the permit now precludes and waives plaintiffs' Constitutional rights to compensation. That provision states:

> "a. That this permit does not authorize the interference with any existing or proposed Federal project and that the permitee shall not be entitled to compensation for damage or injury to the structures or work authorized herein which may be caused by or result from existing or future operations undertaken by the United States in the public interest."

That argument is a complete *nonsequitur* and would turn California real estate law on its head. First, this was nothing more than an affirmance of the USA's navigational servitude, and was intended as an acknowledgement that the COE, in its regulation of navigation, might need to alter the improvements done by Dutra

---

[13] In California, a permit or license gives authority to the licensee to perform acts on the property of another pursuant to the express or implied permission of the owner. The licensee has a personal privilege but does not own or possess either an interest or right in the land or any estate in the property. The privilege conferred by a license is personal to the licensee and cannot be inherited, conveyed, or assigned. Miller & Starr, *California Real Estate* (3rd Ed., updated October 2007) § 15.2.

pursuant to the permit, and no compensation would be available for such activity. There is no evidence that the COE engaged in, or was authorized to engage in, Superfund remediation projects such as have now occurred, or other activities in navigable waters, *other than to regulate navigation*, or that the parties contemplated them doing so. Nor is there any evidence that Dutra intended to willy-nilly waive any Fifth Amendment rights to just compensation by accepting the permit, and certainly none that it contemplated waiving its rights for EPA Superfund activities based on the McCormick & Baxter site across the OMS.[14] To the contrary, over the course of the interactions between Dutra and the USEPA, and once it appeared that the project might impact Dutra's navigational access, Dutra vigorously asserted those very rights, evidencing that it never intended to waive them. [*See, e.g.*, Exhibit 5 to Smith Declaration (Govt. Ex. 29); Exs. 2 and 3 to Voorhees Opposition Declaration.] And the extent of the permit language *did not go beyond the specific improvements done by Dutra* pursuant to the permit. Setting aside those improvements, this language could not operate as an across-the-board relinquishment of Dutra's access and other riparian rights appurtenant to the property, or the Constitutional right to receive just compensation for any public taking of those rights.

But even if the permit language could be stretched to read such that it forever waived *Dutra's* rights to seek just compensation, it had and has no impact on plaintiffs' rights. It was never recorded. [Voorhees Opposition Declaration, ¶ 14.] The language was *personal to Dutra*, the permitee, and simply constituted the COE's authorization for Dutra to do certain things (dredge and build sheet pile

---

[14] There is a large body of law holding that the waivers of Constitutional rights are disfavored, and that there must be clear evidence of a knowledgeable and informed intent to relinquish such rights before such a waiver will be construed. Courts will not presume such a waiver without such evidence. *See, e.g., Aetna Ins. Co. v. Kennedy, supra* (1937) 301 U.S. 389, 393, 57 S.Ct. 809, 811-12; *Johnson v. Zerbst, supra* (1938) 304 U.S. 458, 464, 58 S.Ct. 1019.] There is no such evidence in this case.

walls). It conferred no property interest in either Dutra or the Government. *See, e.g., Jenson v. Kenneth I. Mullen, Inc.* (1989) 211 C.A.3rd 653, 657, 259 Cal.Rptr. 552, 554. The permit plainly states, "*permitee* shall not be entitled to compensation." [Emphasis added.] It does not purport to bind plaintiffs, nor does it curtail or waive their Fifth Amendment rights. The permit is now and has always been a nullity as between plaintiffs and the United States. It confers no rights on plaintiffs, nor does it impose any obligations upon them, or in their property interests. It never did.

In short, the COE dredging permit was not a pre-existing limitation upon plaintiffs' property rights, and is irrelevant to analysis of this case. The permit gives the Government no rights with regard to plaintiffs, or to plaintiffs' property. Certainly, the Government, acting through the Corps, if necessary and appropriate, and *only in the legitimate exercise of the navigational servitude*, might have curtailed or impinged upon plaintiffs' access rights in the OMS, and limited their use of these navigable waters, without being required to pay just compensation. That power existed independent of the Dutra permit. *Further, that is not what has happened.* There has been no exercise of the navigational servitude, or any attempt to improve or foster navigation in the OMS.[15] To the contrary, the Government, acting through the USEPA, has forever foreclosed navigation in the OMS by installing its permanent log boom, for the purpose of appropriating that area to itself for its M&B Superfund project. Plaintiffs never waived their Fifth Amendment rights to just compensation for such a taking, and Dutra did not do so either.

### 5. Plaintiffs have not and were not "creating a nuisance" in their use of their riparian rights; nor was the taking of those rights an abatement of any nuisance created or maintained by plaintiffs.

---

[15] The Government concedes as much. It has not raised the navigational servitude as a defense on this motion.

**a. The maritime usage of navigable waters is not inherently harmful or a nuisance.**

Desperate to avoid the Constitutional requirement for just compensation, the Government tries to blame plaintiffs for its own actions, and those of the now-defunct polluter, M&B. They maintain California state law prohibits the uses plaintiffs now intend in the circumstances in which their property presently exists. Nonsense. Plaintiffs' uses are the very same ones they and others enjoyed in the OMS for years (likely centuries)---free and unfettered navigational access and riparian use of their shoreline. While plaintiffs do not disagree that owners have an obligation not to use their property in an illegal manner or one injurious to the community, there is not a shred of evidence that plaintiffs would ever do so. If the operation of a marina or docking of pleasure boats constitutes a crime or a nuisance, then every harbor, port, marina, pier, and dock in this Country is subject to being shut down on that basis.

**b. The Government's assumptions of nuisance do not constitute evidence.**

Defendant suggests, without citing any evidence, that the test should be "whether California state law would consider the damaging of a sand cap covering hazardous contaminants and the stirring up of those contaminants in a public waterway by boat traffic to be a nuisance." There are several things wrong with that statement. Among them, it makes numerous gigantic assumptions for which there is not one shred of evidence in the record. First, the Government assumes that the riparian uses that plaintiffs made and intended (shallow-draft commercial and recreational marine traffic) would "damage" a 2-foot thick layer of sand lying on the bottom of the OMS, *fourteen feet below the surface*.[16] Second, the statement makes

[16] A two-foot layer of sand, situated under fourteen feet of water, exerts an enormous amount of hydrostatic pressure on the sediment bottom, something like 1,088 lbs./sq. ft. [See Benoit Opposition Declaration, ¶ 27.] Common sense tells one as much. Just think how much a 3 gallon bucket of water weighs?

several additional and astounding leaps in logic to assume that the hypothetical "damage" to the sand cap would be to such an extent that some unknown amount of additional hazardous contaminants would escape from the sediment bottom (these contaminants *sink*, they do not float, which is why they were in the sediment bottom to be capped); that the escaped contaminants would be of significant quantity and concentration to significantly alter the pre-existing contamination level of the OMS; that the "stirring up" of the contaminants escaping from the cap would "stir up" a meaningful level of such contaminants; and that this would result in some real harm to the public over and above the conditions that have existed at or near the OMS since M&B began its creosoting operations, such that it would be found a public "nuisance." Not only are these assumptions unproven, they are *unfounded*. [Benoit Opposition Declaration, ¶¶ 6-29.]

**c. The Government has no evidence that plaintiffs' maritime uses were harmful.**

In short, saying that there would be "damage" to the sand cap, or that contaminants would escape to be "stirred up," does not prove it to be so. The fact that these statements are contained in documents such as the Feasibility Report or the ROD does not make them any more reliable. The Government does not point to one iota of evidence that this was or would be the case, in the ROD or otherwise. Indeed, when examined on this topic at her deposition, the Project Manager for the M&B Superfund project, Marie Lacey, could not cite to *any* evidence that marine traffic in the OMS would be likely to disturb the sand cap to the extent that any meaningful additional level of contamination was likely to escape into the OMS, or that such had been the case before the log boom was installed. [*See, e.g.*, ¶ 10, and Ex. 1, Patton Declaration, at Pages 65-66.] To the contrary, the only evidence is that such marine traffic, the kind type that plaintiffs intended to use their shoreline

for, *would make no difference whatsoever to the sand cap 14 feet below the surface, or to the contaminants buried in the sediment, below an additional 2 feet of sand.* [Declaration of Michel Benoit, PhD., ¶¶ 16-29.]

**d. Plaintiffs have never conceded that the OMS was a public nuisance, that the Government's activities in the OMS abated anything, or that the taking of plaintiffs' riparian rights was necessary to abate a nuisance, none of which is true.**

The Government also tortures plaintiffs' interrogatory responses in this case to try to finesse its argument. It states that "plaintiffs essentially concede" its point (the Government's assumptions about "damage" to the sand cap and "stirring up" of contaminants) by acknowledging that the M&B Site is a public nuisance and that the EPA's actions 'may have helped to prevent the further spread of contaminants from that site." [Govt. Brief, Page 23.] That is a gross mischaracterization of plaintiffs' position. The interrogatory quoted from is plaintiffs' Supplemental Response to Interrogatory No. 17, Government Ex. 35, at DOJ 561 (Document 36-14, Page 62 of 65 in the Court's electronic file). The response makes it crystal clear that plaintiffs differentiate between the EPA's actions "on the McCormick & Baxter site" as opposed to those "within the Mormon Slough." Thus, the statement that the M&B Site, located *south of the OMS*, likely was a public nuisance, is entirely true. *But plaintiffs did not in any way state or concede that the OMS constituted a public nuisance.* Moreover, plaintiffs' responses that "the EPA's clean-up efforts on the M&B site may have helped to prevent the spread of further contaminants from that site," is also accurate. As the EPA itself notes, it long ago sealed off the OMS from the spread of further contamination *from the M&B site* by erecting sheet pile walls and clean-earth berms between the sources of the pollution and the OMS shoreline. [*See* Govt.'s Proposed Findings of Fact No. 29; Patton Exs. 5, 9, 10, 11 (establishing

Government actions to isolate the contamination sources from the OMS in 1996 and 2003, on top of M&B installation of a perimeter dike and stormwater collection system in 1976-78).][17] [*See, also* Benoit Opposition Declaration, at ¶ 9.]

But the interrogatory response as to the OMS, began as follows: "As to the EPA's actions within the Mormon Slough (capping the sediment and erection of a log boom), *which were not on the McCormick & Baxter site*."[18] [Emphasis added.] That response also made it plain that the *there is no evidence* that the USEPA's actions have "eliminated or reduced any nuisance or contamination in the Mormon Slough." That is true; all the EPA has done is bury those contaminants that still exist in the sediment under its 2-foot sand cap. Plaintiffs concede nothing as to Government actions within the OMS, and it is less than honest to treat this interrogatory response as agreeing that there has been any "abatement" of a "public nuisance."

**e. It is the Government's burden to prove nuisance.**

So the proper questions, *not the ones the Government asks*, are whether California state law would consider marina and small boat-related activity in the OMS to be a public nuisance, *and* has the Government proven it on this motion. Obviously, the answer is "no," because such activity occurs daily on virtually every lake and river in California, and such activity is not only inherently not a nuisance, it is among a riparian owner's Constitutionally-recognized property rights. Cal. Const., Art. X, § 2; *see, e.g., In re Waters of Long Valley Creek Stream System, supra,* (1979) 25 Cal.3rd 339, 351, 599 P.2nd 656, 663. Thus, unless the Government

17 The installation of these improvements years ago was the most effective step the EPA could have taken to reduce contamination in the OMS, short of dredging the bottom, which it chose not to do to save money. Its sand cap is no more than gilding the lily in the OMS, because its earlier actions stemmed the flow of contaminants into the slough.

18 A copy of the full text of plaintiffs' third supplemental response to Interrogatory No. 17 is attached as Exhibit 7 to the Patton Opposition Declaration.

affirmatively came forward with undisputed evidence on this motion that under the circumstances at the time of the taking, plaintiffs' uses would be proscribed as a nuisance under California property law, this argument fails.

This Court has held that the burden of identifying the background principles of state property or nuisance law, that would prohibit the use of the land plaintiff intends, as well as setting out the relevant contours of that law, rests with the Government, if it is to avoid compensation. *John R. Sand & Gravel Co. v. United States, supra,* 60 Fed.Cl. 230, 240 (2004). Moreover, the Government also bears the burden of "connecting the state law to the facts of this case to show, for example, that the exercise of plaintiff's claimed property rights would be a nuisance and that actions by the government of which plaintiff complains are actions that could be taken under [California] law to abate the nuisance." *Ibid.* So, under *John R.*, it is the Government's burden to prove that plaintiffs' exercise of their recognized riparian rights constituted a nuisance under California law, and that California nuisance law would allow action (such as erection of a log boom) to prohibit the exercise of plaintiffs' riparian rights. Moreover, on summary judgment, it is the Government's burden to make this showing by way of *undisputed* material facts. *See, e.g., Meyers v. Asics Corp.*, 974 F.2nd 1304, 1307 (Fed.Cir. 1992). It has not come close, as briefly discussed below.

**f. There is no evidence that plaintiffs' activities would damage the sand cap or stir up hazardous chemicals to the extent that a nuisance would be created—the only evidence is to the contrary.**

Plaintiffs do not take issue with the Government's recitation of California law concerning public nuisances, embodied in Section 3479 of the Civil Code.[19]

---

[19] Ironically, but sadly, it is the Government's log boom which constitutes the nuisance, obstructing all marine use of a navigable waterway.

Plaintiffs recognize that a property owner may not maintain or allow a nuisance to exist on their property. Plaintiffs also recognize that property owners are not allowed to pollute the waters of California, and that such activities may be enjoined as a public nuisance. Of course, plaintiffs have never maintained or allowed any such nuisance at the Subject Property, nor have they polluted anything. They have used and developed their property in a lawful and responsible way, ultimately as a small boat marina. The nuisance was *across the OMS, at the M&B site*. Nor have plaintiffs ever maintained any nuisance in the OMS. No California court could issue an injunction against them or compel them to conduct any remedial activities with regard to their property, or the within the OMS.

Nor is there any evidence that the OMS is itself a public nuisance, particularly along the northern shoreline next to the Subject Property, or that the Government's sand cap has materially reduced contamination in the OMS. Its own records show that the contaminants are still buried in the sediment, some 16 feet below the surface. Those contaminants (which are of low solubility and high sorption, according to the Government) *sink*, rather than float or migrate, and remain buried in the sediment. They have not spread beyond the mouth of the slough for the 66 years since M&B began its creosoting operations in 1942. [Benoit Opposition Declaration, ¶ 12.] The Government's records prove that the contamination levels drop dramatically as one moves west and north in the OMS, away from the M&B site toward its mouth and toward the Subject Property.[20] For example, the January 1999 Feasibility Report issued for the project (Govt. Exhibit 20) states:

---

[20] Whatever benefits accrue from the sand cap and log boom, and they are ethereal, could just as readily have been accrued by positioning either or both back (east) in the OMS, and beyond the Subject Property, preserving plaintiffs' maritime uses.

"Boat traffic is rare in the eastern (stagnant) end of the slough, but barges occasionally use the dredged western portion, which contains the least-contaminated sediment. Consequently, the rate of sediment transport out of Old Mormon Slough appears to be very low. *This conclusion is supported by the absence of site-related contamination measured in samples collected near the mouth of the Old Mormon Slough and in the SDC [Stockton Deep Water Channel] nearest the site.*" [Govt. Ex. 20, §1.2.6.3, page 1.18 (emphasis added).]

"Contaminant concentrations were much lower near the mouth of the slough." [Govt. Ex. 20, §1.2.7.2, page 1.21.]

"While some risk to receptor species [carp, catfish, etc.] were attributed to the presence of PAHs [polynuclear aromatic hydrocarbons] and dioxins, and possibly PCP [pentachlorophenol], in surface sediments, there is no evidence of widespread impact to the aquatic ecosystem." [Govt. Ex. 20, §1.2.7.2, page 1.21.]

The Government's own records, based on fish sampling done in 1994,[21] *before* migration of contaminants from the M&B site into the OMS was walled off, indicate that the only potential for harm might be from eating fish caught in the OMS, and then the risk would only reach a level of significance *if one ate a whole fish every day for a period of 30 years*, assuming there were that quantity of fish living in the slough.[22] The acceptable risk range is exceeded only under that fantastic assumption [Feasibility Report, Govt. Ex. 20, ¶ 1.2.7.1, page 1.20, discussing Table 1.4.] And Page 1.20 of the Feasibility Study is telling in this regard, stating:

"However, these data alone are insufficient to determine if locally caught and consumed fish pose an unacceptable risk to local fisherman and their

---

[21] Page 1.20 of the Feasibility Report confirms that the samples of fish tissue were taken in 1994, when contaminants were still getting into the OMS from the M&B site. [Govt. Ex. 20.] No sampling of the levels of contaminants in fish was done after the Government installed its sheet pile walls and clean earth berms, eliminating the spread of contaminants into the OMS. The Government simply assumed, against logic, that the same level of contamination would be found in fish in 2006. [*See* Benoit Opposition Declaration, ¶ 15.]

[22] 350 catfish a year times 30 years equals 10,500 catfish per person. Excuse the pun, but that is a boatload of catfish. There is no suggestion, let alone proof, that these quantities of fish were found within the OMS, let alone eaten by fishermen.

families. . . .Thus, there is some uncertainty regarding the representativeness of the fish data used in the HHRA [Human Health Risk Assessment]." [Govt. Ex. 20, page 1.20.]

Even the Government's Project Manager cannot tell us whether there would be any significant risk reduction benefit to OMS fauna, or when, if ever, any such risk would be reduced. [Lacey Deposition, page 100, Ex. 1 to 4/11 Patton Declaration.] Moreover, the Government's sand cap and log boom don't prevent fishing in the OMS from the shoreline, or from other places on the San Joaquin River beyond the log boom (no fish pen has yet been erected to keep fish in or out of the slough).[23] And, of course, these improvements do not remove or reduce whatever contaminants exist in the OMS, which remain buried below in the sediment.

But the sand cap is not really the issue here. Plaintiffs could live with the sand cap alone. Beyond the sand cap, the real problem and the main physical basis for the taking, is the log boom, which also does nothing to remove or reduce contamination, and instead simply forecloses marine navigation within the OMS and for the majority of the Subject Property. The Government tells us that the "EPA determined that continued marine traffic could jeopardize the integrity and effectiveness of the sand cap." But that is an utter conclusion of law; more aptly, pure conjecture. The sand cap is *fourteen feet below* the surface of the water. The amount of pressure exerted by fourteen feet of water is remarkable. It is in excess of 873 pounds per square foot ("psf")! [Benoit Opposition Declaration, ¶ 22.] Add to that two feet of sand, and the pressure exerted on the sediment bottom is 1,088 psf! [Benoit Opposition Declaration, ¶ 27.] No small boat traffic in the OMS is going to

---

[23] Thus, the Government's conclusion that restricting boat access to the OMS would reduce human exposure to contaminated fish is complete speculation, as there is no evidence of any significant boat fishing in the slough. Moreover, there is no evidence that the level of contamination in fish in the OMS is in any way reduced by the sand cap, nor is there any evidence of a significant threat to humans by such fish. Certainly, the Government has come forward with no evidence that anyone is likely to be eating a whole catfish caught in the OMS each day for the next 30 years.

disturb that sand cap or result in any "resuspension [*sic*] of the contaminated sediment" buried beneath it. [Benoit Opposition Declaration, ¶ 26.] That was the use the plaintiffs were going to apply to the Subject Property until the Government's taking—a small boat marina. [Voorhees Opposition Declaration, ¶ 17.]

And even if evidence existed to show small boat traffic *might* disturb the sand cap or "re-suspend" the sediment beneath it, the sediment, contaminants, and sand would all simply sink back to the bottom immediately upon disturbance. [Benoit Opposition Declaration, ¶ 26.] There is no additional risk without a log boom. The Government has come forward with no evidence to sustain its burden to prove, by undisputed evidence, that its log boom is necessary or even beneficial to preserve the sand cap, let alone to abate a nuisance. That is because it has none, as admitted by its Project Manager. [Lacey Deposition, at 66-68, 108-109, 114-15; ¶ 12, Ex. 1, 4/11 Patton Declaration.] Moreover, there is not a shred of evidence that the State of California or any local entity was entitled to or going to shut down the OMS to marine vessels in 2006 because the EPA dumped 2 feet of sand on the sediment bottom 16 feet below the surface. The Government's "nuisance" argument is a hollow one. The uses taken from plaintiffs were lawful.

**6. California's Public Trust Doctrine has no application where the State has never asserted it to the exclusion of plaintiffs' riparian rights prior to the taking.**

Last, the Government relies on California's Public Trust Doctrine, which when imposed, *may* limit a riparian owner's access to waters governed by the doctrine, establishing a public trust easement to protect the interests of the State's public in access to and use of navigable waters. *See Marks v. Whitney, supra* (1971) 6 Cal.3rd 251, 262-63, 491 P.2nd 374, 382. *That is just the point.* As in the *Marks* case, "The state has not exercised its power in this instance." 6 Cal.3rd 263. In fact,

first Dutra, then plaintiffs, routinely exercised and used their valuable private riparian rights of access and navigation for years on end without one instance of the State seeking to limit or otherwise curtail those rights under its public trust powers. [Voorhees Opposition Declaration, ¶ 18.]

California's Public Trust Doctrine is in fact intended to ensure that the State's citizens *have access* to *and use of* shorelines and navigable waters. *See, e.g., Marks v. Whitney, supra* (1971) 6 Cal.3rd 251, 259-60, 491 P.2nd 374, 378-80; *Aptos Seascape Corp. v. County of Santa Cruz* (1982) 138 C.A.3rd 484, 505, 188 Cal.Rptr. 191, 204. Plaintiffs are citizens of California and among those afforded such public protection. And the fact that the doctrine exists to protect those rights does not mean that a riparian owner has no protectable *private* property rights in the shoreline, which is apparently the Government's argument. If such were the case, then the riparian property owners in the following California-based cases would have had no rights to compensation for Government takings, because their riparian properties were also subject to California's Public Trust Doctrine: *United States v. Gerlach Live Stock Co., supra,* 339 U.S. 725, 70 S.Ct. 955 (1950); *Tulare Lake Basin Water Storage District v. United States, supra,* 49 Fed.Cl. 313, 318-20 (2001); *United States v. 412.715 Acres of Land, Contra Costa County, Cal., supra,* 53 F.Supp. 143 (N.D. Cal.1943). Each of these cases found a compensable taking, and this doctrine simply has no application to the takings claim before this Court.

## VI. CONCLUSION

Unfortunately, due to the number of issues raised by the Government, this has become a very lengthy brief, and the Court's patience and indulgence is appreciated. Plaintiffs sum up what it shows, in terms of the issues raised by the Government, as discussed at the outset in Subpart II(B) above. The answers, as shown by the evidence and applicable law discussed herein, are set forth in bold.

1. When did the taking occur and was this action timely filed? **The taking, a physical one, occurred when the Government installed its sand cap and log boom, foreclosing the shoreline's riparian uses and access to the OMS, in September of 2006. This action was timely filed.**

2. Is plaintiffs' claim dependent upon an assignment of claims from the former owner (Dutra)? **No. Plaintiffs acquired their title to the Subject Property well prior to the taking, and their claim is based upon their ownership, not any assignment of claim rights from the prior owner.**

3. Does plaintiff CRV now have standing to sue, based on its 2004 conveyance of the Subject Property to plaintiff C. Ryan Voorhees? **With the proviso that there should be no prejudice to his taking claim, the proper plaintiff is Mr. Voorhees, the owner of the property at the time of the taking.**

4. Is the claim one that seeks judicial review of the Government's actions, and thus barred under 42 U.S.C. § 9613(h)? **No. The claim is one for just compensation under the Fifth Amendment of the United States Constitution, pursuant to 42 U.S.C. § 1983. However, the Government has raised an issue regarding the efficacy of its actions to "abate a nuisance," which plaintiffs address in subsequent argument.**

5. Do plaintiffs' own any protectable property rights when they do not own title to the riverbed or the navigable waters? **Yes. Under the California Constitution, and developed case law, a riparian/littoral owner owns, among other things, the right to build a pier out to the line of navigability; a right to accretion; a right to navigation; and a right of access from every part of his frontage across the foreshore.**

6. Does the 1986 grant of a dredging permit by the Army Corps of Engineers ("COE") to a prior non-party owner, allowing construction of sheet pile

walls, forfeit the littoral owner's rights to just compensation for a subsequent taking? **No. The dredging permit was personal between the COE and the prior owner, granted no property rights to either, and does not impact plaintiffs' ownership or property rights.**

7. Is the Government's erection of a log boom precluding navigational use exempt from a takings claim, as an "abatement of a nuisance?" **No. First, the operation of a marina for small boat uses is a lawful and appropriate use of riparian property. Second, there is no evidence to meet the Government's burden to establish by undisputed facts that the log boom abates any nuisance. Third, the evidence proves that the log boom barring maritime traffic to plaintiffs' property is completely unnecessary, where plaintiffs' uses for small boat traffic could have no impact on the sand cap or the contaminants buried beneath it.**

8. Does California's public trust doctrine exempt the Government from paying just compensation? **Not at all; especially when the State has found no need to exercise its public trust powers.**

The 5th Amendment to the United States Constitution provides in relevant part, "nor shall private property be taken for public use, without just compensation." U.S.C. Const. Amend. V. It is a *guarantee* of just compensation. Such a taking occurs, without the filing of condemnation proceedings, whenever government action beneficial to the public results in the destruction or restriction of the use and general enjoyment of privately owned property. *See, e.g., Kaiser Aetna v. United States,* 444 U.S. 164, 178-80, 100 S.Ct. 383, 392-93 (1979); *United States v. Causby, supra,* 328 U.S. 256, 261-62, 66 S.Ct. 1062, 1065-66 (1946).

Such a taking occurred in 2006 in this case, when the Government deprived plaintiffs of their riparian rights in the Subject Property and access to the OMS. The

deprivation took place in the form of a physical invasion and occupation of the OMS, on a permanent basis to meet the environmental purposes of the USEPA. That amounts to a physical, compensable taking. But the Government has refused to provide compensation. It should be ordered to provide it.

It is respectfully submitted that the Government's motions should be denied, and interlocutory summary judgment entered in favor of plaintiff C. Ryan Voorhees.

Dated: May 30, 2008

Respectfully Submitted,

SHAPIRO BUCHMAN PROVINE & PATTON, LLP

By: ______________________

John H. Patton
Attorneys for Plaintiffs CRV Enterprises, Inc. and C. Ryan Voorhees

208893.1